## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**FEDERAL TRADE COMMISSION, et al.,**

**Plaintiffs,**

**v.**

**VYERA PHARMACEUTICALS, LLC, et al.,**

**Defendants.**

**Case No.: 1:20-cv-00706-DLC**

**Plaintiffs' Memorandum of Law in Opposition to
Defendant Martin Shkreli's Motion to Dismiss the Amended Complaint**

**Table of Contents**

BACKGROUND ................................................................................................................ 3

ARGUMENT ................................................................................................................... 8

I.   Shkreli is liable for Vyera's anticompetitive conduct............................................... 9

    A.   Shkreli is liable because he has actively participated in Vyera's
        anticompetitive acts and has authority to control Vyera................................. 9

    B.   Shkreli's attempt to rewrite the standard for individual liability fails ........................ 12

        1.   Plaintiffs need not allege that Shkreli personally possessed monopoly
            power or entered into anticompetitive agreements on his own behalf............... 12

        2.   Shkreli's reliance on *Murphy Tugboat* is misplaced.......................................... 13

II.  The FTC's claims are properly in federal court.................................................... 15

    A.   Section 13(b) allows the FTC to sue in federal court when it has reason to
        believe a defendant is violating, or is about to violate the law ................................. 15

    B.   The complaint plausibly alleges reason to believe Vyera and Shkreli are
        violating the law.................................................................................................. 16

    C.   The complaint plausibly alleges reason to believe Vyera and Shkreli are
        "about to violate" the law ........................................................................... 19

III. Plaintiffs have sufficiently alleged a claim against Shkreli for equitable monetary
    relief.................................................................................................................... 20

IV.  Plaintiffs' claims are timely ............................................................................... 22

CONCLUSION.............................................................................................................. 24

# Table of Authorities

## Cases

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975) ........................................................................................ 20

*AMREP Corp. v. FTC*,
    768 F.2d 1171 (10th Cir. 1985) ...................................................................... 16

*Appraisers Coal. v. Appraisal Inst.*,
    845 F. Supp. 592 (N.D. Ill. 1994) .............................................................. 12, 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................... 9

*Bergjans Farm Dairy Co. v. Sanitary Milk Producers*,
    241 F. Supp. 476 (E.D. Mo. 1965) ................................................................ 14

*Boise Cascade Corp. v. FTC*,
    498 F. Supp. 772 (D. Del. 1980) ..................................................................... 16

*Capruso v. Village of Kings Point*,
    23 N.Y.3d 631 (N.Y. 2014) ............................................................................ 23

*Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*,
    256 F. Supp. 2d 249 (D.N.J. 2003) ................................................................ 12

*Clearview Land Dev. Co. v. Commonwealth*,
    327 A.2d (Pa.Commw. Ct. 1974) .................................................................. 23

*Deaktor v. Fox Grocery Co.*,
    332 F. Supp. 536 (W.D. Pa. 1971) ................................................................ 12

*FHFA v. WMC Mortg., LLC*,
    No. 13 Civ. 584 (AKH), 2013 WL 7144159 (S.D.N.Y. Dec. 17, 2013) ............ 20

*FTC v. Bronson Partners, LLC*,
    654 F.3d 359 (2d Cir. 2011) ........................................................................... 22

*FTC v. Cephalon, Inc.*,
    100 F. Supp. 3d 433 (E.D. Pa. 2015) ............................................................. 21

*FTC v. Credit Bureau Ctr., LLC*,
    937 F.3d 764 (7th Cir. 2019) .......................................................................... 22

*FTC v. Crescent Publ'g Grp., Inc.*,
    129 F. Supp. 2d 311 (S.D.N.Y. 2001) ........................................................... 23

*FTC v. Educare Centre Servs., Inc.*,
    433 F. Supp. 3d 1008 (W.D. Tex. 2020) ........................................................ 18

*FTC v. Freecom Commc'ns, Inc.*,
    401 F.3d 1192 (10th Cir. 2005) ................................................................ 11, 12

*FTC v. Grant Connect, LLC*,
    763 F.3d 1094 (9th Cir. 2014) ............................................................ 10, 18, 19

*FTC v. Hornbeam Special Situations, LLC*,
    391 F. Supp. 3d 1218 (N.D. Ga. 2019) ................................................... 16, 20

*FTC v. Instant Response Sys., LLC*,
    No. 13 Civ. 00976 (ILG) (VMS), 2014 WL 558688 (E.D.N.Y. Feb. 11, 2014) .................. 22

*FTC v. LeanSpa, LLC*,
    920 F. Supp. 2d 270 (D. Conn. 2013) .......................................................... 21

*FTC v. Med. Billers Network, Inc.*,
    543 F. Supp. 2d 283 (S.D.N.Y. 2008) ...................................................... 11, 12

*FTC v. Nat'l Urological Grp., Inc.*,
    645 F. Supp. 2d 1167 (N.D. Ga. 2008) ........................................................ 10

*FTC v. Nat'l Urological Grp., Inc.*,
    Civil Action No. 1:04-CV-3294-CAP, 2006 WL 8431977 (N.D. Ga. Jan, 9, 2006) ........... 16

*FTC v. Next-Gen, Inc.*,
    No. 4:18-cv-00128-DGK, 2018 WL 5310414 (W.D. Mo. Sept. 10, 2018) ........................ 17

*FTC v. Shire ViroPharma, Inc.*,
    917 F.3d 147 (3d Cir. 2019) ................................................ 15, 16, 17, 20

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) .......................................................................... 16

*Griffith Labs. U.S.A., Inc. v. Pomper*,
    607 F. Supp. 999 (S.D.N.Y. 1985) ............................................................ 20

*Harlem River Consumers Co-op., Inc. v. Associated Grocers of Harlem, Inc.*,
    408 F. Supp. 1251 (S.D.N.Y. 1976) ........................................................... 11

*Hartford-Empire Co. v. United States*,
    323 U.S. 386 (1945) ........................................................................ 9, 13

*In re Sanctuary Belize Litig.*,
    Civil No. PJM 18-3309, 2019 WL 4243079 (D. Md. Sept. 5, 2019) ........................... 18

*Kokesh v. SEC*,
    137 S. Ct. 1635 (2017) ...................................................................... 22

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976) ................................................................. 20

*Liu v. SEC*,
   No. 18-1501, 2020 WL 3405845 (U.S. June 22, 2020) ....................................... 22

*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951) ....................................................................... 9, 13, 15

*Lynch v. City of New York*,
   952 F.3d 67 (2d Cir. 2020) ............................................................... 21

*Madigan v. Yballe*,
   920 N.E.2d 1112 (Ill. App. Ct. 2009) .................................................. 23

*Mass. Bonding & Ins. Co. v. New York*,
   259 F.2d 33 (2d Cir. 1958) ............................................................... 20

*Matchbox Disposal, Inc. v. Allied Waste Transp., Inc.*,
   No. 05-2064, 2005 WL 8163263 (C.D. Ill. Aug. 3, 2005) ...................... 13, 15

*Matter of People v. Orbital Publ. Grp., Inc.*,
   169 A.D.3d 564 (N.Y. App. Div. 2019) ............................................... 22

*Mercury Ins. Co. v. Lara*,
   35 Cal. App. 5th 82 (Cal. Ct. App. 2019) ........................................... 23

*Monarch Marking Sys., Inc. v. Duncan Parking Meter Maint. Co.*,
   No. 82 C 2599, 1986 WL 3625 (N.D. Ill. Mar. 13, 1986) ...................... 14

*Murphy Tugboat Co. v. Shipowners & Merchs. Towboat Co.*,
   467 F. Supp. 841 (N.D. Cal. 1979) .................................................. 13, 14

