## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**FEDERAL TRADE COMMISSION, et al.,**

        **Plaintiffs,**

        **v.**

**VYERA PHARMACEUTICALS, LLC, et al.,**

        **Defendants.**

**Case No.: 1:20-cv-00706-DLC**

**Plaintiffs' Memorandum of Law in Opposition to
Defendant Kevin Mulleady's Motion to Dismiss the Amended Complaint**

# Table of Contents

BACKGROUND ............................................................................................................... 3

ARGUMENT .................................................................................................................. 9

I.    Plaintiffs plausibly allege antitrust claims against Mulleady ................................. 9

    A.    Mulleady is liable based on his active participation in the anticompetitive acts and his authority to control Vyera ............................................................... 9

    B.    Mulleady's attempt to rewrite the standard for individual liability fails ................... 12

II.    The FTC's claims against Mulleady are properly in federal court ....................................... 14

    A.    Section 13(b) authorizes the FTC to bring suit in federal court whenever it has "reason to believe" a defendant is violating or is about to violate the law ................. 14

    B.    The complaint plausibly alleges reason to believe that Vyera and Mulleady are violating the law ................................................................................................... 15

    C.    The complaint plausibly alleges reason to believe that Vyera and Mulleady are "about to violate" the law ........................................................................................ 19

III.    Plaintiffs have sufficiently alleged a claim against Mulleady for equitable monetary relief .......................................................................................................................... 21

IV.    The Plaintiff States have properly brought their claims against Mulleady ........................ 23

    A.    New York does not assert claims on behalf of governmental entities ....................... 23

    B.    New York does not seek damages ................................................................................ 24

    C.    New York's claim under Executive Law § 63(12) is proper ....................................... 24

    D.    Ohio does not seek monetary relief on behalf of indirect purchasers ........................ 25

CONCLUSION ................................................................................................................. 25

# Table of Authorities

## <u>Cases</u>

*Aaron v. SEC*,
    446 U.S. 680 (1980) ............................................................................................... 19

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975) ............................................................................................... 22

*AMREP Corp. v. FTC*,
    768 F.2d 1171 (10th Cir. 1985) ........................................................................... 15

*Appraisers Coal. v. Appraisal Inst.*,
    845 F. Supp. 592 (N.D. Ill. 1994) ....................................................................... 10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 9

*Boise Cascade Corp. v. FTC*,
    498 F. Supp. 772 (D. Del. 1980) ......................................................................... 15

*Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*,
    256 F. Supp. 2d 249 (D.N.J. 2003) ..................................................................... 10

*Carter-Jones Lumber Co. v. Dixie Distrib. Co.*,
    166 F.3d 840 (6th Cir. 1999) ............................................................................... 25

*Deaktor v. Fox Grocery Co.*,
    332 F. Supp. 536 (W.D. Pa. 1971) ...................................................................... 12

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
    610 F.3d 820 (3d Cir. 2010) ................................................................................ 13

*FHFA v. WMC Mortg., LLC*,
    No. 13 Civ. 584 (AKH), 2013 WL 7144159 (S.D.N.Y. Dec. 17, 2013) ............ 22

*FTC v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ........................................................................... 20

*FTC v. Adept Mgmt., Inc.*,
    Civ. No. 1:16-cv-00720-CL, 2019 WL 2433193 (D. Or. June 7, 2019) ............. 17

*FTC v. Agora Fin., LLC*,
    Civil Case No. 1:19-cv-3100-SAG, 2020 WL 998734 (D. Md. Mar. 2, 2020) .... 17

*FTC v. Bronson Partners, LLC*,
    654 F.3d 359 (2d Cir. 2011) ................................................................................ 23

*FTC v. Cephalon, Inc.*,
    100 F. Supp. 3d 433 (E.D. Pa. 2015) .................................................................. 23

*FTC v. Citigroup Inc.*,
239 F. Supp. 2d 1302 (N.D. Ga. 2001) ............................................................... 20

*FTC v. Credit Bureau Ctr., LLC*,
937 F.3d 764 (7th Cir. 2019) ............................................................................... 23

*FTC v. Educare Centre Servs., Inc.*,
433 F. Supp. 3d 1008 (W.D. Tex. 2020) ...................................................... 17, 20

*FTC v. Elec. Payment Sols. of Am., Inc.*,
No. CV-17-02535-PHX-SMM, 2019 WL 4287298 (D. Ariz. Aug. 28, 2019) ................... 17

*FTC v. Engage-A-Car Servs., Inc.*,
Civ. A No. 86-3758, 1986 WL 15066 (D.N.J. Dec. 18, 1986) ............................ 20

*FTC v. Grant Connect, LLC*,
763 F.3d 1094 (9th Cir. 2014) ............................................................................ 18

*FTC v. Hornbeam Special Situations, LLC*,
391 F. Supp. 3d 1218 (N.D. Ga. 2019) .................................................... 15, 17, 20

*FTC v. LeanSpa, LLC*,
920 F. Supp. 2d 270 (D. Conn. 2013) .................................................................. 22

*FTC v. Magui Publishers, Inc.*,
Civ. No. 89-3818RSWL(GX), 1991 WL 90895 (C.D. Cal. Mar. 28, 1991) ....................... 20

*FTC v. Med. Billers Network, Inc.*,
543 F. Supp. 2d 283 (S.D.N.Y. 2008) ............................................................ 11, 12

*FTC v. Minuteman Press*,
53 F. Supp. 2d 248 (E.D.N.Y. 1998) ................................................................... 20

*FTC v. Moses*,
913 F.3d 297 (2d Cir. 2019) ............................................................................... 10

*FTC v. Mylan Labs., Inc.*,
99 F. Supp. 2d 1 (D.D.C. 1999) .......................................................................... 25

*FTC v. Nat'l Urological Grp., Inc.*,
Civil Action No. 1:04-CV-3294-CAP, 2006 WL 8431977 (N.D. Ga. Jan, 9, 2006) ........... 15

*FTC v. Next-Gen Inc.*,
No. 4:18-cv-00128-DGK, 2018 WL 5310414 (W.D. Mo. Sept. 10, 2018) ......................... 17

*FTC v. Shire ViroPharma, Inc.*,
917 F.3d 147 (3d Cir. 2019) ................................................................. 14, 15, 16, 20

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ............................................................................................ 15

*FTC v. USA Fin., LLC,*
415 F. App'x 970 (11th Cir. 2011) ................................................................ 20

*Georgia v. Pennsylvania R. Co.,*
324 U.S. 439 (1945) ...................................................................................... 24

*Griffith Labs. U.S.A., Inc. v. Pomper,*
607 F. Supp. 999 (S.D.N.Y. 1985) ................................................................ 22

*Hartford-Empire Co. v. United States,*
323 U.S. 386 (1945) ...................................................................................... 10

*Hoffman Motors Corp. v. Alfa Romeo S.p.A.,*
244 F. Supp. 70 (S.D.N.Y. 1965) ................................................................. 10

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,*
767 F. Supp. 2d 880 (N.D. Ill. 2011) ........................................................... 13

*In re Sanctuary Belize Litig.,*
Civil No. PJM 18-3309, 2019 WL 4243079 (D. Md. Sept. 5, 2109) ................... 17

*Johnson v. Hallett,*
No. 14 Civ.1922 (DAB), 2015 WL 1516661 (S.D.N.Y. Mar. 31, 2015) ............ 22

*Kokesh v. SEC,*
137 S. Ct. 1635 (2017) .................................................................................. 23

*Lipsky v. Commonwealth United Corp.,*
551 F.2d 887 (2d Cir. 1976) ......................................................................... 22

*Liu v. SEC,*
No. 18-1501, 2020 WL 3405845 (U.S. June 22, 2020) .................................. 23

*Lorain Journal Co. v. United States,*
342 U.S. 143 (1951) ................................................................................ 10, 14

*Lynch v. City of New York,*
952 F.3d 67 (2d Cir. 2020) ........................................................................... 23

*Mass. Bonding & Ins. Co. v. New York,*
259 F.2d 33 (2d Cir. 1958) ........................................................................... 21

*Matchbox Disposal, Inc. v. Allied Waste Transp., Inc.,*
Case No. 05-2064, 2005 WL 8163263 (C.D. Ill. Aug. 3, 2005) ..................... 14

*Merck & Co. v Reynolds,*
559 U.S. 633 (2010) ...................................................................................... 21

