# Exhibit A

K9M3FTCC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FEDERAL TRADE COMMISSION, et
    al.,
4
                    Plaintiffs,            New York, N.Y.
5
              v.                           20 CV 706 (DLC)
6
    VYERA PHARMACEUTICALS, LLC, et
7   al.,

8                   Defendants.

9   ------------------------------x       Teleconference

10                                        September 22, 2020
                                          4:00 p.m.
11
    Before:
12
                          HON. DENISE COTE,
13
                                          District Judge
14

15                        APPEARANCES
16

17
    MARKUS H. MEIER
18       Attorney for Plaintiff Federal Trade Commission

19  JEREMY KASHA
         Assistant Attorney General for Plaintiff State of New York
20

21  MICHAEL BATTAGLIA
         Assistant Attorney General for Plaintiff State of
22  California

23  RICHARD S. SCHULTZ
         Assistant Attorney General for Plaintiff State of Illinois
24

25
```

K9M3FTCC

KIP STURGIS
    Attorney for Plaintiff State of North Carolina


ELIZABETH M. MAAG
    Assistant Attorney General for Plaintiff State of Ohio


JOSEPH BETSKO
    Assistant Attorney General for Plaintiff Commonwealth of
Pennsylvania


SARAH OXENHAM ALLEN
    Assistant Attorney General for Plaintiff Commonwealth of
Virginia


MORGAN, LEWIS & BOCKIUS LLP
    Attorneys for Defendants Phoenixus AG and Vyera
Pharmaceuticals LLC
BY:  STEVEN REED

DUANE MORRIS LLP
    Attorneys for Defendant Martin Shkreli
BY:  CHRISTOPHER CASEY

KANG HAGGERTY AND FETBROYT LLC
    Attorneys for Defendant Martin Shkreli
BY:  EDWARD KANG
      KANDIS KOVALSKY

KASOWITZ BENSON TORRES LLP
    Attorneys for Defendant Kevin Mulleady
BY:  KENNETH DAVID
      NICHOLAS RENDINO

K9M3FTCC

1          THE COURT:  Good afternoon, counsel.  This is Judge

2     Cote speaking.  I'll briefly take appearances.

3          For the FTC?

4          MR. MEIER:  Good afternoon, your Honor.  Markus Meier

5     on behalf of the FTC.

6          THE COURT:  And for the State of New York?

7          MR. KASHA:  Good afternoon, your Honor.  Jeremy Kasha

8     on behalf of the State of New York.

9          THE COURT:  For California?

10          MR. BATTAGLIA:  Good afternoon, your Honor.  Michael

11     Battaglia on behalf of the State of California.

12          THE COURT:  For Illinois?

13          MR. SCHULTZ:  Good afternoon.  Richard Schultz on

14     behalf of the State of Illinois.

15          THE COURT:  For North Carolina?

16          MR. STURGIS:  Kip Sturgis for North Carolina.

17          THE COURT:  For Ohio?

18          MS. MAAG:  Good afternoon.  This is Elizabeth Maag on

19     behalf of the State of Ohio.

20          THE COURT:  For Virginia?

21          MS. OXENHAM ALLEN:  Hi, your Honor.  This is Sarah

22     Oxenham Allen for the Commonwealth of Virginia.

23          THE COURT:  Is there any other counsel representing a

24     plaintiff?

25          MR. BETSKO:  Joseph Betsko from the Commonwealth of

K9M3FTCC

1    Pennsylvania.

2              THE COURT:  Would you spell your last name for the

3    reporter.

4              MR. BETSKO:  B-E-T-S-K-O.

5              THE COURT:  Thank you so much.  And for the

6    defendants.  Mr. Reed, is it Phoenixus?

7              MR. REED:  Yes, it is.  Steve Reed on behalf of the

8    two corporate defendants, Phoenixus and Vyera.

9              THE COURT:  Thank you very much.  And for Mr. Shkreli?

10             MR. CASEY:  Good afternoon.  Chris Casey from the

11   Duane Morris law firm on behalf of Mr. Shkreli.  I also have

12   colleagues from the Kang Haggerty firm on the phone as well.

13             MS. KOVALSKY:  This is Kandis Kovalsky and I'm here

14   with Edward Kang as well.

