**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA,<br>                              Plaintiffs,<br>        v.<br>VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former officer of Vyera Pharmaceuticals, LLC and Phoenixus AG (formerly known as Turing Pharmaceuticals, LLC and Turing Pharmaceuticals AG); and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC<br>                              Defendants. | Case No. 1:20-cv-00706-DLC |

**DEFENDANT MARTIN SHKRELI'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

I.    PROPOSED FINDINGS OF FACT ...................................................................1

    A.    Founding of Vyera and Phoenixus................................................. 1

          1.    The Price Increase and R&D ..................................................... 2

    B.    Vyera's Sourcing of API.................................................................. 3

    C.    Vyera's Distribution of Daraprim .................................................... 5

    D.    Generic Competition........................................................................ 5

    E.    Mr. Shkreli's Involvement in Vyera After February 2016 ..................... 7

II.    CONCLUSIONS OF LAW ..........................................................................9

    A.    There Can Be No Section 2 Liability Against Mr. Shkreli..................... 9

    B.    There Can Be No Section 1 Liability Against Mr. Shkreli................... 11

    C.    Mr. Shkreli Cannot Be Derivatively Liable for Vyera's Conduct ........... 12

    D.    Any Injunctive Relief Ordered Against Mr. Shkreli Must Be Narrowly Tailored; It May Not Unduly Harm Or Penalize Him ........................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appraisers Coal. v. Appraisal Inst.*, 845 F. Supp. 592 (N.D. Ill. 1994) .........................11

*Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 256 F. Supp. 2d 249 (D.N.J. 2003) ....................10

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)............................14

*Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394 (S.D.N.Y. 2008)
(Jones, J.) ..........................................................................................................10

*In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671 (S.D.N.Y. May 15, 2012)
(Cote, J.)............................................................................................................12

*ES Dev., Inc. v. RWM Enterprises, Inc.*, 939 F.2d 547 (8th Cir. 1991) .........................11

*F.T.C. v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1296 (D. Minn. 1985)), *aff'd*, 743
F.3d 886 (4th Cir. 2014) .....................................................................................17

*F.T.C. v. Ross*, 897 F. Supp. 2d 369 (D. Md. 2012) ...............................................17-18

*Federal Trade Comm'n v. Facebook, Inc.*, No. 20-3590, 2021 WL 2643627
(D.D.C. June 28, 2021)........................................................................................16

*FTC v. Abbvie Inc.*, 976 F.3d 327 (3d Cir. 2020) ...................................................15

*FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001)
(Kaplan, J.)........................................................................................................13

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ...........................................15

*FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283 (S.D.N.Y. 2008)
(Holwell, J.) ......................................................................................................13

*Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 408
F. Supp. 1251 (S.D.N.Y. 1976) (Pierce, J.) ...........................................................13

*Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945)...................................13-15

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951).....................................13-15

*Mahmud v. Kaufmann*, 496 F. Supp. 2d 266 (S.D.N.Y. 2007) (Conner, J.)..................14

*In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209 (E.D.N.Y. 1996) .................11

*Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172 (2d Cir. 2001)...........................................................................................17

*Murphy Tugboat Co. v. Shipowners Merchs. Towboat Co.,* 467 F. Supp. 841 (N.D. Cal. 1979)...................................................................................................12, 15

*Mylan Pharm. v. Celgene Corp.*, CV 14-2094 ES, 2014 WL 12810322 (D.N.J. Dec. 23, 2014).........................................................................................................12

*Naso v. Park*, 850 F. Supp. 264 (S.D.N.Y. 1994) (Conner, J.)........................................11

*Pascarella v. Sandals Resort Int'l, Ltd.*, No. 19-cv-2543, 2020 WL 1048943 (S.D.N.Y. Mar. 4, 2020) (Torres, J.)..............................................................13

*Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244 (2d Cir. 1972)............................17

*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 15 Civ. 211, 2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021) (Schofield, J.)....................................... 17-18

*United States v. W. T. Grant Co.,* 345 U.S. 629 (1953)..................................................15

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2019 WL 130535 (E.D. Pa. Jan. 8, 2019) ........................................................................10

*Yamaha Motor Co. v. Fed. Trade Com.*, 657 F.2d 971 (8th Cir. 1981)........................18

**Statutes**

15 U.S.C. § 1 ............................................................................................... 11-12, 14

15 U.S.C.  § 2 .................................................................................................9-11, 14

15 U.S.C. § 53(b) ...............................................................................................15

**Other Authorities**

Fed. R. Civ. P. 65...............................................................................................17

Defendant Martin Shkreli respectfully submits the following proposed findings of fact and conclusions of law with respect to the trial of this action.

## I.   PROPOSED FINDINGS OF FACT

### A.   Founding of Vyera and Phoenixus

1.      Martin Shkreli has always had a passion for finding cures for rare diseases, and spent years after college studying drug trials, chemistry, and biopharmaceutical stocks.  Written Direct Testimony of Martin Shkreli ("Shkreli Decl.") ¶ 9.

