LCFKFTC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
FEDERAL TRADE COMMISSION,
STATE OF NEW YORK, STATE OF
CALIFORNIA, STATE OF OHIO,
COMMONWEALTH OF PENNSYLVANIA,
STATE OF ILLINOIS, STATE OF
NORTH CAROLINA, and
COMMONWEALTH OF VIRGINIA,

                    Plaintiffs,

          v.                         20 CV 706 (DLC)

MARTIN SHKRELI, et al.,

                    Defendants.
------------------------------x
                                    New York, N.Y.
                                    December 15, 2021
                                    9:30 a.m.
Before:
                    HON. DENISE COTE,
                                    District Judge
                    APPEARANCES

FEDERAL TRADE COMMISSION
BY:  MARKUS H. MEIER
     MARIN HANEBERG
     BRADLEY S. ALBERT
     LAUREN PEAY
     NEAL PERLMAN
     LEAH HUBINGER

NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
BY:  ELINOR R. HOFFMANN
     JEREMY R. KASHA
     AMY E. McFARLANE

DUANE MORRIS LLP
     Attorneys for Shkreli
BY:  CHRISTOPHER H. CASEY
     JEFFREY S. POLLACK
     ANDREW J. RUDOWITZ
     SARAH FEHM STEWART
     SEAN McCONNELL
     J. MANLY PARKS

LCFKFTC1

|    |    |
|----|----|
| 1  | (Trial resumed; in open court) |
| 2  | MR. MEIER:  Markus Meier, on behalf of the Federal |
| 3  | Trade Commission. |
| 4  | THE DEPUTY CLERK:  Please state your names for the |
| 5  | record. |
| 6  | THE COURT:  No, that's just fine.  We did that the |
| 7  | first day of trial.  Thank you very much, Mr. Whertvine. |
| 8  | Excuse me one second. |
| 9  | (Pause) |
| 10 | THE COURT:  I received a letter from counsel for |
| 11 | CareMark dated December 14, and I believe counsel have had an |
| 12 | opportunity to discuss this with each other.  It makes a |
| 13 | request for redaction of passages from the deposition that |
| 14 | appear at pages 103 to 105. |
| 15 | Can someone give me a report from the parties? |
| 16 | MS. STEWART:  Good morning, your Honor.  Sarah |
| 17 | Stewart, on behalf of the defendant. |
| 18 | We're agreeable to the proposed redactions. |
| 19 | MR. MEIER:  Your Honor, on behalf of the FTC, I think |
| 20 | we were already okay with it, so I think it's okay. |
| 21 | THE COURT:  I've reviewed it.  It's limited in |
| 22 | request.  Most of the requests made by CareMark were denied at |
| 23 | a conference on Tuesday.  The limited nature here, I don't |
| 24 | think, is terribly critical to the issues before me and has |
| 25 | some concern about competitive advantages, and, therefore, I |

LCFKFTC1

1    approve the request to redact.

2            With that, I think we're ready to resume examination

3    of the witness.  Am I right, or, counsel, do you have other

4    issues?

5            MR. MEIER:  Yes, your Honor, if I may.  Markus Meier,

6    on behalf of the Federal Trade Commission.

7            We do have just a couple of administrative matters, if

8    we can take those up first, your Honor?

9            THE COURT:  Sure.

10            MR. MEIER:  First, I'd like to introduce the paralegal

11    that will be working with us today and operating the

12    technology — hopefully, we will have more success with the

13    technology — that is Phoebe Flint, your Honor.

14            And next, I wanted to introduce a number of exhibits

15    that we've already discussed with the defendants.  It's my

16    understanding that there should be no objections to any of

17    these, but I did want to take them one by one.

18            The first one is Government Exhibit 9053.

19            Your Honor, Government Exhibit 9053 is the revised

20    designations of the transcript of a witness named Desai from

21    ASD, and, again, we've indicated on the front cover the changes

22    from the original that we submitted back in October, and as

23    with the other designations, they are color-coded in the same

24    manner as we've been submitting to date.

25            THE COURT:  Any objections to receipt of 9053 other

LCFKFTC1

1  than objections on which I've already ruled?

2          MR. POLLACK:  No, your Honor.

3          THE COURT:  Thank you.

4          9053 is received.

5          (Government's Exhibit 9053 received in evidence)

6          MR. MEIER:  The next one, your Honor, is Government

7  Exhibit 9054.  These are the designations of the transcript of

8  Mr. Shah from an Indian company called Aadivignesh — I'm sorry,

9  I don't know how to pronounce that properly, but it's spelled

10 A-a-d-i-v-i-g-n-e-s-h.  In this particular one, there are no

11 changes from the version that was submitted as part of the

12 pretrial package in October.

13         THE COURT:  Any objections other than those I've

14 already ruled on?

15         MR. POLLACK:  No, your Honor.

16         THE COURT:  9054 is received.

17         (Government's Exhibit 9054 received in evidence)

18         MR. MEIER:  The next one, your Honor, is Government

19 Exhibit 9055.  It's the deposition --

20         THE COURT:  Excuse me.

21         If you could be seated, sir, at the back.  Thank you.

22         MR. MEIER:  Your Honor, Government Exhibit 9055, it's

23 the designations of Marco Polizzi from a company called Oakrum

24 and there are no changes from the designations submitted back

25 in October.

LCFKFTC1

1          THE COURT:  Any objections other than those I've

2     already ruled on to 9055?

3          MR. POLLACK:  No, your Honor.

4          THE COURT:  9055 is received.

5          (Government's Exhibit 9055 received in evidence)

6          MR. MEIER:  The next one, your Honor, is Government

7     Exhibit 9056 -- let me put my reading glasses on just to

8     confirm -- yes, 9056, and this is the designations of the

9     deposition of Paula Raese, R-a-e-s-e, from Mylan, M-y-l-a-n,

10    and there are no changes from what we submitted back in

11    October.

12         THE COURT:  Any objection to the receipt of 9056 other

13    than objections on which I've already ruled?

14         MR. POLLACK:  No, your Honor.

15         THE COURT:  Thank you.

16         Received.

17         (Government's Exhibit 9056 received in evidence)

18         MR. MEIER:  The last one for this morning, your Honor,

19    is Government Exhibit 9057.  It's the deposition designations

20    of John Vande Waa, capital V-a-n-d-e, separate word W-A-A, from

21    a company called USA Health, and there are no changes from the

22    versions submitted pretrial in October.

23         THE COURT:  Any objections to the receipt of 9057

24    other than what objections may have been made and on which I've

25    already ruled?

LCFKFTC1

1          MR. POLLACK:  No, your Honor.

2          THE COURT:  9057 is received.

3          (Government's Exhibit 9057 received in evidence)

4          MR. MEIER:  Thank you, your Honor.

5          My colleague from New York A.G.'s Office, Ms. Hoffman,

6     also has an administrative matter she'd like to raise, and then

7     we'll call the next witness.

8          MS. HOFFMAN:  Good morning, your Honor.  Eleanor

9     Hoffman, from New York.

10          Your Honor may recall last Friday, I indicated that we

11    may need briefing on the impact of the defendant's new

12    affirmative defense.  I since discussed with the defendant, and

13    I think we're in agreement, that no briefing is necessary now,

14    and may not be.  So we are not going to be submitting briefs,

15    if that's acceptable to your Honor, before the 21st.

16          THE COURT:  It's what?

17          MS. HOFFMAN:  We will not be submitting briefs, if

18    that's acceptable to your Honor, before the 21st.

19          THE COURT:  Great.  Good.

20          Let me just ask plaintiffs' counsel, Mr. Meier:  I

21    noticed you made a limited offer of exhibits yesterday, some

22    individual exhibits with a witness, but others with a document

23    that listed various exhibit numbers.

24          What is the procedure that you're following?  Are you

25    planning to withdraw most of your exhibits, or are you planning

LCFKFTC1

1    to offer most of them, but in tranches?

2           MR. MEIER:  We are planning to offer most of them, but

3    in tranches, and we're working through those details every

4    night and over the weekend and making sure -- our hope is to

5    initially put in the ones where we don't have any objections,

6    where we can get agreement.  And I probably will be actually

7    doing one of those this afternoon before the day is over, and

8    we're working through -- I think we probably have two or three

9    or four already that are going back and forth.  So that would

10   be the plan, your Honor, we will move them in through -- those

11   that aren't used with a witness in the moment here in Court, we

12   will seek to move in as many of those as possible that we can

13   get agreement on, and those we can't, we'll have to have some

14   discussion with your Honor about.

15          THE COURT:  Great.  Thanks for giving me that

16   heads-up.

17          Is this the time for the witness to retake the stand?

18          MR. MEIER:  Yes, your Honor.  We would recall

19   Mr. Bruno, and, again, my colleague, Neal Perlman, for the FTC,

20   will handle this witness, but I think the defendants want to

21   finish their examination.

22          THE COURT:  Mr. Bruno, if you could take the stand.

23          Mr. Bruno, I remind you, you're still under oath.

24          Counsel.

25          MR. PARKS:  Thank you, your Honor.

LCFKFTC1                    Bruno - Cross

1              And good morning, Mr. Bruno.

2              THE WITNESS:  Good morning.

3              MR. PARKS:  As a first matter, your Honor, yesterday,

4    at the end of the day, I had asked the witness a question, and

5    I had referred to his direct testimony.  I indicated at

6    paragraph 23, this is a question regarding the requirements and

7    capacity reservation provisions in GSK's supply agreement with

8    Fukuzyu and whether they require Fukuzyu to ensure that it

9    meets GSK's requirements first.  We determined, from a quick

10   look yesterday, that my citation to paragraph 23 of that direct

11   testimony was incorrect, and I discovered shortly after the

12   session yesterday, that it was page 23, not paragraph 23.

13             Perhaps we can put that up, Justin.

14             It is paragraph 71, it begins on page 22, but the

15   relevant language can be found at the top of page 23 of the

16   direct testimony.  So I just wanted to correct that reference

17   for the record.

18             With that, your Honor, I will proceed.

19    JAMES BRUNO,

20   CROSS-EXAMINATION CONTINUED

21   BY MR. PARKS:

22   Q.  Sir, in your direct testimony, you state that, "Where the

23   API supplier has already filed a DMF with the FDA, it is

24   unusual for the supplier to agree to exclusivity," and that's

25   in your direct testimony at paragraph 77.  I would like to

LCFKFTC1                    Bruno - Cross

1   focus, sir, on the word "unusual" there.

2              You were saying that based on your personal

3   experience, that would be unusual, correct?

4   A.  That's correct.

5   Q.  Earlier, you said that over your career — and earlier, I

6   mean yesterday in your testimony — you said that over your

7   career, you've been involved in some capacity with 100 --

8   approximately 100 pharmaceutical manufacturing contracts,

9   correct?

10  A.  Correct.

11  Q.  And of those 100 contracts, you said you were closely

12  involved in approximately 40, correct?

13  A.  Correct.

14  Q.  Not one of those 100 pharmaceutical manufacturing

15  agreements that you were involved in some capacity with over

16  your career related to pyrimethamine, correct?

17  A.  That's correct.

18  Q.  And you told us that you did not do any formal study

19  regarding the frequency that different deal terms appear in API

20  supply agreements, correct?

21  A.  That's correct.

22  Q.  You also told us that you did not review, and are not aware

23  of, formal -- any formal survey analyzing the frequency with

24  which different terms or conditions appear in API supply

25  agreements, correct?

LCFKFTC1                         Bruno - Cross

A.  That's correct.

Q.  So because you did not conduct any industrywide analysis,
you really can't say if an agreement to exclusivity under these
circumstances is actually unusual in the industry, can you?

A.  My comment was that based on my experience with the
contracts that I've worked on, and that I've been involved
with, also, with my contacts with other companies, discussing
with CMOs and pharmaceutical companies, that it's unusual.

Q.  So to my question, you can't say whether that's actually
unusual in the industry because you didn't study the industry
for your analysis, did you?

A.  I did not do a formal study.  I did it with companies that
I had been working with over the 40-some years.

Q.  Now, I'd like to turn to Vyera's contract with RL Fine.

        In your direct testimony affidavit, you stated that
the contract Vyera entered into with RL Fine was "not a
legitimate backup API supply agreement," and that's direct
testimony, that's the heading immediately before paragraph 78.

        A core basis for that conclusion was that RL Fine was
not actually able to serve as a backup supplier for
pyrimethamine to Vyera at the time of the agreement, correct?

A.  That's correct.

Q.  Even though RL Fine had not taken steps toward filing a DMF
for pyrimethamine API, it was still the next best supply option
for pyrimethamine API after Fukuzyu at that time, wasn't it?

LCFKFTC1                    Bruno - Cross

1   A.  That's correct.

2   Q.  You don't have an issue, sir, do you, with the fact that

3   Vyera identified RL Fine as a possible alternate supplier of

4   pyrimethamine, do you?

5   A.  As I said in my statement, they were the second best option

6   at the time.

7   Q.  So you don't have an issue with Vyera having identified

8   RL Fine as a potential API supplier, right?

9   A.  That's correct.

10  Q.  And that was the actual conclusion that you reach in your

11  direct testimony, that after Fukuzyu, the next best

12  pyrimethamine API supply option was RL Fine, right?

13  A.  That's correct.

14  Q.  You also take issue with the amount of due diligence done

15  by Vyera before identifying RL Fine.

16          My question for you is this, sir:  Regardless of the

17  amount of due diligence Vyera did, it ended up identifying the

18  exact same next best option for pyrimethamine API supply that

19  you identified in your analysis, didn't it?

20  A.  In the initial phase of it, yes.

21  Q.  Now, you said in your direct testimony affidavit that

22  various aspects of the supply agreement between RL Fine and

23  Vyera were, to use your word, atypical of backup supply API

24  supply agreements and, again, using your language, inconsistent

25  with industry practice regarding such agreements, and that's in

LCFKFTC1                        Bruno - Cross

1    your direct testimony at paragraphs 88 and 90.

2              You are basing those conclusions, again, on your own

3    personal experience and not any study or analysis of the

4    pharmaceutical industry; isn't that right?

5    A.  I did not do a formal study of the industry, as you said.

6    Q.  And so your conclusions about this agreement being atypical

7    and inconsistent with industry practices are actually limited

8    to your own personal observation in your experience and not any

9    study of the industry, correct?

10   A.  It is not based on a formal study.

11   Q.  And they are limited to your personal experience, right?

12   A.  Yes, which is 40 years in the industry.

13   Q.  Well, we'll talk about that.

14             The reference point, over 40 years, is 100 agreements

15   with which you have had some agreement -- I'm sorry, some

16   involvement and 40 agreements with which you were closely

17   involved, right?

18   A.  You have to define when I said the 40, as I said yesterday,

19   40 of them, I was the lead person.  The other ones, I took care

20   of just a portion of it, which would have been the CMC section.

21   Q.  But your reference point for these opinions is those 100

22   agreements and those 40 agreements on which you were the lead

23   of the 100, correct?

24   A.  Not exactly.

25             And, again, I work with a lot of CMOs, and I work with

1  a lot of pharmaceutical companies.  Discussing what the terms

2  and conditions of a contract is part of our discussions, and

3  even before we get to a supply agreement, we are discussing

4  those type of things.  We may not have gotten to the supply

5  agreement, but they're not done in a vacuum, and we're not

6  waiting to the very end to do it.

7           So my conclusions are based on that experience and my

8  discussions with hundreds of CMOs and multiple numbers of

9  pharmaceutical groups.

10 Q.  Yesterday, sir, you told us that of the 40 agreements that

11 you were closely involved in, approximately 20 were backup

12 supply agreements, correct?

13 A.  No, that's not what I said.

14 Q.  You didn't say that?

15 A.  I said 20 were second suppliers.

16 Q.  Secondary supply agreements?

17 A.  Correct.

18 Q.  Were any backup supply agreements?

19 A.  There were no backup suppliers in there.

20 Q.  So you have had no experience with backup supply

21 agreements?

22 A.  Not on -- I have not done a formal backup supply agreement.

23 Q.  Okay.

24          Speaking of backup agreements, generally, you were

25 retained by the FTC as an expert witness in a matter prior to

LCFKFTC1                           Bruno - Cross

1    this case, weren't you?

2    A.   Correct.

3    Q.   That was the AndroGel case, wasn't it?

4    A.   Yes.

5    Q.   In that case, your opinions related, in part, to a backup

6    manufacturing agreement, didn't it?

7    A.   Yes.

8    Q.   And the court in that case granted a motion to preclude you

9    from testifying about part of your opinion, didn't it?

10   A.   I'm not aware of an official judgment on that, on what they

11   precluded.

12   Q.   You're aware that a judge ruled that you couldn't testify

13   to part of your statement in that case, aren't you?

14   A.   I don't recall being advised that I couldn't testify in

15   court.  I gave my deposition, and that's as far as the case

16   went.

17   Q.   Sir, yesterday, you testified that you were deposed in this

18   case on July 29, 2021, and I'd like to take a look at your

19   deposition from July 29, 2021, on page 81, lines 15 through 25.

20             THE COURT:  Have you laid a foundation for this

21   testimony, counsel?

22             MR. PARKS:  I'm sorry?

23             THE COURT:  Have you laid a foundation for examining

24   with respect to this testimony?

25             MR. PARKS:  This testimony -- this is his deposition

LCFKFTC1                          Bruno - Cross

1     in this case.

2                 THE COURT:  So has he testified inconsistently with

3     his deposition?

4                 MR. PARKS:  I believe he has, yes.

5                 THE COURT:  Oh, okay.  Thank you.

6                 MR. PARKS:  Yes.

7     BY MR. PARKS:

8     Q.  And if we look on page 81, at lines 15 through 25, you were

9     asked a question at line 15:  "In any of these five cases that

10    you identify in paragraph 19, were you retained by any of the

11    plaintiffs, who are, in this case, the governmental entities,

12    or the plaintiffs in this case?"

13                And your answer, at line 20, was:  "I was retained by

14    the FTC."

15                And then the question to you was:  "Which one was

16    that?"

17                And your answer was:  "I think that was AndroGel."

18                And the question to you was:  "That was the one where

19    part of your testimony was excluded?"

20                And your answer was:  "I think so.  I would have to

21    check."

22                Right?

23                MR. PERLMAN:  Objection, your Honor.  Counsel is just

24    reading this deposition into the record.  I don't think this is

25    proper impeachment.  Mr. Bruno testified that he was retained

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    by the FTC in AndroGel, so I don't see an inconsistency.

2              THE COURT:  Overruled.

3    BY MR. PARKS:

4    Q.  Sir, you testified in your deposition that you recognized

5    that part of your opinion was excluded in AndroGel, didn't you?

6    A.  If that's what I said, then I forgot that that was the

7    case, and as I said in that, I think that was the one that I

8    didn't recall at this point.

9    Q.  Thank you.

10             You recall -- has that testimony from your testimony

11   refreshed your recollection on that point?

12   A.  I would have to read more of it to see what the discussion

13   was about, to why I was talking about that, but, to be honest

14   with you, that was done a very long time ago, and I don't

15   remember the exact details.  I haven't reviewed that case in

16   years.

17   Q.  Sir, the court in the AndroGel case ruled that because you

18   failed to engage in any quantitative valuation of the backup

19   manufacturing agreement at issue in that case, you were not

20   permitted to offer testimony about a specific monetary

21   valuation for that agreement; isn't that right?

22   A.  I think I understand where you're going, and I think I'm --

23   I think this is what I will recall.  I don't recall all the

24   exact details, but I think I know what this is about.

25   Q.  Is that consistent with your general recollection of the

LCFKFTC1                    Bruno - Redirect

1    court's ruling in that case?

2              MR. PERLMAN:  Objection; relevance, your Honor.

3              THE COURT:  Sustained.

4    BY MR. PARKS:

5    Q.  Sir, just like in AndroGel, where you offered an opinion

6    without doing any substantive valuation analysis that the

7    backup manufacturing agreement there had no value, here, you

8    are offering the opinion that certain provisions in the supply

9    agreements to which Vyera was a party were atypical and

10   inconsistent with industry practice without any substantive

11   industry analysis either, aren't you?

12             MR. PERLMAN:  Objection; relevance and argumentative.

13             THE COURT:  Argumentative, form.  Sustained.

14             MR. PARKS:  I have no further questions for the

15   witness at this time.  Thank you.

16             THE COURT:  Thank you.

17   REDIRECT EXAMINATION

18   BY MR. PERLMAN:

19   Q.  Good afternoon, Mr. Bruno.

20   A.  Good morning.

21   Q.  Again, this is Neal Perlman, and I represent the Federal

22   Trade Commission.

23             Mr. Bruno, I'd like to just start with the second to

24   last topic that Mr. Parks discussed with you.

25             Do you recall discussing, just now, the backup supply

LCFKFTC1                        Bruno - Redirect

1    agreement between RL Fine and Vyera?

2    A.  Yes, I do.

3    Q.  In your professional experience, is Vyera's contract with

4    RL Fine consistent with a typical backup supply agreement?

5    A.  I do not consider it to be consistent with a typical backup

6    supply agreement.

7    Q.  Why not?

8    A.  I think the main point is that RL Fine was not listed in

9    any of the FDA documents.  Since it wasn't added to the AND or

10   the NDA for Daraprim, that from a regulatory point of view,

11   they could not use that API in their formulation in their

12   process.  So inside the contract, there was no relevance to

13   getting that approval, and whether it's a backup supplier or a

14   second supplier or a primary supplier, most of the contracts --

15   almost all of the contracts that I work on, there's some

16   trigger in there that says that you have to be approved, you

17   have to be able to submit your documents.

18          All that has to be done, and RL Fine did not, and was

19   never approved, as a supplier.  So as a backup supplier, as a

20   second supplier, even a primary supplier, their material could

21   not be used in any of the Daraprim that was sold in the U.S.

22   market.

23   Q.  Why does it matter whether a supplier is approved for use

24   by the FDA if it's a backup supplier?

25   A.  The whole premise of a backup supplier, as it's been

LCFKFTC1                        Bruno - Redirect

defined, is that their job is to be available in case there is

a problem and there's some interruption in the delivery of the

materials.  If you're not approved, then if there is an

interruption, that material has to be put into a process, which

gathers information, both on the API and the dosage, tests have

to be done, it has to be submitted to the FDA, and the FDA has

to review that information.

        The FDA review alone could take 18 to 24 months.  So

if there is a supply interruption, then I could be without

product for 18 to 24 months.  Considering, in Vyera's case,

this was their number one product, it's economically what they

lived and died on.  So, if they're not getting that income,

that company could be out of business in that time period, on

just the FDA, not even on the part at the beginning where it

takes to get all that information and the work required.

Q.  In your view, does Vyera's contract with RL Fine mitigate

supply risk?

A.  I don't think it mitigates supply risk at all.

Q.  Why not?

A.  Again, because of the issues associated with the FDA.

Also, there are better ways to mitigate the risk, which would

have been less expensive for them.  Again, they could have

bought inventory.  Also, if you look at the contract, there was

no, again, part of the trigger.  They were getting fees even

though they weren't supplying, even though they couldn't

LCFKFTC1                          Bruno - Redirect

1    supply.  That's not usual in a contract.  The contracts that

2    I've worked on and I've been involved with, as I said, we have

3    milestones.  When the product is approved, you get a milestone

4    payment; when you get a submission, you get a milestone

5    payment.  This gives an incentive to the manufacturer to

6    actually get these things done.

7          RL Fine didn't do that.  Vyera never purchased

8    products to do that.  There was no interaction between the two

9    to move this thing forward, and, therefore, it didn't mitigate

10   the risk of a supply interruption.

11   Q.  I'd like to switch gears a little bit here and turn us to

12   the discussion that you had with Mr. Parks about bargaining

13   leverage.

14         Let me just ask:  Do you recall that discussion with

15   Mr. Parks yesterday?

16   A.  Yes.

17   Q.  In your experience, do API suppliers prefer to include

18   forecasting provisions in their supply contracts with

19   pharmaceutical companies?

20   A.  Yes, they do.

21   Q.  Why is that?

22   A.  It gives them an opportunity for planning.  You have to

23   look at the facility.  Most CMOs that are there, they look at

24   capacity, and when their capacity reaches a certain amount,

25   then they'll invest.  So forecasting allows them to do their

LCFKFTC1                    Bruno - Redirect

planning, it gives them an opportunity to see what products
they can do, they can't do, and, also, it gives them an
opportunity to look at when they're going to implement the
investments.

Often these investments take two years to get all the
permits, to bring in the equipment, to qualify, to certify, and
get things ready, so it's not something that you just do
overnight.  Forecasting is very important for all of that type
of thing.

Q.  Now, in your experience, do API suppliers prefer to have
exclusive provisions in their contracts with pharmaceutical
companies?

A.  The exclusive parts of the contract are a different sense.
It's used often in the very beginning of the project, when it's
in its clinical development.  For one, you don't know if the
project is going to succeed, and, also, there's a cost of
bringing on a second supplier, there's a cost of bringing on a
backup supplier.

The smaller companies, they don't have that
wherewithal, both financially or by the people themselves, so
they may look to get an exclusive arrangement that will get
them through all of their development period, that will get
them potentially into launch, and once they get there, they'll
start looking at second suppliers.  Once they get the product
launched, you know you have a product, you know you have an

LCFKFTC1                      Bruno - Redirect

1   income, you can afford to bring on all those costs.  And some

2   of those costs could run a million dollars.

3         THE COURT:  So I think the question you were asked was

4   from the perspective of the supplier, not the buyer.

5         Can you just answer from the perspective of the buyer?

6         THE WITNESS:  No.  I thought I was talking about the

7   supplier because of that, but I did bring in the buyer because

8   the two are related.

9         MR. PERLMAN:  Your Honor, I can try to ask a

10   clarifying question.

11   BY MR. PERLMAN:

12   Q.  When an API supplier agrees to exclusively sell to one

13   pharmaceutical company -- let me rephrase that.

14         When there's an exclusive contract between -- let me

15   rephrase that again.

16         Does an API supplier prefer to sell to one

17   pharmaceutical company or multiple pharmaceutical companies?

18   A.  A CMO for a product that they develop, they would prefer to

19   supply as many companies as they could.  It gives them more

20   volume and, therefore, better economics.

21   Q.  Okay.

22         So, again, turning to the discussion with Mr. Parks

23   about bargaining leverage, in your understanding and your

24   knowledge of the industry, does an API -- do API suppliers

25   prefer to have a forecasting provision or an exclusivity

1    provision in their contracts?

2    A.   The forecasting provision would be much more important

3    because it goes back to planning.

4    Q.   From the perspective of -- shifting gears, and from the

5    perspective of a pharmaceutical company, does it require more

6    leverage for a pharmaceutical company to secure a forecasting

7    provision from a CMO or an exclusivity provision?

8    A.   I think the forecasting would be more important, because,

9    again, you can --

10             THE COURT:  More important to whom?

11             THE WITNESS:  To the pharmaceutical company — thank

12   you — because it allows both parties to understand what they're

13   going to need for capacity in the future.  So the forecasting

14   becomes extremely important in that respect.

15   BY MR. PERLMAN:

16   Q.   Understood.  I'm asking just a slightly different question,

17   Mr. Bruno.

18             So, thinking about the pharmaceutical company's

19   perspective, and you're thinking about the bargaining dynamics

20   between a pharmaceutical company and an API supplier, would it

21   require more bargaining leverage from the pharmaceutical

22   company to secure an exclusivity provision or a forecasting

23   provision from the API supplier?

24   A.   Based on my experience, it would still be -- the

25   forecasting would be -- would give them more bargaining power

LCFKFTC1                        Bruno - Redirect

because it would give the CMO an understanding of when they

would have to make -- when their income would be generated, so

they would have more of a leverage in order to talk in that

respect.

Q.  I'd like to turn to paragraph 71 of your affidavit.  We

don't need to put it up on the screen, but we spent a lot of

time talking about the relationship yesterday between GSK's

contract with Fukuzyu and Vyera's contract with Fukuzyu.

Do you recall that testimony?

A.  Yes.

Q.  Mr. Bruno, could you remind the Court what the scope of the

exclusivity provision in Vyera's contract with Fukuzyu is?

A.  Basically, they were going to control the U.S. market for

human health in their exclusivity.  So, Vyera would be

restricted from selling any product into the United States for

human health.  That was the primary part of, I would say, their

contract in that regards.

Q.  You just said "Vyera."  Did you mean Fukuzyu?

A.  I'm sorry.  Fukuzyu.

Q.  Just to be clear, under the exclusivity provision, could

Fukuzyu sell pyrimethamine API outside of North America?

A.  That's correct.

Q.  To customers other than Vyera?

A.  And outside of the human health, as well.

Q.  Inside the United States?

LCFKFTC1                    Bruno - Redirect

1   A.  Correct.

2   Q.  I'd like to pose a hypothetical to you, Mr. Bruno.  If

3   demand for pyrimethamine API outside the United States rose, is

4   there anything in the Fukuzyu supply contract with Vyera that

5   would ensure that Fukuzyu would continue to supply Vyera?

6          MR. PARKS:  I am going to object.  It's not in the

7   report, it's not in his direct testimony, there's no expert

8   opinion on this, and so I don't think it's proper.

9          THE COURT:  Overruled.

10          THE WITNESS:  Would you repeat it again, please?

11   BY MR. PERLMAN:

12   Q.  Sure.

13          If demand for pyrimethamine API outside the United

14   States rose, is there anything in Vyera's supply contract with

15   Fukuzyu that would ensure that Fukuzyu would continue to supply

16   Vyera?

17   A.  I saw nothing in the contract that would guarantee that as

18   the volumes rose, that Vyera would be guaranteed deliveries of

19   the material.

20   Q.  Mr. Bruno, in your review of the contract, what happens

21   when Vyera sends a purchase order to Fukuzyu?

22   A.  According to the contract, Fukuzyu has ten days to respond

23   to the contract.

24   Q.  To the purchase order?

25   A.  To the purchase order.

LCFKFTC1                    Bruno - Redirect

1    Q.  Can Fukuzyu reject the purchase order?

2    A.  I saw nothing in the contract that said that Fukuzyu had to

3    accept the contract -- accept the purchase order, and if they

4    didn't do it within the ten-day period, they could, in effect,

5    reject it.

6    Q.  Okay.  Here's my last set of questions.  We're going to

7    shift gears slightly.

8            I think at the beginning of your testimony yesterday,

9    you discussed with Mr. Parks a number of companies that you had

10   worked for before and whether those companies had exclusive

11   contracts.  So I'd like to ask you a few questions about that.

12           Just to start, Mr. Bruno, why do pharmaceutical

13   companies typically seek exclusive API supply contracts?

14   A.  We're talking about the pharmaceutical companies?

15   Q.  That's right.

16   A.  So what happens when you're a company, and you're trying to

17   get an exclusivity, you're looking at your market, and so the

18   limit -- the more you can limit that API going to other people,

19   the longer you can delay the potential of the product going

20   into the marketplace and, in effect, competing with you.

21   Q.  Are there any other reasons?

22   A.  You are also looking to assure that you get supply

23   materials so you can maintain your market share.  So these are

24   the kinds of things that you're trying to do.  Once you've

25   launched a product, you don't want to be without.  As you go

LCFKFTC1                    Bruno - Redirect

1  forward, you want to make sure that you can get all of your

2  regulatory parts.

3          So all those aspects can get tied in, and you're also

4  making investments, so you're spending money, and you want to

5  make sure that you can get a return on all the money you spent

6  in order to get that product launched on the market.

7  Q.  So I'd like to just make sure we're clear about something.

8          When you said that companies prefer to have exclusive

9  supply contracts, are you drawing a distinction between the

10 supply contract and the exclusivity provision itself?

