```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     FEDERAL TRADE COMMISSION,
 3   STATE OF NEW YORK, STATE OF
     CALIFORNIA, STATE OF OHIO,
 4   COMMONWEALTH OF PENNSYLVANIA,
     STATE OF ILLINOIS, STATE OF
 5   NORTH CAROLINA, and
     COMMONWEALTH OF VIRGINIA,
 6
                   Plaintiffs,
 7          v.                           20 CV 706 (DLC)

 8   MARTIN SHKRELI, et al.,

 9                  Defendants.
     ------------------------------x
10                                       New York, N.Y.
                                         December 20, 2021
11                                       9:30 a.m.
     Before:               HON. DENISE COTE,
12                                       District Judge
                             APPEARANCES
13
     FEDERAL TRADE COMMISSION
14   BY:  MARKUS H. MEIER
          MAREN HANEBERG
15        BRADLEY S. ALBERT
          LAUREN PEAY
16        NEAL PERLMAN
          MATT WEPRIN
17        ARMINE BLACK
          AMANDA TRIPLETT
18        LEAH HUBINGER
          JAMES WEINGARTEN
19
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
20   BY:  ELINOR R. HOFFMANN
          JEREMY R. KASHA
21        AMY E. McFARLANE

22   DUANE MORRIS LLP
          Attorneys for Shkreli
23   BY:  CHRISTOPHER H. CASEY
          JEFFREY S. POLLACK
24        ANDREW J. RUDOWITZ
          SARAH FEHM STEWART
25        SEAN McCONNELL
          J. MANLY PARKS
```

1                  (Trial resumed)

2                  THE COURT:  Good morning, everyone.  I had the

3        opportunity this weekend to finish with the deposition binders,

4        and I want to thank the parties for all the hard work that the

5        staff for the parties put into preparing those and the synopses

6        and the color designations.  I know that was an enormous amount

7        of work to present that evidence to me.  But it really paid off

8        in terms of an efficient review.  I'm at the point where I

9        could, for my own purposes, figure out what seemed particularly

10       helpful to me in understanding these events.

11                 I made an error, which we communicated on Friday to

12       counsel for both parties, in the calculation of the defendant's

13       time used to date.  It was 10 hours and 35 minutes.  So we

14       start today with nine hours and 58 minutes for the plaintiff

15       and 10 hours and 35 minutes for the defendant, which is at this

16       point roughly equal.

17                 Let me ask you, Mr. Meier, what's the parties'

18       expectation for completing the evidentiary portion of this

19       trial at this point?

20                 MR. MEIER:  Your Honor, from the government

21       perspective, we think we will be finishing sometime tomorrow.

22       Obviously, it is not a hundred percent.  But I wouldn't be

23       surprised if we are finished by about lunchtime tomorrow.

24       That's the entire case, not just the government's portion, but

25       I believe the defendant's also.

1          THE COURT:  Mr. Casey, is that your expectation too,

2    that the parties will be resting tomorrow midday?

3          MR. CASEY:  Your Honor, if the plaintiffs rest midday

4    tomorrow, we would expect to put on our case and rest by the

5    end of the day.  We don't have that much -- we have two

6    witnesses.  I would expect that that --

7          THE COURT:  Why don't counsel consult for a moment off

8    the record.

9          MR. MEIER:  To be clear, I don't know if Mr. Casey

10   heard me, but I said we would probably be finished tomorrow

11   with everything.

12         THE COURT:  Why don't you consult.

13         MR. MEIER:  We will be finished today.

14         THE COURT:  Why don't you talk.

15         MR. CASEY:  I apologize, your Honor.  I misunderstood

16   Mr. Meier.  I agree with him that we will likely be resting --

17   both parties would be resting sometime midday tomorrow.  I am

18   not sure we can guarantee it would be by lunch, but I think, if

19   anything, it would be shortly thereafter.

20         THE COURT:  Terrific.  That's helpful for me in my own

21   planning.  I appreciate that.

22         Let's resume the trial, plaintiffs.

23         MR. MEIER:  Your Honor, if we could take care of a few

24   administrative matters before we call the first witness.

25         THE COURT:  Sure.

1              MR. MEIER:  First of all, at the end of the Friday
2    there was the issue that we did not have a witness ready at
3    4:00.  Your Honor instructed us to work it out with the
4    defendants and figure out how we would divide up the lost hour.
5              THE COURT:  It's moot because you're ending hours
6    early on Tuesday.
7              MR. MEIER:  Fine.  We had come up with a split, but we
8    will scratch that one off our list.  Thank you very much, your
9    Honor.  Appreciate that.
10             The first thing I'd like to do is move in Government
11   Exhibit 9013.
12             THE COURT:  Any objection to the receipt of 9013 and
13   the exhibits listed therein?
14             MS. STEWART:  No objection, subject to your Honor's
15   rulings.
16             THE COURT:  9013 and the exhibits listed therein is
17   received.
18             (Government Exhibit 9013 and the exhibits listed
19   therein received in evidence)
20             MR. MEIER:  Your Honor, the next exhibit is one of
21   eight deposition transcript exhibits that we will be moving in
22   this morning.  This is Government Exhibit 9066.  It is the
23   transcript of the deposition of Averill Powers from Vyera.  As
24   you can see, your Honor, from the cover page, there have been
25   some withdrawn designations as a result of discussions between

```
 1    the parties.  But it's my understanding that there are no

 2    objections.  Again, we will let the defendants speak for

 3    themselves on that.

 4              THE COURT:  Any objections to 9066?

 5              MR. RUDOWITZ:  No objection.

 6              THE COURT:  Thank you.  Received.

 7              (Government Exhibit 9066 received in evidence)

 8              MR. MEIER:  The next one, your Honor, is Government

 9    Exhibit 9067.  It is the transcript of a witness named Jonathan

10    Haas.  Again, it indicates some of the designations that have

11    been changed as a result of discussions between the parties.

12              THE COURT:  Any objection to the receipt of 9067?

13              MR. RUDOWITZ:  No objection subject to your Honor's

14    rules.

15              (Government Exhibit 9067 received in evidence)

16              MR. MEIER:  The next one, your Honor, is Government

17    Exhibit 9068.  It is the revised deposition designations for

18    the deposition of Donovan Quill from Optime.

19              THE COURT:  Any objection?

20              MR. RUDOWITZ:  No objection subject to your Honor's

21    rules.

22              THE COURT:  Received.

23              (Government Exhibit 9068 received in evidence)

24              MR. MEIER:  The next one, your Honor, is Government

25    Exhibit 9069.  It's the revised transcript designations of
```

1    Michael Hatch from Mylan, again reflecting some of the changes

2    from the versions we submitted back in October.

3              THE COURT:  Any objection?

4              MR. RUDOWITZ:  No objection subject to your Honor's

5    rules.

6              THE COURT:  Received.

7              (Government Exhibit 9069 received in evidence)

8              MR. MEIER:  The next one, your Honor, is Government

9    Exhibit 9070.  It's the revised designations of Hamilton Lenox

10   from LGM Pharma, again, reflecting changes that have been made

11   since the designations were submitted back in October.

12             THE COURT:  Any objection.

13             MR. RUDOWITZ:  No objection, subject to your Honor's

14   rules.

15             THE COURT:  Received.

16             (Government Exhibit 9070 received in evidence)

17             MR. MEIER:  The next one, your Honor, is Government

18   Exhibit 9071.  It's the revised designations of a witness named

19   Akeel Mithani with Vyera.  Again, it reflects some changes that

20   have been made since the October submission.

21             THE COURT:  Any objection?

22             MR. RUDOWITZ:  No objection, subject to your Honor's

23   rules.

24             THE COURT:  Received.

25             (Government Exhibit 9071 received in evidence)

1            MR. MEIER:  The next one, your Honor, is Government

2    Exhibit 9072.  It's the revised designations of a witness named

3    Eve Costopoulos formerly with Vyera.

4            THE COURT:  Any objections?

5            MR. RUDOWITZ:  No objection, subject to your Honor's

6    rules.

7            THE COURT:  Received.

8            (Government Exhibit 9072 received in evidence)

9            MR. MEIER:  Your Honor, the last one for today is

10   Government Exhibit 9073.  It is the revised designations of the

11   deposition of Martin Shkreli.

12           THE COURT:  Any objection?

13           MR. RUDOWITZ:  No objection, subject to your Honor's

14   rules.

15           THE COURT:  Received.

16           (Government Exhibit 9073 received in evidence)

17           MR. MEIER:  Two other brief housekeeping matters, your

18   Honor.

19           We are still in negotiations with defendants with

20   respect to one deposition designation and with respect to one

21   summary exhibit with additional documents.  It's our number

22   9007.  We do not expect that we will have those worked out this

23   morning before the government finishes its case.  My

24   understanding is, in negotiation with defendants, defendants do

25   not object to us moving those in tomorrow, if that's OK with

1   the Court.

2          THE COURT:  That's fine with me.  Thank you, counsel,

3   for working so well with each other.

4          MR. MEIER:  Your Honor, the government is ready to

5   call its next witness.  The government calls Howard Dorfman.

6   My colleague, Matt Weprin, will do the examination.  Mr.

7   Dorfman does not have a declaration.

8          THE COURT:  Mr. Dorfman, if you can come up here and

9   take the witness stand.  No need to rush.  If you could step up

10  on the witness stand and remaining standing.

11  HOWARD LEWIS DORFMAN,

12       called as a witness by the Plaintiffs,

13       having been duly sworn, testified as follows:

14         THE COURT:  Mr. Dorfman, we have had the ventilation

15  checked in this room, so very few people are allowed to remove

16  their masks.  You are one of them.  So is counsel when they are

17  standing at the podium.  Up to you whether to remove your mask.

18  If you would like to, though, you may.

19         Please state your full name and spell your last name.

20         THE WITNESS:  Howard Lewis Dorfman, D-o-r-f-m-a-n.

21         THE COURT:  Counsel, you are now going to examine Mr.

22  Dorfman.

23         MR. WEPRIN:  Thank you Honor.

24         Good morning, your Honor, and may it please the Court,

25  my name is Matthew Weprin on behalf of the government

1   plaintiffs.

2   DIRECT EXAMINATION

3   BY MR. WEPRIN:

4   Q.  Good morning, Mr. Dorfman.

5   A.  Good morning.

6   Q.  You are appearing here pursuant to a subpoena, correct?

7   A.  Correct.

8   Q.  How are you today?

9   A.  I'm well.  Thank you.  And you?

10  Q.  I'm doing well.

11  A.  Good.

12  Q.  Mr. Dorfman, let's start by discussing your professional

13  experience.  You joined Turing Pharmaceuticals in December

14  2014?

15  A.  Yes.

16  Q.  At Turing your title was vice-president and general

17  counsel?

18  A.  Correct.

19  Q.  And you worked for Turing through August of 2015?

20  A.  Correct.

21  Q.  Since then, Turing has changed its name to Vyera.  Will you

22  understand if I use the term Vyera to apply to both Turing and

23  Vyera?

24  A.  Yes, I will.

25  Q.  Before your work at Vyera, you worked as an in-house lawyer

```
 1    or outside counsel for pharmaceutical companies for over 30

 2    years?

 3              MR. POLLACK:  Objection, your Honor.  I realize this

 4    is interest introduction, but all of the questions are leading.

 5              THE COURT:  Sustained.

 6    Q.  How many years in the pharmaceutical industry did you work

 7    prior to your work at Vyera?

 8              MR. POLLACK:  Objection, foundation.

 9              THE COURT:  Overruled.

10    A.  I started in 1978, so I think it's about 30 years or so.

11    Q.  Who hired you to work at Vyera?

12    A.  Mr. Shkreli.

13    Q.  In your role as vice-president and general counsel, did you

14    report to Mr. Shkreli?

15    A.  Yes, I did.

16    Q.  What was Mr. Shkreli's title at the time you were at the

17    company?

18    A.  I believe it was -- I think it was president.  I am not

19    sure.  I don't think he was CEO at that point.

20    Q.  In your role as vice-president and general counsel, did you

21    provide input to the company on business issues?

22    A.  Yes, I did.

23    Q.  Were you part of the management team at Vyera?

24    A.  Yes, I was.

25    Q.  Did the management team discuss issues confronting the
```

```
 1   company on a regular basis?

 2   A.  Yes, your Honor.

 3           MR. POLLACK:  Objection, your Honor.

 4           THE COURT:  Sustained.  Stricken.

 5   Q.  What was the role of the management team at Vyera?

 6   A.  The management team provided advice to Mr. Shkreli and also

 7   discussed issues pertaining to the company.

 8   Q.  Do you recall anyone else who was on the management team at

 9   Vyera while you were there?

10   A.  I am not really good at names, but I can designate by

11   position better.  The chief marketing officer, I forgot her

12   name at the moment; the general counsel, myself; the head of

13   the regulatory affairs group; the head of communications;

14   public relations.  These functions changed over time as the

15   company grew.

16   Q.  Who was the chair of the management team that you were

17   there?

18   A.  Mr. Shkreli.

19   Q.  Was Mr. Shkreli in charge of determining the business

20   strategy for Vyera at that time?

21           MR. POLLACK:  Objection.

22           THE COURT:  Sustained.

23   Q.  Who was in charge of determining business strategy for

24   Vyera at the time that you were there?

25   A.  There were a number of people who Mr. Shkreli would speak
```

1    to and consult with over time, but the ultimate decisions were

2    made by Mr. Shkreli.

3    Q.   How often did the management team meet?

4    A.   Approximately once a week.  Maybe if business demanded it,

5    there would be perhaps an ad hoc meeting, but generally once a

6    week.

7    Q.   What issues did the management team discuss?

8    A.   They discussed every issue that was pertaining to the

9    company at that point in time, such as business strategy,

10   hiring of new personnel, plans to raise additional funds on the

11   market, real estate, the identification of office space that

12   would accommodate a growing business.

13   Q.   Mr. Dorfman, I would like to turn now to Daraprim, the drug

14   at issue in this case.  Are you familiar with the drug

15   Daraprim?

16   A.   Yes, I am.

17   Q.   Approximately when did Vyera acquire Daraprim?

18   A.   The acquisition went through, it was finalized

19   approximately August of 2015.

20   Q.   Who identified Daraprim as an acquisition target?

21   A.   I don't know.

22   Q.   Would it refresh your recollection if I showed you your

23   deposition testimony in this case?

24   A.   Yes, it would.

25           MR. WEPRIN:  Ms. Flint, could you please pull up Mr.

1   Dorfman's deposition on page 47, lines 18 to 25.

2   Q.  Can you please read that silently and let me know if it

3   refreshes your recollection.

4   A.  I believe that it is consistent with what I had testified

5   to.  The ultimate decision, of course, was Mr. Shkreli's, but

6   there were other people providing input to him that I probably

7   was not aware of who they were.

8   Q.  Who proposed raising the price of Daraprim after it was

9   acquired?

10  A.  I believe it was Mr. Shkreli.

11  Q.  Now, shifting gears, I want to talk about your

12  congressional testimony related to this case.  Did you testify

13  about Daraprim before the United States Senate Special

14  Committee on Aging?

15  A.  Yes, I did.

16          MR. POLLACK:  Objection.  His testimony before the

17  United States Senate is an out-of-court statement that would be

18  hearsay.

19          THE COURT:  Counsel, he just asked a fact question.

20  Overruled.

21          MR. POLLACK:  Withdrawn.

22  Q.  When did this testimony take place?

23  A.  Several years ago.  I don't recall the exact date.

24  Q.  Did it take place in 2016?

25  A.  That sounds right.

1    Q.  What was the Senate aging committee investigating?

2    A.  They were investigating the issue of price increases by

3    pharmaceutical manufacturers.

4    Q.  Did you take an oath to tell the truth when you testified

5    at the Senate Special Committee on Aging?

6    A.  Yes, I did.

7    Q.  Was the written testimony you submitted to the Senate

8    Special Committee on Aging truth and accurate?

9    A.  Yes, it was.

10   Q.  I'd like to focus today on two issues that you addressed in

11   your Senate testimony:  Daraprim's closed distribution system

12   and its price increase.

13            Now, first, I want to discuss the closed distribution

14   system.  For Vyera the closed distribution system plays a role

15   in maximizing the return on Daraprim?

16            MR. POLLACK:  Objection, your Honor.

17            THE COURT:  Sustained.

18            MR. WEPRIN:  Your Honor, if I may be heard.

19            THE COURT:  You are going to start with nonleading

20   questions, and we will see if at some point you get to go to

21   leading.

22            MR. WEPRIN:  Thank you, your Honor.

23   Q.  For Vyera did the close distribution system play a role in

24   maximizing the terms on Daraprim?

25            MR. POLLACK:  Objection.

 1                    THE COURT:  Sustained.

 2                    Did Vyera have a closed distribution system?

 3                    THE WITNESS:  I'm sorry?

 4                    THE COURT:  Did Vyera have a closed distribution

 5      system?

 6                    THE WITNESS:  Yes, it did.

 7                    THE COURT:  What role did that play?

 8                    THE WITNESS:  The closed distribution system at Vyera

 9      was designed to maximize control over the utilization of the

10      drug and provide information to the company with regard to

11      those patients who were taking the product, but also played a

12      role in the ability to control prices.

13      Q.  Mr. Dorfman, what effect did the closed distribution system

14      have on generic pharmaceutical companies seeking to obtain FDA

15      approval for Daraprim?

16                    MR. POLLACK:  Objection.

17                    THE COURT:  Overruled.

18      A.  Could you repeat the question.

19      Q.  Sure, Mr. Dorfman.  What effect did the closed distribution

20      system have on generic pharmaceutical companies seeking to

21      obtain FDA approval for Daraprim?

22      A.  I don't know what -- I don't know what they were going

23      through in the process.  I do know that a closed distribution

24      system generally can make it more difficult for a generic to

25      obtain the materials necessary to do the work to file for an

1    ANDA and have a generic approved.

2    Q.   When it acquired Daraprim, did Vyera enter into any

3    exclusive distribution agreements with a specialty pharmacy

4    company?

5    A.   I believe it did, yes.

6    Q.   Was Daraprim in a specialty distribution system prior to

7    the acquisition?

8    A.   My recollection is that the pharmaceutical company from

9    which Daraprim was purchased by Vyera did in fact have such a

10   system in place at the time.

11   Q.   However, even though there was a specialty distribution

12   system in place, did Vyera take any steps to make the

13   exclusivity aspects of distribution more or less restrictive?

14             MR. POLLACK:  Objection.  Leading.

15             THE COURT:  Sustained.

16   Q.   Did Vyera take any steps to change the exclusivity aspects

17   of the distribution system?

18   A.   As I sit here, I don't recall the exact details of the

19   system that was in place prior to the acquisition.

20   Q.   Would it refresh your recollection to see your deposition

21   testimony on this topic?

22   A.   Certainly.

23             MR. POLLACK:  Objection.

24             THE COURT:  Overruled.

25             MR. WEPRIN:  Ms. Flint, could you please pull up Mr.

1    Dorfman's deposition on page 76, lines 10 to 23.

2    Q.  Mr. Dorfman, can you please read these lines.

3          THE COURT:  To yourself.

4    Q.  To yourself, yes.  Let me know when you are finished

5    reading them.

6    A.  I finished.

7    Q.  My question was, did Vyera take any steps to change the

8    exclusivity aspects of the distribution system?

9    A.  Yes, they did.

10   Q.  What steps did they take?

11   A.  As I recall, the distribution system was generally made

12   even more restrictive, identifying with a desire to identify

13   with particularity every -- to the extent possible, every pill

14   that was being distributed by the company.

15   Q.  Did Vyera seek to tighten loopholes that may have existed

16   with the previous specialty pharmacy system?

17          MR. POLLACK:  Objection.

18          THE COURT:  Sustained.

19   Q.  Are there appropriate reasons for specialty pharmacies to

20   be utilized to provide benefits to patients?

21   A.  Yes, there are.

22   Q.  Was the business rationale for Vyera specialty pharmacy

23   system based on one of these appropriate reasons?

24          MR. POLLACK:  Objection.

25          THE COURT:  Overruled.

 1                    MR. POLLACK:  Leading.

 2   A.  Yes, they were.

 3                    MR. WEPRIN:  Ms. Flint, can you please pull up Mr.

 4   Dorfman's deposition, page 85, line 22 to 86-3.

 5                    Ms. Flint, that's page 85 line 22 to 86, line 3.  I'm

 6   sorry.  That was 85 line 18 to 86, line 3.

 7                    MR. POLLACK:  Your Honor, can we get a proffer as to

 8   what is being done with this testimony that is being offered?

 9                    THE COURT:  Overruled.

10                    MR. WEPRIN:  Thank you, your Honor.

11   Q.  "QUESTION:  Can you explain what you meant in this

12   statement?

13   "A.  What I was suggesting was that unlike the appropriate

14   utilization of a specialty pharmacy, in the case of Daraprim,

15   that was apparently not the commercial and business rationale

16   for the specialty pharmacy system."

17                    That testimony was truthful and accurate?

18   A.  Yes, it was.

19   Q.  For Vyera what was the business rationale for implementing

20   a specialty distribution system?

21   A.  There were a number of reasons.  One of them was to provide

22   better control over patient care in terms of delivery of

23   product on a timely basis and the ability to promptly report --

24   obtain reports of any adverse events or other untoward

25   consequences of the utilization of the drug.  In this case

1    another reason was the desire to maintain control over the

2    distribution and preclude any other companies from

3    identifying -- from obtaining products sufficient to file an

4    ANDA application.

5    Q.  Was the closed distribution system motivated by Vyera's

6    desire to block a generic entrant?

7            MR. POLLACK:  Objection.  Leading.

8            THE COURT:  I think he just testified to that, so I

9    think the question is trying to make sure that the questioner

10   understood the answer.

11           Please revise your question.

12   Q.  Do I understand that you are saying that the closed

13   distribution system was part of Vyera's desire to block generic

14   entry?

15   A.  Block or certainly to delay entry of any generic.

16   Q.  How long did Vyera hope to delay a generic entrant using a

17   closed distribution system?

18   A.  There was some discussion at the management committee

19   meeting that the objective was three years.

20   Q.  Now, I want to move on to discuss the price increase for

21   Daraprim.  Now, you testified earlier that Mr. Shkreli proposed

22   raising the price of Daraprim after it was acquired.  Do you

23   recall approximately how much the price per pill increased?

24   A.  For some reason, the number 700 times is something that

25   sticks in my mind, but I don't recall right now exactly what

1    the ultimately price increase turned out to be.

2    Q.  In your experience, sometimes a company may justify a price

3    increase by pointing to a research and development of drug,

4    correct?

5    A.  Yes.

6              MR. POLLACK:  Objection.

7              THE COURT:  Counsel, I am going to ask you, if you

8    can, to use nonleading questions, if you are able to.

9              MR. WEPRIN:  Thank you, your Honor.

10   Q.  Did you object to Mr. Shkreli's proposed price increase?

11   A.  The reason I'm hesitating, I am trying to consider whether

12   my answer in any way would cause me to rely on attorney-client

13   privilege, given my position.

14             Would you read the question again, please.

15   Q.  Did you object to Mr. Shkreli's post price increase for any

16   business reasons?

17   A.  Yes, I did.

18   Q.  What were your business concerns about the price increase?

19   A.  Given the patient populations that were dependent on the

20   ability to acquire Daraprim for their condition, I felt that

21   certainly the timing of the price increase was -- would raise

22   serious public relations and other business concerns, such as

23   the ability of the company to raise funds in the open market.

24   There was also, in my opinion, the concern that the company had

25   not yet undertaken the type of expenditures, such as research

1    and such, at that time to justify the price increase.

2    Q.   Did you consider the price increase to be justified?

3    A.   I did not see --

4              MR. POLLACK:   Objection.   Calls for an improper lay

5    opinion.

6              THE COURT:   Overruled.

7    A.   I did not see the circumstances that I had just raised in

8    my answer to be -- being taken into consideration at that time.

9    Q.   Did you consider the price increase to be ethical?

10             MR. POLLACK:   Objection.   Relevance.

11             THE COURT:   Overruled.

12   A.   Given the lack of research that was going to be or

13   purportedly going to be done, given the very severe

14   consequences that could arise to the patient populations that

15   were dependent upon the drug, I found it to be certainly a very

16   serious question of whether it was or was not ethical.

17   Q.   How did Mr. Shkreli respond to your objections?

18   A.   He was not happy.

19   Q.   Why wasn't he happy?

20             MR. POLLACK:   Objection.

21             THE COURT:   Sustained.

22             MR. POLLACK:   Calls for speculation.

23             THE COURT:   Did he tell you why he was not happy?

24   Q.   Did he tell you why he was not happy?

25   A.   Yes, he did.

1    Q.  What did Mr. Shkreli say?

2    A.  He said that he was -- he said I did not know what I was

3    speaking about, that he was -- he considered himself an

4    authority in price increases as a business model and basically

5    did not appear to want to hear my business objections to his --

6    to the price increase.

7    Q.  Did Vyera implement Mr. Shkreli's proposed price increase?

8    A.  Eventually they did, yes.

9    Q.  Were you fired from Vyera after you objected to the price

10   increase?

11   A.  Yes, I was.

12           MR. WEPRIN:  Thank you, your Honor.  I have no further

13   questions.

14   CROSS-EXAMINATION

15   BY MR. POLLACK:

16   Q.  Good morning, Mr. Dorfman.

17   A.  Good morning.

18   Q.  My name is Jeff Pollack.  I'm an attorney for Martin

19   Shkreli.  I have some questions to follow up on Mr. Weprin's

20   questions to you this morning.

21           First of all, in terms of how Vyera identified

22   Daraprim for acquisition, you don't know how the company went

23   about that, do you?

24   A.  No.

25   Q.  You don't know how the company went about arriving at the

1  decision to increase the price for Daraprim, do you?

2  A.  That's not exactly accurate.

3           MR. POLLACK:  Justin, could we bring up Mr. Dorfman's

4  deposition testimony at page 56, line 24 to 57-3.

5  Q.  Mr. Dorfman, at your deposition you were asked:  Do you

6  have an understanding of how Turing arrived at the decision to

7  increase the price of Daraprim?  Your answer was no.

8  A.  Correct.

9  Q.  That was truthful at the time?

10  A.  Absolutely.

11  Q.  You told Mr. Weprin that the sale of Daraprim closed in

12  August of 2015, correct?

13  A.  Yes.

14  Q.  And he didn't put a date on it, but is August 7 the correct

15  date for that closing?

16  A.  That sounds right.

17  Q.  And you left the company August 13, is that right?

18  A.  Correct.

19  Q.  After you left the company, you don't know what Vyera did

20  in terms of R&D, correct?

21  A.  Correct.

22  Q.  You don't know what the company did -- by company, I mean

23  Vyera -- in terms of drug development, correct?

24  A.  Correct.

25  Q.  You don't know how much money the company invested into R&D

1  and drug development, do you?

2  A.  At the time --

3  Q.  After you left.

4  A.  Correct.

5  Q.  After you left the company, you don't know what Vyera did

6  in terms of educational programs related to Daraprim, do you?

7  A.  No, I don't.

8  Q.  You touched on the fact that when Daraprim was acquired by

9  Vyera it was already in specialty distribution, correct?

10 A.  Correct.

11 Q.  And that specialty distribution agreement was assigned from

12 the previous owner to Vyera, correct?

13 A.  I am not sure that they -- I am not sure --

14 Q.  I will ask a different question.  Do you know that that

15 agreement was assigned to Vyera?

16 A.  I don't think so.

17 Q.  Do you know anything about the terms of the agreement with

18 the previous owner and Walgreens Specialty?

19 A.  As I sit here now I can't recall, no.

20 Q.  Did you know that the prior owner's agreement with

21 Walgreens Specialty appointed Walgreens as the exclusive

22 specialty pharmacy dispensing for Daraprim in the United

23 States?

24        THE COURT:  Objection to form.  Counsel.

25 Q.  Mr. Dorfman, let me ask you this way.  You don't know, do

1    you, after you left the company what Vyera did in terms of

2    expanding its distribution network, do you?

3    A.   I know that we were in the process of expanding it and

4    identifying additional resources prior to my leaving.

5    Q.   You don't know what other additional steps the company took

6    after you left to expand distribution, do you?

7    A.   To expand distribution?

8    Q.   Yes.

9    A.   No.

10   Q.   When a drug is in specialty distribution, there are a

11   number of ways that another company, a third party not Vyera,

12   can purchase referenced lists drug or RLD, correct?

13   A.   Correct.

14   Q.   For example, they can get a physician's prescription,

15   correct?

16   A.   A company cannot obtain a drug by a prescription to the

17   company.  It would have to be a prescription from a physician

18   to a patient, and I believe that there are restrictions on the

19   physician writing the prescription for a product that he or she

20   does not believe is medically necessary.

21   Q.   Mr. Dorfman, do you recall at your deposition being asked:

22   Do you have an understanding of how a pharmaceutical company

23   attempting to obtain FDA approval of a generic version of a

24   drug can obtain sufficient quantities of the drug it is copying

25   outside the closed distribution system?  You answered:  One

1    can -- a company can attempt to purchase the product on the

2    open market from other, you know, pharmacy sources.  Sometimes

3    physicians are -- are able to provide at least a certain amount

4    to -- for valid for testing.

5    A.  Yes.  I remember that testimony, yes.

6    Q.  Was your testimony truthful when you gave it at your

7    deposition?

8    A.  Yes, it was.

9    Q.  Another way that a company can obtain RLD is through the

10   open market -- through other pharmacy sources, correct?

11   A.  Correct.

12   Q.  Mr. Dorfman, I have no further questions for you.  Thank

13   you today.

14            THE COURT:  Any redirect?

15            MR. WEPRIN:  No, your Honor.

16            THE COURT:  You may step down.

17            (Witness excused)

18            THE COURT:  Next witness.

19            MR. MEIER:  Your Honor, the government calls as its

20   next witness professor Scott Hemphill.  My colleague, Lauren

21   Peay, will handle that.

22            MS. PEAY:  Your Honor, may I approach the bench with

23   copies of the binders.

24            THE COURT:  Professor Hemphill, if you would take the

25   stand and remain standing.

1   SCOTT HEMPHILL,

2        called as a witness by the Plaintiffs,

3        having been duly sworn, testified as follows:

4        THE COURT:  Professor, you don't have to take off your

5   mask.  The courtroom's ventilation system has been tested.  You

6   may take off your mask, if you wish, when you are seated there,

7   as can counsel from the podium.

8        I believe you are being provided with a document which

9   bears an exhibit number GX-8004.  I am going to ask you,

10  please, to turn to the last page of that document, which I

11  think is page 58, and ask you if you authorized your electronic

12  signature to be added there.

13       THE WITNESS:  Yes, that's correct.

14       THE COURT:  Before doing that, giving that

15  authorization, did you read this document with care?

16       THE WITNESS:  Yes.

17       THE COURT:  Do you swear to the truth of its contents?

18       THE WITNESS:  Yes, I do.

19       THE COURT:  Any objection to the receipt of Government

20  Exhibit 8004?

21       MR. McDONNELL:  No objection, your Honor.

22       THE COURT:  Received.

23       (Government Exhibit 8004 received in evidence)

24       THE COURT:  Cross-examination.

25       MS. PEAY:  Your Honor, may I be heard?

```
 1              THE COURT:  Sure.

 2              MS. PEAY:  I would like at this time to move into

 3   evidence GX-9014, which lists eight summary exhibits that

 4   accompany Professor Hemphill's written direct.

 5              THE COURT:  Great.

 6              MS. PEAY:  May I hand up the papers?

 7              THE COURT:  You don't need to ask permission.  You may

 8   just approach.

 9              Any objection to the receipt of Government Exhibit

10   9014 and the exhibits listed in it?

11              MR. McDONNELL:  Your Honor, no objection.

12              THE COURT:  Received.

13              (Government Exhibit 9014 received in evidence)

14              THE COURT:  Cross-examination.

15   CROSS-EXAMINATION

16   BY MR. McDONNELL:

17   Q.  Good morning, Professor Hemphill.

18   A.  Good morning.

19   Q.  My name is Sean McConnell.  I'm an attorney for the

20   defendant, Mr. Shkreli, in this case.

21              You have authored two written expert reports in this

22   case, correct, professor?

23   A.  That's correct.

24   Q.  The first is a corrected expert report, C. Scott Hemphill

25   Ph.D., JD.  Is it OK if I refer today to that as your opening
```

1   report, Professor?

2   A.  Yes, that's fine.

3   Q.  The second written report, Defendant's Exhibit 329, is a

4   corrected reply report of C. Scott Hemphill.  Is it OK if I

5   refer to that as your reply report today, Professor?

6   A.  Yes.  That makes sense.

7   Q.  At your deposition do you recall testifying that all of the

8   opinions that you intend to offer at trial in this case are

9   contained in either your opening report or your reply report,

10  correct?