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016) ............................................................... 8

*People v. Apple Health & Sports Clubs, Ltd.*,
   80 N.Y.2d 803 (N.Y. 1992) ............................................................... 10

*People v. Greenberg*,
   27 N.Y.3d 490 (N.Y. 2016) ........................................................... 22, 23

*POM Wonderful, LLC v. FTC*,
   777 F.3d 478 (D.C. Cir. 2015) ........................................................... 11

*Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*,
   418 S.E.2d 648 (N.C. 1992) ............................................................... 23

*Schwartz v. Eaton*,
   264 F.2d 195 (2d Cir. 1959) ............................................................... 20

*SEC v. Commonwealth Chem. Sec., Inc.*,
   574 F.2d 90 (2d Cir. 1978) ............................................................... 19

iv

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ............................................................... 21

*SEC v. Payton*,
  14 Civ. 4644, 2016 WL 3023151 (S.D.N.Y. May 16, 2016) ............................................ 21

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
  No. 97 Civ. 5499 (DNE), 2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ........................... 9, 13

*Standard Oil Co. of Cal. v. FTC*,
  596 F.2d 1381 (9th Cir. 1979) ............................................................... 16

*State v. Rich Food Servs., Inc.*,
  535 S.E.2d 84 (N.C. Ct. App. 2000) ......................................................... 10

*Tillamook Cheese & Dairy Ass'n v. Tillamook Cty. Creamery Ass'n*,
  358 F.2d 115 (9th Cir. 1966) ............................................................... 15

*United States v. Dish Network, L.L.C.*,
  75 F. Supp. 3d 942 (C.D. Ill. 2014) ......................................................... 22

**Statutes**

15 U.S.C. § 53(b) ............................................................................... 15

N.Y. C.P.L.R. § 213(9) ......................................................................... 22

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ......................................................... 11

**Rules**

Fed. R. Civ. P. 8(a)(2) ......................................................................... 21

Defendant Martin Shkreli is the architect and foreman of Defendants' ongoing scheme to impede generic competition to the life-saving drug Daraprim. In 2014, Shkreli founded Vyera Pharmaceuticals, LLC and Phoenixus AG[1] to repeat a lucrative anticompetitive strategy he had successfully employed at his previous pharmaceutical company, Retrophin Inc. He sought to purchase an old, off-patent drug that is essential to a small patient population, impose an enormous price increase, and use restrictive contracts to impede competition from lower-cost generic alternatives. In particular, Shkreli knew that generic companies need to buy substantial quantities of a branded drug in order to conduct FDA-mandated testing necessary for approval to enter the market. And, as he told his Retrophin investors, he knew that preventing generic companies from buying that branded product therefore "takes the AB substitutable rating that generics rely on and neuters it."

With Shkreli as CEO, Vyera purchased Daraprim—an old, off-patent, essential drug with no generic alternative—and immediately raised the price by 4,000%. It then entered resale-restriction agreements with distributors and purchasers that prevent them from reselling Daraprim to potential generic competitors. Once these restrictions were in place, Shkreli added new anticompetitive strategies to the Retrophin blueprint. Under his stewardship, Vyera began seeking exclusivity agreements with suppliers of pyrimethamine API—the essential active ingredient in Daraprim—so they would not supply to generic companies.

Shkreli ceased to have a formal role at Vyera when he was arrested for securities fraud in December 2015. But he has continued to control the company and to participate in the conduct. Using his large ownership share, he has selected board members and executives loyal to him—such as Defendant Kevin Mulleady—and directed them to take additional steps to further his

---

[1] Unless otherwise specified, this brief refers to Vyera and Phoenixus collectively as "Vyera" when discussing their joint conduct relating to Daraprim.

anticompetitive scheme. Although currently incarcerated, he continues to communicate with Mulleady and other executives about strategies to block generic competition to Daraprim.

Shkreli moves to dismiss the claims against him on several grounds.

First, he argues that he cannot be held personally liable for the anticompetitive scheme he conceived and directed because he himself never possessed monopoly power or signed any of the anticompetitive agreements. Under traditional principles of agency liability, however, Shkreli is liable for Vyera's anticompetitive conduct both because he directly participated in it and because he had the authority to control it—first as CEO and then as a controlling shareholder with the ability to shape company policy.

Second, relying on the Third Circuit's decision in *FTC v. Shire ViroPharma*, Shkreli contends that the FTC lacks authority to bring suit against him because he is not currently violating the law or imminently about to do so. But the complaint plausibly alleges reason to believe Shkreli *is* still violating the law—due to his ongoing participation in the anticompetitive conduct and continued authority as a controlling shareholder—and also "is about to violate" the law, given his pattern of deliberate, egregious anticompetitive conduct and his ongoing search for another drug to replicate this lucrative anticompetitive strategy.

Finally, Shkreli contends that Plaintiffs have not given him sufficient notice of their claims for equitable monetary relief, and that certain claims are barred by statutes of limitations. These arguments misunderstand the governing law or simply disregard Plaintiffs' factual allegations.

Shkreli is the reason Vyera exists and the reason it is engaged in an ongoing anticompetitive scheme. If not enjoined, he is likely to repeat his anticompetitive conduct. The Court should not allow him to evade liability.

# BACKGROUND

Defendant Martin Shkreli is the founder of Phoenixus and Vyera, the largest shareholder and former chairman of Phoenixus, and the former CEO of Vyera. Amended Complaint for Injunctive and Other Equitable Relief, Apr. 14, 2020, ECF No. 87 ("Am. Compl.") ¶ 31. He currently owns approximately ███ of Phoenixus shares and controls approximately ███ of shareholder votes. *Id*. ¶ 46. Shkreli originated and implemented Vyera's scheme to exclude would-be rivals seeking to market lower-cost generic versions of Daraprim. He continues to direct that scheme despite his current incarceration in federal prison. *Id*. ¶ 31.

### Shkreli devises his anticompetitive scheme at Retrophin

Shkreli started his career in finance by founding and running three hedge funds, which all failed. *Id*. ¶ 32. He next turned to pharmaceuticals despite having no industry experience. *Id*. ¶ 33. In 2011, Shkreli founded Retrophin, Inc. *Id*. As Retrophin's CEO, Shkreli pioneered the scheme he would later use for Daraprim: He acquired the off-patent, sole-source drug Thiola, restricted its distribution, and raised its price by 2,000%. *Id*. ¶¶ 34, 96.

Shkreli recognized that distribution restrictions on a pharmaceutical product can impede potential generic competition. To obtain FDA approval for a generic product, an applicant must show that its generic drug is therapeutically equivalent—or "bioequivalent"—to the brand version, meaning that it has the same active ingredient with the same rate and extent of absorption as the brand drug. *Id*. ¶¶ 56-59. A generic applicant must obtain substantial quantities of the brand product to conduct these bioequivalence studies. *Id*. ¶¶ 58-60. Typically, these samples are readily available through normal distribution channels such as pharmacies and wholesalers. *Id*. ¶¶ 61, 94. But, as Shkreli bragged to Retrophin's investors, a "closed distribution system . . . allows for us to control the release of our product. We do not sell Retrophin products to generic companies." *Id*. ¶ 97. Shkreli explained that blocking generic

access to drug samples in this way "takes the AB substitutable rating that generics rely on and neuters it." *Id.*

**Shkreli creates Vyera and reprises his anticompetitive scheme with Daraprim**

In 2014, after being ousted from Retrophin, Shkreli founded Vyera with the explicit purpose of replicating his Thiola strategy: buy a sole-source, off-patent drug, execute a massive price hike, and then impede and delay generic competition through restrictive agreements. *Id.* ¶¶ 35-36, 86. Shkreli settled on Daraprim as the right candidate for his scheme.