*Monarch Marking Sys., Inc. v. Duncan Parking Meter Maint. Co.,*
No. 82 C 2599, 1986 WL 3625 (N.D. Ill. Mar. 13, 1986) .............................. 13

*Murphy Tugboat Co. v. Shipowners & Merchs. Towboat Co.*,
    467 F. Supp. 841 (N.D. Cal. 1979) ............................................................ 12, 13

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ........................................................................ 9

*People v. Apple Health & Sports Clubs, Ltd.*,
    599 N.E.2d 683 (N.Y. 1992) ...................................................................... 10

*People v. Greenberg*,
    27 N.Y.3d 490 (N.Y. 2016) ........................................................................ 23

*People v. Toomey*,
    203 Cal. Rptr. 642 (Cal. Ct. App. 1984) .................................................... 10

*POM Wonderful, LLC v. FTC*,
    777 F.3d 478 (D.C. Cir. 2015) .................................................................... 11

*Schwartz v. Eaton*,
    264 F.2d 195 (2d Cir. 1959) ........................................................................ 22

*SEC v. Am. Bd. of Trade, Inc.*,
    751 F.2d 529 (2d Cir. 1984) ........................................................................ 19

*SEC v. Commonwealth Chem. Sec., Inc.*,
    574 F.2d 90 (2d Cir. 1978) .................................................................... 19, 20

*SEC v. Culpepper*,
    270 F.2d 241 (2d Cir. 1959) ........................................................................ 21

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ...................................................................... 23

*SEC v. Materia*,
    745 F.2d 197 (2d Cir. 1984) ........................................................................ 19

*SEC v. Mgmt. Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975) .................................................................... 19, 20

*SEC v. Monarch Fund*,
    608 F.2d 938 (2d Cir. 1979) ........................................................................ 19

*SEC v. Payton*,
    14 Civ. 4644, 2016 WL 3023151 (S.D.N.Y. May 16, 2016) ...................... 22

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
    No. 97 CIV. 5499 (DNE), 2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ............ 9, 12

*Standard Oil Co. of Cal. v. FTC*,
    596 F.2d 1381 (9th Cir. 1979) .................................................................... 15

*State v. Midland Equities of N.Y., Inc.*,
    117 Misc. 2d 203 (N.Y. Sup. Ct. 1982) ............................................................. 17

*Tillamook Cheese & Dairy Ass'n v. Tillamook Cty. Creamery Ass'n*,
    358 F.2d 115 (9th Cir. 1966) ............................................................................. 14

## **Statutes**

15 U.S.C. § 53(b) .................................................................................................. 14, 15

N.Y. Executive Law § 63(12) ....................................................................................... 24

N.Y. Gen. Bus. Law § 342 ........................................................................................... 24

O.R.C. § 109.81 ............................................................................................................ 25

O.R.C. § 1331 ............................................................................................................... 25

O.R.C. § 1331.11 ......................................................................................................... 25

## **Rules**

Fed. R. Civ. P. 8(a)(2) .................................................................................................. 23

Defendant Kevin Mulleady is the current chair of the board of directors of Defendant Phoenixus AG—the parent company of Defendant Vyera Pharmaceuticals, LLC—and the former CEO of Vyera.[1] He helped Defendant Martin Shkreli found Vyera in 2014 and has been a key participant in the company's anticompetitive scheme to impede lower-cost generic competition to its lucrative drug Daraprim from its inception. As Plaintiffs' detailed factual allegations reflect, Mulleady: (1) directly participated in 2015 as Shkreli's chief of staff in setting up Vyera's resale-restriction agreements with distributors and purchasers to prevent them from reselling Daraprim to potential generic competitors; (2) was installed as a director and CEO in 2017 to carry out Shkreli's anticompetitive agenda and maintain Vyera's ongoing anticompetitive agreements; (3) directly participated in tightening the distribution restrictions, setting up additional monitoring systems, and buying back Daraprim that had been inadvertently sold to an unauthorized purchaser; (4) negotiated and signed the RL Fine API exclusivity agreement at Shkreli's direction, and later bragged that doing so had excluded two potential generic competitors; (5) signed at least one of Vyera's data-blocking agreements with distributors to prevent them from selling data that provides key market information to potential generic competitors; (6) approached a potential generic competitor in an effort to convince it to partner with Vyera rather than compete; and (7) continues to communicate with Shkreli about blocking generic competition to Daraprim.

Mulleady nonetheless contends that all claims against him must be dismissed, asserting that "Plaintiffs cannot and do not allege any facts showing how Mr. Mulleady himself

---

[1] Unless otherwise specified, this brief refers to Vyera and Phoenixus collectively as "Vyera" when discussing their joint conduct relating to Daraprim.

purportedly executed an elaborate, multi-part scheme to block generic entry."[2] He also argues that he cannot be held personally liable for Vyera's antitrust violations because they are not per se illegal. And he challenges the statutory authority of the FTC and certain State Plaintiffs to bring this lawsuit. None of these arguments warrants dismissal.

First, Mulleady is personally liable for Vyera's antitrust violations under traditional principles of corporate agency liability because he both participated in and had the authority to control Vyera's unlawful conduct. Courts have repeatedly applied these principles to hold corporate officers and directors liable for antitrust violations, as well as other violations of the FTC Act and state laws. Agency liability does not require a showing that Mulleady "himself" took each and every act in furtherance of the scheme to obstruct generic competition to Daraprim. Nor is it limited to "inherently wrongful" or per se violations.

Second, the FTC sufficiently pleads its statutory authority to bring this suit in federal court, because it has alleged "reason to believe" that Mulleady "is violating" the law due to his ongoing participation in the anticompetitive conduct and continued authority as chair of the Phoenixus board. The complaint also alleges facts that provide reason to believe Mulleady "is about to violate" the law—including both the egregious nature of the ongoing violation and his current search for another drug to replicate this anticompetitive scheme. Moreover, even absent Mulleady's current participation and control, nothing in his cited authority suggests that the FTC cannot name him as an additional defendant in a federal court suit to enjoin Vyera's ongoing anticompetitive scheme.

---

[2] Mem. of Law in Support of Def. Kevin Mulleady's Mot. to Dismiss Am. Compl., ECF No. 122 ("Mulleady Mem.") at 1 (internal quotation marks omitted). At various points, Mulleady also "incorporates by reference" arguments made in other Defendants' briefs. Plaintiffs respond to those arguments in their responses to those briefs.

Finally, Mulleady's other arguments should also be rejected. The FTC has provided sufficient notice of its claim for equitable monetary relief. And the State Plaintiffs have alleged sufficient facts to invoke their respective statutory authorities.

Plaintiffs' well-pleaded allegations amply belie Mulleady's claims that he was uninvolved, unaware, or had no authority over Vyera's anticompetitive scheme. Mulleady was not just an executive and board member who happened to be involved with a company that violated the antitrust laws. He played a key role in planning and implementing those violations. The Court should reject his efforts to avoid liability for his actions.

## BACKGROUND

### Mulleady's partnership with Vyera founder Martin Shkreli

Mulleady began working with Martin Shkreli in 2011. Amended Complaint for Injunctive and Other Equitable Relief, Apr. 14, 2020, ECF No. 87 ("Am. Compl.") ¶ 50. His initial role was to find investors for Shkreli's hedge funds. *Id.* ¶ 50. But he soon helped Shkreli found the pharmaceutical company Retrophin, Inc., even though he had no experience in the pharmaceutical industry. *Id.* ¶¶ 48-50. Retrophin then acquired Thiola—a drug with a small but dependent patient population and no patent protection—implemented a restricted distribution system, and significantly increased Thiola's price. *Id.* ¶¶ 34, 50. Shkreli publicly bragged that he intended to use distribution restrictions to block generic competition to Thiola. *Id.* ¶¶ 34, 96-97.

In 2014, Shkreli was ousted from Retrophin. *Id.* ¶ 35. Mulleady then helped Shkreli create Vyera and replicate his Retrophin strategy. *Id.* ¶¶ 36, 51. Initially, Mulleady was Vyera's managing director and chief of staff to CEO Shkreli. *Id.* ¶ 51. Mulleady participated in the search for a sole-source, off-patent drug that could be put into restricted distribution and helped implement that system for Daraprim. *Id.*

In December 2015, Shkreli was arrested for securities fraud related to financial conduct at Retrophin as well as his hedge funds. *Id*. ¶ 38. Shortly thereafter, Vyera terminated Mulleady's employment *Id*. ¶ 51. Shkreli was subsequently convicted of multiple felonies and sentenced to seven years in federal prison. *Id*. ¶ 38. Mulleady was an unindicted co-conspirator in the criminal case against Shkreli. *Id*. ¶ 50.