15             THE COURT:  Thank you so much.  And is there anyone

16   else representing Mr. Shkreli who wishes to put their

17   appearance on the record?  Fine.

18             Mr. Mulleady?

19             MR. DAVID:  This is Kenneth David from Kasowitz Benson

20   Torres, and on the phone is my colleague Nicholas Rendino.

21             THE COURT:  Thank you so much, counsel, and thank you

22   for making yourselves available on such short notice.  I feel

23   we've made some progress, though it might not feel like that to

24   you.  I know it's been a lot of correspondence in the last two

25   weeks or so.

K9M3FTCC

1          Let me deal first with the sealing issues.  Thank you

2     so much for identifying with brief statements why you believe

3     certain materials should be redacted or filed under seal.

4     That's of enormous assistance to me so that I can either

5     consider and accept or consider and reject your reason.  So

6     you've simplified my work, and I thank you for that.

7          There is one more thing that I'd ask you to do if you

8     could.  And that is, when you're filing your redacted letter or

9     other document on ECF, and providing me with an unredacted

10    version, please highlight if you could the redacted passages so

11    it's easy for me to find those without having to compare the

12    two documents, the unredacted with the filed redacted copy.

13    And the FTC has been doing that, but I'd ask counsel from Duane

14    Morris, please, if you could also make an effort to highlight

15    the passages that you've redacted in the publicly filed

16    document.  Thank you so much.

17          MR. CASEY:  Yes, your Honor.  This is Chris Casey.  We

18    apologize for that, and we'll certainly do that going forward.

19          THE COURT:  Thank you.  I appreciate it.

20          So let's get to the substance of the issue.  As

21    counsel have acknowledged in your letters to me, I have not

22    ruled that any of the material in the FTC's or plaintiff's

23    possession that it received from the Bureau of Prisons pursuant

24    to a subpoena is in fact privileged.  And I cited today in an

25    order of course the Second Circuit decision that counsel are

K9M3FTCC

familiar with indicating that this material is not privileged.

Nonetheless, I exercised my discretion to hold back the plaintiffs from reviewing all of the material captured pursuant to that subpoena served on the Bureau of Prisons.  And it has been of great assistance to me to review the document that defendant Shkreli filed, I believe it is a September 14 document filed under seal that lists in that document eight different categories of attorneys or groups of counsel for which at that time identified matters on which those different individuals and groups of lawyers were working.

As a result of that disclosure, the FTC on September 17 revised its request and focused on two categories: I, which lists Ms. Kovalsky, and the Kang Haggerty firm, with respect to many different items of representation.  I think there are 23 listed in all.  And then in the third category, there is a representation by an attorney Scott Vernick as part of the Fox Rothschild law firm's representation of Mr. Shkreli, and in connection with that disclosure, there are 10 different matters listed.

In its September 17 letter, FTC is explaining why it believes these two categories are the two categories of documents it wishes to see, and the defendant has responded on September 18.

So, I don't have a resolution here, and therefore, I wanted to talk with counsel.  But here is my view, generally:

K9M3FTCC

1    None of this is privileged, and therefore, the FTC has the

2    right under the law to look at all of this.  We're now down to

3    looking at two of the eight groups of materials, and it seems

4    to me that the burden should not be on the FTC to spend more

5    time trying to identify, you know, reasons for looking at

6    material it has a total right to review.  So the burden is on

7    Mr. Shkreli if he feels there is any particular reason to hold

8    back the material captured within category I or category III,

9    and I want to give him an opportunity to make that showing to

10   me.

11          It's not going to be based on a privilege argument.

12   This material is not privileged.  And it seems to me we're down

13   to generally talking about relevance and generally talking

14   about advice or communications that concern, in one way or

15   another, the events described in the complaint in this case.

16   And if there is material that is not connected to the events

17   described in the complaint, then I'm willing to consider a

18   showing by the defendant that that material should not be

19   reviewed by the FTC.

20          I have another concern here, and that is that we've

21   already spent several weeks -- and I know the parties have

22   spent several months -- talking about these issues.  And I

23   think any showing has to be made to me fairly quickly, and I

24   don't know what volume of material is involved here, but with

25   respect to the first category, it seems that communications

K9M3FTCC

1    span several years and the volume could be high, and the task

2    of trying to pull out what the defendant believes should not be

3    reviewed by the FTC could be a very burdensome task.