2.      In September 2014, after several years at Retrophin, a company he founded in 2010 that focused on rare diseases such as Duchenne Muscular Dystrophy (DMD) and pantothenate kinase-associated neurodegeneration (PKAN), Mr. Shkreli co-founded Vyera and Phoenixus.[1]  *Id.* ¶¶ 9-11; 15.

3.      He personally invested approximately $18 million into Vyera.  *Id.* ¶ 15.

4.      From the date of Vyera's and Phoenixus' founding until December of 2015, Mr. Shkreli was the CEO of Vyera and, until January 2016, he served as a Director and Chairman of the Board of Phoenixus AG.  *Id.* ¶ 72.

5.      Mr. Shkreli never received a salary or any form of compensation from either company.  *Id.* ¶ 17.

6.      Early on, Mr. Shkreli advised the Phoenixus Board of Directors that while he had been acting as Vyera's CEO, it was not a role that he planned or wanted to fill much longer, and urged the company to identify and hire a new CEO with greater pharmaceutical industry experience than he had.  *Id.* ¶ 18.

---

[1] Turing Pharmaceuticals LLC and Vyera Pharmaceuticals LLC will be referred to herein as "Vyera." Turing Pharmaceuticals AG and Phoenixus AG will be referred to as "Phoenixus."

7.     Mr. Shkreli recruited well-credentialed and experienced scientists at Vyera to conduct research and development ("R&D"), including Vyera's head of R&D, Eliseo Salinas, M.D, former head of global R&D for Shire Pharmaceuticals; Dr. Adam Brockman, a parasitologist with two decades of experience in the biopharmaceutical industry; Dr. Matthew Welsch, a medicinal chemist; Dr. Steven Thomas, also a medicinal chemist and currently Chief Scientific Officer for ValenzaBio; and Dr. Wendy Cousin, currently the lead scientist at Spring Discovery. *Id.* ¶ 19.

8.     Mr. Shkreli and his co-founders envisioned that Vyera would, among other things, acquire established pharmaceuticals that treat rare diseases but were largely ignored and neglected by the larger pharmaceutical companies. *Id.* ¶¶ 21-24.

9.     One of these drugs was Daraprim, which Vyera acquired from CorePharma in August of 2015. *Id.* ¶ 32. Mr. Shkreli believed that Vyera could develop a better version of Daraprim with less severe side effects, while at the same time providing shareholder value. *Id.* ¶ 30.

### 1.     The Price Increase and R&D

10.     After Vyera purchased Daraprim, it increased its price from $17.50 to $750 per pill. Mr. Shkreli authorized the price increase because he believed that Daraprim was significantly underpriced relative to other lifesaving medications such as drugs that treat hepatitis C (*e.g.*, Sovaldi and Harvoni), and HIV drugs. *Id.* ¶ 33.

11.     Mr. Shkreli also believed that the price increase would allow Turing to invest in R&D to create a new and better version of Daraprim. *Id.* ¶ 34. Mr. Shkreli's vision was to make a combination pill containing both Daraprim and leucovorin. *Id*.

12.     Mr. Shkreli believed that if Vyera were going to increase the price of the drug, it had an obligation to the patient community to invest the revenues from the price increase into research and development.  *Id.* ¶ 35.

13.     Mr. Shkreli urged the company to invest revenues from the price increase into new drug development, including either a drug with an entirely new chemical composition, effective against toxoplasmosis, or a combination pill combining Daraprim and leucovorin.  *Id.* ¶ 36.

### B.     Vyera's Sourcing of API

14.     API supply is an area where Mr. Shkreli and the other founders of Vyera believed that Vyera could outperform Daraprim's prior owners.  *Id.* ¶ 46.  Mr. Shkreli and his co-founders believed that the larger pharmaceutical companies such as CorePharma, which have hundreds of drugs, tend not to pay attention to details for certain drugs, such as ensuring API supply through a secondary supplier.  *Id.*  For Vyera, which depended on Daraprim sales to generate revenue, having a back-up supplier was important to ensure both that it could continue to offer and make sales of Daraprim and that there would be no interruption in the supply of Daraprim to the patients who depend upon it.  *Id.*; Pelliccione Written Direct ¶ 26; Written Direct Testimony of Kevin Mulleady (the "Mulleady Decl.") ¶ 42; Salinas Dep. Tr. at 158:23-160:5.

15.     While Mr. Shkreli served as CEO of Vyera, he asked Vyera's manufacturing team to look into contracting with not only a primary API supplier, but also a secondary supplier. Shkreli Decl. ¶ 47.  However, that process was not completed by the time he left the company in December 2015.  *Id.* ¶ 48.

16.     Prior to Mr. Shkreli's resignation from Vera, Vyera had had discussions with an Indian company, Neuland Laboratories, about supplying Vyera with pyrimethamine. *Id.*  However, those discussions did not progress very far.  *Id.*

3

17.     In addition, Vyera's head of manufacturing, Dr. Hasmukh Patel, approached a second company, Ipca Laboratories, about supplying API in the United States, during the time that Mr. Shkreli was CEO.  *Id.*  However, those efforts were ultimately unsuccessful, as Dr. Patel left the company in November or December of 2015.  *Id.*

18.      After Mr. Shkreli resigned from Vyera, he learned that it had signed a supply contract with a Japanese company called Fukuzyu.  *Id.* ¶ 43.