11 A.  I --

12         THE COURT:  Counsel, I'm a little confused by the

13 reference to company.  If you could identify if you're talking

14 about the purchaser, the pharmaceutical company purchasing the

15 API, or the manufacturer supplying it, I could better

16 understand your question.

17         MR. PERLMAN:  Sure.  And I will try to rephrase it, as

18 well.

19 BY MR. PERLMAN:

20 Q.  Let me ask you this question, Mr. Bruno:  Why do

21 pharmaceutical companies typically seek exclusivity provisions

22 in their supply contracts?

23 A.  The exclusivity will guarantee them a supply of material,

24 it will limit the amount of API that is available in the

25 marketplace, so it will allow them to maintain market share,

LCFKFTC1                    Bruno - Redirect

and because they're covering an investment, they need to make
sure that they can maintain that income in order to cover the
investment, which has occurred -- which could be several years.

Q.  How does an exclusivity provision guarantee supply?

A.  It doesn't guarantee supply from a manufacturing point of
view because unless you put something in the contract, and it's
not just an exclusive provision that says that I will make the
material, I will have either inventory available, I will have
capacity available, so those are other provisions within the
contract that give you that guarantee of the supply.  The
exclusivity, I don't see that in the contracts I've done, have
not limited the ability for you not to get material — excuse
the double negative — but you need other stipulations within
the terms of the contracts.  The exclusivity provision does not
do it.

Q.  Do exclusivity provisions — and I want to stay focused on
the exclusivity provision itself — in API supply contracts
ensure high quality for the pharmaceutical company?

A.  Again, the exclusivity doesn't do that.  You're -- within
the context of the contracts, there's normally a provision that
says something about you'll maintain GMP standards, you'll have
specifications.  Those are what dictates your quality and also
your quality agreement, not the exclusive provision.

Q.  Okay.

        So I'd like to just wrap up with this question:  Do

LCFKFTC1                    Bruno - Redirect

1    you recall discussing the exclusivity provision in the Fukuzyu

2    supply agreement with Mr. Parks?

3    A.  Yes.

4    Q.  Does the exclusivity provision in Vyera's contract with

5    Fukuzyu mitigate supply risk?

6    A.  As I said in my report, it does not mitigate the supply

7    risk because the exclusivity is one piece of it.  Also inside

8    that contract, there's nothing that guarantees that they will

9    get their material and that Fukuzyu guarantees the supply of

10   material.  There's no provisions for the forecasting, there's

11   no provisions for saying that I'll give you the capacity.

12           In the Glaxo, the GSK one, those things exist, and

13   it's clear that you know that you're going to be able to get

14   the material, but, again, those are provisions outside of this,

15   I would say, exclusive provision.

16           MR. PERLMAN:  Your Honor, I have no further questions

17   for the witness at this time.

18           THE COURT:  Thank you.

19           Any recross?

20           MR. PARKS:  Manly Parks, for the defendants.

21           No, your Honor.

22           THE COURT:  Thank you.

23           So, there was a line of questions that I found

24   confusing about leverage.

25           THE WITNESS:  Okay.

LCFKFTC1                          Bruno - Redirect

1          THE COURT:  So let me just see if I can summarize what

2     I thought I understood you to be saying.

3          Forecasting provisions, suppliers of API like them

4     because they permit them to plan?

5          THE WITNESS:  Correct.

6          THE COURT:  And so if you were a pharmaceutical

7     company seeking to buy, it would be easier for you probably to

8     convince the manufacturer to include, as part of the contract

9     provisions, forecasting?

10          THE WITNESS:  Correct.

11          THE COURT:  But that's linked, from the buyer's point

12     of view, probably, to other provisions that would make sure

13     that orders you placed connected to the forecasting would be

14     fulfilled.  And what are those provisions?

15          THE WITNESS:  So what happens on a -- first of all,

16     you can talk about what we refer to as rolling forecasts.  And

17     so just -- I'll make up some time frames.  So if your contract

18     begins, essentially, say, January 1st, so in the third or

19     fourth quarter of the year before, you would put in what we

20     refer to as rolling forecasts.  So we call it rolling because

21     throughout the course of the year, it could be changing, so

22     it's not a fixed number.

23          So what the supplier will do is they'll talk to the

24     pharmaceutical company.  The pharmaceutical company will say,

25     well, we think we're going to need this much material on this

1   date, and they're planning it around the dosage as well as the

2   API.

3           So then what will happen is you'll get the forecast,

4   and then you'll order purchase orders against the forecast and

5   say I'll give you a purchase order on January 1st of something,

6   and then that becomes a binding -- and that's the binding

7   piece.

8           THE COURT:  So what is the contract provision linked

9   to that that indicates -- that links the forecast to the

10  binding nature of fulfilling the purchase order?

11          THE WITNESS:  Well, you'll have a forecasting piece,

12  and you'll have a purchasing order piece.  And you'll define

13  the purchasing order that the first purchasing order would be

14  put on a certain day and, that will be binding, and then you'll

15  talk about additional purchasing orders throughout the course

16  of the year.

17          But, also, what you will put in the contract, the

18  forecasting piece, is -- and, again, just to make up a number,

19  I may say I'm going to make 100 kilos, and that's what my

20  forecast is.

21          (Continued on next page)

22

23

24

25

LCFMFTC2                        Bruno

1          THE COURT:  Who are you referring to?

2          THE WITNESS:  I'm sorry.  The contract manufacturer

3    will be told by the pharmaceutical company that they are going

4    to need a hundred kilos.  The contract manufacturer, the CMO,

5    will then put into their budget that they are going to make a

6    hundred kilos.  But inside the forecasting piece of the

7    contracts they normally have a provision for going above that

8    number.  So as an example --

9          THE COURT:  So it's a minimum order requirement?

10         THE WITNESS:  Not an order.  It's a forecast at this

11   point still.  They have planned to make 100 kilos, but in their

12   plan --

13         THE COURT:  Who is planning to make a hundred kilos?

14         THE WITNESS:  The contract manufacturer.  I'm sorry.

15   I'll try to be more exact.  The contract manufacturer has the

16   hundred kilo number.  They, the contract manufacturer, will

17   turn around and in their gross planning for the year for all of

18   their products the contract manufacturer will put 100 kilos.

19   But most likely they will put 120 kilos.  When I worked for a

20   CMO and I was in charge, we put about a 20 percent because you

21   want to be able to cover that number.

22         Then once that number is in place, you have your

23   planning.  Then the next provision will be the purchase order.

24   Purchase orders will be the binding orders.  Normally, in the

25   forecasting piece the company, the pharmaceutical company and

LCFMFTC2                        Bruno

1    the CMO will be talking throughout the year and they will be

2    discussing their needs and the demand, how they go up and how

3    they go down.  They will make adjustments in the forecast.  And

4    then the purchase orders will be issued according to that and

5    purchase order is normally the binding piece of it in that

6    respect.  It's a constant and continuous conversation between

7    the two parties.  Neither one of them is doing this in a

8    vacuum.

9             THE COURT:  But the contract doesn't commit to the

10   state you have described it to us yet that that purchase order

11   must be filled.

12            THE WITNESS:  Normally, in the contract, the first

13   part of the contract talks about a purchase order that must be

14   filled.  They guarantee that they will supply the minimum

15   amount, which would be the hundred kilos.  They, the CMO,

16   guarantees that they will supply that much based on the

17   forecast.

18            THE COURT:  What's the time lag, or does it depend on

19   the product and the manufacturer, between receipt of the

20   forecast from the customer, the buyer of the API, and the

21   receipt of the purchase order which defines the precise

22   quantity desired at that moment?

23            THE WITNESS:  Normally, you do the forecast the

24   quarter before the contract year starts.  So, again, just say

25   you would do it in November if the contract starts January 1.

LCFMFTC2                              Bruno

1     That's the first piece.

2              Inside the contract, the first purchase order, there

3     will be a date and that has to be submitted.  You may say you

4     must do that in January, February, or March or some time frame.

5              And that purchase order, depending on what the two

6     have either agreed to or what the discussions are, will either

7     be the orders for the year or it will be the order for the next

8     quarter.  If it's an existing product, pyrimethamine was an

9     existing product.  I could envision getting a contract that

10    gave me a rolling forecast of, again, a hundred kilos and then

11    getting an order in the first quarter which could have been, I

12    want 50 kilos in January and I want 50 kilos in June, that type

13    of thing.  That would be, again, the purchase order and that

14    would be defined in the purchase order in that regards.

15             THE COURT:  What contract provisions protect the buyer

16    of the API that it will actually get from the supplier the API

17    that it needs?

18             THE WITNESS:  In the contract, I normally see it in

19    the purchase order, that that hundred kilos will now be defined

20    as the minimum amount of material that they must buy for that

21    year.

22             THE COURT:  If I provide, pursuant to contract terms,

23    a forecast in the fourth quarter and then I submit a purchase

24    order to you the following year on a schedule we have agreed

25    to, you are required, seller of the API, to provide that amount

LCFMFTC2                      Bruno

1  of API that I defined in my forecast at a minimum.

2              THE WITNESS:  At a minimum, yes.

3              THE COURT:  Or there is a financial penalty if you do

4  not.

5              THE WITNESS:  There is normally some kind of financial

6  penalty.

7              What I often see in the contracts, especially if you

8  have a second supplier, because the first supplier normally

9  supplies a larger amount, they normally get a better price.

10  There is a second supplier, smaller amount, they normally have

11  a higher price.  The contracts that I have worked on will often

12  define that difference in price.  If I don't supply you, then I

13  have to pay -- I, the CMO.  I have to pay that or pay some

14  penalty in that respect.

15             THE COURT:  So you testified earlier this morning that

16  once a DMF is filed for a particular API, it's unusual for the

17  manufacturer of the API and the buyer of the API to have an

18  exclusivity provision in their contract.

19             THE WITNESS:  If that API -- if that DMF --

20             THE COURT:  Did I understand your testimony correctly?

21             THE WITNESS:  I think so.  But I think there was more

22  to it that may not be correct.

23             THE COURT:  Please explain.

24             THE WITNESS:  So if I have what I refer to as a

25  multioutlet product, what I would say is, those kinds of

LCFMFTC2                        Bruno

1    products, you want to sell as much as you can.  So I, the CMO,

2    would submit a DMF.  The DMF would go into a file and the whole

3    world would know that I'm making that product.

4            THE COURT:  Are you saying that the knowledge that you

5    have filed, that you the manufacturer have filed in the DMF is

6    public information.

7            THE WITNESS:  Once you filed, you will get a number

8    from the FDA and that is in a database and it is another

9    database.  When I looked at who could do pyrimethamine, I went

10   into two databases.  One was the FDA DMF list and the other was

11   a pay service that I support.

12           THE COURT:  A subscription service.

13           THE WITNESS:  A subscription service.  That was the

14   Newport.  A lot of companies will actually use that almost as

15   an advertisement, so I can show the world I'm making it.  If

16   you're a generic house, you are going to call me up and say, I

17   see you're making this.  Therefore, can you supply me.

18           THE COURT:  Now the details of the DMF, the

19   manufacturing process, the quality controls, perhaps the

20   ingredients even, those are not public when you file the DMF.

21           THE WITNESS:  That's correct.  The whole concept of

22   the DMF was instituted when they wanted to have this generic

23   model, if you will.  So the CMO company argued that we didn't

24   want to give that information to a pharmaceutical company who

25   could either misuse it, who could give it to somebody else.  So

LCFMFTC2                    Bruno

they created this DMF.  So everything within the context of the DMF is confidential.

THE COURT:  Therefore, tying it together, once an API supplier has filed a DMF, they are less likely to be interested in entering into a contract with an exclusivity provision because?  Could you explain.

THE WITNESS:  The main reason is, you want to make volume, even if it's a smaller volume product.  It doesn't matter the scope of the project.  The more customers you have, the more likely you are going to be able to sell your material.

Also, it will be an advantage because then you will start to develop a relationship with a company, so the company being the pharmaceutical company.

So, as I said, it's not a good example, but it's almost it's like an advertisement.  I'm making this.  I can make this.  I have a DMF.  I am going to be able to support you.  The more I make, the lower my costs are.  The better my economics are, the more profit I'll make.

The other side of it is, you reduce your risk, you from the CMF point of view.  If I only offer it to you, again, using Vyera as an example, what if they have a bad year?  What if they don't do well in the marketplace?  What if somebody else comes in, like a generic, another generic, and does a better job?  There are things that they can do to do that.

One, I lose market share as the CMO.  But, more

LCFMFTC2                    Bruno

important, as it goes down, my costs go up.  Not just for the

product.  Because keep in mind that a CMO, when they look at

their overhead cost, it's based on how much they make, how much

material, not necessarily one product.  So the more products I

make, the lower my overheads are and the more profit I have.  I

have reduced my risk as the CMO so I could support that

production.  I reduced my cost because I continue to make more.

It's their advantage to have that type of thing.  For these

kinds of products, that's the case.

            THE COURT:  In a bargaining situation, if you, the

manufacturer, have filed the DMF so the world knows that I have

a manufacturing process for this API and I'm available to the

world for contracts to supply you with this API, the DMF is

filed.  That news is out there.

            THE WITNESS:  Correct.

            THE COURT:  Now I'm, from the point of view of the

pharmaceutical company, coming to the manufacturer and saying,

yes, I know.  The world is aware that you are a producer of

this API.

            THE WITNESS:  Correct.

            THE COURT:  But I want to be your only purchaser in

America.  I want an exclusivity provision.  Even though

everyone else, every other pharmaceutical company in America

knows you have produced this API, I want you only to sell to

me.

LCFMFTC2                        Bruno

1          I have to provide you in this hypothetical with

2    incentives because you are depriving yourself, you, the

3    manufacturer, are depriving yourself of alternative outlets for

4    your API.

5          THE WITNESS:  Correct.

6          THE COURT:  And those incentives could be promises and

7    forecasts of a growth in the pharmaceutical company's business

8    for not just only supplying that API, but maybe other products

9    that the manufacturer produces.

10          THE WITNESS:  Correct.

11          THE COURT:  We won't go to your competing

12    manufacturers.  We will instead come to you and purchase other

13    products from you.

14          THE WITNESS:  Correct.  I think the other part of it

15    also is, once you start to build that relationship, it costs

16    money to develop a product because you have to audit plans, you

17    have to have that relationship.  And, in my experience, when

18    you put a face to the project, things tend to go a lot

19    smoother.

20          As a consultant, when I'm working with a

21    pharmaceutical company, and that's where a lot of my business

22    is interfacing with the contract manufacturer, the first thing

23    I do is try to get the two parties in the room so you can start

24    to develop that relationship.  Because I can assure you in this

25    these types of projects something is going to go wrong.  Those

LCFMFTC2                          Bruno

1    are relationships that help.

2            But also when you talk about the DMF, again, these

3    aren't being done in a vacuum.  You have people talking

4    constantly.  If I'm making pyrimethamine for you, my business

5    development guy is going to go in there and say, I am making

6    this.  What else are you looking at?

7            And Vyera may be a little different because it only

8    has the one product essentially at this time.  It has a few

9    that they are thinking about.  Some of them were, as I heard

10   yesterday, were more line extensions, which just means more

11   volume of that product, not of everything else.  There is a

12   dynamic going on between both parties throughout the whole

13   course of the time.

14           In many of the generics, especially on the market

15   today, the contract manufacturer will actually start working on

16   those products very early on.  I have worked on generics that

17   the generic product is made and the ANDA is submitted almost

18   the day that it gets approved by the innovator.  This could be

19   seven or eight years in advance you're starting to work on the

20   development of it so that you are ready when it becomes a

21   generic three or four years later.

22           THE COURT:  Let me make sure I understand what you

23   just said.

24           You are saying that the manufacturer of the API and a

25   generic not infrequently will work hand in hand so that they

LCFMFTC2                    Bruno

1    are both developing their processes at the same time.

2              THE WITNESS:  Not exactly.  You have the right idea.

3              But what I'm saying is, the generic company will say,

4    look, they go to Fukuzyu and they say, you know what, we are

5    making this product.  We have been working with you.  We are

6    looking to develop these two products and maybe they are five

7    or six or seven years out.

8              So then Fukuzyu will say, OK, let me look at it.  They

9    will go into their lab.  They look at research.  If you go on

10   the Internet for a lot of the major CMOs, you will not only see

11   a product line, you will see a development line.

12             Again, this is an indication, these are things, we

13   don't have them.  We don't have a DMF.  We don't even have a

14   process.  These are the things we are looking at.  Again, this

15   interaction is going on.  It's not a vacuum, is all I was

16   trying to say.

17             There is a lot of discussions and all of that.  When I

18   was doing more of this as a BD person, business development

19   person, as you move up the proverbial chain, when I was the

20   person calling on the generic house, one of the first things

21   you did is, you talked about what was next.  If you are doing a

22   good job on one, you get the next one.

23             In the case of Fukuzyu, for Vyera, in principle, when

24   Vyera bought the product, Fukuzyu was the only supplier for the

25   product because he was the only one that was approved.

LCFMFTC2                        Bruno

1          THE COURT:  By the FDA.

2          THE WITNESS:  By the FDA, yes.

3          Since no one else was in the submission that was sent

4     to the FDA by the original GSK, then Impax and then eventually

5     Vyera, Vyera had no choice.  It's not like they could say,

6     well, I'll use RL Fine.  They had to go through this whole

7     process of getting the approval.  That could take some time.

8          THE COURT:  That is, if they went to RL Fine, as

9     opposed to Fukuzyu, they would have to go through an entire

10    process to get RL Fine approved?

11         THE WITNESS:  Exactly.  My point that I was trying to

12    make earlier is that without that approval, in principal you

13    can't make the material.  Yes, you can make it.  But then you

14    better go through that long period of getting the approval.

15         I don't know the exact number today, but in my

16    business we review with the FDA, because they print some of

17    this, how many applications are in the submissions, how many

18    submissions -- how many applications for an approval.

19         The FDA has been backlogged at times with over 5,000

20    submissions that are being reviewed.  That could take several

21    years.  I had a client once that wanted to amend their

22    submission and in this case this would be an amendment to a

23    submission.

24         Because it was going to take so long and the

25    amendments go on the bottom of the pile, the new submissions go

LCFMFTC2                        Bruno

1    on the top.  They really just resubmitted a whole new thing, so

2    they were higher on the list.  Because it takes long and it's

3    an uncertainty in the time.

4            In the case of Fukuzyu, this is why I said I don't

5    think RL Fine mitigates the risk, is because I can't make the

6    product and no one is doing anything to get me approved in a

7    reasonable amount of time because in one respect I don't know

8    the time.  The estimate is two years, approximately, for just

9    the review part of it.  What I do I do for two years?

10           THE COURT:  Thank you.

11           Do counsel have questions for the witness based on the

12   questions I have placed to him?

13           MR. PERLMAN:  Nothing for plaintiffs, your Honor.

14           MR. PARKS:  Nothing for defendants, your Honor.

15           THE COURT:  Thank you.  You may step down.

16           THE WITNESS:  Thank you.

17           (Witness excused)

18           THE COURT:  Next witness.

19           MR. MEIER:  Your Honor, my colleague, Lauren Peay will

20   handle the next witness for the government.  We call Dr. W.

21   David Hardy, M.D. to the stand.

22           THE COURT:  Dr. Hardy, if you would come up here,

23   please, and take the witness stand.

24           Excuse me, Mr. Bruno.  If you could just stay one

25   minute.

LCFMFTC2                          Bruno

1            Thank you and thank you for your patience.  I just

2     wanted to confirm that I had no other questions.  Thank you.

3     WILLIAM DAVID HARDY,

4            called as a witness by the Plaintiffs,

5            having been duly sworn, testified as follows:

6            THE COURT:  Dr. Hardy, you are about to be handed a

7     document which I believe is your direct testimony.

8            MS. PEAY:  Your Honor, may I approach the bench and

9     the witness with copies?

10           THE COURT:  Thank you.  What's the exhibit number for

11    Dr. Hardy's affidavit?

12           MS. PEAY:  It is Government Exhibit 8003.

13           THE COURT:  Dr. Hardy, if you could turn to page 36 of

14    your exhibit, I believe you authorized someone to

15    electronically sign your name on page 36, is that right?

16           THE WITNESS:  That is correct, your Honor.

17           THE COURT:  Before you gave that authorization, did

18    you read this document with care?

19           THE WITNESS:  Yes, I did.

20           THE COURT:  Do you swear to the truth of its contents?

21           THE WITNESS:  Yes, I do.

22           THE COURT:  Any objection other than those already --

23    I don't think I have any already made.  Any objection to

24    receipt of 8003.

25           MR. McCONNELL:  No objection.

LCFMFTC2                          Hardy – Cross

1           THE COURT:  8003 is received.

2           (Government Exhibit 8003 received in evidence)

3           THE COURT:  Cross-examination.

4    CROSS-EXAMINATION

5    BY MR. McCONNELL:

6    Q.  Good morning, Dr. Hardy.  How are you?

7    A.  Good morning.  I'm fine.  Thank you.

8    Q.  In describing your expertise in this matter you point out

9    that you have treated well over 1500 HIV AIDS patients over

10   your 30-year plus career, is that correct?

11   A.  That is correct.

12   Q.  Are you familiar, Dr. Hardy, with the direct testimony that

13   Professor Hemphill intends to offer in this case?

14   A.  No, I'm not.

15   Q.  Professor Hemphill intends to testify that the most recent

16   available estimate suggests that there are slightly less than

17   10,000 cases of toxoplasmosis per year in the United States.

18   Do you agree with that estimate from Professor Hemphill?

19   A.  Not ever really counting the cases, I'm not really an

20   expert in terms of how many cases there are or in terms of the

21   diagnosis, treatment, prevention.

22   Q.  In your clinical experience do you believe the number to be

23   more or less than 10,000 per year?

24           MS. PEAY:  Objection, your Honor.  This is a question

25   that's outside the Scope of the witness' direct testimony.

1            THE COURT:  Overruled.

2            You may answer.

3   A.  I would have no good basis to make a good judgment whether

4   that number is correct or not.

5   Q.  According to your direct testimony in this case, Dr. Hardy,

6   you have treated roughly 400 patients for toxoplasmosis over

7   the course of your entire career, is that right?

8   A.  My estimate is somewhere between 200 and probably 350, is

9   best I can say.

10  Q.  According to your testimony in this case, about 200 of

11  those 200 to 350 toxoplasmosis patients you treated with FDA

12  approved pyrimethamine, is that correct?

13  A.  That is correct.

14  Q.  So for the few cases to the 150 cases, based on your total

15  estimation of patients that you have treated, those patients

16  received a treatment other than FDA-approved pyrimethamine,

17  correct?

18  A.  To my best estimate, that would be true.

19  Q.  Dr. Hardy, I'd like to discuss a little bit your clinical

20  background with respect to treatment for toxoplasmosis.  OK?

21  You began your clinical experience with toxoplasmosis as a

22  resident physician from the period 1982 to 1986, correct?

23  A.  My residency was actually '82 to '84, but, yes, that would

24  be close to correct.

25  Q.  During that period of time of 1982 to 1986, you would

LCFMFTC2                         Hardy - Cross

1  prescribe pyrimethamine and sulfadiazine for a toxoplasmosis

2  patient unless he or she had an allergy to a sulfonamide

3  antibiotic, correct?

4  A.  That is correct.  In terms of the treatment of active

5  toxoplasmosis disease usually in the brain.

6  Q.  At some point between 1982 and 1986, the FDA approved

7  pyrimethamine for toxoplasmosis, correct?

8  A.  I don't know the exact date, but I do know that

9  pyrimethamine has been approved by the FDA for the treatment of

10  toxoplasmosis, yes.

11  Q.  Do you remember being deposed in this case on July 27,

12  2021, Dr. Hardy?

13  A.  Yes.

14  Q.  At your deposition you testified that you believed that

15  some point between 1982 and 1986, the FDA approved

16  pyrimethamine for use for patients with toxoplasmosis.  Do you

17  agree with that testimony?

18  A.  I do remember my deposition, and I faintly remember that

19  date.  It may have been actually earlier, but I know it has

20  been approved by the FDA.  It may have been done earlier than

21  that, but I am not exactly sure of the date.

22  Q.  Would it be fair to say that by 1986 the FDA had approved

23  pyrimethamine for treatment for patients with toxoplasmosis?

24  A.  That is my best understanding and recollection, yes.

25  Q.  So during that period of 1982 to 1986, you did not rely on

LCFMFTC2                         Hardy - Cross

1    any published guidelines in order to select that course of

2    treatment for toxoplasmosis patients because no published

3    guidelines existed at that time yet, correct?

4    A.  That is true.

5    Q.  During this period of 1982 to 1986, the approximate failure

6    rate for the pyrimethamine treatment regimen for acute active

7    toxoplasmic encephalitis was about one-third, right?

8    A.  I don't have good data to support that, but, to my best

9    recollection, in the early days of the AIDS epidemic, that was

10   a pretty good estimate, yes.

11   Q.  Now I'd like to move to the late 1980s, to the period 1986

12   to 1991.  Is that OK?

13   A.  '86 to '91.  OK.

14   Q.  Between 1986 and 1991, the number of toxoplasmosis patients

15   that you were treating each year increased to about 36 patients

16   per year, correct?

17   A.  Yes, approximately 36 per year.

18   Q.  And the only treatment regimen that you used during this

19   time to treat active toxoplasmosis was a pyrimethamine-based

20   regimen, correct?

21   A.  To the best of my recollection, that was my primary -- that

22   was my primary regimen for treatment, yes.

23   Q.  The failure rate of the pyrimethamine-based regimen

24   remained the same for the period 1986 to 1991 for active

25   toxoplasmosis patients, correct?

LCFMFTC2                        Hardy - Cross

1    A.   Again, I have no data to prove that, but I would estimate

2    that knowing what was happening, AIDS epidemic during those

3    years, that that high failure rate would continue, yes.

4    Q.   Now I am going to move into the early 1990s.  I am going to

5    discuss a drug -- I am going to try my best -- trimethoprim

6    sulfamethoxazole.  Are you familiar with that drug?

7    A.   Yes, I am.

8    Q.   Would it be OK if I referred to that drug today as either

9    TMP-SMX or Bactrim?

10   A.   That's fine with me.

11   Q.   Those can be used interchangeably, sir?

12   A.   Trimethoprim sulfamethoxazole is a generic name, TMP-SMX is

13   an acronym for that name, and Bactrim is actually a brand name

14   for that product.

15   Q.   Sometime around 1991, physicians treating toxoplasmosis got

16   lucky in that it was discovered that TMP-SMX not only prevented

17   pneumocystis carinii pneumonia, but was also fairly good at

18   preventing toxoplasmic encephalitis, correct?

19   A.   I don't remember the exact year that that was recognized,

20   but I do remember that, from large pneumocystis prevention

21   studies, there was also a decrease not only in the occurrence

22   of pneumocystis, but also, secondarily, decrease in occurrence

23   of toxoplasmic encephalitis, yes.

24   Q.   Within one year of that discovery, by 1992, TMP-SMX studies

25   began to demonstrate decreases in the occurrence of active

LCFMFTC2                          Hardy – Cross

1    toxoplasmosis, correct?

2    A.  Again, the dates to me are not entirely definitive.  I do

3    know that as more TMP-SMX was being used for the prevention

4    primarily of pneumocystis pneumonia that there was some

5    decrease in the occurrence of toxoplasmosis plastic

6    encephalitis as well.

7    Q.  With TMP-SMX you get the benefit of treating two

8    opportunistic infections with one drug, isn't that right?

9    A.  To be more specific, you get the benefit of preventing two

10   opportunistic infections.  It's a complicated situation.  But

11   the primary reason that TMP-SMX is used for prophylaxis of

12   toxoplasmic encephalitis is because commonly the patient is

13   already taking it to prevent pneumocystis pneumonia.  It is

14   simply continued.

15   Q.  And studies showed that TMP-SMX was effective as a

16   prophylactic for toxoplasmosis, correct?

17   A.  Correct.  Studies have shown that.

18   Q.  In fact, around this time you wrote a couple of textbook

19   chapters documenting the use of TMP-SMX to prevent both

20   pneumocystis pneumonia and toxoplasmosis around that time,

21   right?

22   A.  Sometime in the early '90s, yes.  I wrote chapters

23   reporting that, yes.

24   Q.  Eventually, TMP-SMX became the recommended medication for

25   primary prevention of toxoplasmosis, correct?

LCFMFTC2                          Hardy - Cross

1  A.  Yes.  That is what our guidelines say.

2  Q.  According to your expert testimony in this case, Dr. Hardy,

3  the three distinct goals for treating and preventing toxoplasma

4  encephalitis are treatment of the active toxoplasmosis disease,

5  primary prophylaxis, which is preventing the development of

6  active disease, and secondary prophylaxis, which is maintenance

7  therapy to prevent recurrence of the active disease.  Is that

8  correct?

9  A.  Yes, that is correct.

10  Q.  Today you consider TMP-SMX to be the gold standard for

11  primary prophylaxis for toxoplasmic encephalitis, correct?

12  A.  Yes, I consider it to be the most highly recommended agent

13  for the primary prevention of toxoplasmic encephalitis.

14  Q.  Do you remember testifying at your deposition, Dr. Hardy,

15  that you considered TMP-SMX to in fact be the gold standard for

16  primary prophylaxis for toxoplasmic encephalitis?

17  A.  I don't remember that exact term gold standard, but I

18  cannot equivocate with it.  It is the number one recommended

19  option, yes.

20  Q.  So you would agree with me that TMP-SMX is the gold

21  standard for primary prophylaxis for toxoplasmic encephalitis?

22  A.  Yes.

23  Q.  Now, another benefit of TMP-SMX is that it can be

24  administered in intravenous form, correct?

25  A.  Yes, that is correct.

LCFMFTC2                        Hardy - Cross

Q.  And a pyrimethamine-based regimen, on the other hand,

requires that the patient take several pills per day, correct?

A.  A total pyrimethamine regimen, yes, does require that.  The

number of pyrimethamine pills is low.  The number of pills that

go along with the other medication, sulphadiazine, is very

high.  But the regimen itself does contain many pills, yes.

Q.  I remember reading in your deposition that a

pyrimethamine-based regimen patient would be taking

approximately nine tablets per day.  Is that right?

A.  That is correct.

Q.  And the pyrimethamine-based pill regimen is sometimes a

limiting factor when a patient cannot swallow a pill reliably,

correct?

A.  Yes.  In the situation where the patient is obtunded or

comatose and cannot reliably survive pills, an intravenous form

of treatment is sought.

            THE COURT:  Obtunded meaning?

            THE WITNESS:  Unable to -- have a decreased mental

alertness.

            THE COURT:  Thank you.

Q.  For that type of patient, Dr. Hardy, that you just

described, intravenous high dose TMP-SMX can be useful to

assure adequate drug delivery, correct?

A.  That is correct.

Q.  I'd like to turn our discussion to another drug,

1    atovaquone.  Are you familiar with that?

2    A.  Atovaquone is a drug I'm familiar with.

3    Q.  Atovaquone is an alternative treatment for treating

4    toxoplasmosis, correct?

5    A.  Yes, that is true.

6    Q.  And you started to use atovaquone to treat active

7    toxoplasmosis sometime after 1991, correct?

8    A.  No, I don't believe that is correct.  Until pyrimethamine

9    became difficult to obtain, my number one choice, as per

10   guideline recommendations, to treat active disease from

11   toxoplasmosis in the brain was pyrimethamine plus sulphadiazine

12   or pyrimethamine plus clindamycin.  Atovaquone has always been

13   an alternative, second or third choice regimen.