11  A.  I don't know if I have a specific recollection, but that

12  sounds right.

13  Q.  Your direct testimony in this case has just been entered

14  into evidence as GX-8004, correct?

15  A.  I know it has just been entered into evidence.

16  Q.  I believe you have it in front of you, if you just want to

17  confirm.

18  A.  That it's GX-800 -- yes.  GX-8004.

19  Q.  Perfect.  Thank you, Professor.

20          Let's turn now to your opinion regarding the relevant

21  product market in this case.  OK?

22  A.  OK.

23  Q.  It is your opinion, Professor Hemphill, that the relevant

24  product market is no broader than FDA-approved pyrimethamine

25  products, correct?

1  A.  That's correct.

2  Q.  So alternative treatments for toxoplasmosis are not

3  included in that relevant product market, correct?

4  A.  That's right.

5  Q.  For example, TMP-SMX is an alternative product that is not

6  in your proposed relevant product market, correct?

7  A.  Correct.  TMP-SMX is not part of the relevant product

8  market.

9  Q.  Atovaquone is also an alternative treatment for

10 toxoplasmosis that is not in your proposed relevant product

11 market, correct?

12 A.  That product is not part of the relevant product market.

13 Q.  Compounded pyrimethamine as an alternative treatment for

14 toxoplasmosis, that is also not in your relevant product

15 market, right?

16 A.  Compounded pyrimethamine is not part of the relevant

17 product market.

18 Q.  Professor, you are familiar with cross-price elasticity,

19 right?

20 A.  Yes.

21 Q.  Would you agree that cross-price elasticity refers to the

22 degree to which an increase or decrease in the price of a

23 product results in a change in the quantity demanded of another

24 product?

25 A.  Yes, I would agree with that.

1  Q.  If two products have a high cross-price elasticity, then

2  they are closer substitutes to one another, correct?

3  A.  What I'd say is, the higher the cross-price elasticity, the

4  closer the degree of substitutability.

5  Q.  The higher the degree of cross-price elasticity between two

6  products, the more likely it would suggest that those two

7  products may need to be included in the same relevant product

8  market, correct?

9  A.  It's one piece of the puzzle.  It's not the central issue

10  in an economic analysis of relevant product market.  But

11  cross-price elasticity is relevant, yes.

12  Q.  You agree with my characterization of how cross-price

13  elasticity would impact what products fall into the relevant

14  product market?

15  A.  The higher the cross-price elasticity, the stronger the

16  case for inclusion.

17  Q.  Thank you.

18          In your reports and in your direct testimony you do

19  not say what threshold of cross-price elasticity there needs to

20  be in order for a product to be in or out of your relevant

21  product market, correct?

22  A.  That's correct.

23  Q.  In your reports you conclude that empirical research that

24  you did suggests that Dr. Reddy's generic Daraprim demonstrated

25  a degree -- a sufficient degree of cross-price elasticity of

1    demand with branded Daraprim to meaningfully constrain the

2    exercise of market power, correct?

3    A.  Yes.  That's the result of a much larger analysis, as

4    opposed to the analysis itself.

5    Q.  And the data that you relied on for that empirical research

6    was provided to you from Vyera, right?

7    A.  From Vyera and also from Dr. Reddy's because the entry of

8    Dr. Reddy's had economic effects and the data from Dr. Reddy's

9    plays a role in calculating the overall price in the market of

10   FDA-approved pyrimethamine.

11   Q.  This data from Vyera provided you with quantity and prices

12   paid for Vyera's Daraprim, right?

13   A.  Yes, that's right.

14   Q.  Now, the data that you used for this empirical research

15   from Vyera and from Dr. Reddy's did not include quantity and

16   price information about TMP-SMX, correct?

17   A.  That's accurate, yes.

18   Q.  The data that you used from Vyera and from Dr. Reddy's as

19   part of this empirical research did not include any quantity

20   and price information about compounded pyrimethamine, correct?

21   A.  That's correct.  There was some information about

22   compounded and about TMP-SMX.  That data was not from Vyera or

23   DRL.  A limited amount of information.

24   Q.  But that information was not included in your empirical

25   research regarding cross-price elasticity in this case, right?

1    A.  The limitations in the available data about TMP-SMX and

2    about compounded played a role in thinking about the

3    feasibility of a numerical calculation of cross-price

4    elasticity.  So I disagree to that extent.

5    Q.  Let me ask it this way, Professor.  You would need price

6    and quantity information to empirically test cross-price

7    elasticity between TMP-SMX and Daraprim, correct?

8    A.  You would need a lot of information in order to make a

9    numerical calculation of the kind that I think you have in

10   mind.  For a qualitative characterization of high or low

11   cross-price elasticity you don't need data of that kind.  I

12   would agree that you would need a lot of information, which you

13   said, and even more to do a proper cross-price elasticity

14   calculation.

15   Q.  Thanks, Professor.

16           Now, you testified on direct that it is not possible

17   to determine the precise quantity of Daraprim lost to those

18   alternative therapies that we talked about, correct?

19   A.  Yes, that's correct.

20   Q.  You did not do an empirical study regarding how many

21   patients of toxoplasmosis switched from Daraprim to any

22   alternative treatments for toxoplasmosis, correct?

23   A.  That's correct, yes.

24   Q.  I'd like to now turn and talk a little bit about market

25   power, Professor.  You conclude that Vyera exercised market

1  power and monopoly power in the market for FDA-approved

2  pyrimethamine products, right?

3  A.  Yes, that's correct.

4  Q.  And one approach that you used to confirm this power you

5  called the direct approach, right?

6  A.  That's right.  That's one of several routes to establish

7  market power and monopoly power.

8  Q.  A showing that Vyera profitably charged a price

9  substantially above the competitive level, that is, the price

10  that would prevail under competitive conditions, suffices to

11  establish market power and monopoly power as an economic

12  matter, correct?

13  A.  Yes, that sounds like what I wrote.

14  Q.  You referred to this competitive level as the price that

15  would prevail under competitive conditions, correct?

16  A.  Yes, that's right.

17  Q.  Now, you do not offer an opinion in this case as to what

18  the precise competitive level for FDA-approved pyrimethamine

19  is, right?

20  A.  That's not quite right.  I offer an opinion about the upper

21  bound of the competitive level and offer two different ways of

22  understanding what that competitive level is.

23  Q.  So you propose a range of possibilities for the competitive

24  level, correct?

25  A.  No.  I wouldn't put it that way.  There are two

1    calculations, one short run and one longer run.  I agree that

2    there is a range, that there is a difference between those two,

3    so inherently a range.  I don't think describing it as a range

4    is quite right either.

5    Q.  You do not identify a specific price point that you

6    consider to be the competitive level for the price that would

7    prevail under competitive conditions for your relevant product

8    market, correct?

9    A.  I don't think that's quite right.  I would say that -- I

10   understand we are not supposed to say the price.  The higher

11   price listed is my estimate of the conservative upper bound on

12   the competitive price level.

13   Q.  Using evidence of pricing conduct in your --

14        THE COURT:  Excuse me, counsel.  I am just going to

15   interrupt because I don't remember this limitation with respect

16   to this particular dollar figure, which is just fine.  We had

17   lots of rulings.

18        To understand your question, I am going to ask the

19   professor, please, to direct me to the paragraph that contains

20   the dollar figure to which he just alluded.

21        THE WITNESS:  Yes.  On page 17, figure 4, the number

22   above the red bar, which is the average price post DRL entry

23   for FDA-approved pyrimethamine.  That number is the measure of

24   the competitive level.  It's the higher of the two.  It's the

25   short-run measure of the competitive level.

1              THE COURT:  Thank you.

2     Q.  My question, Professor, you just said the higher of the

3     two.  What's the other number?

4     A.  The lower number, which I believe can be said, is $12,

5     which is the price of FDA-approved pyrimethamine during the

6     early period, call it 2013, when multiple generics were making

7     preparations to enter the market in competition with Daraprim.

8     Q.  And you conclude, Professor, that because Vyera was able to

9     profitably charge a price above that $160 that we have just

10    talked about, did you conclude that Vyera's pricing conduct

11    directly demonstrates market power?  Correct?

12    A.  That, in conjunction with other things, including the fact

13    that once Dr. Reddy's entered the market, the price fell to

14    this competitive level.  It's not just that the price was high,

15    but that it fell in response to Dr. Reddy's' competitive entry.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

 1   Q.  But the fact that for the five years preceding the entry,

 2   you concluded that the price of Daraprim charged by Vyera was

 3   higher than the upper bound, $160, is why you concluded that

 4   Daraprim had market power in this case, correct?

 5   A.  That is not the entirety of the basis, but that is, I would

 6   agree, a part of the examination, a part of the analysis.

 7   Q.  And you concede in your reply report that based on this

 8   direct approach to determining market power, Dr. Reddy's might

 9   have exercised market power in 2020, correct?

10   A.  Sorry, you're asking me about the reply report?

11   Q.  Yes, sir.

12   A.  Could you ask that one more time?

13   Q.  Sure.

14        You concede in your reply report that based on your

15   direct approach, Dr. Reddy's might have exercised market power

16   also in 2020, correct?

17        MS. PEAY:  Objection, your Honor, to the form of the

18   question.

19        THE COURT:  You understand the question?

20        THE WITNESS:  Yes.

21        I disagree that it's a concession.  It's an

22   implication --

23        THE COURT:  This is the answer?

24        THE WITNESS:  Yes.

25        It's an implication of the analysis -- it's an

1    implication of economic analysis, period, that Dr. Reddy's

2    might well exercise the market power -- it would not be at all

3    surprising that Dr. Reddy's might well exercise some market

4    power as of the end of 2020.  Competition hasn't yet had a

5    chance to work its way through.  It's not at all surprising to

6    expect that after 2020, the prices would continue to fall.  In

7    fact, that's part of the analysis in thinking that a 12-dollar

8    estimate of the competitive level is supportable.

9    BY MR. McCONNELL:

10   Q.  You partly anticipated my next question, Professor.

11        The reason that Dr. Reddy's may have exercised market

12   power in 2020 is because there is uncertainty about the precise

13   competitive price level because we have not yet had the

14   opportunity to see the competitive process under generic

15   competition fully play out, correct?

16   A.  Right.  Prices may well fall further beyond 2020, as the

17   competitive process continues to play out.

18   Q.  In reaching your conclusions in this case, have you

19   considered whether it would be possible for, even after the

20   competitive process under generic competition fully plays out,

21   that Dr. Reddy's might still be able to exercise market power

22   by continuing to charge a price higher than the competitive

23   level determined in your direct approach?

24   A.  Well, it's certainly possible that post 2020, prices might

25   settle out at a level higher than, let's say, $12, and that,

1  depending on a lot of factors, that Dr. Reddy's might continue

2  to exercise the market power beyond 2020.  That wouldn't be

3  surprising or inconsistent with my opinions.

4  Q.  You also used this direct approach regarding pricing

5  conduct to confirm the scope of your relevant product market,

6  correct?

7  A.  The direct approach does confirm that the relevant market

8  is FDA-approved pyrimethamine drugs, yes.

9  Q.  Now, given the results that we just talked about, about

10 this direct approach to market analysis, is there any testimony

11 that Dr. Hardy could have given in this case that would cause

12 you to reconsider that your relevant product market is limited

13 to FDA-approved pyrimethamine products?

14 A.  The focus of an economist's analysis of market definition

15 is economic factors rather than underlying medical testimony.

16 Given the powerful economic evidence of what actually happened

17 when the generic came into the market, I think of the medical

18 testimony as supportive and confirmatory, but not central.  So

19 I guess I struggle to think of what that would look like.

20 Q.  If Dr. Hardy provided testimony consistent with a relevant

21 product market that is broader than one consisting of only

22 FDA-approved pyrimethamine, would you reconsider your relevant

23 product market opinion in this case?

24 A.  Well, I would certainly take into consideration any

25 evidence, including evidence that seems at odds with what the

1   data and the economics tell us, but speaking as an economist,

2   understanding what actually happens in response to entry, what

3   actually happens when Vyera raises its price, that's central,

4   and the medical testimony is secondary.

5   Q.  Turning to your assessment of competitive effects,

6   Professor Hemphill, as part of your assignment in this case,

7   plaintiffs asked you to assess what competitive effects, if

8   any, arose from the challenged conduct, correct?

9   A.  Yes, that's right.

10  Q.  And the challenged conduct that you looked at consisted of

11  Vyera's arrangements with its API suppliers and certain

12  distribution restrictions, correct?

13  A.  Yes, that's right.

14  Q.  The challenged conduct that you looked at are all vertical

15  restraints, right?

16  A.  Yes, that's correct.

17  Q.  You are not offering an opinion in this case about whether

18  so-called data-blocking agreements had any sort of competitive

19  effects, correct?

20  A.  That's right.

21  Q.  So when I refer to the challenged conduct today, can we

22  agree that this refers to, one, Vyera's agreements with its API

23  suppliers, and, two, distribution restrictions?  Is that okay?

24  A.  Yes.

25  Q.  To determine whether the challenged conduct had competitive

1    effects, you identified three conditions in your opening report

2    that you say must be met, correct?

3    A.  Yes, that's right.

4    Q.  So the first condition is that the drugmaker is able to

5    exercise market power and charge a supercompetitive price in

6    the absence of generic competition, correct?

7    A.  I don't know if that exact language is right, but the

8    ability to exercise market power, monopoly power is the first

9    condition.

10   Q.  The second condition is that the exclusion is sufficiently

11   effective as to make a real difference to competition, correct?

12   A.  Right, because, otherwise, harmless -- you could imagine a

13   contract that was just harmless and had no effect, and we want

14   to check that that's not the case.

15   Q.  And the third condition, Professor, is that the conduct

16   does not have demonstrated pro-competitive effects that would

17   offset any harm to purchasers, correct?

18   A.  That's right.

19   Q.  So in order for you to conclude that Vyera's challenged

20   conduct had anticompetitive effects, all three of those

21   conditions must be satisfied, correct?

22   A.  Yes, that's right.

23   Q.  So the single fact that Vyera raised the price of Daraprim,

24   regardless of how high, is insufficient conduct alone for you

25   to conclude that the challenged conduct had anticompetitive

 1   effects, correct?

 2   A.  Yes, I agree with that.

 3   Q.  Now, let's focus on the second of those three conditions,

 4   okay?

 5        In paragraph 192 of your opening report, you write

 6   that the second condition is that the exclusion is sufficiently

 7   effective as to make a real difference to competition; is that

 8   right?

 9   A.  You're asking me if paragraph 192 of my opening -- yes, I

10   see that.  Yes, it says that.  It's the same as in the written

11   direct, I think, but, yes, I agree with that.

12   Q.  Now, Professor, you have not seen that specific formulation

13   that you use in your opening report sufficiently effective as

14   to make a real difference to competition used in any economic

15   literature, correct?

16   A.  I mean, I struggle to think of any specific formulation as

17   to how this basic economic idea is worded.  I agree -- this

18   exact language, I couldn't say one way or the other.

19   Q.  And you've also published a number of academic papers which

20   are listed in your curriculum vitae, correct?

21   A.  Yes, I agree with that.

22   Q.  And in all of your writings, you cannot identify any

23   publication that you have authored that uses that same

24   formulation, correct?

25   A.  I agree with that, right.

1  Q.  Now, to you, the phrase "sufficiently effective" seeks only

2  to identify whether the challenged conduct causes more than no

3  foreclosure, right?

4  A.  Yeah, I think I'd agree with that.  I mean, the basic idea

5  is to check whether, you know, these contracts are actually not

6  foreclosing, for example, because, you know, a generic could

7  just as easily get API, or what have you, samples from another

8  outlet.  So you want to rule that out.  I think that's what the

9  economic literature tells us to do in order to figure out

10  whether there's an anticompetitive effect.

11  Q.  There isn't any magic to the phrase "sufficiently

12  effective," correct?

13  A.  I would agree with that, yes, there's no magic to the

14  particular language used here.

15  Q.  If this Court were to conclude that there was no

16  foreclosure caused by the challenged conduct, you'd agree that

17  your second condition would not be satisfied, correct?

18  A.  Yes, I think that's right.

19  Q.  Now, Professor, virtually all vertical agreements restrain

20  competition to some degree, correct?

21  A.  No, I don't agree with that.

22  Q.  You do not agree that vertical agreements restrain

23  competition to some degree?

24  A.  In general, vertical agreements do.  I don't agree that

25  virtually every single one does restrain competition.

1  Q.  But it's fair to say, I guess, that all vertical agreements

2  restrain competition to some degree; is that correct?

3  A.  No, I think I still disagree with that.

4  Q.  Would it be fair to say some vertical agreements restrain

5  competition to some degree?

6  A.  Sure, yes.

7  Q.  In paragraph 192 of your opening report, you opine that the

8  challenged conduct must make a real difference to competition,

9  correct?

10  A.  This is the paragraph we looked at before?

11  Q.  Correct, Professor.

12  A.  I think if we're just quoting from the -- could you repeat

13  the question again?

14  Q.  Sure.

15        It's the first sentence there, Professor.  In

16  paragraph 192 of your opening report, you opine that the

17  challenged conduct must make a real difference to competition,

18  correct?

19  A.  Yes, that's what it says in my opening report.

20  Q.  And you also use the phrase "real difference" in your reply

21  report, correct?

22  A.  The exact language "real difference"?  I don't know.

23        MR. McCONNELL:  Justin, why don't you please bring up

24  the reply report at paragraph 95, I believe.

25  Q.  There, Professor, for part 2, it's the second condition,

1    Vyera's restrictive agreements were sufficiently effective as

2    to make a real difference to competition, correct?

3    A.  Yes.  And I'm probably citing my opening report for that,

4    yes.

5    Q.  In quantifying whether your second condition is satisfied,

6    you testified at your deposition that the challenged conduct

7    must impede generics in a non-zero fashion, correct?

8    A.  I remember us talking about this at deposition.  I think of

9    it as a characterization rather than a quantification, but,

10   yes, that's one way of putting the same basic economic point.

11   Q.  And the methodology that you were using for determining

12   whether an exclusion makes a real difference to competition was

13   trying to ascertain whether the restriction is present or

14   absent, correct?

15   A.  I don't understand that.  Sorry.

16   Q.  Sure.

17            MR. McCONNELL:  Justin, can you please bring up

18   Professor Hemphill's deposition testimony at page 155.

19   Q.  You were asked:  "Do you have a methodology for determining

20   whether an exclusion makes a real difference to competition?"

21            Do you see that?

22   A.  Yes.

23   Q.  And you testified:  "Again, the idea here is just, you

24   know, we're trying to ascertain -- (1), we analysts are trying

25   to ascertain whether the restriction is, you know, present or

 1    absent."

 2             Correct, that was your testimony?

 3    A.  Yeah, it might be helpful to look above and below, but,

 4    yes, I think it looks like that's something that was said --

 5    that I said at deposition.

 6    Q.  Today, in your direct testimony, your second condition for

 7    assessing competitive effects is now whether the exclusion is

 8    sufficiently effective as to make a difference to competition,

 9    correct?

10    A.  Is -- we could look.

11    Q.  Sure.

12    A.  Again, this is sort of very tightly parsing some language

13    that's making a pretty basic point, but I don't recall the

14    exact language.

15    Q.  If I can point you, Professor, to GX 8004, at page 043,

16    paragraph 29.

17    A.  At 043, paragraph 9?

18    Q.  Yes, Professor.

19    A.  You don't mean paragraph 29, I think.

20    Q.  Paragraph 129.  Sorry, I forgot the 1.

21             So, now, the second condition is that the exclusion is

22    sufficiently effective as to make a difference to competition,

23    right?

24    A.  Yes, that's what it says.  This is making the same point

25    three or four different ways, but, yes, the language is not

1  exactly the same.  I see what you're saying.

2  Q.  So you've taken out the word "real" from the second

3  condition, correct?

4  A.  Yes, I agree.

5  Q.  And even after dropping the word "real" from your second

6  condition, it is still the case, Professor, that you cannot

7  identify any economic publication that uses that same

8  formulation that you do, correct?

9  A.  I think the economic literature uses the same formulation,

10  the same idea, but it doesn't use the exact same language.

11  Q.  So when I say formulation, I mean the specific language,

12  correct?

13  A.  That's what I inferred you to mean, yes.

14  Q.  Are you aware, Professor Hemphill, that the Supreme Court

15  has found that under the rule-of-reason framework, that the

16  plaintiff has the initial burden to prove that the challenged

17  restraint has a substantial anticompetitive effect that harms

18  consumers in the relevant market?

19       MS. PEAY:  Objection.  This is outside the scope of

20  this witness' direct testimony.

21       THE COURT:  I'll allow it.

22       THE WITNESS:  Could you read the question?

23  BY MR. McCONNELL:

24  Q.  Sure.

25       Are you aware that the Supreme Court has found that,

1    under the rule-of-reason framework, that the plaintiff has the

2    initial burden to prove that the challenged restraint has a

3    substantial anticompetitive effect that harms consumers in the

4    relevant market?

5    A.  I'm aware that there is a statement that gets at some of

6    that.  I don't know if that's the exact language or not.  I

7    struggle with "found" a little bit.  It's a sentence in a

8    Supreme Court opinion that has some of what you said.

9    Q.  And did you consider that framework from the Supreme Court

10   in the context of rendering your opinion in this case,

11   Professor?

12   A.  No, no, the Supreme Court's dicta on this point is not part

13   of my economic analysis.

14   Q.  If you could please turn, Professor, to your direct

15   testimony on pages 41 and 42, and we'll discuss, a little bit

16   more, the second condition.

17        On those two pages, Professor, footnotes 63 and 64.

18   Let me know when you're there.

19   A.  Yes, I'm there.

20   Q.  None of the passages quoted in footnotes 63 or 64

21   articulate the standard using the same formulation that you do

22   in this case, meaning sufficiently effective to make a

23   difference to competition, correct?

24   A.  So far as I know, the economic literature, including the

25   articles cited, though lots more could be cited, do not use the

1   precise language that I use or that the Supreme Court

2   discusses, for that matter.  They're not getting at the exact

3   specifics of the language and trying to make this basic

4   economic point.

5   Q.  Now, in footnote 64, you cite the LaFontaine and Slade

6   article titled "Exclusive Contracts and Vertical Restraints:

7   Empirical Evidence and Public Policy."

8        Do you see that?

9   A.  Yes, I see that.

10  Q.  Are you aware, Professor, that the empirical findings in

11  that study led the authors to state that vertical restraints,

12  in the manufacturer setting, can be publicly desirable?

13  A.  In a handbook chapter about vertical contracts, it would be

14  extremely surprising for them not to say that sometimes

15  vertical contracts can be pro-competitive.  So I don't have a

16  specific recollection of that.  There's probably a fair amount

17  in that article on that point, but it's a basic point.

18  Q.  Are you aware, Professor, that the empirical results in

19  that study led the authors to conclude that the presumption

20  should not be that vertical restraints are detrimental to

21  consumers?  Correct?

22  A.  I'm not aware that they say that.

23  Q.  Turning back to your opening report, Professor, do you

24  recall that as part of your assignment in this case, plaintiffs

25  asked you to assess what competitive effects resulted from

1    Vyera's agreements restricting the sale of Daraprim and its

2    exclusive agreements with API suppliers, correct?

3    A.   Yes.

4    Q.   And you concluded in your opening report that the

5    challenged contracts impeded competition from lower-priced

6    competing therapies, thereby preserving Vyera's market power,

7    correct?

8    A.   That's right.  To the extent that the contracts had this

9    impediment, an anticompetitive effect would follow it.

10           I understand that there is some confusion about this,

11   and we talked about it at deposition at some length, but that's

12   what that statement is getting at.

13   Q.   You also concluded that, as a result, purchasers were

14   forced to pay a higher price for FDA-approved pyrimethamine,

15   correct?

16   A.   Right.  A further consequence is that we would expect that

17   to happen.

18   Q.   Now, looking at paragraph 194 of your opening report, you

19   write that, "Vyera's agreements restricting access to samples

20   impeded generic companies that needed to obtain Daraprim for

21   FDA-mandated bioequivalent studies," correct?

22           Would you prefer to see your report, Professor?

23   A.   It might be easier.

24   Q.   Sure.

25           Why don't you take a look, and let me know when you've

1    completed your review of paragraph 194.

2    A.   Yes, I see that.

3    Q.   Do you agree with my recitation of the first statement

4    there in 194?

5    A.   I agree with your recitation of the first sentence of

6    paragraph 194.

7    Q.   Now, to reach the conclusion that Vyera's agreements

8    restricting access to samples impeded generic companies, you

9    looked to real-world evidence as support for your conclusion

10   that this restriction was anticompetitive, correct?

11   A.   I think that's not quite right.  Just to be clear -- and I

12   understand that there was some confusion about this — I've

13   tried to make it clear in both the deposition and in the

14   written direct — I'm not offering an opinion, as a factual

15   matter, about whether this impediment occurred.  That's not my

16   role here.

17           The point that I am just trying to get out is that if

18   it's right that there was an impediment to the various

19   contracts, evidence that is being developed separate from me,

20   then it would follow that there is this anticompetitive effect

21   harm to the competitive process, a prediction about prices

22   rising as a consequence.

23   Q.   Thank you for the clarification, Professor.

24           I think you clarified, in paragraph 99 of your reply

25   report, that you are not offering an opinion on whether, as a

1    factual matter, Vyera's restrictions made it more difficult for

2    generics to obtain necessary inputs, such as Daraprim samples

3    and API, correct?

4    A.   Right, yes, there's a statement to that effect in the reply

5    report.

6    Q.   At your deposition, you clarified that you are not offering

7    an opinion that any impairment, in fact, occurred as a result

8    of Vyera's challenged conduct, right?

9    A.   I'm not offering an opinion either way about that, yes.

10   That is a factual matter that I'm not opining on.

11   Q.   So you aren't offering an opinion that there was some

12   but-for cause and effect between Vyera's challenged conduct and

13   any anticompetitive effects in this case, correct?

14   A.   I think that's right.  What I would say is, I'm offering an

15   opinion about how if certain facts are established, there's a

16   prediction from economics about the consequences — harm to the

17   competitive process, higher prices.

18   Q.   As part of that, you have not done any sort of quantitative

19   analysis of how much any costs of any competitor in this case

20   went up, if at all, due to Vyera's challenged conduct, right?

21   A.   That's right.  There's not a quantitative analysis of the

22   degree to which costs were raised.  There was testimony that,

23   in fact, they were delayed by a year and change, let's say, but

24   no quantitative analysis of that kind.

25   Q.   In paragraph 14 of your direct testimony, you testified

1    that "Vyera's exclusive supply arrangements and distribution

2    restrictions, to the extent that they made it more difficult

3    for generic manufacturers to access the resources they need to

4    develop competing products, harmed the competitive process,"

5    correct?

6    A.   It sounds like you were reading from -- yes, that's right.

7    That's what I say in paragraph 14.

8    Q.   So when you state, "To the extent that they made it more

9    difficult for generic manufacturers to access the resources

10   they need to develop competing products," you are referring to

11   a factual conclusion that the factfinder must first reach

12   before you can conclude that there was harm to the competitive

13   process, correct?

14   A.   Yes, that's the work being done by "to the extent that."

15   Yes, I agree with that.

16   Q.   Now, offering any opinion that Vyera's challenged conduct

17   actually caused some sort of impairment is contrary to what you

18   stated in paragraph 99 of your reply report that you would not

19   be doing in this case, correct?

20   A.   Sorry.  Try me again on that.

21   Q.   Sure.

22        You are not offering any opinion, in this case, that

23   Vyera's conduct actually caused some sort of impairment,

24   correct?

25   A.   I'm not opining that, as a factual matter, these contracts

 1    impaired.

 2    Q.  And one step further, you are not offering an opinion that,

 3    as a matter of fact, Vyera's challenged conduct actually harmed

 4    the competitive process, correct?

 5    A.  My opinion about harm to the competitive process is

 6    predicated on a factual finding about impairment.

 7    Q.  You have not done any independent analysis or inquiry into

 8    the factual details about the universe of potential API

 9    suppliers in this case, correct?

10    A.  That's correct, no, I've not done an inquiry, separate

11    inquiry, no.  No, I'm relying on Mr. Bruno and others, yes.

12    Q.  If you could, please, Professor, flip to paragraph 133 of

13    your direct examination.

14    A.  Yes, I'm at 133.

15    Q.  So in paragraph 133 of your direct testimony, you refer to

16    Vyera's distribution restrictions, correct?

17    A.  Right, yes, that's the italicized language at the beginning

18    of the paragraph.

19    Q.  And you describe testimony and documents from generic

20    drugmakers Cerovene and Fera, correct?

21    A.  At least those two, yes.  I mean, I think there's also some

22    evidence about Mylan, for example, and perhaps InvaTech.

23    Q.  You conclude your testimony in that paragraph by stating

24    that evidence of "delayed and deterred entry supports the

25    conclusion that Vyera's conduct impaired the opportunities of

1    its rivals to avert a degree that made a difference to

2    competition," correct?

3    A.  Yes, I see that sentence, yes.

4    Q.  So in paragraph 133, you are offering your view as to

5    whether Vyera's challenged conduct, in fact, harmed

6    competitors, correct?

7    A.  I'm offering the view that there was evidence supporting

8    this conclusion.  I'm not offering an opinion that, in fact,

9    these contracts, in fact, impaired.

10   Q.  If you could please turn, Professor, to paragraph 134 of

11   your direct examination.

12   A.  Yes.

13   Q.  In paragraph 134, you refer to Vyera's exclusive supply

14   agreements, correct?

15   A.  That's right, yes.  That's the italicized language at the

16   beginning.

17   Q.  And in that paragraph, you describe testimony and documents

18   from generic manufacturers Fukuzyu and RL Fine, correct?

19   A.  Yes, I see that.

20   Q.  And you also refer to the testimony of Dr. Bruno.  Do you

21   see that?

22   A.  Yes.

23   Q.  I believe that's a typo, right?  I believe it's Mr. Bruno,

24   he's not a doctor; is that right?

25   A.  Well, I see Mr. Bruno.  It may be a typo on your end.  It

1    says Mr. Bruno in the written direct.

2           Oh, I see what you're saying.  Yes, Dr. Bruno and then

3    corrected.  It's wrong in line 2, and it's correct in line 3.

4    Yes, Dr. Bruno should be Mr. Bruno.

5    Q.  Okay, thanks.

6           You stated in paragraph 134 that multiple generic

7    drugmakers have stated that they faced more than a year of

8    delay, increased costs, or both because of Vyera's agreements,

9    correct?

10   A.  Yes, I say that.  I believe it's a true statement.

11   Q.  You then conclude that paragraph by stating that, "This

12   amount of impairment would establish that the API exclusivity

13   agreements made a difference to competition," correct?

14   A.  Yes, that's what the sentence says.

15   Q.  So in paragraph 134, you are similarly offering your view

16   as to whether Vyera's challenged conduct, in fact, harmed

17   competitors, correct?

18   A.  No, I disagree in a parallel way to my disagreement a

19   moment ago.

20   Q.  You would agree, Professor Hemphill, that to the extent

21   that there are any factual conclusions in paragraphs 133 and

22   134 of your direct testimony, that those must be made by the

23   factfinder in this case, correct?

24   A.  Yes, yes.  It's certainly the factfinder's role, not mine,

25   to, in this context, answer whether, in fact, there was an

1  impairment.

2  Q.  Okay.  Returning back to paragraph 133 of your direct

3  testimony, Professor Hemphill, where you refer to documents and

4  testimony from Cerovene and Fera, you testified that certain

5  evidence from generic drugmakers shows that these two companies

6  were "unable to obtain a sufficient quantity of Daraprim after

7  failing to secure adequate samples," correct?

8  A.  I think the sentence is as the evidence indicates.  I think

9  you said shows.  I don't know if it shows it or not.  There is

10 evidence in support of that point.  Whether that evidence is

11 credited by the factfinder or not is not up to me.  The

12 evidence indicates; there is evidence.

13 Q.  Thank you.

14      In making the statements in paragraph 133 of your

15 direct, were you aware that Dr. Reddy's Laboratories, which

16 launched Cerovene's generic pyrimethamine product, was able to

17 source Daraprim samples from two different suppliers as early

18 as February 2018?

19 A.  I don't have an understanding, one way or the other, on

20 that particular statement.

21 Q.  Were you aware, Professor, that Dr. Reddy's Laboratories

22 chose not to purchase those samples in February 2018, given the

23 high upfront costs?  Were you aware of that evidence when you

24 wrote paragraph 133 of your direct?

25 A.  I don't have a recollection, one way or the other, about

1  that as I sit here.  I understand that there's discussion on

2  this point.

3  Q.  You are not making any assessment, in paragraph 133, that

4  Dr. Reddy's Laboratories' choice not to order the samples it

5  needed in February 2018 was a result of Vyera's challenged

6  conduct in this case, correct?