Prior to February 2020,[2] Daraprim had been the only FDA-approved drug containing the active pharmaceutical ingredient ("API") pyrimethamine, which is the gold-standard treatment for toxoplasmosis. *Id.* ¶¶ 73, 78. Toxoplasmosis is a parasitic infection that is potentially fatal in immunocompromised patients. *Id.* ¶¶ 69-71. Approved by the FDA in 1953, Daraprim had been sold as an affordable, life-saving treatment for more than 60 years. *Id.* ¶ 75. In 2010, it cost about $1 per tablet. *Id.* ¶ 80. By 2015, after several ownership changes, the price was $17.50 per tablet. *Id.* ¶¶ 82-85.

In August 2015, at the direction of Shkreli, Vyera acquired Daraprim and immediately raised the price from $17.50 to $750 per tablet—an increase of more than 4,000%. *Id.* ¶ 89. The price hike caused Daraprim's annual revenues to skyrocket from ███████ to over ███████. *Id.* ¶ 87. But Shkreli knew this revenue boon could be temporary: Daraprim had long ago lost any patent protection or regulatory exclusivity, and the massive price increase would attract lower-priced generic competition. *Id.* ¶¶ 3, 75, 93. Shkreli and Vyera thus pressed ahead with his plan to protect the Daraprim monopoly by impeding generic competition.

---

[2] On February 28, 2020, the FDA approved a generic version of Daraprim. Am. Compl. ¶ 78.

The central planks in Shkreli's scheme were resale-restriction agreements like the ones he had used at Retrophin. Before 2015, Daraprim was distributed openly for more than 60 years without any restrictions; generic companies could easily obtain it from a local pharmacy. *Id.* ¶ 94. Upon acquiring Daraprim, Vyera entered agreements with its distributors and purchasers that prevent them from selling the drug to generic companies without Vyera's specific approval. ¶¶ 100-22. Setting up this these restrictions was Vyera's "#1 priority" and "exceptionally time sensitive." *Id.* ¶ 98. They were considered "an integral part of the company's desire to block a generic entrant for at least three years." *Id.* ¶ 95.

Shkreli also sought to block potential competitors' access to the most viable sources of pyrimethamine API, the key ingredient in Daraprim and any generic equivalent. The FDA must separately approve the API, the manufacturing process used to make it, and the manufacturer's quality controls, facility, and practices. *Id.* ¶ 62. If a generic applicant cannot find an API supplier with an existing process meeting FDA standards, it needs to develop and validate a new manufacturing process, which can take a year or more and cost ██████████████. *Id.* ¶¶ 63, 174-75. Shkreli therefore sought to impede potential generic competitors by locking up the pyrimethamine API suppliers with existing processes most likely to meet FDA standards.

In 2015, only two suppliers had registered pyrimethamine API manufacturing processes with the FDA: Ipca Laboratories Ltd. and Fukuzyu Pharmaceutical Co., Ltd. *Id.* ¶ 149. At Shkreli's direction, Vyera contacted both seeking to enter API exclusivity agreements. *Id.* Ipca informed Vyera that the FDA had recently banned imports of its products due to manufacturing deficiencies. *Id.* ¶ 150. In June 2015, Vyera touted this import ban to potential investors, emphasizing that it would cause "significant disruption" and delay to potential generic competitors. *Id.*

**Shkreli continues to direct Vyera's anticompetitive scheme after leaving the company**

In December 2015, Shkreli was arrested for securities fraud stemming from conduct at his hedge funds and at Retrophin. *Id*. ¶ 38. But after his departure, Shkreli continued to maintain his influence over Phoenixus and Vyera through his close associates and his position as Phoenixus's largest shareholder. *Id*. ¶ 39. Shkreli "handpicked" his longtime ally Ron Tilles to succeed him as interim CEO. *Id*. During Tilles's tenure, Vyera maintained its resale restrictions and proceeded to lock up the most viable pyrimethamine API supplier by entering an API exclusivity agreement with Fukuzyu. *Id*. ¶ 152.

Shkreli briefly lost control of Vyera in April 2017, when Dr. Eliseo Salinas—who was resistant to Shkreli's influence—replaced Tilles as interim CEO. *Id*. ¶ 40. But Shkreli acted quickly to wrest back control. Just two months later, he waged a successful proxy fight, removed Salinas from his position, (*id*. ¶ 40) and installed his allies Mulleady and Akeel Mithani as board members and as the sole members of the board's newly formed "Executive Committee" to "take over the tasks of the Senior Management (CEO, CFO, CCO and CLO)." *Id*. ¶ 41. Mulleady became interim and then permanent CEO, despite concerns that this would be viewed ███ ████████████████████████████████████████████████████ *Id*. Mithani, a recent college graduate, became senior vice president of business development. *Id*. ¶ 42.

Having installed his allies in positions of control, Shkreli then directed them to continue and expand his scheme to impede generic Daraprim competition. *Id*. ¶ 43. In August 2017, Shkreli became aware that RL Fine was working with two generic companies to supply pyrimethamine API. *Id*. ¶ 160. RL Fine had never supplied this API for the U.S. market, but the European Union had approved its pyrimethamine API manufacturing process, which indicated that its facilities and manufacturing practices were likely sufficient to obtain FDA approval. *Id*.

Shkreli directed Mulleady and Mithani to poach RL Fine from the generic companies. *Id*. ¶¶ 161-62. Shkreli drafted an email to RL Fine inquiring about pyrimethamine API and instructed Mithani to send it. *Id*. ¶ 162. In December 2017, Vyera executed an API exclusivity agreement with RL Fine depriving two generic competitors of their API source. *Id*. ¶¶ 160, 163.

Shkreli's control of Vyera has continued even after his incarceration in September 2017. Shkreli has remained in regular contact with Mulleady and Mithani through phone calls, emails, in-person visits, WhatsApp messaging, and potentially other means. *Id*. ¶ 44. In these communications, Shkreli continues to strategize ways to prevent generic Daraprim competition. *Id*. The *Wall Street Journal* reported in March 2019 that Shkreli "remains the shadow power at Phoenixus AG," using a contraband cell phone to run Vyera from prison. *Id.* ¶ 45.[3]

As recently as August 2019, Shkreli had separate discussions with Mulleady and Mithani about limiting all sales of Daraprim to one bottle at a time to prevent generic competitors from obtaining sufficient Daraprim samples for bioequivalence testing. *Id*. ¶ 129. Shkreli urged Mulleady to "really carefully screen every doctor" and ensure that no one could "sell more than one bottle at a time" to prevent a generic company from "get[ting its] hands on anything." *Id.* And he instructed Mithani that Vyera should "do everything" it could to prevent a generic company from obtaining samples of Daraprim, because preventing generic competition would make Daraprim a "$600 million asset . . . in perpetuity." *Id*.

**The present action**

On January 27, 2020, the FTC and State of New York jointly filed a complaint against Vyera, Phoenixus, Mulleady, and Shkreli in this Court. ECF No. 2. The complaint alleged that Vyera's "unlawful scheme to maintain a monopoly on Daraprim continues to this day."

[3] ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ Am. Compl. ¶ 45.

Complaint for Injunctive and Other Equitable Relief, Jan. 27, 2020, ECF No. 2 ("Compl.") ¶ 1. For example, its contracts with distributors and purchasers still barred the resale of Daraprim to generic companies. *Id.* ¶¶ 94-107, 113-16, 121-22, 128. Its exclusive supply agreement with Fukuzyu was still in effect. *Id*. ¶ 152. And no generic company had received FDA approval or entered the market. *Id*. ¶¶ 271-73, 282. In the prayer for relief, Plaintiffs requested "[t]hat Defendants [be] permanently enjoined from continuing their course of conduct." *Id.* Prayer for Relief 7.