In April 2017, following the departure of his hand-picked successor, Ron Tilles, and frustrated by his inability to control Vyera's new management, Shkreli waged a successful proxy fight and installed Mulleady as chair of the Phoenixus board. *Id*. ¶¶ 39-41. Mulleady and Shkreli protégé, Akeel Mithani, were also appointed as the only two members of the board's newly formed "Executive Committee," which would "perform executive functions and take over the tasks of the Senior Management (CEO, CFO, CCO, and CLO) on a temporary basis." *Id*. ¶ 41.

In September 2017, Mulleady was appointed interim CEO of Vyera, and two months later the appointment was made permanent. *Id*. He remained Vyera's CEO until March 2019 (*id*. ¶ 52) and is still chair of the Phoenixus board. *Id*. ¶ 47. Mulleady has stayed in close contact with Shkreli and regularly communicates with him in prison through phone calls, email, in-person visits, and other means. *Id*. ¶ 44. They continue to discuss strategies to prevent generic competition to Daraprim. *Id*. ¶¶ 44, 129.

**Mulleady's participation in or direction of the anticompetitive scheme**

In his various roles at Vyera, Mulleady directly participated in or directed every aspect of the anticompetitive scheme to impede generic competition to Daraprim. Am. Compl. ¶ 3.

***Distribution resale-restriction agreements***. From the outset, Mulleady was a key participant in Vyera's resale-restriction agreements with distributors and purchasers. As Shkreli's chief of staff in 2015, he told employees that a restricted distribution system was

Vyera's "#1 priority" and "exceptionally time sensitive," and he urged them to "all work extra long hours to get this done." *Id*. ¶ 98. When Mulleady returned as Vyera's CEO in 2017, he immediately focused on the distribution restrictions. He was concerned that, in his absence, there had been "leakage" and some Daraprim may have been obtained by a generic company. *Id*. ¶ 130. Mulleady ordered a "full out audit of daraprim" so he could "know where every bottle of daraprim we sold went to." *Id*. The next month, Mulleady set up a more elaborate reporting system with ASD Healthcare, one of Vyera's main distributors, to identify "outlier" purchases that might be intended for a generic company. *Id*.

ASD subsequently reported that a company called Centrastate Specialty Script had purchased five bottles of Daraprim. *Id*. ¶ 131. Concerned that a potential generic competitor might obtain these five bottles, Mulleady decided that Vyera should buy them back. *Id*. ¶ 132. Using a middleman, Mulleady agreed to repurchase all five bottles for ██████████ the price Centrastate had paid for them. *Id*. As part of the repurchase contract, Centrastate agreed "not to purchase, directly or indirectly . . . any Daraprim, except directly through Vyera." *Id*. ¶ 133.

Centrastate's sister company, Reliant Specialty LLC, had previously sold two bottles of Daraprim to a potential generic competitor, ██████████████████. *Id.* ¶ 254. But when ██ ██████████████████████████, Reliant told ███ that Mulleady had bought back its remaining Daraprim inventory and that Vyera had barred it from selling Daraprim in the future. *Id*. Mulleady later directly confirmed this to ███. *Id*. ¶ 256.

During Mulleady's tenure as CEO, Vyera further tightened its distribution system. In May 2018, Vyera instructed its distributor Optime to implement a "Product Use Attestation" in its agreements with hospitals, which prevented the hospitals from selling Daraprim to generic pharmaceutical companies. *Id*. ¶ 117. And under Vyera's 2018 contract with Optime, the

distributor can sell only three bottles at a time to any purchaser and only if the purchaser provides the patient diagnosis. *Id*. ¶ 127.

Mulleady's involvement with the resale restrictions is ongoing. The resale restrictions with distributors, group purchasing organizations, and individual hospitals all remained in place while Mulleady was CEO and continue to this day. *Id*. ¶¶ 52, 113, 122. Mulleady remains chair of the Phoenixus board, and as recently as August 2019, he and Shkreli discussed limiting all sales of Daraprim to one bottle at a time. *Id*. ¶ 129. Shkreli urged Mulleady to "really carefully screen every doctor" and ensure that no one could "sell more than one bottle at a time" to prevent a generic drug company from "get[ting] its hands on anything." *Id*.

*API exclusivity agreements*. As CEO, Mulleady was integral to ensuring that Vyera's competitors would not have access to pyrimethamine, the active pharmaceutical ingredient ("API") in Daraprim. While the Fukuzyu exclusive contract was executed before Mulleady rejoined the company, it remained in place during his tenure as CEO and Fukuzyu regularly communicated with Vyera about rejecting sales to generic manufacturers during that period. Am. Compl. ¶¶ 153, 156. The Fukuzyu contract is still in force today. *Id*. ¶ 158.

Mulleady also directly negotiated and signed Vyera's API exclusivity agreement with RL Fine. In August 2017, shortly after Shkreli secured Mulleady's election to the Phoenixus board, Vyera became aware that RL Fine was working with two generic companies to supply them with pyrimethamine API. *Id*. ¶ 160. At Shkreli's direction, Mulleady and Vyera's head of business development, Mithani, approached RL Fine to pursue an exclusive agreement. *Id*. ¶ 161. Despite having no experience with API sourcing or FDA requirements, Mulleady and Mithani conducted the negotiations alone, without support or input from Vyera's regulatory or manufacturing personnel. *Id*. ¶ 171.

On December 27, 2017, Mulleady, in his roles as Vyera's CEO and chair of the Phoenixus board, executed two agreements with RL Fine. In the first, Vyera agreed to pay RL Fine ███████████ for future collaboration on the development of ██ products. (Neither Vyera nor RL Fine ever took any subsequent steps to develop the products.) *Id*. ¶ 164. In the second agreement, Vyera agreed to pay RL Fine ███████████████ and ███████ ███████████████, and RL Fine agreed to name Vyera as its exclusive distributor for pyrimethamine API. *Id*. ¶¶ 165-66.

Vyera has never distributed and never intended to distribute pyrimethamine API. *Id.* ¶ 165. But this designation gave Vyera the power to veto any sale of RL Fine's pyrimethamine API outside of India. *Id.* Vyera used this power to prevent potential generic competitors from purchasing pyrimethamine API from RL Fine. *Id*. ¶¶ 220, 232, 256. In October 2019, Vyera paid ███████ to prematurely terminate the RL Fine agreement after extensive questioning about it from FTC staff. *Id.* ¶ 172.

***Data-blocking agreements***. During his tenure as CEO, Mulleady also presided over Vyera's implementation of two data-blocking agreements with its distributors. Am. Compl. ¶¶ 184-85. Mulleady signed at least one of these agreements. *Id.* ¶ 52; Mulleady Mem. 7 n.5. Under these agreements, Vyera paid two of its key distributors to not report Daraprim sales numbers to data aggregator companies, such as IQVIA. *Id.* ¶¶ 183-85. Generic companies typically purchase and rely on IQVIA data when determining whether to develop a generic product. *Id.* ¶ 177. But without data from Vyera's primary distributors, IQVIA's Daraprim data is "extremely incomplete and not very useful." *Id*. ¶ 186. Vyera entered these data-blocking agreements to deter generic companies from seeking to develop a generic Daraprim product, by masking the

true size of the Daraprim market. *Id*. ¶¶ 181-88. These agreements remained in place for the duration of Mulleady's tenure as CEO and continued under his board direction.

### The present action and recent developments

On January 27, 2020, the FTC and State of New York jointly filed a sealed complaint against Vyera, Phoenixus, Mulleady, and Shkreli. This initial complaint alleged that Defendants' "unlawful scheme to maintain a monopoly on Daraprim continues to this day." Complaint for Injunctive and Other Equitable Relief, Jan. 27, 2020, ECF No. 2 ("Compl.") ¶ 1. At the time of the complaint, Vyera's contracts with distributors and purchasers still barred the resale of Daraprim to generic companies. *Id*. ¶¶ 94-107, 113-16, 121-22, 128. Vyera's exclusive supply agreement with Fukuzyu was still in effect. *Id*. ¶ 152. No generic company had received FDA approval or entered the market. *Id*. ¶¶ 271-73, 282. And the complaint alleged that Vyera continued to possess monopoly power with respect to Daraprim. *Id*. ¶ 287. In its prayer for relief, Plaintiffs requested "[t]hat Defendants are permanently enjoined from continuing their course of conduct." *Id*. Prayer for Relief 7.