4           So with those observations, Mr. Casey, do you want to

5    be heard?

6           MR. CASEY:  Yes, your Honor.  Thank you, if I may.

7    Your Honor, I would like, if the Court would permit me, to just

8    take a step back and to talk about the practicalities of

9    representing an inmate like Mr. Shkreli who is in federal

10   prison and the hurdles we've encountered.  And the reason I

11   raise that, your Honor, is not to bypass the issues you've

12   raised, which I think we agree on the issues on the table.  But

13   if we decide, if the Court decides that there are certain

14   matters that are certainly not relevant, our position on that

15   would be that they should not be in discovery, and there

16   shouldn't be any reason for the plaintiffs to have access to

17   those.  That's the first part.

18          But the second part is for those items in discovery,

19   the communications that you have already said are not

20   connected, or are connected to the events in this case, it's

21   those communications that we are the most concerned about

22   because we effectively do not have representation of

23   Mr. Shkreli in the way that representing a client outside of

24   prison would have.

25          As all of the people on the call have at least on our

K9M3FTCC

1   side have experienced this.  You have essentially unlimited

2   access to your client.  In this case, your Honor, there are

3   three modes of communicating with Mr. Shkreli that are

4   unmonitored by the BOP, all of them are impractical.  If I may

5   go through those for just a minute.  I don't want to take a lot

6   of time.

7          You can do a prison visit.  Well, since COVID-19 has

8   started, they stopped prison visits.  So we've had no visits

9   with Mr. Shkreli.  In fact, I've not met Mr. Shkreli.  Prior to

10  COVID, there was a norovirus outbreak at Allenwood, which

11  stopped visits going back to January.  That is just out.  We

12  can't do that.  Second is unmonitored phone calls.  These are

13  calls that counsel can arrange with the prison in advance,

14  they're done on a very infrequent basis, and usually, always

15  you have to have a good reason for the call.  And they're

16  limited in time.  I've had 15-minute calls with him, I've had

17  30-minute calls, and you have a list of things you race through

18  and then you're done.  You're done for a couple of weeks,

19  frankly, so it is just not effectively.  The third is legal

20  mail.  The old fashioned U.S. Postal Service mail.  I think

21  everyone would agree, in a fast-paced litigation, that is

22  simply impractical.

23         What happens is inmates communicate with their

24  attorneys on TRULINCS.  The attorneys try to limit the extent

25  they are revealing confidences and confidential subjects on the

K9M3FTCC

1    call.  But as a practical matter, under Rule 1.4 of the model

2    rules of professional responsibility, we are obliged to get our

3    client's consent on matters that are pending.  So, we feel a

4    heavy obligation to communicate with him.

5         So these are the obstacles we're up against, as is

6    every other counsel representing inmates in these prisons.  And

7    that's why, since the *Mejia* case in 2011, there has been a

8    widespread outcry to change the BOP system.  In fact, there is

9    a bill that's passed the Congress that will do just that.  It

10   will make all these attorney-client communications privileged.

11        I respect the Court's ruling on that.  I am not going

12   to go back to it.  But I think it is important to understand

13   what practically is going on here.  Because, particularly with

14   the COVID-19 pandemic, we effectively don't have access to

15   Mr. Shkreli as we would normally.  So I think that's a very

16   important consideration for the Court.  Because if we get to a

17   place where -- and I want to be practical about this -- where

18   we've narrowed it down to just those communications that are

19   connected to the events in this case, the plans and defenses,

20   those are the very communications that are protected by the

21   privilege.  It is effectively eroded because of the reasons I

22   mentioned.  I wanted to make that statement at the outset.  And

23   I appreciate the Court's indulgence on that.

24        But I do agree that relevance is a key issue here.

25   And we have tried to push back, if you will, on plaintiffs on

the relevance issue from the very beginning of this dispute way

back in June.  When we saw in the production 20,700

communications that Mr. Shkreli has made from prison, not only

with his attorney, but with his family and friends and e-mails

of a personal nature, that clearly to us didn't seem relevant

and didn't belong in the case.