19.     Mr. Shkreli did not negotiate or sign, and is not familiar with any of the terms of, Vyera's contract with Fukuzyu. *Id.*

20.     Two years later, in 2017, when Mr. Shkreli was no longer an employee of Vyera or director of Phoenixus, he became aware of another potential API manufacturer of pyrimethamine, an Indian company named ████.  *Id.* ¶¶ 49-50.

21.     Around that same time, Mr. Shkreli fortuitously learned in conversations with either Mr. Mulleady or Vyera employee Akeel Mithani that Vyera was already engaged in discussions with ████.  *Id.* ¶ 51.

22.     Mr. Shkreli informed Mr. Mulleady of what he had learned, namely that ████ was working towards the manufacture of pyrimethamine.  *Id.* ¶ 52.

23.     Mr. Shkreli did not know whether Mr. Mulleady and Mr. Mithani already knew that ████ was working towards the manufacture of pyrimethamine, but thought it was important to inform Vyera management of this fact because he thought that it could mean that entry of a generic alternative to Daraprim was imminent, which would have a significant effect on his investment in the company.  *Id.* ¶¶ 53-54.  As a shareholder, Mr. Shkreli also thought it important to convey this information so that Vyera management could project when that entry might occur and make

whatever decisions they thought appropriate to prepare for it--such as reducing the sales force. *Id.* ¶ 54.

24.    Mr. Shkreli also recognized that ▆▆▆▆ represented a potential secondary or back-up source of pyrimethamine for Vyera, and that ▆▆▆▆ could be a potential partner with Vyera in creating a combined drug containing pyrimethamine and leucovorin. *Id.* ¶ 55.

25.    Mr. Shkreli does not know what, if anything, Mr. Mulleady did with the information he provided him about ▆▆▆▆. *Id.* ¶ 56.

26.    Mr. Shkreli later learned that Vyera approached ▆▆▆▆ about purchasing pyrimethamine, and he counseled Mr. Mithani, who was inexperienced in such matters, on how to approach ▆▆▆▆ on this subject and the possible partnership for a combination pill. *Id.* ¶ 56.

27.    Mr. Shkreli also learned that Vyera entered into an API supply agreement with ▆▆ ▆▆. *Id.* ¶ 57.  However, Mr. Shkreli did not negotiate that agreement, did not sign it, and has never seen it. *Id* .

### C.    Vyera's Distribution of Daraprim

28.    Mr. Shkreli has very little knowledge concerning the specifics of Vyera's distribution of Daraprim, other than the fact that it is offered through specialty distribution, just as it was under its previous owner, Core Pharma. *Id.* ¶ 58.

29.    The distribution of Daraprim was handled by Vyera executives who understood specialty distribution, and not by Mr. Shkreli. *Id.* ¶ 59.

30.    Mr. Shkreli did not negotiate, did not sign, and is not familiar with any of the terms of any of the distribution contracts Vyera entered with distributors. *Id.* ¶ 60.

### D.    Generic Competition

31.    As a shareholder of Phoenixus, Mr. Shkreli from time to time makes suggestions to Vyera management regarding the company. *Id.* ¶ 64.  However, often his suggestions are ignored.

*Id.* ¶ 64; Mulleady Decl. ¶ 64; Mulleady Dep. Tr., at 122:14-123:10; Mithani Dep. Tr., at 259:10-18.  One significant example of Vyera management ignoring Mr. Shkreli's suggestions after he left the companies is their failure to follow his suggestion that Vyera develop an alternative to or a better form of Daraprim to treat toxoplasmosis.  Shkreli Decl. ¶ 65.

32.     Ever since Vyera purchased Daraprim, Mr. Shkreli has anticipated the development of a generic competitor.  *Id.* ¶ 66.  Mr. Shkreli's view, as he expressed to his Vyera colleagues, is that the only way to mitigate the impact of generic competition is to develop a new or better drug. *Id.* ¶¶ 66-67.

33.     In a September 26, 2015 email to Vyera employee Ed Painter, who had asked Mr. Shkreli if an annual price reduction commitment might discourage generics from entering the market, Mr. Shkreli responded that he did not think there is much that can be done to prevent generics from entering the market other than to introduce a new drug.  *Id.* ¶ 67; Trial Ex. DX 126.

34.     This drove Mr. Shkreli, while he was CEO of Vyera, to ensure that R&D was a core focus for the company. *Id.* ¶ 68.

35.     Mr. Shkreli explained his philosophy about R&D in a 2017 email to Tracy Seckler, the Chief Visionary Officer for Charley's Fund, a charity dedicated to developing life-saving treatments for DMD.  Mr. Shkreli told Ms. Seckler that if a company increases the price of a pharmaceutical, as Vyera did, it needs to use the profits to fund lab research and develop a better drug.  *Id.* ¶ 69; Trial Exhibit DX 481.