14   Q.  Dr. Hardy, that was not responsive to my question.  My

15   question was simply that you did not start using atovaquone at

16   all in any respect to treat active toxoplasmosis until sometime

17   after 1991, correct?

18   A.  Sometime after 1991, yes.  It wasn't available at the time

19   until after that date I'm sure.

20   Q.  Between 1991 and 1996, you participated in at least two

21   studies using atovaquone for both active toxoplasmosis and for

22   pneumocystis carinii pneumonia that were fairly successful,

23   correct?

24   A.  I do remember participating in some studies investigating

25   the use of atovaquone in those diseases, yes.

LCFMFTC2                         Hardy - Cross

1   Q.  Those studies showed that it was effective, correct?

2   A.  I would have to review the studies to really understand and

3   make a decision whether -- what the term effective means.  But

4   I remember participating in them as a clinical research site.

5   Q.  Fair enough with the term effective.

6           Do you remember at your deposition testifying that

7   those studies were fairly successful, Dr. Hardy?

8   A.  I think the term fairly successful is one I would agree

9   with.  Again, it's put into the context of a high-mortality

10  disease that was untreatable in many ways, and fairly

11  successful could be taken in many different ways because of

12  that.

13  Q.  But you agree with it, correct?

14  A.  Yes.

15  Q.  So before 1991, in the 1980s, when you were seeing many

16  patients a year during the HIV AIDS epidemic, TMP-SMX and

17  atovaquone were not used to treat patients with toxoplasmosis,

18  correct?

19  A.  That is correct.

20  Q.  From 1991 to 1996, according to your direct testimony in

21  this case, the number of patients you saw fortunately went down

22  a bit to about 20 patients with toxoplasmosis per year,

23  correct?

24  A.  Yes, that is correct.

25  Q.  Your primary prescription choice for those patients that

LCFMFTC2                         Hardy - Cross

1   presented with active toxoplasmosis was a pyrimethamine-based

2   regimen during that time, correct?

3   A.  Yes, that is correct.

4   Q.  In that 1991 to 1996 time frame, you also had an

5   alternative to pyrimethamine-based regimen and had the ability

6   to prescribe TMP-SMX for active toxoplasmosis, correct?

7   A.  TMP-SMX is, again, an alternative second or line choice.

8   It was available, and I did not use it frequently, no.

9   Q.  But it is possible that you did prescribe TMP-SMX for

10  toxoplasmosis patients during that time, correct?

11  A.  It is possible that I may have prescribed it in the case

12  where an intravenous form of medication was necessary because

13  of a lack of oral route of administration in a patient who

14  could not swallow pills.

15  Q.  In that same time frame, as an alternative to a

16  pyrimethamine-based regimen, it is also possible that you

17  prescribed atovaquone for active toxoplasmosis patients,

18  correct?

19  A.  Yes, it is possible.  I would -- I do not remember doing it

20  frequently, however.

21  Q.  So since the introduction of TMP-SMX and atovaquone in the

22  early 1990s, there are now three to four alternative treatments

23  for treating active toxoplasmosis, correct?

24  A.  Yes.  Although I would correct the descriptive term from

25  alternative to secondary or tertiary recommended regimens.

1    Q.  Do you remember at your deposition, Dr. Hardy,

2    characterizing TMP-SMX and atovaquone as alternatives for

3    treating active toxoplasmosis?

4    A.  Yes, I do.

5    Q.  You testified truthfully at your deposition, correct?

6    A.  Yes, I did.

7    Q.  And the survival rate for your patients with active

8    toxoplasmosis encephalitis was no different whether you treated

9    them with Daraprim or TMP-SMX, correct?

10   A.  That's a complicated question because of the time periods

11   in which I was treating patients with different medications and

12   the availability of antiretroviral therapy, which became

13   available after 1996.

14           MR. McCONNELL:  Justin, could you please pull up

15   Dr. Hardy's deposition for me, please, page 44.

16   Q.  You were asked at your deposition Dr. Hardy:  So do you

17   have an estimate of approximately what percentage of

18   toxoplasmic encephalitis you treated during that time period

19   with treatment regimens other than pyrimethamine sulphadiazine

20   or pyrimethamine clindamycin, correct?

21           THE COURT:  What time period is that question

22   referring to?

23           MR. McCONNELL:  The middle 1990s, your Honor.

24   A.  From '91 to '96?

25           THE COURT:  Is that the time period, counsel?

1          MR. McCONNELL:  I believe so, your Honor, yes.

2   Q.  Do you see the question, Dr. Hardy?

3   A.  Yes.

4          MS. PEAY:  Objection, your Honor.  This is improper

5   impeachment or improper refreshing of the witness'

6   recollection.

7          THE COURT:  We don't have the question yet.  We have

8   the question asked at the deposition but not the question asked

9   at the trial.

10          Wait until the question is finished.

11          We now know what the question asked at the deposition

12  is referring to, a period of time between 1991 and 1996.  The

13  answer?

14          MR. McCONNELL:  Yes, it's between 1991 and 1996.  I

15  apologize, your Honor.  I can continue.

16          The opposing counsel at the deposition asked for

17  clarification of whether the question referred to active toxo

18  or just generally, and then the examining attorney clarified

19  toxoplasmic encephalitis and then the witness asked if he could

20  clarify that.  And then the witness answered:  OK.  I would

21  have to say the survival rate of the patient was no different.

22  Q.  Do you agree with that testimony, Doctor?

23  A.  Yes, I do agree with it based on my deposition.

24          THE COURT:  Before antiviral therapy for AIDS patients

25  became available in 1996, the survival rate for those treated

LCFMFTC2                         Hardy – Cross

1    with the two alternative therapies was no different, as you

2    recollect?

3            THE WITNESS:  As I recollect, in that pretherapy --

4    antiviral therapy period, they were about the same.

5            THE COURT:  Thank you.

6    Q.  Dr. Hardy, moving past 1996, you have continued to

7    prescribe primarily TMP-SMX for primary prophylaxis of

8    toxoplasmosis, correct?

9    A.  Yes, that is correct.

10   Q.  But from 2000 to 2015, you do not know what percentage of

11   toxoplasmosis cases in the United States were treated with

12   FDA-approved pyrimethamine tablets, correct?

13   A.  I do not have data to support an answer for that.  I can

14   tell you that the number of toxoplasmosis cases decreased

15   sharply after 1996.  And to know exactly how and what they were

16   treated with would be a difficult -- it would be a guess on my

17   part.

18   Q.  So the treatment choices of your colleagues in the medical

19   field between 2000 and 2015, you don't have data to support

20   whether they were prescribing FDA approved pyrimethamine

21   tablets or some other treatment for toxoplasmosis during this

22   time, right?

23   A.  I can say that the CDC, NIH, IDSA, HIVMA sponsored

24   guidelines continue to recommend a pyrimethamine-based regimen.

25   I do not have data to prove how patients were actually treated.

LCFMFTC2                          Hardy - Cross

1   Q.  Thank you.  That was my question regarding the data.

2           Those guidelines were developed in response to the

3   AIDS and HIV epidemic in the 1980s, correct?

4   A.  I believe they were first put together in the late 1980s,

5   early '90s, in order to be able to give physicians direction of

6   how to treat what were previously very rare infections.

7   Q.  Unfortunately for those patients, at that time, in the late

8   1980s, there were many more toxoplasmosis patients than there

9   are today to be able to do more effective studies on effective

10  treatment, correct?

11  A.  That is correct.

12  Q.  But by the time TMP-SMX and atovaquone were introduced in

13  the 1990s, there were few toxoplasmosis patients to run similar

14  studies, correct?

15  A.  It would really depend upon the time period.  Prior to

16  1996, the number of toxoplasmosis cases was about the same as

17  they were in the 1980s, maybe even greater, because there were

18  more patients that being were treated.  After 1996, with the

19  advent of antiviral therapy, the number of all opportunistic

20  infections, including toxoplasmosis, markedly decreased.

21  Q.  Just to be clear, the guidelines recommending FDA-approved

22  pyrimethamine came out in the late 1980s, before TMP-SMX or

23  atovaquone were used to treat toxoplasmosis, correct?

24  A.  I can say that with definition for atovaquone because it

25  was not available.  TMP-SMX has been available since the 1970s,

LCFMFTC2                          Hardy - Cross

1    so I can't really give an estimate, whether it was ever used to

2    treat toxoplasmosis encephalitis.  It may have been.  I don't

3    know.  I have no data to support it one way or the other.  But

4    it was not seriously tested in clinical trials until the early

5    1990s.

6    Q.  Thank you.

7         I want to move, Dr. Hardy, to the post 2015 to present

8    time frame.  Is that OK?

9    A.  Of course.

10   Q.  In 2015, you encountered some difficulties obtaining

11   pyrimethamine for your patients due to price, correct?

12   A.  Correct.

13   Q.  After a price increase on pyrimethamine, about 85 to 90

14   percent of the time that you tried to obtain pyrimethamine

15   sulphadiazine it was unsuccessful, correct?

16   A.  That is correct.

17   Q.  When you could not obtain a pyrimethamine-based regimen,

18   you prescribed TMP-SMX as an alternative in a majority of those

19   cases that you just described, correct?

20   A.  Yes, I did.

21   Q.  When infectious disease experts could not obtain a

22   pyrimethamine-based regimen during this time, some started

23   prescribing compounded pyrimethamine as an alternative as well,

24   correct?

25   A.  Yes.  I have heard of that and have seen some limited

1    research articles published.

2    Q.  Albeit based on, as you said, very limited data, TMP-SMX

3    may be the most commonly used medication for active

4    toxoplasmosis since 2015 in the United States, correct?

5    A.  I cannot give an opinion about what is most commonly used.

6    That's not part of my expertise.  So I really can't give you a

7    good answer on that.

8    Q.  At conferences that you have attended for your industry you

9    have learned that the unavailability due to the price of

10   pyrimethamine over the past few years has made TMP-SMX the most

11   commonly used medication for toxoplasmosis outside of the

12   United States, correct?

13   A.  Again, I have no data.  I cannot remember whether or not I

14   heard that at a conference or not.  I do know that the lack of

15   availability of pyrimethamine has greatly affected the choice

16   for treatment of this life-or-death disease in which therapy

17   must be started within a very short period of time after

18   diagnosis.

19   Q.  Since the price increase of pyrimethamine after 2015, you

20   are not aware of any published data establishing a negative

21   impact on patient care, correct?

22   A.  No, I'm not aware of any published data.

23   Q.  You do not know what percentage of pyrimethamine

24   prescriptions in the United States are prescribed to treat

25   active toxoplasmosis, correct?

1  A.  Again, that's not part of my expertise.  In looking at the

2  marketing or use of pyrimethamine.

3  Q.  So you don't know, correct?

4  A.  I do not know.

5  Q.  You do not know what percentage of active toxoplasmosis

6  cases in the United States are treated with FDA approved

7  pyrimethamine tablets, correct?

8  A.  Again, I have done no survey.  I have seen no research.  I

9  have no data to confirm that number in any way.

10  Q.  You do not know what percentage of active toxoplasmosis

11  cases in the United States are treated with compound

12  pyrimethamine either, correct?

13  A.  Again, I have no data to be able to make a reliable answer

14  to that question.

15  Q.  For your expert work on this case you did not make any

16  attempt to determine those percentages, did you?

17  A.  No, I did not.

18  Q.  Now, you have testified on direct that you have designed,

19  conducted, and reported the results of over 30 clinical trials

20  testing investigational medications for treatment and

21  prevention of AIDS-related opportunistic infections, correct?

22  A.  That is correct.

23  Q.  But you are not aware of any peer-reviewed studies that

24  have looked at the frequency of use of different treatment

25  regimens for toxoplasmosis during any of the time periods

LCFMFTC2                          Hardy – Cross

between 2000 and the present, correct, Dr. Hardy?

A.   Frequency of use is not usually a topic published in medical journals, as opposed to toxicity and efficacy, but I have not seen or am I aware of any articles that look at that question, no.

Q.   In your clinical experience, is one of the reasons why there are no such peer-reviewed studies is because there are an insufficient number of toxoplasmosis patients to run such a rigorous study?

A.   That is correct.  The number of cases of toxoplasmosis has decreased markedly.  Among HIV-positive persons it has remained somewhat consistent, among other immunocompromised patients, such as those receiving stem cell or bone marrow transplants, but that number is still pretty low.

Q.   Again, unfortunately, you would agree with me that none of the treatment regimens, pyrimethamine-based regimens, TMP-SMX or atovaquone, would be capable of actually eradicating latent toxoplasmosis in patients, correct?

A.   Yes, that is correct.

Q.   As far as you are aware, Dr. Hardy, there has not been a new medication approved to treat toxoplasmosis since atovaquone, which, as we discussed, came out in about the mid 1990s, is that correct?

A.   That is correct.

Q.   You testified at your deposition that the development of

LCFMFTC2                          Hardy - Cross

1  new medications for toxoplasmosis has not been a high priority

2  for the biopharmaceutical industry whatsoever and that is

3  primarily because the diseases, while life threatening and

4  several and always needing treatment, does not occur at a

5  high-enough prevalence to make development of a drug for this

6  disease profitable, correct?

7  A.  I would have to see the exact words from my either direct

8  testimony or deposition that you just read.  But, in general,

9  yes, that is a belief of mine, yes.

10  Q.  If you agree with that testimony I don't think we have to

11  go back and show you, if that's OK with you, Dr. Hardy.

12          You went on to note at your deposition that clinical

13  trials comparing the efficacy of pyrimethamine to TMP-SMX are

14  not feasible any longer because so few patients are developing

15  toxoplasmosis these days, correct?

16  A.  That is correct.

17  Q.  For your engagement on this case, you have not personally

18  done a statistical survey of infectious disease practitioners

19  preferences for treating toxoplasmosis, correct?

20  A.  I have not and am not aware of any either.

21  Q.  In your direct testimony, Dr. Hardy, you testified that the

22  opportunistic infections guidelines contain treatment

23  guidelines for the treatment of toxoplasmosis, correct?

24  A.  Yes, they do.  That is correct.

25  Q.  But you would agree with me, though, that whether a single

LCFMFTC2                        Hardy - Cross

1    physician in his or her own personal practice follows those

2    guidelines is a matter of personal physician choice, correct?

3    A.   What a physician does in terms of treatment is always their

4    choice.  What kind of guidelines they follow is always their

5    choice.  Whether they endeavor to practice evidence-based

6    medicine or not is always their choice.

7    Q.   According to Professor Hemphill's direct testimony that he

8    intends to give to this Court, pyrimethamine is considered the

9    standard of care for all manifestations of toxoplasmosis.  Do

10   you agree with that opinion of Professor Hemphill?

11   A.   In large part, that is very true.  There are -- there is

12   one specific type of toxoplasmosis that is treated with a

13   different drug called spiramycin in a very specific clinical

14   situation.  But in all other situations in which toxoplasmosis

15   is being treated, yes, that is true.

16   Q.   If one of your infectious disease colleagues treated a

17   toxoplasmosis patient with TMP-SMX instead of pyrimethamine,

18   would you consider that to be a breach of that physician's

19   standard of care?

20   A.   To judge a physician's standard of care is not my job or am

21   I an expert in judging physician's care.  Again, it is a

22   personal choice based upon teaching, experience, etc.

23   Q.   Are you able to think of situations where a physician would

24   not prescribe FDA-based pyrimethamine and for a toxoplasmosis

25   patient and still be within the proper standard of care?

1    A.  Certainly in a situation where a patient cannot take oral

2    medication, the use of intravenous TMP-SMX is in fact

3    recommended by the guidelines as a route of administration and

4    really the only medication that is available to treat such a

5    patient.  So in that situation, yes, I would say that is a

6    proper and recommended form of treatment.

7    Q.  That's just one example, correct, Dr. Hardy?  There are

8    other situations besides intravenous indication for a

9    toxoplasmosis patient where a colleague of yours could

10   prescribe TMP-SMX and be within the proper standard of care for

11   that patient, correct?

12   A.  Again, each physician practices medicine by their own style

13   and methodology.  How they do that is up to them.

14   Q.  Is that answer yes?

15   A.  That answer is, yes, I'm aware of that happening.

16   Q.  When you have heard of that happening, you haven't thought

17   that your colleague was breaching a standard of care to his

18   patient, his or her patient, correct?

19   A.  Again, I cannot judge my colleagues' standard of care and

20   how they treat their patients.

21   Q.  If one of your infectious disease colleagues treated a

22   toxoplasmosis patient with TMP-SMX instead of pyrimethamine,

23   only because of the price of pyrimethamine, would you consider

24   that to be a breach of that physician's standard of care?

25   A.  Having done that myself, because of the price and the

LCFMFTC2                          Hardy - Cross

1    availability of pyrimethamine and by necessity of needing to

2    start a medication in a very short period of time, the

3    immediate availability of TMP-SMX is what I have done myself,

4    so I would not judge a physician for doing that.  It's a

5    necessity of the current marketplace.

6    Q.  As part of your engagement for this case, Dr. Hardy, you

7    had a conversation with some members of the Federal Trade

8    Commission in April or May of 2019 regarding the general issue

9    of drug access to pyrimethamine in the form of Daraprim for the

10   treatment of toxoplasmosis, your personal experience, and what

11   you knew as the leader of HIVMA, correct?

12   A.  I do remember having a telephone conversation with someone

13   from the FTC about this topic, and I was the chair of the board

14   of HIVMA at that time.

15   Q.  Is it fair to say that that conversation happened sometime

16   in April 2019?

17   A.  I believe that was about the day, yes.

18   Q.  Now, do you remember sending an e-mail on April 3, 2019 to

19   over 30 of your fellow infectious disease colleagues regarding

20   this issue?

21   A.  Yes, I do.

22   Q.  In that e-mail you stated to your 30-plus infectious

23   disease colleagues that the Federal Trade Commission has asked

24   you to testify, has asked you, Dr. Hardy, to testify regarding

25   whether this enormous price hike of pyrimethamine has limited

LCFMFTC2                        Hardy - Cross

1    patients' access to this life-saving drug.  Do you remember

2    sending that e-mail?

3    A.  Yes, I do.

4    Q.  And your intent in sending that initial e-mail from April 3

5    of 2019 was to look to your fellow infectious disease

6    colleagues working in urban areas that have historically cared

7    for many HIV-positive persons to look for cases of problems

8    with access to pyrimethamine, correct?

9    A.  My intent was to simply, as you alluded to before, do a

10   very informal survey of colleagues who I know worked in areas

11   where HIV-AIDS had been and still was prevalent to better

12   understand what their experience had been in terms of treating

13   toxoplasmosis.

14   Q.  At your deposition you could only remember receiving two

15   responses from your colleagues to that e-mail, correct?

16   A.  I believe there were overall three, as I look at the

17   records more carefully, but yes at least -- I believe there

18   were three responses that I can remember.

19   Q.  So you e-mailed 30 plus colleagues and you got three

20   responses, correct?

21   A.  Correct.

22   Q.  And one of those responses to your inquiry regarding the

23   FTC's questions was an April 4, 2019 e-mail that you received

24   from Dr. Rajesh Gandhi, correct?

25   A.  I believe I did receive something from Rajesh Gandhi.  I

LCFMFTC2                        Hardy – Cross

1    can say for sure that was him.  But go ahead.

2    Q.  Would it refresh your recollection, sir, to see the e-mail?

3    A.  That would refresh me.  Yes.  Please do.

4            MR. McCONNELL:  Justin, could you please bring up

5    DX-456 to help refresh Dr. Hardy's memory.

6    Q.  Dr. Hardy, please take a moment to review the e-mail and

7    let me know when you have completed your review.

8    A.  Yes, I do remember this e-mail.

9    Q.  Does the e-mail from April 4, 2019 reflected in DX-456

10   refresh your recollection, Dr. Hardy?

11   A.  Yes, it does.

12   Q.  Dr. Gandhi responded to your e-mail to provide you with an

13   update regarding Massachusetts General Hospital's issues with

14   pyrimethamine access, correct?

15   A.  Correct.

16   Q.  The MGH there in the e-mail stands for Massachusetts

17   General Hospital, correct?

18   A.  That is correct.

19   Q.  Dr. Gandhi told you that we at Massachusetts General

20   Hospital have been able to access pyrimethamine through a

21   noncommercial source but that that will no longer be the case

22   as of September 2019.  As a result, our patients will either

23   need to use the commercial product, 400 to $900 per

24   25-milligram tablet, or we'll be forced to switch to

25   trimethoprim sulfamethoxazole instead?

LCFMFTC2                          Hardy - Cross

A.   That is correct.

Q.   And trimethoprim sulfamethoxazole is the TMP-SMX that we
have discussed today?

A.   That is true.

Q.   Is it possible, Dr. Hardy, that the noncommercial source
referenced by Dr. Gandhi was a reference to compound
pyrimethamine?

          THE COURT:  Sustained.

Q.   Dr. Gandhi also noted that the Massachusetts General's
toxoplasmosis patients will either need to use the commercial
product or be forced to switch, correct?

A.   That is the reading of his e-mail, yes.

          MR. McCONNELL:  You can take that down, please,
Justin.

Q.   You did not rely on that e-mail from Dr. Gandhi in offering
your expert report or testimony in this case, correct,
Dr. Hardy?

A.   No, I did not.

Q.   Dr. Hardy, you will agree with me that the research finds,
although not conclusively, that TMP-SMX is a well-tolerated
alternative to pyrimethamine-based treatment regimens for
toxoplasmosis patients, correct?

A.   It is true that there have been two studies, randomized
trials.  One was never finished.  One was problematic.  And the
results -- the conclusions from those studies were exactly as

LCFMFTC2                          Hardy - Cross

1    you said, yes.

2    Q.  You in fact cited to at least one of those studies in book

3    chapters and articles that you have written over the course of

4    your career, correct?

5    A.  Yes, I probably have.  I don't remember the exact citation,

6    but having written many book chapters and articles on this

7    topic, I probably did use those because they were the only ones

8    available.

9    Q.  We talked a little bit earlier, as part of your engagement

10   on this case you sent out an e-mail to your colleagues and you

11   got three responses.  We just checked one.  I'd like to discuss

12   another one with one of your colleagues, but the identity of

13   that person has to remain confidential.  Do you understand

14   that, Dr. Hardy?

15   A.  I understand that.  I am aware.

16                (Continued on next page)

17

18

19

20

21

22

23

24

25

Q.  Do you remember the contents of that email back and forth

that you engaged in with that colleague of yours that responded

to your inquiry?

A.  Yes, I do.

Q.  So that colleague of yours responded to your request and

informed you that:  "I think what we have learned is that there

are better tolerated and less toxic alternatives.  We either

use Bactrim or the combination of clinda/atovaquone, which

ironically is what ophthalmologists have been using for ocular

toxo for years, and I am unaware of any poor outcomes in

transplants or HIV from not having pyrimethamine," correct?

A.  I do remember that email, yes.

Q.  And you responded to your colleague that:  "The scant

research seems to find, although not conclusively, that TMP/SMX

is a well-tolerated alternative to Pyr-Sulfa or Pyr-Clinda for

CNS toxo and atovaquone clinda regimen is used successfully in

ocular toxo," correct?

A.  I do remember writing that, yes.

Q.  And just for clarity of the record, Pyr-Sulfa is

pyrimethamine -- I'm sorry, I shouldn't have even tried.

        Dr. Hardy, can you please clarify what Pyr-Sulfa was

in your email?

A.  By Pyr-Sulfa, I was referring to pyrimethamine and

sulfadiazine.

Q.  The reference to Pyr-Clinda, what were you referring to

LCFKFTC3                         Hardy - Cross

1    there?

2    A.   Pyrimethamine plus clindamycin.

3    Q.   And CNS, the reference there to CNS toxo, that's central

4    nervous system, correct?

5    A.   Correct.

6    Q.   The atovaquone/clinda regimen that's referred to in that

7    email is an alternative treatment that has been used in ocular

8    toxoplasmosis patients, correct?

9    A.   There are case reports that that has been used, yes.

10   Q.   And then you followed up with that colleague in a

11   subsequent email and asked:  "Do you feel that TMP/SMX or

12   atovaquone/clinda is as effective as pyrimethamine

13   sufadiazine," correct?

14   A.   Can you show me the rest of that email?

15   Q.   I can.

16            MR. McCONNELL:  Justin, if you bring it up.

17            Your Honor, I believe it has been properly redacted.

18            Justin, if you could bring it up to refresh the

19   witness' recollection.  Sorry, it's DX 453.

20            THE COURT:  Don't publicly display it.  Display it

21   just to counsel and the witness and me.

22   BY MR. McCONNELL:

23   Q.   Dr. Hardy, please let me know after you have had a chance

24   to review the email.

25            (Pause)

LCFKFTC3                        Hardy - Cross

1    A.  Yes, I've read that -- reread that.

2    BY MR. McCONNELL:

3    Q.  Dr. Hardy, does the email reflected at DX 453 refresh your

4    recollection?

5    A.  Yes, it does.

6    Q.  And at the very bottom of the first page of DX 453 is the

7    question I just referenced where you addressed your colleague

8    with the question, "Do you feel that TMP/SMX or

9    atovaquone/clinda is as effective as pyrimethamine

10   sulfadiazine," correct?

11   A.  Yes, I did ask that question.

12   Q.  And the colleague that you posed that question to

13   responded:  "In my opinion, I think Bactrim is as good, better

14   tolerated, less toxicity, and cheaper.  I held that stance for

15   years before Martin.  The necessary placebo-controlled trials

16   were never done and unlikely to be ever done," correct?

17   A.  Correct.

18   Q.  And she also responded to your question that:

19   "Pyrimethamine is not available in many parts of the world, and

20   toxo is treated with SMX/TMP.  I have not seen data that

21   mortality is higher," correct?

22   A.  That is correct.

23   Q.  Do you have any reason to disagree with that opinion?

24   A.  I accept my colleague's opinion and how this doctor has

25   recommended treatment, which I do not agree with in my own

1   practice, in my own teaching, in my own training, and primarily

2   because it's not consistent with our treatment guidelines for

3   this disease.  But her opinion is her opinion.

4   Q.  You don't think that this physician is breaching a standard

5   of care to her patients, correct?

6   A.  No, I do not.

7   Q.  And then with the other part of your question, regarding

8   clinda/atovaquone, your colleague responded, "As far as

9   clinda/atovaquone, all I have seen are a few cases, and all

10  recovered," correct?

11  A.  Correct.

12         MR. McCONNELL:  You can take that down, Justin.  Thank

13  you.

14  Q.  And you did not, Dr. Hardy, rely on that email

15  correspondence with that infectious disease colleague of yours

16  in rendering your opinion in this case, correct?

17  A.  No, I did not.

18  Q.  So you did not do a statistical survey of what your

19  infectious disease colleagues were doing as far as treatment of

20  toxoplasmosis for this case, correct?

21  A.  No.  My opinion is based upon a much larger body of

22  evidence called the treatment guidelines, not upon the opinions

23  of two colleagues.

24  Q.  Well, that's actually not -- that's a separate question.

25  I'm just asking -- my first question is just simply:  You did

1    not do a statistical survey of what other physicians were doing

2    as far as treatment for toxoplasmosis for your expert opinion

3    in this case, correct?

4    A.  Not a formal survey, no.

5    Q.  But what you did do is you emailed, roughly, 38 of your

6    infectious disease colleagues for their input to help answer

7    this question posed to you by the Federal Trade Commission,

8    correct?

9    A.  I was curious as to what my colleagues' experience with

10   treating toxoplasmosis in the current era was all about, yes.

11   Q.  Correct.  Because the FTC wanted to know whether there were

12   patient access issues because of the high price of

13   pyrimethamine, correct?

14   A.  It was not so much the FTC wanting to know; it was the fact

15   that I was curious myself and wanted to be better informed

16   about if there were issues, that I would understand them

17   better.

18   Q.  And that email to 38 of your colleagues received three

19   responses, two of which we've discussed today, correct?

20   A.  Correct.

21   Q.  The third, I don't believe has been produced in this

22   litigation; is that correct?

23   A.  It is part of the witness packet -- I mean the evidence

24   packet.  Yes, I've seen it.

25   Q.  Well, I haven't had the opportunity to see it, but,

1    regardless, you only received three responses to your inquiry

2    to your 38 infectious disease colleagues, correct?

3    A.   Correct.

4    Q.   And two of those physicians endorsed using Bactrim as an

5    alternative treatment for toxoplasmosis to pyrimethamine-based

6    regimens, correct?

7    A.   Yes.  One endorsed it as her recommended regimen, one

8    endorsed it as a have to using the word forced to use TMS/SMX.

9            MR. McCONNELL:  Thank you very much, Dr. Hardy.

10           THE COURT:  We're going to take our midmorning recess.

11   Thank you.

12           (Recess)

13           THE COURT:  The witness can retake the stand.

14           Is somebody getting other defense counsel?

15           COUNSEL:  Yes, your Honor.

16           THE COURT:  Thank you.

17           (Pause)

18           THE COURT:  So any redirect?

19           MS. PEAY:  Yes, your Honor.  Lauren Peay, from the

20   Federal Trade Commission.  We'll have some redirect.

21   REDIRECT EXAMINATION

22   BY MS. PEAY:

23   Q.   Good morning, Dr. Hardy.

24   A.   Good morning.

25           MS. PEAY:  My name is Lauren Peay, your Honor, on

1    behalf of the Federal Trade Commission, for the government

2    plaintiffs.

3    Q.  And, Dr. Hardy, I'll have a few questions for you in

4    redirect now.

5    A.  Yes.

6    Q.  Dr. Hardy, during your testimony in response to questions

7    from defense counsel just now, you mentioned the guidelines

8    several times.

9         Do you recall that?

10   A.  Yes, I do.

11   Q.  And, Dr. Hardy, can you explain what the guidelines are

12   that you're referring to?

13   A.  Yes, I can.  The guidelines are a compilation of as much

14   available scientific and medical evidence that there is extant

15   to be able to create some very clear and graded recommendations

16   for how to diagnose, treat, and prevent opportunistic

17   infections that were associated with HIV/AIDS.

18   Q.  Who publishes the guidelines?

19   A.  The guidelines are published by the CDC, the National

20   Institutes of Health, the Infectious Disease Society of

21   America, and also the HIV Medical Association.

22   Q.  How are you familiar with the guidelines?

23   A.  I'm familiar with the guidelines because I was trained to

24   refer to them, to use them, to follow them in situations where

25   I ever had questions in terms of diagnosis, treatment, or

1    prevention of one of the opportunistic infections.  I helped

2    create data for them and was part of a group that was

3    specifically involved in the guidelines around pneumocystis and

4    toxoplasmosis, and I use them not only in my own training, but

5    in teaching my trainees and clinical practice, of course.

6    Q.  To make it clear on the record, these guidelines, the

7    opportunistic infections guidelines, they provide guidance for

8    a number of different opportunistic infections, correct?

9    A.  Correct.

10   Q.  Dr. Hardy, do you have an understanding of how these

11   guidelines are developed?

12   A.  Yes, I do.

13          The guidelines really seek to take into account all

14   laboratory, animal-based models, and clinical research, and

15   even clinical experience where clinical research may be

16   lacking, in order to be able to come up with a consensus of

17   opinion as to how to best diagnose, treat, and prevent these

18   opportunistic infections.

19   Q.  Do you have an understanding of whether the guidelines are

20   ever updated?

21   A.  Yes, they are.  The panel is pulled together to review new

22   data when it becomes available in order to see whether that new

23   data will, in fact, impact the current guidelines.