7  A.  I'm not offering an opinion that Dr. Reddy's and Cerovene

8  made a choice of the kind that you're describing, one way or

9  the other.

10  Q.  In making the statements in paragraph 133 of your direct

11  examination, were you aware, Professor, that Fera had the

12  ability to source Daraprim as early as December 2016?

13        MS. PEAY:  Objection, your Honor.  This line of

14  questioning lacks foundation.

15        THE COURT:  Sustained.

16        Counsel, I think I have got your fundamental point —

17  at least I hope I have — that it's for me to decide whether an

18  impairment occurred, and only then might the expert's analysis

19  of anticompetitive harm be useful to me.

20        MR. McCONNELL:  I will do my level best to avoid

21  similar questions like that, your Honor.

22        THE COURT:  Okay, good.

23  BY MR. McCONNELL:

24  Q.  Just to be clear — and I don't think I'm intrigued on that

25  instruction — Professor Hemphill, you are not making any

1    assessment in paragraph 133 that Fera's business decision

2    regarding how many bottles of Daraprim it would purchase in

3    2018 was the result of Vyera's challenged conduct, correct?

4    A.  I think I agree with that, including whether there was such

5    a business decision at all of the kind that you're implying.

6    Q.  Turning to paragraph 134 of your direct examination,

7    Professor Hemphill, you refer to the exclusive supply

8    arrangements between Vyera with Fukuzyu and RL Fine, right?

9    A.  Yes, there is that reference.

10   Q.  You stated that the evidence indicates that the contracts

11   increased the expense of procuring API supply and entailed

12   additional investment to assemble the extensive data required

13   for FDA approval, right?

14   A.  Yes, that's what it says.

15   Q.  And the evidence that you referred to there is testimony

16   from generic drugmakers and the opinion of Mr. Bruno, correct?

17   A.  That's what comes to mind right now.

18   Q.  Apart from relying on Mr. Bruno's opinion, you are not

19   offering an independent opinion in this case that Fukuzyu and

20   RL Fine were in the "best position" to provide pyrimethamine

21   API, correct?

22   A.  It's true I'm not offering my own opinion about that

23   factual matter.

24   Q.  Just skipping over some questions following the guidance of

25   the Court:

1          You are not, Professor Hemphill, making a factual

2     determination in paragraph 134 that any business decisions by

3     Cerovene related to how it sourced its API was actually caused

4     by Vyera's challenged conduct, correct?

5     A.   Correct, including whether they had a decision like that to

6     make.

7     Q.   In reaching your conclusions in paragraphs 133 and 134 of

8     your direct examination, you did not consider any record

9     evidence regarding the challenged conduct's impact on Teva's

10    entry into the relevant market, correct?

11         MS. PEAY:  Objection, your Honor.  This line of

12    questioning lacks foundation.

13         THE COURT:  Excuse me one second.

14         MS. PEAY:  Yes, your Honor.

15         Sustained.

16         MR. McCONNELL:  Your Honor, I'm just confirming that

17    Professor Hemphill did not consider that as part of his

18    opinion.

19         THE COURT:  You can place another question.  That

20    wasn't the question you asked.

21    BY MR. McCONNELL:

22    Q.   In reaching your conclusions in paragraphs 133 and 134,

23    Professor Hemphill, you did not consider any evidence regarding

24    the challenged conduct's impact on Teva, correct?

25    A.   These paragraphs are analysis of other generics, not of

1    Teva.  There's not an analysis of Teva contained in those

2    paragraphs.

3    Q.  Thank you.

4         I'd like to turn now, Professor Hemphill, to your

5    calculation of excess profits.  Okay?

6    A.  Yes.

7    Q.  I believe that starts at paragraph 148 of your direct

8    examination.

9    A.  It could be.  Let me look.

10        Yes, that's right.

11   Q.  You attempted to contemplate excess profits as the

12   difference between Vyera's actual profits and its profits in

13   the but-for world in which competitive entry was not impeded by

14   Vyera's conduct, correct?

15   A.  That's the basic nature of the calculation that I made,

16   yes.

17   Q.  And you concede, Professor, that Vyera's conduct may not,

18   in fact, have impeded the entry of competing generics, right?

19   A.  I don't -- I don't have an opinion that I'm expressing

20   here, one way or the other, about that.

21   Q.  If it is determined that Vyera's conduct did, in fact,

22   impede the entry of competing generics, then delay of the date

23   of generic entry is a likely, but not certain, consequence,

24   correct?

25   A.  Yes, I would agree with that — likely, but not certain.

1  Q.  And if it's determined that Vyera's conduct did, in fact,

2  impede the entry of competing generics, and that a consequence

3  of that was a delay of generic entry, you agree that there is

4  no way to know for certain exactly when generic pyrimethamine

5  would have launched absent Vyera's conduct, correct?

6  A.  Yes, that's always true and also true here.

7  Q.  So your excess profits calculation necessarily involves

8  making assumptions about what would have happened in a but-for

9  world, correct?

10 A.  Yes.  And the multiplicity of scenarios is of a piece with

11 not knowing for certain what would have happened in the but-for

12 world.

13 Q.  Now, one of the factors for your excess profits calculation

14 is determining the date of generic entry in the but-for world,

15 correct?

16 A.  Yes.  It depends on what we mean by determine, but, yes, it

17 is an important input into the calculation, what the but-for

18 entry date is.

19 Q.  And this is an important factor to your calculation,

20 correct?

21 A.  Yes.

22 Q.  The number of generic entrants is also a significant factor

23 to your excess profits calculation, correct?

24 A.  Yes, significant.  Much less important, but significant.

25 Q.  For your calculations, you model two alternative entry

1    dates for Cerovene, correct?

2    A.  Yes, that's right.

3    Q.  And for your calculations, you model a single alternative

4    entry date for Fera, correct?

5    A.  Yes.  You have the alternative of entry at that date or

6    entry not at all, so...

7    Q.  And you reached these -- or I guess you decided on these

8    alternate entry date inputs only after conversations with

9    counsel in this case, correct?

10   A.  Yes, coming up with a set of assumptions had a number of

11   inputs — reviewing documents, reviewing testimony,

12   conversations with counsel — trying to come to the best answer

13   we can.

14   Q.  And the ultimate product of that conversation was a set of

15   assumptions, correct?

16   A.  The ultimate result of that process, which included

17   conversations, was this set of assumptions.

18   Q.  And each of those assumptions in that set of assumptions

19   needs to bear out to be correct by the factfinder in this case

20   for your excess profits calculation to be accurate, correct?

21   A.  Well, you know, to the extent that the findings of the

22   factfinder differ from the assumptions in the excess profits

23   calculation, the excess profits calculation, I presume, would

24   be less helpful.

25   Q.  Your excess profits calculation does not model potential

1   entry for any other generic, correct?

2   A.  Beyond Cerovene and Fera, I think you mean.

3         That's basically right.  I mean, these other would-be

4   entrants, to the extent that they were impaired, offer a

5   degree -- result in a degree of conservatism in my

6   calculations.

7   Q.  To make these assumptions about when Cerovene and Fera

8   would have launched, in the absence of Vyera's challenged

9   conduct, you looked at testimony and documents from certain

10  generic drugmakers, correct?

11  A.  I looked -- could you read that back?  I'm sorry.

12  Q.  Sure.

13        To make these assumptions about when Cerovene and Fera

14  would have launched, in the absence of Vyera's challenged

15  conduct, you looked at testimony and documents from certain

16  generic drugmakers, correct?

17  A.  Yes, and, also importantly, what happened in the real world

18  in terms of how long it took things to transpire during the FDA

19  approval process, bioequivalence testing and so forth.

20  Q.  And you are not offering an opinion as to what, in fact,

21  would have occurred in terms of early entry absent the alleged

22  conduct, correct?

23  A.  That's true, yes.

24  Q.  You are not offering an opinion as to whether any delay, in

25  fact, occurred at all as a result of Vyera's challenged

1   conduct, right?

2   A.   Right.  Yes, that's correct.

3   Q.   In your direct testimony, you say that the alternative

4   entry dates are based on reasonable assumptions, correct?

5   A.   That sounds right.  I don't remember the exact language.

6   Q.   Would it be helpful if we took a look at the language, just

7   to be clear?

8   A.   Sure.

9   Q.   If you could look at paragraph 149 of your direct,

10  Professor.

11  A.   Yes.  The calculating of excess profits necessarily

12  involves making reasonable assumptions.  I think that's kind of

13  a global statement about this kind of calculation, but it

14  includes this particular one, yes.

15  Q.   So you are characterizing these assumptions as reasonable

16  based on your experience as an economist, correct?

17  A.   Yes.  My experience as an economist is a part of -- is a

18  part of that, yes, I would agree.

19  Q.   I want to be clear, because my understanding is that you

20  also have a law degree, that you are not offering a legal

21  opinion as to the reasonableness of that set of assumptions,

22  correct?

23  A.   I'm not offering a legal opinion, in any event, but I'm not

24  sure what it would mean, in this context, to offer a legal

25  opinion on that question.

1   Q.  You have no expertise, Professor Hemphill, in the FDA's

2   regulatory process or how the FDA prioritizes its review of

3   ANDAs, correct?

4   A.  I'm not an expert on these questions.  I have some

5   understanding of the FDA approval process, not extending to the

6   prioritization question that you asked at the end of your

7   question.

8   Q.  You are not, Professor, an expert on API manufacturing or

9   the length of time that a manufacturer would need in order to

10  be able to manufacture pyrimethamine API, correct?

11  A.  Right.  I don't consider myself an expert on those

12  questions.

13  Q.  In creating these alternative entry date inputs for your

14  but-for world, you did not take into account alternative

15  sources of delay other than Vyera's challenged conduct,

16  correct?

17  A.  I think that's -- I think I agree with your statement, yes.

18  I mean, if there was some totally independent force that meant

19  that there was no delay, no difference, between the real world

20  and the but-for world, you know, a different set of

21  calculations would follow.

22  Q.  There is no paragraph in your opening report, your reply

23  report, or in your direct examination where you consider an

24  alternative reason for any delay experienced by Cerovene and

25  Fera from entering the relevant market, correct?

1   A.  I think that's right.  I'm not sure that's right, but I

2   think that sounds right.

3   Q.  And, Professor Hemphill, that's because you did not

4   consider any other sources of delay in modeling these

5   alternative entry dates, right?

6   A.  I don't know that I didn't consider it, in the sense that,

7   in coming up with a set of assumptions, you know, I was just

8   doing the best I could to try to produce a set of scenarios

9   that would be helpful in understanding the excess profits

10  associated with the conduct.

11  Q.  So it would be fair to say that you did not consider

12  whether there was some other conduct, other than Vyera's

13  challenged conduct, that would have prevented Cerovene or Fera

14  from acting the way you predict in the but-for world, correct?

15  A.  So I'm not making a prediction — I don't think that's

16  right — nor do I think it's correct that I didn't consider it.

17        What I would agree is that there's no calculation that

18  reflects some independent force.  Totally apart from Vyera's

19  conduct, there's no calculation based on a scenario that looks

20  like that.

21  Q.  Are you able to point, Professor Hemphill, to any portion

22  of your opening report, your reply report, or your direct

23  examination where you describe that consideration?

24  A.  As I sit here, no, I don't recall a sentence saying exactly

25  that.

1    Q.  Okay.

2              MR. McCONNELL:  Thank you, Professor Hemphill.

3         That's all for now, your Honor.

4              THE COURT:  We're going to take our midmorning recess.

5         (Recess)

```
 1              THE COURT:  Any redirect?

 2              MS. PEAY:  Yes, your Honor.

 3    REDIRECT EXAMINATION

 4    BY MS. PEAY:

 5    Q.  Good afternoon, Professor Hemphill.

 6    A.  Hi.

 7    Q.  I just have a few questions for you here.  Do you recall

 8    defense counsel asking you earlier about your assessment of

 9    cross-price elasticity?

10    A.  Yes, I do.

11    Q.  Did you calculate cross-price elasticity in this case?

12    A.  No.  I didn't make any numerical calculation.  It wasn't

13    necessary for the analysis that I was doing.

14    Q.  Why was it not necessary for the analysis you were doing?

15    A.  Well, I mean, in order to evaluate a market, the most

16    important thing is what happens in response to entry by a

17    competitor or exit.  What happens, in fact, in terms of

18    consumer response to a price change or to entry.  Answering

19    that question provides a basis for assessing the degree of

20    substitutability and cross-price elasticity is one way of

21    talking about that.  But it's not the main event for

22    understanding the ability of a firm or a set of firms to

23    exercise market power or monopoly power.

24    Q.  Do you recall defense counsel ask also asking you whether

25    there was a numerical threshold for cross-price elasticity
```

1   which you could use to assess whether the cross-price

2   elasticity was sufficiently high or low?

3   A.  Yes, I do recall that.

4   Q.  Is a numerical threshold of that type necessary for

5   performing the analysis you performed in this case?

6   A.  No, it's not necessary to make a numerical calculation and

7   neither is there some numerical threshold that is used in order

8   to make this kind of evaluation.

9   Q.  I'd like to turn now to some questions that defense counsel

10  asked you regarding your competitive effects opinion.

11  A.  OK.

12  Q.  Do you recall defense counsel asking you about the second

13  condition in your competitive effects analysis?

14  A.  Yes, I do.

15  Q.  What that second condition?

16  A.  The second condition is basically just trying to get at

17  whether there is any foreclosure such that we might anticipate

18  anticompetitive effects.  That is, it's a spot for us to rule

19  out situations in which the availability of alternative

20  contracting partners is so easy that there is no foreclosure,

21  that there is no impediment.

22  Q.  Do you recall defense counsel asking you about whether the

23  specific terminology you used in describing that second

24  condition is found in the economic literature?

25  A.  Yes, I do.

1    Q.   Is that specific terminology found in the economic

2    literature?

3    A.   No, it's not.  But economists are taught using magic

4    language that has some precise wording to it that matters to

5    economists.  There is a half dozen ways of expressing this same

6    very basic idea.

7    Q.   This very basic idea, is that found in the economic

8    literature?

9    A.   Yes.  I think in all the papers that we are talking about

10   there is attention to this basic question about whether there

11   is any actual foreclosure.  The models are discussing

12   situations where there is and there is not.

13   Q.   Do you recall that counsel also asked you about your

14   articulation of the second condition, whether you included real

15   difference to competition or difference to competition?  Do you

16   recall that?

17   A.   Yes.  From an economist standpoint, this is a distinction

18   without a difference.  There is no like meaningful difference

19   intended with and without that word.

20   Q.   Professor Hemphill, I'd like to turn now to your excess

21   profits calculations and opinion.

22   A.   Yeah.

23   Q.   Did you include Mylan in your excess profits model?

24   A.   I considered Mylan and it plays a role to the extent that

25   it offers an extra element of conservatism because I don't

1   attribute any additional excess profits to Mylan's entry in a

2   but-for world, to the extent that Mylan might have entered the

3   true level of excess profits that is higher than what I've

4   calculated.

5   Q.  Why didn't you attribute any additional excess profits to

6   Mylan's entry in a but-for world?

7   A.  I did the best that I could with the materials that I had

8   at hand, that is, with the materials that are in the record

9   about what might have happened in the but-for world.  I felt

10  with respect to Mylan that there wasn't enough there on which

11  to hang your hat in terms of actually cranking out a

12  calculation.

13  Q.  I have a similar question regarding InvaTech.  Did you

14  include InvaTech in your excess profits calculation?

15  A.  Yes.  InvaTech comes in in my consideration in exactly the

16  same way as Mylan, more or less.  It adds an element of

17  conservatism.  We don't have, I feel, enough to go on in order

18  to actually render a calculation.

19  Q.  Thank you, Professor Hemphill.  That's all I have.  Thank

20  you.  No further questions.

21          THE COURT:  Any recross?

22          MR. McDONNELL:  Your Honor, may I just consult with my

23  colleagues for a second?

24          THE COURT:  Sure.

25          MR. McDONNELL:  Your Honor, no recross.  Thank you.

1              THE COURT:  Thanks so much.

2              Professor, there is testimony here that would permit a

3    finding that Fera would have entered the marketplace in August

4    of 2019, and your calculations are based on an assumption of

5    entry in the last quarter of 2019.  Am I right?

6              THE WITNESS:  I want to doublecheck at that point in

7    '19 versus 2018.  Some of these later years run together for

8    me.  Just bear with me a second.  Yes.  That's right.  My

9    calculation is last quarter of 2019.  Is that what you said?

10             THE COURT:  Yes.

11             THE WITNESS:  Yes.

12             THE COURT:  At least that's what I intended to say.

13             Let's turn to Cerovene.  You do two different

14   calculations on the assumption of entry into the market in two

15   different dates.  Am I right, October and December of 2018?  Is

16   that right?

17             THE WITNESS:  Yes, that's correct, your Honor.

18             THE COURT:  So there is evidence in the record to

19   support an entry date of roughly a year earlier, September

20   2017.

21             THE WITNESS:  Yes, your Honor.

22             THE COURT:  Using your methodology, is it possible to

23   back into an excess profits calculation if the fact finding

24   uses such a different date?

25             THE WITNESS:  I think under those circumstances the

1    calculation that I made would be conservative.  It would be

2    less than the level with the earlier entry date.  The

3    difference could be substantial from the earlier entry date.

4    The set of scenarios that I set up doesn't deliver an answer

5    for that earlier date.  It's not a simple matter of just, you

6    know, pressing a button.  There is not an immediate way to get

7    to the higher calculation that would be consistent with the

8    higher -- with the earlier entry date.

9            THE COURT:  Do counsel have any additional questions

10   for the witness based on what the questions that I put to him?

11           MS. PEAY:  Yes, your Honor.  I have two questions.

12   REDIRECT EXAMINATION

13   BY MS. PEAY:

14   Q.  Professor Hemphill, if you were given a different entry

15   date, would you be able to take that entry date and calculate

16   the excess profits for that date?

17   A.  Oh, yes.  The method permits it, yes.

18           MS. PEAY:  Thank you, your Honor.  That is all.

19           THE COURT:  But the calculation into which, for

20   instance, someone else like me could put different numbers is

21   not available to me on this record?

22           THE WITNESS:  I think that's right.

23           THE COURT:  Thank you.

24           Counsel.

25           MR. McDONNELL:  No further questions, your Honor.

1            THE COURT:  Thank you.

2            You may step down, Professor.

3            (Witness excused)

4            THE COURT:  Next.

5            MR. MEIER:  Your Honor, the government calls as its

6     next witness Kevin Mulleady.

7            My colleague, James Weingarten, will be examining

8     Mr. Mulleady.

9            THE COURT:  Mr. Mulleady, if you could come up here

10    and take the witness stand.  If you would take the witness

11    stand and remain standing, please.

12    KEVIN PATRICK MULLEADY,

13         called as a witness by the Plaintiffs,

14         having been duly sworn, testified as follows:

15            THE COURT:  Mr. Mulleady, the ventilation systems in

16    this courtroom have been tested.  As a result, you may take off

17    your face mask, if you would like.  You are free to leave it

18    on.  Also, counsel, when they are at podium, may take off their

19    mask.  But only when they are at the podium.

20            Please state your full name.

21            THE WITNESS:  Kevin Patrick Mulleady.

22            THE COURT:  Please spell your last name.

23            THE WITNESS:  M-u-l-l-e-a-d-y.

24            MR. POLLACK:  There is an affidavit coming in, your

25    Honor.

```
 1              THE COURT:  Yes.

 2              I don't think I have the DX-number for that.

 3              MR. POLLACK:  This is DX-545.

 4              THE COURT:  You're being handed a document which is

 5      the affidavit cons constituting your direct testimony, DX-545.

 6      If you could turn to the last page, page 33.

 7              Mr. Mulleady, is that your signature there?

 8              THE WITNESS:  Yes, your Honor.

 9              THE COURT:  Before signing it, did you read this

10      document with care?

11              THE WITNESS:  Yes, your Honor.

12              THE COURT:  Do you swear to the truth of its contents?

13              THE WITNESS:  Yes, your Honor.

14              THE COURT:  Any objection by plaintiffs to the receipt

15      of DX-545?

16              MR. WEINGARTEN:  No, your Honor.

17              THE COURT:  DX-545 is received.

18              (Defendant's Exhibit 545 received in evidence)

19              MR. POLLACK:  Your Honor, for the record, I will point

20      out, there was one alteration to the written testimony before

21      it came in, which is we removed the name of one of the API

22      suppliers and replaced it with the name that we are using in

23      this litigation.

24              THE COURT:  Thank you.

25              Counsel.
```

 1              MR. WEINGARTEN:  Thank you, your Honor.

 2    DIRECT EXAMINATION

 3    BY MR. WEINGARTEN:

 4    Q.  Good morning, Mr. Mulleady.

 5    A.  Good morning.

 6    Q.  I would like to start by asking you a few questions about

 7    your background and how it is you came to work at Vyera.

 8              From 2005 to 2013, you worked in finance and real

 9    estate, correct?

10    A.  Yes, that sounds correct.

11    Q.  Included in that is two years that you worked at

12    Mr. Shkreli's hedge fund MSMB Capital Management?

13    A.  Yes.

14    Q.  That was from 2011 to 2013 that you worked for Mr. Shkreli

15    at the hedge fund, right?

16    A.  Yes, sounds correct.

17    Q.  It was Mr. Shkreli himself who hired you for that job at

18    MSMB, correct?

19    A.  Yes.

20    Q.  At MSMB you reported directly to Mr. Shkreli?

21    A.  Yes.

22    Q.  Now, while you were at MSMB, Mr. Shkreli started a new

23    company called Retrophin, right?

24    A.  Yes.

25    Q.  I believe in your direct testimony you stated that you

 1  performed some limited tasks at Retrophin, is that right?

 2  A.  Yes.

 3  Q.  Now, your job at Retrophin was predominantly focused on

 4  raising money for Retrophin, right?

 5  A.  Yes.  I think that's fair.

 6  Q.  Again, you reported to Mr. Shkreli while you worked at

 7  Retrophin, right?

 8  A.  Yes.

 9  Q.  You were a founder of Retrophin, correct?

10  A.  Yes, I was the cofounder.

11  Q.  Mr. Shkreli awarded you so-called founders shares in

12  Retrophin, correct?

13  A.  That is correct.

14  Q.  You left Mr. Shkreli's employ in 2013, right?

15  A.  That sounds accurate, yes.

16  Q.  And that was until 2014, when Mr. Shkreli asked you to join

17  Vyera, right?

18  A.  Yes.

19  Q.  And at the point in time it was called Turing and the name

20  changed to Vyera, right?

21  A.  That is correct.

22  Q.  If we refer today to the entities as Vyera, will you

23  understand what I mean?

24  A.  Yes.

25  Q.  If at any point you think it's important to clarify between

1    Turing and Vyera, please do so.  OK?

2    A.  OK.

3    Q.  Now, you joined Vyera in 2014, correct?

4    A.  That sounds accurate.  I believe it was towards the tail

5    end of 2014.

6    Q.  Mr. Shkreli started what eventually became Vyera after he

7    had been terminated from Retrophin, correct?

8    A.  I believe there was a separation from Retrophin.  I am not

9    sure what stage the termination process was and if it was

10   formally entitled as a termination at that point.

11        THE COURT:  You can move that mic and you can move it

12   sort of down under your chin.

13   Q.  Now, at some point then, we can agree, sir, after

14   Mr. Shkreli ceased working at Retrophin, he founded a company

15   called Turing, right?

16   A.  Yes.

17   Q.  Turing eventually became Vyera Pharmaceuticals, right?

18   A.  Yes.  If I may, there is, obviously, Turing AG and Turing

19   Pharmaceuticals LLC.  Turing Pharmaceuticals LLC became Vyera

20   LLC and Turing AG became Phoenixus AG.

21   Q.  The relationship is, the AG is the parent company of the

22   pharmaceuticals company?

23   A.  Yes.  Based in Switzerland.

24   Q.  The AG is based in Switzerland?

25   A.  Yes.

1   Q.  Since the founding of Turing AG or Pharmaceuticals, either

2   one, Mr. Shkreli has been the largest shareholder in that

3   entity, is that right?

4   A.  Yes.

5   Q.  Mr. Shkreli asked you to join Turing, right?

6   A.  Yes.

7   Q.  Initially your title there was managing director, correct?

8   A.  Yes, I believe that's accurate.

9   Q.  You were Vyera's chief of staff also for some period of

10  time?

11  A.  I believe that title was used, but I don't think it was

12  ever a formal title.

13  Q.  The title of chief of staff was used with respect to your

14  responsibilities at Turing, correct?

15  A.  Yes.  I would say that's correct.

16  Q.  Again, you reported to Mr. Shkreli from the period of 2014

17  to 2015, correct?

18  A.  Yes, that's correct.

19  Q.  And, again, your role involved helping to get investors to

20  invest in the company?

21  A.  I don't know if that would be fully accurate.  Amongst

22  other things.

23  Q.  Was one of your responsibilities between 2014 and 2015

24  helping to get investors for Turing?

25  A.  I would not agree with that statement as a formal role in

 1   my company.  I did not bring investors in.  If anything, I

 2   helped with the process of onboarding interested parties.

 3   Q.  Interested parties being investors?

 4   A.  Yes.

 5          MR. WEINGARTEN:  Ms. Flint, could we turn to the

 6   investigational hearing transcript for Mr. Mulleady.  It's page

 7   22, lines 12 to 20.  You can do 16 to 20.  That's fine:

 8   "Q.  Sure.  Other than finding office space, what were your

 9   responsibilities at Turing during that time?

10   "A.  I assisted with capital raise.

11   "Q.  So getting investors for the company?

12   "A.  That is correct."

13   Q.  That was your sworn testimony, sir?

14   A.  Yes, it seems like it.

15   Q.  It was truthful and accurate when you gave it?

16   A.  Yes.

17          MR. WEINGARTEN:  You can take that down, please,

18   Ms. Flint.

19   Q.  Now, you left Vyera in around June 2016, correct?

20   A.  Yes.

21   Q.  Even though you had left your role, you continued to be a

22   shareholder in Vyera?

23   A.  Yes.

24   Q.  In 2015, before you departed Vyera, you founded your own

25   drug company, right?

1    A.  Yes.

2    Q.  That company was called Prospero?

3    A.  Prospero Pharmaceuticals LLC, yes.

4    Q.  It was Mr. Shkreli who suggested to you that you form

5    Prospero, correct?

6    A.  No.

7            MR. WEINGARTEN:  Could you please turn to the

8    investigational hearing transcript, page 30, lines 6 through 9:

9    "Q.  Did Mr. Shkreli ask you to form Prospero Pharmaceuticals?

10   "A.  He suggested it, but it was ultimately my decision."

11   Q.  That testimony was truthful and accurate when you gave it,

12   right, sir?

13   A.  Yes.

14   Q.  Mr. Shkreli suggested that you form Prospero

15   Pharmaceuticals?

16   A.  To me suggested assumes that it was -- the idea originated

17   from him.  That wasn't the case.

18   Q.  Your testimony was that he suggested forming Prospero,

19   correct?

20   A.  Could you say that again, please.

21   Q.  Your testimony under oath was that Mr. Shkreli suggested

22   forming Prospero Pharmaceuticals, correct?

23   A.  Yes.

24           MR. WEINGARTEN:  Ms. Flint, you can take that down.

25   Q.  Mr. Shkreli also invested in Prospero, right?

1    A.   By means of a convertible debt piece, yes.

2    Q.   Now, you departed Vyera in or around June of 2016 and your

3    direct testimony is that you were rehired at Vyera on or about

4    June of 2017, correct?

5    A.   That sounds accurate, yes.

6    Q.   To be precise, on June 21 of 2017, you were elected to the

7    Phoenixus AG board of directors?

8    A.   That sounds accurate, yes.

9    Q.   And after you had left your role at Vyera in 2016, it was

10   Mr. Shkreli who approached you about joining the Phoenixus AG

11   board, correct?

12   A.   Yes.

13   Q.   And you don't know any reasons Mr. Shkreli gave you for why

14   he asked you to be on the Phoenixus board, correct?

15   A.   I do not recall.

16   Q.   You don't recall any reasons that he may have provided you

17   about why he asked you to join the Phoenixus board in 2016,

18   right?

19   A.   Not specifically, no.

20   Q.   But, nonetheless, you agreed to be a nominee for the

21   Phoenixus board as part of a slate of directors that

22   Mr. Shkreli was proposing, correct?

23   A.   Yes.

24   Q.   And Mr. Shkreli was supporting a slate of people to be

25   elected to the Phoenixus board to replace the existing board,

1    correct?

2    A.  Yes, that's accurate.

3    Q.  And the vote on Mr. Shkreli's slate, of which you a part,

4    occurred in June 2017, right?

5    A.  That sounds accurate, yes.

6    Q.  And the entire Shkreli slate was elected to the board of

7    Phoenixus in June of 2017?

8    A.  Yes.

9    Q.  And everyone who previously comprised the board of

10   Phoenixus AG was defeated, correct?

11   A.  No.

12   Q.  Do you think it would refresh your recollection, sir, if we

13   looked at the minutes reflecting the election of the board of

14   directors in June of 2017?

15          MR. POLLACK:  Objection, your Honor.  He didn't say he

16   didn't remember.

17          MR. WEINGARTEN:  That's fine.  We will do it as an

18   impeachment, if I may, your Honor.

19          THE COURT:  Yes, you may.

20          MR. WEINGARTEN:  I would like Ms. Flint to put up

21   Government Exhibit 1344.  This was already admitted into

22   evidence as part of Government Exhibit 9005.

23   Q.  This cover e-mail, sir, is from a Lukas Dascher to several

24   individuals, including yourself, correct?

25   A.  Yes.  That's what the document states.

1    Q.  It's dated June 28, 2017.  Do you see that?

2    A.  Yes.

3    Q.  Mr. Dascher writes:  Dear all, attached, please find a scan

4    copy of the signed minutes of the 21 June 2017 EGM of Turing

5    Pharmaceuticals AG.  Do you see that?

6    A.  Yes.

7    Q.  Is EGM, to your understanding, an acronym for extraordinary

8    general meeting?

9    A.  Yes.

10   Q.  Is that a reference to the meeting at which Mr. Skhreli's

11   slate of directors was elected to the board of Turing?

12   A.  Seems like it, yes.

13            MR. WEINGARTEN:  Ms. Flint, if you could please turn

14   to page 005 of that document.

15   Q.  Do you see number 2 heading there it says:  Election of

16   members of the board of directors, proposals by the board.  Do

17   you see that?

18   A.  Yes.

19   Q.  Number 1 says:  The board of directors proposed the

20   election of Eliseo O. Salinas to the board.  You see that?

21   A.  Yes.

22   Q.  Was Mr. Salinas approved to be on the board or were the

23   votes against him being on the board?

24   A.  He did not receive the necessary maturity to be voted on

25   the board, so he did not win.

1              MR. WEINGARTEN:  Ms. Flint, if you could go down to

2    number 2.

3    Q.  The board of directors proposed the election of Zsolt

4    Lavotha.  The board was proposing Mr. Lavotha to be on the

5    board of directors.  Do you remember that?

6    A.  I do not specifically remember Mr. Lavotha, but I have no

7    reason to believe this document is not accurate.

8    Q.  As stated in the minutes, the general meeting of the

9    shareholders rejected the proposal of the board to elect

10   Mr. Lavotha, correct?

11   A.  Yes.

12             MR. WEINGARTEN:  Ms. Flint, could you look at number 3

13   down below.

14   Q.  The board also proposed election of a Richard Berman to the

15   board of directors.  Do you see that, sir?

16   A.  Yes.

17   Q.  The general meeting of the shareholders also rejected that

18   proposed board member, correct?

19   A.  Yes.

20             MR. WEINGARTEN:  You can take that one down, please,

21   Ms. Flint.

22   Q.  As part of being elected to the board with Mr. Shkreli's

23   slate, the first order of business for your new slate was to

24   remove Mr. Salinas, who was then the CEO, correct?

25   A.  One of the initial decisions that was made was to put

1    Mr. Salinas under investigation -- on suspension pending the

2    outcome of an investigation.

3    Q.  That was one of the first things that the newly elected

4    board members did after the election, correct?

5    A.  It was in the early days of our tenure, yes.

6    Q.  Even though that was one of the first things that the newly

7    elected slate of Shkreli directors did, you don't ever remember

8    talking to Mr. Shkreli about removing Mr. Salinas?

9    A.  Could you ask that again, please.

10   Q.  You don't have any recollection of talking to Mr. Shkreli

11   about removing Mr. Salinas?

12   A.  I don't know if that's accurate.

13          MR. WEINGARTEN:  Ms. Flint, could you please pull up

14   page 86 of Mr. Mulleady's deposition.  It's page 86, line 20 to

15   lines 25:

16   "Q.  OK.  OK.  Did you talk to Mr. Shkreli about whether

17   Mr. Salinas should be removed from his position with the

18   company?