On April 14, 2020, the FTC and New York filed an amended complaint adding six more state Plaintiffs—California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia. ECF No. 87. The amended complaint includes updated factual allegations that, a month after Plaintiffs filed suit, the FDA approved a generic version of Daraprim and that product subsequently entered the market. Am. Compl. ¶¶ 216-18. The amended complaint continues to allege that Defendants' anticompetitive scheme is ongoing and that Vyera's restrictive agreements remain in place. *Id.* ¶¶ 1, 100-13, 118-22, 134-36, 158.

## ARGUMENT

Shkreli contends that Plaintiffs' complaint—and more specifically the claims against him—are deficient in several ways and should be dismissed.[4] When a party moves to dismiss under Rule 12(b)(6), the court must "constru[e] the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016). Plaintiffs' factual allegations need only "be enough to raise a right to relief above the speculative level" to state a claim that is "plausible on

---

[4] At various points, Shkreli incorporates the arguments in Vyera's or Mulleady's motions to dismiss. *See* Shkreli Mem. 10 n.5, 15, 19, 20 n.8, 22 n.11. Plaintiffs address those arguments in their separate responses to those motions, and do not restate them here.

its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007). Under these well-settled

standards, Plaintiffs' complaint (1) pleads plausible antitrust claims against Shkreli; (2) alleges

facts sufficient to allow the FTC to sue him in federal court; (3) supports a claim for equitable

monetary relief against him; and (4) establishes that Plaintiffs timely filed their claims.

## I.      Shkreli is liable for Vyera's anticompetitive conduct

### A.      Shkreli is liable because he actively participates in Vyera's anticompetitive acts and has authority to control Vyera

Under traditional agency law principles, an individual can be liable for a corporation's

antitrust violation if they "participated in the unlawful acts" or "acquiesced or ratified the actions

of other officers or agents of the corporation who violated the antitrust laws." *Six W. Retail*

*Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 Civ. 5499 (DNE), 2000 WL 264295, at

*35 (S.D.N.Y. Mar. 9, 2000) (complaint sufficiently alleged antitrust claims against individual

corporate officers because of their influence over corporate policy). The Supreme Court has

applied these standards to hold individuals liable under Sections 1 and 2 of the Sherman Act.

*Hartford-Empire Co. v. United States*, 323 U.S. 386, 401-02 (1945) (affirming liability for

individuals "who offended against the antitrust laws by acting on behalf of, or in the name of, a

corporate defendant"); *Lorain Journal Co. v. United States*, 342 U.S. 143, 145 n.2, 158-59

(1951) (upholding injunctive relief against four individuals who "participated in the conduct

alleged to constitute the attempt to monopolize"). Similar principles govern individual liability

under the FTC Act[5] and under the state laws that underpin the Plaintiff States' claims.[6] Plaintiffs'

allegations establish Shkreli's liability as Vyera's agent under this standard.

---

[5] *See FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019) ("An individual may be held liable under the FTCA for a corporation's deceptive acts or practices if, with knowledge of the deceptive nature of the scheme, he either participates directly in the practices or acts or has authority to control them." (brackets and quotation marks omitted)).

First, the complaint amply alleges Shkreli's direct participation in Vyera's anticompetitive scheme. As Vyera's founder, first CEO, and the first chair of the Phoenixus board, Shkreli devised and implemented the corporate strategy that remains in place today: identify and purchase an inexpensive drug that faces no competition; raise the price dramatically; and then implement anticompetitive agreements to delay and impede generic entry. Am. Compl. ¶¶ 31, 36, 50, 86. He selected Daraprim as the candidate for this strategy (*id*. ¶¶ 88-89), and then directed and oversaw the rollout of the resale restrictions (*id.* ¶¶ 100-113), and the initial attempts to lock up available pyrimethamine API suppliers with exclusivity agreements. *Id*. ¶¶ 149-150. Even if Shkreli's direct participation had ceased at this point, he would still be liable for the ongoing scheme. *See FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1103 (9th Cir. 2014) (corporate officer may be liable for continuance of conduct that did not "materially change[] after" his tenure).

But Shkreli's active participation in the anticompetitive scheme did not end with his arrest and abdication from his official titles. For example, in August 2017, Shkreli directed then-Executive Directors Mulleady and Mithani to approach RL Fine about an exclusive API contract (*id*. ¶¶ 160-61) and drafted the introductory e-mail for Mithani to send. *Id*. ¶ 162. He remains in regular communication with Mulleady and Mithani, and in summer 2019 instructed them to place further restrictions on the sale of Daraprim. *Id*. ¶¶ 44, 129. The fact that he retains no formal title has no legal significance. *See FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1208 (N.D. Ga. 2008) (finding a non-employee liable because "corporate defendants did

---

[6] *See, e.g., State v. Rich Food Servs., Inc.*, 535 S.E.2d 84, 93 (N.C. Ct. App. 2000) (individuals may be held liable where they participate in, or have actual knowledge of, the illegal conduct); *People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803, 807 (N.Y. 1992) (same).

engage in violations of the FTC Act; accordingly, [the non-employee] is individually liable for his participation in those violations.").

Second, Shkreli also has "authority to control the corporate defendant[s]." *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008). Shkreli initially had this authority due to his roles as CEO of Vyera and chairman of the Phoenixus board. He was "active[ly] involve[d] in business affairs and the making of corporate policy," and "assum[ed] the duties of a corporate officer." *Id.*; *see also POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498 (D.C. Cir. 2015) (corporate executive had sufficient "authority to control" to be individually liable for corporation's false advertising where he "had the authority to determine which advertisements should run").

Even after Shkreli left his formal role as a corporate officer and director, however, he retained authority to control Phoenixus and Vyera because he was "the controlling shareholder of the closely-held corporate defendants; in other words, he owned the corporate defendants." *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1205 (10th Cir. 2005).[7] Shkreli, with ██ share, is by far the largest shareholder of Phoenixus and, with the proxy votes of several other shareholders, controls even more of the voting shares.[8] Am. Compl. ¶ 46. Using this authority, he installed Ron Tilles, his longtime ally and "handpicked successor," to continue his anticompetitive vision. *Id.* ¶ 39. When Tilles was briefly replaced by Dr. Eliseo Salinas—who

---

[7] *See* Controlling Shareholder, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A shareholder who can influence the corporation's activities because the shareholder either owns a majority of outstanding shares or owns a smaller percentage but a significant number of the remaining shares are widely distributed among many others.").

[8] Relying on *Harlem River*, Shkreli erroneously claims that he cannot be held individually liable as a shareholder. Shkreli Mem. 16 (quoting *Harlem River Consumers Co-op., Inc. v. Associated Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1270 (S.D.N.Y. 1976)). But *Harlem River* concerned the imposition of liability on a corporation due to a shareholder's activity, not the liability of the shareholder due to his actions on behalf of the corporation, as alleged here. Regardless, Shkreli's liability is not predicated merely on his shareholder position, but rather on the fact that his dominant share gave him the ability to control the corporation *and* that he used that control to carry out an anticompetitive scheme. *See Freecom*, 401 F.3d at 1205.

was resistant to Shkreli—Shkreli successfully ousted Dr. Salinas and installed two loyal lieutenants—Mulleady and Mithani—as board members and executives. *Id.* ¶¶ 40-42. To this day, Mulleady remains chairman of the Phoenixus board and Mithani remains Vyera's head of business development. *Id.* ¶¶ 42, 47. Shkreli communicates regularly with both of them about Vyera business strategy. *Id.* ¶ 44. "Consequently, a substantial inference exists that [Shkreli] had the authority to control the [anticompetitive conduct] carried on in the name of his corporations." *Freecom*, 401 F.3d at 1205.