On February 28, 2020, one month after the FTC and New York filed their initial complaint, the FDA approved Cerovene's generic Daraprim product. Am. Compl. ¶ 216. Two weeks later, a Phoenixus subsidiary announced it would launch an "authorized generic" version of Daraprim. *Id*. ¶ 217.[3] On March 20, 2020, seven years after starting development, Cerovene launched its generic Daraprim product through its commercial partner Dr. Reddy's Laboratories. *Id*. ¶ 218.

---

[3] An authorized generic product is chemically identical to the brand drug but sold under a generic label. A brand company often launches an authorized generic version of its product when it expects generic entry so that it can retain some revenues it would otherwise lose. Am. Compl. ¶ 217.

On April 14, 2020, the FTC and New York filed an amended complaint adding six more State Plaintiffs—California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia. The amended complaint included updated allegations to reflect the intervening FDA approval and entry of Cerovene's generic Daraprim product. *Id.* ¶¶ 216-18.

## ARGUMENT

When a party moves to dismiss under Rule 12(b)(6), the court must "constru[e] the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016). To state a claim that is "plausible on its face," a plaintiff's factual allegations need only "be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007). Under these well-settled standards, Plaintiffs' complaint (1) alleges plausible antitrust claims against Mulleady, (2) pleads facts sufficient to allow the FTC to sue him in federal court, (3) supports the FTC's claim for equitable monetary relief against him, and (4) states claims against him under New York and Ohio law.

## I. Plaintiffs plausibly allege antitrust claims against Mulleady

### A. Mulleady is liable based on his active participation in the anticompetitive acts and his authority to control Vyera

Under traditional agency law principles, a corporate officer or director can be liable for an antitrust violation if they "participated in the unlawful acts" or "acquiesced or ratified the actions of other officers or agents of the corporation who violated the antitrust laws." *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 CIV. 5499 (DNE), 2000 WL 264295, at *35 (S.D.N.Y. Mar. 9, 2000) (holding complaint sufficiently alleged antitrust claims

against individual corporate officers because of their influence over corporate policy).[4] The Supreme Court has applied these standards to hold individuals liable under Sections 1 and 2 of the Sherman Act. *See Hartford-Empire Co. v. United States*, 323 U.S. 386, 401-02 (1945) (affirming liability for individuals who participated in an antitrust conspiracy "in their capacities as officers and directors of corporations"); *Lorain Journal Co. v. United States*, 342 U.S. 143, 145 n.2, 158-59 (1951) (upholding injunctive relief against four individuals who "participated in the conduct alleged to constitute the attempt to monopolize"). And similar principles govern individual liability under the FTC Act[5] and under state laws that underpin the State Plaintiffs' claims.[6]

The complaint alleges facts that plausibly support Mulleady's liability under these standards. First, it is replete with specific allegations that Mulleady directly participated in "acts done [o]n behalf of his corporate employer in violation of the" antitrust laws. *Hoffman Motors Corp. v. Alfa Romeo S.p.A.*, 244 F. Supp. 70, 82 (S.D.N.Y. 1965). After helping Shkreli found Vyera, Mulleady was personally involved in setting up the resale-restriction agreements. Am. Compl. ¶ 51. Later, as Vyera's CEO, Mulleady established a monitoring system to ensure that Vyera's distributors and purchasers honored their agreements not to sell Daraprim to generic

---

[4] To establish agency liability, Plaintiffs need not show that Mulleady personally possesses monopoly power or that he entered into unlawful agreements on his own behalf. Mulleady's contrary contention (Mulleady Mem. 12), relying on *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 284-85 (D.N.J. 2003), is misplaced because there is no indication that the plaintiffs there had alleged liability under agency principles. Indeed, *Carpet Group* cites repeatedly to *Appraisers Coal. v. Appraisal Inst.*, which dismissed monopolization claims against individuals, but in so doing explained that the plaintiffs "do not specifically allege any vicarious liability upon which the Court might include the individual Defendants." 845 F. Supp. 592, 603 n.6 (N.D. Ill. 1994).

[5] *See FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019) ("An individual may be held liable under the FTCA for a corporation's deceptive acts or practices if, with knowledge of the deceptive nature of the scheme, he either participates directly in the practices or acts or has authority to control them." (internal quotation marks omitted)).

[6] *See, e.g.*, *People v. Apple Health & Sports Clubs, Ltd.*, 599 N.E.2d 683, 686 (N.Y. 1992) (individuals may be held liable where they participate in, or have actual knowledge of, the illegal conduct); *People v. Toomey*, 203 Cal. Rptr. 642, 651 (Cal. Ct. App. 1984) (same).

competitors, and received reports about potentially unusual sales. *Id.* ¶ 130. After one such report, he personally arranged for Vyera to buy back five bottles of Daraprim to ensure that these samples did not fall into the hands of a potential generic competitor. *Id.* ¶¶ 132-33. Mulleady also acted as the lead negotiator for the RL Fine API exclusivity agreement and signed the final contract himself. *Id.* ¶¶ 160-64.[7]

Second, since 2017, Mulleady also has "had authority to control the corporate defendant[s]." *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008). "Authority to control" is not limited to the company's sole decision-maker. Instead, the requisite authority "can be evidenced by [Mulleady's] active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Id.*; *see also POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498 (D.C. Cir. 2015) (corporate executive had sufficient "authority to control" to be individually liable for corporation's false advertising where he "had the authority to determine which advertisements should run" even if he did not have "final say"). Mulleady was Vyera's CEO from the summer of 2017 through the spring of 2019 and remains chair of the Phoenixus board. Am. Compl. ¶ 52. While serving in these leadership roles, he has had the authority to control Vyera's conduct and is therefore liable for the company's anticompetitive acts—including the RL Fine agreement, data-blocking agreements, and additional resale-restriction agreements and monitoring.

Finally, Mulleady "knew of the [anticompetitive] acts or practices." *Med. Billers*, 543 F. Supp. 2d at 320. In addition to his direct participation in many of Vyera's anticompetitive

---

[7] Contrary to Mulleady's claim, Plaintiffs are not "alleging multiple lawful acts taken by Mr. Mulleady in the ordinary course of Vyera's business and asking the Court to combine them to concoct an antitrust claim." Mulleady Mem. 16. Instead, Plaintiffs allege that each of the challenged acts are exclusionary and unlawful under Section 1 and/or Section 2 of the Sherman Act. *See* Pls.' Mem. of Law in Opp'n to Mot. to Dismiss by Defs.' Vyera Pharmaceuticals, LLC and Phoenixus AG ("Pls.' Opp.") at 30-49.

agreements, Mulleady also knew of and "acquiesced" to anticompetitive conduct that started before his tenure but remains in force, such as the Fukuzyu exclusive supply contract. *Six W. Retail*, 2000 WL 264295, at *35; *see also Med. Billers*, 543 F. Supp. 2d at 320 ("An individual's degree of participation in business affairs is probative of knowledge."). Indeed, Mulleady well understood that the goal of Vyera's scheme was to block generic competition. He signed an additional API exclusivity agreement with RL Fine to do just that. Am. Compl. ¶¶ 171, 256. And when he learned that a generic company was in the process of developing a generic Daraprim product, he attempted to pay that company not to enter the market—and bragged about his success in foiling other generic competitors' attempts to do so. *Id.* ¶ 256.

In short, Mulleady has been and continues to be Vyera's agent and "is individually liable for [antitrust violations] committed by him pursuant to his agency." *Deaktor v. Fox Grocery Co.*, 332 F. Supp. 536, 542 (W.D. Pa. 1971), *aff'd*, 475 F.2d 1112 (3d Cir. 1973).

### B. Mulleady's attempt to rewrite the standard for individual liability fails

Citing a single, oft-criticized 1979 opinion from the Northern District of California, Mulleady argues that he cannot be held individually liable for the corporations' violations because his conduct was not "inherently wrongful," which he equates to a per se antitrust violation. Mulleady Mem. 13-14 (discussing *Murphy Tugboat Co. v. Shipowners & Merchs. Towboat Co.*, 467 F. Supp. 841 (N.D. Cal. 1979), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981)). Mulleady's reliance on *Murphy Tugboat* is misplaced for three reasons.