        We've tried to engage with the plaintiffs on that for

a long time, and I agree we have made progress.  I do

appreciate the Court's assistance in that regard.

        But I would say this:  The plaintiffs have conceded

that there are various matters that other attorneys, other than

Ms. Kovalsky and Mr. Vernick, have worked on that are simply

not relevant to this case, and I agree with that of course.  I

also think similarly they should agree and concede that many of

the matters on which Kang Haggerty was engaged with Mr. Shkreli

are simply not relevant, and I'm happy to provide more detail

on that.

        I would say generally, your Honor, items 1 and 2 of

category I would be the category that may potentially have

relevant communications.  And just another point the Court

should understand.  We, the Duane Morris firm and Kang Haggerty

got involved in late December of 2019.  Prior to that time, he

had no awareness that he was even a subject of this

investigation.  And we frankly scrambled to get together a

presentation to the commission in January.  And then the

K9M3FTCC

1    complaint was filed in late January.

2           The communications they're asking for go to

3    February 12.  That's the communications they've asked for to

4    date.  Those are the very communications about when we were

5    just getting engaged in the case.  I would venture to guess,

6    your Honor, there are e-mail communications in that production

7    that would relate to the matters, that relate to the client and

8    defense, so we're concerned about the disclosure of those.

9           We're also concerned about ongoing sort of realtime

10   disclosures to our adversary, as I think you can appreciate.

11          But just getting back to that.  The first two matters

12   are ones we would say may potentially have relevant

13   communications, but I would say it would be limited in the

14   sense that some of it is not relevant.  But then if you go to

15   number 3 through 15, and then 18 to 23, all of those are

16   irrelevant and do not deal with matters that would be connected

17   to the events in this case.

18          I just pause for just a minute on item 16 and 17.

19   These are the items they've asked for in their letter.  16 is

20   direction and preparation of trust agreement for Mr. Shkreli.

21   On that item, plaintiffs have asked for communications relating

22   to that because they believed or had a theory that Mr. Shkreli

23   may have been setting up a trust to hide assets to prevent the

24   plaintiffs from getting access to his assets.  They made that

25   representation in the letter to the Court.  As we explain in

K9M3FTCC

our reply letter, that's not the case at all.  It was a voting

trust agreement that he was negotiating with Vyera on.  It had

nothing to do with this case.  So those communications would

not be relevant.

         Number 17, providing legal advice and shareholder

rights to Mr. Shkreli.  Again in our letter we explained that a

dispute arose regarding indemnification of fees.  There was

some discussion about Mr. Powers' role in that, and that's

where that advice came in.  I would say some of that may be

relevant.  I don't know, frankly.  But, this is just the kind

of advice that lawyers perform all the time for clients.

         It is not, as plaintiffs have claimed, business

advice.  Ms. Kovalsky is a lawyer.  She's not a business

advisor.  She advises on the law.  And that argument that they

made I think was rebutted effectively and shouldn't be

considered any longer to the Court.

         If they're after business communications as to

Mr. Vernick's communications, I will be candid with the Court

and tell the Court that I'm not as familiar with Mr. Vernick's

representation of Mr. Shkreli.  I'm happy to get more

information about that.  But looking at some of the matters,

just looking at the case caption, it appears that many of those

are just litigations that have nothing to do with this case.

         I'd also say, your Honor, there are a number of

attorneys here, Mr. Brafman's law firm and others, that have

K9M3FTCC

1   matters that the plaintiffs have said they are not interested

2   in.  Some of those overlap with the matters listed in item 1.

3   So, they waived that.  They can't go back now and try to get

4   Ms. Kovalsky's communications relating to those matters that

5   they say they are not interested in.

6           So that's our position on the relevance, your Honor.

7   I don't think they've made their case that they are entitled.

8   And in terms of the *Mejia* case, we understand that the Court

9   has ruled on that.  I would just say that the case was in 2011,

10  there have been developments in this, again, getting back to

11  the practicality of this, in this area that has made that case

12  difficult to apply, particularly in the face of the pandemic.