36.     After his resignation, Mr. Shkreli repeatedly advised and implored Vyera employees to continue this research.  *Id.* ¶ 70.  However, Mr. Shkreli believes his advice went unheeded, and Vyera has not developed a new or better drug to treat toxoplasmosis.  *Id.*

37.     Mr. Shkreli is not aware of any plan by Vyera—which owned Daraprim for only four months before he resigned as CEO—to stop or slow a generic pharmaceutical company from manufacturing and selling a generic version of Daraprim, which he does not believe is possible. *Id.* ¶ 71.

**E.     Mr. Shkreli's Involvement in Vyera After February 2016**

38.     Since resigning as Vyera's CEO on December 18, 2015, and from Phoenixus' Board on February 10, 2016,   Mr. Shkreli's only role in Vyera or Phoenixus has been that of Phoenixus shareholder.  *See* Tilles Dep. Tr., at 147:23-148:2, 183:3-24; Retzlaff Dep. Tr., at 210:3-10; Shkreli Decl. ¶ 73.

39.     As a shareholder, Mr. Shkreli is entitled to vote his shares and to contact company management about sales data like any other shareholder.  Tilles Dep. Tr., at 183:17-22; Retzlaff Dep. Tr., at 181:9-10; Shkreli Decl. ¶ 75.

40.     After resigning from Vyera, Mr. Shkreli was not able to control or manage the business of Vyera, and was not able to control the decision-making of Vyera as it related to Daraprim.  Costopoulos Dep. Tr., 141:20-142:20.

41.     Mr. Shkreli did not negotiate any supply agreements on behalf of Vyera during this time period (or any other period), nor did Mr. Shkreli control the decision-making as it related to Vyera's distribution agreements for Daraprim.  Costopoulos Dep. Tr., 144:2-145:4.

42.     After Mr. Shkreli left Vyera as CEO in December of 2015, it was Vyera's view that Mr. Shkreli should have no role in the management of the company.  Costopoulos Dep. Tr., 145:18-146:9.

43.     Mr. Shkreli has not attended meetings of Vyera's Senior Leadership team since December 2015 and, as an example, was specifically barred from attending such meetings as early as February 2016 "because he was no longer a part of management" of Vyera.  Costopoulos Dep.

Tr., at 55:23-57:18, 141:20-142:12; Tilles Dep. Tr., at 161:25-162:22, 163:17-164:3; Retzlaff Dep.

Tr., at 210:3-10.

44. Mr. Shkreli sought a consulting agreement with Vyera after his departure, but the

company refused to retain him as a consultant. Tilles Dep. Tr., at 165:4-6; Costopoulos Dep. Tr.,

at 145:12-17; Shkreli Decl. ¶ 78.

45. While Mr. Shkreli has made suggestions to company management, these

suggestions have been ignored. Tilles Dep. Tr., at 10-13; Shkreli Decl. ¶¶ 64, 81.

46. When Mr. Shkreli requested a Vyera email address following his resignation, Vyera

management told him that he could not have an email address because he was "no longer part of

the company . . . you're not part of this." Tilles Dep. Tr., at 84:10-13; *see also* Tilles Dep. Tr., at

189:10-18.

47. Mr. Shkreli's communications with Vyera management since leaving the company

have focused on sales data relevant to his status as a large shareholder, consistent with the

company's view that "he's entitled to shareholder updates, but nothing beyond that." Tilles Dep.

Tr., at 183:9-24; *see* Tilles Dep. Tr., at 165:24-166:17; Retzlaff Dep. Tr., at 181:9-10; Shkreli Decl.

¶ 75.

48. Mr. Shkreli has not been physically present at Vyera's offices since his resignation.

Tilles Dep. Tr., at 173:14-174:2; Retzlaff Dep. Tr., at 211:8-11.

49. Since leaving the companies, Mr. Shkreli has not had the authority to make, and

has not made, any decisions for Vyera or Phoenixus in any way relating to Daraprim or any other

drug. Shkreli Decl. ¶ 76.

50.    Since leaving Vyera and Phoenixus in February 2016, Mr. Shkreli has been in contact with Mr. Mulleady and current employee Akeel Mithani and, more recently, with Vyera's current CEO and General Counsel, Averill Powers.  Shkreli Decl. ¶ 80.

51.    Mr. Shkreli has known Mr. Mulleady and Mr. Mithani for years and has considered both of them friends.  *Id.*  Following his resignation from Vyera, he has had many discussions and communications with both of them on various topics ranging from pop culture to personal matters to matters affecting Vyera.  *Id.*

52.    From the time that Mr. Powers was promoted to interim CEO in December 2018, Mr. Shkreli has had a limited number of conversations with him, beginning in 2020.  *Id.*  In the course of the many discussions Mr. Shkreli has had with Messrs. Mulleady, Mithani and Powers, he has made suggestions to each of them about Vyera, primarily relating to business development, in his role as a major shareholder in Phoenixus.  *Id.* at 81.  But no Vyera employee, including Mr. Mulleady, Mr. Mithani, or Mr. Powers, is required or bound to follow Mr. Shkreli's suggestions. *Id.*  In fact, more often than not they ignore, or at least do not follow, those suggestions, which has been a continuing source of frustration for Mr. Shkreli.  *Id.*; Mulleady Dep. Tr., at 122:14-123:10; Mithani Dep. Tr., at 259:10-18.