24   Q.  Do you have an understanding of what types of data the

25   guidelines drafters consider in evaluating their guidelines in

LCFKFTC3                          Hardy - Redirect

1   deciding whether to update them?

2   A.  The guidelines drafters consider a wide range of data.

3   They prefer it always to be peer reviewed and published.  They

4   rarely take into account nonpeer-reviewed data, but they put as

5   a highest priority randomized controlled clinical trials of

6   diagnostic treatment or prophylactic modalities, but accept

7   cohort studies, which are uncontrolled and not randomized, as

8   well as meta-analyses, as well, when randomized controlled

9   trials are not available.

10  Q.  And, Dr. Hardy, do you recall defense counsel asking you

11  about prophylaxis for toxoplasmosis?

12  A.  Yes, I do.

13  Q.  Do you recall also testifying about the treatment of the

14  active disease of toxoplasmosis?

15  A.  Yes, I do.

16  Q.  Are there different treatment goals for toxoplasmosis?

17  A.  Yes, there are.

18  Q.  What are those different treatment goals?

19  A.  The goal for prophylaxis is what I would always consider to

20  be a lower bar to meet in terms of trying to prevent the

21  occurrence of an opportunistic infection in a patient at risk

22  for that infection because of their degree of immune

23  deficiency.  The higher bar, in my mind, is always treatment.

24  Once the organism has become active in the person's body, then

25  bringing -- treating that active infection is oftentimes more

LCFKFTC3                         Hardy - Redirect

1    difficult, requires longer treatment, and oftentimes more

2    potent treatment, especially combination treatments, in order

3    to be able to bring that infection back under control.

4    Q.  What is the ultimate goal of treating the active infection?

5    A.  The ultimate goal of treating toxoplasmosis in the brain or

6    CNS toxoplasmosis is to put the organism that has become active

7    back into a latent state.

8         As I said earlier, none of our antibiotics that we use

9    to treat or prevent toxo will eradicate the cystic state of the

10   organism, but the medications are used to keep it in its

11   cystic, inactive state, just like a competent immune system

12   would.

13   Q.  Do you recall earlier defense counsel mentioning another

14   treatment goal for toxoplasmosis, the secondary prophylactic

15   treatment goal?

16   A.  Yes.  Sorry.  Secondary prophylaxis was commonly used, and

17   still sometimes is used, in order to keep a successfully

18   treated active infection -- keeping it inactive.  In the case

19   of toxoplasmosis, before the advent of anti-retroviral therapy,

20   the immune deficiency persisted despite successful treatment of

21   the opportunistic infection.  If treatment would have been

22   abruptly stopped, it would only be a matter of time for the

23   organism that was inactive to become active again.

24        In order to prevent that, we learned that a continuous

25   dose of oftentimes the same medication used to treat the

1    infection, but at a lower dosage, would be necessary to keep

2    the organism suppressed and in a latent state and not causing

3    harm to the patient.

4    Q.  Returning to the guidelines, do the guidelines provide

5    different recommendations for the three different treatment

6    goals you just testified about?

7    A.  Yes, they do.

8    Q.  And starting with prophylaxis, primary prophylaxis for

9    toxoplasma gondii, what are the guidelines recommendations?

10    A.  For primary prophylaxis of toxoplasmosis gondii, the

11    guidelines recommend a daily tablet of either single strength

12    or double strength TMP/SMX.

13            I also want to point out that the reason that this is

14    recommended is not only because there has been some data to

15    support that, but for convenience reasons, most patients are

16    already taking TMP/SMX to prevent pneumocystis pneumonia.

17            And so since those drugs were already being part of

18    the patient's medication regimen, an added benefit was to

19    prevent toxoplasmosis.  So the reasoning for using TMP/SMX is

20    most commonly a continuation in the rare case that the patient

21    was not at risk for pneumocystis.  Also, TMP/SMX would also

22    still be chosen because it has been shown to be effective.

23    Q.  What are the guidelines recommendations for the treatment

24    of active toxoplasmosis?

25    A.  For active toxoplasmosis, the guidelines give a

1  pyrimethamine-based regimen, the highest recommendation as A1.

2  Pyrimethamine does need to be combined with a second

3  antibiotic, either sulfadiazine, sulfonamide, or clindamycin.

4  Q.  What do the guidelines recommend for the secondary

5  prophylaxis for toxoplasmosis?

6  A.  For secondary prophylaxis, lower doses of pyrimethamine and

7  sulfadiazine or pyrimethamine and lower doses of clindamycin

8  are recommended.

9          THE COURT:  Say that again?  Slow down.  I'm sorry.

10          THE WITNESS:  Sorry.

11          For secondary prophylaxis, or what is also considered

12  to be maintenance therapy, the guidelines recommend lower doses

13  or less frequent dosing of both pyrimethamine plus

14  sulfadiazine, or, if the patient cannot tolerate a sulfa drug,

15  lower doses of pyrimethamine plus clindamycin.

16  BY MS. PEAY:

17  Q.  Dr. Hardy, do you have an understanding of why the

18  guidelines recommend different treatments for toxoplasmosis

19  depending on the treatment goal?

20  A.  Yes, I do.

21  Q.  What is that understanding?

22  A.  My understanding is that one would always like to prevent

23  an infection if possible.  It took us, as AIDS-treating

24  physicians and researchers, several years to figure out that we

25  could do that.  So we treated opportunistic infections for many

years until we realized that prevention, both before and after

acute treatment, was necessary.

            So the goals are different in terms of the immediate

life-threatening effects of each disease state.  Prophylaxis is

used when there is a potential for active toxoplasmosis to

occur.  Active toxoplasmosis is the life-threatening disease

that we hope to prevent, or if we can't prevent it, then to

treat it successfully to put it back into a latent state.

Q.  Thank you.

            Dr. Hardy, you've offered an opinion that FDA-approved

pyrimethamine in combination with sulfadiazine or clindamycin

is the gold standard for treating active toxoplasmosis,

correct?

A.  Correct.

Q.  Can you explain the basis for that opinion?

A.  The basis for that opinion really derives directly from the

grading system that the panel of the guidelines uses.  It's a

well-recognized academic system that is acronymed G-R-A-D-E.  I

don't remember exactly what the acronym stands for, but it is a

very highly analytic way of looking at data and being able to

place value and confidence in the data.  It results in a

number -- excuse me.  It results in a letter grade of A, B or

C — a being best, C being less — in terms of strength of data,

and a number — 1, 2, and 3 — relying on the quality of the

data.

LCFKFTC3                        Hardy - Redirect

1              So I think the way the guidelines really kind of boil

2      a huge amount of information down is by simply listing what

3      each treatment has been ranked.  Pyrimethamine-based regimens

4      with either sulfadiazine or clindamycin receive the highest

5      recommendation of A1, the strongest data with the highest

6      reliability, TMP/SMX receives a grade of B1, less strength of

7      the data, because of being tested less, of it being shown to

8      have much less potency when used in laboratory and in animal

9      models, compared to pyrimethamine, sulfadiazine, and,

10     therefore, this is really, I think, the best attempt at

11     providing guidance to practice evidence-based medicine really

12     going to the level of laboratory tests, animal models, and

13     human clinical experience, and human clinical trials to derive

14     something that will result in an easy-to-read and easy-to-use

15     grading system of recommendations.

16     Q.  Now, in your --

17             THE COURT:  Excuse me.  This testimony you've just

18     given about the A1 versus the B1 ratings, is that for the

19     treatment of the active disease?

20             THE WITNESS:  Yes, it is.

21             THE COURT:  Thank you.

22     BY MS. PEAY:

23     Q.  Dr. Hardy, sticking with the treatment of the active

24     disease, in your written direct testimony, you provided an

25     opinion regarding the use of TMP/SMX for the treatment of

active toxoplasmosis; is that correct?

A.  That is correct.

Q.  What is that opinion?

A.  My opinion of the use of TMP/SMX for the treatment of
active toxoplasmosis is really following what the guidelines
really recommend, and that is, if the first and most highly
recommended — the gold standard — regimen is not available, and
a decision to treat this disease has to be made quickly, then
one must use other alternative options.

          I think it's important to put into context that when a
patient with active toxoplasmosis presents to a hospital or
medical center, there is very little time to try to procure
antibiotics.  This is a life-threatening disease immediately,
it is affecting the intimate tissues of the brain, and if
treatment is not initiated within hours, the patient could, in
fact, die or have significant neurologic deficits.  So waiting
for pharmacy orders, waiting for insurance approvals, waiting
for ways to try to obtain a difficult-to-procure antibiotic is
really not feasible.  Therapy has to be started within hours of
diagnosis.  And that's why, in the period of time where
pyrimethamine became difficult to obtain, TMP/SMX became used
much more commonly.

Q.  Dr. Hardy, counsel for defendants asked you some questions
about some emails that you had with some colleagues that you're
connected with through HIVMA.

1            Do you recall that?

2   A.  Yes, I do.

3   Q.  To the extent that these colleagues expressed a preference

4   for TMP/SMX, is that consistent or inconsistent with the

5   opinions you're offering in this case?

6   A.  One of the opinions — and I underscore the word opinion —

7   and own clinical experience is different than mine, of the

8   opinion I'm purporting here, because I use what I consider to

9   be the highest level of evidence-based medicine treatment

10  guidelines as the way that I make my treatment decisions.  I am

11  not perplexed, frustrated, or disappointed at some of my

12  colleagues that have different experiences.  I respect their

13  work; I respect their research.  They simply have different

14  experiences of treating, different styles of treating, than I

15  do.

16  Q.  And, Dr. Hardy, in your written direct testimony, you

17  offered the opinion that TMP/SMX is not interchangeable with a

18  pyrimethamine-based regimen for the treatment of active

19  toxoplasmosis.

20            Do you recall that?

21  A.  Yes, I do.

22  Q.  Can you explain the basis for that opinion, that TMP/SMX is

23  not reasonably interchangeable?

24  A.  The reason I feel like it's not readily interchangeable is

25  because this is not a situation in which both have been

LCFKFTC3                         Hardy – Redirect

recommended as equal options for treatments.  There is a clear

gradation that our guidelines give us, in terms of the ranking

system, of A1 for pyrimethamine-based regimens and B1 for

TMP/SMX regimens.

        That's the basis of my opinion that they are not

readily interchangeable.

Q.  Are there populations of patients for whom TMP/SMX is not

an option?

A.  Yes, there are patients who cannot tolerate sulfonamide

because of the sulfamethoxazole that is part of the TMP/SMX.

Q.  Can patients who cannot tolerate sulfonamide, can they be

prescribed a pyrimethamine-based regimen?

A.  Yes, they can.  They can be prescribed a combination of

pyrimethamine plus clindamycin.

Q.  Do you have an understanding of how common sulfonamide

intolerances are among patients who are infected with active

toxoplasmosis generally?

A.  Yes.  There is good published evidence that sulfonamide

hypersensitivity or allergy is much more common in HIV positive

persons than HIV negative persons, being calculated somewhere

around 30 to 35 percent of all patients with HIV.

Q.  Can TMP/SMX be used in making an empirical diagnosis of

active toxoplasmosis?

A.  That's also another difficulty with using that drug.  To

elaborate just a bit, optimally, physicians would like to have

what's called a tissue diagnosis to be able to obtain tissue
from the patient in order to demonstrate clearly the infectious
organism.  In the case of toxoplasmosis in the brain, we're
talking about needing to do a brain biopsy, which carries with
it a high complication rate in a patient that's already
neurologically compromised.

One of the ways that we confirm the diagnosis of CNS
toxoplasmosis or toxoplasmic encephalitis is by a positive
response to therapy in order to avoid having to do a brain
biopsy.

The specificity that pyrimethamine sulfadiazine has
for treating toxoplasmosis is also one of its benefits.  On the
other hand, TMP/SMX was developed to treat primarily bacterial
infections.  Later on, after its use in the 1980s and '90s, it
was found that it could also treat other types of organisms,
such as pneumocystis pneumonia or toxoplasmosis.  The problem
here is that if there's a positive response to TMP/SMX, we do
not know for certain that the organism being treated is, in
fact, toxoplasmosis.  There have been cases of brain --
bacterial brain abscesses and even hemoptysis of the brain that
could, in fact, be treated successfully with TMP/SMX, at least
partially treated, for some period of time.

So the specificity of how well pyrimethamine-based
regimens treat toxoplasmosis are an important part of why we
use it.

1          MS. PEAY:  Your Honor, at this time, I have no further

2     questions for the witness.

3          Thank you, Dr. Hardy.

4          THE WITNESS:  Thank you.

5          THE COURT:  Any recross?

6          MR. McCONNELL:  Sean McConnell, for defendant, Mark

7     Shkreli.  Yes, please, your Honor.

8     RECROSS EXAMINATION

9     BY MR. McCONNELL:

10    Q.  Hello again, Dr. Hardy.

11    A.  Hello.

12    Q.  Real quickly, you just provided testimony in response to

13    questions from plaintiffs' counsel regarding the gradation of

14    treatment for active toxoplasmosis with a pyrimethamine-based

15    treatment plan being A1 and the SMP/TMX being B2, correct?

16    A.  B1.

17    Q.  B1?

18    A.  Correct.

19    Q.  Sorry.

20          The reason for that gradation is solely as a result of

21    the guidelines you mentioned in your testimony, correct?

22    A.  The basis of those gradations are based upon the strength

23    of the evidence.  That is where the A and B differ in terms of

24    the strength of the data supporting each one of those choices.

25    Q.  Correct.

LCFKFTC3                          Hardy - Recross

1          And you, at the beginning of your redirect, explained

2     the hierarchy of the type of strength to go into that type of

3     evidence for the guidelines, correct?

4     A.  Correct.

5     Q.  So, number one, best evidence would be clinical review

6     trials, correct?

7     A.  Randomized controlled clinical trials are looked upon as

8     the highest level of testing medications, yes.

9     Q.  So, ideally, you would have those types of tests to test

10    the various treatment options for active toxoplasmosis,

11    correct?

12    A.  Correct.

13    Q.  And then you said the number two, if you don't have the

14    ability to do CRTs, the next best type of evidence would be

15    peer-reviewed studies, correct?

16    A.  Would be peer-reviewed cohort studies or what's called a

17    meta-analysis, a systemic review, of a collection of small

18    studies or even case reports.

19    Q.  And just to be clear, there are no available CRTs or

20    peer-reviewed studies establishing the benefits of a

21    pyrimethamine-based regimen versus SMP/TMX that have been

22    published since be 2000, correct?

23    A.  Since 2000?  I know that one was published in the 1990s,

24    the one from Italy.  There was a second one from Thailand that

25    was published — I don't have the exact date when that was

1    published.  That may have been published after 2000.  I don't

2    remember exactly the date on that, but there are two, there are

3    two randomized controlled trials.  The one from Italy was

4    small — 77 patients.  The problem with that study was that, in

5    my opinion, it was a bit sloppy in the way the diagnosis of

6    toxoplasmosis was confirmed.  There was no antibody test that

7    is normally and preferentially done to show the patient is

8    harboring toxoplasmosis in their body.  They simply used a

9    brain-imaging study to make the diagnosis.

10         When those patients in whom there was serologic

11   confirmation of toxoplasmosis infection were taken out of that

12   study, it really loses its statistical power very quickly.

13         The other study, from Thailand, was never finished.

14   The rate of problems or why they couldn't enroll more patients

15   or other situations was not entirely clear, but it was never

16   finished.  So it never reached the point where any statistical

17   power was available.  So there has been attempts to do this.  I

18   don't remember when the Thai study was published, though.  It

19   may have been after 2000.

20   Q.  So just to be crystal clear, the two ideal forms of

21   evidence to support the guidelines are randomized clinical

22   trials or peer-reviewed studies, and you're only aware of two

23   such studies since 1990, correct?

24   A.  Correct.

25   Q.  And both of those results, despite the limitations that you

1    just described, revealed no significant difference between

2    treatment of active toxoplasmosis between Bactrim and Daraprim,

3    correct?

4    A.  I think the best way -- that was the conclusion of the

5    authors, yes.  That was the conclusion of the authors.

6    Q.  And there have been no other clinical randomized trials or

7    peer-reviewed studies on this topic since 1990 despite those

8    two, correct?

9    A.  I don't believe so for active toxoplasmosis in the brain.

10              MR. McCONNELL:  Thank you.

11              No further questions, your Honor.

12              THE COURT:  There was a series of questions, Doctor,

13    about survival rates, and I'm not sure I understand the import

14    of those questions entirely.  I'm sure counsel will enlighten

15    me down the road.

16              But with respect to an HIV population, particularly

17    before the antiviral drugs were introduced in, I think you

18    said, 1996 --

19              THE WITNESS:  Correct.

20              THE COURT:  -- what can you say about survival rates

21    when a patient also has active toxoplasmosis?

22              THE WITNESS:  Active toxoplasmosis is a high mortality

23    disease.  The estimates of around 30 to maybe 40 percent death

24    either because of lack of treatment success or because of

25    recurrence after the initial treatment, and death due to that

1    was very common during those days.

2         I can tell you that what we as physicians were simply

3    doing was postponing the inevitable in terms of trying to treat

4    several, oftentimes at one time, in one patient, opportunistic

5    infection.  And toxoplasmosis was always one of the worst

6    because it involves probably the most important organ in the

7    body — the brain.  And, therefore, survival really depended

8    upon promptness of diagnosis, promptness of institution of

9    treatment, completion of treatment, which went very easily six

10   to eight weeks, and then in order to ensure some degree of

11   latency of the organism, promptly putting the patient on the

12   secondary prophylactic or maintenance regimen.

13        What we were finding, of course, was an ever-declining

14   immune system and trying to use pharmacologic coverage as a way

15   to make up for that ever-declining immune system.

16        Sometimes that worked very well, sometimes it didn't.

17   I would just say in my experience, the average lifespan for a

18   person who was diagnosed with toxoplasmosis before 1996 was no

19   greater than 12 to 18 months.

20        THE COURT:  And, typically, for that patient

21   population, were they suffering solely from active

22   toxoplasmosis, or were there a variety of infections that had

23   to be addressed at the same time?

24        THE WITNESS:  At the immunological deficit level that

25   toxoplasmosis occurs, which means that they have –– and this

1    has been very clearly worked out by many studies — at CB4

2    positive T cell count, an immune cell count of 100 or less,

3    when the normal range is between 500 to 1500, at a T cell count

4    less than 100, the person is susceptible to many opportunistic

5    infections — pneumocystis pneumonia, cryptococcal meningitis,

6    candidal infections throughout the esophagus and other parts of

7    the gastrointestinal tract, cryptosporidiosis causing horrible

8    diarrhea.

9              So what oftentimes we were dealing with was a series,

10   and sometimes even concurrencies of these infections, which

11   made treatment oftentimes difficult.

12             So this is something that I look back on in my memory

13   as being a very difficult time of watching persons die of

14   diseases that were kind of converging on them, and the ability

15   to treat or prevent all of them was a great difficult chore.

16             THE COURT:  Because of that, is it difficult to say

17   what a survival rate is due to one infection, when there are

18   multiple attacks on the system?

19             THE WITNESS:  Exactly.  I think you are perceiving

20   this very clearly, in the fact that mortality due to a single

21   opportunistic infection was very hard during that period of

22   time to really delineate.  We could only say a patient would

23   die with a disease, not necessarily of a disease.  It

24   oftentimes was the last opportunistic infection we diagnosed

25   that became the cause of the disease, or at least a

1    contributing cause, but there were probably many infections,

2    some of which we didn't even diagnose.

3              THE COURT:  So let's take 1996 and the miracle with

4    which these patients and the physicians treating them were

5    given.

6              What can you say on the same topic of survival rates

7    with patients who have active toxoplasmosis after 1996?

8              THE WITNESS:  It was really almost like night and day.

9              Number one, one of the most important impacts of

10   successful anti-retroviral therapy was reconstitution of the

11   immune system and T cell counts that were always going down

12   reversed and starting going up.

13             We learned very quickly that if a patient had a T cell

14   count less than 100 and was at risk for toxoplasmosis, and

15   often had to be on prophylaxis primary prevention, as soon as

16   that T cell count got over 150, we could stop the prophylaxis,

17   and the cases of toxo really diminished very quickly because of

18   that, because of the healing power that the anti-retroviral

19   medications had of reconstituting the immune system that was

20   really the big problem, is why all of these opportunistic

21   infections were occurring.  So survival was remarkably

22   different, and the number of cases of toxoplasmosis also

23   decreased remarkably to those persons who were afforded the

24   availability of the anti-retroviral medication.

25             THE COURT:  Thank you.

LCFKFTC3                              Hardy - Recross

1                  So, based on my questions of Dr. Hardy, do counsel

2       have any additional questions?

3                  MS. PEAY:  No further questions for plaintiffs, your

4       Honor.

5                  MR. McCONNELL:  Sean McConnell, your Honor, for

6       defendant, Shkreli.

7                  No further questions.  Thank you.

8                  THE COURT:  Thank you.

9                  So, Doctor, I can't let you leave the stand without

10      thanking you for the care you've given to your patients and

11      those who love them, and so thank you.

12                  (Witness excused)

13                  THE COURT:  Next witness.

14                  MR. MEIER:  Your Honor, Markus Meier, on behalf of the

15      FTC.

16                  We'd call -- first of all, let me introduce the

17      attorney from the FTC who will be handling this.  It is

18      Attorney Black, and the witness is Christina Ghorban.

19                  THE COURT:  Is it Ms. Ghorban?

20                  THE WITNESS:  Yes.

21       CHRISTINA GHORBAN,

22          called as a witness by the Plaintiffs,

23          having been duly sworn, testified as follows.  Please be

24      seated you may remove your mask you may stated your full name.?

25                  THE WITNESS:  Christina Ghorban.

LCFKFTC3                         Ghorban - Direct

1              THE COURT:  Can you spell your first and last name,

2        please?

3              THE WITNESS:  C-h-r-i-s-t-i-n-a G-h-o-r-b-a-n.

4              THE COURT:  Counsel.

5              MX. BLACK:  Thank you, your Honor, and good afternoon.

6              Armine Black, on behalf of plaintiffs, and good

7        afternoon, Ms. Ghorban.

8        DIRECT EXAMINATION

9        BY MX. BLACK:

10       Q.  Ms. Ghorban, let's begin with your professional background

11       and responsibilities when you worked at Vyera.

12             You worked at Vyera from April 2015 to October 2016,

13       correct?

14       A.  Yes.  It was Turing Pharmaceuticals then.

15       Q.  Understood.

16             And for the clarity of the record, I will refer to

17       Turing and Vyera interchangeably.

18             Will you understand me to refer to the same company?

19       A.  Yes, I will.

20       Q.  You were Vyera's head of marketing and business analytics

21       when you left the company, correct?

22       A.  Yes.

23       Q.  One of your responsibilities at Vyera was to support

24       commercial assessment of potential drug acquisition targets,

25       correct?

1   A.  Yes.

2   Q.  And one of the drugs you helped to evaluate for acquisition

3   was Daraprim, correct?

4   A.  Yes.

5   Q.  Vyera bought Daraprim in early August of 2015, correct?

6   A.  Yes.

7   Q.  And after Vyera acquired Daraprim, you managed the launch

8   of Daraprim?

9   A.  Yes, along with other people.

10  Q.  In fact, you led all aspects of Daraprim's launch after

11  acquisition, correct?

12  A.  I participated in a lot of the launch activities.  I was

13  not the chief commercial officer.

14  Q.  And the chief commercial officer was Nancy Retzlaff?

15  A.  Yes, it was.

16  Q.  And she was your boss?

17  A.  She was my boss, yes.

18  Q.  You reported directly to her?

19  A.  Yes.

20  Q.  And she reported directly to Martin Shkreli?

21  A.  Yes.

22  Q.  Ms. Ghorban, you helped to set up Vyera's Daraprim

23  distribution system, correct?

24  A.  Yes.

25  Q.  You helped to set up Vyera's Daraprim distribution

1    agreement?

2    A.   Yes.

3    Q.   You helped to manage the distribution agreements after they

4    were set up?

5    A.   Yes.

6    Q.   And you tracked where Daraprim's sales went?

7    A.   Yes.

8    Q.   And Ms. Ghorban, outside of Vyera, you have -- or including

9    Vyera, you have to about 20 years of experience in the

10   pharmaceutical industry, correct?

11   A.   Yes.

12   Q.   And you have worked at six different companies over the

13   course of your career?

14   A.   I believe so.

15   Q.   And these were pharmaceutical companies?

16   A.   Yes.  There was a brief stint where I was consulting, but,

17   otherwise, yes.

18   Q.   Now, let's talk a little bit about your interactions with

19   Martin Shkreli during your time at Vyera.

20            Martin Shkreli was Vyera's CEO when you joined the

21   company in April of 2015, correct?

22   A.   Yes.

23   Q.   Did Shkreli interview you for the job?

24   A.   I don't recall.

25   Q.   Martin Shkreli remained the CEO until December of 2015,

1   when he was arrested, correct?

2   A.  Yes.

3   Q.  So you overlapped with Mr. Shkreli for about nine months?

4   A.  Yes.

5   Q.  And during those nine months, you saw him on a regular

6   basis?

7   A.  Yes.

8   Q.  And how often is a regular basis?

9   A.  Every day, multiple times a day.

10  Q.  You had direct interactions with Martin Shkreli about

11  Daraprim acquisition?

12  A.  Yes.

13  Q.  And you had direct interactions with Martin Shkreli about

14  Daraprim price increase?

15  A.  Yes.

16  Q.  And you had direct interactions with Martin Shkreli about

17  Daraprim distribution?

18  A.  I don't recall if it was directly with Martin at that time

19  or if it was through his team of business development

20  colleagues.

21              (Continued on next page)

22

23

24

25

LCFMFTC4                        Ghorban - Direct

1    Q.  Martin Shkreli asked you about Daraprim distribution

2    channels, correct?

3    A.  After the acquisition or before?

4    Q.  Either.

5    A.  I know we had discussions of the distribution.  I would

6    think it would have been before and after.  There were a lot of

7    conversations that happened during that period.

8    Q.  Martin Shkreli definitely asked you about Daraprim sales

9    after acquisition?

10   A.  Yes.

11   Q.  And you gave Martin Shkreli updates on Daraprim business

12   and the source of the business after acquisition?

13   A.  Yes.

14   Q.  And you took direction from Martin Shkreli about Daraprim

15   business, correct?

16   A.  Yes.

17   Q.  Ms. Ghorban, you mentioned earlier Vyera's business

18   development team.  I would like to ask you some questions about

19   that.

20        The role of Vyera's business development team was to

21   find drug acquisition targets for the company, correct?

22   A.  That was one of their roles.  The other one was to ensure

23   the direction for those products that were acquired were

24   carried out by the rest of the organization.

25   Q.  And the directions came from Martin Shkreli?

1  A.  I think directly from him, but also they discussed them in

2  meetings pretty frequently, so overall strategy was decided by

3  that team quite often.

4  Q.  And evaluation of Daraprim acquisition was led by the

5  business development team?

6  A.  Yes.

7  Q.  And Martin Shkreli as well?

8  A.  Yes.

9  Q.  Martin Shkreli directed Vyera's business development team?

10  A.  Yes.

11  Q.  And he directed Vyera's business development team in

12  addition to serving as the CEO of the company?

13  A.  Yes.

14  Q.  Was Michael Smith a member of the business development

15  team?

16  A.  Yes, he was.

17  Q.  He came to Vyera from Retrophin?

18  A.  I believe so.

19  Q.  Patrick Crutcher was a member of the business development

20  team?

21  A.  Yes.

22  Q.  He also came to Vyera from Retrophin?

23  A.  I believe so.

24  Q.  And Edwin Urrutia of the business development team?

25  A.  Yes.

1    Q.  He as well came to Vyera from Retrophin?

2    A.  I don't know.  I don't recall where he came from.

3    Q.  And Ron Tilles was a member of the business development

4    team?

5    A.  I don't remember what his role was at that time that we

6    acquired Daraprim.

7    Q.  Did he become a member of the business development team

8    eventually?

9    A.  I don't recall him being a part of that team.  I'm not

10   exactly sure what role he played until after Martin left.

11   Q.  After Martin left, Martin Shkreli left, he became the CEO?

12   A.  Yes.

13   Q.  Mr. Tilles joined Vyera from Retrophin as well?

14   A.  I don't know.

15   Q.  Ms. Ghorban, let's briefly discuss Mr. Shkreli's

16   involvement in Vyera after he resigned as the CEO.

17   A.  OK.

18   Q.  You don't recall directly communicating to Martin Shkreli

19   after he resigned as the CEO, correct?

20   A.  No.  I had no phone calls or texts with him.

21   Q.  But it is your understanding that Shkreli continued talking

22   to Vyera's business development team after he left as CEO, is

23   that correct?

24   A.  That was my understanding.

25   Q.  And it was your understanding that there was a certain

1    number of people at Vyera who continued to have a relationship

2    with him after he left as CEO of the company?

3    A.  Yes.  I was told that.

4    Q.  Who told you that?

5    A.  I believe it was Michael Smith told me that.  I believe

6    Edwin told me that as well.

7            THE COURT:  Edwin --

8            THE WITNESS:  Edwin Urrutia.  I don't recall who else,

9    but I know that we were hearing -- I was getting requests from

10   people within the organization for information and data,

11   updates on the path of Martin.

12   Q.  You were getting requests about Daraprim business?

13           MR. CASEY:  Your Honor.  I am going to object.  These

14   questions are eliciting hearsay.

15           THE COURT:  Overruled.

16   Q.  I'll reask the question, Ms. Ghorban.

17           You said earlier that you were getting requests about

18   data?

19   A.  Yes.

20   Q.  Were those requests concerning Daraprim business?

21   A.  Yes.

22   Q.  And Vyera's business more generally?

23   A.  It was primarily focused on Daraprim because that was the

24   entire business at that time.

25           THE COURT:  Counsel, I think you might need to move

LCFMFTC4                        Ghorban - Direct

```
 1    that mic.

 2              THE WITNESS:  Is it me?

 3              THE COURT:  I don't think it's the witness.  I think

 4    it's counsel.

 5              MS. BLACK:  Thank you, your Honor.  Let me know if

 6    issues continue.

 7    Q.  What was the nature of the request that you were getting

 8    about Daraprim business?

 9    A.  I don't recall offhand, but we were giving regular reports

10    about sales, regular reports about contracting.  There were

11    just sort of general business reports that you would report in

12    any company.

13    Q.  Those were the reports that you would present or were those

14    reports that were given to you?

15    A.  No.  They were reports that my team created.

16    Q.  Those reports were presented to Martin Shkreli?

17    A.  I gave them to whoever asked them, asked for them, so it

18    could have been Nancy, it could have been Michael Smith.  It

19    could have been any number of people on the business

20    development team.

21    Q.  And the members of the business development team continued

22    talking to Martin Shkreli after he left as CEO?

23    A.  That was my understanding, yes.

24    Q.  Now, let's focus on the Daraprim acquisition.  Vyera's

25    evaluation of Daraprim acquisition occurred in the spring,
```

1    summer of 2015?

2    A.  Yes, I believe so.

3    Q.  And you helped Martin Shkreli and the business development

4    team to evaluate drug Daraprim as a possible acquisition

5    target?

6    A.  I helped, but it was not in a primary role.

7    Q.  You participated in a lot of discussions about Daraprim

8    acquisition?

9    A.  Some, yes.

10   Q.  I believe you testified in your deposition that you

11   participated in a lot of discussions about Daraprim, correct?

12   A.  Yeah.  There were a lot of discussions and it was

13   definitely an important topic.

14   Q.  These discussions were led by the business development

15   team?