19   "A.  I do not recall."

20   Q.  That was your sworn testimony at your deposition, correct?

21   A.  That's what the document states, yes.

22   Q.  You gave truthful and accurate testimony at your

23   deposition, correct?

24   A.  Based on the facts and information I knew at the time, yes.

25   Q.  Now, at that same meeting where the newly constituted board

1    met and put Mr. Salinas on leave, the board named you and

2    Mr. Akeel Mithani as the two members of an executive committee,

3    correct?

4    A.  Mr. Mithani and myself were named to the executive

5    committee.  I do not recall the specific meeting.

6    Q.  The executive committee performed the executive functions

7    for Vyera, correct?

8    A.  Could you please expand on executive functions.

9    Q.  Well, the executive committee was empowered to take over

10   the tasks of senior management of Vyera, correct?

11   A.  I believe that is --

12              MR. POLLACK:  Objection to the form, your Honor.

13              THE COURT:  Is there an objection?

14              MR. POLLACK:  To form.

15              THE COURT:  Overruled.

16   A.  I believe there is a documentation saying that the

17   executive committee would involve the oversight for many

18   offices, but predominantly I would say it would be comparable

19   to CEO tasks.

20   Q.  So you and Mr. Mithani comprised a new executive committee

21   for Vyera, correct?

22   A.  Yes.

23   Q.  That was starting on June 22, 2017, correct?

24   A.  Again, I don't recall the specific meeting, but if it was

25   that same meeting, that sounds accurate.

1   Q.  Would it refresh your recollection if we looked at the

2   meeting minutes at which this transpired?

3   A.  Sure.  If you would like me to look at them.

4          MR. WEINGARTEN:  Ms. Flint, could you please put

5   Government Exhibit 1151 on the screen.

6          Your Honor, this is also already admitted into

7   evidence as part of Government Exhibit 9005.

8          Let's just look at the heading, please, Mr. Flint.

9   Q.  Just to be clear, the minutes for what was Turing AG and

10  became Phoenixus AG are both in German and English, correct?

11  A.  It's bilingual.  I am not sure if it's German, Italian or a

12  blend.

13  Q.  We will be looking at the English part of the minutes, so

14  that's OK.

15  A.  Thank you.

16  Q.  Sir, GX-1151 is the meeting minutes for a Turing

17  Pharmaceuticals AG board meeting held on June 22, 2017?

18  A.  Yes.

19         MR. WEINGARTEN:  Ms. Flint, could you go down below

20  the line where it says present, and there is a list of people.

21  Q.  You attended, correct?

22  A.  Yes.

23         MR. WEINGARTEN:  And Ms. Flint, could you please turn

24  to page 005, the bottom paragraph right before the number 5

25  where it says an executive committee.

1    Q.  According to the meeting minutes -- let me strike that.

2            Does this refresh your recollection, sir, that the

3    date of the meeting we are discussing was June 22, 2017?

4    A.  I don't know if it refreshes recollection, but that's what

5    the document states, and I have no reason to disagree with it.

6    Q.  Let's see what the document says about the executive

7    committee.  According to the meeting minutes, an executive

8    committee consisting of the board members Mulleady and Mithani

9    is established.  Together with the chairman of the board, the

10   committee will perform executive functions and will take over

11   the tasks of the senior management -- CEO, CFO, CCO, and CLO --

12   on a temporary basis.  Do you see that, sir?

13   A.  Yes.

14   Q.  So the board empowered you and Mr. Mithani, together with

15   the chairman, to take over the tasks of the senior management

16   of Vyera, correct?

17   A.  Yes.

18           MR. WEINGARTEN:  Ms. Flint, you can take that document

19   down, please.

20   Q.  You noted in your direct testimony, sir, that around

21   November 2017, you then took on the role of CEO of Vyera on an

22   interim basis, correct?

23   A.  Could you please state the date again.

24   Q.  Sure.  Around November of 2017, you became the interim CEO

25   of Vyera, correct?

 1    A.   That sounds accurate, yes.

 2    Q.   And you moved for the board to appoint you as interim CEO,

 3    correct?

 4    A.   I'm not positive.  I am not sure if I could move to appoint

 5    myself as CEO, but I have no reason to believe that I couldn't,

 6    besides logistics.

 7    Q.   Do you recall whether you did that, sir, or not?

 8    A.   No.

 9    Q.   You don't recall?

10    A.   No.  Not as I stand here today or sit here today.

11    Q.   Do you think it would refresh your recollection, sir, if we

12    looked at the meeting minutes at which you were made interim

13    CEO?

14    A.   Yes.

15              MR. WEINGARTEN:  Ms. Flint, could you please put up

16    Government Exhibit 1153.  If you could please turn to page 005.

17    This is not yet in evidence, so I am just going to ask you to

18    look at the very bottom paragraph, please.

19              If you could please blow that up, Ms. Flint.

20    Q.   Take a look, sir, please, at the last sentence starting

21    with he.  Do you see that?

22    A.   Yes.

23    Q.   Does that refresh your recollection, sir, that you moved

24    the board of directors to appoint you as interim CEO of Vyera

25    Pharmaceuticals?

1  A.  I have no reason to believe not to.  It says he, which I

2  don't know if the pronoun is Kevin or Akeel.  I have no reason

3  to believe it wouldn't be me, and I have no reason to debate

4  it.

5  Q.  It was either you or Mr. Mithani who moved to have you

6  appointed as interim CEO of Vyera?

7  A.  Yes.  My only apprehension is, I am not sure if I'm allowed

8  to motion myself into a position.

9  Q.  At that meeting, after the motion was made to have you

10  appointed as interim CEO, some of the board members expressed

11  concerns about that appointment, correct?

12  A.  I found that out at a later date, yes.

13  Q.  And some of the board members expressed concerns that your

14  appointment would represent an excessive exercise of influence

15  by Mr. Shkreli at the company?

16          MR. POLLACK:  Objection, your Honor.  Hearsay.

17          THE COURT:  Objection is overruled.

18  A.  Please repeat that, Mr. Weingarten.

19  Q.  Sure.  Some of the board members expressed a concern that

20  your appointment as interim CEO of Vyera would represent an

21  excessive exercise of influence by Martin Shkreli on the

22  company, correct?

23  A.  I was not present for those conversations.

24  Q.  Did you later learn about those conversations?

25  A.  Through the minutes.

1    Q.  Those conversations are reflected in the minutes of the

2    company?

3    A.  That's my recollection, yes.

4            MR. WEINGARTEN:  Ms. Flint, let's go to GX-1153, the

5    first page, please:  Page 001.  Thank you.  If you could blow

6    up the top, the heading.

7    Q.  This is a copy of the minutes of the meeting of the Turing

8    board on September 27, 2017.  Is that right, sir?

9    A.  Yes.  That's what the document states.

10            MR. WEINGARTEN:  Your Honor, I move to admit

11    Government Exhibit 1153.

12            THE COURT:  It's received.

13            (Government Exhibit 1153 received in evidence)

14            MR. WEINGARTEN:  Thank you, your Honor.

15    Q.  Let's look, sir, at the minutes that you just referred.

16            MR. WEINGARTEN:  Page 006, please, Ms. Flint.  It's

17    the second paragraph that starts with Edward Painter.  Thank

18    you.

19    Q.  According to the minutes, Edward Painter and Ron Tilles

20    voiced concerns that the appointment of Kevin P. Mulleady as

21    Vyera Pharmaceuticals LLC's interim CEO may impose substantial

22    risks on the company.  That's reflected in the minutes, right,

23    sir?

24    A.  Yes.

25    Q.  The next sentence in the minutes is:  This would

1   particularly be the case if insurers, authorities, banks and

2   other involved parties would regard said appointment as an

3   excessive exercise of influence by Martin Shkreli on the

4   company.

5           That's also reflected in the official minutes of the

6   company, right?

7   A.  Yes.

8           MR. WEINGARTEN:  You can take that down, Ms. Flint.

9   Q.  Despite the concerns that we just looked at in the minutes,

10  the board did eventually appoint you as CEO of Vyera, correct?

11  A.  Yes.

12  Q.  In November of 2017, the board elected you as chairman of

13  the board of directors, correct?

14  A.  Could you please state the date again.  Excuse me.

15  Q.  In November of 2017, the board elected you as chairman of

16  Vyera's board of directors?

17  A.  That sounds accurate.

18  Q.  In January of 2018, the board named you as permanent CEO of

19  Vyera?

20  A.  I am not sure.  I believe there was an interim period.

21  Q.  Right.  So you were appointed as interim CEO in 2017 and in

22  January 2018 you were named permanent CEO, correct?

23  A.  OK.  That sounds accurate.  Thank you for the clarity.

24  Q.  Your testimony on direct was that you served as Vyera's CEO

25  through February of 2019, correct?

 1   A.  Yes.  That sounds accurate.

 2   Q.  Your testimony on direct was, at that point you left the

 3   role of CEO, right?

 4   A.  Yes.

 5   Q.  And you testified that the board subsequently voted to

 6   terminate you as CEO after you left your role, right?

 7   A.  Yes.

 8   Q.  But the board terminated your appointment as of February

 9   2019, correct?

10   A.  I do not recall the specific date, but it was around that

11   time.

12   Q.  And the board terminated you for cause, correct?

13   A.  I believe that is a position they took, yes.

14   Q.  Part of that cause that the board cited related to disputes

15   between you and other board members about interactions with

16   Mr. Shkreli, correct?

17   A.  I believe that's accurate, yes.

18   Q.  Even though the board removed you as CEO in early 2019, you

19   stayed as chairman of the board until November 2020, correct?

20   A.  That sounds accurate, yes.

21   Q.  During that time period in 2019 and 2020, while you were

22   still chairman, you talked with other board members and

23   executives about Mr. Shkreli's influence on Vyera, correct?

24           MR. POLLACK:  Objection.  Hearsay.

25           THE COURT:  Overruled.

```
 1   Q.  You may answer, sir.

 2   A.  Yes.  That would be accurate.

 3   Q.  Let's look at an example.

 4           MR. WEINGARTEN:  Ms. Flint, can you please put on the

 5   screen GX-1256.  This is already admitted into evidence as part

 6   of Government Exhibit 9005.

 7           Let's start with the top e-mail, please, Ms. Flint.

 8   Q.  This is an e-mail from Averill Powers, correct?

 9   A.  Yes.

10   Q.  It's dated May 29, 2019, correct?

11   A.  Yes.

12   Q.  What was Mr. Powers' role at the company in May of 2019?

13   A.  May of 2019.  Excuse me as I go through the timeline in my

14   head.  I believe he was CEO at that point.

15   Q.  In May of 2019, you were still chairman of the board?

16   A.  Yes.

17   Q.  And the e-mail includes you, Mr. Jordan Walker, and

18   Mr. Mithani, correct?

19   A.  Yes.

20   Q.  Was Mr. Walker on the board of directors at that time?

21   A.  Yes.

22   Q.  Was Mr. Mithani on the board at that time?

23   A.  Yes.

24   Q.  Mr. Powers writes:  See my comments below.

25           The subject is about an annual general meeting of
```

```
 1  Phoenixus AG, correct?

 2  A.  Yes.

 3          MR. WEINGARTEN:  Ms. Flint, could you please turn to

 4  page 004 of this document.

 5  Q.  You'll see the bottom e-mail it says on May 17, 2019,

 6  Phoenixus AG investor relations wrote to the shareholders of

 7  Phoenixus AG and there is a letter.  Do you see that, sir?

 8  A.  Yes.

 9  Q.  If you look at the third paragraph up from the bottom it

10  says:  In addition to these accomplishments, the new management

11  team has proposed to expand the size of the board from three

12  directors to five.  Do you see that, sir?

13  A.  Yes.

14  Q.  In 2019, management proposed expanding Phoenixus' board,

15  right?

16  A.  Yes.  It looks that way.

17          MR. WEINGARTEN:  Let's go up to the next e-mail from

18  Mr. Craig Rothenberg.  If you look up, it says external e-mail

19  right below that.  Excellent.

20  Q.  Mr. Craig Rothenberg responded to the investor relations

21  e-mail and said:  I believe you should disclose to shareholders

22  what, if any, prior relationships either of the two newly

23  proposed board members have had with Martin Shkreli.  Do you

24  see that?

25  A.  Yes.
```

 1   Q.  Do you recall what role Mr. Rothenberg had, if any, with

 2   respect to Vyera?

 3   A.  I believe his title was chief communications officer.

 4   Q.  Was he also a shareholder?

 5   A.  I believe a small one.

 6   Q.  And in response to Mr. Rothenberg's note asking about the

 7   relationship of new board members, proposed new board members

 8   to Mr. Shkreli, you and Mr. Powers and Mr. Mithani and

 9   Mr. Jordan had a discussion.  Do you remember that?

10   A.  Yes.  This is recalling my memory.

11          MR. WEINGARTEN:  Ms. Flint, could you go to page 001.

12   Q.  The e-mail that says from Kevin Mulleady.  Do you see that?

13   A.  Yes.

14   Q.  You contributed your thoughts to this discussion.  Do you

15   remember that, sir?

16          MR. WEINGARTEN:  You can take it, Ms. Flint, from the

17   heading all the way down to the first bullet point, please.

18   From Kevin Mulleady all the way through the first bullet.

19   Q.  You see that e-mail from you, sir?

20   A.  It seems as if from the different fonts that it's an edit

21   of a previous e-mail and comments put in, so I think it would

22   be a hybrid of multiple parties.

23   Q.  Exactly.  You wrote originally some bullets.  And then

24   Mr. Powers in the e-mail above said:  Please see my comments.

25   Do you remember that, sir?

```
1              MR. WEINGARTEN:  Ms. Flint, we can go to the e-mail
2    above.  Very top even.
3    Q.  You see where Mr. Powers wrote:  See my comments?
4    A.  Yes.
5    Q.  It looks like he wrote his comments directly into the
6    bullets that you had circulated?
7    A.  Seems that way, yes.
8    Q.  Let's try it this way.
9              MR. WEINGARTEN:  Ms. Flint, I'm sorry to do this to
10   you, but could you try GX-1692, please.
11   Q.  Does this refresh your recollection, sir, that you drafted
12   the e-mail with bullets to Mr. Walker, Mr. Powers, and
13   Mr. Mithani?
14   A.  I do not recall this e-mail specifically, but I have no
15   reason to challenge its authenticity.
16             MR. WEINGARTEN:  Your Honor, move to admit Government
17   Exhibit 1692 into evidence, please.
18             THE COURT:  Received.
19             (Government Exhibit 1692 received in evidence)
20   Q.  I just want to focus on your first bullet, sir, and then we
21   will come back to Mr. Powers' comments.  Your first bullet is:
22   I almost would rather not bring attention to Martin.  He is a
23   shareholder, just like everyone else.
24             Do you see that you wrote that to these gentlemen?
25   A.  Yes.
```

1          MR. WEINGARTEN:  Ms. Flint, let's go back to 1526,

2    please.  Let's go to that first bullet, please.

3    Q.  The beginning there where it says:  I almost would rather

4    not bring attention to Martin.  Those are your words, right?

5    A.  Seems that way, yes.

6    Q.  Then Mr. Powers comments are:  I completely agree.  We do

7    not want to bring undue attention to Martin.  However, he is

8    the founder of the company and its largest shareholder and a

9    former CEO and chairman of the board.  As the WSJ and other

10   articles recently make clear, no one else is more publicly

11   associated with the company.

12          Do you see that next part.  It says:  He is a

13   shareholder, just like everyone else.  Those are your words,

14   right, sir?

15   A.  It seems that way from the difference of boldness, I

16   suppose, for lack of a better word.

17   Q.  From the e-mail we just looked at before, number 1692?

18   A.  Yes.

19   Q.  Mr. Powers writes in response to your comment that

20   Mr. Shkreli is a shareholder, just like everyone else,

21   Mr. Powers writes:  He is most certainly not just another

22   shareholder.  No other shareholder has helped create the

23   company as he has, and no other shareholders or group of

24   shareholders' reputation affect the company in the way he does.

25   No other shareholder has wrestled the board away from prior

 1  management successfully.

 2          Mr. Powers' response to you, sir, was that no other

 3  shareholder besides Mr. Shkreli had wrestled the board away

 4  from management successfully, correct?

 5  A.  That is correct.  That was Mr. Averill's response according

 6  to this document.

 7  Q.  Do you understand that wrestling the board away

 8  successfully is a reference to the June 2017 election of

 9  Mr. Shkreli's slate of directors?

10  A.  I can't speak for Mr. Averill's comments, Mr. Powers'

11  comments.

12  Q.  Are you aware of any other election at which a shareholder

13  defeated management's proposed slate of directors?  Withdrawn.

14          Let's talk about your interactions with Mr. Shkreli

15  while you were on the board with Phoenixus/Vyera.

16          Mr. Shkreli is currently incarcerated, correct?

17  A.  To my knowledge, yes.

18  Q.  You communicated with Mr. Shkreli during the period of his

19  incarceration, correct?

20  A.  Yes.

21  Q.  You've spoken on the phone with him on several occasions

22  while he has been in prison?

23  A.  Yes.

24  Q.  Is it correct, sir, that over the course of 2020, you

25  became more uncomfortable with the amount of time you were

1    spending talking to Mr. Shkreli?

2    A.   I became more uncomfortable.  I don't know if I would

3    posture it as the catalyst being time spent.

4    Q.   Were you more uncomfortable talking to Mr. Shkreli because

5    he wanted to talk more and more about Vyera?

6    A.   I didn't take issue to talking about Vyera.  I took issue

7    to becoming more involved in the day-to-day management of

8    Vyera.

9            MR. WEINGARTEN:  Ms. Flint, could you please turn to

10   page 11 of Mr. Mulleady's deposition transcript.  It's lines 5

11   through 18 on page 11:

12   "Q.   And why did your conversations become more sporadic over

13   the course of 2020?

14   "A.   I feel like I was being less receptive.  I was

15   uncomfortable with the amount of times we were talking and the

16   topic of conversation.

17   "Q.   And what about the topic of conversation over the course

18   of 2020 with Mr. Shkreli made you uncomfortable?

19   "A.   He wanted to talk more and more about the company.

20   "Q.   And when you say the company, to what are you referring,

21   sir?

22   "A.   Excuse me.  Phoenixus."

23   Q.   Was that your testimony at your deposition, sir?

24   A.   It looks like it, yes.

25            (Continued on next page)

1  BY MR. WEINGARTEN:

2  Q.  And that was truthful and accurate when you gave it?

3  A.  Yes.

4          MR. WEINGARTEN:  You can take that down, please,

5  Ms. Flint.

6  Q.  For example, in 2020, Mr. Shkreli asked you to send him

7  some resumes for some candidates to become Vyera's CEO,

8  correct?

9  A.  Yes, that is my recollection.

10  Q.  And Mr. Shkreli had actually been talking to you about

11  reviewing candidates to be CEO since 2019, right?

12  A.  I am not sure specifically when the conversations

13  originated.

14  Q.  Do you think it would refresh your recollection, sir, if we

15  looked at your deposition testimony on this topic?

16  A.  Yes.

17          MR. WEINGARTEN:  Let's take a look, please, Ms. Flint,

18  at page 13 of the deposition, line 18, through page 14, line 5.

19  13/18 to 14/5, please.

20  Q.  Read this to yourself, please, sir, and let me know when

21  you have had a chance to read it.

22  A.  In its entirety, 18 to 05?

23  Q.  Yes, please.

24  A.  Yes, I read it.

25          MR. WEINGARTEN:  You can take that down, Ms. Flint.

1   Q.  Does that refresh your recollection, sir, that your

2   conversations with Mr. Shkreli about new candidates to be CEO

3   started in 2019?

4   A.  I believe my statement was I wasn't sure of the exact date,

5   and I think that that deposition states that I wasn't sure of

6   the exact date.  I don't know if I have recollection of the

7   conversations, respectfully.

8   Q.  Let's take a look, sir, at the testimony again.

9          MR. WEINGARTEN:  Ms. Flint, 13/18 to 5.

10  Q.  Question:

11  "Q.  When were these conversations happening with Mr. Shkreli

12  about him wanting to review candidates to be the CEO of

13  Phoenixus?

14  "A.  Conversations with Mr. Shkreli regarding candidates, I

15  would think, would date back to almost the early stages of

16  Averill Powers' tenure.

17  "Q.  Can you put a year to that, or a month and a year?

18  "A.  I do not know the exact date, but I believe he became

19  permanent CEO in March/April 2019."

20         That testimony was truthful and accurate when you gave

21  it?

22  A.  Yes.

23         MR. WEINGARTEN:  You can take that down, please,

24  Ms. Flint.

25  Q.  So, Mr. Shkreli was talking to you, through 2019 and into

1   2020, about candidates to replace Mr. Powers as CEO, correct?

2   A.  Yes, I think that's a fair statement, amongst other things.

3          MR. WEINGARTEN:  Let's take a look, please, at,

4   Ms. Flint, Government Exhibit 1374.  Let's look at some more

5   communications on this topic.  This is already admitted into

6   evidence as part of Government Exhibit 9001.  Let's just look

7   at the very top heading, please, for a second.

8   Q.  This is an email from Mr. Shkreli to you, correct?

9   A.  It looks that way, yes.

10  Q.  And it's dated February 22nd, 2020?

11  A.  Yes.

12         MR. WEINGARTEN:  You can zoom back out to the full

13  document.

14  Q.  This is an email chain between you and Mr. Shkreli while

15  he's incarcerated, correct?

16  A.  It seems that way, yes.

17         MR. WEINGARTEN:  At the very, very bottom, Ms. Flint,

18  there's one little heading there, it says, "Mulleady, Kevin."

19  The email continues on to the next page.  Yes.

20  Q.  Do you see, at the very bottom there, sir, it says,

21  "Mulleady, Kevin, on 2/21/2020, 1:06 a.m. wrote."

22         Do you see that?

23  A.  Yes.

24  Q.  And that indicates what follows is a message that you wrote

25  to Mr. Shkreli, right?

1    A.  May I read it?

2    Q.  Of course.

3         (Pause)

4    A.  The question was for me to indicate this?

5    Q.  I'm asking or confirming, yes, this is an email that you

6    wrote to Mr. Shkreli during his incarceration, correct?

7    A.  It seems that way, yes.

8    Q.  And the last two sentences of your email are, first, you

9    said to Mr. Shkreli, "My opinion would be to call an EGM to

10   replace AP with DM immediately."

11        Do you see that?

12   A.  I do see that, yes.

13   Q.  And an EGM, again, is a shareholder meeting, right?

14   A.  An extraordinary general shareholder meeting, yes.

15   Q.  And "AP" refers to Averill Powers?

16   A.  I think that would be a fair assumption.  I've used that

17   abbreviation before to reflect Mr. Powers.

18   Q.  So you're telling Mr. Shkreli, during his incarceration,

19   that it's your opinion that there should be an extraordinary

20   general meeting to replace Mr. Powers, right?

21   A.  It seems that way, but it's a bit confusing.  I don't

22   recall this exact message, and I don't know who "DM" is.

23        MR. WEINGARTEN:  You can take that down, please,

24   Ms. Flint.

25   Q.  Now, Mr. Shkreli had made it clear to you over time that

 1  his ownership of the company meant he could fire anybody at

 2  Vyera that he wanted to, right?

 3  A.  I think that might be broadly overarching.

 4          MR. WEINGARTEN:  Let's take a look, please, Ms. Flint

 5  at Government Exhibit 3277.  This has already been admitted as

 6  part of Government Exhibit 9001.

 7  Q.  This is a transcript, sir, of a call made on March 12,

 8  2020.

 9          MR. WEINGARTEN:  Ms. Flint, could you go to the first

10  page, or page 002, please.  Let's just look at page 4.  If you

11  could blow up all of page 4 for Mr. Mulleady.

12  Q.  This is a transcript of a call between you and Mr. Shkreli

13  during his incarceration.  Okay?

14          Do you see where it says:

15          "Martin Shkreli:  Hello.

16          "Kevin Mulleady:  Hey"?

17  A.  Yes.

18          MR. WEINGARTEN:  Let's take a look, please, Ms. Flint,

19  at page 003 — that's pages 5 through 8 of the transcript — and

20  I want to look, in particular, at page 7 of the transcript.

21  Q.  I want to look at that first full paragraph, sir.  That's

22  Mr. Shkreli saying:  "The point is, you know, the company's not

23  prepared, and I'm ready to hold Averill accountable, Akeel

24  accountable, and you accountable if you don't get done -- if

25  something doesn't get done.  And, you know, I -- I think it's

1  fair."

2          Do you remember Mr. Shkreli telling you he would hold

3  you, Mr. Powers, and Mr. Mithani accountable if something

4  didn't get done?

5  A.  I don't remember this specific instance, but he had alluded

6  to comments like that.

7  Q.  Mr. Shkreli continues:  "You know, I mean, ultimately, you

8  know, Averill's supposed to be there because he's some, you

9  know, respectable guy with a suit and tie that everyone can

10  trust, but, clearly, you know, he's not doing his job, you

11  know, getting the broker account open or finding some other

12  solution, creative solution, by investing in a fund or doing

13  something like that.  He hasn't done anything."

14          Do you remember Mr. Shkreli expressing frustration to

15  you about Mr. Powers not getting things done?

16  A.  Similar answer — not the specific conversation, but he

17  definitely had expressed that.

18  Q.  And Mr. Shkreli is saying that Mr. Powers is there because

19  he's a respectable guy with a suit and tie.  "There" refers to

20  being at Vyera?

21  A.  I can't comment on Mr. Shkreli's statement.

22          MR. WEINGARTEN:  Let's look at the bottom there,

23  Ms. Flint.  It's the Martin Shkreli, on page 7 of the

24  transcript, line 22, to page 8, line 4.  Thank you very much.

25  Perfect.

1    Q.  Mr. Shkreli continues:  "So at the end of the day, he's

2    focused on trading his portfolio probably more than he is on

3    trading, you know, our portfolio.  So I'm ready.  You know, I

4    have EGM power."

5              Do you understand "EGM power" to mean the power to

6    call an extraordinary general meeting of the shareholders of

7    Vyera?

8    A.  I can't specifically say what Martin was trying to express

9    there, but I think that would be a fair assumption.

10   Q.  And then Mr. Shkreli writes -- or said, rather, "I mean, I

11   have no problem firing everybody, to be frank, if you guys

12   can't figure it out.  And, again, I'm -- take the context, I'm

13   not threatening anything, right?  Take the context correctly,

14   but you can use that context to light a fire --"

15             And, Ms. Flint, I'm sorry, can you please keep going

16   down the transcript there on page 8.?  That's good.  Thank you.

17   Q.  And you responded:  "I understand."

18             And Mr. Shkreli finished his thought:  "Light a fire

19   under people's asses, you know what I mean, by saying"--

20             And then you say:  "Mm-hmm."

21             -- "listen, Martin read me the riot act, and he's

22   ready to fire me, and I'm worried, right?"

23             Do you see that, sir?

24   A.  Yes.

25   Q.  So, on occasion, Mr. Shkreli would threaten to use his

1    power to fire you or Mr. Mithani or Mr. Powers?

2    A.  Yes.

3    Q.  Let's take a look at a different conversation that you had

4    with Mr. Shkreli six months later.

5         MR. WEINGARTEN:  Ms. Flint, you can take that down,

6    please, and please put Government Exhibit 3284 on the screen.

7    Q.  Government Exhibit 3284 is already admitted into evidence

8    as part of Government Exhibit 9001.  This is, sir, a

9    September 17, 2020 call, and it's a transcript of that call.

10        MR. WEINGARTEN:  Let's look at page 002, please,

11   Ms. Flint.  And if you would just zoom in on page 4, please.

12   Q.  Do you see the call that starts, "Kevin Mulleady, hello"?

13   Do you see that?

14   A.  Yes.

15   Q.  And it tells you that you're getting a call from Martin

16   Shkreli, an inmate at a federal prison.  Do you see that?

17   A.  Yes.

18   Q.  It tells you the call is being recorded?

19   A.  Yes.

20        MR. WEINGARTEN:  Let's just take a look, please,

21   Ms. Flint, at page 005.  It's page 15 and 16 of the transcript.

22   Q.  Do you see where it says, "One, look," page -- line 21 of

23   page 15?

24        MR. WEINGARTEN:  That's goods right there.  Thank you.

25   Q.  That's Mr. Shkreli talking, and he says, "One, look, we

1    have a cap.  Being on the board of Phoenixus means, you know,

2    you're on the Martin and Kevin board.  Between the two of us,

3    we control more than 50 percent, so that's the first thing you

4    need to know off the rip."

5           That's correct, sir, isn't it, that between you and

6    Mr. Shkreli, you control more than 50 percent of the voting

7    power of Vyera at that time?

8    A.  I don't know if we ever exceeded 50 percent.

9    Q.  That's what Mr. Shkreli is saying, though, correct?

10   A.  It seems that way from this documentation, yes.

11   Q.  And Mr. Shkreli continues, he says:  "The second thing you

12   need to" --

13          And you interrupt and say:  "Yeah.  And I told him

14   just to be" --

15          Mr. Shkreli says:  "You have to be okay with that."

16          And then you speak:  "Inaudible.  I'm not going to --

17   you know, I've worked with Martin -- listen, any partnership

18   has ups and downs.  I've worked with him for ten years and have

19   been -- I never screwed him, and I never intend to.  So I just

20   want to make sure that's not going to happen."

21          Do you see that, sir?

22   A.  Yes.

23   Q.  Those are your words to Mr. Shkreli?

24   A.  That's what the transcript states, yes.

25   Q.  And Mr. Shkreli responds:  "Yeah."

1          MR. WEINGARTEN:  And then, Ms. Flint, can you zoom

2    out, please.

3          Can you go, please, to the next page of the document,

4    006.  And if you would go to page 17, lines 1 through 8, of the

5    transcript.

6    Q.  Mr. Shkreli says:  "And then, two -- but, you know, that's

7    just the first -- like the first thing is -- it's like

8    Facebook.  You can't go in there and tell Zuckerberg what to

9    do.  It's just" --

10          And then you say:  "Right."

11          Mr. Shkreli responds -- or continues, rather:  "You

12    know, can you give him advice?  Can you -- you know, it's just,

13    he just happens to own the thing, and that's the way it is."

14          So Mr. Shkreli is there, is he comparing -- strike

15    that.

16          He's talking about Mr. Zuckerberg just owning

17    Facebook, and that's the way it is?

18          MR. POLLACK:  Objection, your Honor.  That's gone on

19    for a number of questions.  I fail to see the relevance of this

20    line of questioning.  It has nothing to do with the challenged

21    conduct of the case.

22          THE COURT:  Actually, it has a great deal to do with

23    Mr. Shkreli's control during the period of time of the company.

24          Can you answer the question, sir?

25          THE WITNESS:  I can if Mr. Weingarten would be so kind

```
 1   as to restate it, your Honor.

 2             MR. WEINGARTEN:  Sure.  I'm happy to.

 3   BY MR. WEINGARTEN:

 4   Q.  Mr. Shkreli is comparing himself to Mark Zuckerberg in this

 5   passage, correct?

 6   A.  It seems that way, yes.

 7   Q.  And he's saying about Mr. Zuckerberg, he just happens to

 8   own the thing, and that's the way it is?

 9   A.  Yes.

10   Q.  Just like Mr. Shkreli owns Vyera, and that's the way it is?

11   A.  As I've written here, or are you asking me to make that

12   comparison?

13   Q.  I'm asking you, sir, is that your understanding of

14   Mr. Shkreli's statement?

15   A.  I can't say specifically what Mr. Shkreli was alluding to,

16   but I would like to say this was when I was chairman, and this

17   was about a month before I brought to the board's attention

18   that I had some issues with this.

19   Q.  And let's talk about that, okay, your departure from --

20             THE COURT:  We're going to break for lunch.  I'll see

21   everyone at 2:00 o'clock.  Thanks.

22             (Luncheon recess)

23

24

25
```

1                        AFTERNOON SESSION

2                           2:00 P.M.

3            (Trial resumed; in open court)

4            THE COURT:  Mr. Mulleady should take the stand.  Thank

5   you.

6            Thanks so much.

7            Counsel.

8            MR. WEINGARTEN:  Thank you, your Honor.

9    KEVIN MULLEADY, resumed.

10  DIRECT EXAMINATION CONTINUED

11  BY MR. WEINGARTEN:

12  Q.  Mr. Mulleady, before the break, you noted that you brought

13  some of your concerns about Mr. Shkreli to the attention of the

14  Vyera board.

15           Do you remember that?

16  A.  Yes.

17  Q.  Let's talk a little bit more about what happened when you

18  raised those concerns.

19           Now, there was a board meeting scheduled for November

20  of 2020, correct?

21  A.  Yes, that sounds accurate.

22  Q.  And prior to that meeting, you circulated an agenda for the

23  meeting, right?

24  A.  Yes.

25  Q.  And you were, at that time, still the chair of the Vyera

1    board, right?