Finally, Shkreli "knew of the [anticompetitive] acts or practices" because he originated and directed them. *Med. Billers,* 543 F. Supp. 2d at 320.

In short, Shkreli directly participates in, controls, and directs Vyera's anticompetitive scheme, and therefore "is individually liable for [antitrust violations] committed by him pursuant to his agency." *Deaktor v. Fox Grocery Co.*, 332 F. Supp. 536, 542 (W.D. Pa. 1971), *aff'd*, 475 F.2d 1112 (3d Cir. 1973).

### B. Shkreli's attempt to rewrite the standard for individual liability fails

#### 1. Plaintiffs need not allege that Shkreli personally possessed monopoly power or entered into anticompetitive agreements on his own behalf

Relying on two out-of-circuit district court cases, Shkreli asserts that the individual monopolization claims against him are legally deficient because the complaint does not allege that he personally possessed monopoly power. Memorandum of Law in Support of Defendant Martin Shkreli's Motion to Dismiss Amended Complaint, ECF No. 129 ("Shkreli Mem.") at 14-15 (*citing Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 284-85 (D.N.J. 2003) and *Appraisers Coal. v. Appraisal Inst.*, 845 F. Supp. 592, 592 & n.6 (N.D. Ill. 1994)). But the courts in *Carpet Group* and *Appraisers* required allegations of individual defendants' monopoly power because the plaintiffs' liability theory was predicated on the

individual defendants themselves committing anticompetitive acts in their personal capacities. *See Appraisers*, 845 F. Supp. at 592 & n.6 (plaintiffs failed to "specifically allege any vicarious liability upon which the Court might include the individual Defendants"). Unlike those cases, here the liability theory against Shkreli is predicated on agency principles. In such circumstances, there is no requirement that the individual personally possessed monopoly power. *Matchbox Disposal, Inc. v. Allied Waste Transp., Inc.*, No. 05-2064, 2005 WL 8163263, at *3 (C.D. Ill. Aug. 3, 2005) (declining to require monopoly power for individual liability under Section 2).[9]

Similarly, because Shkreli's liability is predicated on his participation and control of Vyera, he is liable for Vyera's anticompetitive agreements even where he did not personally "negotiate[], sign[], or enforce[]" them or deal directly with counterparties. Shkreli Mem. 16-18; *see also Hartford-Empire*, 323 U.S. at 401-02 (affirming individual liability for individuals that participated in agreements between corporate defendants).

**2.  Shkreli's reliance on *Murphy Tugboat* is misplaced**

Citing a single, oft-criticized 1979 opinion from the Northern District of California, Shkreli argues that he cannot be held individually liable for the corporations' violations because his conduct was not "inherently wrongful," which he equates to a *per se* antitrust violation. Shkreli Mem. 15-16, 19 (discussing *Murphy Tugboat Co. v. Shipowners & Merchs. Towboat Co.*, 467 F. Supp. 841 (N.D. Cal. 1979), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981)). Shkreli's reliance on *Murphy Tugboat* is misplaced for three reasons.

---

[9] *See also Lorain Journal*, 342 U.S. at 145 n.2, 158-59 (upholding injunctive relief against four individuals for attempted monopolization without examining whether they personally had monopoly power); *Six W. Retail*, 2000 WL 264295, at *35 (same).

First, no court in this circuit has adopted the *Murphy Tugboat* "inherently wrongful" standard. Meanwhile, several other courts have recognized that it "cannot be taken as a correct statement of the law." *Monarch Marking Sys., Inc. v. Duncan Parking Meter Maint. Co.*, No. 82 C 2599, 1986 WL 3625, at *2 (N.D. Ill. Mar. 13, 1986); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 & n.8 (3d Cir. 2010) ("We question the persuasive value of Murphy Tugboat."); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 908 (N.D. Ill. 2011) (same). And as one court explained, *Murphy Tugboat*'s reasoning "would result in a fundamental change in the Sherman Act's scope." *Monarch Marking*, 1986 WL 3625, at *2.

Second, in adopting its "inherently wrongful" requirement, *Murphy Tugboat* distinguished the Supreme Court's decisions in *Lorain Journal* and *Hartford-Empire*—both of which affirmed individual liability without requiring "inherently wrongful" conduct. *Murphy Tugboat*, 467 F. Supp. at 851 & n.6. It did so because those cases were "government suits for injunctive relief," not private suits for damages. *Id.* Like *Lorain Journal* and *Hartford-Empire* (and unlike *Murphy Tugboat*), this case is a "government suit[] for injunctive relief."

Finally, Shkreli's argument is based on the erroneous premise that *Murphy Tugboat*'s "inherently wrongful" standard is limited to *per se* antitrust violations. But *Murphy Tugboat*'s "inherently wrongful" analysis found the challenged conduct was "supported by legitimate business considerations" and (consistent with a rule-of-reason analysis) considered "all the surrounding facts and circumstances." 467 F. Supp. at 853. Moreover, the court cited a case holding individuals liable for an unlawful attempt to monopolize under Section 2 (a non-*per se* violation) in support of its "inherently wrongful" standard. *Id.* (citing *Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F. Supp. 476 (E.D. Mo. 1965)). Indeed, contrary to Shkreli's suggestion (Shkreli Mem. 15 & 16 n.7), numerous courts have found individuals liable as agents

for non-*per-se* antitrust violations.[10] Here, unlike in *Murphy Tugboat*, the complaint alleges that Shkreli was fully aware of the anticompetitive nature of his conduct and that his actions were not supported by legitimate business considerations. Am. Compl. ¶¶ 37, 86, 95-99.

## II. The FTC's claims are properly in federal court

Section 13(b) of the FTC Act empowers the FTC to file suit in federal court when it has reason to believe a defendant "is violating, or is about to violate" the antitrust laws. 15 U.S.C. § 53(b)(1). Relying on the Third Circuit's decision in *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019), Shkreli contends that the FTC has not met this statutory standard—at least as to him. But the complaint alleges that all Defendants, including Shkreli, are currently violating the antitrust laws and are likely to continue to do so in the future. And Shkreli's participation in and authority to control Vyera's ongoing anticompetitive scheme bear no resemblance to the long-past conduct in *Shire*. Moreover, there is ample reason to believe Shkreli's anticompetitive conduct will continue in the future absent injunctive relief.

### A. Section 13(b) allows the FTC to sue in federal court when it has reason to believe a defendant is violating, or is about to violate the law

Section 13(b) provides, in relevant part, that "Whenever the Commission has reason to believe . . . that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission . . . the Commission . . . may bring suit in a district court of the United States to enjoin any such act or practice." 15 U.S.C. § 53(b). The statute further provides that, "in proper cases, the Commission may seek, and after proper proof, the court may issue, a permanent injunction." *Id.*

---

[10] *See, e.g.*, *Lorain Journal*, 342 U.S. 143, 145 n.2, 158-59 (affirming judgment against individual defendants in attempted monopolization case); *Tillamook Cheese & Dairy Ass'n v. Tillamook Cty. Creamery Ass'n*, 358 F.2d 115, 118 (9th Cir. 1966) ("The individuals through whom a corporation acts and who shape its intentions can be held liable on a charge of attempted monopolization."); *Matchbox Disposal*, 2005 WL 8163263, at *3 (same).