First, as Mulleady acknowledges, no court in this circuit has adopted *Murphy Tugboat*'s "inherently wrongful" standard. Mulleady Mem. 14 n.10.[8] Meanwhile, several other courts have recognized that it "cannot be taken as a correct statement of the law." *Monarch Marking Sys., Inc. v. Duncan Parking Meter Maint. Co.*, No. 82 C 2599, 1986 WL 3625, at *2 (N.D. Ill. Mar. 13, 1986) (explaining that *Murphy Tugboat*'s reasoning "would result in a fundamental change in the Sherman Act's scope"); *see also Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 n.8 (3d Cir. 2010) ("We question the persuasive value of *Murphy Tugboat*."); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 908 (N.D. Ill. 2011) (same).

Second, in adopting its "inherently wrongful" requirement, *Murphy Tugboat* distinguished *Lorain Journal* and *Hartford-Empire*—both of which affirmed individual liability without requiring "inherently wrongful" conduct. It did so because they were "government suits for injunctive relief," not private suits for damages. 467 F. Supp. at 851 n.6. Like those two cases (and unlike *Murphy Tugboat*), this case is a government suit seeking equitable relief.

Finally, Mulleady's argument is based on the erroneous premise that *Murphy Tugboat*'s "inherently wrongful" standard is limited to per se antitrust violations. But *Murphy Tugboat*'s "inherently wrongful" analysis found the challenged conduct was "supported by legitimate business considerations" and (consistent with a rule-of reason-analysis) considered "all the surrounding facts and circumstances." *Id.* at 853. Moreover, the court cited a case holding individuals liable for an unlawful attempt to monopolize under Section 2 (a non-per se violation) in support of its "inherently wrongful" standard. *Id.* (citing *Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F. Supp. 476 (E.D. Mo. 1965)). Indeed, contrary to Mulleady's suggestion (Mulleady Mem. 14 n.10), numerous courts have found individuals liable for non-per se antitrust

---

[8] The few out-of-circuit cases that Mulleady cites to the contrary simply applied the "inherently wrongful" standard with no reasoning beyond a citation to *Murphy Tugboat*. *See* Mulleady Mem. 14 (citing cases).

violations.[9] Here, unlike in *Murphy Tugboat*, the complaint alleges that Mulleady was fully aware of the anticompetitive nature of his conduct and that his actions were not supported by legitimate business considerations. *See, e.g.*, Am. Compl. ¶¶ 51, 130-33, 171, 256.

## II. The FTC's claims against Mulleady are properly in federal court

Section 13(b) of the FTC Act empowers the FTC to file suit in federal court when it has reason to believe a defendant "is violating, or is about to violate" the antitrust laws. 15 U.S.C. § 53(b)(1). Relying on the Third Circuit's decision in *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019), Mulleady contends that the FTC has not satisfied this statutory standard—at least as to him. But the complaint alleges that all Defendants—including Mulleady—are currently violating the antitrust laws and are likely to continue to do so in the future. Mulleady's participation in and authority to control Vyera's ongoing anticompetitive conduct bears no resemblance to the long-past conduct in *Shire*. Moreover, there is ample reason to believe his anticompetitive conduct will continue in the future.

### A. Section 13(b) authorizes the FTC to bring suit in federal court whenever it has "reason to believe" a defendant is violating or is about to violate the law

Section 13(b) provides, in relevant part, that "[w]henever the Commission has reason to believe . . . that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission . . . the Commission . . . may bring suit in a district court of the United States to enjoin any such act or practice." 15 U.S.C. § 53(b). The statute further provides that, "in proper cases, the Commission may seek, and after proper proof, the court may issue, a permanent injunction." *Id.*

---

[9] *See, e.g.*, *Lorain Journal*, 342 U.S. at 145 n.2, 158-59 (affirming judgment against individual defendants in attempted monopolization case); *Tillamook Cheese & Dairy Ass'n v. Tillamook Cty. Creamery Ass'n*, 358 F.2d 115, 118 (9th Cir. 1966) ("The individuals through whom a corporation acts and who shape its intentions can be held liable on a charge of attempted monopolization."); *Matchbox Disposal, Inc. v. Allied Waste Transp., Inc.*, Case No. 05-2064, 2005 WL 8163263, at *3 (C.D. Ill. Aug. 3, 2005) (same).

By its terms, Section 13(b) does not condition the FTC's ability to sue in federal court on whether a defendant *in fact* "is violating" or "is about to violate" the law. Rather, the statute permits the FTC to bring suit when it has "*reason to believe*" they are. *Id.* (emphasis added). Some courts have held that the FTC's "reason to believe" determination is unreviewable,[10] while others have concluded it is subject to only limited judicial review.[11] Given Rule 12(b)(6)'s lenient plausibility standard, Section 13(b) thus imposes—at most—a minimal pleading burden: The FTC need only allege "at least some facts to support a reasonable inference" that at the time it files suit the Commission has reason to believe Defendants were violating or about to violate the law. *FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218, 1223 (N.D. Ga. 2019); *see also Shire*, 917 F.3d at 158 (requiring the FTC to plead, "at the time it files suit," that a defendant is violating or is about to violate the law).[12]

## B. The complaint plausibly alleges reason to believe that Vyera and Mulleady are violating the law

Plaintiffs filed this suit in January 2020, alleging that all Defendants, including Mulleady, are engaged in an "unlawful scheme to maintain a monopoly on Daraprim [that] continues to this

---

[10] *See FTC v. Nat'l Urological Grp., Inc.*, Civil Action No. 1:04-CV-3294-CAP, 2006 WL 8431977, at *5 (N.D. Ga. Jan, 9, 2006) (holding judicial review "impossible" because Section 13(b) provides "no meaningful standard by which to measure the lawfulness of the FTC's actions"); *Boise Cascade Corp. v. FTC*, 498 F. Supp. 772, 779 (D. Del. 1980) (judicial review of FTC's reason to believe determination under Section 5 of the FTC Act would require the court to "probe [the Commissioners'] mental processes, a practice condemned by the Supreme Court").

[11] *See AMREP Corp. v. FTC*, 768 F.2d 1171, 1177 (10th Cir. 1985) ("All that the law requires is that the FTC actually had some 'reason to believe.'"); *Standard Oil Co. of Cal. v. FTC*, 596 F.2d 1381, 1386 (9th Cir. 1979) (absent a finding "that the complaint was issued solely because of some outside pressure or with complete absence of a 'reason to believe' determination," courts should not disturb the Commission's reason to believe determination), *rev'd on other grounds sub nom. FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232 (1980). Although the Supreme Court reversed the Ninth Circuit's holding that issuance of the administrative complaint was final agency action under the Administrative Procedure Act, it expressly reserved the Ninth Circuit's holding concerning the scope of judicial review that is not governed by the APA. *Standard Oil*, 449 U.S. at 245 n.13.

[12] Although this brief primarily discusses the allegations in Plaintiffs' April 14, 2020 amended complaint, Mulleady's argument that he was not violating or about to violate the law at the time Plaintiffs filed suit specifically puts at issue the allegations in Plaintiffs' initial complaint, filed under seal on January 27, 2020. This brief uses "Am. Compl." to refer to the April 14 amended complaint and "Compl." where necessary to refer to the January 27 initial complaint.

day." Compl. ¶ 1. This initial complaint (ECF No. 2) alleges that most of Vyera's exclusionary agreements with distributors, purchasers, and suppliers remain in place (*id.* ¶¶ 94-107, 113-16, 152, 180, 184); that no generic version of Daraprim has yet entered the market (*id.* ¶¶ 271-73, 282); and that Vyera continues to exercise monopoly power (*id.* ¶ 287). In its prayer for relief, the complaint requests "That Defendants [be] permanently enjoined from continuing their course of conduct." Compl. Prayer for Relief 7.