13  I'd ask the Court to consider that.

14          THE COURT:  Well, Mr. Casey, I'm quite familiar with

15  the difficulties that the pandemic has posed to incarcerated

16  defendants.  It is a big part of my docket, as it is as every

17  federal judge's docket.  And of course, the FTC is not seeking

18  the communications from your law firm who is representing the

19  defendant in this lawsuit.  And if we had a carve-out from

20  March 2020 forward, of course, that would take into account the

21  impact of the pandemic on the prison system and prisoners in

22  the system.

23          There may be other issues with respect to the

24  individual facility in which the defendant was incarcerated in

25  the period before March of this year.  But, the pandemic issue

K9M3FTCC

1  and the impact that it's had on the ability of inmates to

2  communicate effectively with counsel is really cabined in time.

3        So, before I hear from counsel for the FTC, Mr. Casey,

4  I don't know what the volume is of the communications with

5  Ms. Kovalsky and Mr. Vernick in were in categories I and III on

6  the chart.  Do you have any idea?

7        MR. CASEY:  The volume, your Honor?

8        THE COURT:  Yes.

9        MR. CASEY:  I do not, your Honor.  I can check on that

10  and get back to the Court, unless one of my colleagues from

11  Kang Haggerty is more familiar with that.

12        THE COURT:  Okay.  Let me hear from --

13        MR. CASEY:  Your Honor, if I may, just I apologize for

14  interrupting but just briefly.  You mentioned that they are not

15  seeking e-mails from the Duane Morris law firm.  In fact there

16  are no such e-mails.  We have not been on the TRULINCS system.

17  I can tell you it's difficult to get on the system, and we've

18  been trying.  But, I just wanted to make that point for the

19  record.  Thank you.

20        THE COURT:  Okay.  You are listed as category 7.  That

21  is the law firm.

22        MR. CASEY:  There should be a note that we have not

23  had any communications to date.  If you look at footnote 11,

24  your Honor, page 7.

25        THE COURT:  Yes.  Okay.

1          MR. CASEY:  Thank you.

2          THE COURT:  Let me give the FTC a chance to respond.

3          MR. MEIER:  Thank you, your Honor.  Markus Meier on

4     behalf of the FTC.

5          I'd like to start just by setting just a little bit of

6     context and then I'll get right to the heart of the issue.  As

7     your Honor has heard from the defendant throughout this

8     litigation, the FTC did a multiyear pre-complaint

9     investigation, and the vast, vast majority of the Bureau of

10    Prisons materials that we collected were collected

11    pre-complaint, before we ever even filed the complaint.

12         So with respect to Mr. Casey's hardship argument, I

13    think, frankly, and I hesitate to say this, but I think they

14    are a little bit of a red herring, and here's why.  The FTC

15    committed at the outset of these issues with Mr. Casey, and we

16    did this in writing, we did it numerous times, that we would

17    not seek any Bureau of Prisons materials going forward, and

18    that was in recognition of COVID issues.  But all of the

19    materials we collected are pre-March 2020, thus pre-COVID.

20         And I note, and it was interesting, despite all of the

21    back and forth we've had to date, Mr. Shkreli's counsel have

22    not made any showing of any type of particularized hardship in

23    the pre-COVID period of communicating with his lawyers, and in

24    fact, Mr. Casey's on record right now saying that the Duane

25    Morris firm apparently hasn't been prohibited from having

K9M3FTCC

confidential communications since the pre-COVID period.  So,

that's a starting point for us.

But, let me talk a little bit about the relevance

issue.  Because Mr. Casey has spent a lot of time talking to us

about that, and he's raised it in some of the briefing before

your Honor.  Again, the issue for us was the FTC conducted a

pre-complaint investigation, and of course, government

investigations aren't governed by the federal rules of evidence

or federal rules of civil procedure and the scope is broader.

In FTC cases it is determined by the commission's process

resolution that attaches to all subpoenas that are sent,

investigative subpoenas and investigative demands.  So, and

that makes sense because at that point we're trying to figure

out whether the law's been violated, if so, which laws, and if

so, who was involved.  And if so, what to do about it.