## II.    CONCLUSIONS OF LAW

### A.    There Can Be No Section 2 Liability Against Mr. Shkreli

53.    Plaintiffs' Section 2 claims against Mr. Shkreli fail because Mr. Shkreli does not possess monopoly power.[2]  To meet the monopoly power element, a plaintiff must show that the

---

[2] The Court previously struck Mr. Shkreli's Fifteenth Affirmative Defense on this ground, holding that "to succeed at trial, the plaintiffs need not prove that Shkreli . . . personally possessed any market power."  Oct. 6, 2020 Opinion and Order on Mr. Shkreli's Motion to Dismiss ("Motion to Dismiss Order") (ECF 365) at 10.  However, that affirmative defense merely restates what is, in the first instance, plaintiffs' burden to prove.  Thus, Mr. Shkreli respectfully reasserts that the government must, but cannot, meet this burden.

defendant possesses "the power to control prices or exclude competition." *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 404 (S.D.N.Y. 2008) (Jones, J.) (quoting *Heerwagen v. Clear Channel Communications*, 435 F.3d 219, 226 (2d Cir. 2006)).

54.     Courts that have addressed the rare monopolization claim brought against individuals have held that an individual cannot be liable on a monopolization theory unless the individual possesses monopoly power.  In *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2019 WL 130535 (E.D. Pa. Jan. 8, 2019), the plaintiffs sued a cooperative, its members (including natural born individuals), and certain third-party distributors, alleging claims under, *inter alia*, Section 2 of the Sherman Act, alleging that the defendants violated Section 2 by "conspiring to acquire or maintain, acquiring or maintaining, and/or attempting to acquire or maintain monopoly power."  *Id.* at *5.  However, the claims against the individuals could not stand because "to sustain their claims of monopolization and attempted monopolization," the court held, plaintiffs must "prove the required elements against *each individual defendant*."  *Id.* (quotations and citation omitted, emphasis added).  The plaintiffs' claims against the individual defendants failed because just as in a related class action in which the plaintiffs failed to allege that "any of the individual member defendants had a dangerous probability of achieving monopoly power" themselves, the plaintiffs in *Winn-Dixie* alleged no facts that the individual defendants possessed monopoly power themselves.  *Id.*

55.     Other courts are in accord; individuals do not possess monopoly power by virtue of their association with corporate defendants.  *See Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 256 F. Supp. 2d 249, 284-85 (D.N.J. 2003) (granting summary judgment on Section 2 claim because plaintiffs failed to prove individual defendants possessed monopoly power, holding that plaintiffs do not even *"*contend that [the individual defendant,] separate from [the company,]

possesses market power*";* "[the individual defendant] is not in the business of importing oriental rugs and therefore has no market share whatsoever …[the defendant] as an individual possesses no power to prevent newcomers from entering the market"); *Appraisers Coal. v. Appraisal Inst*., 845 F. Supp. 592, 602-03 (N.D. Ill. 1994) (dismissing Section 2 claim against individuals where the plaintiff made "no allegation with respect to the market power of any individual"); *see also ES Dev., Inc. v. RWM Enterprises, Inc*., 939 F.2d 547, 554 (8th Cir. 1991) (holding in a Section 1 case that "the Sherman Act does not impart liability for actions by an individual, regardless of their anticompetitive motive or effect, unless the individual entity possesses monopoly power.").

### B.     There Can Be No Section 1 Liability Against Mr. Shkreli

56.     Section 1 of the Sherman Act proscribes every "contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To satisfy the elements of a Section 1 claim, Plaintiffs must prove "(1) a contract, conspiracy, or combination, (2) which restrains trade such that the anticompetitive effects outweigh the procompetitive effects, and (3) which proximately causes injury to plaintiff." *Naso v. Park*, 850 F. Supp. 264, 272 n.6 (S.D.N.Y. 1994) (Conner, J.) (citing *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 687 F. Supp. 800, 806-07 (S.D.N.Y. 1988)); *see also In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 215 (E.D.N.Y. 1996) (Section 1 claim requires "(1) concerted action, (2) by two or more persons, (3) which unreasonably restrains interstate or foreign trade or commerce."). Mr. Shkreli cannot be liable under Section 1 because during the four and a half months he was with Vyera, he was not involved in any of the supply or distribution agreements that are the basis of plaintiffs' allegations. Almost all of those agreements were negotiated, entered and signed after Mr. Shkreli had left Vyera. Nor was Mr. Shkreli involved in those agreements after he had resigned from Vyera. Mr. Shkreli did not negotiate, did not sign, and is not familiar with any of the terms of any of the distribution contracts that Vyera entered with distributors. Shkreli Decl. ¶ 60. Likewise, Mr.