16   A.  Yes, they were.

17   Q.  And Martin Shkreli?

18   A.  Yes.

19   Q.  As part of the Daraprim acquisition you helped to evaluate

20   the opportunities and challenges with acquiring Daraprim?

21   A.  Yes, I did.

22   Q.  You conducted market research --

23   A.  Yes.

24   Q.  -- into Daraprim?

25   A.  Yes.

LCFMFTC4                        Ghorban - Direct

1    Q.  And you presented your findings to Mr. Shkreli?

2    A.  I don't recall if I presented them directly to him, but I

3    did do a report on it.  I think we included the findings and

4    some of the internal documents.

5    Q.  You presented your findings to Nancy Retzlaff?

6    A.  Yes.

7    Q.  And the business development team?

8    A.  I don't recall if we presented them directly to them, but

9    they had -- I know I sent them the report.

10   Q.  You sent your findings to the business development team?

11   A.  I believe so.

12   Q.  Now, let's focus on your discussions about Daraprim price

13   increase after acquisition.

14          Martin Shkreli was involved with the Daraprim price

15   increase, correct?

16   A.  He led the strategy behind it.

17   Q.  And you discussed the Daraprim price increase with Martin

18   Shkreli?

19   A.  Yes.

20   Q.  And the business development team?

21   A.  Yes.

22   Q.  And your boss, Nancy Retzlaff?

23   A.  Yes.

24   Q.  How many discussions did you have with Martin Shkreli about

25   the price increase?

LCFMFTC4                          Ghorban - Direct

1    A.   Multiple.  I don't recall how many.  It definitely came up

2    multiple times in multiple different meetings.

3    Q.   More than ten meetings?

4    A.   I don't think I was included in more than ten meetings, but

5    definitely every meeting that we had on Daraprim included a

6    conversation around the price increase.

7    Q.   Those meetings occurred in the spring and summer of 2015?

8    A.   Yes.  I was primarily involved towards the end of that

9    period.

10   Q.   And in these discussions you raised the issue that there

11   could be a pushback to the price increase from Daraprim

12   patients?

13   A.   Yes, I did.

14   Q.   Martin Shkreli did not believe you?

15   A.   He said I didn't know what I was talking about.

16   Q.   And he knew what he was talking about?

17   A.   I don't know what he thought.

18   Q.   Martin Shkreli told you that there will not be any

19   reactions to the price increase from Daraprim patients,

20   correct?

21   A.   He said there wouldn't be any reaction, right.

22   Q.   Shkreli ultimately made the decision to raise the price of

23   Daraprim?

24   A.   Yes.

25   Q.   And the price increase was about 4,000 percent?

1   A.  Yes.

2   Q.  You haven't seen a price increase of this magnitude in your

3   20 years of experience in the pharmaceutical industry, correct?

4   A.  I have not.

5   Q.  It was unprecedented?

6   A.  I can't say that it was unprecedented.  I haven't seen a

7   price increase that high in my experience.

8           MS. BLACK:  Ms. Flint, could you please put Government

9   Exhibit 1228 on the screen.

10  Q.  Ms. Ghorban, I'll be sharing some documents with you today.

11  They will appear on your screen.  I'll ask some questions about

12  them.

13          Is the document on your screen right now?

14  A.  Yes.

15  Q.  Ms. Ghorban, have you seen the document marked as GX-1228

16  before?

17  A.  Yes.

18  Q.  And it is an April 2015 chat between you and Michael Smith,

19  correct?

20  A.  Yes.

21  Q.  And Michael Smith was a member of the business development

22  team?

23  A.  Yes.

24          MS. BLACK:  Your Honor, I move to admit GX-1228 in

25  evidence.

LCFMFTC4                          Ghorban - Direct

1            THE COURT:  Received.

2            (Government Exhibit 1228 received in evidence)

3   Q.  Ms. Ghorban, this is an April 2015 conversation between you

4   and Michael Smith, correct?

5   A.  Yes.

6   Q.  And this occurred about four months before Vyera bought

7   Daraprim?

8   A.  Yes.

9   Q.  I'd like to direct your attention to the line that starts

10  with Tina Ghorban, 9:14 a.m.

11  A.  Yes.

12  Q.  The second sentence says:  Martin also asked us to think

13  about possible commercial challenges to selling Daraprim

14  specifically since that's more near term, and I just wanted to

15  understand the pricing, both current and planned.

16            Do you see that?

17  A.  Yes, I see that.

18  Q.  Martin is Martin Shkreli?

19  A.  Yes.

20  Q.  Does us refer to you and Michael Smith here?

21  A.  I think this refers to us as the commercial team, so myself

22  and Nancy Retzlaff.

23  Q.  Commercial challenges refers to challenges due to the

24  planned price increase?

25  A.  I don't think it was specific to price increase.  I think

1    it was just any commercial challenges of selling the product.

2    Q.  Including distribution challenges?

3    A.  I don't think I understood anything about the distribution

4    process at that point, and I hadn't previously worked on

5    distribution, so I wouldn't have considered it.

6    Q.  I'd like to direct your attention now to the line that says

7    Tina Ghorban, 9:20 a.m.

8    A.  Um-hum.

9    Q.  You see where it says:  Just thinking that doctors tend to

10   be less price sensitive, but the HIV patient advocacy groups

11   are really well-organized and very sensitive to issues that

12   disproportionately affect their members.  There could be

13   backlash to such a significant price increase.

14          Do you see that?

15   A.  Yes, I do.

16   Q.  Are you referring to a significant price increase of

17   Daraprim?

18   A.  I can't recall if this was about -- I think we were looking

19   at sulphadiazine as well, but I think it was about Daraprim.

20   Q.  Backlash refers to backlash from patient advocacy groups?

21   A.  Yes.

22   Q.  Staying with the same message, but focusing on the last

23   line where it says:  Seems there are no alternatives, though.

24   So maybe it's a moot point.  Do you see that?

25   A.  Yes, I do.

LCFMFTC4                        Ghorban - Direct

1    Q.   You are saying that there are no alternatives to Daraprim

2    for the treatment of toxoplasmosis here?

3    A.   I think that's what I'm alluding to and this, again, was

4    very early on in the analysis.  So we hadn't quite fully

5    understood the commercial -- the competitive framework.

6    Q.   And you reached this conclusion about there being no

7    alternatives based on your market research in advance of

8    Daraprim acquisition?

9    A.   Again, I think it was very early on, so based on the quick

10   look at the market, I think that's what I came to, was this

11   was -- there were not a lot of alternatives.

12   Q.   Did this remain your conclusion about there being no

13   alternatives as you continued working with Daraprim after

14   acquisition?

15   A.   The conclusion that we came to was that Daraprim plus

16   sulphadiazine was the gold standard for the treatment of active

17   toxoplasmosis.  But there were alternatives, but less desirable

18   alternatives.

19        MS. BLACK:  We can take down this exhibit.  Thank you,

20   Phoebe.

21   Q.   Ms. Ghorban, now let's talk about Daraprim distribution.

22   A.   OK.

23   Q.   To set some definitions first, are you familiar with the

24   term open distribution?

25   A.   I am now.

LCFMFTC4                          Ghorban – Direct

1   Q.  Open distribution generally means that a drug is broadly

2   distributed through multiple full-line distributors and

3   available for purchase through retail pharmacies?

4   A.  Yes.

5   Q.  And closed distribution, in contrast, generally means that

6   a drug is distributed through a more limited number of

7   distributors and is not available at retail pharmacist?

8   A.  Yes.

9           THE COURT:  Sorry, counsel.  I lost track of time

10  here.  I'm very sorry.  We are going to take our luncheon

11  recess.  We will start back at 2:00.

12          Enjoy your lunch.  Thank you.

13          (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

LCFKFTC5                        Ghorban – Direct

```
1                        AFTERNOON SESSION

2                           2:00 P.M.

3            (Trial resumed; in open court)

4            THE COURT:  The witness may retake the stand.

5            Counsel.

6            MX. BLACK:  Yes, your Honor.

7     CHRISTINA GHORBAN, resumed.

8   DIRECT EXAMINATION CONTINUED

9   BY MX. BLACK:

10  Q.  All right.  Welcome back.

11  A.  Thank you.

12  Q.  Right before the recess, we started talking about open and

13  closed distribution.

14            Do you remember that?

15  A.  Yes.

16  Q.  And just to briefly recap, open distribution generally

17  means that a drug is broadly distributed through multiple

18  full-line distributors, correct?

19  A.  Yes.

20  Q.  And available through retail pharmacies?

21  A.  Yes.

22  Q.  And closed distribution generally means that a drug is

23  distributed through a more limited number of distributors,

24  correct?

25  A.  Yes.
```

1  Q.  And is not available at retail pharmacies?

2  A.  That's not a term that I would say is common in the

3  pharmaceutical industry.  I think we usually typically say a

4  product is in retail or it's in specialty.  Those are the terms

5  that I've seen more frequently.

6  Q.  For the first 60 years after Daraprim launched, it was an

7  open distribution, correct?

8            MR. CASEY:  Your Honor, I object.  I don't believe

9  that counsel has established the necessary adversity of this

10  witness to be asking leading questions.

11            THE COURT:  Overruled.

12            THE WITNESS:  Would you repeat the question?

13  BY MX. BLACK:

14  Q.  Yes.

15            For the first 60 years after Daraprim launched, it was

16  in open distribution, correct?

17  A.  I don't know.  I assume that -- I know it was in retail at

18  some point before Vyera acquired it.

19  Q.  During your time at Vyera, Daraprim was distributed through

20  a closed distribution system, correct?

21  A.  It was distributed through specialty pharmacies and

22  institutions.

23  Q.  And that kind of distribution is more closed than the open

24  distribution, which is defined?

25  A.  Closed, meaning -- what do you mean when you say "closed"?

1           THE COURT:  It's more closed than retail distribution?

2           THE WITNESS:  It's limited.  Yeah, there's more -- the

3    distribution is limited to a fewer number of outlets.

4    BY MX. BLACK:

5    Q.  And limited distribution is sometimes referred to as closed

6    distribution?

7    A.  Vyera was the only place I've ever heard it referred to it

8    as that way.  I had never heard that term, and continue to not

9    hear that term.  It's specialty versus retail mostly, in my

10   experience.

11   Q.  But at Vyera, you heard the term "closed distribution"

12   used?

13   A.  I did hear the term there.

14   Q.  And you heard the business development team using that

15   term?

16   A.  I did.

17   Q.  And Martin Shkreli using that term?

18   A.  I don't recall if I ever heard him say specifically closed

19   distribution, but I think it was on emails, and definitely he

20   was part of those chains.

21   Q.  So since Vyera, the company, referred to Daraprim

22   distribution as closed, I will refer to it as such for this

23   trial.

24   A.  Okay.

25   Q.  Is that okay?

LCFKFTC5                      Ghorban - Direct

1          So Daraprim wasn't available for purchase in retail

2     pharmacies after Vyera acquired the product, correct?

3     A.   Correct.

4     Q.   And it was only available through specialty pharmacies?

5     A.   It was available through specialty pharmacies and

6     institutions.

7     Q.   Such as hospitals?

8     A.   Hospitals.  I believe we opened it up to clinics related to

9     hospitals, ADAPs.  We had stock in Walgreens specialty pharmacy

10    stores that were located in institutions.

11             THE COURT:  What does the term "ADAP" mean?

12             THE WITNESS:  It's AIDS Drug Assistance Program.

13    BY MX. BLACK:

14    Q.   And there were no safety issues with Daraprim, as far as

15    you know, that required a change from open to closed

16    distribution system, correct?

17    A.   Not as far as I know.

18    Q.   Let's focus, Ms. Ghorban, on your conversations with Martin

19    Shkreli and the business development team about the use of

20    closed distribution system for Daraprim.

21          You have heard Martin Shkreli say that closed

22    distribution can make it harder for generics to obtain the

23    branded drug, correct?

24    A.   I don't recall him specifically saying it at any point,

25    but -- I just don't recall.  I know it was a conversation that

LCFKFTC5                          Ghorban – Direct

1    we had multiple times in many different situations before Vyera

2    acquired Daraprim and after.

3    Q.  You testified in your deposition that Martin Shkreli

4    mentioned using closed distribution to prevent generics to

5    obtain Daraprim?

6    A.  Again, I don't recall specifically.  We had a lot of

7    conversations, there were a lot of emails about it.  I think I

8    was forwarded an email.  So I just don't recall, to be honest,

9    a specific instance of him exactly saying that.  But it was a

10   conversation that we had many, many times in multiple meetings,

11   with all -- with him in those meetings, with the BD business

12   development team in those meetings.

13   Q.  In June of 2015, Martin Shkreli and the business

14   development team discussed with you the strategy of using a

15   closed distribution system to prevent generic entry, correct?

16   A.  I think we started getting emails about it, and we started

17   having discussions about it then.

18   Q.  So the answer is yes?

19   A.  Yes.

20   Q.  When you say we started getting questions about it, are you

21   referring to yourself and Nancy Retzlaff?

22   A.  Yes, and the broader commercial team at that time.

23   Q.  Who else was in the commercial team?

24   A.  I think we had a head of sales on that team by that point,

25   we had a small sales team, but it would have been the sales

LCFKFTC5                        Ghorban - Direct

1    leadership, myself, Nancy, perhaps some other marketing people

2    that may have been involved.

3    Q.  Could you name names?

4    A.  It was still a small group.  I can't remember exactly at

5    what point we hired certain people, but there were multiple

6    people involved.

7    Q.  And in those meetings you just mentioned, Martin Shkreli

8    and the business development team discussed using closed

9    distribution to make it harder for generics to acquire

10   Daraprim, correct?

11   A.  Yes.

12   Q.  And generic companies seeking to develop a competing

13   generic Daraprim required Daraprim samples, correct?

14   A.  I believe so.

15   Q.  And Daraprim samples are necessary to show to the FDA that

16   the generic is bioequivalent to Daraprim?

17   A.  Yes, they have to conduct studies that compare their

18   product to the listed product to be able to show equivalence.

19   Q.  And the business development team told you that they had an

20   interest in not making it easy for a generic company to acquire

21   Daraprim?

22   A.  Yes.

23   Q.  And they had this interest because a generic launching with

24   a competing product would have a dramatic impact on Vyera's

25   revenue, correct?

1  A.  Yes.

2  Q.  And a generic launch would, in fact, dramatically decrease

3  Vyera's revenue?

4  A.  Yes.

5  Q.  It would decimate it?

6  A.  Yes.

7  Q.  Daraprim was Vyera's primary source of revenue during your

8  time, correct?

9  A.  Yes.

10  Q.  So it was one of the objectives of the business development

11  team and Martin Shkreli to impede generic entry?

12  A.  Yes.

13  Q.  And you have heard discussions -- you have had discussions

14  with the business development team about using closed

15  distribution to make it harder for generics to get access to

16  Daraprim?

17  A.  Yes.

18  Q.  And, in fact, multiple people at Vyera discussed that

19  objective with you at multiple times?

20  A.  I would say primarily the business development team.

21  Q.  So the business development team discussed that objective

22  with you on multiple occasions?

23  A.  Yes.

24  Q.  And using a closed distribution to impede generics was very

25  much a topic of discussion at the time of the Daraprim

LCFKFTC5                         Ghorban - Direct

1    acquisition?

2    A.  Yes.

3    Q.  And given the importance of Daraprim to the company's

4    revenue, every single person from business development was

5    involved, at one point or another, in Daraprim distribution

6    contracts, correct?

7    A.  I don't know if every single person on the business

8    development team was involved in contracts.  I would say the

9    three we mentioned — Chris -- sorry, Mike Smith, Edwin Urrutia,

10   Patrick Crutcher — were the ones that I worked most closely

11   with.  I think there were a couple of other people on that team

12   that I didn't have as much contact with.

13   Q.  And Daraprim distribution contracts were incredibly

14   important documents, correct?

15   A.  Yes.

16   Q.  Because they enabled Vyera to sell product?

17   A.  Yes.

18   Q.  And generate sales?

19   A.  Generate revenue, yes.

20   Q.  And every person who was interested, which included Martin

21   Shkreli and his business development team, reviewed

22   distribution contracts?

23   A.  I don't know that every single person reviewed the

24   distribution contracts.  They're fairly lengthy, there's a lot

25   of legal terminology.  Legal definitely reviewed the

LCFKFTC5                    Ghorban - Direct

```
 1   distribution contracts.  I recall sitting in with Mike Smith
 2   and going pretty thoroughly through some of the contracts.  I
 3   shared a lot of contracts, but I don't know that every single
 4   person reviewed them.
 5   Q.  Why don't we take a look at your deposition.
 6           MX. BLACK:  Phoebe, could you bring up page 226.
 7   Q.  Ms. Ghorban, do you have it on your screen?
 8   A.  Yes.
 9   Q.  Do you see, starting on line 4:
10   "Q.  Do you remember Mr. Shkreli being involved in these
11   distribution contracts in any way that wasn't hands-on like the
12   manner you described?"
13           And then starting on line 9:
14   "A.  I don't remember -- I don't remember specifics.  I know
15   that they were incredibly important documents because it
16   enabled us to sell the product and distribute the product and
17   would generate sales.  So I know that every person who was
18   interested, which was him and his team and obviously the
19   commercial leadership, would have reviewed it."
20           Do you see that?
21   A.  I see that.
22           MR. CASEY:  Your Honor, I object to the witness using
23   this for impeachment.  I don't think it's proper impeachment
24   when it hasn't been established as to whether the witness
25   testified contrary to the deposition.
```

LCFKFTC5                        Ghorban - Direct

1           THE COURT:  Sustained.  Stricken.

2           MX. BLACK:  Could I use it for refreshment?

3           THE COURT:  Certainly, but you need to lay a

4   foundation.

5   BY MX. BLACK:

6   Q.  Ms. Ghorban, you testified earlier that you did not

7   remember every single person reviewing Daraprim distribution

8   contracts, correct?

9   A.  Correct.

10  Q.  Would looking at your deposition transcript refresh your

11  memory?

12          MR. CASEY:  Objection, your Honor.  She's trying to

13  impeach the witness --

14          THE COURT:  Sustained.  Sustained.

15          MX. BLACK:  Okay.  I'll move on.

16  BY MX. BLACK:

17  Q.  Ms. Ghorban, let's take a look at one other document.

18          MX. BLACK:  Phoebe, could you bring up GX 1207.

19  Q.  Do you see it on your screen?

20  A.  I see that.

21  Q.  And GX 1207 is an April 2015 email chain from Michael Smith

22  to you and Nancy Retzlaff?

23  A.  Yes, I see it.

24  Q.  And the subject line is sulfadiazine?

25  A.  Yes.

LCFKFTC5                          Ghorban - Direct

1              MX. BLACK:  Your Honor, I move Exhibit 1207 in

2       evidence.

3              THE COURT:  Received.

4              (Government's Exhibit 1207 received in evidence)

5       BY MX. BLACK:

6       Q.  Ms. Ghorban, let's look at the bottom email on this page

7       from Michael Smith.

8              And Michael Smith was on the business development

9       team?

10      A.  Yes.

11      Q.  The email says, "Another item to keep on your radar is

12      sulfadiazine.  It is a sole-source (U.S. only, generic ex U.S.)

13      infectious disease product from Sandoz indicated for

14      toxoplasmosis.  This would be the classic closed distribution

15      play.  We think it could do more than 250 million per annum.  I

16      have attached a short dec and the model for some quick

17      background."

18             Do you see that?

19      A.  I do.

20      Q.  I think you mentioned already earlier that sulfadiazine was

21      another product that Vyera was considering acquiring around

22      spring/summer of 2015?

23      A.  Yes.

24      Q.  And sulfadiazine was a sole-source product in the United

25      States?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCFKFTC5                        Ghorban - Direct

1    A.  That's what he's telling me in this email.

2    Q.  And "sole source" means that there is only one company

3    producing that product with that API?

4    A.  I don't know about the API part, but it's the way that I

5    interpret it as, it's one company selling the product.

6    Q.  And it means that it doesn't have a generic competitor?

7    A.  I don't know if this is a brand, so I can't say that it has

8    a generic competitor or not.  If it's a generic, then it's a

9    generic, but it just tells me that this is -- there's only one

10   company selling this product at the moment.  It could be brand

11   or generic.

12   Q.  Got it.

13             So, in this case, it would mean it was the only

14   generic on the market?

15   A.  It was the only product -- the only product of that

16   molecule on the market.

17   Q.  And Michael Smith is using the term "classic closed

18   distribution play," correct?

19   A.  Yes, that's the term he's using.

20   Q.  And that term refers to the concept that you could use

21   closed distribution to make it more difficult for generics to

22   get reference-listed drugs for bioequivalence studies, correct?

23   A.  I know that now.  I didn't know that at the time.  I didn't

24   know what he meant by that.  I had never heard that term

25   before.

LCFKFTC5                          Ghorban - Direct

1    Q.  But you understand it to mean that now?

2    A.  Yes.

3    Q.  And using closed distribution -- strike that.

4           So Vyera was considering a closed distribution

5    strategy for sulfadiazine to impede generic -- another generic

6    competitor?

7    A.  Yeah, I think that's what he meant.

8    Q.  So let's look at the top email in the same document,

9    GX 1207.  And the second paragraph, the second full paragraph,

10   says -- it starts with, "We are also now in the process" -- so

11   it says, "We are also now in the process of bidding for

12   Daraprim (pyrimethamine) as a sole-source product from Impax

13   Labs.  Pyrimethamine plus sulfadiazine combo therapy is the

14   gold standard for toxoplasmosis.  I would build a similar dec

15   specific to Daraprim."

16          Do you see that?

17   A.  Yes, I do.

18   Q.  So this email was sent on April 29, 2015, correct?

19   A.  Yes.

20   Q.  And it was when around the time business development team

21   was evaluating Daraprim as a potential acquisition target?

22   A.  Yes.

23   Q.  And pyrimethamine refers to the active ingredient in

24   Daraprim?

25   A.  Yes.  It's the generic name for it.

1    Q.  And a sole-source product means that -- that refers to

2    Daraprim not having pyrimethamine competitors in the United

3    States?

4    A.  Correct.

5    Q.  And it mattered to the business development team that

6    Daraprim didn't have generic competitors, correct?

7    A.  Yes.

8    Q.  And why did it matter?

9    A.  There was an increased opportunity for revenue.

10           MX. BLACK:  Thanks, Phoebe.  You can take it down.

11   Q.  Let's look at another document.

12           MX. BLACK:  Phoebe, could you bring up GX 1303 --

13   sorry, sorry, 1302.

14   Q.  Ms. Ghorban, do you have GX 1302 on your screen?

15   A.  I do.

16           MX. BLACK:  Your Honor, GX 1302 is already in evidence

17   as one of the documents on plaintiffs' first list of exhibits

18   to be admitted in GX 9001.

19   Q.  So, Ms. Ghorban, GX 1302 is a June 2015 email chain from

20   Nancy Retzlaff, your boss and chief commercial officer at the

21   time, correct?

22   A.  Yes.

23   Q.  The subject line is Project DART.

24           Do you see that?

25   A.  Yes.

LCFKFTC5                          Ghorban - Direct

1   Q.  And Project DART is the code name for Vyera's plan to buy

2   Daraprim?

3   A.  Yes.

4   Q.  Now let's take a look at the bottom email on the first

5   page.  And it carries over to the next page, but we can start

6   on the first page.

7            It says, "Tina, Rick:  Martin shared an update today

8   re Project DART (Daraprim) at the leadership team today.  Based

9   on today's discussions, he anticipates roughly a two-week

10  timeline until the deal potentially closes.  As you're both

11  aware, the priority work stream is to ensure the product is

12  moved into closed distribution as swiftly as possible in order

13  to minimize exposure."

14           Do you see that?

15  A.  I do.

16  Q.  So this email is from June 9, 2015?

17  A.  Yes.

18  Q.  And that was two months before Vyera acquired Daraprim?

19  A.  Yes.

20  Q.  And "Martin" in this email refers to Martin Shkreli?

21  A.  Yes.

22  Q.  "Priority work stream' refers to the highest priority

23  tasks?

24  A.  Yes.

25  Q.  Which was said by Martin Shkreli?

LCFKFTC5                          Ghorban - Direct

1    A.   I'm assuming because he said it's an update and based on

2    other conversations.

3    Q.   Do you have any reason to doubt that it was said by Martin

4    Shkreli?

5    A.   No.

6    Q.   Where it says "to ensure the product is moved into closed

7    distribution," "the product" refers to Daraprim?

8    A.   Yes.

9    Q.   So the highest priority task said by Martin Shkreli was

10   moving Daraprim into a closed distribution system after

11   acquisition?

12   A.   That's what she's saying, yes.

13   Q.   And that was true?

14   A.   It was one of the -- it was one of the priorities, yes.  It

15   was a priority for the business development team.

16   Q.   And Martin Shkreli?

17   A.   Yes.

18   Q.   And it was necessary to do it as swiftly as possible to

19   minimize exposure to generic competitors being able to access

20   Daraprim?

21   A.   Yes.

22        MX. BLACK:   Thanks, Phoebe.  You can take it down.

23   Q.   Ms. Ghorban, let's talk now a little bit about IQVIA data.

24   A.   Okay.

25   Q.   IQVIA is a standard data source in the pharmaceutical

LCFKFTC5                    Ghorban - Direct

1    industry, correct?

2    A.  Yes, it is.

3    Q.  And it used to be called IMS, correct?

4    A.  Correct.

5    Q.  IQVIA collects and reports a variety of pharmaceutical

6    data?

7    A.  Yes.

8    Q.  It captures prescribing data?

9    A.  Yes.

10   Q.  Sales data?

11   A.  Yes.

12   Q.  Data around patients' age groups?

13   A.  Yes.

14   Q.  Prescribers' specialties?

15   A.  Yes.

16   Q.  And prescribers' age groups?

17   A.  Yes.  And a lot more stuff.  There's a lot more data in

18   there than just those.

19   Q.  It's a rich dataset?

20   A.  Yes.

21   Q.  And IQVIA data is a standard data source that companies and

22   analysts will look at to understand the dynamics of markets and

23   products?

24   A.  Yes.

25   Q.  In your experience, IQVIA data is always part of the

LCFKFTC5                         Ghorban - Direct

1   assessment in decisions to acquire a product, correct?

2   A.   It's always a starting point.

3   Q.   You always check IQVIA data to assess products for drug

4   acquisition?

5   A.   Yes.

6   Q.   And you always check IQVIA data to assess products for drug

7   development?

8   A.   Yes.  Or Symphony.  Symphony is another data source.

9   Q.   So Symphony is another pharmaceutical data aggregator?

10  A.   Yes.

11  Q.   And IQVIA data isn't free, correct?

12  A.   No.  As a pharmaceutical company, you have to pay for a

13  subscription.

14  Q.   And Vyera, in fact, had paid for a subscription to IQVIA

15  data when you were at the company?

16  A.   Yes.

17  Q.   And you looked at IQVIA data to assess Daraprim for

18  acquisition?

19  A.   I know I would have checked IQVIA.  I don't know if there

20  was -- it's a small product -- it was a small product, so when

21  you have smaller products, the data is not as consistent and is

22  not as reliable, but I would have started there.

23  Q.   So you looked at IQVIA data as a starting point?

24  A.   Yes.

25  Q.   And Vyera's business development team also looked at IQVIA

1   data?

2   A.  I think they used an epidemiological model, which is

3   patient-based, but I'm sure they would have looked at IQVIA

4   data as well.

5   Q.  For Daraprim?

6   A.  Yeah.

7   Q.  Now, let's discuss the direction you received from the

8   business development team about blocking Daraprim data.

9          So after the Daraprim acquisition, the business

10  development team asked you to talk to Daraprim distributors

11  about not reporting Daraprim distribution data to IQVIA and

12  other data aggregators, correct?

13  A.  Yes.

14  Q.  And other data aggregators would have included Symphony?

15  A.  Yes.

16  Q.  And one of the reasons that the business development team

17  asked you to talk to Daraprim distributors about this issue was

18  so that data-reporting companies would show less in terms of

19  volume and sales for Daraprim?

20  A.  Yes.

21  Q.  And that mattered because if sales looked like they were

22  going down, there would be less interest from other companies

23  to develop generic Daraprim?

24  A.  That was their belief.

25  Q.  And data blocking was part of the business

LCFKFTC5                        Ghorban - Direct

1    development team's strategy to discourage generic entry?

2    A.   Yes.

3    Q.   And it was part of Martin Shkreli's strategy?

4    A.   Yes.

5    Q.   And this strategy was communicated to you on multiple

6    occasions?

7    A.   Yes.

8    Q.   You had multiple conversations with the business

9    development team about data blocking?

10   A.   Yes.

11   Q.   And Martin Shkreli was involved in those conversations?

12   A.   I think we started talking about data blocking after the

13   acquisition, so I was mostly dealing with the BD team directly

14   at that point about some of the details, but the BD team talked

15   to him on a regular basis, and I know we had bigger discussions

16   about it.

17   Q.   And you know, through the business development team, that

18   Shkreli requested that IQVIA data -- sorry, that IQVIA not have

19   their Daraprim data?

20   A.   Yes.  They actually asked me to track the data in IQVIA to

21   see if it was going down.

22   Q.   And Shkreli made that request, right, that IQVIA not have

23   Daraprim data?

24   A.   Yes.

25   Q.   Now, let's talk a little bit about your conversations with

LCFKFTC5                    Ghorban - Direct

1     Daraprim distributors about blocking Daraprim data.

2              MX. BLACK:  Phoebe, could you bring up GX 1556.

3     Q.  So GX 1556 is an August 2015 email chain from Michael

4     Smith, a member of the business development team, correct?

5     A.  Yes.

6     Q.  And it is to you and Nancy Retzlaff?

7     A.  Yes.

8     Q.  And the subject line is, "Tell Walgreens/ICS We Don't Want

9     Them Reporting To IMS Or Any Other Databases."

10             Do you see that?

11    A.  Yes.

12             MX. BLACK:  Your Honor, I move to admit

13    Exhibit GX 1556 in evidence.

14             THE COURT:  Received.

15             (Government's Exhibit 1556 received in evidence)

16    BY MX. BLACK:

17    Q.  Ms. Ghorban, let's take a look at the bottom email first.

18    It is dated August 10, 2015?

19    A.  Yes.

20    Q.  So it was three days after Vyera bought Daraprim?

21    A.  I don't recall the exact date, but it was early August that

22    the acquisition was complete.

23    Q.  So it was shortly after?

24    A.  I think so.

25    Q.  And the subject is, "Tell Walgreens/ICS We Don't Want Them

LCFKFTC5                      Ghorban - Direct

1    Reporting To IMS Or Any Other Databases."

2            Do you see that?

3    A.  Yes.

4    Q.  Walgreens and ICS were the only Daraprim distributors at

5    the time, correct?

6    A.  Yes.

7    Q.  And "we" in the subject line refers to the business

8    development team?

9    A.  I don't know who he's referring to at that point.  "We" --

10   I would think it would be business development, but I can't,

11   for sure, say.

12   Q.  And "reporting" refers to reporting Daraprim distribution

13   data?

14   A.  Daraprim prescription data and sales data.

15   Q.  And that's Daraprim prescription and sales data that

16   distributors own?

17   A.  I'm sorry, hold on.  It would be -- yeah, for Walgreens, it

18   would be the prescription data, and for ICS, it would be the

19   sales data.

20   Q.  And they owned the data?

21   A.  They collect the data because they distribute the product.

22   Q.  But it is their data to report or not to IQVIA?

23   A.  I don't know if it's their data.  It's kind of the

24   company's data because they report the data back to the

25   company, but, ultimately, it's their decision who they report

1    to, who they report the data to.