2    A.   Yes.

3    Q.   One of the items that you put on the agenda was

4    Mr. Shkreli's continued involvement with Vyera, right?

5    A.   It sounds accurate, yes.

6    Q.   And specifically, you called the board meeting to discuss

7    Mr. Shkreli's ownership and involvement with Vyera, right?

8    A.   Yes, amongst other agenda items.

9    Q.   And you added that agenda item, about Mr. Shkreli, because

10   you had concerns about Mr. Shkreli's involvement with the

11   board?

12   A.   Yes.  And the company, I believe, as a whole.

13   Q.   And you asked the board to keep that agenda item

14   confidential from Mr. Shkreli; is that right?

15   A.   Yes.

16   Q.   And you did that because you were worried that if board

17   members informed Mr. Shkreli, he would see that item that you

18   were raising as a threat, and he would try to influence the

19   board to stop your meeting, right?

20   A.   Amongst other things.  I wanted to make sure that the board

21   members did not violate their duty of confidentiality.

22   Q.   But you were concerned that if the information got to

23   Mr. Shkreli, that you were raising this item, he might try to

24   influence the board to stop the meeting, right?

25   A.   I think that's fair, yes.

1  Q.  So at the board meeting, you didn't get a chance to raise

2  any of the items on your agenda, correct?

3  A.  That is correct.

4  Q.  You didn't get a chance to raise the item that you had put

5  on there about Mr. Shkreli, correct?

6  A.  Yes.

7  Q.  And, in fact, before you could discuss any business at all,

8  another board member called for a vote to remove you as

9  chairman of the board, right?

10  A.  Correct.

11  Q.  And the board then immediately voted and did, in fact,

12  remove you as chairman, right?

13  A.  Yes.

14  Q.  And at that same meeting, you also learned that Mr. Shkreli

15  had called for another EGM, right?

16  A.  Yes.

17  Q.  And the purpose of that EGM was to vote on removing you and

18  another board member from the Vyera board entirely, correct?

19  A.  And reinstating another board member who resigned a week

20  prior.

21  Q.  Did the EGM to remove you from the board that Mr. Shkreli

22  had called take place?

23  A.  Yes.

24  Q.  And the result of that EGM was that you were removed from

25  the board, right?

1   A.  All of Mr. Shkreli's proposals were accepted and approved.

2   Q.  Including removing you from the board?

3   A.  Yes.

4   Q.  And including removing Mr. Thomas from the board?

5   A.  Yes.

6   Q.  And Mr. Thomas had supported you remaining as chair of

7   Vyera, correct?

8   A.  Yes.

9   Q.  And so when you raised concerns to the board about

10  Mr. Shkreli's involvement, Mr. Shkreli arranged for you to be

11  voted off the board, right?

12  A.  Could you please say that again, Mr. Weingarten?

13  Q.  Sure.

14          After you raised concerns about Mr. Shkreli's

15  involvement with the board and Vyera, Mr. Shkreli called a

16  meeting at which you were voted off the board, right?

17  A.  Yes, he called the extraordinary general meeting.

18  Q.  And you were voted off the board at that meeting?

19  A.  Yes.

20  Q.  Let's turn, sir, if we could, to a different topic.

21          Now, you understand that if a generic company cannot

22  acquire Daraprim referenced listed drug, they cannot develop

23  and got approval of a generic Daraprim product?

24  A.  There is some exclusions to that, but, to my understanding,

25  Daraprim does not -- has not been able to have those

1    exclusions, so I believe they do need the bottles to run

2    bioequivalence.

3    Q.  So it's your understanding that a generic company needs

4    Daraprim referenced listed drug to do its bioequivalence

5    studies for Daraprim, right?

6    A.  Yes.

7    Q.  And without the required bioequivalence studies, a generic

8    product can't get FDA approval, right?

9    A.  To the best of my knowledge, yes.

10   Q.  And if we use the acronym RLD, would you understand that to

11   mean reference listed drug?

12   A.  Yes, sir.

13   Q.  And you also understand that if a generic company doesn't

14   have a source for the active pharmaceutical ingredient

15   pyrimethamine, then they wouldn't be able to come to market

16   with a generic pyrimethamine product, right?

17   A.  Yes, that would be a necessity for the development of the

18   drug.

19         MR. WEINGARTEN:  Ms. Flint, could you please put

20   Government Exhibit 1127 on the screen.

21         Your Honor, this is already admitted in evidence as

22   part of Government Exhibit 9005.

23         Can you show us the top heading, please, Ms. Flint?

24   Zoom in.  Thank you.

25   Q.  Now, Government Exhibit 1127 is an email from you to an

1    email address called staff sales force.

2          Do you see that, sir?

3    A.  Yes.

4    Q.  And "To:  Staff Sales Force," that means it's going to the

5    Vyera sales force?

6    A.  Yes, I would say so, and maybe a few other individuals, but

7    that's the purpose.

8    Q.  And you sent this email on June 27, 2017, right?

9    A.  That's what the document states, correct.

10   Q.  Shortly after you had rejoined the board of Vyera, right?

11   A.  Yes.

12         MR. WEINGARTEN:  Ms. Flint, could you please zoom in

13   on the first paragraph after, "I hope you are well."

14   Q.  So you wrote to the sales force, "As you know, today the

15   FDA released a publication announcing that they could

16   immediately accept an ANDA (abbreviated new drug application)

17   for some drugs and specifically mentioned pyrimethamine

18   (Daraprim's active ingredient)."

19         Do you see that?

20   A.  Yes.

21   Q.  So the FDA communicating that they would immediately accept

22   an ANDA for pyrimethamine prompted you to write an email to the

23   sales force, right?

24   A.  The FDA -- the sales force's response to that FDA statement

25   prompted me to write a message to the sales force.

 1   Q.  I see.

 2          And the sales force had concerns about -- it was your

 3   understanding that the sales force had concerns about that FDA

 4   announcement?

 5   A.  Yes, sir.

 6          MR. WEINGARTEN:  Let's look at the third paragraph,

 7   please, Ms. Flint, that starts, "in my opinion."

 8   Q.  Did you write this email to assuage, or at least try to

 9   assuage, the concerns of the sales force?

10   A.  I don't use "assuage" in my daily vocabulary.  Could you

11   use a different word or define --

12   Q.  Sure.

13          Did you write this email to try and reassure the sales

14   force?

15   A.  Yes.

16   Q.  And you wrote to the sales force, "In my opinion, this not

17   an immediate concern."

18          I assume you meant this is not an immediate concern?

19   A.  Yes.

20   Q.  Okay.

21          "Getting to the point of filing an ANDA is a

22   cumbersome process.  Personally, I can tell you the FDA

23   approval is generally not the main barrier to entry for

24   generics in our class.  Amongst other necessities, a company

25   would have to successfully create the active ingredient on

1  scale using a well-controlled process and then formulate."

2         Is that a reference, "active ingredient," to active

3  pharmaceutical ingredient, sir?

4  A.  That would be a fair assumption, yes.

5  Q.  Then you continued:  "Next, they would have to obtain RLD

6  (registered listed drug), ten labeled and unexpired bottles

7  (informed estimation), of Daraprim to complete a study in

8  healthy volunteers to demonstrate bioequivalence."

9         Now, your estimation there, that you said is

10 informed -- do you see that?

11 A.  Yes.

12 Q.  And that was informed based on knowledge that you had

13 because Vyera also had a generics business, right?

14 A.  Amongst other information sources.

15 Q.  So you were writing to the sales force to reassure them

16 that it takes at least two necessities to be able to file an

17 ANDA, right?

18 A.  Yes.

19        MR. WEINGARTEN:  Ms. Flint, can you take that down and

20 zoom out, please?

21        Let's go back to the main document.  Can you go to the

22 next paragraph, please, that starts, "getting to the front of

23 the line."

24 Q.  You wrote, "Getting to the front of the line is helpful,

25 but getting to the line is not an easy task.  I can't imagine

1    ANDA submission preparation taking less than 18 months

2    (extremely conservative).  Since Turing actively collects

3    competitive intelligence concerning other potential developers,

4    we would most likely be aware of this process going on and have

5    plenty of time to prepare."

6         Do you see that?

7    A.  Yes.

8    Q.  And you're telling the sales force that Turing collects --

9    actively collects competitive intelligence about potential

10   developers of a generic Daraprim product, right?

11   A.  That is what the document states, yes.

12        MR. WEINGARTEN:  You can take that down, please,

13   Ms. Flint.

14   Q.  Now, in your direct exam, or your direct testimony, you

15   testified that while you were a Vyera employee at the time

16   Vyera acquired Daraprim, you were "not involved with or

17   responsible for" — now I'm going to paraphrase — the company's

18   decision to keep it in specialty distribution.

19        Do you remember that was your testimony?

20   A.  I don't remember that specific line, but that is an

21   accurate statement.

22   Q.  And Vyera acquired Daraprim in August of 2015; is that

23   right?

24   A.  That sounds accurate, yes.

25   Q.  And in June 2015, you were the project manager for Vyera's

1    work getting its specialty distribution agreements in place,

2    correct?

3    A.  No.

4           MR. WEINGARTEN:  Ms. Flint, let's introduce, please,

5    Government Exhibit 1218.

6    Q.  And if you could please look, sir, at the top email.  I

7    know you're not on it, but we'll get there.

8           MR. WEINGARTEN:  If you could please do the top

9    heading, Ms. Flint.

10   Q.  This email is from Walter Worsham to a Richard DeYoung, and

11   it copies Nancy Retzlaff, Howard Dorfman, and another person.

12          Do you see that?

13   A.  Yes.

14   Q.  The subject is "Re:  Boilerplate contracts — Accredo and

15   CuraScript Specialty Distribution."

16          Do you see that?

17   A.  Yes.

18   Q.  I know you're not on that, but if you could turn to

19   pages 002 through 004, you're on several of the other emails in

20   the chain.

21          Do you see at the bottom there on 002, sir, that one

22   is blocked out, but you're on that one, right?

23   A.  I do see that, yes.

24          MR. WEINGARTEN:  Let's go to 003, Ms. Flint.

25   Q.  And you're on all of the -- strike that.

 1              You're at the very bottom one from Mr. Osborne

 2    addressed to Kevin.  You're on that email, right?

 3    A.  I see that, yes.

 4              MR. WEINGARTEN:  Let's go to 004, please.

 5    Q.  Lets look at the email that starts -- it says, "From Kevin

 6    Mulleady."

 7              You're definitely on this one, right?

 8    A.  Yes.

 9              MR. WEINGARTEN:  Your Honor, we move to admit

10    Government Exhibit 1218 into evidence.

11              THE COURT:  Received.

12              (Government's Exhibit 1218 received in evidence)

13              MR. WEINGARTEN:  Ms. Flint, could you go to page 005.

14    BY MR. WEINGARTEN:

15    Q.  The first email that starts the chain, it's from June 1,

16    2015, and it's from Mr. Rob Osborne of Express Scripts.

17              Do you see that?

18    A.  Yes.

19    Q.  He writes at the top, "This will get us started.  Please

20    redline as you see fit and keep in mind these are boilerplate,"

21    and he's attached a number of things or referenced a number of

22    things.

23              Do you see that list?

24    A.  I do, yes.

25    Q.  One of the items is CuraScript Specialty Distribution

1    agreement?

2    A.  Yes.

3    Q.  And another item down there is the Accredo Specialty

4    Pharmacy agreement?

5    A.  Yes.

6    Q.  Let's see your response to Mr. Osborne.

7          MR. WEINGARTEN:  Ms. Flint, can you go back to

8    Page 004, please.  And you'll see at the bottom, it says on

9    June 1 -- exactly.

10   Q.  You respond to Mr. Osborne:  "Thank you, Rob.  I have

11   included our internal counsel."

12         "Howard, could you please take the contract lead and

13   turn this around as quick as humanly possible?  This is

14   currently the number one priority of Turing and exceptionally

15   time sensitive.  I will be the interim project manager."

16         Do you see that?

17   A.  Yes.

18   Q.  So you were addressing something to Howard.  Is that Howard

19   Dorfman you were talking about?

20   A.  I would assume so.  Howard Dorfman was the only Howard that

21   I recall that worked in the legal department.

22   Q.  So Mr. Dorfman was one of Vyera's in-house lawyers?

23   A.  Yes.  He was general counsel.

24   Q.  And you directed the general counsel to take the contract

25   lead and turn them around as quick as humanly possible?

 1  A.  That's what the document states, yes.

 2  Q.  And you described yourself on the chain as the interim

 3  project manager on this effort?

 4  A.  That's what the document states, yes.

 5  Q.  And then two sentences down, you say, "I have also cc'd

 6  Martin so that he can efficiently stay in the loop."

 7          Do you see that?

 8  A.  Yes.

 9  Q.  Okay.  That's a reference to Mr. Shkreli?

10  A.  I would assume so, yes.

11  Q.  So you took on the role of project manager with respect to

12  at least these two specialty agreements, right?

13  A.  That's what the document says, interim project manager,

14  but, to be clear, I did not really know much about it.  It was

15  new to the company and was trying to be a squeaky wheel.

16          MR. WEINGARTEN:  You can take that one down,

17  Ms. Flint.

18  Q.  I wanted to talk a little bit more about keeping

19  Mr. Shkreli in the loop for a second.

20  A.  Sure.

21          MR. WEINGARTEN:  Ms. Flint, could you put up

22  Government Exhibit 1349 on the screen, please.  It's produced

23  in native, but we have printed it, but can you go to page 002,

24  please, Ms. Flint.

25  Q.  Mr. Mulleady, is Government Exhibit 1349 a log of

1   communications that you either prepared or had prepared?

2   A.  It seems like it.  Without looking at it in its entirety,

3   it's definitely the format of a document I put together.

4   Q.  Is this a record you kept of your email communications with

5   Mr. Shkreli?

6   A.  Yes.  I just paused because I didn't know if it included

7   phone calls, but it seems predominantly emails.

8   Q.  It might have phone calls, too, but we can agree it's a

9   record of at least some of the communications you had with

10  Mr. Shkreli?

11  A.  Yes.

12  Q.  The first item starts on December 26, 2019, right?

13  A.  It looks that way.

14          MR. WEINGARTEN:  And if you go down, Ms. Flint, to

15  page 042.

16          MR. POLLACK:  Your Honor, objection to the foundation

17  of this document.

18          THE COURT:  Overruled.

19  BY MR. WEINGARTEN:

20  Q.  The last item --

21          MR. WEINGARTEN:  If you can go to 042, please,

22  Ms. Flint.

23  Q.  The last item, sir, row 1551, is a log of an item from

24  July 14, 2020.

25          Do you see that?

1    A.  Yes, I do.

2    Q.  So this document, Government Exhibit 1349, is a log that

3    you kept of some communications you had with Mr. Shkreli

4    between December 26, 2019, and July 14, 2020?

5    A.  It's inclusive of those dates, but I do see this goes to

6    page 50.  It might be a more expansive than that.

7    Q.  Okay.  So --

8            MR. POLLACK:  Your Honor, objection.  This document is

9    not in evidence.

10           MR. WEINGARTEN:  I'm about to move it in evidence,

11   your Honor.

12           I would like to move Government Exhibit 1349 into

13   evidence, please.

14           MR. POLLACK:  I object.  It's an improper summary

15   document.

16           THE COURT:  I think foundation has been laid, but you

17   may inquire.  Do you want a voir dire with respect to the

18   foundation?

19           MR. POLLACK:  I'm sorry, your Honor?

20           THE COURT:  Do you want to voir dire on the

21   foundation?  I think an adequate foundation has been laid, but

22   if you want to conduct a voir dire, you may.

23           MR. POLLACK:  No, thank you, your Honor.

24           THE COURT:  Received.

25           (Government's Exhibit 1349 received in evidence)

1    BY MR. WEINGARTEN:

2    Q.  So we'll move quickly from this one, but if you would look,

3    sir -- we can stay on the same page -- column H, there's a

4    column called "Action."

5            Do you see that?

6    A.  Yes.

7    Q.  And that's where you would make a note of whether the items

8    you discussed with Mr. Shkreli required follow-up or not,

9    right?

10   A.  Me or someone at my direction.

11   Q.  And so this document, for the period we just discussed,

12   from December 26, 2019, to July 14, 2020, has some 1,550 rows,

13   at least, of communications with Mr. Shkreli?

14   A.  It seems that way from looking at this page, yes.

15           MR. WEINGARTEN:  You can take that down, Ms. Flint.

16   Q.  So you kept Mr. Shkreli in the loop fairly extensively

17   during the period -- well, strike that.

18           You kept Mr. Shkreli in the loop fairly extensively,

19   correct?

20   A.  Are you asking that based on this documentation or --

21   Q.  Yes, sir.

22   A.  I don't know if that would be a fair assumption based upon

23   that.  That's him reaching out to me, and it talked about

24   various different topics.

25   Q.  Let's talk about some time after you became a member of the

1    executive committee.

2           Now, soon after you became part of that executive

3    committee with Mr. Mithani, you made inquiries at the company

4    about where every bottle of Daraprim had gone.

5           Do you remember that?

6    A.  I do, as I sit here today, after preparing for this trial.

7           MR. WEINGARTEN:  Let's take a look, please, Ms. Flint,

8    at Government Exhibit 1358.  This is already in evidence as

9    part of Government Exhibit 9005.

10   Q.  We'll zoom in on a part in a second, but this is an email

11   chain, if you can read it, sir, between you and Mr. Chris Lau.

12          Do you see that?

13   A.  Yes, sir.

14   Q.  The top email is dated September 14, 2017?

15   A.  Yes.

16   Q.  And that's during the period that you and Mr. Mithani

17   comprised the executive committee?

18   A.  It sounds accurate, yes.

19   Q.  And Mr. Lau was Vyera's manager of business analytics and

20   intelligence?

21   A.  I'm not positive of his exact title, but I have no reason

22   to dispute that.

23          MR. WEINGARTEN:  If we could go to the very bottom

24   email, Ms. Flint, and zoom in on the email.  Thank you.

25   Q.  This is an email you sent to Mr. Lau on September 8, 2017;

1    "Subject:  Audit."

2           You wrote to Mr. Lau, "We want to do a full out audit

3    of Daraprim.  Where would be a good place to start if we wanted

4    to know where every bottle of Daraprim we sold went to,

5    et cetera?  I want access to all our data.  Thanks," and then

6    you signed it.

7           You sent that message to Mr. Lau on September 8?

8    A.  That's what the document states, yes.

9    Q.  You sent a similar message to Ms. Kirby, correct?  Do you

10   remember that?

11   A.  As I sit here today, yes, I've seen that document.

12   Q.  You also asked Ms. Kirby to know where every bottle Vyera

13   ever had wound up, correct?

14   A.  I couldn't say verbatim, unless you'd like to put the

15   document in front of me, but it was something along those

16   lines.

17          MR. WEINGARTEN:  Let's look at Government

18   Exhibit 1354, please.  Let's start at the very bottom, the

19   message from Mr. Mulleady.  Thank you.

20   Q.  The next day from the email we just looked at,

21   September 9th, you wrote to Ms. Kirby, "Subject:  Daraprim

22   Audit."  You said something complimentary to her, and then you

23   said, "I'd really like to start working with you on

24   understanding our distribution.  A good beginning point would

25   be just knowing where every bottle we have ever sent out went."

```
 1            Do you see that, sir?
 2  A.  I do, yes.
 3            MR. WEINGARTEN:  And then, Ms. Flint, can you go to
 4  the very top of this document and give us that header, please.
 5  That's good.
 6  Q.  And Ms. Kirby responded, correct?
 7  A.  It seems that way, yes.
 8  Q.  And do you recall, sir, did she tell you that she wouldn't
 9  help you or she said she would help you?
10  A.  Would you like me -- is it based upon this email?
11  Q.  Do you recall, sir, how she responded?
12  A.  No, but I highly doubt a response would be that I'm not
13  going to help you.
14  Q.  And then let's just see here.  She says, "Hi Kevin!  It
15  would be great to talk through our distribution and get your
16  thoughts."
17            Do you see that?
18  A.  Yes.
19  Q.  And then she gives you a lot of additional detail?
20            Do you see that?
21  A.  I see more information, yes.
22            MR. WEINGARTEN:  And then, Ms. Flint, can we go to the
23  very top header of this email chain.
24  Q.  You sent that exchange with Ms. Kirby to Mr. Shkreli,
25  correct?
```

1   A.  It seems that way off this document.

2   Q.  And you don't remember why -- let me strike that.

3        Mr. Shkreli wasn't employed at Vyera in September of

4   2017, correct?

5   A.  No, I don't believe so.

6   Q.  And Mr. Shkreli wasn't on the board of Vyera in

7   September 2017, correct?

8   A.  No.

9   Q.  And you don't remember why you forwarded this email to

10  Mr. Shkreli, correct?

11  A.  No.  I think I recall a bit of why I forwarded it to him.

12  Q.  You do recall now?

13  A.  Is there something counter to that?

14  Q.  Sir, I'm just asking you the question:  Do you or do you

15  not recall why you forwarded this to Mr. Shkreli?

16  A.  I do recall.

17  Q.  I see.

18        And at your deposition, sir --

19        MR. WEINGARTEN:  If you could please turn, Ms. Flint,

20  to page 240, line 24, to 241, line 11.

21  Q.  And the question was asked:

22  "Q.  Okay.  And my question is why did you forward -- do you

23  remember why you forwarded this email exchange between you and

24  Ms. Kirby to Mr. Shkreli?

25  "A.  I do not remember why, but I can say that my primary goal

1    was to learn the business as much as possible so that I could

2    do the job for our stakeholders as the best as possible, and

3    Martin knew the business quite well, and I wouldn't be

4    surprised if I was curious to see if he could work -- if his

5    input could help me get up the learning curve faster."

6            Do you see that?

7    A.  Yes.

8    Q.  That testimony was truthful when you gave it, right?

9    A.  Yes, but I don't see that contradicts my previous

10   statement.

11   Q.  Okay.  So you do recall why -- you don't remember why you

12   forwarded it, other than you were curious to get Mr. Shkreli's

13   input to help you get up the learning curve faster?

14   A.  That's what I can recall at this current moment.

15           MR. WEINGARTEN:  Let's take a look, Ms. Flint, please,

16   at Government Exhibit 1357.  And let's take a look at page 002,

17   please.

18           This is already in evidence as part of Government

19   Exhibit 9005.

20           Let's go back to the bottom of 001, just so we can get

21   the email header.  Thank you so much.

22   Q.  So on October 11th, you wrote again to Mr. Lau, and you

23   cc'd Mr. Mithani, right?

24   A.  That is what the document states, yes.

25   Q.  And you wrote to Mr. Lau, "Who are the wholesalers and what

 1   function do they have?  I worry that someone added more

 2   complexity (and leakage) to the channel while we were gone.

 3   Who can the wholesalers sell to?"

 4          Do you see that?

 5   A.  Yes, sir.

 6   Q.  So you were inquiring of Mr. Lau now about your concerns

 7   that there had been leakage in the channel.

 8          Do you see that?

 9   A.  Yes.

10   Q.  Does "the channel" refer to the mechanism through which

11   Vyera distributed Daraprim?

12   A.  I would assume so.  I'm not an expert in distribution, and

13   I probably was just repeating buzz words that I heard.

14   Q.  Do you think you heard the word "leakage" from Mr. Shkreli?

15   A.  I do not recall.

16          MR. WEINGARTEN:  You can take that one down, please,

17   Ms. Flint.

18   Q.  In October of 2017, around the same time as that email we

19   just looked at, you and Mr. Mithani directed Ms. Kirby to

20   establish a system for Vyera to be notified if anyone had

21   ordered five or more bottles of Daraprim, correct?

22   A.  If I heard you correctly, I thought that system was already

23   in place.  Would you mind repeating it, just so I'm answering

24   accurately?

25   Q.  Sure.

1          In October of 2017, you and Mr. Mithani directed

2    Ms. Kirby to establish a system with one of the wholesalers to

3    notify Vyera of any orders of five or more bottles of Daraprim,

4    correct?

5    A.   I think that could be possible.  I believe there was

6    systems in place, but I think that they may have been expanded

7    with different distributors.

8    Q.   And Ms. Kirby sent you and Mr. Mithani periodically reports

9    about any orders for five or more bottles of Daraprim, correct?

10   A.   I don't recall too many reports about five or more bottles

11   because it was very rare, but we did receive reports

12   periodically.

13   Q.   Okay.  Ms. Kirby would send to you and Mr. Mithani

14   information when someone had ordered five or more bottles of

15   Daraprim, correct?

16   A.   I believe I received some of those emails, but I don't know

17   if I would receive all of them as a standard operating

18   practice.

19   Q.   And in April of 2018, Ms. Kirby told you that she was

20   working with Vyera's distributors, Cardinal and ASD, to go

21   further and find a way to block or approve particular orders

22   for Daraprim, correct?

23   A.   I wouldn't be able to confirm that without having

24   documentation to reference.

25   Q.   Okay.

1              MR. WEINGARTEN:  Ms. Flint, please take a look and put

2     on the screen 1388, Government Exhibit 1388.  Thank you.

3     Q.  It's a little bit confusing — the format, sir — but do you

4     see at the top, it says, "Type:  Instant Message"?

5     A.  I do, yes.

6     Q.  And then --

7              MR. WEINGARTEN:  You can take that --

8     Q.  It says "From" and a phone number, "Anne Kirby."

9              Do you see that?

10    A.  Yes, sir.

11             MR. WEINGARTEN:  I'm sorry.  I'll just state for the

12    record, this is already in evidence as part of Government

13    Exhibit 9005.

14             You can take down that zoom.

15             And if you would look, Ms. Flint, where it says "body

16    and source and timestamp," can you get those three rows,

17    please?  Thank you.

18    Q.  The body of the message says:  "No worries!  Thanks for

19    update!  Talked to Cardinal Specialty and ASD and told them

20    they need to find a way we can approve or block orders.  Optime

21    Care WebEx scheduled Monday."

22             And the source application here is iMessage —

23    Kevin.Mulleady@gmail.com.

24             Do you see that?

25    A.  Yes.

1    Q.  This is an instant message from Ms. Kirby to you, correct?

2    A.  Yes, it seems that way.  I'm not very familiar with this

3    format, but it does look like the type was instant message, and

4    I have the source application as recipient.  It does seem that

5    it came to my iMessage, which is an email, which is odd, but it

6    was a communication.  I can confirm that based on this

7    document.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Ms. Kirby communicated to you that she had talked to

2  Cardinal Specialty and ASD about how to block or approve orders

3  for Daraprim, right?

4  A.  That's what the document states, yes.

5  Q.  And Cardinal Specialty and ASD were two of Vyera's

6  distributors for Daraprim?

7  A.  Yes, I believe that's accurate.

8  Q.  You had some other messages with Ms. Kirby on April 6 that

9  I want us to take a look at.

10          MR. WEINGARTEN:  Ms. Flint, could you back that back

11  down and pull up Government Exhibit 1633.  This is already in

12  evidence also as part of Government Exhibit 9005.  Ms. Flint,

13  could you go to page 002, please.

14  Q.  This is a little bit more familiar format for some text

15  messages, right, Mr. Mulleady?  Let's take a look starting from

16  the top.  You see the first message there from the 212 number.

17  It's dated April 6, same day as the message we were just

18  looking at.  Do you see that?

19  A.  Yes.

20  Q.  6:58 in the morning.  It says please call me ASAP.  That

21  number.  The 212 number, that's Ms. Kirby's number, right?

22  A.  No.

23          MR. WEINGARTEN:  Let's take a look, sir, Ms. Flint, if

24  we could, at Government Exhibit 10032-014.  Let's start with

25  Government Exhibit 0132-001.

 1   Q.  You submitted to interrogatory responses in this case,

 2   correct, sir?

 3   A.  Yes.

 4   Q.  I'm sorry, Mr. Mulleady.  The 212 number.  That's your

 5   number, isn't it, sir?

 6   A.  It is.

 7   Q.  Let's go back then to 1633-002.  I apologize.

 8           Let's start again.

 9           The 212 number is your number, right, sir?

10   A.  Yes.

11   Q.  The 917 number in this list, that's Ms. Kirby's number,

12   right?

13   A.  Does it say that somewhere?  I don't have her number

14   memorized.

15   Q.  I guess we will have to do it again.  Let's go back to

16   Government Exhibit 0132-014.  Do you see five rows down Ms.

17   Kirby is listed there in the interrogatory response?

18   A.  Yes, sir.

19   Q.  You identified in your interrogatory response Ms. Kirby's

20   cell phone number?

21   A.  Yes.

22   Q.  Is that the phone number that's listed on Government

23   Exhibit 1633?

24   A.  Yes.

25   Q.  Let's go back to 1633.

1   A.   Pardon me.  I wasn't trying to be complicated.

2   Q.   I understand.  I was not.  You wrote to Ms. Kirby, please

3   call me ASAP at 6:58 in the morning on April 6?

4   A.   That's what the document states, yes.

5   Q.   Then also at 6:58 you also emphasized please call me ASAP,

6   right?

7   A.   Yes.

8   Q.   At 7:30 you told her you were in the office and she had she

9   would be there shortly?

10  A.   I believe --

11  Q.   Ms. Kirby said I'm in the office.  You said:  I'll be there

12  shortly.  Then Ms. Kirby writes at 5 p.m. that day.  I hope you

13  enjoy Starbucks.  She follows up again at 8:41.  Please tell me

14  your coffee run was successful.  Then you finally get back to

15  her at 9:07 and you say:  Sorry for delay.  All good.  Meeting

16  in the morning at Starbucks.  She writes back:  No worries.

17  Thanks for the update.  Then comes her message that we looked

18  at before about approving her blocking orders, right?

19  A.   Yes.  That's what the document states.

20  Q.   So you and she are talking about a Starbucks run on April

21  6, 2018.  And then after you tell her it's all good, she brings

22  up the topic of blocking orders, right?

23  A.   That's what the document states, yes.

24  Q.   And the coffee run that you were discussing on April 6 with

25  Ms. Kirby was your trip to Starbucks to repurchase five bottles

 1   of Daraprim from Mr. Satya Valiveti, correct?

 2   A.  I can't say specifically.  I don't know the date off the

 3   top of my head.  But I have no reason to dispute it.

 4          MR. WEINGARTEN:  Let's take a look, please, Ms. Flint,

 5   Government Exhibit 3004.

 6   Q.  I want to refresh your recollection, sir.

 7   A.  Thank you.

 8          MR. WEINGARTEN:  Ms. Flint, you can highlight that.

 9   Q.  Don't read it out loud, sir.  Look at it to yourself.  Look

10   at especially the date and who it is to.  Let me know when

11   you've had a chance to look at that.

12   A.  I've looked at it, Mr. Weingarten.

13   Q.  Does that refresh your recollection about the date on which

14   you were going to meet Mr. Valiveti?

15   A.  Yes, it does.  Thank you.

16   Q.  The date you were going to meet Mr. Valiveti about the five

17   bottles of Daraprim was April 6, 2018?

18   A.  On or around, I would assume.  I am not sure if we actually

19   met that day.

20          MR. WEINGARTEN:  You can take that down, please,

21   Ms. Flint.

22   Q.  Now, Ms. Kirby had alerted you that Mr. Valiveti of

23   Reliant -- strike that.

24          MR. WEINGARTEN:  Let's introduce Government Exhibit

25   1379.

1   Q.  Do you see the first e-mail there?

2              MR. WEINGARTEN:  Highlight the whole thing, if you

3   don't mind.  Ms. Flint, can we do the bottom e-mail, please,

4   from Sandy.

5   Q.  That's an e-mail from Sandy to Ms. Kirby.  It's subject to

6   is request for approval to purchase.  Do you see that?

7   A.  Yes, I do.

8   Q.  It's signed by Mr. Satya Valiveti of Reliant Specialty.

9   You see that?

10  A.  I see his digital signature, yes.

11             MR. WEINGARTEN:  Now, Ms. Flint, can we go to the top

12  e-mail header.

13  Q.  Ms. Kirby forwarded that to you and Mr. Mithani?

14  A.  Looks that way, yes.

15             MR. WEINGARTEN:  Move to introduce Government Exhibit

16  1379, your Honor.

17             THE COURT:  Received.

18             (Government Exhibit 1379 received in evidence)

19  Q.  Let's take a look at what Mr. Valiveti wrote to Ms. Kirby,

20  that bottom e-mail.  Mr. Valiveti is asking for approval to buy

21  five bottles of Daraprim on January 3, 2018, correct?

22  A.  It seems that way, yes.

23  Q.  If we go to the top header and the top e-mail, Ms. Kirby

24  forwarded that to you and Mr. Mithani, correct?

25  A.  It seems that way, yes.

1   Q.  She says:  Please see forwarded request from Reliant

2   Specialty.  She gave you a website.  You see that?

3   A.  Yes.

4   Q.  You don't recall any response to this request from

5   Mr. Valiveti to purchase Daraprim RLD, correct?

6   A.  I'm sorry, Mr. Weingarten.  Could you ask that one more

7   time.