By its terms, Section 13(b) does not condition the FTC's ability to sue in federal court on whether a defendant *in fact* "is violating" or "is about to violate" the law. Rather, it permits the FTC to bring suit when it has "*reason to believe*" they are. *Id.* (emphasis added). Some courts have held that an FTC "reason to believe" determination is unreviewable.[11] Others have concluded it is subject to very limited judicial review.[12] Given Rule 12(b)(6)'s lenient plausibility standard, Section 13(b) thus imposes—at most—a minimal pleading burden: the FTC need only allege "at least some facts to support a reasonable inference" that the Commission brought suit based on a reason to believe a defendant was violating or about to violate the law. *See FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218, 1223 (N.D. Ga. 2019); *see also Shire*, 917 F.3d at 158 (requiring the FTC to plead, "at the time it files suit," that a defendant is violating or is about to violate the law).

### B. The complaint plausibly alleges reason to believe Vyera and Shkreli are violating the law

When the FTC filed this suit, it alleged that the defendants, including Shkreli, were engaged in an "unlawful scheme to maintain a monopoly on Daraprim [that] continues to this day." Compl. ¶ 1.[13] Its initial complaint (ECF No. 2) alleged that virtually all of Vyera's

---

[11] *See FTC v. Nat'l Urological Grp., Inc.*, Civil Action No. 1:04-CV-3294-CAP, 2006 WL 8431977, at *5 (N.D. Ga. Jan, 9, 2006) (holding judicial review "impossible" because Section 13(b) provides "no meaningful standard by which to measure the lawfulness of the FTC's actions"); *Boise Cascade Corp. v. FTC*, 498 F. Supp. 772, 779 (D. Del. 1980) (judicial review of FTC reason to believe determination under Section 5 of the FTC Act would require the court to "probe [the Commissioners] mental processes, a practice condemned by the Supreme Court").

[12] *See AMREP Corp. v. FTC*, 768 F.2d 1171, 1177 (10th Cir. 1985) ("All that the law requires is that the FTC actually had some 'reason to believe'"); *Standard Oil Co. of Cal. v. FTC*, 596 F.2d 1381, 1386 (9th Cir. 1979) (absent a finding "that the complaint was issued solely because of some outside pressure or with complete absence of a 'reason to believe' determination," courts should not disturb the Commission's reason to believe determination), *rev'd on other grounds sub nom. FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232 (1980). Although the Supreme Court reversed the Ninth Circuit's holding that issuance of the administrative complaint was final agency action under Administrative Procedure Act, it expressly reserved the Ninth Circuit's holding concerning the scope of judicial review that is not governed by the APA. *Standard Oil*, 449 U.S. at 245 n.13.

[13] Although this brief primarily discusses the allegations in Plaintiffs' April 14, 2020 amended complaint, Shkreli's argument that he was not violating the law at the time Plaintiffs filed suit specifically puts at issue the allegations in (Continued…)

anticompetitive conduct was ongoing: that most of Vyera's exclusionary agreements with distributors, purchasers, and suppliers remained in place (*Id.* ¶¶ 94-107, 113-16, 152, 180, 184); and that Vyera continued to exercise monopoly power (*id.* ¶ 287). With respect to Shkreli, described as the "shadow power" at Vyera, the complaint alleged that he had installed his close allies Mulleady and Mithani as executives and board members and continued to direct them to carry out his anticompetitive scheme. *Id.* ¶¶ 35, 38-39, 123, 155-67. In its prayer for relief, the FTC requested "That Defendants [be] permanently enjoined from continuing their course of conduct." *Id.* Prayer for Relief 7.

Notwithstanding these well-pleaded allegations, Shkreli argues that this Court should apply the Third Circuit's decision in *Shire* and dismiss the claims against him. *Shire* held that Section 13(b) "does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation." 917 F.3d at 156. But this standard plainly permits the FTC to file suit in federal court when, as here, there is ongoing unlawful conduct. *See, e.g.*, *FTC v. Next-Gen, Inc.*, No. 4:18-cv-00128-DGK, 2018 WL 5310414, at *4 n.6 (W.D. Mo. Sept. 10, 2018) ("Even if *Shire* applies and is correctly decided, it has no import because Plaintiffs adequately plead a present or future violation.")

Shkreli disputes that he is "currently violating the law" on the ground that he "has not been an officer, director or employee of the Company since December 2015." Shkreli Mem. 10-11. But this argument simply ignores the basis for his liability: it rests not on any formal title, but on his ongoing exercise of power as Phoenixus's controlling shareholder to install directors and executives—in particular Mulleady and Mithani—and to continue to participate directly in his anticompetitive scheme. And the Rule 12(b)(6) standard forecloses Shkreli's factual disputes

Plaintiffs' original complaint, filed under seal January 27, 2020. This brief thus uses "Am. Compl." to refer to the April 14 amended complaint, and "Compl." where necessary to refer to the January 27 initial complaint.

with these allegations of ongoing control and direction. *See FTC v. Educare Centre Servs., Inc.*, 433 F. Supp. 3d 1008, 1016-17 (W.D. Tex. 2020) (distinguishing *Shire* given factual dispute about whether conduct had actually stopped before FTC's lawsuit); *In re Sanctuary Belize Litig.*, Civil No. PJM 18-3309, 2019 WL 4243079 (D. Md. Sept. 5, 2019) (declining to dismiss case where existence of ongoing conduct was disputed).

Furthermore, irrespective of Shkreli's continued personal involvement, nothing in the text of Section 13(b) requires a reason to believe that *each defendant* in a permanent injunction suit "is violating or about to violate" the law. The statute permits the FTC to sue for injunctive relief "whenever the Commission has reason to believe a person, partnership, or corporation" is or is about to violate the law. Here, Vyera's anticompetitive scheme is ongoing, and the FTC has exercised its authority to sue to enjoin it. Nothing in the statutory language precludes the FTC from naming all defendants liable for an ongoing violation in one proceeding and *Shire* does not suggest otherwise.

Indeed, the FTC has previously named an individual defendant in a Section 13(b) suit under Section 13(b) when a corporate entity's unlawful conduct is ongoing, but the individual's misconduct has ceased. In *FTC v. Grant Connect, LLC*, an individual defendant, Kimoto, had engaged in numerous violations of the FTC Act through his wholly controlled company, Vertek. 763 F.3d 1094, 1097 (9th Cir. 2014). A year before the FTC brought suit against Kimoto and numerous other corporate and individual defendants, Kimoto was incarcerated for other conduct and "ceased to actively participate in Vertek's daily activities." *Id.* at 1100-01. Although Kimoto's involvement had ceased before suit, the Ninth Circuit affirmed his liability because he "both controlled Vertek when the scheme was organized, and directly participated in establishing the scheme." *Id.* at 1103. Thus, even if Shkreli were not currently participating in or directing

Vyera's anticompetitive scheme, he is properly named as a defendant because he "directly participated in establishing the [ongoing] scheme." *Id.*

### C. The complaint plausibly alleges reason to believe Vyera and Shkreli are "about to violate" the law

In addition to their ongoing conduct, the FTC amply alleges reason to believe that Vyera and Shkreli are "about to violate" the law because they are likely to continue to engage in similar conduct in the future. Relying primarily on the arguments in Vyera's motion to dismiss, Shkreli contends that the allegations against him do not meet *Shire*'s interpretation of "about to violate." As discussed more fully in Plaintiffs' opposition to that motion, however, to the extent *Shire* required more than likelihood of recurrence to establish "about to violate," it is inconsistent with the Second Circuit's interpretation of the nearly identical phrase "is engaged or [is] about to engage [in violations]" in the SEC statutes.[14] The Second Circuit has held that this standard is satisfied by a past violation combined with a "reasonable likelihood of further violation in the future." *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 98-99 (2d Cir. 1978) (Friendly, J.).