As to Mulleady, the complaint alleges that his control of Vyera and his participation in this anticompetitive scheme—the bases for the claims against him—are also ongoing. Mulleady remains chair of the Phoenixus board and has helped implement and oversee Vyera's scheme since its inception—including personally monitoring distributors' sales to ensure compliance with the resale-restriction agreements and personally signing multiple exclusionary agreements on behalf of the company. *See, e.g., id.* ¶¶ 41, 124-27, 157. And he continues to regularly communicate with Shkreli about strategies to block generic entry. *Id.* ¶¶ 38, 123.[13]

Mulleady argues that this Court should apply the Third Circuit's decision in *Shire* and dismiss the claims against him because "the Complaint contains *no* allegations concerning an ongoing or imminent violation of the law" as to him. Mulleady Mem. 8-9. But the Rule 12(b)(6) standard forecloses Mulleady's factual dispute with Plaintiffs' allegations of ongoing illegal conduct. And his reliance on *Shire*'s discussion of past violations is wholly misplaced. *Shire* dismissed an FTC suit brought "five years after Shire had stopped its allegedly illegal conduct." 917 F.3d at 159. That complaint "contain[ed] no allegations that Shire engaged in [unlawful

---

[13] Mulleady notes that the most recent factual allegation that specifically mentions him dates to December 2019, one month before the FTC filed suit. Mulleady Mem. 9 n.6. But nothing in the complaint suggests that these discussions suddenly stopped before the FTC's January 2020 lawsuit. The allegation that he was continuing to communicate with Shkreli about anticompetitive steps to block generic access to Daraprim supports a reasonable inference that such discussions continued after December 2019, even if the FTC had not collected evidence beyond that point.

conduct] in the five-year gap between the 2012 cessation in petitioning and the 2017 lawsuit." *Id.* at 160. Indeed, "whether violations had actually ceased was not a disputed fact." *FTC v. Educare Centre Servs., Inc.*, 433 F. Supp. 3d 1008, 1016 (W.D. Tex. 2020) (citing *Shire*, 917 F.3d at 160). In those circumstances, "the Third Circuit held that the alleged misconduct was too far in the past to support the FTC's belief that the defendant was presently violating or about to violate the law." *Id.*

*Shire*'s unusual facts make it an outlier. Courts that have subsequently addressed similar arguments have consistently construed the *Shire* decision narrowly and declined to apply it to different factual circumstances.[14] And Mulleady's attempt to equate the allegations here—an ongoing anticompetitive scheme—to the long-past conduct addressed in *Shire* strains that decision far past its breaking point.

First, Mulleady's contention that he is not currently violating the law because he "is no longer CEO of Vyera" and is "not involved in the company's day-to-day affairs" (Mulleady Mem. 9) misunderstands Plaintiffs' claims against him. As described above, Mulleady's liability is based on his participation in the anticompetitive scheme, as well as his authority to control Vyera as chair of the Phoenixus board—both of which Plaintiffs plausibly allege are ongoing.[15]

---

[14] *See Educare*, 433 F. Supp. 3d at 1016 (declining to apply *Shire* where conduct allegedly ceased six months before FTC's lawsuit); *FTC v. Elec. Payment Sols. of Am., Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at *9-11 (D. Ariz. Aug. 28, 2019) (declining to follow *Shire* based on Ninth Circuit precedent and plausible allegations that defendants' cessation of their alleged misconduct occurred during the period prior to suit when the government was prosecuting other aspects of the illegal scheme); *Hornbeam*, 391 F. Supp. 3d at 1223 (finding "the differing circumstances of the instant case" supported a reasonable inference that the defendants were "about to violate" the law); *FTC v. Adept Mgmt., Inc.*, Civ. No. 1:16-cv-00720-CL, 2019 WL 2433193, at *1 (D. Or. June 7, 2019) (rejecting *Shire* "as contrary to well-established precedent in the Ninth Circuit and as distinguishable from the facts in the case at bar"); *FTC v. Agora Fin., LLC*, Civil Case No. 1:19-cv-3100-SAG, 2020 WL 998734, at *13 (D. Md. Mar. 2, 2020) (concluding that, in contrast *Shire,* "the FTC has 'reason to believe' that Defendants will continue to violate the FTC Act"); *In re Sanctuary Belize Litig.*, Civil No. PJM 18-3309, 2019 WL 4243079, at *1-2 (D. Md. Sept. 5, 2109) (declining to dismiss case where ongoing conduct was disputed); *FTC v. Next-Gen Inc.*, No. 4:18-cv-00128-DGK, 2018 WL 5310414, at *4 n.6 (W.D. Mo. Sept. 10, 2018) (same).

[15] Even if Mulleady had ceased the activities giving rise to his liability—which he has not—Plaintiff State of New York could still pursue injunctive relief against him under N.Y. Exec. Law § 63(12). *See State v. Midland Equities* (Continued…)

Second, the plain text of Section 13(b) does not require a reason to believe that *each defendant* in a permanent injunction suit is violating or is about to violate the law. It permits the FTC to sue in federal court for injunctive relief when it has reason to believe there is an ongoing violation. Vyera's anticompetitive scheme is ongoing, and the FTC has sued to enjoin it.[16] Nothing in the statutory language precludes the FTC from naming additional appropriate defendants when it brings a Section 13(b) permanent injunction suit, and *Shire* does not suggest otherwise.

Indeed, the FTC has previously named an individual defendant in a Section 13(b) suit when a corporate entity's unlawful conduct was ongoing, but the individual's misconduct had ceased. In *FTC v. Grant Connect, LLC*, an individual defendant, Kimoto, had engaged in numerous violations of the FTC Act through his wholly controlled company, Vertek. 763 F.3d 1094, 1097 (9th Cir. 2014). A year before the FTC sued Kimoto and numerous other corporate and individual defendants, Kimoto was incarcerated for other conduct and "ceased to actively participate in Vertek's daily activities." *Id*. at 1100. Although Kimoto's involvement in the scheme had ceased before suit, the Ninth Circuit affirmed his liability because he "both controlled Vertek at the time the scheme was organized, and directly participated in establishing the scheme." *Id*. at 1103. Thus, even if Mulleady were not currently participating in or directing Vyera's anticompetitive scheme, he is properly named as a defendant because he "directly participated in establishing the scheme."

---

*of N.Y., Inc.*, 117 Misc. 2d 203, 206 (N.Y. Sup. Ct. 1982) (issuing injunction pursuant to N.Y. Exec. Law § 63(12) and noting that "[v]oluntary discontinuance of improper or illegal activity is no assurance that such activity will not be resumed").

[16] *See* Pls.' Opp. 16-20.

### C. The complaint plausibly alleges reason to believe that Vyera and Mulleady are "about to violate" the law

In addition to ongoing conduct, the complaint amply alleges reason to believe that Vyera and Mulleady are "about to violate" the law because they are likely to continue to engage in similar conduct in the future. The Second Circuit has not squarely interpreted the meaning of "is violating, or is about to violate" in Section 13(b). But it has held that the nearly identical phrase in the SEC statutes, "is engaged or [is] about to engage [in violations,]," is satisfied by a past violation combined with a "reasonable likelihood of further violation in the future." *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 98-99 (2d Cir. 1978) (Friendly, J.). In *Commonwealth Chemical*, the defendants argued that an injunction was improper because the SEC had sued them 15 months after their last violation, and they had "voluntarily terminated all connection with [the securities business] long before the injunction issued." *Id.* at 98. The Second Circuit rejected that argument, holding that "[e]xcept for the case where the SEC steps in to prevent an ongoing violation, this language seems to require a finding of 'likelihood' or 'propensity' to engage in future violations." *Id.* at 99.[17]

Here, in addition to the allegations that this anticompetitive scheme represents Vyera's ongoing business model, the complaint (ECF No. 2) alleges that Mulleady himself has a pattern of engaging in this type of conduct and is likely to reprise his anticompetitive scheme with a different drug if not enjoined. Before helping Shkreli found Vyera, Mulleady assisted him in setting up a similar scheme at Retrophin. Compl. ¶¶ 28, 44. Mulleady helped form Vyera to

---

[17] The Supreme Court later endorsed this interpretation. *See Aaron v. SEC*, 446 U.S. 680, 701 (1980) ("In cases where the [SEC] is seeking to enjoin a person '*about* to engage in any acts or practices which . . . *will* constitute a violation of [the securities laws], the Commission must establish a sufficient evidentiary predicate to show that such future violation may occur." (emphasis in original) (citing *Commonwealth Chem.*, 574 F.2d at 98-100)); *see also SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 537 (2d Cir. 1984); *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984); *SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979); *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).

repeat this strategy with Daraprim. *Id.* ¶¶ 44-45. And Mulleady is actively looking for other drugs with which to replicate this scheme again—either through Vyera or a new company. *Id.* ¶ 286. Mulleady's assertion that these allegations of a likely future violation are "wholly conclusory" (Mulleady Mem. 9) ignores the facts reflecting his pattern of participating in similar schemes across multiple companies. *See Hornbeam*, 391 F. Supp. 3d at 1223 (considering *Shire* and declining to dismiss claim where "the FTC has alleged facts about past bad behavior which includes a pattern of reoccurrence"); *Mgmt. Dynamics*, 515 F.2d at 807 (assessing reasonable likelihood of recurrence based on "the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant").[18]