But even under the federal rules of civil procedure,

discovery is broader than this narrow concept of relevance that

I've heard Mr. Casey make reference to numerous times in our

conversations, and I think that's what he's talking about with

your Honor, too.  A sort of a relevance standard that we

wouldn't expect to have discussions about until we get to the

point where we're preparing exhibit lists and making excerpts

of depositions and the kinds of things that are done pretrial,

but of course discovery is broader than that.

And moreover, as your Honor is very familiar, parties

K9M3FTCC

1    and third parties often produce materials in response to

2    discovery requests that aren't "relevant" in some narrow

3    evidentiary sense.  It happens all the time.  And we'll deal

4    with the relevance issues -- in our view we should deal with

5    the relevance issues at the relevant time, which is pretrial.

6            What we have shown, your Honor, and what we believe to

7    be the case, is that there are communications in those

8    materials that clearly talk about business matters, and some of

9    them do involve communications with attorneys.  And we've

10   specifically limited ourselves at this point to those involving

11   Ms. Kovalsky and Mr. Vernick.

12           I understand Mr. Casey is not that familiar with some

13   of the materials with Mr. Vernick, but just to give a little

14   bit of background about him.  He was a lawyer that was

15   originally hired by Mr. Shkreli for business matters.  He later

16   became effectively Vyera's corporate counsel, essentially their

17   general counsel, the outside lawyer before the corporate

18   entities got a general counsel.  He was involved in Vyera's

19   business decision-making activity, including much of the

20   conduct that was alleged in the complaint.  And that's why

21   we're looking for materials from him.  Ms. Kovalsky, as best we

22   can tell, has also been involved in business discussions and

23   decisions.  And sometimes, we know from e-mails that we have

24   seen that we have been able to look at, that Mr. Shkreli

25   sometimes uses lawyers as conduits and as a connection back to

1    the non-prison world, to have discussions about business

2    matters and to continue to have discussions on his behalf, sort

3    of his messengers, if you will, or go-betweens on business

4    issues.

5          So, I think within the spirit of what the federal

6    rules of civil procedure require for this conduct that's

7    relevant in discovery, that there are likely to be many

8    relevant documents within those materials.  What ultimately

9    becomes relevant for purposes of trial might be something much

10   narrower.  It always is.  But at this point we don't think we

11   should be hamstrung by the defendant's choices as to what is

12   and isn't relevant to us.

13         That's all I have to say, your Honor.  Thank you.

14         THE COURT:  Okay.  Mr. Meier, do you have a sense of

15   the volume of material in categories I and III of the

16   communications with Ms. Kovalsky and Mr. Vernick?

17         MR. MEIER:  Your Honor, I do not.  But I do, I know a

18   couple of my colleagues are on the line who did not make a

19   notice of appearance, and one in particular, I can call on him

20   right now and see if he happens to know that because he is very

21   close to these issues, if your Honor would like.

22         THE COURT:  Certainly.

23         MR. MEIER:  Okay.  Neil Perlman.

24         Mr. Perlman, do you happen to know roughly what the

25   volume of those materials are?

K9M3FTCC

1          MR. PERLMAN:  Good afternoon, your Honor.  This is

2     Neil Perlman.  We don't have an exact count, because as your

3     Honor knows, we've redacted a number of these materials in

4     response to the August 20 order.  But, I believe these

5     redactions span a large number of files across I believe 28

6     different sets of e-mail exchanges.  And each one of those

7     documents does not just contain one e-mail, but instead it

8     contains a large number of chains.  So while we aren't able to

9     give you an exact number, we know it is a large volume, and

10    moreover, we don't really have an ability to sort of segregate

11    by subject matter or the topic of representation by the

12    counsel.  They're all in one document, as it were.

13          THE COURT:  So you can sort -- if I understand this

14    correctly -- by recipient or sender, so you're able to identify

15    those communications that would be between Mr. Shkreli and

16    Ms. Kovalsky and Mr. Vernick.  Am I right?

17          MR. PERLMAN:  Your Honor, we're able to figure out

18    which e-mails were between Mr. Shkreli and Ms. Kovalsky or

19    Mr. Shkreli and Mr. Vernick.  We aren't able to sort in the way

20    that one often thinks of in terms of using metadata, because

21    these documents were produced to us by the Bureau of Prisons in

22    PDF form.  So we have to manually search each one of them for

23    the relevant recipients or senders.