Shkreli did not negotiate Vyera's agreement with Fukuzyu, did not sign it, and is not familiar with any of its terms. *Id.* ¶ 43.  And, Mr. Shkreli did not negotiate Vyera's agreement with ████, which was entered into while he was in prison, did not sign it, and has never seen it. *Id.* ¶ 57.

57.    Additionally, the record contains no evidence that Mr. Shkreli had any contact at all with anyone at any of the counterparties to the allegedly illegal agreements.  Thus, there can be no "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement'" between Mr. Shkreli and any other person or entity, to support a Section 1 claim. *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. May 15, 2012) (Cote, J.) (internal quotation marks omitted); *see also Mylan Pharm. v. Celgene Corp.*, CV 14-2094 ES, 2014 WL 12810322, at *8 (D.N.J. Dec. 23, 2014).

### C.    Mr. Shkreli Cannot Be Derivatively Liable for Vyera's Conduct

58.    Plaintiffs' theory of Mr. Shkreli's liability—*i.e.*, that under agency principles Mr. Shkreli can be held liable for Vyera's alleged anticompetitive conduct, is untenable.[3]  A director or officer cannot be liable for a company's allegedly anticompetitive conduct unless that conduct constitutes a *per se* violation of the antitrust laws.  *Murphy Tugboat Co. v. Shipowners Merchs. Towboat Co.,* 467 F. Supp. 841, 853-54 (N.D. Cal. 1979) (CEO's knowing approval or ratification of company's policy of refusing to deal with competitors did not impose liability under Sherman Act on CEO because the company's policy was not a *per se* violation or "inherently wrongful.").  Plaintiffs are not alleging "inherently wrongful" conduct or *per se* antitrust violations by Vyera,

---

[3] Mr. Shkreli acknowledges that in the Motion to Dismiss Order, the Court rejected the argument that plaintiffs' "reverse agency" theory was the wrong standard, and that it is enough that the plaintiffs establish Mr. Shkreli's "participation" in Vyera's allegedly anticompetitive conduct.  Mr. Shkreli urges the Court to reconsider this conclusion on the proper standard to apply.  Nonetheless, as developed more fully herein, even under a "participation" standard Mr. Shkreli should not be held liable.

so Mr. Shkreli cannot be held liable based solely upon his former roles as an officer and director of Vyera and Phoenixus.

59.     Nor can Mr. Shkreli be held liable for Vyera's acts by virtue of his status as the company's former agent. "It is a basic principle of agency law that '[o]nly an agent's own tortious conduct subjects the agent to liability....An agent is not subject to liability for torts committed by the agent's principal that do not implicate the agent's own conduct; there is no principle of respondeat inferior.'" *Pascarella v. Sandals Resort Int'l, Ltd.*, No. 19-cv-2543, 2020 WL 1048943, at *6 (S.D.N.Y. Mar. 4, 2020) (Torres, J.) (alterations in original) (citation and internal quotation marks omitted).

60.     Mr. Shkreli's status as a shareholder in Phoenixus does not confer liability. *See Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1270 (S.D.N.Y. 1976) (Pierce, J.) (holding that the fact that a person is a shareholder "does not give him authority to act for the corporation"). Additionally, there is no evidence that Mr. Shkreli's share ownership in Phoenixus gave him the authority to control Vyera's decisions relating to Daraprim, so as to give rise to his liability for the company's acts. *See FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 321 (S.D.N.Y. 2008) (Holwell, J.); *FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311, 324 (S.D.N.Y. 2001) (Kaplan, J.).

61.     There is also no basis to hold Mr. Shkreli liable on the theory that he "participated" in Vyera's alleged scheme to monopolize the market for Daraprim. In its Motion to Dismiss Order, the Court relies upon the Supreme Court's opinions in *Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945) and *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), stating "An individual may be held liable under the Sherman Act to the extent that individual has 'participated in violations of' the antitrust laws, such as by 'negotiating, voting for[,] or executing agreements

which constituted steps in the progress of the conspiracy.'"  ECF 229, at 35-36.  However, neither *Hartford-Empire* nor *Lorain Journal* supports application of a "participation" theory of liability in a Section 2 monopolization case.  And even if those cases do support application of such a theory, Mr. Shkreli cannot be found liable based upon such a theory.

62.     The Supreme Court's holding in *Hartford-Empire* does not establish grounds to hold Mr. Shkreli liable.  The facts in that case are very different from the facts here.  *Hartford-Empire* involved an industry-wide conspiracy involving various horizontal exclusionary agreements amongst 12 competing corporations and 101 individuals associated with those corporations as officers and directors to create and maintain a monopoly.  *Hartford-Empire*, 323 U.S. at 392.  The allegations here are against a single corporate entity and two of its former officers and directors, alleging monopoly maintenance and agreements in restraint of trade, analyzed under the rule of reason.  The gravamen of the Amended Complaint, indeed the first count, is single-firm conduct—monopoly maintenance in violation of Section 2 of the Sherman Act by Vyera.  Am. Compl. (ECF 87) ¶ 65-66.  And while the Amended Complaint alleges that the distribution and supply agreements violated Section 1, plaintiffs do not allege the type of wide-ranging conspiracy that existed in *Hartford-Empire.*  We are not aware of any case in the intervening 76 years since *Hartford-Empire* was decided that has adopted a "participation" theory and applied it in the context of a case alleging monopolization under Section 2 and agreements in restraint of trade under Section 1.[4]