2    Q.  So they ultimately decide whether or not to report the

3    data?

4    A.  Yes.

5    Q.  Pending any agreement with the manufacturer?

6    A.  Yes.

7    Q.  And other databases in the subject line refers to data

8    aggregators such as Symphony?

9    A.  Yes.

10   Q.  So, shortly after the Daraprim acquisition, Michael Smith

11   asked you to tell Daraprim distributors that Vyera does not

12   want them reporting Daraprim sales and prescription data to

13   IQVIA and other data aggregators, correct?

14   A.  Yes.

15   Q.  Now, let's take a look at your response to the email.

16        So you reply:  "We are talking to both this morning,

17   so will mention it again."

18   A.  Yes.

19   Q.  And "we" refers to you and Nancy Retzlaff?

20   A.  I think it was myself and Nancy.  Mike could have been on

21   the phone.  I'm not exactly sure who it would have been.  There

22   were some other people that were working through the

23   agreements, I believe, and I didn't have any experience in

24   this, so I needed somebody else to help with the process.

25   Q.  And the "Mike" you mentioned, that's Michael Smith?

1    A.  Mike Smith, yeah.

2    Q.  So you planned to talk to Walgreens and ICS about data

3    blocking?

4    A.  We were talking to them about the process of reassigning, I

5    think, the contracts and how we set up a vendor relationship

6    with both of them.  So I think, in the context of this email, I

7    was saying we're already talking to them, so we'll mention it

8    again in that conversation.

9    Q.  So you're saying that you will mention data blocking of

10   Daraprim data again to ICS and Walgreens?

11   A.  Yes, in that meeting we already set up.

12   Q.  And you had discussions with Walgreens and ICS about data

13   blocking of Daraprim data before this email?

14   A.  I think we had -- I think we had mentioned it to them.  The

15   context was trying to reassign contracts, establish vendor

16   relationship, make sure that there was no disruption in supply.

17   So this was a component of those discussions.  It wasn't a

18   priority for the commercial team, nor was it an objective to

19   have a conversation; it was part of the larger discussions.

20   Q.  That you had at the direction of the business development

21   team?

22   A.  The conversation about the databases and the data blocking

23   was at the direction of the business development team.  The

24   other conversations were to ensure supply wasn't disrupted.

25        MX. BLACK:  Thanks, Phoebe.  You can take it down.

LCFKFTC5                         Ghorban - Direct

1    Q.  Let's take a look at another document.

2              MX. BLACK:  Phoebe, could you bring up GX 1289.

3    Q.  So GX 1289 is an August 2015 email from you to Nancy

4    Retzlaff, cc'ing Michael Smith?

5    A.  Yes.

6    Q.  And the subject line is:  "Update On Distribution Progress

7    and Additional Questions"?

8    A.  Yes.

9              MX. BLACK:  Your Honor, I move to admit GX 1289 in

10   evidence.

11             THE COURT:  Received.

12             (Government's Exhibit 1289 received in evidence)

13   BY MX. BLACK:

14   Q.  So, in this email, Ms. Ghorban, you followed up on Michael

15   Smith's data blocking request that we just saw and are now

16   updating Nancy Retzlaff and Michael Smith on outstanding items?

17   A.  Yeah.  This is just a general follow-up, and the data

18   blocking is part of that.

19   Q.  And I'd like to focus on the data blocking aspect.

20             Let's take a look under the heading "Walgreens

21   Progress."  And I'd like to focus on the fourth bullet.  It

22   says, "Confirmed that they do not disclose Daraprim sales/Rxs

23   to any data reporting company.  This was in the original

24   contract with Impax."

25   A.  Yes.

LCFKFTC5                        Ghorban - Direct

1    Q.  Do you see that?

2            And "RXs" refers to prescriptions?

3    A.  Yes.

4    Q.  So you talked to Walgreens again?

5    A.  Yes.

6    Q.  And you told them that Vyera didn't want Daraprim

7    distribution data to be reported to IQVIA and other data

8    aggregators?

9    A.  Yes.

10   Q.  And Walgreens confirmed that it does not disclose Daraprim

11   data to any data aggregator?

12   A.  Yes.  That was the agreement they had with Impax before we

13   acquired it.

14   Q.  And you requested that they continue not reporting Daraprim

15   data --

16   A.  Yes.

17   Q.  -- After Vyera took over?

18   A.  Yes.

19   Q.  And data blocking wasn't actually spelled out in Impax's

20   contract with Walgreens, correct?

21   A.  I don't recall.

22   Q.  You do not know why Impax had Walgreens not report data,

23   correct?

24   A.  No, I do not.

25   Q.  It could have also been done to make generic entry less

LCFKFTC5                      Ghorban - Direct

1    attractive?

2    A.   Based on the theory from the business development team at

3    Vyera, potentially, but I don't know for sure why they did it

4    or when they did it.

5    Q.   Fair enough.

6          Now, let's take a look under the last section, titled

7    "Requests/Questions for ICS."

8          Focusing on the fifth item, it says, "We need them to

9    agree not to report into any sales databases, such as IMS,

10   Symphony, et cetera."

11         Do you see that?

12   A.   Yes.

13   Q.   Who does "we" refer to?

14   A.   "We" is the company.

15   Q.   And that includes Martin Shkreli?

16   A.   Yes.

17   Q.   And "them" refers to ICS?

18   A.   Yes.

19   Q.   So Vyera and Martin Shkreli wanted ICS to agree not to

20   report Daraprim data to IQVIA and other data aggregators?

21   A.   Yes.

22   Q.   And you got ICS to agree to this request?

23   A.   I don't remember if that was actually part of the

24   agreement.  I forget if that made it into the contract or not.

25   Q.   Was there an understanding outside a formal contract that

LCFKFTC5                        Ghorban - Direct

1    ICS would not report data?

2    A.  Not that I'm aware of.  I know I asked -- I requested it of

3    them, but I don't recall if we formalized that and they agreed

4    to it.  But based on my experience, they wouldn't just tell us

5    they weren't going to do it and not put it in a contract.  It

6    would have had to have made it into some contract, I believe.

7                MX. BLACK:  Phoebe, you can take this one down.

8                And I'll share yet another exhibit, and it's GX 1307.

9    Q.  Ms. Ghorban, do you see it on your screen?

10   A.  Yes.

11   Q.  So this is a May 2016 email chain between you and --

12               MX. BLACK:  Actually, could you zoom out, Phoebe.

13   Q.  The whole chain -- most of the chain, I guess, is between

14   you and Elizabeth Feldman from ASD?

15   A.  Yes.

16   Q.  And ASD was one of the Daraprim distributors at the time?

17   A.  Yes.  We added them.

18               MX. BLACK:  Your Honor, I move to admit GX 1307 in

19   evidence.

20               THE COURT:  Received.

21               (Government's Exhibit 1307 received in evidence)

22   BY MX. BLACK:

23   Q.  Now, let's turn to the second page of this email chain, and

24   the second sentence of -- sorry, one second.

25               Yeah, let's take a look at the March 12, 2016 email

LCFKFTC5                        Ghorban - Direct

1   from you to Elizabeth Feldman.  In the second sentence of this

2   email, you write, "Also, I'm not sure if I included language

3   regarding not sharing our sales data with third-party data

4   providers, such as IMS.  We would like that clause added."

5          Do you see that?

6   A.  Yes.

7   Q.  So you requested ASD to block Daraprim distribution data

8   from IQVIA, correct?

9   A.  Yes.

10  Q.  And other data aggregators?

11  A.  Yes.

12  Q.  Such as Symphony?

13  A.  Yes.

14  Q.  And that request came from the business development team?

15  A.  Yes.

16  Q.  And the business development team had an interest to block

17  Daraprim data?

18  A.  Yes.

19  Q.  Still looking at the second page of GX 1307, and focusing

20  on Ms. Feldman's response, it says, "Hi Tina.  I am meeting

21  with legal today to discuss the amendment.  I will also run the

22  data item below by the team.  Usually, as a policy from ABC, we

23  don't agree to block data, but will see what I can do."

24          Do you see that?

25  A.  Yes.

1    Q.  "ABC" here refers to AmerisourceBergen?

2    A.  Yes.

3    Q.  And it's ASD's parent company?

4    A.  Yes.

5    Q.  Now, going to page 1 of this exhibit, GX 1307, you follow

6    up at the bottom of the page.  It says, "Hi Liz.  Was there any

7    resolution as to whether you could block data to IMS?  I know

8    ICS was able to comply with us for that request."

9            Do you see that?

10   A.  Yes.

11   Q.  So ICS agreed to block Daraprim data per Vyera's request?

12   A.  I guess they did.

13   Q.  So still staying on the first page of GX 1307, Ms. Feldman

14   responds, "Hello Tina.  I was able to follow up with our data

15   team at the corporate headquarters.  Unfortunately, at this

16   time, we will be unable to block data to IMS.  Missing data

17   devalues our relationship with our third-party aggregator

18   partners and our policy to provide a complete picture of the

19   industry."

20           Do you see that?

21   A.  Yes, I do.

22   Q.  So in May of 2016, ASD did not agree to block its Daraprim

23   sales and prescription data from aggregators?

24   A.  Correct.

25   Q.  Do you know if they eventually agreed to do so?

LCFKFTC5                        Ghorban - Direct

1    A.  I don't -- not -- I don't believe so when I was there.

2    Q.  So not during your time?

3    A.  No.

4    Q.  So now, still staying with GX 1307, looking at the top

5    email on the page, so you forwarded ASD's response to a number

6    of individuals.

7          Do you see that?

8    A.  Yes.

9    Q.  And you forwarded it to Nancy Retzlaff?

10   A.  Yes.

11   Q.  Your boss?

12   A.  Yes.

13   Q.  And several members of the business development team?

14   A.  Correct.

15   Q.  One of them is Edwin Urrutia?

16   A.  Yes.

17   Q.  Another one is Patrick Crutcher?

18   A.  Yes.

19   Q.  And the third one is Michael Smith?

20   A.  Yes.

21   Q.  And you forwarded ASD's request to these individuals

22   because they were the ones who asked for this kind of activity

23   regarding data blocking of Daraprim to go on, correct?

24   A.  Correct.

25          MX. BLACK:  Thanks, Phoebe.  You can take it down.

1              I have one last document on data blocking.  Phoebe,

2       could you bring up GX 1405.

3       BY MX. BLACK:

4       Q.  Ms. Ghorban, do you see it on your screen?

5       A.  Yes.

6       Q.  It is a September 2016 email from you with a subject line,

7       "Cardinal Distribution Agreement"?

8       A.  Yes.

9              MX. BLACK:  Your Honor, I move to admit GX 1405 into

10      evidence.

11             THE COURT:  Received.

12             (Government's Exhibit 1405 received in evidence)

13      BY MX. BLACK:

14      Q.  So in this email, Ms. Ghorban, you email Crutcher, Patrick

15      Crutcher, and Michael Smith from the business development team?

16      A.  Yes.

17      Q.  And Nancy Retzlaff?

18      A.  Yes.

19      Q.  And you cc Ron Tilles?

20      A.  I cc Ron and Nancy.

21      Q.  Oh, sorry, yes.  Thanks for that correction.

22             And Ron Tilles was the CEO at the time?

23      A.  On September 14th?  I don't recall if he was the acting CEO

24      or -- he was playing a leadership role.  He may have been still

25      CEO at that time.

1    Q.   So he was either CEO or interim CEO?

2    A.   Yeah, I think so.

3    Q.   Let's take a look at the second sentence, which starts

4    with, "We are expanding distribution to add in Cardinal for

5    inpatient and outpatient hospital pharmacy purchases."

6    A.   Yes.

7    Q.   "This accomplishes two objectives."

8         And focusing on the second objective there, it says,

9    "The BD group's objective of limiting data availability to IMS:

10   Cardinal Specialty is willing to not report their Daraprim

11   sales to IMS.  However, note that their fee for distribution

12   will be 3.05 percent, or 105 basis points, higher than ASD's

13   fee of 2 percent.  IMS is a revenue source for them, and the

14   premium is to compensate them for that lost revenue."

15        Do you see that?

16   A.   Yes, I do.

17   Q.   So the business development group had an objective of

18   limiting data availability to IMS?

19   A.   Yes.

20   Q.   And distributors, such as Cardinal, sell their data to IMS

21   and get paid for it?

22   A.   Yes.

23   Q.   It's a revenue source for them?

24   A.   Correct.

25   Q.   And Cardinal agreed to block Daraprim data, but requested a

1    data blocking fee in exchange to compensate them for the lost

2    revenue?

3    A.   Correct.

4    Q.   And they requested 3.05 percent of Daraprim's list price?

5    A.   I don't recall what that percentage was.  I want to say

6    it's a percentage of the price of the drug, but there may be

7    some other percentages in there.

8    Q.   And ASD agreed to data blocking in September 2016?

9    A.   I don't know.  I don't recall if they did.  Based on this

10   email -- I'm not sure if that 2 percent, if that's a data

11   blocking percentage or if it's a distribution percentage.  I

12   don't recall what that was for.

13   Q.   Okay.

14           So, now, looking at the last line of this email, it

15   says, "Also, based on your request, we have followed up with

16   all the specialty pharmacies in our network, and they are not

17   willing to withhold our data from IMS as a policy."

18           Do you see that?

19   A.   Yes.

20   Q.   And "your request," does that refer to the request from

21   Michael Smith and Patrick Crutcher?

22   A.   Yes.

23   Q.   And "all the specialty pharmacies in our network," how many

24   specialty pharmacies are you referring to?

25   A.   By September of 2016, we had expanded beyond just Walgreens

specialty pharmacy to enable patients to access the medication
more quickly and access our patient affordability programs, and
we were in the process of -- we had moved to a hub network,
which is basically a single-source intake, and then the hub
does all the insurance work, applies any affordability
programs, and then sends it to a specialty pharmacy for
dispensing to the patient.

       I don't recall the exact number, but we were adding as
needed to ensure that patients had access.  So I don't -- it
was more than three, I think, but we were evaluating and
expanding as needed.

Q.  So three -- more than five?

A.  We were definitely adding a lot at that time, but I don't
remember exactly because there was a lot of discussion around
which ones would be -- would serve which purpose and where they
were located in the country, and which ones were covered by
payors.  There's a lot of other details.

Q.  So at least three pharmacies?

A.  I believe so.

Q.  So following the business development team's request, you
reached out to every entity who had Daraprim distribution data
and asked them not to report their data to IQVIA?

A.  I believe I reached out to our hub, who was the one that
was coordinating the specialty pharmacies, and asked them to
reach out to the specialty pharmacies because they had direct

LCFKFTC5                          Ghorban - Direct

1    contact with them, I didn't.  They managed that network.  And I
2    believe that they came back and said, just as a policy, you
3    know, a lot of specialty pharmacies don't do that because it's
4    a source of revenue.
5    Q.  And in addition to the hub, you reached out to ICS?
6    A.  I think ICS was like the year before.
7    Q.  But just like overall --
8    A.  Overall, yes.
9    Q.  -- you reached out to ICS?
10   A.  Yes.
11   Q.  You reached out to Walgreens?
12   A.  Yes.
13   Q.  You reached out to ASD?
14   A.  Yes.
15   Q.  You reached out to Cardinal?
16   A.  Yes.
17   Q.  And you asked them to not report Daraprim sales data to
18   IQVIA?
19   A.  Correct.
20   Q.  So now --
21        MX. BLACK:  We can take this one down.
22   Q.  Let's switch gears a little bit and talk about Daraprim
23   purchase limits during your time at Vyera.
24        Ms. Ghorban, you were involved in setting up purchase
25   limits on Daraprim orders, correct?

LCFKFTC5                         Ghorban – Direct

1    A.  I was involved in setting up the process of how hospitals

2    could order from ICS, and part of that was the request to limit

3    the number of bottles they could buy at any one time.

4    Q.  The request came from the business development team?

5    A.  Yes, it did.

6    Q.  Anyone in particular?

7    A.  I don't recall exactly who it was.

8            MX. BLACK:  Phoebe, could you bring up GX 1217.

9    Q.  So GX 1217 is an August 2015 email chain between you and

10   Georgios Tserotas of ICS?

11   A.  Yes.

12   Q.  And ICS was a Daraprim distributor at the time?

13   A.  Yes.

14           MX. BLACK:  Your Honor, I move to admit GX 1217 in

15   evidence.

16           THE COURT:  Received.

17           (Government's Exhibit 1217 received in evidence)

18   BY MX. BLACK:

19   Q.  Ms. Ghorban, let's take a look at the bottom email on the

20   first page of GX 1217.

21           Ms. Ghorban, this email was sent from you?

22   A.  Yes.

23   Q.  To Georgios Tserotas?

24   A.  Georgios, yeah.

25   Q.  Georgios, okay.

LCFKFTC5                    Ghorban - Direct

1            Cc'ing Michael Smith?

2  A.  And Nancy, yes.

3  Q.  And Nancy?

4            And Georgios Tserotas was an ICS representative,

5  right?

6  A.  Yes.  He was our customer service contact.

7  Q.  So staying on the first page, this bottom email, let's take

8  a look at the text of your email.  It says, "Hi Georgios.

9  Thanks for sending the sales report.  We should discuss

10 possibly limiting the maximum number of bottles that we send to

11 any one customer at one time.  Our concern is that a generic

12 company could access multiple bottles of our product, perhaps

13 attained through a hospital reselling it or distributing

14 product to surrounding retail pharmacies, and use it to create

15 a generic version."

16           Do you see that?

17 A.  Yes.

18           (Continued on next page)

19

20

21

22

23

24

25

LCFMFTC6                        Ghorban - Direct

1    Q.  When you say, we should discuss in the first highlighted

2    sentence, are you referring to you and Georgios Tserotas?

3    A.  Yes.

4    Q.  Maximum number of bottles, that refers to bottles of

5    Daraprim?

6    A.  Yes.

7    Q.  Customers refers to Daraprim buyers?

8    A.  Yes.

9    Q.  That includes hospitals buying Daraprim from ICS?

10   A.  Yes.

11   Q.  And specialty pharmacies?

12   A.  At that period of time, in August of 2015, there were no

13   other specialty pharmacies except for Walgreens.

14   Q.  It's referring to maximum number of bottles sold to

15   hospitals?

16   A.  Hospitals, institutions, yeah.

17   Q.  So here Vyera and ICS are discussing the possibility of

18   limiting the maximum number of bottles that ICS can send to

19   hospitals that want to buy Daraprim?

20   A.  Limiting per order.

21   Q.  Looking at the second sentence, our concern is that a

22   generic company could access multiple bottles of our product.

23   Generic companies need multiple bottles of Daraprim for FDA

24   required studies, correct?

25   A.  I don't know how many bottles they need.  I'm not familiar

1    with the process of creating a generic.

2    Q.  They need more than one?

3    A.  I would think, but I don't really have any idea.

4    Q.  When you say our concern, whose concern are you referring

5    to?

6    A.  When I wrote the e-mail, I think it was sort of the royal

7    we, the company concern.

8    Q.  Business development team's concern?

9    A.  It wasn't my concern, so it was coming from -- it was an

10   objective being directed by the business development team.

11   Q.  And Martin Shkreli's concern?

12   A.  Yes.

13   Q.  Business development team and Martin Shkreli were concerned

14   that a generic could buy multiple bottles of Daraprim and use

15   them to create a generic version?

16   A.  Yes.

17   Q.  And you talked to multiple people from the business

18   development team about setting purchase limits to impede

19   generics?

20   A.  Yes.

21   Q.  One of the people was Michael Smith?

22   A.  Yes, definitely Michael Smith.

23   Q.  And you made this purchase limit request at the request of

24   the business development team?

25   A.  Yes.  It was definitely part of it was the generic concern.

1    The other part of it was the redistribution of product to

2    retail pharmacies because at this point they were able to buy

3    the product for a penny a pill.  So if they diverted product

4    from say a 340B hospital into sort of the mainstream non-340B

5    patients, it would negatively impact our sales, essentially

6    cannibalize our sales.

7    Q.  Are you aware of any instances of 340B entities reselling

8    it to non-340B buyers?

9    A.  When we tracked hospital sales data, which is a common

10   practice for any pharmaceutical company, we saw that there were

11   aberrations in purchasing habits for more hospitals.  They were

12   buying more than they had in the past, in the history that we

13   could see, so we weren't sure if they were using it to treat

14   non-340B patients, which is not appropriate.  It's an

15   inappropriate use of the 340B system.  Again, it would

16   cannibalize our sales.

17   Q.  You don't actually know if they actually used Daraprim

18   improperly by reselling it --

19   A.  There is not a way to really track it unless you open an

20   investigation, and we weren't in the position to really accuse

21   anybody of anything at that time.

22   Q.  So you tracked Daraprim's sales, you noticed aberrations,

23   but you did not know one way or another if there were actually

24   any instances of abuse from 340B entities?

25   A.  No.

LCFMFTC6                         Ghorban - Direct

1    Q.  So one of the reasons for Daraprim purchase limits was the

2    objective of the business development team to make it more

3    difficult for generics to get access to Daraprim, correct?

4    A.  Yes.

5    Q.  And the purchase limits that ICS and Vyera agreed on were

6    not in response to any shortages of Daraprim, correct?

7    A.  No.

8    Q.  And purchase limits on multiple bottles of Daraprim make it

9    more difficult for generics to obtain multiple bottles of

10   Daraprim for bioequivalent studies, correct?

11   A.  I have no idea.  I don't know.

12   Q.  Let's briefly look at the date of the e-mail.  It is August

13   13, 2015.

14   A.  Yes.

15   Q.  So this was shortly after Vyera bought Daraprim, correct?

16   A.  Yes.

17   Q.  So shortly after Vyera bought Daraprim you reached out to

18   Vyera's Daraprim distributor to agree on purchase limits?

19   A.  Yes.

20   Q.  Now, still staying on the first page of GX-1217, let's take

21   a look at the reply from Georgios Tserotas to you.  It says:  I

22   agree with this.  Based on the sales report you received, what

23   do you think is a reasonable threshold?  Five vials?  Please

24   let me know and we can implement these limits in our system.

25           Do you see that?

1    A.   Yeah.

2    Q.   So your authorized distributor, ICS, agreed with Vyera to

3    implement purchase restrictions on Daraprim?

4    A.   Yes.

5    Q.   And ICS in fact established purchase limits on Daraprim as

6    requested, correct?

7    A.   Yes.  I don't remember what the limit was.  I don't think

8    it was five bottles, but I could be wrong.

9    Q.   But there was a limit implemented?

10   A.   Per purchase order.  A customer could order multiple times.

11   They would just split it up by whatever the limit was.

12   Q.   If a customer placed multiple orders one after another,

13   would you flag this series of transactions?

14   A.   I would definitely flag it just to look into it and maybe

15   try to understand, again, if they were -- if it was different

16   than what we had seen them order historically, what was that

17   pattern and, potentially, were they diverting it was my chief

18   concern.  Again, I don't know how generics obtained product for

19   creating a generic and doing the research on it.  But, yes, I

20   would have flagged it.

21   Q.   So you would flag multiple orders to the business

22   development team, correct?  Because they were interested in

23   making it less easy for generics to obtain Daraprim?

24   A.   I don't know that I would flag it to the business

25   development team.  I would probably would flag it just as

1    something to look into further and potentially talk to maybe

2    somebody on the sales team or look at the history and see if it

3    was consistent.  I don't know that I even would necessarily say

4    they couldn't sell multiple purchases, but it would be

5    something that would come to my attention, and I would probably

6    explore it further.

7    Q.  And it would come to your attention because one of your

8    roles was to track Daraprim sales, right?

9    A.  Yes.

10   Q.  So if a customer tried to purchase a number of Daraprim

11   bottles exceeding the purchase limit at a given time, then ICS

12   would reach out to Vyera for approval, correct?

13   A.  Yes.

14   Q.  Then Vyera would review the order exceeding the purchase

15   limit and decide whether to approve it or to deny it, correct?

16   A.  Yes.

17   Q.  And if Vyera approved the order, ICS would be able to sell

18   Daraprim in excess of the purchase limit?

19   A.  Yes.  I think that was the process we established.

20   Q.  If Vyera denied the order, ICS would not be able to sell

21   Daraprim in excess of the purchase limit?

22   A.  Correct.

23   Q.  And one of the things that Vyera would evaluate in making

24   the decision whether the order seemed -- one of the factors

25   that it would look into to decide whether or not to approve the

1   order is whether the order was a diversion from prior

2   historical patterns?

3   A.  Yes.  That institution's buying patterns before we had

4   acquired -- before Vyera had acquired Daraprim.

5   Q.  Analyzing this kind of diversion from historical appearance

6   was important because the business development team was worried

7   that generics were somehow getting Daraprim through hospitals,

8   correct?

9   A.  I think that was their interest in it and, again, it was

10  the diversion to non-340B patients that potentially would

11  impact revenue, which would affect the company as a whole.

12  Q.  And also diversion to generics?

13  A.  Correct.

14  Q.  And Martin Shkreli was also concerned that Daraprim was

15  being diverted to generics?

16  A.  Yes.

17  Q.  And he directed implementation of restrictions to make it

18  harder for generics to obtain Daraprim, correct?

19  A.  Yes.

20  Q.  Among those restrictions were customer restrictions?

21  A.  Customers -- when you say customers, do you mean certain

22  institutions or just -- having it in a specialty pharmacy and

23  selling directly to institutions, yes.

24  Q.  Another restriction that Martin Shkreli directed to make it

25  harder for generics to obtain Daraprim were purchase limits?

LCFMFTC6                         Ghorban – Cross

1    A.  I don't recall having a specific conversation with him

2    about purchase limits.  I think I mostly worked with Michael

3    Smith on that.

4    Q.  Michael Smith reported to Martin Shkreli?

5    A.  Yes.

6    Q.  The third kind of restriction that we discussed today to

7    impeach generic entry was data blocking, correct?

8    A.  Correct.

9    Q.  That was also implemented at the direction of Martin

10   Shkreli and the business development team?

11   A.  Yes.

12   Q.  To discourage generic entry?

13   A.  Yes.

14   Q.  Thank you, Ms. Ghorban.

15            MX. BLACK:  Your Honor, I pass the witness.

16            THE COURT:  Why don't we take our midafternoon recess.

17            Excuse me just one second here.

18            Thanks so much, counsel.  We will take a five-minute

19   recess.

20            (Recess)

21            THE COURT:  Put the witness back on the stand.

22            Excuse me just one second.

23            Counsel, you may begin.

24   CROSS-EXAMINATION

25   BY MR. CASEY:

1  Q.  Good afternoon, Ms. Ghorban.  My name is Christopher Casey,

2  and I'm here representing the defendant, Martin Shkreli.  I

3  have some questions for you this afternoon based upon your

4  testimony earlier.

5           First, I wanted to just go back to the distribution

6  discussion that you were having earlier regarding the

7  distribution of Daraprim.  Do you recall that general topic?

8  A.  Yes.

9  Q.  And counsel indicated that the word closed distribution was

10  used at Vyera and you agreed with that statement.  Do you

11  remember that testimony?

12  A.  Yes.

13  Q.  I think you also testified that you understood it as

14  specialty distribution.  Did I understand you correctly?

15  A.  What I said was that the more common term in terms of

16  distribution that I've heard is you can either have specialty

17  distribution, meaning it goes through specialty pharmacies, or

18  it goes through retail channels, which is more broad.  That's

19  typically the terms that I have heard before then and since

20  then.

21  Q.  I am going to use your term, if it's OK, and call it

22  specialty distribution.  You understand that I'm talking about

23  that kind of distribution if I use that term?

24  A.  Yes.

25  Q.  Are there products other than Daraprim that are distributed

1    through specialty distribution?

2    A.  Yeah.

3    Q.  Have you seen specialty distribution systems at other

4    pharmaceutical companies that you have worked at in your

5    career?

6    A.  Yes.

7    Q.  I'd like to just focus on the specialty distribution

8    systems at Vyera with regard to Daraprim.

9        Do the specialty distribution systems at Vyera benefit

10   patients who are prescribed Daraprim?

11   A.  They do.  You want me to expand on that?

12   Q.  Yes, please.

13   A.  They do because of the high price of the product.  After

14   Vyera increased the price, retail pharmacies would no longer

15   carry it.  Even if Vyera had allowed them to, they wouldn't

16   stock a product that is that expensive.

17       It's also a small patient population.  So a retail

18   store to have a product that pricey on its shelf, waiting for a

19   potential patient to come in, doesn't make good business sense

20   to them, as well as it is an orphan disease or an orphan

21   condition.  And many of those products, because they are higher

22   price, tend to be distributed through a specialty pharmacy

23   network.

24   Q.  Does the specialty pharmacy network have benefits to

25   patients?

1    A.   Sorry.  Yes.  The specialty pharmacy a lot of times will do

2    the intake on the patient.  So they look at the benefits, the

3    insurance benefits.  They contact the insurance company, work

4    with them if they need a prior authorization or other medical

5    information from the doctor.  They coordinate with the doctor.

6    They coordinate with the patient.  They apply any copay

7    benefits or if there is a Medicare -- I forgot what we called

8    it.  It's a Medicare charitable network that will contribute to

9    the price of the product.  They will apply that, potentially.

10   If it's an indigent patient or uninsured patient, they will

11   potentially give them benefits as well, and then they will

12   contact the patient, ship to the patient so they kind of become

13   the one-stop shop for the patient and the doctor and the

14   insurance.

15   Q.   Thank you.

16        Earlier I think you used the word in reference to

17   these programs, patient assistance programs.  Did I have that

18   correct?

19   A.   Yes.

20   Q.   What are patient assistance programs?

21   A.   There is a variety of then.  The most common is copay

22   cards, copay benefits.  If an insurance company will cover the

23   product for the patient but the patient has to pay $150 out of

24   pocket or some price, a lot of times the copay programs will

25   step in and support bringing that out of pocket to the patient,

1    bringing it down, making it more affordable to the patient, and

2    the manufacturer, the pharmaceutical company, pays for that, so

3    they pay for those benefits to the patient.

4          They also -- like I said, they do these -- they used

5    to, I don't know if it's allowed anymore, but there were these

6    Medicare charitable organizations that you can contribute to

7    that would, if you had a Medicare patient that had an

8    out-of-pocket price that was unaffordable, they would step in

9    and help to bring that cost to the patient down so that patient

10   could access the medicine.

11         Also, programs for indigent patients, if they made a

12   certain income per year, you do that based on the federal

13   poverty limit.

14         And then there are also patients, like cash programs

15   for patients who are uninsured.  And the pharmaceutical company

16   will typically, for patients who are truly uninsured, will sell

17   that product to the patient for a much reduced price so the

18   patient can have access to the medicine.

19   Q.  When Daraprim is distributed through specialty pharmacies

20   as you have described, does this system increase the adherence

21   of the patient to the medication regimen?

22   A.  It's technically supposed to.  Sometimes it doesn't because

23   of the mail order component of it.  Just receiving the call

24   from the specialty pharmacy, somebody has to be at home to get

25   it.  It slows down the process a bit.  But it is typically

LCFMFTC6                    Ghorban - Cross

1    looked at as helping the patient adhere to the medication in

2    the way that it is supposed to be taken.

3    Q.  Thank you.

4         Now, did Vyera fund a foundation to help patients if

5    there were affordability issues with affording Daraprim?

6    A.  Yes.  There are multiple -- Vyera had multiple patient

7    affordability programs.