8   Q.  Sure.  You don't recall any response to this e-mail request

9   from Mr. Valiveti about purchasing some Daraprim RLD, right?

10  A.  As I sit here, no, I do not recall that.  But I don't know

11  if it means that didn't happen.

12  Q.  But you do recall clicking on that link that Ms. Kirby

13  forwarded to you.  Do you remember that?

14  A.  Do I recall the actual action of clicking on that link?

15  No.  But I do remember seeing an image about the Reliant

16  Specialty, I think -- that that had them based in a strip mall

17  or something along those lines.  I'm not sure exactly which

18  link that was or what I clicked.

19  Q.  Let me turn you, sir, if we could, in your deposition, to

20  page 256 of your deposition, lines 11 to 20.  See if this

21  refreshes your recollection.  It says:  No.

22          MR. WEINGARTEN:  Can we do lines 11 to 20, Ms. Flint.

23  Q.  Take a look at that, sir.  Let me ask you if that refreshes

24  your recollection that you clicked on the link.

25  A.  I don't know if I would use the terminology of refreshing

1  my recollection.  In all due respect, I recalled potentially

2  clicking it and seeing a picture of a mini mall.  This seems to

3  confirm my recollection.

4  Q.  Let's take a look at the website then.

5       MR. WEINGARTEN:  Can we please look at Government

6  Exhibit 4064.  This is already in evidence.

7  Q.  This is a screenshot of Reliant's website and it's the same

8  link that Ms. Kirby sent you.  If you look at the bottom of

9  page there, where it says HTTP, you see that?

10 A.  Yes, I do.

11 Q.  It says in big letters in blue, we supply innovator

12 products/reference listed drugs.  You see that?

13 A.  Yes.

14 Q.  If you look under our services, the box on the bottom left,

15 it says:  Pharmaceutical innovator products/reference listed

16 drugs for the development of bio similar and abbreviated new

17 drug applications.  Procurement of innovator products/reference

18 listed drugs in large quantities for bioequivalence and

19 clinical trials.  Do you see that?

20 A.  Yes.

21 Q.  According to Reliant's website, Reliant provides RLD to

22 companies doing bioequivalence studies, right?

23      MR. POLLACK:  Your Honor -- sorry, your Honor.  Never

24 mind.  No problem.

25 Q.  Ms. Kirby sent you that link on January 3, 2018.  Let's

 1  fast forward to April.  You had concerns when you learned that

 2  a company called CentraState had purchased five bottles of

 3  Daraprim, right?

 4  A.  I believe concerns were brought to my attention, if I

 5  recall correctly.

 6  Q.  And you testified in your direct examination that you

 7  decided to further investigate the CentraState purchase?

 8  A.  I have no reason to disagree with that.

 9  Q.  And you learned that Satya Valiveti might be the purchaser?

10  A.  Sounds accurate, yes.

11  Q.  And you learned that Mr. Valiveti owned Reliant, which was

12  affiliated with CentraState, correct?

13  A.  I don't know if I ever learned of organizational structure

14  and ownership, but I learned of an affiliation.

15  Q.  So you learned that Reliant and CentraState had an

16  affiliation?

17  A.  An affiliation too.

18  Q.  Reliant and CentraState had an affiliation with each other,

19  correct?

20  A.  Being Satya.  Sandy is his name.  Agree.  I agree to that.

21  Q.  In your direct testimony that you submitted to the Court

22  earlier today, you omitted any mention of Reliant's services

23  procuring reference listed drug for use in bioequivalence

24  testing, correct?

25  A.  I am not sure.  I don't have the document in front of me

1  and I haven't went over it thoroughly or have it memorized.

2  Q.  I'm sorry.  I didn't catch that last part, sir.

3  A.  I have it memorized.  I will try to get a little closer to

4  you.

5  Q.  I appreciate you said you didn't go over it thoroughly, but

6  you did read it accurately before you signed it.  You did read

7  it thoroughly before you signed it, correct?

8  A.  Maybe thoroughly wasn't an appropriate -- I don't have it

9  memorized.

10  Q.  But you stand by the testimony, is that right?

11  A.  Yes, sir.

12  Q.  Let's talk about some details of the repurchase that were

13  not in the direct testimony.  Now, you testified that Vyera

14  agreed to pay Mr. Valiveti twice for what he had paid for the

15  five bottles, right?

16  A.  I don't believe that's fully accurate.  I believe, if I

17  could expand on it.

18  Q.  Let's take a look, if we could, at your written direct.

19  It's page 28, paragraph 83.

20       Would you like a copy, sir, of your written direct

21  testimony?

22  A.  Sure.  I think I have it here.  I thought it was going to

23  be pulled up on the screen.

24  Q.  We are getting there.  Your written direct testimony, on

25  page 28 of your written direct.  It's 545.

1    A.  Yes, I'm there.

2    Q.  You see in the second sentence:  Mr. Valiveti offered.  You

3    see that sentence, sir?

4    A.  Yes.

5    Q.  Your testimony on direct was, Mr. Valiveti offered to sell

6    the bottles to Vyera for twice the amount he paid, and we

7    agreed to that price.  Do you see that?

8    A.  Yes.

9    Q.  So that was truthful and accurate when you gave that

10   testimony, correct?

11   A.  Yes.  What had changed, which I was hoping to expand on, I

12   have seen since then that people have paid higher prices than

13   that, and I think this might be an assumption that Mr. Valiveti

14   paid the wholesale price of $75,000, but I don't know if that

15   was specifically confirmed to me.

16   Q.  In your direct testimony you say you don't have a specific

17   recollection of the details of the payment to Mr. Valiveti or

18   being involved in that payment.  Do you remember that?

19   A.  Yes.  That sounds accurate.

20   Q.  In your role as CEO of Vyera at the time you would have

21   approved a payment of that size, correct?

22   A.  I believe so, yes.

23   Q.  And you didn't negotiate the price with Mr. Valiveti,

24   correct?

25   A.  I don't believe there is much negotiation.

1    Q.  He asked for $750,000 and you agreed, right?

2    A.  Yes.  I believe that's accurate.

3    Q.  After the payment was made, you met with Mr. Valiveti at a

4    Starbucks parking lot to reacquire the five bottles of

5    Daraprim, is that right?

6    A.  I met with Mr. Valiveti at a Starbucks.

7    Q.  You met him at his car in the Starbucks parking lot?

8    A.  After having coffee in the Starbucks.

9    Q.  Mr. Valiveti handed you the five bottles of Daraprim in a

10   Fed Ex envelope?

11   A.  Yes.

12   Q.  And you handed Mr. Valiveti a repurchase and collaboration

13   agreement, correct?

14   A.  I handed him an agreement.  I'm not exactly sure what type.

15          MR. WEINGARTEN:  Let's take a look at Government

16   Exhibit 1135, please.

17   Q.  This is a document entitled product purchase and

18   collaboration agreement by and among Vyera Pharmaceuticals AG,

19   CentraState, another entity and Reliant Pharmacy.  Do you see

20   that?

21   A.  Yes.

22   Q.  This is a copy of the repurchase contract that you handed

23   to Mr. Valiveti in the Starbucks parking lot, correct?

24   A.  I don't have a reason to dispute that.  I don't know if

25   there was variations.  It would be helpful to be able to

1    confirm the date.

2            MR. WEINGARTEN:  Your Honor, we move to admit

3    Government Exhibit 1135.

4            MR. POLLACK:  Your Honor, I don't think he has

5    identified it as authentic, that he didn't recognize it.

6            THE COURT:  Didn't this come in already?

7            MR. WEINGARTEN:  Another version of it came in with

8    Mr. Valiveti, your Honor.  I wanted the one from Vyera's files.

9            THE COURT:  You may inquire further.

10   Q.  Let's take a look, sir, if I can refresh your recollection.

11   Let's go to your deposition, page 265, line -- 265, line 23 to

12   266-4.

13           MR. WEINGARTEN:  I'm sorry to do this to you,

14   Ms. Flint.  265, line 11 to 266-4.  266-21.  Sorry.  265-21 to

15   266-4, please.  Thank you.

16   Q.  Take a look at line 21 through the bottom, sir, where it

17   starts with OK.  It says:

18   "Q.  OK.  So do you have 1135 open?

19   "A.  I do, yes.

20   "Q.  And is this the document that you were referring to when

21   you were talking about an agreement setting forth the terms of

22   the repurchase of the Daraprim from CentraState?

23   "A.  I do not have a reason to believe that it is not."

24           I move to admit the exhibit, your Honor.

25           MR. POLLACK:  Your Honor, that's not a definitive

1     identification of the document.

2          THE COURT:  If there is a basis to believe that this

3     is not the authentic document produced by Vyera, that will be

4     very important to know, but this would otherwise be sufficient

5     to admit the document.

6          It's admitted.  Overruled.

7          (Government Exhibit 1135received in evidence)

8     Q.  Let's go back to 1135 then briefly.  The title of the

9     document is product purchase and collaboration agreement,

10    right?

11    A.  Yes, sir.

12    Q.  And let's turn to page 002, please.  If you look at section

13    2, it says repurchase Daraprim inventory.  You see that?

14    A.  Yes.

15    Q.  There is a reference to repurchasing five bottles of

16    Daraprim held by CentraState Freehold and/or Reliant for

17    $750,000, right?

18    A.  That's what the documents states, yes.

19    Q.  It is also called a collaboration agreement because the

20    document proposed future collaboration with Reliant, right?

21    Let's take a look at section 4, please.

22    A.  Thank you.

23    Q.  Same page, future collaboration.  The document that you

24    handed Mr. Valiveti also proposed a future collaboration among

25    Vyera and Reliant and CentraState, right?

1    A.  That's what the document states, yes.

2          MR. WEINGARTEN:  You can take that down, please,

3    Ms. Flint.

4    Q.  In August of 2019, you had a conversation with Mr. Shkreli

5    while he was incarcerated in which he suggested tightening that

6    bottle limit from five even further to one bottle.  Is that

7    right, sir?

8    A.  Yes.  As I sit here today, after reviewing transcripts.

9    Q.  And that also occurred during a conversation when you were

10   talking about Mr. Frank Della Fera?

11   A.  I am not sure from memory.  I could look at a document, if

12   you would like, but I have no reason to dispute it.

13   Q.  Let's take a look at Government Exhibit 3088, please.  This

14   one is already in evidence as part of Government Exhibit 9001.

15   It's another transcript of a telephone call between you and

16   Mr. Shkreli, dated August 5, 2019.

17         MR. WEINGARTEN:  Ms. Flint, could you please turn to

18   002, which is transcript page 6.  Strike that.  003, transcript

19   page 6.  It's transcript page 6, lines 2 to 4.  Let's start at

20   the top.

21   Q.  Mr. Shkreli says to you:  But nothing big.  Nothing bad but

22   interesting.  You heard about this Frank Della Fera.  You

23   respond:  Yeah.  Mr. Shkreli says:  So what do you think?  Then

24   you tell him:  I am going to have -- the person who actually

25   introduced me to him in the past -- and he's one of these guys

1   that's always networking and he keeps his ear to the ground.

2   Then you and Mr. Shkreli talk about who it might be.  At the

3   bottom you say:  I am going to have lunch.

4           MR. WEINGARTEN:  And let's carry on to the next page,

5   please, page 7 of the transcript.

6   Q.  You tell Mr. Shkreli:  I am going to have lunch with him

7   and just see kind of where his deal is because it's all -- the

8   timing is really kind of consistent from when he acquired or if

9   he ever did acquire RLD.  I am trying to get a better

10  understanding of when that's going to happen.  I think that --

11  well, with the timing and everything, he really would have had

12  to kind of -- while we were in conversations with him in the

13  past, if you remember, and it just didn't work out, he would

14  have really had to have acquired it pretty much a month or two

15  after that.

16          The it you're talking about, the acquired it, that's

17  RLD of Daraprim, sir?

18  A.  I do not recall, but it seems that's what the document is

19  alluding to.

20  Q.  Let's look at the next paragraph:  And I don't think he did

21  for it to be a threat, I think, in the next couple months, if

22  I'm doing the timing correctly.  So I want to do a little bit

23  of diligence on it.  But you know he's obviously invested in

24  it.  I mean, he's pursuing it.  Is the he there Mr. Della Fera?

25  A.  Same as before.  I don't recall specifically, but that's

1    what the document alludes to.

2    Q.  It looks like he is going to be coming to market.  It's

3    probably a matter of time, unless he can never acquire --

4    unless he has issues acquiring what he needs for the BE.  BE

5    there means bioequivalence?

6    A.  I don't recall specifically, but BE is used as an

7    abbreviation for bioequivalence.

8            MR. WEINGARTEN:  Let's turn to pages 9 and 10 of the

9    transcript, please, Ms. Flint.  I think it's page 4 on the GX

10   number.  Transcript page 9, line 20 to 10-6.

11   Q.  Mr. Shkreli is talking to you starting on line 13.  I want

12   to direct to you line 20.  Mr. Shkreli starts at the end of

13   that sentence saying:  So, you know, the company should, in my

14   opinion -- the company should, you know, just make sure it

15   really doesn't sell more than one bottle at a time, you know.

16   That would be -- you say mm-hmm.  Mr. Shkreli continues:  The

17   number one thing I would do and just really carefully screen

18   every doctor that you know.  Even if it drops sales a little

19   bit, it's a good -- you know, really make sure he's not getting

20   his hands on anything.  I think that's probably the best way to

21   do it.  And then, you know, you can even sort of lob in a call

22   to him and say, do you guys -- do you want to buy RLD, you

23   know.

24            Do you see that?

25   A.  Yes.

1   Q.  As part of your conversation with Mr. Shkreli about Mr.

2   Della Fera and acquiring Daraprim RLD, you're talking about

3   increasing the limits on bottles to one bottle per order,

4   right?

5   A.  Are you asking me if I was talking about that.

6   Q.  You and Mr. Shkreli are having a conversation about that,

7   right?

8   A.  I'm listening to him talk about it.

9           MR. WEINGARTEN:  You can take that down, please.

10  Q.  I want to talk to you a little bit about data blocking.

11  Mr. Mulleady, you directed Ms. Kirby to -- strike that.  You

12  agree that generics would be more interested in Daraprim if IMS

13  data showed more sales for Daraprim, right?

14  A.  Sorry.  One more time, Mr. Weingarten.

15  Q.  Sure.  You agree that generic companies would be more

16  interested in Daraprim if the IMS sales data showed larger

17  sales for Daraprim, right?

18  A.  Yes.

19  Q.  And you executed an agreement with Cardinal Health to

20  implement a data block on Daraprim's sales data, right?

21  A.  Who was the other party?

22  Q.  Cardinal.  I don't mean to cut you off, but let's take a

23  look at Government Exhibit 1178, please.  This is already in

24  evidence as part of Government Exhibit 9002.  Is that an

25  amendment to a specialty pharmaceutical distribution agreement,

1  sir?

2  A.  Yes, it looks that way.

3  Q.  If you look at the bottom right, is that your signature,

4  sir?

5  A.  Yes, sir.

6  Q.  On behalf of Turing Pharmaceuticals?

7  A.  Yes.

8  Q.  If you go to the page 002, Ms. Flint, number 4 is data

9  blocking fee, right?

10  A.  Um-hum.

11  Q.  So you executed an agreement with Cardinal Health with

12  respect to data blocking, right?

13  A.  Looks that way, yes.

14          MR. WEINGARTEN:  Let's take that down, please.

15  Q.  I want to talk to you briefly about API, sir.  You know API

16  stands for active pharmaceutical ingredient, right?

17  A.  Yes.

18  Q.  The generic that wants to submit an ANDA has to secure an

19  API source?

20  A.  Yes.  I believe that's accurate.

21  Q.  Your direct testimony -- strike that.  There was a company

22  that supplied API called Fukuzyu, right?

23  A.  Yes.

24  Q.  Your direct testimony is that you were not involved in the

25  negotiation, execution, or approval of the supply agreement

1   between Fukuzyu and Vyera, right?

2   A.  I could say that I do not recall that.  I do not have the

3   direct testimony memorized.  I could have a look at it, if you

4   would like that confirmation.

5          MR. WEINGARTEN:  Let's look at DX-545, please, page

6   12, paragraph 40.

7   Q.  You see the last sentence there:  As a result, I was not

8   involved in the negotiation, execution, or approval of the

9   supply agreement between Vyera and Fukuzyu.  You see that?

10  A.  Yes.

11  Q.  So that's your direct testimony to this court, right?

12  A.  Yes, sir.

13  Q.  Now, in August of 2018, however, you actually went to Japan

14  to personally establish a relationship with Fukuzyu, correct?

15  A.  Sounds accurate.  I did go to Japan.  I just don't know the

16  exact date off the top of my head.

17  Q.  You did go to Japan to establish a relationship personally

18  with Fukuzyu, right?

19  A.  To get to know them.  I don't know if it was to establish a

20  relationship, but we did go there to visit him.

21  Q.  You told senior management at Vyera that you were "taking

22  point on this part of the project" with Fukuzyu, right?

23  A.  I would need to know what part of the project that is to be

24  able to answer that.

25  Q.  You worked, sir, on making sure that Fukuzyu's supply

 1   contracts with any other manufacturers precluded sales of API

 2   for human use in the United States?

 3   A.  Did I work to preclude that?

 4   Q.  Did you work on making sure that Fukuzyu didn't sell API

 5   for human use in the United States to anyone else?

 6   A.  I believe those contracts were already in place.

 7   Q.  Let's look at Government Exhibit 1674, please.  This is

 8   already in evidence as part of Government Exhibit 9005.  These

 9   are e-mails between you and Mikio Arisawa.  You see that?

10   A.  Yes.

11   Q.  Ms. Arisawa either worked for or represented Fukuzyu,

12   right?

13   A.  He was our translator.

14          MR. WEINGARTEN:  Let's go to page 002, please.

15   Q.  The first e-mail that starts this chain, Arisawa writes in

16   the second paragraph:  FKZ informed me about the development of

17   the business with Pegasus.  It received a letter from Pegasus

18   saying Pegasus Laboratories, Inc. confirmed the only use of

19   pyrimethamine by the company is in the animal health market.

20   Pegasus Laboratory, Inc. does not sell pyrimethamine or use

21   pyrimethamine in any finished products for human health use.

22   Mr. Arisawa says:  I think this agreement removes the

23   uncertainty of the use of pyrimethamine by Pegasus.

24          Do you see that?

25   A.  Yes.

```
 1              MR. WEINGARTEN:  Let's go to the previous page, 001.
 2    Q.  You say at the bottom e-mail in response:  Thank you for
 3    sending over and please thank FKZ for promptly inquiring.  I
 4    agree this letter removes the uncertainty of the use of
 5    pyrimethamine by Pegasus.  Do you think it will be too much to
 6    ask FKZ to ask Pegasus to sign an agreement stating they will
 7    continue to operate in this manner in the future.  We would be
 8    more than happy to draft an agreement for FKZ's review.
 9              Do you see that?
10    A.  Yes.
11    Q.  Then Mr. Arisawa responded above:  Dear Kevin, FKZ agreed
12    to modify its contract with Pegasus to add the term to restrict
13    the use of FKZ's API.  You see that?
14    A.  Yes.
15    Q.  Let's go to the very final e-mail from you.  You write back
16    to Mr. Arisawa:  That is great.
17              You were in fact communicating with ensuring that
18    Fukuzyu had restrictions in place on sale of API in the United
19    States for human use, right?
20    A.  I was enforcing agreements that were already in place with
21    the organization and making sure they were documented
22    appropriately.
23    Q.  Those agreements were about restricting Fukuzyu's sales of
24    API pyrimethamine in the United States for human use, right?
25    A.  We had an exclusive agreement with Fukuzyu to provide us
```

 1  with API.

 2  Q.  Let's talk about RL Fine.

 3         MR. WEINGARTEN:  Ms. Flint, could you take that down,

 4  please.

 5  Q.  Now, in August of 2017, you received a report from a

 6  company called Pennside Partners.  Do you remember that?

 7  A.  I have received reports from Pennside Partners, yes.

 8  Q.  Pennside is an intelligence -- competitive intelligence

 9  consultant that Vyera has hired from time to time?

10  A.  I am not sure of their complete business model, but that is

11  one of the services they provide, to my understanding.

12  Q.  And Vyera retained Pennside to produce reports about the

13  competitive landscape for Daraprim?

14  A.  Yes.  Prior to -- I didn't have those in place, but they

15  were there.

16  Q.  And Pennside informed Vyera that it had contacted RL Fine

17  to determine if they had taken steps to file a U.S. DMF and

18  make pyrimethamine API available to a U.S. generic firm, right?

19  A.  As I sit here today, after recently reviewing one of those

20  Pennside reports, I believe that is accurate.

21  Q.  And you had conversations at Vyera about RL Fine maybe

22  filing a DMF in the United States for pyrimethamine, right?

23  A.  Sorry.  One more time, Mr. Weingarten.

24  Q.  Yup.  You had conversations at Vyera about RL Fine filing a

25  DMF in the United States for pyrimethamine, right?

1    A.  I don't recall specifically.

2    Q.  Maybe I'll refresh your recollection.  Do you think it

3    would refresh your recollection if you looked at deposition

4    testimony on that subject?

5    A.  I don't see why it wouldn't if it states that.

6    Q.  Let's take a look at deposition, page 176, line 25 to

7    177-12.  Read that to yourself, please.

8    A.  What were the lines again, please?

9    Q.  The whole thing that's on the screen, line 25, page 176 to

10   page 177-12.

11   A.  Thank you.

12   Q.  Does that refresh your recollection, sir, about having had

13   conversations about RL Fine's ability to file a DMF for

14   pyrimethamine in the U.S.?

15   A.  This document says that I do not recall specifically.

16   Q.  The last line, sir, read it to yourself.  Does that refresh

17   your recollection that you had those conversations?

18   A.  I don't recall specifically having those conversations, and

19   I think here I am stating that RL Fine was a company that was

20   on our radar screen prior to my being CEO and chairman and we

21   could be Vyera.  It's a little bit unclear from this document,

22   so I can't say with full confidence.

23   Q.  Is it your testimony, sir, that you did not have

24   conversations?

25   A.  No.  My testimony is, I'm uncertain.

1    MR. WEINGARTEN:  You can take that down.

2    Q.  You subsequently reached out to RL Fine about RL Fine

3    supplying pyrimethamine API to Vyera, correct?

4    A.  I did, along with many others and amongst other topics.

5    Q.  Mr. Mithani, in the summer of 2017, e-mailed RL Fine and

6    said Vyera was interested in pyrimethamine API, correct?

7    A.  That sounds accurate, yes.

8    Q.  Let's take a look at Government Exhibit 1104.  This is an

9    e-mail chain involving Mr. Mithani, you, a Mr. Ramachandra of

10   RL Fine, and Mr. Shkreli, right?

11   A.  It looks that way, yes.

12   Q.  The subject is antimalarial APIs?

13   A.  Yes.

14          MR. WEINGARTEN:  Your Honor, move to admit Government

15   Exhibit 1104.

16          THE COURT:  Received.

17          (Government Exhibit 1104 received in evidence)

18   Q.  Let's look at page 002.  You see that first e-mail from

19   Mr. Mithani.  He is writing to RL Fine and CCs you.  You see

20   that?

21   A.  Yes.

22   Q.  He says in part:  We are interested in sulfadoxine and

23   pyrimethamine APIs, among other ones.  You see that?

24   A.  Yes.

25   Q.  Let's go up to the next e-mail.  Mr. Mithani follows up.

1    He says:  Hello.  Just wanted to follow up.  We are excited to

2    explore working with RL Fine.  You see that?

3    A.  Yes.

4    Q.  Let's go to page 001.  See what RL Fine says.

5    Mr. Ramachandra of RL Fine writes back to you and Mithani says:

6    Thanks for the mail.  Let us know if the dosage is a

7    combination drug and the requirement so that we can comment

8    further.

9        Then let's see the e-mail about that.  Actually, you

10   see that little forward there, that whole thing there, you see

11   at the bottom there, sir, on Thursday, August 24.  That

12   indicated that you forwarded that e-mail from Mr. Ramachandra,

13   right?

14   A.  Would it be possible to zoom out?

15   Q.  Yes.  There you go.

16   A.  The question was, it seems that I forwarded it?

17   Q.  Yes?

18   A.  Yes, it looks that way.

19   Q.  Then Mr. Shkreli has the e-mail and he says -- he writes a

20   statement there:  We are looking to purchase 10 to 20KG

21   annually of pyrimethamine API with a U.S. DMF.  You see that?

22   A.  Yes.

23   Q.  He sends that to you.  You see that?

24   A.  Yes.

25       MR. WEINGARTEN:  And then let's go zoom out, please.

1    Q.  You send that to Mr. Mithani, right?

2    A.  Here it says who I forwarded it to.  But below it doesn't

3    say that I forwarded it to.

4    Q.  You did send Mr. Shkreli's note to Mr. Mithani, right?

5    A.  It seems that way, yes.

6    Q.  Actually, first, you wrote to Mr. Shkreli before you

7    forwarded it:  We will keep you more on the loop on

8    communications.  You see that?

9    A.  Yes.

10   Q.  Then you forwarded that whole thing, the e-mail Mr. Shkreli

11   wrote, your comment about the loop, all of that, to

12   Mr. Mithani, right?

13   A.  Seems that way, yes.

14   Q.  Let's look at Government Exhibit 1129, please:  This is

15   another set of e-mails between you, Mr. Mithani and RL Fine,

16   right?

17   A.  Looks that way, yes.

18           MR. WEINGARTEN:  Move to admit Government Exhibit

19   1129.

20           THE COURT:  Received.

21           (Government Exhibit 1129 received in evidence)

22   Q.  Look at the bottom e-mail there from Mr. Mithani.  He

23   writes to Mr. Ramachandra, and he copied and pasted and

24   actually what Mr. Shkreli had sent to you, isn't that right?

25   A.  Looks that way, yes.

1            MR. WEINGARTEN:  Let's go up in the chain a little

2    bit, please, Ms. Flint.

3    Q.  What is Mr. Ramachandra's response?  He says:  Noted and

4    wish to inform you that we have already working on

5    pyrimethamine and would not be able to offer to you.

6            As of August 24, 2017, RL Fine told you they would not

7    be able to sell pyrimethamine API to Vyera, correct?

8    A.  Seems that way, but I don't know if there is something lost

9    in translation.  I don't know why if they are working on it

10   they wouldn't be able to offer, but it does say we would not be

11   able to offer, yes.

12   Q.  That's August 24, 2017.

13           MR. WEINGARTEN:  You can take that down, Ms. Flint.

14   Q.  After that date, you started some conversations with RL

15   Fine about supplying pyrimethamine to Vyera, right?

16   A.  Started or continued?

17   Q.  You had conversations with RL Fine after August 24 about

18   supplying pyrimethamine to Vyera, right?

19   A.  Yes.

20   Q.  And you spoke to a Mr. Jacob Mathew of RL Fine about

21   forming a relationship between Vyera and RL Fine?

22   A.  Yes.

23   Q.  And you approached RL Fine about becoming an exclusive

24   partner to supply API to Vyera?

25   A.  Amongst other things, yes.

1  Q.  But you don't remember the specific conversations about any

2  of the terms that you discussed with Mr. Jacob, right?

3  A.  One more time, please, Mr. Weingarten.

4  Q.  You don't remember any specific conversations about the

5  terms that were discussed with RL Fine, right?

6  A.  Any terms?

7  Q.  You don't remember any of the specific conversations about

8  the terms that were discussed, correct, sir?

9  A.  I don't know if that would be fair.

10  Q.  Let's take a look at page 197 of your deposition, pages

11  lines 14 to 22.

12  "Q.  And who -- I'm sorry.  I guess my question is, I am not

13  asking you to recall necessarily the terms of the agreement.

14  I'm asking if you recall any of the conversations that led to

15  the agreements where the terms were discussed.

16  "A.  Not specifically.  I can speak in general --

17  generalities."

18          That was your testimony, sir?

19  A.  I have no reason to believe that it wasn't.

20  Q.  Truthful and accurate when you gave it?

21  A.  Yes.

22  Q.  Let's take a look at Government Exhibit 1338, further along

23  into 2017.

24          MR. WEINGARTEN:  If you could go to page 002, please,

25  Ms. Flint.  This is already in evidence as part of Government

1   Exhibit 9001 as a text message and it says:  It's Shkreli.

2   Trying to get in touch with you urgently.  Hearing pyri ANDA

3   approval in December 2017.  That's dated October 25, 2017,

4   correct?

5   A.  Yes.

6   Q.  Then there is that 212 number.  That's you, right?

7   A.  Yes.

8   Q.  You write:  Hey, I believe you spoke to Akeel.  Feel free

9   to call me if you need to.  Right?

10  A.  That's what the document states, yes.

11  Q.  You had conversations with Mr. Shkreli about pyrimethamine

12  ANDAs while he was incarcerated, right?

13  A.  Yes.  I think that would be a fair statement.

14  Q.  Let's see.  That was October 25.  Let's go forward to

15  November 2.

16          MR. WEINGARTEN:  Let's put up GX-1130, please.  Let's

17  go to the very -- let's turn the page, please.

18  Q.  This is a series of e-mails between you and a Mr. Deepak

19  Mohan, correct?

20  A.  Yes, seems that way.

21  Q.  Mr. Mohan worked at a company called Mape Group, right?

22  A.  Yes.

23  Q.  Mape Group was the majority owner of RL Fine?

24  A.  I believe so.

25          MR. WEINGARTEN:  Your Honor, I move to admit

1    Government Exhibit 1130.

2              THE COURT:  Received.

3              (Government Exhibit 1130 received in evidence)

4    Q.  This e-mail that Ms. Flint has highlighted, let's take a

5    look at that whole thing.

6              On November 2, you write to Mr. Mohan:  Nice to

7    virtually meet you.  As previously discussed, we would like to

8    formalize our exclusive agreement with RL Fine chem for the

9    distribution of any and all pyrimethamine-based products.  Do

10   you see that?

11   A.  Yes.

12   Q.  As of November 2, you had already discussed an exclusive

13   agreement with RL Fine, right?

14   A.  That's what it would seem like, yes.

15   Q.  Now you are trying to formalize that discussion, right?

16   A.  Yes.  It seems that way.

17   Q.  At this point you are telling Mr. Mohan the terms are for

18   $1.2 million a year to be paid monthly and $250,000 to be paid

19   immediately upon execution of a term sheet, right?

20   A.  That is what this states, yes.

21   Q.  Then you also offered him a guarantee of a minimum of $1

22   million for other products and/or investments to RL Fine,

23   right?

24   A.  Seems that way, yes.

25   Q.  You can take that down.

1       In fact, you flew to India in November 2017 and

2  discussed this e-mail with RL Fine in person, right?

3  A.  I believe so, yes.

4  Q.  So somehow between the e-mail we saw where they said, RL

5  Fine said no about supplying pyrimethamine, you got them to get

6  to a yes, right?

7  A.  Again, I'm a little bit confused by that first message of

8  why they said they couldn't do it, and I would also add to that

9  I don't know if it was a sole endeavor.  But if we are going to

10  go off the basis that they had said, no, which I am not sure if

11  I can agree with, and now they are saying yes, it seems that

12  their mind was changed and I would agree with that statement.

13  Q.  RL Fine changed its mind after you introduced a, quote,

14  more robust relationship as a concept, right?

15  A.  I and others, yes.

16  Q.  A more robust relationship meant signing an additional

17  product development agreement, for example, right?

18  A.  I believe -- I could be mistaken.  I believe it was a

19  collaboration agreement.

20  Q.  That was part of having a more robust relationship with RL

21  Fine?

22  A.  Amongst other things, yes.

23  Q.  And a more robust relationship ultimately meant more money

24  for RL Fine, right?

25  A.  Yes.

1    MR. WEINGARTEN:  Let's take a look at Government

2  Exhibit 1108, please.  This is already in evidence as

3  Government Exhibit 9005.  Let's take a look at 002, please,

4  Mr. Flint.

5  Q.  You see that title, product collaboration agreement?

6  A.  Yes.

7  Q.  Those were your initials at the bottom along with someone

8  else's, right?

9  A.  Yes, sir.

10  Q.  Let's go to page 010, please.  You signed this one on

11  behalf of Vyera Pharmaceuticals?

12  A.  Yes.  That's my signature.

13  Q.  Let's take a look at 012, please.  That's the distribution

14  and supply agreement for pyrimethamine API, right?

15  A.  Yes.

16  Q.  And you again initialed every page of this agreement,

17  right?

18  A.  I can't say every page, but I have no reason to believe

19  that I didn't.

20  Q.  Let's make sure about your signature at least.

21    MR. WEINGARTEN:  On page 016, if we could turn to

22  that, Ms. Flint.  Let's go to the very end of this one.  Keep

23  going.  Keep going.