Here, the complaint alleges that Shkreli has a pattern of engaging in this type of conduct and, absent an injunction, is likely to reprise his anticompetitive scheme with a different drug. Shkreli first used this strategy at Retrophin, then formed Vyera to repeat it with Daraprim. Compl. ¶¶ 28, 30. He is currently seeking other drugs with which to replicate this scheme again—either through Vyera, which he still controls, or through a new company. *Id.* ¶ 285. Shkreli's contention that the allegations of a likely future violation are vague and conclusory (Shkreli Mem. 11-13) simply ignores his pattern of using similar schemes across multiple

---

[14] *See* Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss by Defendants Vyera Pharmaceuticals, LLC and Phoenixus AG ("Pls.' Opp.") at 23-25.

companies. *Mgmt. Dynamics*, 515 F.2d at 807 (assessing reasonable likelihood of recurrence based on "the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant"); *Hornbeam*, 391 F. Supp. 3d at 1223 (considering *Shire* and declining to dismiss claim where "the FTC has alleged facts about past bad behavior which includes a pattern of reoccurrence").[15]

## III. Plaintiffs have sufficiently alleged a claim against Shkreli for equitable monetary relief

Shkreli's contention that Plaintiffs' request for monetary relief does not provide him "sufficient notice" and is not supported by factual allegations is both legally and factually unavailing. Shkreli Mem. 20 & 21 n.9.

First, Shkreli's argument is premature. Under Federal Rule of Civil Procedure 54(c), "it is the court's responsibility to award relief required by the facts on any proper ground, regardless of the theories urged by the parties." *Mass. Bonding & Ins. Co. v. New York*, 259 F.2d 33, 40 (2d Cir. 1958).[16] Striking or otherwise foreclosing Plaintiffs' demands for equitable monetary relief at this stage would be "futile and meaningless" because the Court retains the power and responsibility to award any appropriate relief based on the facts it ultimately finds. *Schwartz v. Eaton*, 264 F.2d 195, 197 (2d Cir. 1959); *see also, e.g.*, *FHFA v. WMC Mortg., LLC*, No. 13 Civ. 584 (AKH), 2013 WL 7144159, at *1 (S.D.N.Y. Dec. 17, 2013) (denying motion to strike money

---

[15] Shkreli also suggests that "the entry of Cerovene's generic product" two months after the FTC filed this case is relevant to the "about to violate" analysis. Shkreli Mem. 12. But even *Shire* recognized that the relevant inquiry focuses only on the facts "at the time [the FTC] files suit." *Shire*, 917 F.3d at 158 ("The 'about to violate' pleading requirement . . . is applied right out of the gate."); *see also* Pls.' Opp. at 16-17.

[16] The Court would refuse otherwise appropriate relief only when the defendant is "substantially prejudice[d]." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 410 (1975); *see also Griffith Labs. U.S.A., Inc. v. Pomper*, 607 F. Supp. 999, 1001 (S.D.N.Y. 1985). Shkreli's conclusory statement that he "cannot adequately defend himself if he does not know what type" of equitable monetary relief is sought does not meet this standard. Shkreli Mem. at 20. Regardless, neither the appropriateness of an equitable remedy, nor any potential prejudice to Shkreli can be determined on this motion to dismiss. *See, e.g., Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 898 (2d Cir. 1976) (noting when a "District Judge sits as an equity judge . . . it is for the court to fashion the proper remedy after all the relevant facts have been found").

damages because it was "premature and should not be decided on a motion to dismiss"). Indeed, even if Shkreli had not received *any* unjust gains up to this point, as a shareholder of Phoenixus (Am. Compl. ¶ 31, 46), he may receive some between now and the remedy stage of this case.

Second, Plaintiffs are "not required to identify in [their] complaint the precise amount of disgorgement . . . sought." *SEC v. Payton*, 14 Civ. 4644, 2016 WL 3023151, at *3 (S.D.N.Y. May 16, 2016), *aff'd*, 726 F. App'x 832 (2d Cir. 2018) (collecting cases); *see also FTC v. Cephalon, Inc.*, 100 F. Supp. 3d 433, 439 (E.D. Pa. 2015). The Federal Rules require only that a complaint plausibly show "that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020). And the Court "has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996).

Third, the complaint alleges that Shkreli was "unjustly enriched" by the anticompetitive scheme he masterminded and set in motion. Shkreli Mem. 21. As Phoenixus's largest shareholder (Am. Comp. ¶¶ 31, 39, 46), Shkreli has and continues to directly benefit from Phoenixus's ill-gotten gains. Shkreli's reliance on *FTC v. LeanSpa, LLC*, 920 F. Supp. 2d 270, 280 (D. Conn. 2013), is thus misplaced. In that case, the complaint failed to allege that the defendant financially benefited in any way from the unlawful conduct. *Id.* ("The amended complaint does not allege that any of LeadClick's fees went to Chiang, nor does it allege that Chiang was paid for his role in the alleged deceptive scheme.").

Finally, contrary to Shkreli's contention that Plaintiffs must specifically call their requested relief "restitution, disgorgement or some form of damages" (Shkreli Mem. 20), the Supreme Court recently explained that the label parties or courts apply to equitable monetary remedies is largely irrelevant. In *Liu v. SEC*, the Court confirmed that depriving wrongdoers of

their unjust profits, while it has "gone by different names" is a long-recognized equitable remedy. No. 18-1501, 2020 WL 3405845, at *5 (U.S. June 22, 2020) (explaining that the terms restitution, disgorgement, or accounting for profits are largely coextensive). Regardless of the label, the Supreme Court confirmed that such a remedy is a form of equitable relief. *Id.* at *5-6. The FTC can seek this type of equitable monetary relief under Section 13(b). *See FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011).[17] And Plaintiff States' laws likewise allow for this type of equitable monetary relief, and provide that it may properly be sought from individuals where the individual has actual knowledge of the illegal conduct, or participated in it. *See, e.g.*, *People v. Greenberg*, 27 N.Y.3d 490, 497-98 (N.Y. 2016); *see also Matter of People v. Orbital Publ. Grp., Inc.*, 169 A.D.3d 564, 566 (N.Y. App. Div. 2019).

## IV. Plaintiffs' claims are timely

Shkreli's timeliness challenges are meritless. To begin with, the FTC's "claims for equitable relief under § 13(b) are simply not subject to any statute of limitations." *United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1004 (C.D. Ill. 2014), *opinion vacated in part on other grounds*, 80 F. Supp. 3d 917 (C.D. Ill. 2015); *see also FTC v. Instant Response Sys., LLC*, No. 13 Civ. 00976 (ILG) (VMS), 2014 WL 558688, at *3 (E.D.N.Y. Feb. 11, 2014) (collecting cases).

And Shkreli only challenges some of the States' claims as untimely filed—those subject to a four-year statute of limitations, and not those like New York's Executive Law claim, which has a six-year limitations period. N.Y. C.P.L.R. § 213(9). Even as to these, Shkreli's reliance on

---

[17] Shkreli claims that the FTC's ability to seek equitable monetary relief is in question in light of *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). Shkreli Mem. 20. In *Liu*, however, which was decided after Shkreli filed his motion, the Supreme Court expressly rejected this argument. 2020 WL 3405845 at *1. Shkreli also cites *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019) (petition for certiorari pending), in which the Seventh Circuit held that Section 13(b) of the FTC Act does not authorize equitable monetary relief. The Second Circuit, however, has squarely held the opposite. *See Bronson Partners, LLC*, 654 F.3d 359 ; *see also* Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss by Defendant Kevin Mulleady at 23 & n.23.

the statute of limitations is misplaced because questions of timeliness are governed by the doctrine of laches.

But laches does not apply to the government as an enforcer.