Finally, to the extent *Shire* requires more than a likelihood of recurrence to establish "about to violate," it is inconsistent with the Second Circuit's interpretation of "is engaged, or is about to engage" in the SEC statutes. *See Commonwealth Chem.*, 574 F.2d at 98-99.[19] *Shire* declined to consider this contrary interpretation because it viewed the text of Section 13(b) as so clear and unambiguous that it foreclosed consideration of analogous language in other statutes. 917 F.3d at 158. But before *Shire*, 40 years of unbroken precedent had allowed the FTC to sue for injunctive relief under Section 13(b) using the same "likelihood of recurrence" standard that the Second Circuit applied in *Commonwealth Chemical*.[20] Indeed, by the time Section 13(b) was

---

[18] *See also FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 260-61 (E.D.N.Y. 1998) (listing factors, including the nature and character of past violations, the harm inflicted on consumers, and the sincerity of any assurance against future violations); *FTC v. Magui Publishers, Inc.*, Civ. No. 89-3818RSWL(GX), 1991 WL 90895, at *15 (C.D. Cal. Mar. 28, 1991) (same).

[19] At least one court has suggested that *Shire*'s statement that the FTC needed to allege more than a likelihood of recurrence was a product of the unusual factual backdrop of that case. *See Educare*, 433 F. Supp. 3d at 1016.

[20] *See, e.g.*, *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201-02 (10th Cir. 2009) (injunctive relief warranted in light of past conduct that had ended prior to FTC suit); *FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011) (permanent injunctive relief appropriate when "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future"); *FTC v. Citigroup Inc.*, 239 F. Supp. 2d 1302, 1305-06 (N.D. Ga. 2001) (denying motion to dismiss because complaint sufficiently alleged a likelihood of future violations); *FTC v. Engage-A-Car Servs., Inc.*, Civ. A No. 86-3758, 1986 WL 15066, at *1, 5 (D.N.J. Dec. 18, 1986) (denying a motion (Continued…)

enacted, it was well understood that "about to violate" and analogous phrases required only a reasonable likelihood of recurrence.[21] Based on Mulleady's extensive and intentional participation in Vyera's anticompetitive scheme, as well as his participation in other similar schemes and his active interest in reprising the conduct, the FTC plausibly alleges more than sufficient reason to believe that Mulleady's unlawful conduct is likely to recur.

### III. Plaintiffs have sufficiently alleged a claim against Mulleady for equitable monetary relief

Mulleady contends that the FTC's request for monetary relief is "impermissible because Plaintiffs do not allege that any funds from the unlawful conduct were unjustly paid to him." Mulleady Mem. 10. Mulleady specifically limits this argument to "the FTC's claims" for monetary relief and not the State Plaintiffs'. Mulleady Mem. 10-11 ("The FTC's request for monetary relief from Mr. Mulleady is also impermissible."). Regardless, the argument is both legally and factually unavailing.

First, Mulleady's argument is premature. Under Rule 54(c) of the Federal Rules of Civil Procedure, "it is the court's responsibility to award relief required by the facts on any proper ground, regardless of the theories urged by the parties." *Mass. Bonding & Ins. Co. v. New York*, 259 F.2d 33, 40 (2d Cir. 1958). Striking or otherwise foreclosing the FTC's demand for equitable monetary relief at this stage would be "futile and meaningless" because the Court retains the power and responsibility to award any appropriate relief based on the facts it ultimately finds.

---

to dismiss that asserted the "FTC has failed to allege that [either defendant] is violating or is about to violate any law enforced by the FTC" because "the facts pleaded . . would support an inference that the defendants' § 5 violations are likely to recur").

[21] In 1959, 14 years before Section 13(b) was enacted, the Second Circuit held in *SEC v. Culpepper* that the "is engaged or about to engage" language in SEC statutes includes situations where a past violation has ceased but there is "a reasonable expectation of further violations." 270 F.2d 241, 250 (2d Cir. 1959). Courts assume that "when Congress enacts statutes, it is aware of relevant judicial precedent." *Merck & Co. v Reynolds*, 559 U.S. 633, 648 (2010).

*Schwartz v. Eaton*, 264 F.2d 195, 197 (2d Cir. 1959); *see also, e.g.*, *FHFA v. WMC Mortg., LLC*, No. 13 Civ. 584 (AKH), 2013 WL 7144159, at *1 (S.D.N.Y. Dec. 17, 2013) (denying motion to strike money damages because it was "premature and should not be decided on a motion to dismiss").[22] Indeed, even if Mulleady had not received *any* unjust gains up to this point, as a shareholder and director of Phoenixus (Am. Compl. ¶¶ 41, 52-53), he may receive some between now and the remedy stage of this case.

Second, the complaint sufficiently alleges that Mulleady received an unjust gain from the unlawful conduct. Specifically, it alleges that Mulleady holds a ▮ share of Phoenixus (Am. Compl. ¶ 53), and he therefore directly benefits from Phoenixus's unjust gains. Mulleady also received unjust gains while serving as Vyera's CEO for multiple years and carrying out Shkreli's anticompetitive plans. *Id.* ¶¶ 41, 52. Mulleady's reliance on *FTC v. LeanSpa, LLC*, 920 F. Supp. 2d 270, 280 (D. Conn. 2013), is thus misplaced. There, the court simply dismissed a claim for monetary relief against an individual where there were no allegations that the individual ever financially benefited from the unlawful conduct. *Id.* ("The amended complaint does not allege that any of LeadClick's fees went to Chiang, nor does it allege that Chiang was paid for his role in the alleged deceptive scheme.").

Third, Plaintiffs are "not required to identify in [their] complaint the precise amount of disgorgement . . . sought." *SEC v. Payton*, 14 Civ. 4644, 2016 WL 3023151, at *3 (S.D.N.Y. May 16, 2016), *aff'd*, 726 F. App'x 832 (2d Cir. 2018) (collecting cases); *see also FTC v.*

---

[22] Only when it "substantially prejudices" the defendant do courts refuse otherwise appropriate relief. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 410 (1975); *see also Griffith Labs. U.S.A., Inc. v. Pomper*, 607 F. Supp. 999, 1001 (S.D.N.Y. 1985). Mulleady has not alleged any prejudice he would face from a claim for disgorgement of his unjust gains. Regardless, neither the appropriateness of an equitable remedy, nor any potential prejudice to Mulleady, can be determined on this motion to dismiss. *See, e.g.*, *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 898 (2d Cir. 1976) (noting when a "District Judge sits as an equity judge . . . it is for the court to fashion the proper remedy after all the relevant facts have been found"); *Johnson v. Hallett*, No. 14 Civ.1922 (DAB), 2015 WL 1516661, at *5 (S.D.N.Y. Mar. 31, 2015) ("[E]quitable remedies require courts to make factual determinations that may not be possible at [the pleading] stage.").

*Cephalon, Inc.*, 100 F. Supp. 3d 433, 439 (E.D. Pa. 2015). The Federal Rules require only that a complaint plausibly show "that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020). And the Court "has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996).[23]

## IV.  The Plaintiff States have properly brought their claims against Mulleady

Plaintiff States each assert both federal and state law claims. Am. Compl. ¶¶ 314-64. Mulleady challenges only New York's and Ohio's state law claims. He does not seek dismissal of: (a) New York and Ohio's federal claims; or (b) the state and federal claims of the other Plaintiff States. The motion directed to New York and Ohio is based on a misunderstanding of the complaint's allegations and a continued conflation of damages with equitable monetary relief.

### A.  New York does not assert claims on behalf of governmental entities

New York does not assert claims on behalf of any government entities, let alone "unnamed" ones. Mulleady Mem. 17. The complaint contains no such allegations. N.Y. Gen. Bus. Law § 342-b is irrelevant, as there are no claims on behalf of any "political subdivision" (such as cities, towns, and counties). Nor are there claims on behalf of a "public authority" (such as the New York State Thruway Authority or the School Construction Authority). *Id.*

---

[23] Relying on *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), Mulleady contends that the monetary relief the FTC seeks here is a "penalty" and thus unavailable in equity. Mulleady Mem. at 11 n.8. After Mulleady filed his motion, however, the Supreme Court in *Liu v. SEC* rejected this argument, holding that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible" under the SEC's statutes. No. 18-1501, 2020 WL 3405845, at *1 (U.S. June 22, 2020). Furthermore, it is clear under New York law that disgorgement is an "equitable remedy" under N.Y. Exec. Law § 63(12) and that disgorgement "does not result in any actual economic penalty." *See People v. Greenberg*, 27 N.Y.3d 490, 497 (N.Y. 2016) (citations omitted). Relatedly, Mulleady criticizes the Second Circuit's decision in *FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011), which held that the FTC can seek equitable monetary relief under Section 13(b), because the Seventh Circuit last year reached a contrary conclusion in *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019) (petition for certiorari pending). *Bronson* remains good law in the Second Circuit.