24          THE COURT:  Thank you.  So, I know counsel are busy

25    working on a variety of issues concerning this litigation.  But

1    I'm going to ask you, Mr. Meier and Mr. Casey, to have one more

2    conversation today or tomorrow, if possible.  What I'm

3    envisioning is an agreement that would allow the FTC to review

4    the materials captured by items I and III, unless the defendant

5    was able to identify a particular reason that that review

6    should not take place, and the timetable to permit the

7    defendants an opportunity to identify specific communications

8    that would fall within that category.

9         So, it's not a privilege log, and of course I don't

10   want to mislead anyone by suggesting that I'm using the term

11   "relevance" in a way that would be the 401 standard under the

12   federal rules of evidence.  And I need a discussion from you

13   about timetable.  And if you're not able to reach an agreement

14   on the method that would give Mr. Shkreli one last opportunity

15   to sort of hold back particular items from categories I and

16   III, which it believes are either totally irrelevant from his

17   point of view and/or prejudicial for FTC to review, and I'll

18   just have to think about this further myself, and decide

19   whether wholesale review of those categories of documents

20   should go forward.

21        Obviously you can talk about a date cutoff.  It sounds

22   like there isn't anything captured in these categories from the

23   COVID era.  But it sounds like there won't be any difficulty in

24   agreeing that there should be a cutoff date so that COVID-era

25   communications are off limits.

1          Before we end this conversation, Mr. Casey, did you

2     have any comment or question?

3          MR. CASEY:  Well, just, your Honor, briefly on that

4     note on the COVID issue.  Some of these communications are from

5     January and February up to March 12.  When you use that term

6     COVID era, do you have a sense of any particular date, because

7     I know there are communications that predate March 12.

8          THE COURT:  I don't have at my fingertips the date in

9     which the Bureau of Prisons essentially shut down operations.

10    I believe it was in March, but that date is knowable.

11         MR. CASEY:  Okay.  Thank you for that.  Your Honor,

12    the other thing I was going to mention as a potential way to

13    cut through this, plaintiffs have offered, or the plaintiffs

14    have said in their letters that what they're really interested

15    in is items 16 and 17.  And those are items that we would be

16    willing to provide those documents to them.  As said, and I

17    don't think they are relevant, but if they want them, I think

18    we're willing to let them have them.  And as I said before, I

19    do think that with the exception of numbers 1 and 2, all of the

20    others are simply not relevant.  That's just something that I

21    would propose as a compromise.

22         THE COURT:  I appreciate you thinking along those

23    lines, and I'll let you discuss that with the FTC.

24         Mr. Meier, is there any comment or question you had

25    before we end this call?

1          MR. MEIER:  Yes, your Honor.  Thank you.  I was trying

2     to write down your Honor's general instructions.  And one

3     statement your Honor made caught my attention, because I could

4     see how this could become a difficulty when we have these

5     discussions with Mr. Casey and his colleagues.

6          Your Honor talked about something being totally

7     irrelevant or prejudicial, and did your Honor mean unfairly

8     prejudicial as opposed to simply prejudicial?  Because clearly,

9     anything in those documents that might be useful to the FTC

10    will be prejudicial to Mr. Shkreli.  But I am assuming the

11    Court meant unfairly prejudicial in the rule of evidence sense,

12    and not just merely prejudicial.

13         THE COURT:  Yes.  Not probative of liability but

14    something so personal or confidential that it is unrelated to

15    this case.  Really, I don't think the distinction is unfair

16    prejudice, because things that can be unfairly prejudicial for

17    a jury would be highly relevant in terms of the discovery

18    process.  So I think we're not talking in that category at all.

19    But certainly anything that involves Mr. Shkreli's health or

20    family issues or personal issues unrelated to his business, I

21    don't think the FTC is asking to see any of that or needs to

22    see any of that.  So I'll let counsel have further discussions

23    and hope to hear from you tomorrow or the next day at the

24    latest, and hope that you are able to find a way forward here.

25    Thank you so much.

K9M3FTCC

1           MR. CASEY:   Thank you, your Honor.

2           MR. MEIER:   Thank you, your Honor.

3           (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25