---

[4] A corporation cannot conspire with its officers, employees or agents to violate the antitrust laws.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984); *Mahmud v. Kaufmann*, 496 F. Supp. 2d 266, 275 (S.D.N.Y. 2007) (Conner, J.) ("It is well-established that the Sherman Antitrust Act does not apply to concerted action among officers or employees of the same enterprise acting as such.").  Thus, Mr. Shkreli cannot be found liable based on any theory that he "conspired" with Vyera.  The only "conspiracy" that could conceivably be found is one between Vyera and each of its distribution and supply partners.  But this theory fails because the record is devoid of the required "concerted action" by Vyera's counterparties, either with Vyera or among themselves.  *See* Defendants' Memorandum

63.     In addition, the Supreme Court's opinion in *Lorain Journal* did not examine, nor was the Court asked to rule on, the grounds on which any individual defendants were found liable. Instead, the Court merely noted, without critique or analysis, that certain individual defendants were alleged to have "participated in the conduct alleged to constitute the attempt to monopolize." *Lorain Journal*, 342 U.S. at 145 n.2. These *dicta* do not support the establishment of a rule that individuals may be liable for "participation" in an alleged monopolization scheme.[5]

64.     But even if the *Hartford-Empire* "participation" standard is the correct rule to apply to this case, plaintiffs have failed to show that Mr. Shkreli can be held liable. The record shows that Mr. Shkreli was not involved in any of the allegedly anticompetitive agreements.

**D.     Any Injunctive Relief Ordered Against Mr. Shkreli Must Be Narrowly Tailored; It May Not Unduly Harm Or Penalize Him**

65.     Under the FTC Act, the FTC may "in proper cases[,]"seek a permanent injunction. 15 U.S.C. § 53(b). Such relief is forward looking. *United States v. W. T. Grant Co.,* 345 U.S. 629, 633 (1953). Its "purpose . . . is to prevent future violations." *Id.* Thus, injunctive relief is not punitive. To be entitled to injunctive relief, plaintiffs must show that a permanent injunction is necessary—*i.e.*, because harm to competition is ongoing or is likely to recur, an injunction is needed to stop it. *See id.* (a permanent injunction is appropriate where the moving party shows that "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive"); *see also FTC v. Abbvie Inc.*, 976 F.3d 327, 380 (3d Cir. 2020) (a plaintiff seeking an injunction must prove a "cognizable danger" of a recurrent violation; proof that a recurrent violation is "merely possible" is insufficient); *FTC v.*

---

Addressing Questions of Law Expected To Arise at Trial ("Defendants' Pre-Trial Memorandum") at 43-46 and Defendant Kevin Mulleady's Pre-Trial Memorandum of Law ("Mulleady's Pre-Trial Memorandum") at 12-14.

[5] Indeed, the Northern District of California noted in *Murphy Tugboat* that "there is no discussion whatever in" either case—*Hartford Empire* or *Lorain Journal* —"of liability of officers or directors." 467 F. Supp. at 851 n.6.

*Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) ("As a general rule, [p]ast wrongs are not enough for the grant of an injunction; an injunction will issue only if the wrongs are ongoing or likely to recur."); *Federal Trade Comm'n v. Facebook, Inc.*, No. 20-3590, 2021 WL 2643627, at *18 (D.D.C. June 28, 2021) (declining to award the FTC injunctive relief where the only actionable conduct occurred years prior to the filing of the complaint and where "no actionable violation is either ongoing or about to occur").

66.     There is no factual foundation on which the Court could base a permanent injunction, because the record shows that as of the time the Complaint was filed, Mr. Shkreli was not "violating" or "about to violate" the law.  The Amended Complaint makes reference to communications Mr. Shkreli had—months before the Complaint was filed—with Vyera executives about the company, and contains a vague allegation that Mr. Shkreli was at that time "looking for" drugs other than Daraprim to hatch a similar scheme (Am. Compl. (ECF 87) ¶ 293), but no such evidence was developed in discovery.  Additionally, since the filing of the Complaint three generic companies have had their ANDAs for generic Daraprim approved, so there is no risk of any harm to competition by any acts of Vyera or Mr. Shkreli.  Thus there is simply no evidentiary support for any ongoing or imminent violations of the law, and thus no basis for any type of injunction.