8    Q.  Can you explain for the Court what those were.

9    A.  So there was -- I believe there was a copay card that would

10   help commercial patients, patients who had a commercial

11   insurance.  There was a Medicare foundation, charitable

12   foundation that would disseminate funds according to whether or

13   not that patient qualified.  And if they needed help and

14   couldn't access the medicine because the out-of-pocket was too

15   high, there was indigent patient support.  And when we created

16   that, we actually did a much higher limit for federal poverty

17   limit.  So we expanded the number that group of patients who

18   would qualify for that program.

19        I don't think that there was a cash program.  There

20   was also, I think -- early on, there was the move to decrease

21   the price, the price to hospitals, institutions.  I believe we

22   cut the price by half per institutions to make the product more

23   affordable for them to stock.  And I believe we also came out

24   with a 30-count bottle, again, because it's a very small

25   patient population.  So to have a 100-count bottle sitting on

LCFMFTC6                        Ghorban - Cross

the shelf taking up cash and eating into your inventory didn't

make sense.  So maybe giving them a smaller-count bottle would

make it more affordable, and they would be able to stock in

case a patient came in.

Q.  You mentioned earlier today the 340B program.  Can you

explain what that is.

A.  Yeah.  The 340B, and I wasn't aware of this program before

I worked for Vyera, the 340B program is a program, it's a

national program that covers -- it covers certain institutions.

The institutions have to have, I believe -- over 50 or 60

percent of the patients within their system have to be within a

certain level of the poverty limit.  Essentially, it's a

program for institutions to buy product at a cheaper price to

distribute to those patients.  The price that they get it at

for Daraprim, when we bought it, was a penny a pill, so they

were able to buy a 100-count bottle for a dollar.

Q.  Do you know as a percentage basis how many of the patients

who are on Daraprim received Daraprim for a penny a pill?

A.  The only thing I know, I didn't know the patient part of it

because there is not really a way to see that once it goes into

an institution.  But what I could track was, I think it was 50

to 60 percent of sales were going into a channel, a sales

channel that was for a penny a pill.  So it was at that greatly

reduced price.

Q.  Just to get back to the 340B issue as it came up earlier

LCFMFTC6                        Ghorban - Cross

about the diversion issue, could you explain that in more

detail, so I understand it, exactly what the concern was there.

A.  Sure.  I'm not an expert on this.  It's a fairly

complicated system.  But my understanding when we started

talking to institutions and trying to understand the process of

the 340B system is that when hospitals buy product at that 340B

price, that greatly reduced price, they are supposed to, when

they have it in the pharmacy, they are supposed to hold it

separately from product that is meant for commercial patients.

        When a patient comes in, they are typically supposed

to determine if that patient has commercial insurance and,

potentially, the commercial insurance will pay for the product,

or part of the product, or if it's a patient who qualifies for

that 340B benefit, and they get the product at the very, very

low price.

        What we have heard, and I think it's been kind of a

common discussion in the pharmaceutical industry, is that

hospitals will sometimes mix the product, and they will buy

340B product at a greatly reduced price and then use it for

commercial patients and get the payment from the commercial

insurance.

        Again, I'm not an expert on this, so I may have some

of my facts wrong.  But when we had these discussions, those

were the points that were made, and I believe we talked to

consultants, and we also talked to people internally who knew a

1    lot more about it than I did.

2    Q.  That's helpful.

3         The concern -- I believe you testified that that was

4    one of the motivating reasons for the bottle limits that you

5    testified about, is that right?

6    A.  Correct.

7    Q.  Can you explain that part of it.  What is the connection

8    between those two things?

9    A.  Say if we are looking at the State of Georgia.  The

10   institutions there had -- typically, if I summed them all up,

11   the institutions there had been buying 50 bottles a year, and

12   we had historical data.

13        If they had been buying 50 bottles historically a year

14   of Daraprim, and even at the lower price, that kind of

15   indicates to me that that's the demand in that market.  You get

16   some spurts sometimes, you get some outbreaks, but, again, it's

17   a really, really small patient population.  Then we buy it, we

18   increase the price.  And, all of a sudden, we are seeing

19   institutions buying at one fell swoop 40 bottles, 50 bottles.

20   That's a clear deviation from what was happening before.

21        So the thought was, from the BD team, potentially it's

22   going to a generic, I don't know how that would happen

23   mechanistically, or maybe they are buying it at that low price,

24   and they are using it to give to commercial patients and they

25   are pocketing the difference, ultimately cannibalizing the

LCFMFTC6                        Ghorban - Cross

1    sales that we may have had from those commercial patients in a

2    more normal scenario.

3    Q.  Just so I'm clear, this is something the business

4    development team told you that they were concerned about?

5    A.  No.  Their primary concern, I believe, was the issue around

6    the generic accessibility.  I think we had a patient-access

7    person that was working with us, and I think from that person

8    we started thinking about this 340B diversion issue.  Again,

9    it's something that's been in the news.  You can Google it.  It

10   is clear that it wasn't just Vyera that was having those

11   concerns.  There were sort of persistent concerns in the

12   pharmaceutical industry.

13   Q.  Thank you for that.

14            I want to go back to an e-mail that you were shown

15   earlier.  It's GX-1302.

16            MR. CASEY:  Justin, if you could get that, please.

17   Q.  Do you have it up there on the screen, Ms. Ghorban?

18   A.  Yes.

19   Q.  Do you remember being asked questions about this document?

20   A.  Yes.

21   Q.  I'd like to direct your attention to the bottom of page

22   1302-001, that e-mail.  You were asked about this phrase:  The

23   priority work stream is to ensure the product is moved into

24   close distribution as swiftly as possible in order to minimize

25   exposure.  Do you see that?

LCFMFTC6                         Ghorban - Cross

```
 1   A.  Yes.
 2   Q.  You were asked about that.  Do you remember that?
 3   A.  Yes.
 4   Q.  I believe your testimony was that you believe that
 5   minimized exposure meant minimized exposure to generic
 6   competitors getting access to Daraprim?
 7   A.  Yes.
 8   Q.  Is that your testimony?
 9   A.  Yes.
10   Q.  Do you recall, Ms. Ghorban, having your deposition taken in
11   this case on January 6 of 2021?
12   A.  Yeah.
13          MR. CASEY:  Can I have the deposition transcript,
14   please, at page 70, line 12.
15   Q.  Ms. Ghorban, everything you said in your deposition was
16   true and accurate, correct?
17   A.  Yes.
18   Q.  At page 70, starting at line 12, do you see it there you
19   were asked:
20          Do you understand what Ms. Retzlaff meant when she
21   said that the priority work stream was to move it into closed
22   distribution as swiftly as possible in order to minimize
23   exposure.  Do you know what she meant by minimize exposure?
24          Your answer was:  I -- I think when I read it, I
25   don't -- I don't remember exactly what she meant when she said
```

LCFMFTC6                          Ghorban - Cross

1    minimize exposure.  I'm assuming it's around generic

2    accessibility or accessibility of the product to generics.

3          Do you see that?

4    A.  Yes.

5    Q.  At the time of your deposition you were assuming that.  You

6    didn't actually know that for a fact, correct?

7    A.  Yeah.  I think the wording exposure, to me, it is like

8    risk.  That's the reason why I would say it's equivalent to

9    risk, having an open distribution system in the context of the

10   discussions we had.

11   Q.  Do you actually know what Ms. Retzlaff meant by that

12   phrase, minimized exposure?

13   A.  I can't speak for her.

14   Q.  So the answer is no?

15   A.  No.

16   Q.  Ms. Ghorban, you were asked at the beginning of examination

17   about your long experience in the pharmaceutical industry, 20

18   years of experience.  Based upon that experience, do you

19   believe it's possible to keep generic companies from accessing

20   drug products?

21   A.  I think it would be very hard to keep them from accessing

22   it.  But I don't know -- again, I haven't worked in the

23   generics business, so I don't know how they acquire product to

24   do their testing to show that it's equivalent.

25   Q.  Again, if I could go back to that deposition again.  I am

LCFMFTC6                        Ghorban - Cross

1    going to direct you to page 74 of your deposition, starting at

2    line 22.

3              You said:  I mean, I think the one comment I would

4    make is preventing generic entry was something that I don't

5    think was possible.  I still don't believe it's possible.

6              You see that?

7    A.  Yes.

8              MX. BLACK:  Your Honor, I object to foundation.

9              THE COURT:  Sustained.  Stricken.

10   Q.  You talked a little bit earlier about the expansion of the

11   distribution system.  I would like to direct your attention to

12   that testimony.

13             The specialty distribution system that Vyera used to

14   distribute Daraprim was inherited from the prior owner of

15   Daraprim, a company called Impax, correct?

16   A.  Yes.

17   Q.  Specifically, Vyera inherited a contract that Impax had

18   with ICS as a 3PL selling to hospitals, correct?

19   A.  Correct.

20   Q.  What is a 3PL?

21   A.  As I know it, a 3PL -- and, again, this was not my area of

22   expertise when I was at Vyera or before or since.  But the 3PL,

23   as I understand it, is a company that works with a

24   pharmaceutical manufacturer.  Part of what they do is hold

25   inventory, and then they are equipped to sell inventory to

1   wholesalers, to specialty pharmacies, to institutions, etc.

2   They are kind of your key partner in terms of knowing where the

3   product goes and keeping the product that you have, the

4   finished inventory saved.

5   Q.  Vyera also inherited a contract that Impax had with

6   Walgreens specialty pharmacy, correct?

7   A.  Correct.

8   Q.  You were asked about issues of access following the

9   acquisition of Daraprim.  Can you explain what the reasons were

10  for the access issues after the acquisition of Daraprim?

11          MX. BLACK:  Your Honor.  I object.  Beyond the scope

12  of my direct examination.

13          MR. CASEY:  I'll withdraw it, your Honor.

14  Q.  Ms. Ghorban, after the acquisition of Daraprim, did Vyera

15  realize that the distribution agreements it had inherited from

16  Impax were not adequate to meet the needs of Vyera's

17  prescribers and patients?

18  A.  Yes.

19  Q.  What, if anything, did Vyera do about that?

20  A.  We started trying to understand what the needs were for

21  physicians.  We didn't understand that the turnaround time to

22  getting product to patient was more urgent than a specialty

23  pharmacist could sometimes manage.

24          We started to look at ICS and how they were able to

25  sell to institutions.  It turned out they were not very well

1   equipped to sell to institutions because there was an account

2   set up that most institutions didn't have, so we added ASD to

3   distribute to institutions.

4            We added Cardinal because a lot of institutions, I

5   believe, had agreements already with Cardinal and had to buy

6   exclusively from Cardinal.

7            We added the hub to ensure that patients were able to

8   access the benefits, the copay benefits and the affordability

9   benefits that we were offering, and expanded the specialty

10  pharmacy network to ensure that no matter where the patient was

11  in terms of geography and also who the patient's commercial

12  insurance was, because commercial insurance is also partner

13  with specialty pharmacies, no matter where they were and what

14  they needed, they were able to get it.  It wasn't a hundred

15  percent, but we tried to meet the needs of the patients and the

16  prescribers.

17  Q.  You mentioned a hub program.  What is that?

18  A.  A hub program is -- it functions like a specialty pharmacy

19  except for it is sort of the hub of the specialty pharmacy

20  wheel.  If you think about the specialty pharmacies as the

21  spokes, the hub is the key intake for the patient and then we

22  will do all the work on the affordability, the insurance, and

23  then we will send that prescription, once it's ready to be

24  dispensed, it will send that to a specialty pharmacy.  The

25  specialty pharmacy will reach out to the patient and will send

1    the product to the patient.

2    Q.  Once the hub model was instituted, was Walgreens replaced

3    as the exclusive specialty distributor of Daraprim?

4    A.  They weren't replaced.  They were no longer the exclusive

5    pharmacy, specialty pharmacy.  It was an add-on.

6    Q.  And you added specialty pharmacy in addition to Walgreens,

7    correct?

8    A.  Yes.

9    Q.  You also were asked about ADAP programs.  I think you said

10   they are an AIDS Drug Assistance Program?

11   A.  Yes.

12   Q.  Can you explain what they are.

13   A.  Again, it's really complicated, but I believe that it's

14   state run and it's essentially an assistance program that was

15   set up during the epidemic of AIDS and HIV to support patients

16   at a local level.

17          So what we found was that there were ADAPs in certain

18   states that couldn't access the product.  Either they couldn't

19   establish an account with ICS or -- again, the mechanism is

20   very confusing to me.  But, essentially, we had to do something

21   to make sure that they could buy product, and they could buy

22   product at the 340B price, so they were buying it at a penny a

23   pill.  But we had to expand to include them as customers to

24   ensure that they could buy the product and disseminate it to

25   their patient.

LCFMFTC6                         Ghorban – Cross

1   Q.  So Vyera expanded the distribution of Daraprim to include

2   ADAPs?

3   A.  Yes.

4   Q.  And all of these additional distribution outlets broadened

5   the accessibility of Daraprim, correct?

6   A.  That was the intent, yes.

7   Q.  In fact, that's what happened, correct?

8   A.  I believe so.

9   Q.  Did you consider these changes to the distribution system

10  of Daraprim to be improvements?

11  A.  Yes.

12  Q.  You testified earlier about the 30-pill Daraprim bottle for

13  hospitals.

14  A.  Yes.

15  Q.  Did Vyera also create sample packs for hospitals?

16  A.  Sample packs can't go through hospitals, but we created

17  sample packs for prescribing physicians in the typical clinic

18  setting.

19  Q.  What is a sample pack?

20  A.  A sample pack is just a small number of pills.  Usually,

21  doctors often have them in their offices, and they will give

22  them to patients to see if patients react well to the product,

23  if it helps, if they have a reaction.  They can also be used as

24  starters to start a patient on medication.

25          The way that we used it for Daraprim was sort of as a

1    bridge for while the patient was waiting for the product from

2    the specialty pharmacy, that they didn't have to wait, and

3    potentially it was readily available to them.  If the doctor --

4    I think we had a mailing system for the samples.  But it should

5    have been more readily available than sometimes waiting for

6    insurance to clear the approval on the product.

7    Q.  Thank you.

8         You were also asked some questions about Vyera buying

9    back bottles or the bottle limits, rather.  I'm sorry.

10        Withdraw that question.

11        I'd like to discuss the IQVIA data questions you were

12   asked.

13        Was the reporting of sales data to data-reporting

14   companies a deciding factor in any of Vyera's contracts?

15   A.  No.  It was a request.  It didn't decide whether or not we

16   were work with certain partners.

17   Q.  There are alternatives to IQVIA data, correct?

18   A.  There are alternatives.  There is also historical data that

19   doesn't go away if you decide not to share the data going

20   forward.  There is still historical data.

21   Q.  What are some of the alternatives?

22   A.  Symphony is a data source.  A lot of times you will look at

23   a company -- if you are looking to acquire a product from a

24   company, you will look at a company's financial reports, so

25   their 10-Ks and their 10-Qs.  A lot of times they will report

LCFMFTC6                          Ghorban - Cross

1    volume of sales there.  That's typically one of the steps --

2    when you do an assessment, that's one of the steps you take.

3         There are other sort of reporting companies that

4    aggregate information on certain therapeutic areas, certain

5    products, certain companies that sometimes you can find that

6    data in.  It depends on how public it is.

7    Q.  Thank you.

8         The reliability of IQVIA data depends on the drug,

9    correct?

10   A.  Correct.

11   Q.  Can you explain that?

12   A.  For products that treat -- that aren't as large, so for a

13   very large product, like a Lipitor, the data would be pretty

14   solid because there is a lot of volume there.  For products

15   that treat orphan indications, small patient populations

16   disseminated through hospitals or disseminated through clinics,

17   say the doctor buys it and distributes it directly to patients,

18   the data is not as robust for those different types of

19   medications.

20   Q.  So you have already testified that Daraprim was a small

21   patient population, correct?

22   A.  Correct.

23   Q.  If I understand you, the IQVIA data would not be as

24   reliable for Daraprim data, correct?

25   A.  Correct.  It might not capture just because it's not as

LCFMFTC6                          Ghorban - Redirect

1    large -- it's not as large of a product.

2    Q.  Because of these limitations on the data, it's not a

3    decision-making tool, correct?

4    A.  For certain products it's not a decision-making tool.

5    You'd have to go further to look at other data sources if you

6    are looking at a product to acquire.  For other products, where

7    it is reliable, you would use that data source pretty heavily.

8    Q.  But in terms of Daraprim, which is, as you have testified,

9    a small patient population where the data is not as reliable,

10   it would not be a decision making tool for assessing the

11   Daraprim market, right?

12   A.  I think we would -- we looked at the data, but -- and it

13   factors into the conversation and the analysis, but it wouldn't

14   be a single factor that would make a decision for us.

15   Q.  No one would decide to acquire a product based solely on

16   IQVIA data, correct?

17   A.  No.  That's not the process of acquisition.

18   Q.  No meaning --

19   A.  No.  You would never use just a data source to make a

20   decision on whether or not to buy a product.

21   Q.  Thank you, Ms. Ghorban.  I have no further questions.

22              THE COURT:  Any redirect?

23              MX. BLACK:  Yes, your Honor.

24   REDIRECT EXAMINATION

25   BY MX. BLACK:

LCFMFTC6                    Ghorban - Redirect

1    Q.  Ms. Ghorban, you testified a moment ago about specialty

2    benefits of high-cost drugs.  Do you recall that?

3    A.  I'm sorry.  Specialty benefits?

4    Q.  Yeah.  To high-cost drugs.

5    A.  Benefits of being distributed in specialty pharmacies?

6    Q.  Yes.

7    A.  Yes.

8    Q.  Martin Shkreli made Daraprim a high-cost drug, correct?

9    A.  Yes.

10   Q.  It was not a high-cost drug for 60 years?

11   A.  When we -- when Vyera acquired it, it was not what I

12   considered to be a high-cost drug.

13   Q.  And you said that high-cost drugs with small patient

14   populations benefit from being distributed in specialty.  Do

15   you recall that?

16   A.  Yes.

17   Q.  Because it makes it harder to stock for pharmacies?

18   A.  It makes -- when you have a high-cost product for a

19   low-patient population, it's hard -- it's unaffordable for

20   retail pharmacies to stock it, and also you have issues with

21   insurance.  So specialty pharmacies or hub models help on both

22   those points in terms of stocking, as well as working with

23   insurance.

24   Q.  Daraprim has always been a small patient population drug,

25   correct?

1   A.  Yes.

2   Q.  Before the price increase that Martin Shkreli implemented,

3   the small patient population did not present stocking issues,

4   correct?

5   A.  Not that I'm aware of.

6   Q.  Ms. Ghorban, you also testified in response to Mr. Casey's

7   question that specialty distribution technically is supposed to

8   improve patient compliance.  Do you recall that?

9   A.  Yes.

10  Q.  Do you know if patient compliance actually increased after

11  the transition to specialty distribution for Daraprim?

12  A.  I don't have a comparator for before Vyera acquired it to

13  say that it improved or decreased patient compliance.

14  Q.  So patient compliance might have actually decreased after

15  the transition to specialty?

16  A.  I don't know.  I don't have a comparator.

17  Q.  And you testified a moment ago about 340B programs.  Do you

18  recall that?

19  A.  Yes.

20  Q.  340B program, it's a federal program, correct?

21  A.  I believe so.

22  Q.  It's not a program that Vyera created?

23  A.  No.

24  Q.  You also testified a minute ago about using historical

25  IQVIA data for Daraprim.  Do you remember that?

LCFMFTC6                          Ghorban - Redirect

1    A.   Yes.

2    Q.   Would historical IQVIA data be reliable after Vyera's price

3    increase?

4    A.   Because it's a small patient population, I don't know that

5    it would have been accurate.  I've seen products that are high

6    priced more recently that the sales are inaccurate in IQVIA,

7    and I can't say whether or not it would have been accurate.

8    Q.   Daraprim volume declined after the price increase, correct?

9    A.   I believe it did.

10   Q.   It significantly declined, correct?

11   A.   I believe so.

12   Q.   And given the decline in volume, historical IQVIA data

13   after the price increase would not be representative of

14   Daraprim volume sales -- let me start it over.

15            Given the decline in volume in historical IQVIA data

16   before the price increase would not have been representative of

17   Daraprim volume sales after the price increase, correct?

18            MR. CASEY:  Objection, your Honor.  She is going

19   beyond the scope of the cross-examination.  I don't know where

20   this is going.

21            THE COURT:  Excuse me one second.

22            Overruled.

23            (Continued on next page)

24

25

LCFKFTC7                    Ghorban - Redirect

1    A.  I'm sorry, can you repeat that question?

2    Q.  Yes.

3          Given the decline in Daraprim volume after the price

4    increase, the historical IQVIA data, before the price increase,

5    would not have been representative of Daraprim volume sales

6    after the price increase, correct?

7    A.  I believe so, because the sales -- there's a couple of

8    sources of sales, but, yeah, the price is factored into the

9    sales as IQVIA reports it.

10   Q.  In other words, generic companies could not have just

11   looked at historical IQVIA data after the price increase to

12   figure out the Daraprim market opportunity, correct?

13   A.  They could -- usually, you look at it in two ways.  You

14   look at the volume of the prescriptions, and you look at the

15   sales.  And so they could potentially -- assuming the sales

16   were captured appropriately, given it's a small patient

17   population, they could look historically and see that the

18   volume was, you know, for example, 10,000 prescriptions a year.

19   They could see that.  And they knew the new price, so they

20   could do the calculation, but the sales would be different

21   because IQVIA considers the sale price when it reports

22   volume -- I'm sorry, when it reports the sales.

23   Q.  You mentioned that Daraprim was a small patient population

24   drug before, correct?

25   A.  Yes.

LCFKFTC7                        Ghorban - Redirect

1    Q.  And, yet, you used IQVIA data as a starting point in your

2    analysis for Daraprim acquisition, correct?

3    A.  Yes.

4    Q.  You also talked earlier about expanding the Daraprim

5    distribution system that Vyera inherited from previous owners.

6            Do you remember that?

7    A.  Yes.

8    Q.  But given the system that you've described with additional

9    customers, it had customer restrictions on authorized classes

10   of trade, correct, that Vyera could sell Daraprim to?

11   A.  Yes, it did.

12   Q.  You also added purchase limits, correct?

13   A.  Correct.

14   Q.  That previous owners did not have?

15   A.  I don't believe they had them, no.

16   Q.  Let me stop there.

17            MX. BLACK:  That's all I have.

18            THE COURT:  Any additional cross?

19            MR. CASEY:  No, your Honor.

20            THE COURT:  Thank you.

21            So what caused you to leave Vyera?

22            THE WITNESS:  It was a very distressing place to work.

23   It was stressful, it was not fulfilling, and it was just not a

24   good environment to be in.

25            THE COURT:  Does any counsel have any question for

LCFKFTC7                         Della Fera - Direct

1    this witness based on the question I just asked her?

2              MX. BLACK:  No, your Honor.

3              MR. CASEY:  No, your Honor.

4              THE COURT:  You may step down.

5              (Witness excused)

6              THE COURT:  Next witness.

7              MR. MEIER:  Yes, your Honor.  The government, at this

8    time, calls Frank Della Fera, and my colleague, Neal Perlman,

9    will be handling this witness.  This witness is with a

10   declaration.

11             THE COURT:  So, Mr. Della Fera, if you could come up

12   here, please, and take the witness stand and remain standing.

13    FRANK DELLA FERA,

14        called as a witness by the Plaintiffs,

15        having been duly sworn, testified as follows:

16             THE COURT:  You may take off your mask.

17             You're being handed a document, counsel.  What is the

18   exhibit number?

19             MR. PERLMAN:  8007, your Honor.

20             THE COURT:  Thank you.

21             And, Mr. Della Fera, if you would look at page 17, is

22   that your signature on this document?

23             Oh, Mr. Della Fera, I forgot to do something

24   important.  Could you please state your name for the record.

25             THE WITNESS:  Frank Della Fera.

1              THE COURT:  And could you spell your last name,

2      please?

3              THE WITNESS:  D-e-l-l-a F-e-r-a.

4              THE COURT:  And is that two words?

5              THE WITNESS:  Yes.

6              THE COURT:  So it's capital D and capital F?

7              THE WITNESS:  Correct.

8              THE COURT:  Thank you.

9              And if you could look now at Government Exhibit 8007,

10     which I believe is at the front of your binder.  And page 17,

11     is that your signature on that document?

12             THE WITNESS:  Yes.

13             THE COURT:  Before signing that document, did you read

14     it with care?

15             THE WITNESS:  Yes.

16             THE COURT:  Do you swear to the truth of its contents?

17             THE WITNESS:  Yes.

18             THE COURT:  Any objections to the receipt of

19     Government Exhibit 8007?

20             MR. POLLACK:  Yes.  Good afternoon, your Honor.  Jeff

21     Pollack, on behalf of the defendant.

22             Your Honor, first off, and I think the colloquy we

23     just did may have addressed this already, but I did want to

24     raise that your Honor's procedures require the submissions of

25     affidavits as sworn testimony, and Mr. Della Fera's statement

LCFKFTC7                          Della Fera - Direct

 1    is not sworn or --

 2              THE COURT:  You have to keep your mask on until you're

 3    at the podium.  Thank you so much.

 4              MR. POLLACK:  May I move to the podium where I don't

 5    have to have my mask on?

 6              THE COURT:  You may.

 7              MR. POLLACK:  Thank you, your Honor.

 8              So, your Honor, I was saying that perhaps the colloquy

 9    we just went through addresses this, but your Honor's

10    procedures do require affidavits, and the written statement

11    that Mr. Della Fera submitted was not sworn.  I only raise it

12    as a point of procedure, and your Honor will guide us

13    appropriately on that.

14              THE COURT:  Oh.  Thank you.

15              Yes, of course, the testimony given in court must be

16    sworn, but I think the witness has just done that, and that's

17    sufficient.

18              MR. POLLACK:  Okay.  Very good.

19              Your Honor, we do have some objections.  Allow me to

20    grab -- paragraph 40 of Mr. Della Fera's affidavit, he recites

21    a conversation that he had with an individual, Mr. Valiveti,

22    about something that he was informed about from former Vyera

23    employee Kevin Mulleady.  Your Honor, we object to this

24    paragraph as hearsay.

25              THE COURT:  Give me just one second, please.

LCFKFTC7                          Della Fera - Direct

1             I'm on page 12, paragraph 40?

2             MR. POLLACK:  Correct.

3             THE COURT:  I think that's -- well, I'll hear from

4    plaintiffs' counsel, but I think that's just received not for

5    the truth, but for the fact that it was said by Mr. Valiveti to

6    the witness.

7             Am I right?

8             MR. PERLMAN:  Correct, your Honor.

9             THE COURT:  It's received in that vein.

10            (Government's Exhibit 8007 received in evidence)

11            MR. POLLACK:  Your Honor, then I turn us next to

12   paragraph 46, and specifically, I look down to beginning with,

13   I believe it's, the third to last sentence, three lines from

14   the bottom, where it begins "it is my view," where

15   Mr. Della Fera says, "It's my view that if we had used Fukuzyu

16   as our pyrimethamine API supplier, Vyera would have been able

17   to respond within the review period," referring to the review

18   period for their ANDA submission.  Your Honor, I submit that is

19   speculation and improper lay opinion.

20            Mr. Della Fera has, admittedly, a lengthy career in

21   the pharmaceutical industry, but except for one year in which

22   he was the president of Sandoz, he spent the remainder in sales

23   and marketing, and it does not appear that there's a foundation

24   laid for that statement in his affidavit.

25            THE COURT:  Overruled.  Obviously, he is testifying

LCFKFTC7                          Della Fera - Direct

1    here as someone knowledgeable about his company's business and

2    judgments made during the course of that business.  I'll

3    receive it as proper lay opinion under 701.

4              MR. POLLACK:  And, your Honor, before we proceed, I

5    believe that plaintiffs' counsel was going to move in some

6    evidence.  I'd like to know what's in evidence on the affidavit

7    before we begin.

8              THE COURT:  I'm happy to rule on any other objections

9    that you have.  This objection is overruled.

10             I'm sorry, what do you mean?  Which exhibits?

11             MR. POLLACK:  There was one document referenced in the

12   affidavit that we do have an evidentiary objection to.  There

13   was two that we've resolved with counsel.  The one that's an

14   objection is GX 3286.

15             Justin, if we could pull that up?

16             This is a summary document --

17             If we go to page 2, Justin.

18             -- a summary document of a series of events recorded

19   by Mr. Della Fera's employee, Scott, I believe his last name

20   is --

21             THE COURT:  Florentino.

22             MR. POLLACK:  Florentino, yes.  Thank you very much.

23             -- Scott Florentino at the top.

24             And, your Honor, this is a hearsay document.  It

25   cannot fall under the business records exception.  The record

LCFKFTC7                    Della Fera - Direct

1    must be made at or near the time of the events discussed.  This

2    was made in 2018, and the events go all the way back to '16.

3    When we talk about events involving Vyera, the earliest Vyera

4    meeting is in April of 2018 on this document.

5            Additionally, your Honor, it has to be created by

6    someone with knowledge.  When we look at this document --

7            And, Justin, if we could find the entry for May 14 of

8    2018.

9            -- we see here that there was a meeting with attendees

10   Kevin, meaning Mr. Mulleady, and Frank, meaning Mr. Della Fera.

11   Mr. Florentino was not even present here.  And if we look below

12   May 8, 2018, it does not even reference who the attendees were

13   in this meeting.

14           So in addition to not being a business record, this

15   document has several layers of hearsay within hearsay and

16   sometimes within hearsay, and, therefore, would be an

17   inadmissible record.

18           THE COURT:  Where is this referenced in the affidavit?

19   What paragraph?  So I can see the purpose for which it's being

20   offered.

21           MR. POLLACK:  Your Honor, this is referenced in

22   paragraph 51 of the affidavit.

23           THE COURT:  Thank you.

24           Let me ask plaintiffs' counsel if you want to address

25   the objection.  Are you offering 3286?

LCFKFTC7                    Della Fera - Direct

1              MR. PERLMAN:  Yes, your Honor, we are.  And we

2      actually, also, have one of the 9000 series documents with a

3      large bulk of the remaining exhibits in Mr. Della Fera's

4      affidavit, as well, to enter.

5              For GX 3286, we believe this is a contemporary

6      business record compiled by a Fera employee to memorialize a

7      series of meetings between Fera and Vyera.  As it says in

8      paragraph 51, Mr. Della Fera directed Mr. Florentino to

9      memorialize these events as listed.  And I can lay, on

10     redirect, additional foundation to support the fact that it's

11     Fera's practice to memorial discussions with outside parties

12     such as this one.

13             THE COURT:  So I'll receive it subject to connection,

14     and I will ask defense counsel if they feel, on redirect, a

15     sufficient basis hasn't been laid, or if the cross-examination

16     also suggests that I should not receive this, I will allow a

17     renewed objection.

18             Is that agreeable, counsel?

19             MR. POLLACK:  Thank you, your Honor.

20             THE COURT:  Good.

21             Anything else?

22             MR. POLLACK:  Nother further.  And we're ready to

23     proceed.

24             THE COURT:  Thank you so much.

25             Hold on one second, because I think there was going to

LCFKFTC7                        Della Fera - Direct

1    be an additional offer of evidence, and then we'll begin

2    cross-examination.

3              MR. POLLACK:  Your Honor, one point I would make is

4    that Mr. Della Fera is not the only employee of Fera who's

5    present today.  His coworker, Susan McDougal, is also present,

6    and I would ask to sequester the witness.

7              THE COURT:  Yes, unless the parties agree otherwise,

8    all witnesses are sequestered until their testimony is done

9    except for expert witnesses.  That's the general rule.