24  Q.  Those are all your initials at the bottom, right?

25  A.  Yes.

 1  Q.  That's your signature at the end of the document on behalf

 2  of Vyera, right?

 3  A.  Yes.

 4  Q.  This document said that RL Fine would not sell API anywhere

 5  in the world other than India, pyrimethamine API to anyone else

 6  anywhere in the world other than India, right?

 7  A.  Could you say that one more time, please.

 8  Q.  This document had an exclusivity provision, right?

 9  A.  I believe so, yes.

10  Q.  In fact, let's just take a quick look.

11        MR. WEINGARTEN:  016, Ms. Flint, please.

12  Q.  You see the little (b) there, exclusivity?  You see that?

13  A.  Yes.

14  Q.  Do you understand that provision to mean that RL Fine won't

15  accept, with Vyera's consent, sell any pyrimethamine API

16  anywhere other than India?

17  A.  So this is added with the consent, and I would have to see

18  the definition of territory.

19  Q.  We can get to the definition of territory.

20        MR. WEINGARTEN:  Can you page up, Ms. Flint, to page

21  002.  Actually, strike that.  Can you go to 015.

22  Q.  Do you see the word territory is defined there, sir?

23  A.  Yes.

24  Q.  Territory means the world other than India?

25  A.  Yes.

 1   Q.  The exclusivity was, without Vyera's consent, RL Fine won't

 2   sell API anywhere other than India, right?

 3   A.  Yes.  Without Vyera's consent.

 4   Q.  Let's look a little bit at the payments.

 5            MR. WEINGARTEN:  Can we go to 002, please.

 6   Q.  Here at the bottom it says purchase price.  Vyera would pay

 7   fair market value for any pyrimethamine API RL Fine sold,

 8   right?

 9   A.  I'm sorry again.  One more time.

10   Q.  Under the terms of the agreement, Vyera would pay fair

11   market value for any pyrimethamine API it bought from RL Fine,

12   right?

13   A.  Yes.

14   Q.  Let's go to the next page, 023.  Vyera also paid -- if you

15   would look to section 5.01, it says:  Payment upon execution.

16   Upon execution and delivery by the parties of this agreement,

17   Vyera pays RL Fine $1 million.  Do you see that?

18   A.  Yes.  Towards expenses for filing the U.S. DMF.

19   Q.  Vyera paid that before RL Fine did any work on the DMF,

20   right?

21   A.  I am not sure.

22   Q.  And you included that provision about $1 million upon

23   execution of the agreement because you thought it was necessary

24   to beginning the relationship with RL Fine, right?

25   A.  I think that's a fair statement, yes.

1    Q.  Meaning there were lots of parties out there that may have

2    wanted to work with RL Fine and Vyera wanted to stand out,

3    correct?

4    A.  I think that's fair, yes.

5    Q.  Money talks in business, so you paid a premium, right?

6    A.  I think that's fair, yes.

7          MR. WEINGARTEN:  Let's just look at the product

8    collaboration agreement, 003, please, Ms. Flint.  Another

9    payment.

10   Q.  Do you see section 4, payment upon execution?

11   A.  Yes.

12   Q.  Here too, sir, upon execution and delivery by the parties

13   of this agreement, the company pays provider, that is, Vyera

14   pays RL Fine another million dollars as a nonrefundable

15   payment, right?

16   A.  Yes.

17         MR. WEINGARTEN:  You can take that down, Ms. Flint.

18   Thank you.

19   Q.  In your direct testimony you already stated that Vyera did

20   not conduct extensive due diligence on RL Fine, right?

21   A.  Would you mind if we looked at that?

22   Q.  Sure.  Paragraph 51, page 16 of your testimony.  We did not

23   conduct extensive due diligence on RL Fine during the

24   negotiations.  That was your testimony, right?

25   A.  Yes, Mr. Weingarten.

1    Q.  That's truthful and accurate, right?

2    A.  Yes.

3    Q.  You actually personally conducted some due diligence on RL

4    Fine, you said, and toward their facilities?

5    A.  Yes.

6    Q.  But you don't have any formal training in reviewing API

7    facilities, correct?

8    A.  No.

9    Q.  You wouldn't know what to look for at RL Fine's facilities,

10   correct?

11   A.  I was looking at it more from a business and practical

12   standpoint.  I wanted to see that there was bricks and mortar.

13   I wanted to see that there was employees.  I wanted to see that

14   there was boots on the ground and operations and a buttoned-up

15   business.

16   Q.  Other than seeing that there was actually a structure and

17   maybe employees, you wouldn't know what to look for at an API

18   manufacturing facility, correct?

19   A.  I do not have formal training in conducting inspections of

20   API facilities.

21   Q.  You wouldn't know what to look for, right?

22           MR. POLLACK:  Objection.  Vague and argumentative.

23           THE COURT:  Overruled.

24   A.  I think that's a fair statement, yes.

25   Q.  One last thing, sir.

1          MR. WEINGARTEN:  Can we look at Government Exhibit

2    1490, please:

3    Q.  RL Fine, to your knowledge, never filed a DMF for

4    pyrimethamine, right?

5    A.  To my knowledge, no.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   BY MR. WEINGARTEN:

 2   Q.  And you never ended up -- strike that.

 3           Vyera never ended up introducing any products with

 4   RL Fine, right?

 5   A.  Disappointingly, no.

 6   Q.  The answer was no?

 7   A.  Yes, sir.

 8           MR. WEINGARTEN:  Let's look at Government Exhibit

 9   1490, please.  And this is another set of board minutes.  This

10   is already in evidence as part of GX 9005.

11   Q.  December 15, 2017 board minutes for Turing Pharmaceuticals;

12   do you see that?

13   A.  Yes.

14           MR. WEINGARTEN:  And, Ms. Flint, let's go to the

15   attendees.

16   Q.  Do you see where it says, "Present:  Kevin Mulleady,

17   Chairman"?

18   A.  Yes.

19           MR. WEINGARTEN:  Let's go to page 003, please,

20   Ms. Flint.

21   Q.  In the first paragraph, one of the attorneys is informing

22   members of the board about discussions about collaborating in a

23   business relationship with RL Fine, right?