"As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest." *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 324 & n.81 (S.D.N.Y. 2001). The same is true for Plaintiff States when—as here—they are "acting in a governmental capacity to protect a public interest." *Capruso v. Village of Kings Point*, 23 N.Y.3d 631, 642 (N.Y. 2014).[18]

Moreover, even if the claims were subject to the statute of limitations, they are not time-barred, because Plaintiffs allege ongoing anticompetitive conduct, and seek forward-looking relief to prevent future harm. Am. Compl. ¶¶ 101-113, 119-122, 127, 135, 153, 156-58, 183-85, Prayer for Relief. Even voluntary discontinuance of misconduct does not foreclose an injunction, and here Defendants continue their conduct. *See, e.g.*, *Greenberg*, 27 N.Y.3d at 496-97. Moreover, Plaintiffs allege examples of Shkreli's personal involvement in specific anticompetitive acts as recently as last year—*after* he purportedly "left" the company. Am. Compl. ¶ 129 (describing Shkreli's August 2019 discussions with Mulleady "about limiting all sales of Daraprim to one bottle at a time" to prevent generics from obtaining sufficient samples for bioequivalence testing). Such conduct is within all potentially applicable statutes of limitations.

---

[18] *See also id*. at 641 ("[A]s a matter of law, laches cannot bar the State's cause of action"); *Mercury Ins. Co. v. Lara*, 35 Cal. App. 5th 82, 112 (Cal. Ct. App. 2019) (California law); *Madigan v. Yballe*, 920 N.E.2d 1112, 1122-1123 (Ill. App. Ct. 2009) (Illinois law); *Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 653 (N.C. 1992) (common law doctrine of *nullum tempus occurrit regi* "survives in North Carolina"), *Clearview Land Dev. Co. v. Commonwealth*, 327 A.2d 202 (Pa. Commw. Ct. 1974) (laches is not a defense to an action taken by the Commonwealth to enforce its police power).

Shkreli relies on distinguishable authorities concerning civil rights, which have no bearing here. *See* Shkreli Mem. at 22 (citing *Kubicek v. Westchester County*, 2009 U.S. Dist. LEXIS 117061 (S.D.N.Y. Oct. 8, 2009) (Title VII); *Bernstein v. Mony Group*, 228 F. Supp. 2d 415 (S.D.N.Y. 2002) (Title VII); *Remigio v. Kelly*, 2005 U.S. Dist. LEXIS 16789 (S.D.N.Y. Aug. 2, 2005) (vehicle seizure by police)). Instead, Plaintiffs seek forms of injunctive and equitable monetary relief that are squarely within the powers of the Court. *Supra*, Mem. at 22 n.17.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny Shkreli's motion to dismiss in full.

Dated: July 6, 2020                    Respectfully Submitted,

*/s/ Markus H. Meier*
Markus H. Meier
Bradley S. Albert
Armine Black
Daniel W. Butrymowicz
D. Patrick Huyett
Neal J. Perlman
J. Maren Schmidt
James H. Weingarten
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3748
*Counsel for Plaintiff Federal Trade Commission*

Dated:  July 6, 2020                    Respectfully submitted,

                                        FOR PLAINTIFF STATE OF NEW YORK

                                        LETITIA JAMES
                                        Attorney General

                                        Christopher D'Angelo
                                        Chief Deputy Attorney General
                                        Economic Justice Division
                                        (pro hac vice forthcoming)

                                        */s/ Elinor R. Hoffmann*
                                        Elinor R.  Hoffmann
                                        Acting Chief, Antitrust Bureau
                                        Elinor.Hoffmann@ag.ny.gov

                                        Saami Zain
                                        Saami.Zain@ag.ny.gov
                                        Amy McFarlane
                                        Amy.McFarlane@ag.ny.gov
                                        Jeremy Kasha
                                        Jeremy.Kasha@ag.ny.gov
                                        Bryan Bloom
                                        Bryan.Bloom@ag.ny.gov

                                        Office of the New York Attorney General
                                        Antitrust Bureau
                                        28 Liberty Street, 20th Floor
                                        New York, NY 10005
                                        Tel: (212) 416-8262
                                        Fax: (212) 416-6015

Dated: July 6, 2020                    Respectfully submitted,

                                       FOR PLAINTIFF STATE OF CALIFORNIA

                                       */s/ Michael D. Battaglia*
                                       Michael D. Battaglia
                                       Deputy Attorney General

                                       Office of the Attorney General of California
                                       455 Golden Gate Avenue, Suite 11000
                                       San Francisco, CA 94102
                                       Telephone: (415) 510-3769
                                       Fax: (415) 703-5480
                                       Michael.Battaglia@doj.ca.gov

                                       *Counsel for Plaintiff State of California*


Dated: July 6, 2020                    Respectfully submitted,

                                       FOR PLAINTIFF STATE OF ILLINOIS

                                       */s/ Richard S. Schultz*
                                       Richard S. Schultz
                                       Assistant Attorney General

                                       Office of the Attorney General of Illinois
                                       100 W. Randolph Street, 11th Floor
                                       Chicago, IL 60601
                                       Tel: (312) 814-3000
                                       Fax: (312) 814-4902
                                       rschultz@atg.state.il.us

                                       *Counsel for Plaintiff State of Illinois*

Dated: July 6, 2020

Respectfully submitted,

FOR PLAINTIFF
STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ K.D. Sturgis*
K.D. Sturgis
Special Deputy Attorney General
ksturgis@ncdoj.gov

Jessica V. Sutton
Assistant Attorney General
Jsutton2@ncdoj.gov

North Carolina Dept of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
Fax: (919) 716-6050

Dated: July 6, 2020

Respectfully submitted,

FOR THE PLAINTIFF STATE OF OHIO
DAVE YOST, Attorney General

BETH A. FINNERTY
Assistant Section Chief

*/s/ Elizebeth M. Maag*
Elizebeth M. Maag
Associate Assistant Attorney General

Office of the Ohio Attorney General
Antitrust Section
150 E. Gay Street, 22nd Floor
Columbus, OH 43215
Telephone: 614.466.4328
beth.finnerty@ohioattorneygeneral.gov
Liz.Maag@ohioattorneygeneral.gov

Dated:  July 6, 2020

Respectfully submitted,

FOR PLAINTIFF COMMONWEALTH OF
PENNSYLVANIA

JOSH SHAPIRO
Attorney General

Tracy W. Wertz
Chief Deputy Attorney General
twertz@attorneygeneral.gov

*/s/ Joseph S. Betsko*
Joseph S. Betsko
Senior Deputy Attorney General
jbetsko@attorneygeneral.gov

Stephen Scannell
Deputy Attorney General
sscannell@attorneygeneral.gov

Pennsylvania Office of Attorney General
Antitrust Section
Strawberry Square, 14th Floor
Harrisburg, PA 17120

Attorneys for Plaintiff Commonwealth of
Pennsylvania

Dated: July 6, 2020

Respectfully submitted,

FOR PLAINTIFF
COMMONWEALTH OF VIRGINIA

MARK R. HERRING
Attorney General of Virginia

Sarah Oxenham Allen
Senior Assistant Attorney General/Unit Manager
soallen@oag.state.va.us

*/s/ Tyler T. Henry*
Tyler T. Henry
Assistant Attorney General
thenry@oag.state.va.us

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2020, I have electronically filed a true and correct copy of

the **Plaintiffs' Memorandum of Law in Opposition to Defendant Martin Shkreli's Motion to**

**Dismiss the Amended Complaint** with the Clerk of the Court using the CM/ECF system, which

will automatically send e-mail notification of such filing to all counsel of record.


Dated: July 6, 2020

/s/ Markus H. Meier

Markus H. Meier
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3748
mmeier@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*