New York's claims are properly brought under the Donnelly Act and the Executive Law. N.Y. Gen. Bus. Law § 342 ("The attorney-general may bring an action . . . to restrain and prevent . . . ."); N.Y. Executive Law § 63(12) (similar language). The action is proper under federal law because it is brought "on behalf of the people of the State of New York to protect the state, its general economy, and its residents." Am. Compl. ¶ 17; *see Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 447 (1945) (recognizing that states can sue under federal antitrust laws for equitable relief for general harm to economy and welfare of citizens).

### B.    New York does not seek damages

New York does not seek damages. Indeed, none of the Plaintiffs do. *See* Am. Compl. Prayer for Relief; Order, June 30, 2020, ECF No. 172 (denying discovery because of distinction between equitable monetary relief and damages). New York is thus not seeking "damages . . . on behalf of natural persons" (Mulleady Mem. 18), and the issue is moot.[24]

### C.    New York's claim under Executive Law § 63(12) is proper

Mulleady contends that his conduct is not ongoing, and therefore New York has no claim under Exec. Law § 63(12). This is wrong, as explained in the contemporaneously filed Plaintiffs' Memorandum of Law in Opposition to Defendants Vyera Pharmaceuticals, LLC and Phoenixus AG's Motion to Dismiss. *See* Pls.' Opp. 28-29.

The complaint contains extensive allegations about Mulleady's central role in the scheme, including specific allegations from just this past year. *See, e.g.*, Am. Compl. ¶ 129 ("In August 2019, Shkreli had separate discussions with Mulleady . . . about limiting all sales of Daraprim to one bottle at a time in order to prevent a generic competitor from obtaining

---

[24] New York denies Mulleady's assertion that "The Donnelly Act . . . does not permit the NYAG to seek damages on behalf of the residents of New York." Mulleady Mem. 18. This is not correct. However, the Court need not address this issue since there is no damages claim in this case, and the issue is therefore moot.

sufficient Daraprim samples to conduct bioequivalence testing.") There is no basis to dismiss these claims at this stage, before the evidence against Mr. Mulleady is even presented at trial.

### D. Ohio does not seek monetary relief on behalf of indirect purchasers

There are no claims on behalf of any purchasers—whether direct or indirect—in this case. The argument against Ohio's state law claim is therefore a red herring. This is an enforcement action seeking an injunction and equitable monetary relief. The Ohio Attorney General has an affirmative duty to "do all things necessary" to enforce the antitrust laws, by bringing suits for "equitable relief," O.R.C. § 109.81, or "to restrain and enjoin" violations, or by seeking to have violations "enjoined or otherwise prohibited," or through "injunction or other proceedings," *id.* § 1331.11. There are no limitations on the kinds of equitable relief that Ohio may seek or that this Court can grant. *See generally* O.R.C. Chapter 1331; O.R.C. § 109.81. "Federal courts are courts in law and in equity, and a court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999); *see also FTC v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 8 (D.D.C. 1999) (confirming Ohio's right to seek an equitable remedy in an antitrust action).

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendant Kevin Mulleady's Motion to Dismiss the Amended Complaint.

Dated: July 6, 2020                    Respectfully Submitted,

                                       /s/ Markus H. Meier
                                       Markus H. Meier
                                       Bradley S. Albert

                                       Armine Black
                                       Daniel W. Butrymowicz
                                       D. Patrick Huyett
                                       Neal J. Perlman
                                       J. Maren Schmidt
                                       James H. Weingarten
                                       Federal Trade Commission
                                       600 Pennsylvania Avenue, NW
                                       Washington, DC 20580
                                       Tel: (202) 326-3748

                                       *Counsel for Plaintiff Federal Trade Commission*

Dated:  July 6, 2020

Respectfully submitted,

FOR PLAINTIFF STATE OF NEW YORK

LETITIA JAMES
Attorney General

Christopher D'Angelo
Chief Deputy Attorney General
Economic Justice Division
(pro hac vice forthcoming)

*/s/ Elinor R. Hoffmann*
Elinor R.  Hoffmann
Acting Chief, Antitrust Bureau
Elinor.Hoffmann@ag.ny.gov

Saami Zain
Saami.Zain@ag.ny.gov
Amy McFarlane
Amy.McFarlane@ag.ny.gov
Jeremy Kasha
Jeremy.Kasha@ag.ny.gov
Bryan Bloom
Bryan.Bloom@ag.ny.gov

Office of the New York Attorney General
Antitrust Bureau
28 Liberty Street, 20th Floor
New York, NY 10005
Tel: (212) 416-8262
Fax: (212) 416-6015

Attorneys for Plaintiff State of New York

Dated: July 6, 2020

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA

*/s/ Michael D. Battaglia*
Michael D. Battaglia
Deputy Attorney General

Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Telephone: (415) 510-3769
Fax: (415) 703-5480
Michael.Battaglia@doj.ca.gov

*Counsel for Plaintiff State of California*

Dated: July 6, 2020

Respectfully submitted,

FOR PLAINTIFF STATE OF ILLINOIS

*/s/ Richard S. Schultz*
Richard S. Schultz
Assistant Attorney General

Office of the Attorney General of Illinois
100 W. Randolph Street, 11th Floor
Chicago, IL 60601
Tel: (312) 814-3000
Fax: (312) 814-4902
rschultz@atg.state.il.us

*Counsel for Plaintiff State of Illinois*

Dated: July 6, 2020

Respectfully submitted,

FOR PLAINTIFF
STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ K.D. Sturgis*
K.D. Sturgis
Special Deputy Attorney General
ksturgis@ncdoj.gov

Jessica V. Sutton
Assistant Attorney General
Jsutton2@ncdoj.gov

North Carolina Dept of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC  27603
Telephone: (919) 716-6000
Fax: (919) 716-6050

Dated: July 6, 2020

Respectfully submitted,

FOR THE PLAINTIFF STATE OF OHIO
DAVE YOST, Attorney General

BETH A. FINNERTY
Assistant Section Chief

*/s/ Elizebeth M. Maag*
Elizebeth M. Maag
Associate Assistant Attorney General

Office of the Ohio Attorney General
Antitrust Section
150 E. Gay Street, 22nd Floor
Columbus, OH 43215
Telephone: 614.466.4328
beth.finnerty@ohioattorneygeneral.gov
Liz.Maag@ohioattorneygeneral.gov

Dated: July 6, 2020                     Respectfully submitted,

FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General

Tracy W. Wertz
Chief Deputy Attorney General
twertz@attorneygeneral.gov

*/s/ Joseph S. Betsko*
Joseph S. Betsko
Senior Deputy Attorney General
jbetsko@attorneygeneral.gov

Stephen Scannell
Deputy Attorney General
sscannell@attorneygeneral.gov

Pennsylvania Office of Attorney General
Antitrust Section
Strawberry Square, 14th Floor
Harrisburg, PA 17120

Attorneys for Plaintiff Commonwealth of Pennsylvania

Dated: July 6, 2020

Respectfully submitted,

FOR PLAINTIFF
COMMONWEALTH OF VIRGINIA

MARK R. HERRING
Attorney General of Virginia

Sarah Oxenham Allen
Senior Assistant Attorney General/Unit Manager
soallen@oag.state.va.us

*/s/ Tyler T. Henry*
Tyler T. Henry
Assistant Attorney General
thenry@oag.state.va.us

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2020, I have electronically filed a true and correct copy of the **Plaintiffs' Memorandum of Law in Opposition to Defendant Kevin Mulleady's Motion to Dismiss the Amended Complaint** with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

Dated: July 6, 2020

Respectfully submitted,

*/s/ Markus H. Meier*
Markus H. Meier
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: 202-326-3759
*Counsel for Plaintiff*
*Federal Trade Commission*