67.     Additionally, there is no likelihood that the challenged conduct in this case—even though proper —will continue into the future.  Mr. Shkreli recognizes that, after he is released from prison, his conviction will significantly limit his future employment options. Shkreli Decl. ¶ 82.  He is aware that he will need to work to rehabilitate his public image, so if he does pursue employment within the pharmaceutical industry, he is not interested in acquiring commercial assets or the day-to-day affairs of commercializing medicine.  *Id.* ¶ 83. Instead, he hopes to

16

continue playing a role in the discovery of cures and treatments for rare and life-threatening diseases. *Id.* He would like to return to the type of work he did when working on cures for DMD and PKAN, and focus on experimental and research-based opportunities related to discovery of new medicines and new uses for existing medicines. *Id.* None of that would involve him in pricing pharmaceuticals, sourcing API, or contracting with pharmaceutical distributors. And, thus, an injunction is unnecessary as against him.

68.     Even if the Court were to disagree, and find injunctive relief appropriate, the relief plaintiffs seek is grossly overbroad. An injunction must not go any further than necessary to prevent future violations. As such, "the injunction must not 'unduly harm the defendants . . . [by] put[ing] them out of business, but [must] simply ensure that they will conduct their business in a manner which does not violate Section 5 of the FTC Act.'" *F.T.C. v. Ross*, 897 F. Supp. 2d 369, 387 (D. Md. 2012) (quoting *F.T.C. v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1296 (D. Minn. 1985)), *aff'd*, 743 F.3d 886 (4th Cir. 2014). In other words, and as required in all cases, under Federal Rule of Civil Procedure 65, the court must ensure that any injunctive relief is "narrowly tailored to fit specific legal violations' and avoid unnecessary burdens on lawful commercial activity." *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 15 Civ. 211, 2021 WL 1553926, at *14 (S.D.N.Y. Apr. 20, 2021) (Schofield, J.) (quotation and citation omitted).

69.     Plaintiffs do not precisely define the injunctive relief they seek in this case. However, they do seek to penalize Mr. Shkreli by enjoining him from owing in part or whole or working for a company engaged in the pharmaceutical industry.[6] As the District of Maryland held,

---

[6] Plaintiffs' use of the vague and undefined term "pharmaceutical industry" is equal grounds to deny the relief sought. The Second Circuit has vacated and affirmed the denial of injunctions that are impermissibly vague. *See Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 178 (2d Cir. 2001) ("the vagueness of this injunction serves as sufficient reason to require that we vacate it"); *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, 249 (2d Cir. 1972) (affirming denial of injunction because of "the breadth and vagueness of [the injunctive relief] sought"). The relief requested could be interpreted to reach lawful conduct that is totally outside the bounds of the alleged conduct, such as owning stock in a pharmacy like Walgreens or CVS or publishing an industry journal.

in *Ross,* this is improper.  In that case, the FTC filed suit, seeking injunctive relief, against a group of corporate entities and an individual for alleged deceptive conduct in connection with the sale of computer software.  *Ross*, 897 F. Supp. 2d at 374.  The relief granted was an injunction restraining the individual defendant from "the marketing and sale of computer security software and software that interferes with consumers' computer use as well as from engaging in any form of deceptive marketing."  *Id.* at 387.  Notably, the individual defendant was not enjoined from working in her chosen field of marketing and selling computer security software.  As the court held, "[s]he may still utilize her marketing talents as long as they are used for legitimate products and ventures and do not contribute to deceiving the public."  *Id.*  Thus, to the extent any injunctive relief is entered in this case—which it should not be—such relief should be narrowly tailored and not so broad as to penalize Mr. Shkreli by preventing him from finding employment in his chosen field of work. Such an injunction would constitute undue punishment, which is not the proper function of an equity court, particularly in a rule of reason antitrust case.

<div style="margin-left: 40%">

Respectfully submitted,

By:     */s/ Christopher H. Casey*
        Christopher H. Casey, Esq. (admitted *pro hac vice*)
        Jeffrey S. Pollack, Esq. (admitted *pro hac vice*)
        A.J. Rudowitz, Esq. (admitted *pro hac vice*)
        Sarah Fehm Stewart
        DUANE MORRIS LLP
        30 South 17th Street
        Philadelphia, PA  19103-4196
        Telephone: (215) 979-1155/1299/1974

        *Attorneys for Defendant Martin Shkreli*

</div>

---

Equally vague are plaintiffs' requests to enjoin defendants' undefined "course of conduct" and from "engaging in similar and related conduct in the future."  Plaintiffs do not define the conduct at issue, nor do they state whether it may have other pro-competitive purposes.  As the Eighth Circuit held in *Yamaha Motor Co. v. Fed. Trade Com.*, 657 F.2d 971, 984 (8th Cir. 1981) an injunction that makes otherwise lawful conduct a *per se* unlawful restraint "goes beyond any reasonable relationship to the [challenged conduct]."  *See also Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 15 Civ. 211, 2021 WL 1553926, at *14 (S.D.N.Y. Apr. 20, 2021) (Schofield, J.)  (Rule 65 "requires that a permanent injunction be specific and describe in reasonable detail what is restrained." (quoting Fed. R. Civ. P. 65(d))).

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on October 20, 2021, a copy of the foregoing Martin Shkreli's Proposed Findings of Fact and Conclusions of Law was served upon all counsel of record in this matter by email.

<div style="text-align: right;">

*/s/ Andrew J. Rudowitz*
Andrew J. Rudowitz

</div>