10             MR. POLLACK:  Thank you, your Honor.

11             MR. PERLMAN:  No objection, your Honor.

12             Your Honor, may I approach?

13             This is GX 9008.  It has 10 of the documents from

14   Mr. Della Fera and Ms. McDougal's affidavits.  There are three

15   remaining, for which we did not resolve the dispute until 1:45

16   today, so they're not on this list.

17             THE COURT:  Any objection to the receipt of GX 9008

18   and the documents listed therein?

19             MR. POLLACK:  None subject to your Honor's previous

20   rulings.  Thank you.

21             THE COURT:  Received.

22             (Government's Exhibit 9008 received in evidence)

23             THE COURT:  Cross-examination.

24             MR. POLLACK:  Thank you, your Honor.

25

1    CROSS-EXAMINATION

2    BY MR. POLLACK:

3    Q.  Good afternoon, Mr. Della Fera.  How are you?

4    A.  Good, thank you.

5    Q.  I don't know if you heard, but my name is Jeff Pollack.

6    I'm an attorney for Duane Morris, representing the defendant,

7    Martin Shkreli, in this case.  Thank you for being here and

8    answering my questions today.

9         Mr. Della Fera, your written statement was just

10   admitted into evidence.  There were other drafts of that

11   statement, correct?

12   A.  Of the affidavit?

13   Q.  Yes.

14   A.  Yes.

15        MR. POLLACK:  Justin, can we bring up DX 556, please.

16        Your Honor, may I approach?

17        THE COURT:  You don't need to ask permission, counsel.

18        MR. POLLACK:  Thank you, your Honor.

19        THE COURT:  Thank you.

20        MR. POLLACK:  Your Honor, what's the procedure?  Do I

21   hand it directly to the witness or to your staff?

22        THE COURT:  You may hand it directly to the witness.

23        MR. POLLACK:  Thank you.

24   BY MR. POLLACK:

25   Q.  Mr. Della Fera.

1    A.  Thank you.

2    Q.  Sure.

3             Mr. Della Fera, I've just handed to you what we've

4    marked as Exhibit DX 556.  This is a copy of the first draft of

5    your written testimony provided to us by the FTC's attorneys on

6    Friday afternoon.

7             THE COURT:  I'm sorry, you can't testify, counsel.

8             MR. POLLACK:  Okay.

9    Q.  Mr. Della Fera, have you seen this document before?

10   A.  I have to read the whole thing if you're asking me, but,

11   yes, it looks familiar to the affidavit, yes.

12   Q.  Does that appear to be your first draft of your affidavit?

13   A.  If you say so.

14   Q.  Is it your name on the last page of that document?

15   A.  No.

16   Q.  Which document -- what name is on the document?

17   A.  Witness name.

18   Q.  It just says "witness name"?

19   A.  Uh-huh.

20   Q.  Okay.

21            Turn to the front.

22            You're absolutely right.  My mistake.

23            That's your name on the front of the document,

24   correct?

25   A.  Yes.

1  Q.  Can you tell us, just explain, the process by which you

2  received a draft affidavit from the FTC?

3          I'm sorry, let me rephrase because I'm assuming facts.

4          Who sent you your first draft of your affidavit; do

5  you know?

6  A.  My counsel.

7  Q.  Do you know who he got it from?

8  A.  My counsel worked probably with the FTC, I believe.

9  Q.  When did you receive the first draft?

10 A.  I don't remember the date.

11 Q.  How long before -- well, first of all, your affidavit

12 itself is dated October 18, 2021.

13         How long before that did you receive the first draft

14 of your affidavit?

15 A.  I really don't recall, but a month or two.

16 Q.  When you received it, did you review it?

17 A.  Yes.

18 Q.  Did you make any changes?

19 A.  Yes.

20 Q.  How many changes did you make; do you recall?

21 A.  No.

22 Q.  From my review, it appears to be essentially the same

23 document.  Would you agree with that?

24 A.  I have not reviewed the two documents, but I do know which

25 one I signed.

LCFKFTC7                        Della Fera - Cross

1   Q.  And you don't recall how many changes you made?

2   A.  No.

3   Q.  And you don't recall if you signed, essentially, the same

4   document that your lawyer sent to you on day one?

5   A.  I don't know where you're going with that, counsel.  I

6   signed a document that was received from the counsel from FTC

7   just minutes ago — that's what I have in my hand — and then you

8   sent me a copy here.  I have not reviewed the copy.  I'm just

9   listening to your questions.

10  Q.  Mr. Della Fera, did you make any substantive changes to the

11  initial draft you received?

12  A.  I don't recall.

13  Q.  Let's talk about Fera Pharmaceuticals and its business.

14          Fera offers and sells generic and branded

15  pharmaceuticals, correct?

16  A.  Yes.

17  Q.  Your generic business model, as I understand it, is to

18  identify and develop products that have barriers to entry that

19  would otherwise deter your competitors; is that right?

20  A.  The word "deter" or less likely.

21  Q.  And Fera isn't interested, then, in investing in making a

22  generic drug for which there's already a lot of competition, is

23  it?

24  A.  No, we normally would not have an interest for that.

25  Q.  Is it correct -- I think you said before that in

1   determining which pharmaceuticals to pursue, Fera wants to

2   ensure that it, meaning the branded pharmaceutical product --

3   strike that.

4           Some of the barriers that Fera looks at,

5   Mr. Della Fera, are whether the drug was a complex formulation,

6   the type of its dosage form, and the unavailability of API?

7   Are those some of the barriers that you look for?

8   A.   Yes.

9   Q.   And as to API, as I understand it, figure out if that is

10  limited, your employees need to call around to every possible

11  manufacturer, correct?

12  A.   Yes, hopefully.

13  Q.   And what does it mean for API to be limited?

14  A.   Limited is usually one supplier to -- one supplier in the

15  market.

16  Q.   Why does your company, Fera, see that as a benefit to

17  pursuing a generic pharmaceutical?

18  A.   Less competition, potentially, going forward, but there is

19  no guarantee.

20  Q.   How does having limited API lead to less competition for

21  Fera Pharmaceuticals?

22  A.   Our hallmark is to have niche-type products, products that

23  are limited in availability, and to help the market have access

24  to a lower cost product.

25  Q.   So for your company, limited API is not a deterrent to

1    entry, but it's something that you see as a benefit?

2    A.  In some cases, yes.

3    Q.  Did you see it as a benefit when evaluating Daraprim?

4    A.  Yes.

5    Q.  Now, there are also data sources available that identify

6    which companies manufacture and offer for sale API, correct?

7    A.  Yes.

8    Q.  One of those data sources is the Newport database; am I

9    right?

10   A.  Correct.

11   Q.  Fera uses that Newport database to identify API

12   manufacturers; is that right?

13   A.  Yes.

14   Q.  Now, specifically to Daraprim, in September of 2015, your

15   company, Fera Pharmaceuticals, decided to develop a generic

16   Daraprim after seeing press coverage about Vyera's price

17   increase, right?

18   A.  When we decided to pursue the product, yes.

19   Q.  And the first thing you did to assess market opportunity

20   was that your company accessed, I believe — correct me if I'm

21   not pronouncing it right — IQVIA data from 2014?

22   A.  Yes.

23   Q.  And from that data, your company was able to ascertain that

24   the annual sales of Daraprim was approximately 1 million

25   tablets, correct?

LCFKFTC7                        Della Fera - Cross

1    A.   That is correct.

2    Q.   And from that, was Fera able to forecast the market

3    opportunity for generic Daraprim?

4    A.   Yes.

5    Q.   When you looked at that IQVIA data, your company was aware

6    that prescribers were also using other drugs, such as Bactrim,

7    instead of Daraprim because of Bactrim's lower price, correct?

8    A.   At that time, no, we were not looking at Bactrim data.

9    Bactrim is a very broad spectrum antibiotic.  I think there's

10   like 800 million tablets in the U.S. market.  So I would not be

11   looking at that, no.

12   Q.   Were you aware at some point that Bactrim was being used as

13   a substitute for Daraprim?

14   A.   Yes, when it hit the media, where healthcare professionals,

15   especially in hospitals, institutions, who were concerned with

16   the extraordinary costs of Daraprim, they were mentioning to

17   use Daraprim as a second line instead of a first line, and to

18   utilize Bactrim or Bactrim alternatives similar to generics as

19   the first line.

20   Q.   When you say "hit the press," when what hit the press?

21   A.   I'm trying to recall — late 2015 or '16, I don't remember

22   the dates or times — but in that general time there was a lot

23   of media attention drawn to the company Vyera.

24   Q.   Another thing that your company was aware of was that

25   prescribers were switching to compounded pyrimethamine as a

LCFKFTC7                         Della Fera - Cross

1    substitute for Daraprim, correct?

2    A.  I heard about that, but I wasn't -- I'm not familiar with

3    the compound, so -- it's still in those articles, they were

4    definitely out there.

5    Q.  And, in fact, after your company had manufactured its own

6    source of API, a compounder actually reached out to your

7    company to purchase API, correct?

8    A.  Yes.

9    Q.  And by API, I mean pyrimethamine API; are we on the same

10   page?

11   A.  Correct.  And we did not sell to the compounder.

12   Q.  But someone contacted you for it, correct?

13   A.  Yes.

14   Q.  Do you recall which compounder that was?

15   A.  No.

16   Q.  You shook your head, and I think you said no.  Which one

17   was it?

18   A.  It's no.

19   Q.  Okay.  Thank you.

20   A.  But if you want to refresh my memory, if there are any

21   documents I don't remember looking at...

22   Q.  Now, Mr. Della Fera, after your company looked at the IQVIA

23   data in 2015, did you estimate that sales would drop 50 percent

24   in the first year?

25   A.  You know, as time goes on — it's six years — we made a lot

 1    of different estimates, and it's mostly on discussions.  That

 2    would have been a good guess, Jeff, but I don't recall putting

 3    that in writing or anything else, but it sounds like a good

 4    guess.

 5    Q.  Was that a yes?

 6    A.  Yes.

 7    Q.  And later, in 2018 --

 8              THE COURT:  I'm sorry, a 50 percent drop of what?

 9              MR. POLLACK:  You're absolutely right.

10              THE COURT:  Counsel, I don't know what that question

11    and answer referred to.

12              MR. POLLACK:  You're absolutely right.  Let me correct

13    the record.

14              Mr. Della Fera, when we're talking 50 percent your

15    firm projected a 50 percent drop in sales of Daraprim in the

16    first year after the price increase, correct?

17              THE WITNESS:  And I think Jeff means the unit tablets,

18    from a million tablets down to 500,000 tablets.

19    Q.  And even with the projection of 1 million tablets to

20    500,000 tablets, you and your company still viewed generic

21    Daraprim as an attractive opportunity to develop a product,

22    correct?

23    A.  Yes.

24    Q.  And I started off talking about -- fast-forward three years

25    down the road, in 2018, you have a meeting with Vyera's then

1   CEO, Mr. Mulleady, correct?

2   A.  Yes.

3   Q.  And from Mr. Mulleady, am I right that you learned that the

4   sales of Daraprim had actually decreased down to approximately

5   300,000, correct?

6   A.  That is correct.

7   Q.  It was about a 70 percent drop?

8   A.  Correct.  From Mr. Mulleady's share, the data from the

9   company that was accurate.

10  Q.  Did you believe the data to be accurate?

11  A.  I didn't see any reason for him not to be telling the

12  truth, but I still don't know if it's accurate.

13  Q.  Did your company perform projections based on that data?

14  A.  Yes.

15  Q.  And after you did your projections, did you still view

16  generic Daraprim as an attractive opportunity for your company?

17  A.  Yes.

18  Q.  Let's switch topics for a moment and talk about API

19  sourcing.

20          Mr. Della Fera, we'll be very careful not to use the

21  name of your API supplier.  We're going to refer to it as API

22  Company 1.

23  A.  Thank you.

24  Q.  If I say that, you'll understand who I'm referring to,

25  correct?

1  A.  Correct.

2  Q.  Before I get there, would you agree with me that

3  pyrimethamine is not a difficult molecule to manufacture?

4  A.  Agreed.

5  Q.  When you started out looking at Daraprim and you looked at

6  the Newport database -- first of all, was it you who looked at

7  the database, or someone else at your company?

8  A.  It was not me.

9  Q.  Who did that work?  Do you know?

10  A.  I would say Susan McDougal.

11  Q.  Okay, your colleague, Ms. McDougal?

12  A.  Yes.

13  Q.  She's your vice president?

14  A.  Yes.

15  Q.  Is she vice president of something specific or vice

16  president of the company overall?

17  A.  She's recently been promoted to executive vice president of

18  the company.

19  Q.  In 2018, what was her title?  Sorry, 2015; correct myself.

20  A.  I don't remember the title, but her responsibilities

21  increased over that time.  She was a vice president then, at

22  that time.

23  Q.  Well, I digress.  She'll be here to testify, and we can ask

24  her personally.

25  A.  Thank you.

1  Q.  With the Newport database, Fera identified two potential

2  API suppliers with the DMF, Fukuzyu and Ipca, correct?

3  A.  Correct.

4  Q.  And I say Fukuzyu.  I don't know if that's correct; I've

5  heard it's not.  That's what I'm used to, so if I use the word

6  "Fukuzyu," will you understand what I mean?

7  A.  Yes, Jeff.

8  Q.  Okay, thank you.  And feel free to do the same or however

9  you refer to it.

10        According to paragraph 19 of your written testimony,

11  your company reached out only to Fukuzyu, not to Ipca, correct?

12  A.  I want to share that I had diabetic retinopathy, I have

13  eyesight problems, so please bear with me.

14  Q.  Well, Mr. Della Fera, maybe you can answer without looking

15  at your direct testimony.

16        Is it correct your company reached only to Fukuzyu and

17  not to Ipca?

18  A.  I would believe we reached out Ipca in addition to -- I

19  don't have it memorialized but I believe we...

20  Q.  Paragraph 19 of your written statement says, "We reached

21  out to Fukuzyu which was DMF pyrimethamine API, but they did

22  not respond to our initial query," correct?

23        THE COURT:  I'm sorry, counsel, when you read, can you

24  read slowly --

25        MR. POLLACK:  Yes, of course.

LCFKFTC7                          Della Fera - Cross

1          THE COURT:  -- so we can catch every word.

2          So I think the statement you read was, "We first

3    reached out to Fukuzyu, which holds a DMF for pyrimethamine

4    API, but they did not respond to our initial inquiry."

5          Is that statement correct?

6          THE WITNESS:  Yes.

7    BY MR. POLLACK:

8    Q.  Your next paragraph of your affidavit says, "I then decided

9    to meet with two potential API suppliers at an industry

10   conference called Drug, Chemical & Associated Technologies

11   week, usually referred to as DCAT," correct?

12   A.  Correct.

13   Q.  If we look in the next sentence, we see that the companies

14   you reached out to were a company called API 1 and another

15   company called ChemCon, correct?

16   A.  Correct.

17   Q.  Nothing in your affidavit here about Ipca, correct?

18   A.  Correct.

19   Q.  When you went to the DCAT meeting and you met with ChemCon

20   and you met with API Company No. 1, you opted to go with API

21   Company No. 1, correct?

22   A.  I'm sorry, can you repeat that, Jeff?

23   Q.  Sure.  When you were at DCAT and you met with those two

24   companies, ChemCon and API No. 1, you opted to go with API

25   No. 1, correct?

1   A.  Yes.

2   Q.  And that's because API No. 1 was the more affordable option

3   between the two, correct?

4   A.  Affordable, and we had confidence in them executing.

5   Q.  And API No. 1 did not have a DMF on file, correct?

6   A.  Correct.

7   Q.  And DMF, when we say that, we're referring to drug master

8   file, correct?

9   A.  Yes.

10   Q.  That's a filing made with the FDA, correct?

11   A.  Yes.

12   Q.  And that's what an API manufacturer files that says that

13   they have been approved to make a certain API?

14   A.  Yes.

15       THE COURT:  I'm sorry to interrupt, but does it mean

16   that they have been approved, or if there's a DMF, they've

17   filed?

18       MR. CASEY:  Well, let me ask Mr. Della Fera because

19   he's the expert.

20       THE WITNESS:  It's not approved.  They filed.

21   Q.  They filed.  Thank you.

22   A.  And how they get approval, your Honor, is, after someone

23   submits an application utilizing their material and then the

24   FDA reviews the application along with reviewing the

25   manufacturer of the active ingredient, that's when they get

1    approved.

2    Q.  Thank you for that clarification.

3         As I understand it, your business practices, you

4    preferred to work with a company with a DMF, correct?

5    A.  Yes.

6    Q.  But, in this case, you did not?

7    A.  Yes.

8         THE COURT:  Well, you did not work with a company with

9    a DMF?

10         MR. POLLACK:  That was the question.

11         THE COURT:  Okay, but because he just said he reached

12    out to the one company that had the DMF.

13         MR. POLLACK:  And it did not respond.

14         THE COURT:  Right.

15    BY MR. POLLACK:

16    Q.  When you -- did you enter into a contract with API Company

17    No. 1?

18    A.  Yes.

19    Q.  Do you recall when you entered into a contract with API

20    Company No. 1?

21    A.  It was months after the DCAT meeting, so June --

22    approximately June of '16.

23    Q.  Before you contracted with API Company No. 1, did Fera

24    conduct any kind of a tour of the facility --

25    A.  No.

1    Q.  -- of their facilities?

2    A.  No.

3            MR. POLLACK:  Justin, can we pull up DX 113, please.

4    Q.  Mr. Della Fera, can you tell me if you have seen this

5    document before?

6    A.  Yes.

7    Q.  Is this your confidentiality and exclusivity agreement

8    entered into with company -- API Company 1 in June 13 of 2016?

9    A.  Yes.

10           MR. POLLACK:  Your Honor, this document is already in

11   evidence.

12           But could we turn to the second page, please.

13   Q.  If we look at paragraph 3, the document says, "Company

14   confirms" -- "company" meaning API Company No. 1, correct?

15   A.  I've got to read it to see the context.  I'm sorry.

16   Q.  It says, "Company confirms and agrees that during the

17   restricted period, company will not pursue development or

18   supply the API pyrimethamine for its account or on behalf of

19   any other person."

20   A.  Yes.

21   Q.  And it says, "The term 'restricted period' means five years

22   commencing on the effective date," correct?

23   A.  Yes.

24   Q.  So, in other words, this is an exclusive supply agreement

25   between your company, Fera, and API Company No. 1?

1    A.  That was the intention, yes.

2    Q.  And API Company No. 1, under this agreement, cannot supply

3    pyrimethamine API to any other company, correct?

4    A.  Yes, because we were paying for the development personally

5    for our company, yes.

6    Q.  So that's a yes?

7    A.  Yes.

8    Q.  If we go to the next page, please, if we look at paragraph

9    12, we see that the term of the exclusivity period runs for the

10   term of the agreement, five years, correct?

11   A.  Yes.

12          MR. POLLACK:  Can we turn to Exhibit A, please, page

13   115 of the document.  You're on 113.  Look for page FTC FERA

14   115.

15          There we go.  Blow up the commercial statistics

16   section, please.

17   Q.  If we look here, Mr. Della Fera, it appears that API

18   Company No. 1, if we add up the time, is predicting 34 to 40

19   weeks to develop pyrimethamine API, correct?

20   A.  Approximately, yes.

21   Q.  Ultimately, it took them longer than that to complete its

22   first batch of API, correct?

23   A.  Yes.

24   Q.  But you don't know what the source of those delays were at

25   API Company No. 1, do you?

1   A.  No specifics, no.

2   Q.  Whatever those delays were, was API Company No. 1

3   ultimately able to manufacture pyrimethamine API for Fera?

4   A.  Yes.

5   Q.  When was that?

6   A.  I don't recall the timelines.  There's a timeline sheet, if

7   I could -- I don't remember.

8   Q.  You know, Mr. Della Fera, we'll come back to that.

9           MR. POLLACK:  Can we bring up Exhibit DX 115, please.

10  Q.  Mr. Della Fera, what we've marked here -- can you tell me

11  if you recognize this document, from the first page?

12  A.  I recognize it.

13  Q.  Is this your supply agreement between your company and API

14  No. 1?

15  A.  Yes.

16  Q.  Agreed to on April 6, 2018?

17  A.  Yes.

18          MR. POLLACK:  Your Honor, I move to admit DX 115.

19          MR. PERLMAN:  No objection, your Honor.

20          THE COURT:  Received.

21          (Defendants' Exhibit 115 received in evidence)

22  BY MR. POLLACK:

23  Q.  If we turn to page 5 of this document, Section 2.5,

24  Mr. Della Fera, is this document, like the one we just looked

25  at, also subject to an exclusivity agreement?

LCFKFTC7                          Della Fera - Cross

A.  Can you repeat your question, please?

Q.  Sure.  Is this supply agreement, like your confidentiality

agreement with API to Company No. 1, also subject to an

exclusivity agreement?

A.  Yes.

Q.  Subject to this agreement, again, API Company No. 1 shall

only manufacture and supply API exclusively to Fera, correct?

A.  Yes.

          MR. POLLACK:  Justin, can you blow this up a little

bit more, please, to get the whole provision and go down to

2.6.  Thank you.

Q.  Down here, it says, "During the term of the agreement, API

No. 1 shall not cause its affiliates not to purchase,

manufacture, supply or develop an alternate API, DMF and/or

finished dosage form using the API in the territory, or (b)

enter into any agreement with any third party to purchase,

manufacture, supply or develop an alternate API, DMF and/or

finished dosage form using the API for distribution in the

territory."

          Do you see that?

A.  Yes.

Q.  If we look at the agreement, "territory" is defined on page

2, in the fourth whereas clause, as the United States and its

territories, correct?

A.  Yes.

1    Q.  In your written testimony, and just a few moments ago, you

2    alluded to this, you stated that Fera requested exclusivity

3    because of its investment in API 1's development process,

4    right?

5    A.  Yes.

6    Q.  But Fera didn't seek to bar API Company No. 1 from selling

7    pyrimethamine to third parties outside of the territory,

8    correct?

9    A.  Correct.

10   Q.  So those third parties outside of the territory, they can

11   benefit from the investment your company made in API Company

12   No. 1's pyrimethamine manufacturing abilities, correct?

13   A.  It would appear that way.

14            MR. POLLACK:  One moment, your Honor?

15            (Pause)

16            MR. CASEY:  Justin, will you please pull up GX 7015.

17   Q.  Mr. Della Fera, using this document, are you able to tell

18   me when API Company No. 1 was first able to manufacture

19   pyrimethamine?

20            THE COURT:  You can direct his attention to a specific

21   line if you think that would be helpful to you, counsel.

22            MR. POLLACK:  Thank you, your Honor.

23   Q.  Mr. Della Fera, the only thing I see on here about the API

24   is on May 28, 2019, Fera files pyrimethamine API DMF, on page 2

25   of the document.

1          Does that orient you to when API Company No. 1 first

2    manufactured pyrimethamine?

3          MR. PERLMAN:  Objection; this mischaracterizes the

4    document.

5          THE COURT:  Sustained.

6          MR. POLLACK:  Did I misread the document?

7    A.  Yes.

8    Q.  My mistake.

9          May 28, 2019, Fera files pyrimethamine API DMF.

10          Does that orient you to when API Company No. 1 first

11    manufactured pyrimethamine API?

12    A.  Yes.

13          MR. PERLMAN:  Same objection, your Honor.

14          THE COURT:  So you want to use the reference to this

15    filing to see if it refreshes his recollection as to when they

16    first manufactured a batch of API?

17          MR. POLLACK:  That's what I'm trying to do, your

18    Honor.

19          THE COURT:  Okay.

20          So, knowing the date of the filing, does that help you

21    remember when they first succeeded in manufacturing a batch?

22          THE WITNESS:  Yes, your Honor.  What refreshed was the

23    first page of this document.

24    Q.  Oh, my mistake.

25          And what does the first page of the document tell you,

1    sir?

2    A.  In October 2017 the initial batches were produced.

3    Q.  Thank you, sir.

4        Between the time of contracting with API Company No. 1

5    and getting this initial batch, did your company ever reach out

6    to another company with a European DMF called RL Fine?

7    A.  I don't recall.  I mean, we had a few people looking for

8    the API, so...

9    Q.  In fact, you did not, correct?

10   A.  I don't recall.

11       MR. POLLACK:  Justin, can we have his deposition at

12   page 173, line 18 to 23.

13   Q.  Mr. Della Fera, before I ask you about that, do you recall

14   having your deposition taken on January 19, 2021?

15   A.  I'm sorry, just --

16   Q.  He just took it -- he'll put it back up, but do you

17   remember having your deposition taken?

18   A.  When was it?  I'm sorry, Jeff.

19   Q.  January 19, 2021.

20   A.  Yes.

21   Q.  And you were under oath there, as you are here?

22   A.  Yes.

23       MR. POLLACK:  Justin, can you put that back up,

24   please.

25   Q.  You testified:  Okay, so you're not aware of any effort by

1    Fera to contact RL Fine about pyrimethamine API supply, and you

2    said, no, I don't, I don't know any efforts personally, no.

3    A.  I think my answer was the same.  I said I don't recall.

4    This is --

5    Q.  You're the president of the company; is that right?

6    A.  Yes.

7    Q.  Were you involved in your company's efforts to manufacture

8    Daraprim, generic Daraprim?

9    A.  Yes.

10   Q.  After API Company No. 1 manufactured its first batches of

11   pyrimethamine API, did it file for a DMF?

12   A.  I'm sorry, Jeff, can you repeat that?

13   Q.  Yes.  After API Company No. 1 manufactured its first

14   batches of API, it filed for a DMF, correct?

15   A.  No, we -- it takes months to prepare for a final for a DMF.

16   Q.  I understand.  But at some point after the manufacture,

17   there was a filing for a DMF, correct?

18   A.  It was in that other page that you referenced, in May of

19   2019.

20   Q.  Am I correct that your company held the DMF?

21   A.  No.  We created the DMF; we didn't hold the DMF.

22   Q.  Can you explain to us what that means, by creating the DMF?

23   A.  Making those three batches is not a DMF.  It's a huge

24   document, and all the data has to be put together, and testing,

25   and things of that nature.  I think we initiated the work in

LCFKFTC7                    Della Fera - Cross

1   January of '18, a couple of months after we got the raw

2   material, and it took over a year and three months to get it

3   all done.  That's why we prefer using material that's already

4   approved or filed with the FDA.

5   Q.  In 2020, did another generic --

6   A.  But I want to add to that because you asked a good

7   question.

8           I think when we got the material, on January 30, 2018,

9   the two bottles of Daraprim, is when we went full speed,

10  because it's an expensive process, building DMF and doing

11  everything else around the project.

12          So you just helped me recollect.  Thank you.

13  Q.  When you said your company filed for the DMF, does that

14  mean that you were the company of record for the DMF with the

15  FDA?

16  A.  Yes.

17  Q.  And, in fact, in late 2020, were you contacted by another

18  generic pharmaceutical company to purchase API?

19  A.  Yes.

20  Q.  Was that company Tanner Pharmaceuticals?

21  A.  No.

22  Q.  I'm sorry, was that company Teva Pharmaceuticals?

23  A.  Yes.

24  Q.  Thank you.

25          Do you know what price you quoted -- first of all, did

1    you quote a price to Teva?

2    A.  Yes.

3    Q.  Do you know what price you quoted?

4    A.  We gave them a price that they wouldn't buy it.

5    Q.  Why did you do that?

6    A.  Because I don't want to deal with them.

7    Q.  Are you aware that Teva's ANDA for generic Daraprim was

8    approved in August of 2021?

9    A.  Yes.

10   Q.  Do you know who supplied Teva's API?

11   A.  I can make a guess but I don't know a fact.

12           THE COURT:  Is this a good place to stop, counsel?

13           MR. POLLACK:  Yes, I'm about to change topics, your

14   Honor.

15           THE COURT:  Great.  We will recess for the day.  Just

16   give me one second.

17           You may step down, sir.  Thank you so much.

18           THE WITNESS:  Thank you, your Honor.

19           Your Honor, what do I do with these documents?

20           THE COURT:  You just leave them right there.  Counsel

21   are going to take care of them.

22           THE WITNESS:  Terrific.

23           (Witness temporarily excused)

24           THE COURT:  So, counsel, again, I'll check with my

25   team and see if this is accurate, but I think the plaintiffs

LCFKFTC7                    Della Fera - Cross

1    have used six hours and one minute, and the defense counsel

2    have used four hours and twenty-nine minutes, but I'll let you

3    know tomorrow morning if that's wrong.

4            Let me ask counsel — and thank you very much for this

5    notice of the next set of witnesses, beginning with Mr. Dorfman

6    — are we on track, as far as you're concerned?

7            MR. MEIER:  Your Honor, I think we are on track.  It's

8    going a little bit longer, but, as your Honor knows, there have

9    been a few witnesses that have dropped out, so we were always a

10   bit concerned of whether we were going to get a full Wednesday

11   anyway, so I think with Ms. McDougal and Mr. Della Fera

12   finishing, and Ms. McDougal, that we're going to be pretty much

13   on track tomorrow.

14           THE COURT:  Okay, good.

15           So you expect to get through these additional four

16   witnesses tomorrow?

17           MR. MEIER:  So I'm actually missing the email, I'm

18   missing the email that we sent --

19           THE COURT:  Dorfman, Mkhopadhyah, Hemphill and Conroy.

20           MR. MEIER:  I don't think we'll get through

21   Mr. Conroy, and we're hopeful we will get through Mr. Hemphill,

22   or Professor Hemphill.

23           THE COURT:  Okay.  Everyone, have a nice evening.  See

24   you tomorrow morning.

25           (Adjourned to December 16, 2021 at 9:30 a.m.)

```
 1                     INDEX OF EXAMINATION

 2   Examination of:                         Page

 3    JAMES BRUNO

 4   Cross By Mr. Parks . . . . . . . . . . . . . 226

 5   Redirect By Mr. Perlman  . . . . . . . . . . 235

 6   WILLIAM DAVID HARDY

 7   Cross By Mr. McConnell . . . . . . . . . . . 263

 8   Redirect By Ms. Peay . . . . . . . . . . . . 295

 9   Recross By Mr. McConnell . . . . . . . . . . 308

10    CHRISTINA GHORBAN

11   Direct By Mx. Black  . . . . . . . . . . . . 316

12   Cross By Mr. Casey . . . . . . . . . . . . . 378

13   Redirect By Mx. Black  . . . . . . . . . . . 397

14    FRANK DELLA FERA

15   Cross By Mr. Pollack . . . . . . . . . . . . 411

16                    GOVERNMENT EXHIBITS

17   Exhibit No.                          Received

18    9053    . . . . . . . . . . . . . . . . . 222

19    9054    . . . . . . . . . . . . . . . . . 222

20    9055    . . . . . . . . . . . . . . . . . 223

21    9056    . . . . . . . . . . . . . . . . . 223

22    9057    . . . . . . . . . . . . . . . . . 224

23    8003    . . . . . . . . . . . . . . . . . 263

24    1228    . . . . . . . . . . . . . . . . . 329

25    1207    . . . . . . . . . . . . . . . . . 343
```

1  1556  . . . . . . . . . . . . . . . . . 353

2  1289  . . . . . . . . . . . . . . . . . 357

3  1307  . . . . . . . . . . . . . . . . . 360

4  1405  . . . . . . . . . . . . . . . . . 364

5  1217  . . . . . . . . . . . . . . . . . 369

6  8007  . . . . . . . . . . . . . . . . . 406

7  9008  . . . . . . . . . . . . . . . . . 410

8                    DEFENDANT EXHIBITS

9  Exhibit No.                           Received

10  115  . . . . . . . . . . . . . . . . . 428

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25