24   A.  Yes, that's what the document states.

25   Q.  And the collaboration is going to be based on a product
```

1    collaboration agreement, distribution and supply agreement, and

2    the bank payment guarantee, right?

3    A.  Yes, that's what the document states.

4    Q.  And do you remember that part of the deal with RL Fine was

5    they would get a worldwide royalty on pyrimethamine sales?

6    A.  They would get a worldwide royalty on pyrimethamine sales?

7    I was under the impression that they would get a royalty from

8    us for U.S. sales, and we would get a commission for API sales

9    ex-U.S.

10            MR. WEINGARTEN:  Let's quickly — I'm sorry to do

11   this -- 108 at 023.  Let's go back to the agreement.

12   Q.  Can you look where it says Section 5.02(a).

13            MR. WEINGARTEN:  Keep going down, please.  It's 023,

14   Ms. Flint, page 023.

15   Q.  The bottom part says: "Royalty:  Company shall also pay to

16   supplier royalty payments in the amount of 7-1/2 percent of net

17   revenues of products sold by company."

18            Do you see that, sir?

19   A.  Yes, but that's not worldwide.  We were only allowed to

20   sell in the United States.

21   Q.  Well, let's look at the definition of products.

22            MR. WEINGARTEN:  Can we go back a few pages, to 001,

23   please.

24            Strike that.  Let's go to page 15.  We're going to

25   look for the definition of products.

1          Go back one page, to 14, please.

2    Q.  "Product:  'Product' means any product directly or

3    indirectly manufactured, sold, or marketed by company and any

4    of its affiliates that contain the API."

5          Do you see that?

6    A.  So the company could only sell in the United States, so it

7    would be a conflict to worldwide sales.

8    Q.  So any sales of product by the company where it was allowed

9    to sell product, a 7-1/2 percent royalty would go to RL Fine,

10   right?

11   A.  Yes, in the United States.

12   Q.  And that royalty was actually guaranteed by Vyera to be at

13   least $3 million?

14   A.  It sounds accurate.

15          MR. WEINGARTEN:  Let's go back to those board minutes,

16   GX 1490, at 003.

17   Q.  The board approved the deals, right?

18   A.  Yes.

19   Q.  Let's look at the second paragraph on this page, "the

20   rationale."  This is in the board minutes — "The rationale

21   behind the collaboration with RL Fine is the diversification of

22   the group's revenue stream and the potential market entry by

23   generic manufacturers and distributors, respectively."

24          Do you see that, sir?

25   A.  Yes.

1    Q.  And then --

2             MR. POLLACK:  Objection, your Honor.  This is hearsay

3    within hearsay of a statement by an unidentified person in the

4    board minutes.

5             THE COURT:  Overruled.

6    BY MR. WEINGARTEN:

7    Q.  According to information available to the board, according

8    to the minutes, one or two potential competitors are currently

9    in the process of preparing their market entry.

10            Do you see that?

11   A.  Yes.

12   Q.  So potential market entry by generics was discussed as part

13   of the rationale for entering into these agreements with

14   RL Fine, right?

15   A.  Yes.  We needed to diversify our revenue stream because we

16   were concerned that Daraprim would be cliffing off.

17   Q.  "Cliffing off" means a material loss of sales if a generic

18   entered?

19   A.  Yes.

20            MR. WEINGARTEN:  I don't have anything further at this

21   time, your Honor.

22            THE COURT:  Shall we take our midafternoon recess,

23   counsel?

24            (Recess)

25            THE COURT:  Mr. Mulleady, would you like to retake the

 1    stand, please.

 2               THE WITNESS:  Thank you, your Honor.

 3               THE COURT:  Cross-examination?

 4               MR. POLLACK:  Thank you, your Honor.

 5    CROSS-EXAMINATION

 6    BY MR. POLLACK:

 7    Q.  Mr. Mulleady, good afternoon.

 8    A.  Good afternoon.

 9    Q.  My name is Jeff Pollack.  I'm an attorney for Mr. Shkreli.

10    I just have a few questions for you following up on

11    Mr. Weingarten's examination.

12               During your examination, you talked about

13    communications you had had with Mr. Shkreli while you were the

14    CEO and chairman of Vyera and its parent corporation,

15    Phoenixus, correct?

16    A.  Yes.

17    Q.  One of the communications you discussed was

18    Exhibit GX 1104.  It was a communication between you and

19    Mr. Shkreli concerning a potential transaction with RL Fine.

20               Do you remember the document during your examination?

21    A.  No.

22               Is there any chance we can pull it up?

23               MR. POLLACK:  Justin, can we bring that up, please?

24               THE WITNESS:  I have it here.

25               MR. POLLACK:  Can we enlarge everything from the top

1   down to August 24th?  Right there, that's good.

2   BY MR. POLLACK:

3   Q.  Do you remember discussing this document with

4   Mr. Weingarten?

5   A.  Yes, Mr. Pollack.

6   Q.  I just want to draw your attention to your email at the top

7   of the page to Mr. Shkreli, where you say, "We will keep you

8   more in the loop on communications."

9        Mr. Mulleady, why did you offer to keep Mr. Shkreli

10  more in the loop on these kinds of communications?

11  A.  Part of the role of chairman, per the mandate, is to

12  communicate with the shareholders, and Martin, being one of the

13  largest shareholders, he wanted to be more involved in the

14  company and the state of affairs, and I wanted to give him that

15  peace of mind.

16  Q.  Mr. Mulleady, at this point in time, how long had you been

17  with the company as its chairman and CEO?

18  A.  Excuse me.  This would be in the early stages of coming

19  back to the company.  I don't know if I was CEO yet.  I believe

20  I was chairman.

21  Q.  Were there any other reasons why you would reach out to

22  Mr. Shkreli on something like this?

23  A.  As mentioned prior, Mr. Shkreli has a very thorough

24  knowledge base in the industry, and I was trying to come up to

25  the learning curve as quick as possible, and I was trying to

1   use whatever resources were at my disposal in order to come up

2   to that learning curve.

3   Q.  Can you tell us whether or not you were seeking his advice

4   on this matter?

5   A.  I do not recall.

6   Q.  Would your deposition testimony refresh your recollection

7   on this?

8   A.  If it discusses it, yes.

9        MR. POLLACK:  Justin, can we bring up Mr. Mulleady's

10  deposition testimony at page 206, lines 3 through 10, please.

11       You can take that down.  Take that down, please.  I

12  believe it must be his IH testimony.  Give me one moment.

13       Bring up the IH testimony, the same page, please.

14  Q.  Mr. Mulleady, take a moment to read that and tell me if

15  that refreshes your recollection as to why you were reaching

16  out to Mr. Shkreli about this matter on 1104.

17  A.  The previous document was 1104?

18  Q.  The one we were just looking at.

19  A.  Thank you.

20  Q.  Also referenced in the question posed by the questioning

21  attorney here.

22  A.  I see.  Thank you.

23       That is what I state, that I was seeking his advice,

24  and I gave that testimony truthfully and honestly.

25  Q.  And is that why you were offering to keep him in the loop?

 1   A.  I think that's fair to say.

 2   Q.  Now, Mr. Mulleady, when you talked to Mr. Shkreli during

 3   your time as CEO, did Mr. Shkreli make suggestions to you about

 4   the business?

 5   A.  Yes.

 6   Q.  And I believe we saw a spreadsheet at GX 1349 listing a

 7   number of communications you had with Mr. Shkreli during your

 8   tenure either as CEO or chairman of the company, correct?

 9   A.  Yes.  I don't recall the exact exhibit, but if you're

10   referring to the Excel file of email communications, I recall.

11   Q.  When Mr. Shkreli would make suggestions to you about

12   running the business, would you always follow his suggestions?

13   A.  No.  Rarely.

14   Q.  Mr. Mulleady, that's all the questions I have for you.

15   Thank you.

16   A.  Thank you, Mr. Pollack.

17            THE COURT:  Any redirect?

18            MR. WEINGARTEN:  Nothing further, your Honor.  Thank

19   you.

20            THE COURT:  You may step down.

21            THE WITNESS:  Thank you, your Honor.

22            (Witness excused)

23            MR. POLLACK:  I forgot my binder, Judge.

24            THE COURT:  That's fine.

25            Next witness.

1034

1          MR. MEIER:  Your Honor, the government has completed

2     calling all of its witnesses.  Just as a reminder, we talked

3     about a couple of administrative matters this morning.  Subject

4     to moving a couple of more exhibits in tomorrow, we are

5     complete with our presentation of evidence.

6          THE COURT:  So with those two caveats, the government

7     rests?

8          MR. MEIER:  Yes, your Honor.

9          THE COURT:  Defense case.

10          MR. POLLACK:  Thank you, your Honor.

11          We're prepared to call some witnesses.  We'd like to

12     move in some evidence --

13          THE COURT:  Sure.

14          MR. POLLACK:  -- first, if it pleases the Court.

15          Your Honor, the first piece of evidence we would like

16     to move in is Exhibit DX 538.  This is the written testimony of

17     Anne Kirby.  It is being offered by agreement of the parties.

18     We have stricken, I believe, four paragraphs, which is noted in

19     the cover page, also by agreement.

20          THE COURT:  Any objection?

21          MR. MEIER:  No objection, your Honor.

22          THE COURT:  Received.

23          (Defendant's Exhibit 538 received in evidence)

24          MR. POLLACK:  Your Honor, the second piece of evidence

25     we'd like to move in, and it should have been my first, but it

1    was not in the right order, but it's the written testimony of

2    Mr. Shkreli.

3            THE COURT:  DX?

4            MR. POLLACK:  Yes, you're right.  DX 546.

5            We are also moving in with this Trial Exhibits DX 497

6    and DX 126.

7            THE COURT:  Any objection?

8            MR. MEIER:  Your Honor, if I might?

9            MR. POLLACK:  Oh, I've made a mistake.  Let me correct

10   the record.

11           So my colleague just told me that the errata says that

12   we have made a correction to the affidavit, which is that there

13   was a reference to DX 497 -- a reference to DX 126, which

14   should be 497.  And I do understand that the plaintiffs have

15   two objections to this document.

16           THE COURT:  Okay.  So I have just been handed DX 546,

17   which is the Shkreli direct testimony, and on the first page,

18   it explains that the reference to DX 126 should be to DX 497.

19   So the offer is for receipt of 546 and 497?  Is that what I

20   should understand?

21           MR. POLLACK:  So what you should understand is that

22   where Trial Exhibit 126 is referenced in paragraph 67, it

23   should be a reference to 497.

24           THE COURT:  So you're not offering 497?

25           MR. POLLACK:  We will offer it.  We haven't yet

1    conferred with our adversary about that, those two exhibits

2    yet.  We plan to offer them tomorrow.

3            THE COURT:  Okay.  So all you're offering right now --

4            MR. POLLACK:  Is the affidavit.

5            THE COURT:  -- is DX 546, with one change?

6            MR. POLLACK:  Absolutely.  And I'm sorry that I was so

7    unclear about that.

8            THE COURT:  That's no problem.

9            Any objection?

10           MR. MEIER:  Yes, your Honor.

11           The government has objections that we had indicated

12   over the weekend to defendants, with a statement in

13   paragraph 44 of Mr. Shkreli's testimony, and paragraph 45.

14   Specifically, your Honor, paragraph 44 starts with, "while

15   exclusivity clauses between API suppliers and pharmaceutical

16   companies are common," and then it goes on from there.

17   Frankly, your Honor, there's no basis for this testimony from

18   Mr. Shkreli, there's no foundation.  I don't think it's

19   appropriate lay opinion testimony; I think it's appropriate for

20   expert testimony.  And I would strike that clause.

21           THE COURT:  And the same analysis for 45?

22           MR. MEIER:  Correct, your Honor.

23           THE COURT:  I'll hear defense counsel.

24           MR. POLLACK:  Your Honor, Mr. Shkreli is experienced

25   in the pharmaceutical industry dating back to 2012.  These are

1    statements made based upon his experience, his perceptions, and

2    his understandings of the industry.  This is analogous to the

3    same testimony we moved to strike as to other witnesses

4    offering opinions as to the FDA.  We believe it is proper lay

5    testimony on these issues based upon Mr. Shkreli's experience

6    and knowledge.

7         THE COURT:  Well, if you want to direct me to any

8    ruling in particular that I've made which you think this would

9    relate to, I'm happy to consider that, but, off the top of my

10   head, all I remember are statements from pharmaceutical

11   executives, with decades of experience in the industry, talking

12   about their background and understanding that they used in

13   running their companies.  So paragraphs 44 and 45 are stricken.

14         Any other objection?

15         MR. MEIER:  No further objection, your Honor, subject

16   to these exhibits that they also want to move in, which I

17   understand they're going to try to move in tomorrow separately

18   from the declaration itself.

19         THE COURT:  So DX 546, with that amendment, is

20   received.

21         (Defendant's Exhibit 546 received in evidence)

22         THE COURT:  Next?

23         MR. POLLACK:  Your Honor, Mr. Rudowitz will handle the

24   next two exhibits we're moving in.  Thank you.

25         MR. RUDOWITZ:  Your Honor, AJ Rudowitz, on behalf of

1    Martin Shkreli.

2            We seek to admit, first, a list of trial exhibits to

3    be admitted into evidence.  The first one is DX 901, and I

4    believe that we have reached an agreement with plaintiffs for

5    the admission of the documents on this list.

6            THE COURT:  Any objection to the receipt of 901,

7    DX 901, and the exhibits listed on it?

8            MR. MEIER:  Your Honor, we do not have any objections

9    to the admission of DX 901.

10           THE COURT:  And its exhibits?

11           MR. MEIER:  And its exhibits, yes, your Honor.

12           THE COURT:  Received.

13           (Defendant's Exhibit 901 and exhibits listed therein

14   received in evidence)

15           MR. RUDOWITZ:  Your Honor, next, we seek to admit into

16   evidence a second list of exhibits that is Bates numbered

17   DX 902, as well as the exhibits listed therein, and, similarly,

18   I believe that we have reached agreement on these exhibits, as

19   well, with plaintiffs.

20           THE COURT:  Any objection to the receipt of DX 902 and

21   its exhibits?

22           MR. MEIER:  Your Honor, the government does not object

23   to the admission of DX 902 and its exhibits.

24           THE COURT:  Received.

25           (Defendant's Exhibit 902 and exhibits listed therein

1    received in evidence)

2            MR. PARKS:  Your Honor, with that taken care of,

3    Defendant Martin Shkreli calls John Russell.

4            THE COURT:  Thank you.

5            Mr. Russell, if you could take the witness stand here,

6    please — no need to rush — and remain standing.

7     JOHN S. RUSSELL,

8        called as a witness by the Defendant,

9        having been duly sworn, testified as follows: is

10           THE COURT:  Now, ventilation in this room has been

11   tested, and you are permitted to take off your mask while

12   seated in that chair, if you would like.

13           THE WITNESS:  Thank you.

14           THE COURT:  Please state your full name.

15           THE WITNESS:  John S. Russell.

16           THE COURT:  Spell your first name.

17           THE WITNESS:  J-o-h-n.

18           THE COURT:  And then it's middle initial S?

19           THE WITNESS:  S, yes.

20           THE COURT:  And how do you spell your last name?

21           THE WITNESS:  R-u-s-s-e-l-l.

22           THE COURT:  And that mic moves, so adjust it so it's a

23   little bit under your chin.

24           THE WITNESS:  Okay.

25           THE COURT:  Speak towards it, but not directly into

1    it.

2              You're about to be handed an exhibit --

3              And, counsel, what's the DX number?

4              MR. PARKS:  Your Honor, it's DX 542.

5              THE COURT:  -- DX 542, which is your affidavit

6    constituting your direct testimony in this case.

7              If you turn to page 34, I believe you authorized the

8    addition of your electronic signature to that page; am I right?

9              THE WITNESS:  Yes, ma'am.

10             THE COURT:  And before you did that, did you read this

11   document carefully?

12             THE WITNESS:  I did.

13             THE COURT:  And do you swear to the truth of its

14   contents?

15             THE WITNESS:  I do.

16             THE COURT:  Okay.

17             Now, many passages here, counsel, I am aware, have

18   been stricken, based on prior rulings I've made.  Is there any

19   further objection to receipt of DX 902?

20             MR. PARKS:  542, your Honor.

21             THE COURT:  I'm sorry, DX 542?  Thank you.

22             MR. WEINGARTEN:  No, your Honor.

23             THE COURT:  Now, this DX 542, is it a redacted

24   document?

25             MR. PARKS:  Your Honor, there is a version that is for

1  under-seal use, and there is a public version, so I believe the

2  answer to your question, if you mean redactions with respect to

3  sealed issues, yes.  And I have a copy of the public version.

4  I also have a copy of the under-seal version, and I'm happy to

5  distribute whichever the Court would prefer to have, or both.

6         THE COURT:  Well, I have reviewed, in preparation for

7  this testimony, my markup based on what I thought the rulings

8  were that were communicated to counsel.

9         I would just like to make sure that I read everything

10  that counsel think I'm reading, so I would like copies of those

11  two documents that would reflect the redactions based on my

12  rulings.

13         MR. PARKS:  Yes, your Honor.

14         And my understanding, although I was not personally

15  involved in these discussions, is that there were discussions

16  with counsel for the FTC, and there has been agreement reached

17  as to these redactions.

18         THE COURT:  Okay.

19         MR. PARKS:  Or as to the redactions based on the

20  exclusions based on your Honor's ruling.

21         THE COURT:  Great.

22         I need to see those documents.  Thanks so much.

23         MR. PARKS:  This is the under-seal version.

24         This would be the public version.

25         THE COURT:  Thank you.

 1              Cross-examination?

 2    CROSS-EXAMINATION

 3    BY MR. WEINGARTEN:

 4    Q.  Good afternoon, Mr. Russell.

 5    A.  Good afternoon.

 6    Q.  My name is James Weingarten.  I'm an attorney with the

 7    Federal Trade Commission, and I am representing the plaintiffs

 8    in this case.

 9              You and I met previously at your deposition, I

10    believe?

11    A.  That's correct.  I recall.

12    Q.  I'm going to be asking you some questions today about the

13    written testimony that was just submitted to the Court and the

14    opinions that you're offering in this case.  Okay?

15    A.  Fair enough.

16    Q.  I'd like to start by talking to you about the opinions

17    you've offered about Vyera's distribution system.  Okay?

18    A.  Sure.

19    Q.  Daraprim was in open distribution starting in 1953, right?

20    A.  Yes, I believe that's correct.

21    Q.  And you're not offering any opinion in your testimony today

22    about any examples of drugs that were in open distribution for

23    ten or more years and then moved into specialty, correct?

24    A.  That's correct.

25    Q.  In your direct testimony, you state that Vyera identified

 1  some compelling reasons, in your opinion, to market Daraprim

 2  through specialty distribution, right?

 3  A.  Yes.

 4  Q.  And one of the reasons was the cost of Daraprim, right?

 5  A.  Yes.

 6  Q.  Another that you identified is a small patient population

 7  with compliance issues, right?

 8  A.  Correct.

 9  Q.  And another reason you identified was helping patients with

10  insurance claims and assuring coverage for their treatment,

11  right?

12  A.  Yes, I believe that's correct.

13  Q.  Did I miss any of the compelling reasons you identified?

14  A.  I'd have to look at my report, but I think you've covered

15  most of them.

16  Q.  Let's talk about cost.

17          Now, it was Vyera that, in August of 2015, increased

18  the price of Daraprim from almost $17.50 per tablet to $750 per

19  tablet, right?

20  A.  That's my understanding, yes.

21  Q.  Turning to patient compliance:  You're not opining that

22  Vyera's distribution system actually helped with patient

23  compliance, correct?

24  A.  I believe that based on my experience, normally, a drug in

25  specialty distribution does enhance compliance for patients.

1   Q.  Right.

2           I understand your general point, but you're not

3   offering an opinion about actual effects on patient compliance

4   from the Vyera system, right?

5   A.  No, I'm not.

6   Q.  And you're not opining that Vyera's distribution system

7   resulted in better patient compliance than the previous system,

8   right?

9   A.  No, I'm not doing that.

10  Q.  And you didn't identify any realized patient benefits from

11  specialty distribution of Daraprim, correct?

12  A.  Did you mean quantify specific benefits?

13  Q.  Correct.

14  A.  I did not quantify specific benefits, no.

15  Q.  You didn't offer any opinion in this case that there was an

16  unmet patient need with respect to Daraprim at any time, right?

17  A.  Well, I think I mentioned in my report that there were

18  complicated regimens with these antiretrovirals, and having a

19  specialty distribution system would aid and support that kind

20  of thing.

21  Q.  But you're not offering a particular opinion -- strike

22  that.

23          You're not offering a specific opinion that there was

24  an unmet patient need for Daraprim at any particular point in

25  time, right?

1    A.  I did not offer any opinion about enhanced or increased

2    medical need.

3    Q.  And you are not offering an opinion for the Court's

4    consideration that Vyera's distribution system for Daraprim

5    actually helped patients pay for Daraprim, right?

6    A.  I'm sorry, helped patient to what?  Excuse me?

7    Q.  Pay for Daraprim.

8    A.  Oh.  No, I did not.

9    Q.  And you're not opining that Vyera's distribution system

10   actually helped with inventory management of Daraprim, correct?

11   A.  Well, I alluded to it's one of the potential benefits of

12   having a specialty system, yes, in place, correct.

13   Q.  It's a potential benefit, but you're not opining that that

14   potential benefit was actually realized, correct?

15   A.  I did not do that, no.

16   Q.  And let's look at some potential benefits.

17          In your direct testimony, you discuss some potential

18   benefits for distribution of Daraprim in specialty that a

19   company called Amedra identified, right?

20   A.  Yes.

21   Q.  And Amedra identified some potential benefits from

22   specialty distribution, right?

23   A.  They did.

24   Q.  But you didn't evaluate whether anyone ever realized any of

25   the potential benefits Amedra identified, right?

1   A.  Well, I think what I said in my deposition was that

2   normally a company that initiates that kind of specialty

3   distribution system and another company acquires the drug, they

4   would rely on the improvement based on the drug they have, in

5   compliance or any other factors that you were measuring.

6   Q.  Well, let's take a look at your deposition, sir.  It's page

7   213 of your deposition, lines 8 to 14.

8   "Q.  My question is:  Whether it was Amedra that realized the

9   benefits or not, did you ever do any analysis of whether

10  anyone — Vyera or Impax — realized the potential benefits that

11  you talk about in paragraph 86?

12  "A.  I don't believe I did a specific analysis for Daraprim,

13  no."

14          And that testimony was truthful when you gave it,

15  right, sir?

16  A.  I don't see paragraph 86, but I'll take your word for it.

17  Q.  So you didn't do an analysis of whether the potential

18  benefits Amedra identified were actually realized by anyone,

19  correct?

20  A.  That's correct, yes.

21  Q.  Now, you talk about some industry trends in your direct

22  testimony, right?

23  A.  Correct.

24  Q.  Industry trends with respect to specialty distribution

25  generally, right?

1    A.  That's correct, yes.

2    Q.  And you didn't do any -- strike that.

3           You're not offering any opinions or analysis today

4    about industry trends with respect to companies conducting

5    bottle audits, right?

6    A.  I didn't offer an opinion on that.

7    Q.  And you didn't do -- you're not offering an opinion on

8    industry trends with respect to quantity limits on purchases of

9    a prescription drug, right?

10   A.  I don't believe I did, no.

11   Q.  And you don't in an analysis of -- strike that.

12          You're not offering an opinion about industry trends

13   with respect to removing accounts that are eligible to receive

14   a pharmaceutical product, right?

15   A.  No, I'm talking more generally about the benefits of

16   specialty distribution.

17   Q.  Okay.

18          Let's just talk a little bit about data blocking.

19   Now, I believe your opinion that you offer refers to data

20   sharing; is that right?

21          Yes, here we go.

22          Your opinion is that agreements limiting distributor

23   data sharing did not prevent manufacturers from estimating the

24   size of the market opportunity.

25          That is your opinion, right?

1    A.  Yes.

2    Q.  Another word for agreements limiting distributor data

3    sharing is "data blocking agreements," right?

4    A.  They could be construed that way, yes.

5    Q.  That's, in fact, what some of the agreements that are at

6    issue here are called; they're called data blocking agreements,

7    correct?

8    A.  Yes, that's one way to describe them.

9    Q.  Let's talk about your opinions about Vyera's data blocking

10   agreements.

11          In the course of your work on this case, you never

12   reviewed any IQVIA data for Daraprim, right?

13   A.  I did not, no.

14   Q.  You do note there are other sources of data for estimating

15   a pharmaceutical market besides IQVIA, right?

16   A.  Correct.

17   Q.  But you didn't analyze the accuracy of any of those other

18   sources, right?

19   A.  I didn't look at other sources, no.

20   Q.  And you didn't try on your own to undertake an estimate of

21   the size of the market for Daraprim at any point, right?

22   A.  No.  I didn't feel it was necessary.

23   Q.  And you're not offering any opinions about why Vyera

24   entered into data blocking agreements, right?

25   A.  No, I'm not, no.

1    Q.  Let's talk about API.  Let's start first with Fukuzyu.

2         I believe your opinion that you're offering to the

3    Court for its consideration is that Vyera's supply agreements

4    with Fukuzyu were consistent with industry practice; is that

5    right?

6    A.  Yes.

7    Q.  You didn't analyze the terms of Fukuzyu's deal with Vyera,

8    right?

9    A.  I didn't look at the specific terms, no.

10   Q.  And you didn't analyze how the terms of the agreement

11   between Vyera and Fukuzyu mitigated Vyera's supply risk, right?

12   A.  My sense, based on my experience, it would mitigate supply

13   risk because Vyera was a small firm and only had one product in

14   the market, so they were mitigating risk, in my view.

15   Q.  Right.

16        But you're not offering any opinion, sir, as to how

17   the terms, the specific terms, of Vyera's agreement with

18   Fukuzyu mitigated API supply risk, right?

19   A.  Not specifically, no.

20   Q.  And, in fact, Vyera's deal, its supply deal, with Fukuzyu

21   doesn't actually require Fukuzyu to make any deliveries of

22   pyrimethamine API to Vyera, right?

23   A.  As I recall, that's correct.  But I've seen deals of a

24   different nature, which I discussed with you in my deposition,

25   that would seem abnormal perhaps but which are in the

 1   marketplace.

 2   Q.  Would you characterize Vyera's deal with Fukuzyu as also

 3   being one of those abnormal deals?

 4   A.  Not really, no.

 5   Q.  But it doesn't actually require Fukuzyu to supply any

 6   pyrimethamine to Vyera, right?

 7   A.  As I recall, it does not.

 8   Q.  When Vyera acquired Daraprim, the product, it also acquired

 9   a stock or inventory of some pyrimethamine API, right?

10   A.  That's correct.

11   Q.  And you, in discussing Fukuzyu, in your written testimony,

12   you opine that the deposition testimony suggests Vyera

13   employees were concerned that Vyera was going to run out of API

14   to manufacture Daraprim, right?

15   A.  Yes.

16   Q.  And you don't cite any Vyera documents substantiating that

17   concern, right?

18   A.  I don't recall.

19   Q.  Well, let's look at the information at the time.

20           In your opinion, or in your direct testimony to this

21   Court, Vyera had a, quote, substantial amount of pyrimethamine

22   API on hand after it had bought Daraprim, right?

23   A.  Yes.

24   Q.  And in January of 2016, to be precise, Vyera had

25   75 kilograms of pyrimethamine API on hand, right?

1    A.  Sounds right, yes.

2    Q.  And Vyera needed only 55 kilograms per year to make

3    Daraprim, right?

4    A.  Yes, I believe that's right.

5    Q.  Also in your direct testimony, you explained to the Court

6    that 75 kilograms — that's what Vyera had as of January 2016 —

7    75 kilograms of pyrimethamine is enough to make 2.6 million

8    tablets of Daraprim; is that right?

9    A.  Yes, it's in my testimony.

10   Q.  Do you know how many tablets of Daraprim Vyera was selling

11   annually between 2016 and 2019?

12   A.  I don't recall.

13   Q.  Can I refresh your recollection by showing you some of the

14   testimony by some of the executives who might recall?

15   A.  Sure.

16           MR. WEINGARTEN:  Can we put DX 538 up, please.  This

17   is the written testimony of Ms. Kirby — I think it was just

18   entered into evidence — and let's go to page 26, please,

19   paragraph 119.

20           Next page, please.  There you go.

21   Q.  Now, Ms. Kirby's testimony, the defendants just sponsored,

22   was that after the initial sharp drop, annual tablet sales then

23   remained relatively flat, at approximately 250,000 tablets per

24   year from 2016 through 2019.

25           Do you see that?

1  A.  I do.

2  Q.  So does that refresh your recollection, sir, that from 2016

3  to 2019, sales of Daraprim were roughly 250,000 tablets per

4  year?

5  A.  Yes, that's what it says, yes.

6  Q.  So, based on your calculation, then, that in January 2016

7  Vyera had enough pyrimethamine in stock to make 2.6 million

8  tablets, that's ten years of Daraprim, right?

9  A.  Well, based on the tablet numbers cited here, that would be

10  correct, yes.

11  Q.  But your opinion is there was a concern about running out

12  of pyrimethamine API at Vyera?

13  A.  Well, you never know what can happen to inventories, you

14  never know what issues there might occur, again, they were

15  mitigating risk, in my view.

16  Q.  And it was your view also -- strike that.

17       Your opinion that you're presenting to this Court is

18  that Fukuzyu was a large and dependable supplier, right?

19  A.  Yes, they had a good track record.

20  Q.  So even if the ten years of tablets had somehow something

21  happen to them, Fukuzyu was still a large and dependable

22  supplier, right?

23  A.  Correct.  And I remind, this deal was done at arm's-length.

24  I mean, they had an option to consider other alternatives.

25  Q.  You you're not offering any opinions, though, about the

1   negotiation of this deal, are you?

2   A.  Not specific terms, no.

3   Q.  You're not offering any opinions about negotiating

4   strategies of either Fukuzyu or Vyera, right?

5   A.  No, more broadly, I'm saying the type of deal, I feel, was

6   supportive of someone having an exclusive agreement.

7   Q.  Let's talk about another basis for the Fukuzyu deal.

8   Sometimes you say firms might enter into exclusive agreements

9   with an API supplier because they want a long-term relationship

10  with that supplier, right?

11  A.  Yes.

12  Q.  On this point, you say, deposition testimony suggests Vyera

13  was interested in developing a long-term partnership for future

14  toxoplasmosis products, right?

15  A.  Yes.

16  Q.  And you cite Mr. Salinas' deposition testimony for that,

17  right?

18  A.  I do.

19  Q.  You say the company was — and you mean Vyera here, I

20  suppose — was contemplating ways it could develop improved

21  versions of Daraprim?

22  A.  Yes.

23  Q.  And you're not offering an opinion that any of those

24  programs that you mention or that Dr. Salinas testified about

25  ever came to fruition, right?

1  A.  I'm not offering an opinion on that, no.

2  Q.  So the exclusivity provision, as you understand it, between

3  Vyera and Fukuzyu precluded Fukuzyu from selling pyrimethamine

4  API to anybody else for human use in the United States, right?

5  A.  For human use, yes.

6  Q.  And Vyera's contract with Fukuzyu didn't require Fukuzyu to

7  supply any minimum amount of API to Vyera, right?

8  A.  That's right.

9  Q.  So, again, under this deal with Vyera and Fukuzyu, Fukuzyu

10 could supply zero kilograms of pyrimethamine API to Vyera,

11 right?

12 A.  That would be a potential option.

13 Q.  Okay.  Let's talk about RL Fine.

14         In your written direct testimony, you say that you

15 opine that Vyera's API supply agreement with RL Fine was

16 consistent with industry practice, right?

17 A.  Yes.

18 Q.  That's not the same opinion that you offered in your expert

19 report in this case, though, is it?

20 A.  Say that again, please.

21 Q.  That's not the same opinion that you offered in your expert

22 report, right?

23 A.  I'd have to look at the particular passages to compare

24 them.

25         MR. WEINGARTEN:  Let's take a look at Mr. Russell's

1   expert report, please, Ms. Flint, at page 10.

2   Q.  In the first heading there, to paragraph 33, you say,

3   "Vyera's API supply agreement with RL Fine was not inconsistent

4   with industry practice."

5        That's what you said in your report, right?

6   A.  Right.

7   Q.  That's not the same thing as saying something is

8   consistent, is it?

9   A.  I'd have to think about that more carefully.

10        So I think, in terms of how are the languages listed

11   here, I think really what I'm saying is, as a backup supplier,

12   that would be reasonable to do, to have a backup supplier.

13   Q.  Right, but I just want to be clear, sir.  Let's go to page

14   284 of your deposition, lines 4 through 10.  Your opinion in

15   your expert report was not the same as the opinion that you're

16   offering here today; isn't that correct?

17   A.  You would have to show them side by side, if you could.

18   Q.  Yes.  Here we are.  Your opinion today, sir -- you have

19   your written testimony in front of you?  We'll keep it easy for

20   Ms. Flint, if we can.  Do you have your written testimony?

21   A.  I do not, no.

22        MR. WEINGARTEN:  Your Honor, may I approach?

23        THE COURT:  Yes.  You don't need to ask permission.

24   Just identify for the record what you're showing the witness.

25        MR. WEINGARTEN:  I'm handing the witness the

1  under-seal copy of DX 542.

2          THE COURT:  Thank you.

3          THE WITNESS:  Thank you.

4  BY MR. WEINGARTEN:

5  Q.  If you could please go to page 27 of DX -- well, of your

6  written testimony today.

7          Do you see page 27 there, sir?

8  A.  I'm working on it.

9  Q.  Yes.  Take your time.

10  A.  Yes, I have it.

11  Q.  And the big heading at the top, in your testimony to the

12  Court, is, "Vyera's API Supply Agreement with RL Fine Was

13  Consistent With Industry Practice."

14          Do you see that?

15  A.  I do.

16          MR. WEINGARTEN:  And then I want Ms. Flint to please

17  put up page 284 of your deposition, lines 4 through 10.

18          MS. FLINT:  Mr. Weingarten, I am having issues with

19  our monitor right now.

20          MR. WEINGARTEN:  That's okay.

21          Let's try it this way.  Do we have a copy of the

22  deposition for Mr. Russell?

23          MS. FLINT:  I also do not have that.

24          MR. WEINGARTEN:  Your Honor, I know I don't need ask

25  to approach but it's a bit unusual:  I'm handing the witness a

1    copy of his deposition.  I've indicated lines 4 through 10 of

2    page 284.

3    Q.  Sir, can you please read that out loud, with the question

4    and the answer?

5    A.  "Okay.  You don't have an opinion in your report, sir, that

6    the terms of the RL Fine agreement with Vyera are consistent

7    with industry practice, correct?"

8            Then my answer was:  "No, I don't think I opined on

9    that, that's correct."

10   Q.  Thank you, sir.  I'll take that back.

11           So at your deposition you testified that you were not

12   offering the opinion that is in that heading in your written

13   direct testimony, right?

14   A.  Yes, that's correct.

15   Q.  Now, you opine that Vyera would need a reliable backup

16   supplier after their existing inventory of pyrimethamine API

17   was used, right?

18   A.  Yes.

19   Q.  Even though we just talked about the existing inventory

20   being 2.6 million tablets, right?

21   A.  Yes.

22   Q.  And as evidence for the need for a backup supplier on

23   Vyera's part, you cite deposition testimony from two Vyera

24   employees, right?

25   A.  I don't recall exactly, but that's probably right.

1   Q.  Let's take a look at — you have it now, I think I handed it

2   to you — DX 542 from your trial testimony, page 27, paragraph

3   115.

4   A.  Yes, I have it.

5   Q.  So, in support of your proposition about the importance of

6   having a backup supplier for Vyera, you cite the deposition of

7   Mr. Pelliccione and the deposition of Mr. Salinas, right?

8   A.  Yes, that's correct.

9   Q.  Were you here in court, sir, when Mr. Pelliccione and

10  Mr. Salinas testified?

11  A.  I was not.

12  Q.  Did you read any of their trial testimony?

13  A.  I don't recall doing that, no.

14  Q.  So you never heard Mr. Pelliccione testify that no one had

15  ever discussed with him about having a backup supplier for API?

16  A.  No, I wasn't aware of that.

17  Q.  You didn't hear Mr. Salinas testify that he didn't consider

18  it necessary to have a backup supplier after Vyera signed a

19  supply agreement with Fukuzyu?

20  A.  I didn't know that.

21  Q.  Now, we talked about this a little bit.  Fukuzyu was

22  Vyera's primary supplier?

23  A.  Yes.

24  Q.  And, again, you've characterized Fukuzyu as large and

25  dependable as an API supplier?

 1   A.   Yes, I think I called them a major, yes.

 2   Q.   And for RL Fine to supply pyrimethamine to Vyera, it would

 3   need either to have a DMF on file or it would have to amend its

 4   ANDA, Vyera would have to amend its ANDA, to include all the

 5   details about RL Fine's manufacturing process, right?

 6   A.   That would be correct, yes.

 7   Q.   And Vyera and RL Fine signed their exclusive supply deal on

 8   December 27, 2017?

 9   A.   Sounds about right, yes.

10   Q.   And did RL Fine have a DMF on file on December 27, 2017?

11   A.   Not at that time, no.

12   Q.   Has RLF ever filed a DMF for pyrimethamine with the FDA?

13   A.   I don't recall.  But I do know that Cerovene struck a

14   three-year deal with them, RL Fine, an exclusive agreement.

15   Q.   My question, sir, is simply, to your knowledge, has RL Fine

16   ever filed a pyrimethamine DMF with FDA?

17   A.   I don't think so, but I don't know for sure.

18              (Continued on next page)

19

20

21

22

23

24

25

1  Q.  Would it refresh your recollection, sir, if we looked at

2  your deposition transcript?

3  A.  Sure.

4  Q.  Sir, I'm handing your deposition transcript.  You can read

5  it to yourself, sir, please, page 283, lines 20 through 284-3.

6  Just read that to yourself, there to there.  Let me know when

7  you've had a chance to read that.

8        THE COURT:  It just displayed on my screen, so thank

9  you.

10  Q.  Have you had a chance to look at that, sir?

11  A.  Yes.

12  Q.  Does that refresh your recollection as to whether RL Fine,

13  to your knowledge, has ever filed a DMF for pyrimethamine?

14  A.  It appears they have not.

15  Q.  To your knowledge, sir, RL Fine has never taken -- to your

16  knowledge, sir, RL Fine has never taken any steps to qualify as

17  a supplier of pyrimethamine API, correct?

18  A.  For whom?  Would you repeat the question, please.

19  Q.  Sure.  To your knowledge, RL Fine has never taken any steps

20  to qualify as an API supplier of pyrimethamine for Daraprim,

21  right?

22  A.  That's correct, yes.

23  Q.  Let's just take the terms -- strike that.

24        You also know that Vyera has never taken any steps to

25  qualify RL Fine as a supplier of pyrimethamine for Vyera,

1    right?

2    A.   That's correct, yes.

3    Q.   Let's take the RL Fine agreement on its own terms.  You

4    never analyzed the terms of Vyera's deals with RL Fine, right?

5    A.   No, I did not.

6    Q.   You didn't compare the terms of the deal between Vyera and

7    RL Fine to the goal of establishing a backup supply of

8    pyrimethamine, right?

9    A.   I didn't do that analysis, no.

10   Q.   You didn't analyze Vyera's payments to RL Fine, correct?

11   A.   Did you say payments?

12   Q.   Payments.

13   A.   No, I did not.

14   Q.   The RL Fine deal with Vyera has a global royalty payment in

15   it, right?

16   A.   Yes.  I believe it did.

17   Q.   You've never seen a global royalty provision in your

18   career, have you?

19   A.   You mean in an API agreement?

20   Q.   Correct.

21   A.   I don't believe I have.

22   Q.   This is the only API agreement you've seen in your career

23   that has a global royalty provision, right?

24   A.   Yes.  I believe in my career, from what I've seen, I think

25   that's correct.

1    Q.  You've never seen in your career a backup supply deal that

2    required an upfront payment to the backup supplier, right?

3    A.  I am not sure about that one.  That's possible I've seen an

4    agreement or two that a payment was involved.

5    Q.  I am going to show you your deposition again, sir.  It's

6    deposition, page 35, line 21 to 36-4.  It starts here at page

7    35, line 21 and runs to line 4.  Can you read that question,

8    and answer, sir.

9    A.  OK --

10   Q.  Please go slow for the court reporter's sake.

11   A.  OK.  Have you seen -- so I take it, sir, then you have

12   never seen an agreement where the pharmaceutical company paid

13   money up front in a backup API supplier, is that right?  I

14   said:  I don't recall seeing any agreement like that.

15   Q.  That was your testimony at the time, right?

16   A.  Yes.

17   Q.  That was truthful and accurate, right?

18   A.  Yes.  Yes, it was.

19   Q.  You couldn't recall seeing any agreement for backup supply

20   that had an upfront payment to the backup supplier, correct?

21   A.  Correct.

22   Q.  The Vyera RL Fine deal is a backup supply agreement with an

23   upfront payment to the backup supplier, right?

24   A.  It was, yes.

25           THE COURT:  Counsel, the equipment seems to be up and

 1  running again.

 2          MR. WEINGARTEN:  Thank you, your Honor.

 3  Q.  Now, Vyera's contract with RL Fine didn't require RL Fine

 4  to provide any minimum amounts of pyrimethamine to Vyera,

 5  right?

 6  A.  I believe that's correct, yes.

 7  Q.  So just like with Fukuzyu, even if RL Fine had somehow been

 8  qualified or filed a DMF, RL Fine, under its deal with Vyera,

 9  could supply zero kilograms of API to Vyera, right?

10  A.  Potentially correct, yes.

11  Q.  Were you aware, sir, that the time that RL Fine entered

12  into its agreement for executive supply of pyrimethamine with

13  Vyera, it already had another exclusive supply agreement with a

14  different manufacturer?

15  A.  You're saying RL Fine did?

16  Q.  Yes, sir.

17  A.  Yes.  I was aware of that.

18  Q.  And you agree, sir, that it's unusual that RL Fine entered

19  into multiple exclusive agreements at the same time?

20  A.  Yes, that would be unusual.

21  Q.  So that's yet another unusual feature of Vyera's deal with

22  RL Fine, right?

23  A.  It appears to be.

24  Q.  Would you agree, sir, that Vyera's deal with RL Fine is

25  unusual in your experience?

1   A.  Well, there were certain parameters in it which made me

2   think perhaps it would not be a good deal financially for

3   Vyera.

4   Q.  It is your view, sir, that taken on its terms, Vyera's deal

5   with RL Fine was not a good deal for Vyera, right?

6   A.  Well, at a larger view, and I didn't do a detailed analysis

7   of it, there were just certain things that, to me, I thought

8   perhaps it may not be a good deal for Vyera long term.

9          MR. WEINGARTEN:  Nothing further, your Honor.

10  REDIRECT EXAMINATION

11  BY MR. PARKS:

12  Q.  Mr. Russell, I'd like to direct your recollection back to

13  the series of questions you were asked about the quantity of

14  API on hand at Vyera in January of 2016 and how much time into

15  the future that quantity of API would be able to produce

16  product.

17  A.  OK.

18  Q.  My question for you, sir, is, can API -- my first question

19  to you is, can API expire?

20  A.  Yes, it can.  Yes.

21  Q.  Was the inventory, these 2 million and some pills that you

22  were asked about, was that about to expire later in 2016?

23  A.  You know, I am not sure, but that's possible.

24  Q.  If that API was about to expire in 2016, you wouldn't be

25  able to make 10 years with the medicine with it, would you?

1    A.  No, of course not.

2             MR. PARKS:  That's all I have, your Honor.

3             THE COURT:  Any further questions?

4             MR. WEINGARTEN:  No.  Thank you, your Honor.

5             THE COURT:  Do you know one way or the other whether

6    the API that was purchased by Vyera when it acquired Daraprim

7    was about to expire?

8             THE WITNESS:  I don't have direct knowledge of that,

9    no.

10            THE COURT:  Thank you.

11            You may step down.

12            (Witness excused)

13            THE COURT:  Next.

14            MR. CASEY:  Your Honor, the defendant, Mr. Shkreli,

15   calls Dr. Anupam Jena.  My colleague, Sean McDonnell, will be

16   conducting that examination.

17            THE COURT:  Dr. Jena, if you would take the stand and

18   remaining standing.

19   ANUPAM B. JENA,

20        called as a witness by the Defendant,

21        having been duly sworn, testified as follows:

22            THE COURT:  Dr. Jena, we have had the ventilation

23   tested in this room and you are allowed, you are not required

24   to, but you may remove your mask, if you would like to.  Also,

25   counsel, when they are at that podium, may remove their mask.

1           Please state your full name for the record.

2           THE WITNESS:  My full name is Anupam, A-n-u-p-a-m;

3  Jena, J-e-n-a; middle initial B.

4           THE COURT:  You're about to be handed a document and

5  counsel, no doubt, will tell me what its exhibit number is.

6           MR. McDONNELL:  Your Honor, I am moving to admit the

7  trial testimony of Dr. Jena, DX-541, which I believe has been

8  agreed to between the parties.

9           THE COURT:  If you could give the witness the exhibit,

10 please.

11          Doctor, if counsel could approach you and give you a

12 copy of your testimony.

13          If you could turn, please, to page 36.  Is that your

14 authorized signature on page 36, Dr. Jena?

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  Before authorizing your signature to be

17 placed on page 36, did you read this document with care?

18          THE WITNESS:  Yes, your Honor.

19          THE COURT:  And do you swear to the truth of the

20 contents of this document?

21          THE WITNESS:  I do, your Honor.

22          THE COURT:  Thank you.

23          Any objections to the receipt of DX-541 as offered

24 with redactions to reflect, I believe, what was anticipated as

25 being consistent with my rulings?

1          MR. MEIER:  Your Honor, I have a general objection,

2     which is this is the first time I have -- we have been given a

3     copy with the redactions.  I haven't had a chance to review it.

4          Up to now, both parties have these things ahead of

5     time.  We have had a chance to look at it before we come to

6     court.  I've just been handed this by Mr. McConnell.

7          I will take their representation that they have

8     properly redacted it, but I don't know that for myself.  I have

9     not personally verified that, your Honor.  I have not had the

10    chance to do so, nor am I prepared to do that right this

11    minute.

12          MR. McDONNELL:  Your Honor, if I may just reply,

13    please.

14          We did send a copy of our proposed redactions to

15    Exhibit DX-541, and we received a request from plaintiffs'

16    counsel to make additional redactions, which we agreed to make.

17    So, yes, we did not send the final copy incorporating the

18    additional redactions requested by plaintiffs, but they did

19    receive our initial proposed redactions, and we did accept

20    their request for more modifications.

21          MR. MEIER:  Your Honor, I'll accept that

22    representation by counsel, but I did just want to make sure

23    that the Court understood that.

24          THE COURT:  I've just looked at the trial testimony,

25    the version that I have read that struck from it the paragraphs

1    that I required to be stricken, and those paragraphs are

2    stricken from the exhibit, DX-541, that I've been handed.  So I

3    understand that there may be additional passages that the

4    parties agreed should be stricken and that plaintiff's counsel

5    will have overnight to look at that and discuss the issue with

6    defense counsel.

7              With that understanding, I receive DX-541.

8              (Defendant's Exhibit 541 received in evidence)

9    CROSS-EXAMINATION

10   BY MR. MEIER:

11   Q.  Good afternoon, Dr. Jena.

12   A.  Good afternoon.  Nice to see you again.

13   Q.  As you know, I'm Markus Meier, and I'm an attorney at the

14   Federal Trade Commission, and we met via deposition in this

15   case back on June 30 of this year.

16             Is there anything that might affect your ability to

17   give truthful, complete testimony here today, Dr. Jena?

18   A.  No, sir.

19   Q.  What I'd like to do is start today with your medical

20   opinions in this case.  Do you understand that?

21   A.  Yes.

22   Q.  Because you are giving medical opinions in this case and

23   you are giving economic opinions, is that correct?

24   A.  That's correct.

25   Q.  Starting with the medical opinions, according to your

1  written direct, you have been involved in the care of patients

2  with toxoplasmosis, correct?

3  A.  Correct.

4  Q.  But you are not a board certified doctor in infectious

5  diseases, correct?

6  A.  No, I'm not an ID doctor.  I'm a general internist.  I

7  focus on hospitalized patients, some of whom have HIV, minority

8  of whom have had toxoplasmosis, but I mostly focus on

9  hospitalized inpatients and, in this past year and a half,

10 COVID patients.

11         THE COURT:  If you could move back a little bit from

12 that mic.  That mic moves.  So you can put it under your chin.

13 Don't speak directly into it.  Thank you.

14 Q.  My question, Dr. Jena, you are not board certified in

15 infectious disease, correct?

16 A.  Correct.

17 Q.  That is, however, a board certification that doctors can

18 get?

19 A.  Yes.

20 Q.  You are board certified as an internist?

21 A.  Internal medicine.

22 Q.  Internal medicine.  Thank you.

23         And your best estimate --

24         THE COURT:  I am not sure that's what he said.

25         THE WITNESS:  Internal medicine.

1  THE COURT:  You did.

2  THE WITNESS:  I-n-t-e-r-n-a-l medicine.

3  Q.  Your best estimate of the number of patients you've seen

4  with toxoplasmosis is less than five or perhaps one to five?

5  A.  I'd say in my career, practicing as an independent doctor,

6  probably five or so toxoplasmosis patients.  Probably, 50 or

7  so, 50 to a hundred HIV patients, but a small number of

8  toxoplasmosis patients.

9  Q.  Five or so patients with toxoplasmosis?

10 A.  Yes, sir.

11 Q.  That's over a 15-year period?

12 A.  I would say since 2012, so roughly a 10-year period.

13 Q.  Would that include the time you were in medical school?

14 A.  That is after medical school.

15 Q.  Including the time you were in medical school, when you did

16 a residency, and to today, you've been seeing patients for

17 about 15 years?

18 A.  Correct.

19 Q.  In that time you've seen maybe about five toxoplasmosis

20 patients?

21 A.  I think that's about right.

22 Q.  Is it correct that you haven't seen any toxoplasmosis

23 patients in the last one or two years?

24 A.  I think that would be accurate.

25 Q.  That's something you can say for certain, correct?

1  A.  Yes.

2  Q.  Is it correct that you still practice medicine from time to

3  time?

4  A.  Yeah.  I practice about four to six weeks at Mass. General

5  Hospital as an internist.  Last year and a half, as I

6  mentioned, has been mostly in the COVID-19 medical service.

7  Q.  That's four to six weeks a year?

8  A.  Correct.

9  Q.  And the rest of the time you're a professor of what?

10  A.  The rest of the time I'm a professor of health care policy

11  and medicine at Harvard Medical School.  I'm happy to expand on

12  that, if you'd like.

13  Q.  Do you recall even one instance where you prescribed

14  Daraprim?

15  A.  Not specifically.  I have specific recollections of

16  toxoplasmosis patients, but I don't recall the specific

17  medication that was used.

18  Q.  So you don't recall ever having actually prescribed

19  Daraprim, correct?

20  A.  No specific recollection.

21  Q.  Do you have any specific recollection of ever prescribing

22  Bactrim or its generic TMP-SMX for a patient with active

23  toxoplasmosis?

24  A.  No.  I couldn't tell you which medication I had used in

25  those handful of circumstances that I treated toxoplasmosis

 1   patients.

 2   Q.  Have you ever actually prescribed atovaquone or its generic

 3   for a patient with active toxoplasmosis?

 4   A.  Not that I specifically recall.  I've used that drug in

 5   other patients, but not that I specifically recall with

 6   patients for toxoplasmosis.

 7   Q.  You've never actually prescribed atovaquone or its generic

 8   for a patient who has active toxoplasmosis?

 9   A.  I don't believe that is what I testified to.

10   Q.  I'm asking you that now.

11   A.  I couldn't tell you whether I used atovaquone, compounded

12   pyrimethamine, Daraprim, or Bactrim.  I can tell you that I've

13   treated about five patients with this disease over the last 10

14   to 15 years I've been in practice.  But I couldn't tell you

15   specifically which medications.

16   Q.  Were all of these five or so instances at Mass. General

17   Hospital?

18   A.  I believe most of them were.  The other place they would be

19   is where I trained, which is University of Chicago, which is in

20   Chicago.

21   Q.  The Massachusetts General Hospital is a teaching hospital?

22   A.  Yes, sir.

23   Q.  So each patient who is admitted at Massachusetts General is

24   a teaching case?

25   A.  Not entirely.  There are two different medical services at

 1   mast general.  I'm happy to describe them all.

 2   Q.   When a patient presents with toxoplasmosis with active

 3   toxoplasmosis encephalitis, they typically come through the

 4   emergency room, is that correct?

 5   A.   They could come from the emergency room or they could be a

 6   direct admission from an infectious disease or other specialty

 7   clinic in the hospital.

 8   Q.   When they come through the emergency room, they would be

 9   admitted by an emergency room physician?

10   A.   Correct.

11   Q.   It would be the emergency room that would first diagnose

12   the toxoplasmosis, is that correct?

13   A.   It could be, or if the patient was referred to the

14   emergency room by an outpatient physician, that physician may

15   have been responsible for the initial diagnosis.

16   Q.   Typically, as a hospitalist working on the medical ward at

17   Mass. General, you wouldn't actually make the initial diagnosis

18   of toxoplasmosis, is that correct?

19   A.   Not necessarily.  It depends on what diagnostic information

20   was available at the time of transfer from the emergency

21   department to the general medical floor.

22   Q.   In the five or so cases of toxoplasmosis patients you have

23   seen over the course of the last 15 years, how many times have

24   you been the physician who made the diagnosis of toxoplasmosis?

25   A.   If I was the physician involved in the team that made the

1    diagnosis, I would say it's probably one or two times, and my

2    instinct would be that most of the time the diagnosis is made

3    in the emergency department or earlier, before they arrive to

4    the care of the team that I might supervise.

5    Q.  I am not sure really you addressed my question.  Your

6    answer was, if I was the physician involved in the team.  I am

7    not asking you about an if or a hypothetical.  I'm asking you,

8    how many times do you know that you personally made the

9    diagnosis of toxoplasmosis in the five or so patients you've

10   seen in the last 15 years?

11   A.  I would say maybe once, but, again, these are infrequent

12   cases.  I don't have specific recollection, but they would be,

13   at most, one or two.

14   Q.  Do you remember when that was?

15   A.  I remember a specific case, which was about five or six

16   years ago, which I'm happy to describe more details.

17   Q.  No.  That's OK.  You had indicated that you would typically

18   see these patients as part of a team, correct?

19   A.  Correct.

20   Q.  That team would include an infectious disease specialist as

21   part of that team, correct?

22   A.  An infectious disease specialist would often be part of the

23   broader medical team.  But when I used the word team, that

24   wasn't what I was referring to.

25   Q.  In a case of toxoplasmosis at Massachusetts General

1  Hospital, it would typically involve the input from an

2  infectious disease specialist, correct?

3  A.  Correct.

4  Q.  Someone like Dr. Hardy?

5  A.  I don't know Dr. Hardy in particular, but an infectious

6  disease doctor for sure.

7  Q.  An infectious disease doctor like Dr. Hardy.

8  A.  It could be.

9  Q.  According to your trial testimony, only pyrimethamine is

10 FDA approved to treat toxoplasmosis, correct?

11 A.  For the treatment, yes.  For the prophylaxis it's Bactrim.

12 But for primary -- secondary prevention and treatment, it would

13 be toxoplasmosis.  It would be pyrimethamine.

14 Q.  Only pyrimethamine is FDA approved to treat toxoplasmosis,

15 correct?

16 A.  Correct.

17 Q.  And compounded drugs are not FDA approved, correct?

18 A.  They are not FDA approved, but there is FDA guidance around

19 them, but they are not FDA approved.

20 Q.  As part of your work in this case you reviewed the

21 guidelines for the prevention and treatment of opportunistic

22 infections, correct?

23 A.  I did.

24 Q.  And you consulted them as part of the work you did in this

25 case?

1    A.  I did.

2    Q.  And prior to your work in this case, do you recall whether

3    you've actually ever read those guidelines?

4    A.  I'm certain I have, and I'm happy to expand more as to why.

5              MR. MEIER:  If the technology is working again, I'd

6    like to call up the guidelines for the prevention and treatment

7    of opportunistic infections as Government Exhibit 4088.

8              THE COURT:  Counsel, we are at like one minute to 5.

9    Is this a good time?

10             MR. MEIER:  This would be a perfect time, your Honor.

11   Because this segment will take a little while.

12             THE COURT:  It sounded like it.  Good.

13             I'll see everybody tomorrow morning at 9:30.  Have a

14   good night.

15             (Adjourned to December 21, 2021, at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                         Page

HOWARD LEWIS DORFMAN

Direct By Mr. Weprin . . . . . . . . . . . . . 859

Cross By Mr. Pollack . . . . . . . . . . . . . 872

SCOTT HEMPHILL

Cross By Mr. McDonnell . . . . . . . . . . . 878

Redirect By Ms. Peay . . . . . . . . . . . . 919

Redirect By Ms. Peay . . . . . . . . . . . . 924

KEVIN PATRICK MULLEADY

Direct By Mr. Weingarten . . . . . . . . . . 927

Cross By Mr. Pollack . . . . . . . . . . . . .1030

 JOHN S. RUSSELL

Cross By Mr. Weingarten  . . . . . . . . . .1042

Redirect By Mr. Parks  . . . . . . . . . . .1064

ANUPAM B. JENA

Cross By Mr. Meier . . . . . . . . . . . . . .1068

                    GOVERNMENT EXHIBITS

Exhibit No.                                 Received

 9013 and the exhibits listed therein   . . . 854

 9066    . . . . . . . . . . . . . . . . . . 855

 9067    . . . . . . . . . . . . . . . . . . 855

 9068    . . . . . . . . . . . . . . . . . . 855

 9069    . . . . . . . . . . . . . . . . . . 856

 9070    . . . . . . . . . . . . . . . . . . 856

1    9071  . . . . . . . . . . . . . . . . . . 856

2    9072  . . . . . . . . . . . . . . . . . . 857

3    9073  . . . . . . . . . . . . . . . . . . 857

4    8004  . . . . . . . . . . . . . . . . . . 877

5    9014  . . . . . . . . . . . . . . . . . . 878

6    1153  . . . . . . . . . . . . . . . . . . 943

7    1692  . . . . . . . . . . . . . . . . . . 949

8    1218  . . . . . . . . . . . . . . . . . . 974

9    1349  . . . . . . . . . . . . . . . . . . 978

10   1379  . . . . . . . . . . . . . . . . . . 993

11   1135  . . . . . . . . . . . . . . . . . .1001

12   1104  . . . . . . . . . . . . . . . . . .1012

13   1129  . . . . . . . . . . . . . . . . . .1014

14   1130  . . . . . . . . . . . . . . . . . .1018

15                      DEFENDANT EXHIBITS

16   Exhibit No.                             Received

17   545  . . . . . . . . . . . . . . . . . . 926

18   538  . . . . . . . . . . . . . . . . . .1034

19   546  . . . . . . . . . . . . . . . . . .1037

20   901 and exhibits listed therein   . . . . .1038

21   902 and exhibits listed therein   . . . . .1038

22   541  . . . . . . . . . . . . . . . . . .1068

23

24

25