LCMMFTC1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     FEDERAL TRADE COMMISSION,
3    STATE OF NEW YORK, STATE OF
     CALIFORNIA, STATE OF OHIO,
4    COMMONWEALTH OF PENNSYLVANIA,
     STATE OF ILLINOIS, STATE OF
5    NORTH CAROLINA, and
     COMMONWEALTH OF VIRGINIA,
6
                    Plaintiffs,
7         v.                            20 CV 706 (DLC)

8    MARTIN SHKRELI, et al.,

9                   Defendants.
     ------------------------------x
10                                      New York, N.Y.
                                        December 22, 2021
11                                      10:00 a.m.
     Before:              HON. DENISE COTE,
12                                      District Judge
                          APPEARANCES
13
     FEDERAL TRADE COMMISSION
14   BY:  MARKUS H. MEIER
          MAREN HANEBERG
15        BRADLEY S. ALBERT
          LAUREN PEAY
16        NEAL PERLMAN
          MATT WEPRIN
17        ARMINE BLACK
          AMANDA TRIPLETT
18        LEAH HUBINGER
          JAMES WEINGARTEN
19        AMY McFARLANE
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
20   BY:  ELINOR R. HOFFMANN
          JEREMY R. KASHA
21        AMY E. McFARLANE

22   DUANE MORRIS LLP
          Attorneys for Shkreli
23   BY:  CHRISTOPHER H. CASEY
          JEFFREY S. POLLACK
24        ANDREW J. RUDOWITZ
          SARAH FEHM STEWART
25        SEAN McCONNELL
          J. MANLY PARKS

1           THE COURT:  Counsel, I'm so sorry for the late start

2    today.  We will do whatever makes sense to counsel in terms of

3    the schedule for lunch.  When we get close to that time you

4    will consult with each other and tell me what your preferences

5    are.  Thank you.

6           You may begin.

7           MR. MEIER:  Good morning, your Honor.  We will be

8    dividing up the argument this morning.  Real briefly, Lauren

9    Peay will do part of the argument for the government.  Maren

10   Haneberg will also do part of the argument for the government.

11   And then my colleague from the New York AG's office, Amy

12   McFarlane.  Yesterday your Honor asked a question about people

13   appearing from New York or the states with witnesses.  As it so

14   happened, Ms. McFarlane and a number of other state attorneys

15   who were going to be doing witnesses, those witnesses happened

16   to be the ones, coincidentally, that fell out.  But you will

17   also be hearing from Ms. McFarlane.  Ms. Peay will explain how

18   we are going to divide that up.  We are ready to go.

19          THE COURT:  Perfect.

20          MS. PEAY:  Good morning, your Honor.  Lauren Peay from

21   the Federal Trade Commission on behalf of plaintiffs.

22          Your Honor, the witnesses have testified, the evidence

23   is in and had record is closed.  The following facts are not

24   seriously in dispute.  Vyera's distribution restrictions

25   prevented its distributors from selling Daraprim to generics.

1    Vyera's exclusive supply agreements with Fukuzyu and RL Fine

2    prevented the two most viable suppliers from selling

3    pyrimethamine API to generics.  And, three, Vyera's data

4    blocking agreements with two major distributors prevented them

5    from reporting Daraprim sales data to IQVIA, obscuring the

6    market opportunity for would be generic competitors.

7         What defendant, Mr. Shkreli, appears to be disputing

8    is that despite his intentions, his plans, and his company's

9    actions to thwart generic competition to Vyera's most important

10   product, Daraprim, by any means possible and for as long as

11   possible, he argues that none of it made any difference.  And,

12   even if he did, he wasn't responsible.  The evidence

13   overwhelmingly contradicts these defenses.

14        I will be joined today, as Mr. Meier said, by my

15   colleagues, Maren Haneberg of the FTC and Amy McFarlane of the

16   New York Attorney General's office.  I will begin with an

17   overview of the evidence plaintiffs have proffered that

18   established the challenged anticompetitive conduct.  I will

19   then address one of the two overarching themes in Mr. Shkreli's

20   defense, the no harm, no foul defense.  This defense posits

21   that even if the conduct occurred, it did not result in harm,

22   or even if the conducted occurred and it did impede the

23   generics, any harm is attributable to outside forces, like the

24   FDA.

25        I will then turn it over to Ms. Haneberg, who will

1    address the second theme that has emerged in Mr. Shkreli's

2    defense, the it wasn't me defense.  And this defense posits

3    that even if the conduct occurred and even if the generics were

4    impeded, that was all Vyera.  Mr. Shkreli was not involved.

5         Ms. McFarlane will then address the plaintiffs'

6    request for injunctive and equitable monetary relief.

7         Martin Shkreli pioneered the anticompetitive business

8    model at issue in this case, acquiring a small but essential

9    drug with no patent protection, no competitors, but

10   substantially increasing the price of the drug and then

11   restricting distribution to prevent potential competitors from

12   accessing that drug.  You will hear much more about Mr. Shkreli

13   from my colleague later, but Mr. Shkreli first implemented this

14   model as CEO Retrophin, the first pharmaceutical company that

15   he founded.

16        After being outed from Retrophin in September 2014,

17   Mr. Shkreli founded Vyera to be able to continue profiting from

18   his anticompetitive business model.  As the founder, CEO, and

19   largest shareholder of Vyera, in 2015, Mr. Shkreli selected

20   Daraprim as the perfect drug to repeat his monopolization

21   model.

22        With Mr. Shkreli at the helm, Mr. Vyera acquired

23   Daraprim in August of 2015 and promptly raised the list price

24   from $13.50 per tablet to a Shkreli-approved $750 per tablet, a

25   hike of 4,000 percent.

1        I would like to turn now to plaintiffs' claim against

2    the defendant.  The FTC in seven states -- New York,

3    California, Illinois, Ohio, Pennsylvania, North Carolina, and

4    Virginia -- are challenging the actions that Vyera, with the

5    participation of and control by Mr. Shkreli, took to prevent

6    competition.  Specifically, we are challenging this scheme

7    which includes distribution restrictions, exclusive API

8    agreements, and data-blocking agreements to prevent generic

9    competition as monopoly maintenance under Sherman Act Section 2

10   theories, and we are challenging the distribution restrictions

11   and API exclusivity agreements as unreasonable restraints of

12   trade under Sherman Act Section 1 theories.

13       Now, a monopolization claim has two elements:  The

14   possession of monopoly power in a relevant market and the

15   willful acquisition or maintenance of that power as

16   distinguished from growth or development as a consequence of a

17   superior product business acumen or historic accident.

18   Plaintiffs have offered overwhelming evidence that defendant

19   engaged in anticompetitive conduct and there is monopoly power

20   over Daraprim.

21       Let's walk through the evidence of the anticompetitive

22   conduct starting with the distribution restrictions.  As

23   Vyera's Tina Ghorban and Frank Della Fera testified here in

24   court, the FDA requires any generic applicant to conduct

25   bioequivalence testing comparing its product to samples of the

LCMMFTC1                    Summation – Ms. Peay

1    branded drug.  To conduct this FDA mandated testing, the

2    applicant is required to procure sufficient quantities of the

3    branded product.  The evidence has shown that Vyera carried out

4    Mr. Shkreli's vision and that Vyera's distributors cannot sell

5    Daraprim to generics because the distributors have agreed to

6    sell only to specifically authorized customers or customer

7    types.  It is undisputed that generics are unable to purchase a

8    RLD, or reference listed drug, from Vyera's distributors.

9    These restrictions are spelled out in Vyera's agreements with

10   its distribution partners as set forth in Government Exhibit

11   7003 in the demonstrative.

12        As Vyera's executive vice-president of commercial and

13   operations, Anne Kirby testified by affidavit every single one

14   of Vyera's written agreements with its distributors has

15   restrictions on authorized customer types that can purchase

16   Daraprim without Vyera's approval.  Generics and their agents

17   are not authorized customers, so no Vyera distributors can sell

18   Daraprim to them without Vyera's express approval.

19        That express approval never comes.  Generics requests

20   to buy Daraprim follow typically a set pattern.  Vyera's

21   distributor receives a request and forwards it to Vyera's

22   executives seeking approval, as shown here on the slide

23   depicting GX-1139.  The distributor seeks approval to sell

24   Daraprim to the generic or its agent.  Vyera's executives then

25   tell the distributor, do not fulfill the request, and they

1   instructed the distributor to tell the generics or its agent to

2   reach out to Vyera directly.  There is no evidence that Vyera

3   has approved a single request from generics or their

4   intermediaries to purchase Daraprim for bioequivalence testing.

5          As we showed in Government Exhibit 7002, summary

6   exhibit, the distributors benefited from the restrictions.

7   Most Daraprim distributors get a certain percentage of

8   Daraprim's list price, which Mr. Shkreli raised to $75,000 per

9   bottle.  One distributor gets a fee based on the volume sold.

10  Regardless of the fee structure, lack of generic competition is

11  a good thing for these distributors because it means that they

12  can continue selling greater volumes of Daraprim at a higher

13  price.

14          THE COURT:  But even if the distributors didn't

15  benefit financially, that doesn't interfere with your theory of

16  the case.  Am I right?

17          MS. PEAY:  Yes, your Honor.  That is correct.

18          As Ms. Ghorban, Vyera's former head of marketing and

19  business analytics, testified, Mr. Shkreli and his business

20  development team also were concerned that even with these class

21  of trade restrictions, generics could acquire multiple bottles

22  of Daraprim needed for FDA mandated studies.  To mitigate this

23  risk they implemented purchase limits on the number of bottles

24  a customer could buy at a given time.  Any customer seeking to

25  buy a quantity exceeding the limit had to get Vyera's override.

1   Vyera has also aggressively monitored sales to ensure

2   compliance with these agreements and has acted quickly to

3   rectify any breaches.  In fact, in September 2017, Mr. Kevin

4   Mulleady ordered a full-out audit of Daraprim to know where

5   every bottle of Daraprim we sold went to.

6          You have heard from defendant's counsel, and they have

7   suggested that there is nothing unusual about class or trade

8   restrictions, and that specialty distribution system can

9   provide patient benefits.

10         There are two important responses to this.  First, I'd

11  like to make clear that plaintiffs have not offered evidence

12  that specialty distribution in and of itself is

13  anticompetitive.  Rather, the anticompetitive conduct is the

14  restrictions that prevent sales to generics.  As Vyera's former

15  chief commercial officer, Nancy Retzlaff, acknowledged,

16  preventing generics from purchasing Daraprim for use in

17  bioequivalence studies is not at all necessary for specialty

18  distribution to function or for specialty pharmacies to provide

19  services to patients.  One has nothing to do with the other.

20         The second response is that the purpose of Vyera's

21  distribution system is clear.  We have heard it directly from

22  Vyera's executives.  Vyera's first general counsel, Howard

23  Dorfman, testified the closed distribution system was part of

24  Vyera's desire to block or certainly to delay entry of any

25  generic.  Former Vyera executive Tina Ghorban testified that

1  Martin Shkreli and the business development team discussed

2  using closed distribution to make it harder for generics to

3  acquire Daraprim.  This system was designed, implemented, and

4  executed to make it harder, much harder for generics to obtain

5  samples of Daraprim needed for FDA approval.

6          Turning now to the exclusive API supply agreements.

7  The evidence has also shown that exclusivity agreements

8  sideline the two most viable producers of pyrimethamine API:

9  Fukuzyu, and RL Fine.  Pyrimethamine API is the key ingredient

10  in Daraprim.  Any pharmaceutical company seeking to make

11  Daraprim or a generic version needs a source of pyrimethamine

12  API.

13          Developing a pyrimethamine API manufacturing process

14  can take many months.  Mr. Bruno, plaintiffs' manufacturing

15  expert, estimated at least 15 months and Vyera's

16  Dr. Pelliccione estimated 12 to 18 months on the low end.  For

17  this reason drug companies prefer to use an API supplier that

18  already has a manufacturing process, preferably one that has a

19  DMF that is used in the market.  Vyera's Dr. Pelliccione

20  testified that it would help to work with a supplier who

21  already knew how to make the API and who had a U.S. DMF.

22          Now, until the generic companies went out and

23  developed pyrimethamine API manufacturing processes in

24  partnership with their CMOs, the only two API suppliers with a

25  manufacturing process were Fukuzyu and RL Fine.  RL Fine itself

1    could not identify any other API suppliers, and an RL Fine

2    sales executive testified that he has not come across anyone

3    offering pyrimethamine API.  And Mylan, one of the largest

4    generic companies in the world, conducted a 15-month search to

5    find a pyrimethamine API supplier but could only identify RL

6    Fine.

7         THE COURT:  Why do you think that's so?  Why couldn't

8    they identify Fukuzyu?  Isn't that public record information?

9         MS. PEAY:  Yes, your Honor.  It is public record

10   information.  But by the time that they were searching, Fukuzyu

11   had an exclusive agreement and was not entertaining offers to

12   supply pyrimethamine API to other parties.

13        THE COURT:  So it's not that they are the only two

14   suppliers identified with the manufacturing process; it is the

15   only supplier that reportedly was willing to sell.

16        MS. PEAY:  Your Honor, they were the only two

17   pyrimethamine API suppliers with a viable manufacturing process

18   ready.  Fukuzyu and RL Fine were the only ones.  At the time

19   when Mylan was searching for a supplier, they understood that

20   Fukuzyu would not supply them.

21        THE COURT:  Mylan identified Fukuzyu too.

22        MS. PEAY:  They were aware of Fukuzyu too.

23        Let's turn first to Fukuzyu.  The evidence has shown

24   that Fukuzyu agreed to prevent generic companies from obtaining

25   pyrimethamine API in exchange for the promise of additional

1  business.  When Vyera acquired Daraprim, Fukuzyu was the

2  pyrimethamine API supplier for the product on a nonexclusive

3  basis.  Obtaining an exclusive contract with Fukuzyu had long

4  been Mr. Shkreli's goal.  Even before purchasing Daraprim,

5  Vyera contacted Fukuzyu to ask, can you sign up exclusivity

6  with us?

7          After Mr. Shkreli was arrested, Vyera continued to

8  pursue an exclusive supply agreement with Fukuzyu.  On October

9  5, 2016, senior scientific executives from Vyera met with

10  Fukuzyu in Japan.  And on November 22, 2016, Vyera and Fukuzyu

11  entered a supply agreement.  Dr. Pelliccione told his

12  subordinate, we got good news from Mikio in Japan overnight.

13  Fukuzyu has accepted our agreement to provide pyrimethamine

14  exclusively for us for human drugs and will not sell to

15  generics manufacturers.  That is a big sigh of relief for us.

16          THE COURT:  There is this sort of gap in the record

17  perhaps.  Perhaps you can point me to what happened from, let's

18  say, late 2015 to the fall of 2016 to get that exclusive supply

19  agreement with Fukuzyu.  I understand that there is record

20  evidence that Mr. Shkreli had this goal to have an exclusive

21  supply agreement with Fukuzyu from early on.  But is there

22  record evidence about what happened in that roughly nine-month

23  gap to achieve that goal?

24          MS. PEAY:  During that gap, when Vyera originally

25  reached out to Fukuzyu, they didn't express interest in an

1    exclusive agreement at that time.

2              THE COURT:  Yes.  But, as I understand it, then in the

3    fall of 2016, Vyera came back with an offer of a broad-based

4    relationship that would involve not just pyrimethamine but

5    other projects in the future potentially.  So they came up with

6    a strategy to make a play for Fukuzyu that might be more

7    attractive, if I understand the record evidence.

8              My question is, do we have anything about that roughly

9    nine-month gap?  Why did it take nine months for Vyera to

10   figure out a strategy to deal with Fukuzyu's initial response?

11   Can you point me to anything, or not?

12             MS. PEAY:  I don't have anything I can point you to

13   specifically.

14             THE COURT:  Thank you.

15             MS. PEAY:  After Fukuzyu and Vyera entered a supply

16   agreement on November 22, 2016 --

17             THE COURT:  I think the agreement was January, wasn't

18   it?

19             MS. PEAY:  Ms. Guy, can you go back a slide.

20             In November 22, 2016, they accepted the agreement.

21             THE COURT:  Yes.  Sorry.

22             MS. PEAY:  Sorry about that.  It was the wrong

23   wording.

24             Moving to the next slide, Ms. Guy, Vyera promised

25   Fukuzyu additional business in order to compensate them for

1    that exclusive supply agreement.  Dr. Salinas confirmed that

2    the offer of additional business was intended to get them to

3    sign the exclusive supply agreement.  The evidence also shows

4    that the Fukuzyu agreement does not actually guarantee supply.

5    An exclusivity provision ensures that others will not purchase

6    the API, but it does not ensure that you will receive the API.

7              As Mr. Bruno explained, if there was a surge in demand

8    outside the United States, there is nothing in the Fukuzyu

9    contract that would ensure that Vyera would receive

10   pyrimethamine API from Fukuzyu.  And also, to the extent that

11   exclusivity provisions are used in the industry, they are

12   designed to protect an investment, not guarantee supply.  As

13   Mr. Della Fera explained, Fera sought an exclusive contract

14   with API 1 because we were paying for the development

15   personally for our company.  So the exclusive was to protect

16   Fera's investment.

17             Turning now to the RL Fine supply agreement.  With

18   Fukuzyu locked up and eliminated as an API supply option for

19   would be competitors, Mr. Shkreli and Vyera next turned their

20   attention to another potential source of supply for the

21   generics.  Vyera began pursuing RL Fine in August 2017, when it

22   received word that generics may be using RL Fine pyrimethamine

23   API.  And then on December 27, 2017, on behalf of Vyera,

24   Mr. Mulleady executed two contracts with RL Fine.

25             THE COURT:  Now, think there is some evidentiary

LCMMFTC1                      Summation - Ms. Peay

1    record that Vyera had two independent tipoffs of generic

2    interest in RL Fine.  I think there was a Frankfurt trade show

3    and there was another conversation independent of that.  Can

4    you point me to anything else?

5             MS. PEAY:  You are correct.  There are two sources of

6    information that tipped Vyera off that RL Fine may be supplying

7    to generics.  One was a presentation by Pennside Partners, and

8    that identified that two generics were using RL Fine as supply.

9    You are correct, there was a meeting in Frankfurt where RL Fine

10   executives indeed confirmed that they were working with

11   generics and that some of those generics may be ready to file

12   an ANDA as soon as the end of that year.

13            I will walk through that in some more detail in a bit,

14   but, yes, you are correct.

15            Under the agreement with RL Fine, Vyera is appointed

16   the exclusive distributor.  Vyera pays $1 million for a DMF

17   that ultimately was never filed, and Vyera pays RL Fine 7.5

18   percent of Daraprim net revenues, regardless of whether RL Fine

19   provides any API.

20            There is no evidence in the record that Vyera needed a

21   backup supplier or that the RL Fine agreement ensured that

22   Vyera would have a backup supplier.  Vyera's scientific

23   executives, like Dr. Pelliccione, did not even know that this

24   contract existed and never considered getting a backup

25   supplier, and there is no evidence in the record that Vyera

LCMMFTC1                    Summation - Ms. Peay

took any steps to add RL Fine to its NDA, which would allow it
to be a backup supplier, or that it asked RL Fine to take the
steps to be ready or to file a DMF.

THE COURT:  I'm sorry.  What is your point about
Mr. Pelliccione?

MS. PEAY:  Dr. Pelliccione, who has responsibility for
scientific matters at Vyera, so, thus, would be knowledgeable
about things like API supply, when he was deposed in this case,
and this came out in his trial testimony as well, he had not
been aware years later that there was this RL Fine contract,
and he himself testified that he hadn't considered getting a
backup supplier as one of the individuals at Vyera who would
typically have responsibility for those.

THE COURT:  There was some discussion about expiration
dates of the API that Vyera had purchased, sort of the
inventory API when it had purchased Daraprim.  There was a
question about, well, perhaps the fact you had all that API
didn't mean it was readily available for you to use because
even API has expiration dates.  Is there any record evidence
about the expiration dates of the API or what expiration dates
there are for API, as opposed to the Daraprim once it's
manufactured?

MS. PEAY:  Your Honor, I can't point you to that
record evidence right now, but I can note that to the extent
that Vyera was seeking additional pyrimethamine API, if there

was a concern that their existing pyrimethamine API would

expire, that would have been in the context of seeking the

Fukuzyu -- supply from Fukuzyu, who actually did supply them

with API.  The RL Fine contract, which came later, never

resulted in Vyera or RL Fine taking the steps to even allow RL

Fine to even being able to supply the API.

Now, the amount that Vyera paid RL Fine, even though

RL Fine supplied nothing to Vyera, is staggering.  Each monthly

royalty payment amounted to between 300,000 and 450,000.

Ultimately, the evidence shows that Vyera terminated the

agreement in October 2019, after paying RL Fine almost $9.5

million.

To put that figure in perspective, Vyera has paid

Fukuzyu about $500,000 on all purchases of pyrimethamine API

through March 2019.  That means Vyera paid to RL Fine almost 19

times the amount for supplying nothing that it paid Fukuzyu for

supplying all of its API needs.

The only possible conclusion from this evidence is

that Vyera was paying RL Fine not to supply its competitors,

which is in fact what Vyera's board minutes reflect.  In the

December 2017 board minutes, Government Exhibit 1490,

Mr. Mulleady and Mr. Mithani brought the RL Fine agreement to

the board.  They explained that the rationale behind the

collaboration with RL Fine is the diversification of the

group's revenues stream from the potential market entry by

LCMMFTC1                    Summation - Ms. Peay

1  generics manufacturers and distributors.  They do not mention

2  backup supply or supply at all.

3         Mr. Mulleady and Mr. Mithani explained that addressing

4  potential generic competitors are in the Vyera group's

5  interests.

6         Turning now to the data blocking agreements, as former

7  Vyera executive Tina Ghorban testified, IQVIA, formerly known

8  as IMS, is a standard data source that companies and analysts

9  use to understand the dynamics of markets.

10         Reaching back to his days at Retrophin, Mr. Shkreli

11  knew that drug companies relied on IQVIA and other channel

12  audits to forecast their potential revenue for launching drugs.

13  We heard Ms. Ghorban's testimony that Mr. Shkreli knew that if

14  sales appeared to go down, generic companies would have less

15  interest in generic pyrimethamine development.  So he used data

16  blocking as part of his toolbox to discourage generic entry.

17  Just three days after acquiring Daraprim, Vyera employees

18  reached out to ICS and Walgreens, the only Daraprim

19  distributors at the time, to inquire into blocking Daraprim

20  data from IQVIA and other aggregators.

21         Ms. Guy, can you advance the slide.

22         Vyera immediately acted within three days of acquiring

23  Daraprim to reach out to ICS and Walgreens to confirm that they

24  weren't reporting.

25         Then, if you can move to the next slide, in September

2017, Vyera formalized its data blocking agreements with two of its main distributors, ASD and Cardinal, under which Vyera paid each a fee in exchange for the distributors agreement to not report its Daraprim sales data.

I'd like to turn now to monopoly power.  The monopoly power question is whether Vyera can profitably sustain a small but significant price increase.  As Professor Hemphill demonstrated, the shocking price increase here was very profitable for Vyera.  Defendant's economic expert also agreed that Vyera's Daraprim price increase was profitable in every year since its acquisition of the product.  It was not until generic entry that the profits began to drop.

It is undisputed that Vyera had a 100 percent share of FDA-approved pyrimethamine products from 2015 until generic entry in 2020.  The Court has also heard about the significant barriers to entry into this market due to the FDA approval process for generics and Vyera's restrictions at issue.

Defendant's response to this has been to argue that TMP-SMX, or compounded pyrimethamine, can be used to treat toxoplasmosis in at least some circumstances.  That is not the standard.  Market definition looks at whether products restrain price.  It is not enough that they can be used for the same purpose.

The evidence here shows that so many purchasers stuck with Daraprim, that its annual profits increased by tens of

LCMMFTC1                        Summation - Ms. Peay

millions of dollars.  If these other products were close

economic substitutes, no one would have paid a price increase

like Vyera's.  Nearly everyone would have switched.

        But not only is defendant's argument about these other

therapies legally misplaced, it is also contradicted by the

evidence.  Vyera's Dr. Salinas, a medical doctor, acknowledged

that TMP-SMX is medically inferior to Daraprim, and Vyera's

Dr. Pelliccione acknowledges that compounding in the large

scale was not safe or appropriate.  We also heard from

plaintiffs' expert, Dr. Hardy, who explained that Daraprim has

the strongest recommendation from the relevant clinical

guidelines for treating active toxoplasmosis and that other

therapies, like TMP-SMX, are not as good of substitutes.  This

is why people kept using Daraprim, even when the cost

increased, by hundreds of dollars per tablet, despite the fact

that TMP-SMX, or compounded pyrimethamine, cost only a small

fraction of that.

        I'd like to turn now to the first theme of defendant's

defense here:  No harm, no foul.  Rather than fully engage with

the overwhelming evidence of this conduct, Mr. Shkreli has

focused on pointing the blame elsewhere.

        The first way he has tried to shift the blame is by

trying to argue that his vast scheme to prevent generic

pyrimethamine competition actually had no effect.  He would

like the Court to believe that the FDA is to blame for the

LCMMFTC1                    Summation - Ms. Peay

1   delay in generic entry.

2           Your Honor may remember, when Mr. Shkreli's lawyer

3   argued if only the FDA hadn't banned Ipca from importing API

4   into the United States, Cerovene would have had its API supply

5   source and Vyera's exclusive deals wouldn't have made any

6   difference.

7           In addition to blaming the FDA, Mr. Shkreli blames the

8   generics themselves.  He argues that the generics didn't try

9   hard enough to get Daraprim samples.  They made bad -- he

10  argues they made bad business decisions, and he argues that

11  they tried to cut corners by seeking to purchase only three

12  rather than five bottles of Daraprim RLD.  But this defense

13  does not fit with the evidence.

14          As we have heard from the generic companies

15  themselves, they were all actively trying to develop, obtain

16  approval, and launch generic versions of Daraprim.  Mr. Shah

17  testified that Cerovene's approach was, let's try to get the

18  brand bottles, as many as we can as fast as we can.  And Mr.

19  Della Fera likewise testified that Fera wanted to be first to

20  market for its generic pyrimethamine product.

21          But at every turn the generics were stimied by

22  Mr. Shkreli's scheme.  The classic closed distribution play

23  prevented them from getting samples.  The exclusive supply

24  contracts prevented them from getting API.  And for generics

25  that were still in the initial stages of looking at making a

LCMMFTC1                    Summation - Ms. Peay

1    Daraprim product, after 2015, the data blocking made the market

2    opportunity unclear.

3         THE COURT:  So you may not be the lawyer to address

4    this, so I apologize.  It may be the last counsel for the

5    plaintiffs.  But I have tried to understand the defense

6    argument about the generics not trying hard enough.

7         It seems to me that I'm not aware of a legal test that

8    requires a competitor to use extraordinary efforts beyond

9    anything normally seen in the business community or overcome

10   every hurdle placed in their way.  I have tried to understand

11   the relevance, and I know defense counsel will address this,

12   but just so plaintiffs' counsel can anticipate what I've been

13   thinking about, I have tried to think of it instead as an

14   argument about the calculation of damages perhaps.

15        Anyway, I am going to hear the relevance.  You may not

16   be the right lawyer to address this, that it's more an argument

17   about they could have entered some months earlier if they had

18   taken these additional steps, as opposed to really addressing

19   the liability issue.

20        MS. PEAY:  Your Honor, I agree with you that we are

21   not aware of a standard that would require the generics to take

22   every effort possible to get on the market.  You are correct,

23   Ms. McFarlane will be addressing the plaintiffs' case for

24   disgorgement, for equitable monetary relief.

25        Let's move to the next slide, Ms. Guy.

1    I'd like to walk through the first roadblock then that

2    Mr. Shkreli put up for the generics to overcome.  This is the

3    distribution restrictions.  The evidence is clear that

4    Mr. Shkreli's plan to prevent generics from accessing Daraprim

5    impeded their entry and sent them scrambling for many months to

6    try to obtain enough Daraprim to conduct the necessary testing.

7    Cerovene was hit particularly hard by these

8    restrictions.  In 2013, Cerovene had been able to purchase

9    Daraprim samples from a local pharmacy.  Back then, the

10   pharmacy had been able to supply more than enough samples in

11   about a day.

12   Fast forward to late December 2017, when Cerovene

13   learns from the FDA that it needs to repeat its bioequivalence

14   testing and now needs more bottles of Daraprim RLD.  Cerovene

15   had to go out and buy five bottles, all from the same

16   manufacturing lot.  This time around that local pharmacy could

17   not supply any Daraprim RLD at all.

18   So what did Cerovene do?  They reached out to various

19   entities to try to source Daraprim RLD.  This included

20   hospitals, independent pharmacies, and sample procurement

21   companies.  Government Exhibit 3397 is a list of Cerovene's

22   efforts.  None were able to procure five bottles of Daraprim

23   RLD.

24   Cerovene enlisted its marketing partner, Dr. Reddy's

25   to help.  Dr. Reddy's suggested prepaying $550,000 to Reliant

1    to acquire five bottles.  But Vyera's aggressive monitoring

2    allowed it to spring into action and promptly buy back Daraprim

3    from Reliant that otherwise Reliant intended to sell to

4    Dr. Reddy's.

5           On April 4, 2018, CentraState, a pharmacy affiliated

6    with Reliant, ordered five bottles of Daraprim from ASD,

7    Vyera's distributor.  That same day Anne Kirby of Vyera noticed

8    CentraState's five-bottle order of Daraprim where they had only

9    previously purchased two bottles.  She found this deviation

10   suspicious and immediately contacted ASD to inquire about the

11   order and was advised that ASD had already shipped the bottles.

12   Ms. Kirby promptly flagged this transaction to Mr. Mulleady and

13   Mr. Mithani.  Mr. Mulleady then decided to buy back the five

14   bottles from CentraState to avoid the risk of diversion to a

15   generic.

16          Without much negotiation, Mr. Mulleady accepted

17   CentraState's offer to sell the five bottles of Daraprim back

18   to Vyera at $750,000, almost twice the original purchase price.

19          On April 6, 2018, Mr. Mulleady personally met with

20   Satya Valiveti, the owner of CentraState, in a Starbucks

21   parking lot to repurchase the five bottles of Daraprim.

22   Following this buyback, Vyera instructed ASD to block

23   CentraState's and its sister company, Reliant's, access to

24   Daraprim.  ASD implemented Vyera's request immediately.

25          As we have heard from Mr. Valiveti, because of Vyera's

1    buyback, Reliant and CentraState were unable to sell these five

2    bottles of Daraprim to Dr. Reddy's or any other potential

3    generic competitor.  So but for that buyback, Cerovene would

4    have had Daraprim RLD to conduct BE testing no later than April

5    2018.

6           Finally, after Cerovene spends 12 months, basically

7    the entirety of 2018, to obtain Daraprim, Cerovene is able to

8    cobble together three bottles from one source, but never the

9    five they were seeking.

10          Defendant tries to shift blame away from its practices

11   here and claim that Cerovene could have obtained the five

12   bottles it needed back in early 2018 if only it had chosen to

13   work with ProSupplier instead of Reliant.  But there is no

14   evidence in the record, none, that ProSupplier had five bottles

15   of Daraprim RLD in early 2018 or at any other time.

16          In fact, there is no evidence in the record from

17   ProSupplier at all.  There are no documents from ProSupplier,

18   which is based in Switzerland, and no one from ProSupplier was

19   deposed.  Defendants, instead, withdrew their Hague request for

20   discovery from ProSupplier.

21          But we did hear from Cerovene and we did hear from

22   Dr. Reddy's, both of whom testified live.  And Mr. Shah and Mr.

23   Mukhopadhyay testified that there were good reasons why they

24   chose to work with Reliant.  Mr. Shah indicated that because

25   Reliant said they could get the RLD in two weeks versus

1    ProSupplier's estimate of four to six weeks, they went with

2    Reliant.  Time was of the essence.  And Mr. Mukhopadhyay

3    testified to the previous relationship with Reliant and how

4    they were familiar with Reliant and also pointed to Reliant's

5    promise that they could source the bottles sooner than

6    ProSupplier.

7            We also heard from Mr. Valiveti of Reliant, who

8    explained that actually, in 2018, ProSupplier had tried to

9    source Daraprim from him, from Reliant.  Of course we know that

10   Cerovene and Dr. Reddy's were right to focus on Reliant because

11   Reliant did successfully procure five bottles of Daraprim and

12   was on the verge of selling those bottles to Cerovene until

13   Vyera intervened.

14           THE COURT:  Of course it was only successful because

15   of a family relationship.  It was sort of serendipitous.  Maybe

16   that's not the right word.  But unusual.

17           MS. PEAY:  Your Honor, are you referring to the family

18   relationship between CentraState and Reliant?

19           THE COURT:  Yes.

20           MS. PEAY:  Yes, your Honor, that's correct.  But, your

21   Honor, Reliant was in the business of supplying RLD to various

22   pharmaceutical companies.  That was their regular business.

23           Like Cerovene, Fera also expended a great deal of

24   effort trying acquire RLD but could not find any.  Fera tried

25   to get Daraprim from November 2016 through May of 2018.  They

tried their normal supplier, a hospital, and they even went to
Vyera itself through their CMO.  Fera was able to get two
bottles initially from Reliant, but was unable to get more from
them, who by that time had been cut off by Vyera from access to
Daraprim.

Without the required five bottles, Fera was forced to
seek a waiver from the FDA, which was not granted until April
2019.  The exclusive agreement with Fukuzyu also stimied the
generics and wreaked havoc on their efforts to obtain approval
and enter the market.

In 2015, when Cerovene had to find a new API supplier
after its previous supplier Ipca had been banned from
importing, it began negotiations with Fukuzyu.  Cerovene
recognized that Fukuzyu was its best option and even agreed to
purchase much more API than it needed because Cerovene very
much wanted to partner with Fukuzyu.

On October 4, 2016, while Vyera executives were in
route to visit Fukuzyu's headquarters, Fukuzyu's CEO informed
Cerovene that it would no longer be interested in dealing with
Cerovene.  Like Cerovene, Fera was stimied by Vyera's exclusive
contract with Fukuzyu.

Fera contacted Fukuzyu in late 2017 seeking a supply
relationship.  Fukuzyu informed Fera, via a broker, it would
not be able to supply pyrimethamine because they could not sell
to a U.S. company for commercial use in humans.  Fukuzyu's

LCMMFTC1                        Summation – Ms. Peay

1    message to Fera was verbatim.  The language provided to them by

2    Vyera's Dr. Pelliccione.

3          Instead, turned down by Fukuzyu, Fera was forced to

4    work with an API supplier that had to develop a new

5    pyrimethamine API manufacturing process.  This further delayed

6    Fera's entry onto the market.

7          Turning to RL Fine, the exclusive agreement with RL

8    Fine also had significant consequences for generics.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCMKFTC2                    Summation – Ms. Stewart

1          MS. PEAY:   (Continuing)  As Mr. Shah of Cerovene

2     testified by affidavit, after Cerovene learned it could no

3     longer use Fukuzyu, they turned to RL Fine.

4          Now, as I referred to earlier, your Honor, in

5     August 10th of 2017, this is when Vyera receives a report from

6     their competitive intelligence consultant, Pennside Partners.

7     This report was the one that they identified two generics,

8     Mylan and Sandoz, as purchasers of RL Fine pyrimethamine API.

9     At this time, Mr. Mulleady, Mr. Mithani were running Vyera.

10    Mr. Mulleady immediately forwarded the presentation to

11    Mr. Shkreli.

12         Spurred on by Mr. Shkreli, Mr. Mithani and

13    Mr. Mulleady reach out to RL Fine in August 2017 inquiring

14    about pyrimethamine API.

15         Mr. Tilles, the then chairman of the Phoenixus board,

16    meets with RL Fine executives at the end of August 2017 in

17    Frankfurt.  It was at this October 2017 meeting that RL Fine

18    executives, as we discussed earlier, confirmed that the company

19    was supporting several generic companies that would soon file

20    pyrimethamine ANDAs.  This information gets back to

21    Mr. Shkreli, who then texted Mr. Mulleady from his contraband

22    phone:  "It's Shkreli.  Trying to get in touch with you

23    urgently.  Hearing pyri ANDA approval in December 2017."

24         The evidence then shows that Mr. Mulleady and

25    Mr. Mithani pushed forward with negotiations with RL Fine in

LCMKFTC2                    Summation - Ms. Stewart

1    November, ultimately leading to the signing of the exclusive

2    agreement that I referenced earlier on December 27, 2017.

3           Now, on the first day of trial, Mr. Shkreli's lawyer

4    tried to imply that Vyera's RL Fine deal could not possibly

5    have affected RL Fine's decision not to work with the generic

6    companies because the agreement wasn't signed until

7    December 27, 2017, which was nearly a month after RL Fine

8    informed Cerovene that it would no longer supply it with

9    pyrimethamine API.

10          But the full-time line paints a very different

11   picture.  On November 2nd, 2017, Mr. Mulleady reaches out to

12   RL Fine and offers 1.25 million per year to finalize their,

13   quote, exclusive agreement.

14          On November 25, 2017, Mr. Mulleady and RL Fine then

15   reach an informal agreement.  This is just five days before

16   RL Fine cuts off Cerovene on November 30, 2017.  Then, moving

17   forward, two years later, when Vyera ends the RL Fine contract,

18   RL Fine was back supplying Cerovene within a couple of months

19   of the termination of that contract.

20          It is clear from the evidence that the restrictions

21   Mr. Shkreli and Vyera imposed, they resulted in incredible

22   roadblocks that stymied the generics in so many ways.  It's

23   also clear that despite these roadblocks, the generics worked

24   tirelessly for years to try to get on the market.  It's clear

25   that to suggest that outside forces may have played a role in

LCMKFTC2                    Summation - Ms. Stewart

1    the generic difficulties getting to market is to ignore the

2    plain evidence that the root cause of the generics'

3    difficulties were the defendant's actions.  When you consider

4    all this evidence, it is amazing that these companies persisted

5    and that generic entry has occurred at all so far.

6           Now, your Honor, my colleague, Ms. Haneberg, is

7    prepared to address Mr. Shkreli's second overarching defense.

8           THE COURT:  Thank you.

9           MS. HANEBERG:  Thank you, your Honor.

10          Good morning, your Honor.  May it please the Court,

11   Maren Haneberg, from the FTC and on behalf of all plaintiffs.

12          I will now address the second overarching defense we

13   have heard from Mr. Shkreli, and that is, even if there were

14   antitrust violations, it wasn't his conduct that was the root

15   of those violations.  This is despite the fact that he

16   masterminded the scheme at issue.

17          Mr. Shkreli meets the individual liability standard

18   for an antitrust violation.  He had direct participation in

19   those violations and the authority to control Vyera.

20          Mr. Shkreli need not always be an employee of Vyera to

21   be held individually liable.  Mr. Shkreli had, and has, the

22   authority to control the corporation because he is the

23   controlling shareholder; in other words, he owns Vyera.  And

24   even if Shkreli had ceased involvement after setting the scheme

25   in motion, he is still liable for the continuance of that

1    conduct because it did not materially change after his formal

2    tenure at Vyera ended.

3              According to Mr. Shkreli's own written testimony,

4    having only worked at hedge funds since graduating college in

5    2004, and with zero actual pharmaceutical industry experience,

6    Mr. Shkreli formed the drug company that would become Retrophin

7    in late 2010.  There, as Ms. Peay earlier explained, he

8    pioneered the anticompetitive business strategy that he would

9    later apply to Daraprim.  That is acquiring a small, but

10   essential drug with no patent protection and no competitors,

11   substantially increasing the price of the drug, and then

12   restricting the distribution to prevent potential competitors

13   from accessing the drug for FDA-mandated bioequivalence

14   studies.

15             Mr. Shkreli acknowledges that while he was CEO,

16   Retrophin acquired or licensed to such drugs, Chenodal and

17   Thiola, and raised their prices to, quote, generate revenue.

18             Ms. Guy, the slide is up?  Oh, thank you.

19             Mr. Shkreli's plan to protect these price hikes

20   through closed distribution to prevent generic access was not a

21   secret.  In public Retrophin investor calls, Mr. Shkreli

22   proudly boasted of his distribution plan.  In a February 2014

23   investor transcript, he explained:  "Chenodal will continue to

24   be distributed through Centra, a special pharmacy.  This unique

25   distribution system does not allow for generics to access

1   product and to conduct bioequivalence studies as required

2   against the reference listed drug, and the filings are almost

3   impossible unless a generic company illegally penetrates the

4   specialty pharmacy distribution."

5          He goes on to explain, "I think we have a really good

6   handle on making sure that generics won't enter or gain access

7   to our product, and that's a key feature.  To our knowledge, as

8   I mentioned, this model has protected virtually every single

9   company that has it from generic competition."

10          In another investor call in May of 2014, he bluntly

11   stated:  "Our distribution strategy for rare diseases is closed

12   distribution.  The closed distribution system allows for us to

13   control the release of our product.  We do not sell Retrophin

14   products to generic companies.  The specialty pharmacy

15   distribution model takes the AB substitutable rating that

16   generics rely on and neuters it."

17          Again, these are Mr. Shkreli's public statements

18   regarding his reasons for utilizing closed distribution.

19          While at Retrophin, Mr. Shkreli also tried to acquire

20   and apply the strategy to Cuprime and Syprine, other drugs used

21   to treat another life-threatening disease.  Though ultimately

22   unsuccessful in acquiring the drugs, Mr. Shkreli had planned to

23   increase the price of those lifesaving drugs for which there

24   was no alternative therapy by 10 to 30 times and closing the

25   drugs' distribution, so, quote, "Generics become unable to

1    source the product for their bioequivalence study."

2            As Ms. Peay explained, upon Mr. Shkreli's ouster from

3    Retrophin for alleged misconduct, Mr. Shkreli founded Vyera

4    with the intent of replicating the same anticompetitive

5    business strategy that he had successfully implemented at

6    Retrophin.  As bluntly put to early potential investors,

7    exclusivity, meaning closed distribution, creates a barrier and

8    pricing power.

9            And as Mr. Shkreli himself testified, Vyera's business

10   development group focused on identifying lifesaving drugs in

11   which Vyera should invest.  That would be to add shareholder

12   value through licensing or acquiring these drugs and then,

13   quote, "improving distribution networks."

14           Vyera's first target under Mr. Shkreli's direction was

15   Biltricide, another old gold standard treatment for a parasitic

16   infection that had no patent protection.  Mr. Shkreli aimed to

17   increase the price of treatment, which was comprised of a total

18   of six pills, from under $100 to over $100,000, again, using

19   closed distribution to curb generic risk.  Mr. Shkreli actually

20   tried to recruit Fera Pharmaceuticals' CEO, Frank Della Fera,

21   into investing into his Biltricide scheme.  Mr. Della Fera was

22   perplexed as to how he planned to turn this old low revenue

23   drug into a blockbuster.  As Mr. Della Fera testified, "I

24   assumed that he knew of some new indication for Biltricide, but

25   Mr. Shkreli never indicated that was his plan.  Instead, he

LCMKFTC2                        Summation - Ms. Stewart

1   simply mentioned that he planned to raise the price and put the

2   drug into a closed distribution system to deter generic entry."

3          When Mr. Shkreli and Vyera failed to close the deal on

4   Biltricide, they set their sites on Daraprim.  As Mr. Shkreli

5   explained to one investor prior to closing the acquisition,

6   "Despite Daraprim having no orphan or patent exclusivity left,

7   I feel very good that there are no incoming generics, and now

8   that it is closed distribution, there will not be any going

9   forward.  Of course, even if we get three years, it is a great

10  payout."  And it was Mr. Shkreli himself who executed the

11  Daraprim asset purchase agreement on behalf of Vyera.

12         Through the live and designated deposition or

13  investigational hearing testimony of five of Mr. Shkreli's

14  former employees, we have heard repeatedly that the plan to

15  utilize closed distribution was intended to block generic entry

16  and that the plan was originated and driven by Mr. Shkreli.

17         Michael Smith, who worked both in business development

18  with Mr. Shkreli at both Retrophin and Vyera, testified via

19  designation that it was Mr. Shkreli who came up with that

20  thesis.

21         As Ms. Peay cited earlier, Mr. Dorfman, Vyera's prior

22  general counsel, he understood the closed distribution system

23  was part of Vyera's desire to block or certainly to delay entry

24  of any generic.

25         Another former general counsel of Vyera, Eve

1  Costopoulos, testified that it was her personal understanding

2  that there was a strategy to control the drug so that -- and to

3  protect the drug from generics for as long as possible, meaning

4  protect a generic or potential generic manufacturer from

5  obtaining the drug so that they could then develop a generic

6  form of the drug.

7        And as Ms. Peay also pointed out earlier, Ms. Ghorban,

8  Vyera's then head of marketing and business analytics, it was

9  also her understanding that the strategy of using closed

10  distribution was to prevent generic entry.

11        She also testified that a generic launch would

12  decimate Vyera's revenue -- Daraprim revenues on which it was

13  dependent.

14        Finally, Nancy Retzlaff, Vyera's chief commercial

15  officer, also testified via deposition that being a small

16  company, Mr. Shkreli was intimately involved with ultimate

17  responsibility for setting the strategy.

18        And it was Mr. Shkreli's belief that to the extent

19  that a generic company was challenged to get samples of the

20  product, that would impede their ability to conduct a

21  bioequivalence -- to get the product sufficient to conduct a

22  bioequivalence study.  That was the purpose of closed

23  distribution.

24        As the founder and CEO of Vyera, Mr. Shkreli made all

25  of the decisions.  He made the decision to acquire Daraprim at

a premium price of $55 million, despite having only $4 million

in annual sales, and no patent or regulatory protection,

knowing that he would profit from his anticompetitive strategy.

As Mr. Shkreli explained, "It was clear to me that

Daraprim was significantly undervalued and that if Vyera could

acquire the drug at the right price, the acquisition made

sense."

And Mr. Shkreli made the decision to restrict the

distribution of Daraprim to prevent generics from accessing the

RLD they would need for FDA-mandated bioequivalence testing.

And it was Mr. Shkreli who made the decision to raise

the price of Daraprim from $17.50 per tablet to $750 per

tablet.  Even after the public backlash to such an outrageous

price increase to an essential lifesaving drug, Mr. Shkreli

publicly stated that his only regret was not raising the price

even higher.

Asked by an audience member at a healthcare summit

hosted by Forbes what he would do differently if he could go

back in time, he replied, "I probably would have raised prices

higher as that is probably what I should have done.  I could

have raised it higher and made more profits for our

shareholders, which is my primary duty."

It should be noted that Mr. Shkreli is, and always has

been, Phoenixus' largest shareholder.

To this day, Mr. Shkreli defends his conducted:  "I

accept full responsibility for the price increase, which I

still believe was the right decision for the company and the

patient community."

In sum, it was Mr. Shkreli who made all of the

decisions.  As Mr. Tilles, who took over as interim CEO when

Mr. Shkreli stepped down, testified, it was not the senior

leadership team making all the important management decisions,

it was Martin Shkreli.

And in Martin Shkreli's own words:  "I was the boss of

the entire company."

Once Vyera had acquired the Daraprim rights,

Mr. Shkreli's marching orders were to ensure Daraprim was moved

into closed distribution as swiftly as possible in order to

minimize exposure, meaning minimize exposure to generic

competitors being able to access Daraprim.

Under Mr. Shkreli's leadership, Vyera worked to

further restrict the distribution of Daraprim.  As Mr. Dorfman

testified at trial, the distribution system was generally made

even more restrictive, identifying with a desire to identify

with particularity every -- to the extent possible, every pill

that was being distributed by the company.

Vyera also immediately focused on purchase limits,

keeping Shkreli apprised of any developments, and Mr. Shkreli

also closely monitored the Daraprim sales data.  Even after

leaving -- having formally left the company — I'm sorry — he

1    was still a board member.  He carefully tracked the commercial

2    sales of Daraprim in order to make sure that our, quote,

3    "distribution wasn't penetrated by a generic."

4           As my colleague, Ms. Peay, discussed earlier, with

5    Vyera dependent on sales to generate revenue, Mr. Shkreli and

6    Vyera were not content to solely rely on closed distribution to

7    prevent generic entry.  Mr. Shkreli also set the course to do

8    everything possible to keep generics from accessing the most

9    viable sources of API.

10          As Mr. Smith testified, it was Mr. Shkreli's desire to

11   enter an exclusivity agreement with Fukuzyu.  That idea

12   originated with Mr. Shkreli.

13          Mr. Shkreli first had Mr. Smith -- asked Mr. Smith to

14   contact Fukuzyu in May of 2015, just as negotiations with Impax

15   to acquire the rights were beginning.

16          And in June -- early June 2015, a Fukuzyu sales

17   representative responded to Vyera's inquiry, and this is a

18   follow-up to an email Ms. Peay showed earlier - this is

19   GX 1200 -- 1209.  The sales representative responded to Vyera's

20   inquiry as follows:

21          "Do you have any exclusive agreements to supply

22   pyrimethamine in the United States?

23          "Yes, we do.

24          "Can you sell us pyrimethamine?

25          "Sorry, we can't.

1           "Can you sign up exclusivity with us?

2           "Sorry, we can't."

3           When Mr. Smith forwarded this exchange to Mr. Shkreli,

4    Mr. Shkreli replied:  "Hopefully, it is Impax, because then it

5    would be unlikely a generic is out there.  Only one other DMF,

6    which was Ipca, and they can't do it.  I think DMFs are highly

7    preferred by FDA and arguably even required."

8           As Mr. Tilles explained, even if Mr. Shkreli wasn't

9    physically present in Japan for the execution of the agreement,

10   exclusivity with Fukuzyu was Mr. Shkreli's idea and intention,

11   it was something he wanted, and it happened.

12          Data blocking was also key to Mr. Shkreli's plan to

13   prevent generic competition to Daraprim.  Again, even prior to

14   the acquisition, Mr. Shkreli sought to prevent sales data from

15   being reported to IMS, now known as IQVIA, and other

16   third-party data aggregators in order to mask the true size of

17   the Daraprim market opportunity.  As Ms. Retzlaff, the former

18   chief operating officer, explained, Mr. Shkreli believed that

19   by limiting data to generic manufacturers, that would limit or

20   impede their ability to assess the size of the market

21   opportunity.

22          Vyera's efforts to get ICS and Walgreens not to report

23   sales to IQVIA, again when Mr. Shkreli was still CEO, and in

24   May 2016, even after having formally departed from Vyera,

25   Mr. Shkreli wrote Mr. Tilles, Mr. Crutcher, and Ms. Retzlaff

LCMKFTC2                      Summation - Ms. Stewart

1  demanding to know how are there still so many Daraprim bottles

2  getting through to IMS.

3          It is clear that Mr. Shkreli's official exit from the

4  company in February 2016 did not stop his involvement in the

5  anticompetitive scheme.  Mr. Shkreli has regularly used his

6  shareholder voting power, or the threat thereof, to control the

7  management of Vyera.

8          Mr. Tilles who, again, took over as interim CEO upon

9  Mr. Shkreli's departure, understood Mr. Shkreli to be exerting,

10  quote, shadow control over the company.

11          When Mr. Shkreli grew unhappy with those he had left

12  in charge, he called an extraordinary general meeting, known as

13  an EGM, something only he has the sufficient shareholder power

14  to do, and installed a new board comprised of his thoroughly

15  unqualified cronies.

16          As Mr. Shkreli himself testified via affidavit, "In

17  2016, I was not satisfied that Vyera was moving in the right

18  direction and became concerned about the future of the company,

19  which at the time was my largest investment.  I was

20  particularly frustrated by the way that Ron Tilles, who had

21  been named interim CEO, was managing Vyera.  As a result, I

22  organized a proxy fight to remove members of the board of

23  directors of Phoenixus that I didn't think were doing a good

24  job, including Mr. Tilles.  The proxy fight was successful, and

25  my slate of directors, which included Kevin Mulleady and Akeel

LCMKFTC2                    Summation - Ms. Stewart

1  Mithani, was elected."

2          THE COURT:  So does the record reflect anything that

3  would indicate that Mr. Tilles or those in charge before their

4  ouster were doing anything to unwind the anticompetitive

5  conduct you've identified?

6          MS. HANEBERG:  Your Honor, no.  Quite to the contrary,

7  they were pursuing Mr. Shkreli's scheme throughout that time

8  period.

9          THE COURT:  So we have this statement from Mr. Shkreli

10 as to his unhappiness, but do the plaintiffs have a view as to

11 what the record might show as to the source of that

12 unhappiness?

13         MS. HANEBERG:  I believe that -- your Honor, I believe

14 it is a variety of issues, and some of it included personal

15 issues between Mr. Tilles and Mr. Shkreli, and that ultimately

16 resulted in a dissolution of the relationship.

17         Mr. Tilles was actually fired as CEO before the formal

18 EGM took place to remove him, but I don't believe that there

19 was any disagreement over whether he was actually pursuing the

20 anticompetitive business strategy that Mr. Shkreli had set in

21 motion.

22         Prior to the EGM, the then board of directors implored

23 shareholders not to elect Mr. Shkreli's proposed slate for

24 three key reasons --

25         THE COURT:  I'm sorry?

1          MS. HANEBERG:  I'm sorry.

2          Prior to the EGM, the then board of directors implored

3    shareholders not to elect Mr. Shkreli's proposed slate for

4    three key reasons:

5          The first was an utter lack of transparency.

6    Mr. Shkreli provided no rationale behind his proposals.  He

7    initiated litigation against the company, and his

8    communications with Turing's group staff and other shareholders

9    was vitriolic and accusatory.

10         They were also extremely concerned by undue

11   involvement of Mr. Shkreli.  As they explained to shareholders,

12   over the past year, Turing has faced substantial inquiries and

13   mistrust from consultants, auditors, banks, insurers,

14   regulatory authorities, and even potential customers due to

15   Martin Shkreli's actual and perceived involvement in the

16   company, first as the CEO and now as a shareholder.

17         The then board found Mr. Shkreli's proposed slate to

18   be, quote, "woefully inadequate."  The board, quote, "believes

19   that in case of their election, many third parties, including

20   regulatory authorities, will likely deem the newly elected

21   board members to be serving merely as strawmen acting on

22   Mr. Shkreli's behalf."

23         Finally, the board found that there was an utter lack

24   of qualifications, and conflicts of interest were rife.  Board

25   of directors did not believe that the candidates proposed by

LCMKFTC2                    Summation - Ms. Stewart

1   Mr. Shkreli had the independence, nor the finance, biotech, or

2   pharma or leadership experience required for membership on a

3   pharmaceutical board.

4          Despite these serious concerns, Mr. Shkreli used his

5   shareholder power to elect his chosen slate in June 2017.

6   After the vote, it became clear, in the testimony of

7   Mr. Tilles, that Shkreli just wanted absolute control of the

8   votes by installing all his cronies.

9          Within 24 hours of their election, Shkreli's newly

10  elected board fired Dr. Salinas as CEO and Eve Costopoulos as

11  general counsel.  As Dr. Salinas testified at trial,

12  Mr. Shkreli was successful in getting his slate of directors

13  involved despite their lack of qualifications.  In the end,

14  Dr. Salinas was out and Mr. Shkreli's people were in.

15         Key among the five newly elected board members were

16  Kevin Mulleady and Akeel Mithani, who quickly became the sole

17  members of a newly formed executive committee, which was to

18  perform the executive functions and take over the tasks of

19  senior management, meaning chief executive officer, chief

20  financial officer, chief commercial officer, and chief legal

21  officer.

22         Mr. Mulleady had worked for Shkreli at his hedge

23  funds, Retrophin, other Shkreli startups, and Vyera at its

24  founding.  After Mr. Shkreli's formal departure, Mr. Tilles had

25  fired Mr. Mulleady for his lack of abilities.

LCMKFTC2                    Summation – Ms. Stewart

1      Mr. Mithani was a recent college graduate and another

2 close Shkreli associate, who admitted at his deposition that he

3 did not think he had the qualifications to join the board at

4 that time.

5      Mr. Mulleady would go on to assume the role of CEO and

6 chairman of the board.  Mr. Mithani became senior vice

7 president of business development.

8      Mr. Shkreli himself has referred to this board as the,

9 quote, "Martin and Kevin board."  As Mr. Shkreli said in a

10 prison phone call to Mr. Mulleady, "Being on the board of

11 Phoenixus means, you know, you're on the Martin and Kevin

12 board.  Between the two of us, we control more than 50 percent,

13 so that's the first thing you know off the rip."

14      Mr. Shkreli went on to explain, "Like the first thing,

15 it's like Facebook, you can't go in there and tell Zuckerberg

16 what to do.  You know, you can give him advice, you know, it's

17 just he happens to own the thing, and that's the way it is."

18      As Mr. Mulleady testified at trial, Mr. Shkreli in

19 this passage was likening himself to Mark Zuckerberg of

20 Facebook.

21      Central to Mr. Shkreli's continued control of Vyera is

22 his EGM power, that is, his ability as the largest shareholder

23 to call an extraordinary general meeting to remove and/or

24 install his chosen directors.  He has repeatedly flexed this

25 power.

LCMKFTC2                    Summation - Ms. Stewart

In another call from prison, he explained:  "I'm ready to hold Averill — as in Averill Powers, the CEO — accountable, Akeel Mithani accountable, and you, Kevin Mulleady, accountable if something doesn't get done."  He continued that:  "I have EGM power.  I mean, I have no problem firing everybody, to be frank, if you guys can't figure it out."

Mr. Shkreli has fought tooth and nail to ensure that his anticompetitive strategy not only remained in place, but actually expanded in scope even after his imprisonment in September of 2017.

In terms of distribution, Mr. Shkreli urged the tightening, further tightening, of the supply chain.  In a phone call to Mr. Mithani, Mr. Shkreli instructed Mithani that Vyera should be, quote, "doing everything possible to prevent a generic company from obtaining a sample of Daraprim, as this would mean making Daraprim a $600 million asset in perpetuity."

Mr. Shkreli instructed Mulleady on how to deal with Mr. Della Fera when they suspected that Fera might be approaching generic entry.  Mr. Shkreli explained:  "The number one thing I would do is just really carefully screen every doctor that you know, even if it drops sales a little bit. It's a good -- you know, really make sure he's not getting his hands on anything."

And in terms of API, it was Mr. Shkreli who crafted some of the original outreach to RL Fine.  If you compare

LCMKFTC2                          Summation - Ms. Stewart

1    GX 1104 to GX 1129, it is clear that Mr. Shkreli crafted one of

2    the original emails to reach out to RL Fine, which Mr. Mithani

3    simply copied and pasted and sent on to RL Fine.

4           Mr. Shkreli was integrally involved in Vyera's RL Fine

5    exclusivity effort.

6           Ultimately, Mr. Shkreli grew dissatisfied with

7    Mr. Mulleady and called yet another EGM to remove Mr. Mulleady

8    from the board, and Mr. Mulleady was, in fact, voted off the

9    board at an EGM in December of 2020.

10          But Mr. Shkreli's reasons for dropping Mr. Mulleady

11   from the board indicate that Mr. Mulleady never should have

12   been elected to the board in the first place, as he, quote,

13   "lacked pharmaceutical knowledge base."

14          As Mr. Shkreli testified at his deposition:  "One of

15   the things I have implored Mulleady to do over at least the

16   last several years, but certainly in the last 12 months, over

17   and over again, is to really try to focus and learn as much as

18   he can about the pharmaceutical industry, where I think there

19   are topics — not all topics, but some topics — he is fairly

20   deficient in that I think he owes it to himself and to those

21   around him in his career to work on."

22          He continued:  "I wanted him to sort of increase his

23   knowledge base in pharmaceuticals.  This was not —-

24   pharmaceuticals is not an easy business to understand, and

25   there would be many moments in time where I felt Kevin

1    demonstrated his lack of understanding and lack of knowledge

2    and fact-specific knowledge, especially in pharmaceuticals."

3         Having no pharmaceutical knowledge base, one can only

4    infer that Mr. Shkreli elected Mr. Mulleady to run Vyera simply

5    because of his close ties to Mr. Shkreli.

6         Shkreli believes, and regularly demonstrates, that the

7    power to hire and fire falls to him --

8         THE COURT:  Let's just pause there.

9         MS. HANEBERG:  Yes.

10        THE COURT:  With this removal of Mr. Mulleady, again,

11   I'm not aware of any record evidence that before his removal,

12   Mr. Mulleady, or those he was working with within Vyera, were

13   doing anything to unwind the anticompetitive practices to which

14   the plaintiffs are pointing, that the removal had to do with

15   other reasons.

16        Is that your understanding of what the record evidence

17   is as well?

18        MS. HANEBERG:  Your Honor, I agree, the record

19   evidence shows that the removal of Mr. Mulleady was not due to

20   any dampening of anticompetitive efforts; in fact, Mr. Mulleady

21   spearheaded numerous efforts to further restrict the ability of

22   generics to get on the market.  I will just note two points,

23   which is that, after significant questioning by the FTC, Vyera

24   did pay RL Fine to terminate its exclusivity agreement, and

25   there were board minutes reflecting a very different reason for

1    the RL Fine agreement than what had happened when they actually

2    entered into it.

3           Second, I will note that after we filed the complaint

4    in this action, I believe Vyera terminated its data blocking

5    provisions with its distributors.  I believe both of those

6    were -- I think the record would indicate that both of those

7    were in response to investigation or action by the FTC and the

8    state attorneys general, but I did want to be fully candid that

9    those two things did happen under Mr. Mulleady's tenure.

10          THE COURT:  Thank you.

11          MS. HANEBERG:  Mr. Shkreli believes and demonstrates

12   that the power to hire and fire falls to him, as the largest

13   shareholder.

14          He explained in his deposition:  "As the largest

15   shareholder, at least in my experience, a lot of those sorts of

16   decisions" — referring to removing Mr. Powers -- from

17   potentially removing Mr. Powers from the company — "they ended

18   up going to the largest shareholder."

19          The evidence shows, your Honor, that Mr. Shkreli meets

20   the standard for individual antitrust liability.  He

21   masterminded the scheme.  He set the scheme in motion.  He had,

22   and continues to have, control over the corporation through his

23   ability to hire and fire.

24          And even if any of Mr. Shkreli's involvement had

25   ceased, he would still be liable for the continuance because

1    his scheme did not materially change after his formal tenure at

2    Vyera ended.

3            Your Honor, I will now turn over to my colleague, Amy

4    McFarlane, from The New York Attorney General's Office, to

5    discuss remedy.

6            THE COURT:  Before we do that, just one second here,

7    does anyone need a break?

8            Not seeing any desire for that, great, go ahead.

9            MS. McFARLANE:  Good morning, your Honor.  And may it

10   please the Court, I'm Amy McFarland, from the New York State

11   Attorney General's Office.  I'm also speaking today on behalf

12   of the government plaintiffs.

13           I'd like to briefly address our authority to seek

14   injunctive relief and the state's authority to seek equitable

15   monetary relief in this case.

16           Your Honor, ever since New York initiated the Daraprim

17   investigation in 2015, we and the other plaintiff states have

18   worked closely with our sister enforcers at the Federal Trade

19   Commission to address the conduct that allowed defendant, in

20   2015, to implement a 4,000 percent increase in the price of

21   Daraprim, a lifesaving drug, and to unlawfully maintain that

22   4,000 percent increase by engaging in anticompetitive

23   practices.

24           The evidence clearly shows that Martin Shkreli,

25   through the company that he controlled, directed and

LCMKFTC2                    Summation - Ms. Stewart

1    participated in a comprehensive scheme to prevent generic

2    competition for Daraprim to protect his massive price hike.

3    This scheme, designed to maintain a monopoly on Daraprim,

4    violated the antitrust laws.

5           As your Honor knows from our papers, the FTC and the

6    states, particularly New York, have strong independent federal

7    and state law bases for the equitable relief sought in this

8    case.  Here, I'll be touching on those legal bases and on the

9    appropriateness of three aspects of that relief:

10          First, permanently banning Mr. Shkreli from working in

11   the pharmaceutical industry, consulting in the pharmaceutical

12   industry, or having any meaningful ownership interest in a

13   pharmaceutical company.

14          Second, the disgorgement of unjust gains.

15          And, third, the application of joint and several

16   liability in relation to the disgorgement of unjust gains.

17          So, first, with respect to an injunction:  The FTC

18   act, the Clayton Act, and state law authorize the plaintiffs to

19   seek strong injunctive relief, including industry bans against

20   individuals when equity demands it.

21          The New York Attorney General has the ability to seek

22   broad equitable relief under Section 63.12 of the New York

23   executive law, which is a remedial statute, not a penal

24   statute.

25          Through Section 63.12, the Attorney General has

LCMKFTC2                    Summation - Ms. Stewart

1    secured lifetime bans against individuals who repeatedly or

2    persistently violate the law.  In litigated cases, our state

3    courts have exercised their equitable discretion to issue

4    industry bans against lawbreakers in a variety of industries.

5            As noted in our papers, the Attorney General has

6    secured injunctions banning individuals from everything from

7    the business of equipment leasing, to the business of mortgage

8    foreclosure consultation, to the business of selling, breeding,

9    or training of dogs.

10           These industry bans were not time limited, and they

11   did not provide carve-outs for certain activities.  They were

12   permanent, plenary injunctions.

13           Here, federal law and New York law should be used to

14   ban Martin Shkreli from the pharmaceutical industry for life.

15           To be sure, banning an individual from working in an

16   industry is a serious remedy, but where egregious conduct

17   demands it, it is the proper remedy.  And, here, the

18   defendant's conduct warrants a permanent industry ban.  He has

19   repeatedly undertaken to profit by grossly distorting

20   competition in pharmaceutical markets and will do it again

21   unless he is banned from the industry.

22           Mr. Shkreli's chose not to attend this trial and offer

23   his testimony live, but we know from the --

24           THE COURT:  You have to slow down --

25           MS. McFARLANE:  Okay.

LCMKFTC2                    Summation - Ms. Stewart

1    THE COURT:  -- so that the reporter can catch every

2    word you say and so I can catch every word you say.

3    MS. McFARLANE:  Thank you very much, your Honor, and I

4    apologize.

5    THE COURT:  Thank you.

6    MS. McFARLANE:  Mr. Shkreli chose not to attend this

7    trial and offer his testimony live, but we know, from the many

8    facts in evidence at this trial, that Mr. Shkreli participated

9    in, and directed, the illegal scheme at issue in this case.

10   While at his prior pharmaceutical company, Retrophin,

11   Mr. Shkreli pioneered his strategy of restricting distribution

12   to foreclose generic -- to foreclose potential generic

13   competitors from getting the drug samples necessary to conduct

14   FDA testing for generic approval.

15   At Retrophin, he bragged to investors that putting

16   drugs into closed distribution has protected virtually every

17   single company that has it from generic competition.  He used

18   this strategy at Retrophin to protect price increases after he

19   raised the price of Chenodal from $100,000 to $515,000 a year,

20   and raised the price of Thiola from $4,000 to $80,000 per year.

21   Then Mr. Shkreli started Vyera.  His business

22   development team that had implemented his strategies at

23   Retrophin followed him to Vyera.  Vyera, under Mr. Shkreli's

24   control, acquired Daraprim from Impax.  As we've heard from

25   Dr. Hardy, Daraprim is used to treat central nervous system

LCMKFTC2                    Summation - Ms. Stewart

1  toxoplasmosis, a disease that most frequently afflicts

2  immunocompromised individuals, such as those with uncontrolled

3  HIV.

4          Under the control of Shkreli, Vyera acquired Daraprim

5  and immediately increased the price 4,000 percent, a price that

6  we've heard former Vyera executive, Dr. Salinas, call

7  excessive, crazy, irresponsible, and the poster child of

8  everything that is considered wrong about the pharmaceutical

9  industry.

10         Dr. Salinas testified that this kind of massive price

11 hike was Mr. Shkreli's business model.  To be able to protect

12 and maintain this grossly excessive price, Vyera imposed

13 restrictions on API suppliers, distributorships, and

14 information flows.  Mr. Shkreli, the largest shareholder of

15 Vyera's parent corporation, directed and participated in the

16 scheme continuously from 2015 to the present, even from prison.

17 Because of that conduct, generic entry was impeded, and Vyera

18 was able to force patients to pay its exorbitant price for

19 Daraprim.

20         As Dr. Hardy testified, and as we've seen in emails

21 from Massachusetts General Hospital, Shkreli's scheme to

22 inflate the price of Daraprim forced physicians and vulnerable

23 patients in life-threatening situations to turn to second-best

24 treatments.  Mr. Shkreli has testified that he contemplates

25 some sort of return to the pharmaceutical industry when he is

1    released from prison.  This must not happen.

2            Equity demands that Mr. Shkreli be permanently banned

3    from the pharmaceutical industry.  A conduct-specific

4    injunction that would allow Mr. Shkreli's continued

5    participation in the pharmaceutical industry would be more

6    difficult to monitor and enforce and would not be sufficient to

7    protect consumers.

8            We ask the Court to use the federal and New York State

9    law to issue the strong injunctive relief to ensure that

10   Mr. Shkreli cannot repeat this or any other kind of

11   reprehensible conduct in the pharmaceutical industry when he is

12   released from prison.

13           Banning Mr. Shkreli from the pharmaceutical industry

14   would also send a powerful signal to corporate executives in

15   the pharmaceutical industry that they cannot engage in illegal

16   schemes to reap monopoly profits at the expense of vulnerable

17   patients.

18           Turning now to the equitable monetary relief, sought

19   by the state plaintiffs in this case.  As your Honor knows,

20   following the Supreme Court's decision in the AMG case,

21   monetary relief here is the unique province of the states.

22           Your Honor has already found in this case that the

23   plaintiff states have parens patriae standing to bring this

24   action for equitable relief.  Your Honor determined, in your

25   partial summary judgment ruling, that the New York Attorney

LCMKFTC2                        Summation – Ms. Stewart

1    General has the authority to seek disgorgement of defendant's

2    net profits.  Your Honor also ruled that New York has authority

3    to seek disgorgement of unjust gains from the defendant based

4    on the entirety of U.S. sales of Daraprim because the locus of

5    the wrongful activity was in New York State.

6          Case law counsels that the district court has broad

7    discretion in calculating the amount to be disgorged.  In the

8    Second Circuit, *FTC v. Bronson* provides the guiding principles

9    for calculation of disgorgement.  *Bronson* tells us that the

10   plaintiffs bear the burden of showing that the disgorgement

11   calculation reasonably approximated the amount of defendants'

12   unjust gain.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. McFARLANE:  *Bronson* specifies that this should be

2    the calculation of the profits resulting from the unlawful

3    conduct less any direct costs incurred by the defendant.  If

4    plaintiffs make this showing, the burden then shifts to the

5    defendants to show that the figures were inaccurate.

6          *SEC v. First Jersey Securities* counsels that any risk

7    of uncertainty in calculating disgorgement should fall on the

8    wrongdoer whose illegal conduct created the uncertainty.

9          Here, Professor Hemphill has calculated the amount of

10   unjust gain resulting from the illegal activity.  He has

11   reasonably approximated that unjust gain to be $64.6 million.

12   As we heard from Professor Hemphill, he was assigned to

13   construct a model that calculates the amount of excess profits

14   under a variety of counterfeit factual scenarios that reflect

15   the likely timing and extent of entry, absent Vyera's unlawful

16   conduct.  In order to make this calculation, Professor Hemphill

17   undertook four steps, each of which I will briefly address.

18         First, Professor Hemphill calculated Vyera's net

19   Daraprim revenue in the actual world over the relevant period,

20   October 2018, when Professor Hemphill assumed the first generic

21   would have entered, through December 2020.  This is a

22   relatively straightforward calculation.

23         Revenues for the relevant period, less discounts,

24   rebates, and chargebacks paid to distributors, purchasers and

25   payors, Professor Hemphill calculates this figure to be $130.6

1    million.  This is actually a conservative estimate, since he

2    only considered data through the end of 2020, even though

3    Shkreli's scheme continued to yield unjust gains after that

4    date.

5            Second, he calculated Vyera's revenue in the

6    counterfactual but-for world associated with a number of

7    different scenarios for generic and authorized generic entry.

8            Now, one issue that is always central to the

9    construction of the counterfactual is whether the assumptions

10   that were made to construct the counterfactual were reasonable.

11           Here, Professor Hemphill has said that he relied on

12   the testimony and documents from the generic drug makers,

13   Cerovene and Fera.  We have heard from the generic

14   manufacturers, Cerovene and Fera, that they were delayed from

15   entering the market because of restraints on their ability to

16   source API and obtain samples for FDA testing.  This is despite

17   the fact that they doggedly pursued every avenue to overcome

18   the roadblocks erected by Mr. Shkreli and Vyera.

19           We heard from Manish Shah, the president of Cerovene.

20   Mr. Shah testified that in a world where Fukuzyu agreed to

21   supply Cerovene with API in October 2016, and in a world where

22   Cerovene had no trouble sourcing Daraprim RLD, Cerovene could

23   have filed its amended ANDA in February 2017.  Mr. Shah told us

24   that if Cerovene were using Fukuzyu API, the FDA likely would

25   have approved the ANDA in six months, in August of 2017.

LCMMFTC3                    Summation - Ms. McFarlane

1   Cerovene then would have completed validation batches and would

2   have entered in November 2017.  This is actually earlier than

3   Professor Hemphill had anticipated in the very conservative

4   but-for world that he constructed.

5        We also heard from Frank Della Fera, the CEO of Fera.

6   Mr. Della Fera said that in a normal world, without the

7   restraints imposed by the defendant, he would have expected to

8   source API from Fukuzyu in November 2017.  In a normal world,

9   he would have been able to easily acquire RLD and test it

10  against sample batches in June 2018.  In a normal world, he

11  would have filed his ANDA in January of 2019 with approval in

12  September, and he would have launched within 30 days, that is

13  to say, in October 2019.

14       This is consistent with Professor Hemphill's scenarios

15  that assume Fera entry in the fourth quarter of 2019.  As we

16  have heard in the testimony, there is a strong evidentiary

17  basis for Professor Hemphill's scenario that assumes Cerovene

18  entry on or before October 2018 and Fera entry in October 2019.

19       I should note that, as Professor Hemphill testified,

20  this is a very conservative model.  First, it's conservative in

21  that it does not model potential entry from two other firms

22  that sought to enter the market, InvaTech and Mylan, because at

23  the time we constructed the models there was not sufficient

24  information to reasonably determine when these companies might

25  have entered.  It's always conservative in that we project

LCMMFTC3                    Summation - Ms. McFarlane

1   Cerovene entry in October 2018, although we now have testimony

2   from Manish Shah at Cerovene saying that without the illegal

3   conduct, Cerovene might have been able to enter as early as

4   2017.

5          Professor Hemphill considered just Cerovene and Fera

6   and assumed Cerovene entry in October 2018 and Fera entry in

7   October 2019 to calculate Vyera's Daraprim revenues, absent the

8   illegal conduct.

9          The third step of Professor Hemphill's model is a

10  simple mathematical calculation.  In this step, he assesses the

11  difference between Vyera's real-world revenues and the revenues

12  that they would have made in the counterfactual world, where

13  there was no illegality.  By doing this, he determines the

14  incremental revenue attributable to Vyera's conduct.  Professor

15  Hemphill calculates this access revenue, revenue but for the

16  illegal conduct, to be $67.6 million.

17         Which brings us to the fourth and final step of

18  Professor Hemphill's excess profits calculation.  In the

19  counterfactual world, where generics entered earlier, Vyera

20  would have sold less Daraprim.  Vyera's incremental costs,

21  costs associated with the manufacturing of tablets and sales

22  force costs, therefore, would have been lower in the but-for

23  world.

24         So as a final adjustment, Professor Hemphill deducts

25  the cost that Vyera would have avoided if Vyera were making and

LCMMFTC3                    Summation - Ms. McFarlane

1    selling less Daraprim.  After deducting those costs, Professor

2    Hemphill recently approximates that 64.6 million in excess

3    profits were attributable to the illegal conduct.

4           Professor Hemphill's model incorporated assumptions

5    that are well rooted in fact, so he has reasonably approximated

6    the amount of unjust gain.  Plaintiffs have met their burden

7    under *Bronson*.  As I mentioned, under *Bronson*, the burden then

8    shifts to the defendants to show that our approximation of

9    unjust gains is inaccurate.

10          Defendant's expert, Professor Jena, has done nothing

11   to establish that Professor Hemphill's approximation is

12   unreasonable.  He raises no issue with Professor Hemphill's

13   methodology.  Instead, he notes generally, without any

14   specifics, that Professor Hemphill has not provided a sound

15   basis for determining the date of generic entry in the but-for

16   world.

17          He also quibbles with Professor Hemphill's volume

18   assumption, even though Professor Hemphill based those

19   assumptions on the real-world data and on Vyera's own forecast.

20   His thin and uncompelling criticisms do nothing but cast doubt

21   on the accuracy of Professor Hemphill's analysis.  Defendant's

22   have, therefore, failed to meet their burden under *Bronson*.

23          Professor Hemphill has presented a reasonable

24   approximation of ill-gotten gains, and we ask the Court to

25   award at least $64.6 million of disgorgement to the plaintiffs.

LCMMFTC3                   Summation - Ms. McFarlane

1           As a last issue, should the Court award disgorgement

2    in this case, Martin Shkreli should be held jointly and

3    severally liable for the award.  It is well established that

4    the Court can exercise its discretion to impose joint and

5    several liability in disgorgement cases.  This discretion is

6    properly exercised when defendants in a case have collaborated

7    on the illegal scheme.

8           For example, in *SEC v. Pentagon Capital Management*,

9    the Second Circuit found that joint and several liability was

10   appropriate because defendants collaborated on a common scheme.

11          This principle also holds under state law.  In *212

12   Investors Corporation v. Kaplan*, a New York state court

13   observed that there is a significant body of authority holding

14   that when apportioning liability for disgorgement, courts have

15   the discretion to find joint and several liability when two or

16   more individuals collaborate in the illegal conduct.  Where

17   joint and several liability applies in the disgorgement

18   context, as it should here, there is no requirement to show

19   that the ill-gotten profits personally accrued to the

20   defendant.

21          As the Second Circuit noted in *SEC v. Contorinis*,

22   where there is joint and several liability for disgorgement,

23   the amount a court may order a wrongdoer to disgorge may not

24   exceed the total amount of gain from the illegal action, but

25   that does not entail that the gain must personally accrue to

1  the wrongdoer.

2          Whether an award of several and joint liability is

3  appropriate is a fact-specific inquiry.  The facts here clearly

4  establish that the defendant should be held jointly and

5  severally liable for the total amount of disgorgement.

6          Since Martin Shkreli hatched this monopolistic scheme,

7  he has been a primary shareholder of Vyera's parent company and

8  has significant voting rights.  Any increased revenues that

9  have benefited shareholders have benefited Mr. Shkreli first

10 and foremost.

11         As we have heard from Ms. Haneberg, Mr. Shkreli also

12 continuously exercised functional control over the company,

13 even after he was in prison.  Shkreli stayed in regular contact

14 with Kevin Mulleady while Shkreli was in prison, collaborating

15 with him regarding the operation and management of Vyera.

16         As your Honor knows, Shkreli's foliation of messages

17 sent from Shkreli's illegal prison phone have prejudiced our

18 ability to fully understand the scope of those discussions.

19 But we do know, according to Kevin Mulleady's log, that

20 Mulleady had over 1500 communications with Shkreli just in the

21 seven-month period from December 2019 until July 2020, some of

22 which pertained to the operation of Vyera.

23         And we know, from reported prison conversations, that

24 Shkreli thought, as recently as 2020, that being on the board

25 of Phoenixus means you're on the Martin and Kevin board.  He

1    understood himself to be and in fact was controlling the

2    company from prison.  He was personally integrally involved in

3    decision making at Vyera and was collaborating with Vyera

4    executives to continue implementation of the illegal scheme

5    that he had designed.  If defendants have collaborated in an

6    illegal scheme, imposition of joint and several liability is

7    consistent with equitable principles.  The Supreme Court

8    recognized this in *SEC v. Liu* and remanded to the trial court

9    there to determine whether the facts were such that Liu and his

10   wife could be held jointly and severally liable.  On remand,

11   the trial court found that Liu's wife of was an active partner

12   and accomplice in the scheme and imposed joint and several

13   liability.

14        Here, Shkreli designed and maintained an illegal

15   scheme that harmed not only competition but also consumers, the

16   patients who are unable to obtain or afford Daraprim and those

17   who were forced to pay its inflated price.

18        For his role in this scheme Martin Shkreli should be

19   permanently banned from the pharmaceutical industry and should

20   be held jointly and severally liable for a disgorgement award

21   of at least $64.6 million.

22        Thank you, your Honor, for your time and

23   consideration.

24        THE COURT:  There has been a settlement publicly

25   disclosed with respect to the codefendants in this action.  So

1   how does that settlement agreement affect, if at all, the award

2   that you seek here of disgorgement?

3           MS. McFARLANE:  Sure, your Honor.  Should your Honor

4   find $64.6 million of disgorgement appropriate in this case and

5   declare Mr. Shkreli jointly and severally liable, we do believe

6   that equitable principles may require some setoff in the amount

7   of what the settling defendants actually pay in the settlement.

8           THE COURT:  Thank you.

9           MS. McFARLANE:  Thank you, your Honor.

10          THE COURT:  Mr. Casey, what is your preference?  Would

11  you like to take a brief recess before beginning?

12          MR. CASEY:  Yes, your Honor, we would like to.

13          Your Honor, if I can mention one issue.

14          THE COURT:  Sure.

15          MR. CASEY:  It seems that our real time is not

16  working.  I noticed that plaintiffs appears to be.  There may

17  be something technical with this.

18          THE COURT:  We will help you in the interim, but I am

19  sure plaintiffs' counsel technical team will help you too.

20          The real, time the transcript.

21          MR. CASEY:  It's coming up unintelligible.

22          THE COURT:  While I am thrilled we have court

23  reporters and we will rely on the transcript, I have actually

24  not been looking at it during summations.  I see my screen is

25  working.  One of my law clerks and court reporter will try to

1    assist you during that.

2                    MR. CASEY:  How much time, your Honor?

3                    THE COURT:  How much time do you want?

4                    MR. CASEY:  Fifteen minutes.

5                    THE COURT:  Sure.

6                    (Recess)

7                    MR. CASEY:  Your Honor.

8                    THE COURT:  Mr. Casey.

9                    MR. CASEY:  Thank you, your Honor.

10                   Before I begin, the defense has some timelines that we

11   intend to use or allow the Court to look at during the

12   presentation.  I have copies here and these have been provided

13   to plaintiffs' counsel this morning.

14                   THE COURT:  Thank you so much.

15                   MR. CASEY:  Your Honor, we will also have those

16   available electronically when we get to those portions.  They

17   are just for the Court's assistance and the assistance of the

18   plaintiffs.

19                   Your Honor, on behalf of Martin Shkreli I want to

20   thank the Court for your time and attention during this trial.

21                   The first thing I wanted to do, your Honor, before I

22   got into the substance of the argument, is to address just two

23   points that came up during the plaintiffs' summation.

24                   The first is, the Court asked about whether

25   Mr. Shkreli's unhappiness with Mr. Tilles and the other

LCMMFTC3                    Summation - Mr. Casey

1    executives at Vyera that precipitated the proxy fight had to do

2    with anything involving the anticompetitive scheme as alleged.

3    Your Honor, the answer to that is no.

4           I would direct the Court to Mr. Shkreli's written

5    direct testimony where he addresses this.  It's at page 12.

6    This is DX-546 at page 12 where he addresses the proxy fight.

7    I believe the first part was presented by the plaintiffs,

8    paragraph 61.

9           What was not presented was the next paragraph, 62.

10   That says:  The proxy fight was totally unrelated to Vyera's

11   sale and distribution of Daraprim.  Then paragraph 63 says:

12   Despite the fact that my share ownership in Vyera allowed me to

13   make changes to the board of Phoenixus, I never used that power

14   to affect in any way Vyera's distribution of Daraprim, its

15   acquisition of pyrimethamine API for Daraprim, or its policies

16   and practices related to reporting of data.

17          That's unrebutted testimony from Mr. Shkreli.  It

18   clearly shows that there is not a connection between his

19   exercising his authority or his ownership, his rights as a

20   shareholder, and the company's sale of Daraprim.  There is no

21   record evidence to suggest that he was directing Vyera's

22   conduct relating to Daraprim or the distribution of Daraprim

23   during the period after he left the company.  That's the first

24   item I wanted to discuss.

25          Secondly, your Honor --

1           THE COURT:  When you say that, no evidence that he

2   directed Vyera's conduct relating to Daraprim or the

3   distribution of Daraprim after he left the company, what date

4   are you using for after he left the company?

5           MR. CASEY:  He left as CEO in December of 2015, your

6   Honor.

7           THE COURT:  Yes.  But for that last statement is that

8   the date you are using?

9           MR. CASEY:  Well, for that I would use the date that

10  he actually left the board, which was February 2016.

11          THE COURT:  Your contention is following February of

12  2016, he did nothing to affect the company policy with respect

13  to Daraprim?

14          MR. CASEY:  Yes, your Honor.  I think what I would say

15  is, there is record evidence that he made suggestions as a

16  shareholder about the direction of the company and those

17  suggestions included in some cases Daraprim.  But there were

18  merely suggestions and there is also record evidence that the

19  executives did not -- in many cases did not act on those

20  suggestions, so he wasn't directing the policy.  In other

21  words, he may have made suggestions, but it wasn't -- there is

22  no record evidence that I'm aware of that he actually directed

23  the distribution of Daraprim and that the executives

24  furthered -- carried out those directives.

25          THE COURT:  That's a little tough, I think,

1    proposition, given this record and given the transcripts of his

2    calls for the period after February of 2016.

3             MR. CASEY:  Your Honor, there are transcripts of phone

4    calls for certain, and we don't dispute that.  What I'm saying

5    is, those transcripts reflect discussions he had with the

6    executives, including Mr. Mulleady, suggestions about company

7    business.  But in most cases those suggestions were not acted

8    upon.  So he was not controlling company decisions during that

9    period of time.  There is evidence from the executives,

10   including Ms. Costopoulos, Mr. Salinas, others that confirmed

11   that, that he wasn't controlling the company while he was out

12   of the company.

13            THE COURT:  Let's take one example during the period

14   you're focusing on, the period after February 2016, of the

15   discussions about RL Fine.  If you're planning to address those

16   later --

17            MR. CASEY:  I was not, your Honor.

18            THE COURT:  What about his suggestions or directions

19   with respect to how to engage with RL Fine after they learned

20   that generics were looking to RL Fine for supply of the API?

21            MR. CASEY:  Your Honor, what I'm aware of is one

22   e-mail in the record in which Mr. Shkreli suggested what the

23   company should order from RL Fine.  That e-mail did not direct

24   them to form an exclusive contract with RL Fine and there is

25   testimony from Mr. Mulleady that the reason that he was -- I

1    think there was a follow-on e-mail saying I'll keep you in the

2    loop on these communications going forward.  Mr. Mulleady

3    testified just the other day that he was relying on

4    Mr. Shkreli's expertise in the pharmaceutical industry in terms

5    of what should be in that e-mail.  But there is no record

6    evidence of a direction from Mr. Shkreli to the company to form

7    an exclusive deal with RL Fine.  It just doesn't exist.

8              THE COURT:  Thank you, counsel.

9              MR. CASEY:  Thank you, your Honor.

10             One other thing I wanted to address, your Honor.  The

11   plaintiffs said that Mr. Shkreli is blaming others, blaming the

12   generic companies, blaming the FDA.

13             Your Honor, that's not what is happening here.

14   Mr. Shkreli is not blaming anybody.  In fact, he has taken

15   responsibility in his affidavit for some conduct, including the

16   price increase, which he takes responsibility for, and for some

17   of the fallout after that.

18             But what our argument is is simply holding the

19   plaintiffs to their burden of proof.  They have a burden to

20   establish causation.  They have a burden to establish that

21   there was a substantial anticompetitive effect in the market.

22   Our argument is they have not met that burden.

23             That's what I plan to go into with the Court today, is

24   to discuss some of those pieces of record evidence that

25   suggest, we think strongly -- I wouldn't say suggest -- that

1    show that plaintiffs haven't met their burden.

2            It's not debatable that under the rule of reason

3    plaintiffs bear the initial burden -- and I'm quoting from *Ohio*

4    *v. American Express*, Supreme Court decision, 2018 -- the

5    initial burden to prove that the challenged restraint has a

6    substantial anticompetitive effect that harms consumers in the

7    relevant market.

8            That's plaintiffs' burden.  They have to show that

9    these restrictions and this scheme, as they put it, actually

10   delayed the generics in entering the market.  The record

11   evidence does not show that, your Honor.

12           The reason it doesn't is because there were lots of

13   things going on.  There were filings at the FDA.  There were

14   business decisions that these generic companies were making.

15   There is also a lack of evidence of a connection between the

16   agreements and the refusals to deal that are alleged in the

17   complaint.  That's what I would like to go through this

18   morning, this afternoon.

19           THE COURT:  You are conceding that the goal,

20   Mr. Shkreli's goal, was to impede generic entry through the

21   measures he took or directed, but you are arguing that, despite

22   that goal, he failed to achieve his purpose.

23           MR. CASEY:  Your Honor, on that I would say there is

24   record evidence from which the Court could conclude that there

25   was an intent to impede generics.  That was not only

LCMMFTC3                    Summation - Mr. Casey

1    Mr. Shkreli, but it was other executives at the company.  We
2    have heard testimony that it was -- that topic, that discussion
3    was held at the company.  But, as the Court knows,
4    anticompetitive intent is not sufficient.  They have to prove
5    that there was an actual substantial anticompetitive effect.
6    They have not shown that.
7            As I said, the record shows that each of the generic
8    companies made multiple business decisions and FDA filings that
9    impacted the timing of approval of their ANDAs.
10           The record does not support a finding that the
11   challenged agreements caused actual delay in the generic's ANDA
12   approvals.  As this Court said in the *Lavoho LLC v. Apple, Inc.*
13   case, this is 232 F.Supp. 3d 513 (S.D.N.Y. 2016), at page 525
14   this Court said:  "Lack of causation in fact is fatal to the
15   merits of any antitrust claim."
16           Further, the plaintiffs have failed to meet their
17   burden to prove a relevant product market of FDA-approved
18   pyrimethamine products.
19           Finally, even if the Court determines that plaintiffs
20   have met their burden, the relief that they seek is not
21   warranted.  There are now three companies selling generic
22   Daraprim, so there was no need for an injunction to preserve
23   competition in the market.
24           Plaintiffs' requests for a pharmaceutical industry ban
25   amounts to a penalty provision that is inappropriate for a

LCMMFTC3                    Summation – Mr. Casey

1    court of equity.  Plaintiffs' request for equitable monetary

2    relief against Mr. Shkreli which relies upon a joint and

3    several liability theory is legally and factually unsupported.

4             Now, with that introduction, your Honor, I would like

5    to just go through, if I may, starting with Cerovene, the

6    timeline that you have, the first timeline is Cerovene that

7    deals with their API sourcing.

8             So the first broad point, your Honor, is Cerovene was

9    able to source API.  That's clearly in the record.  Starting in

10   2013 and 2014, Cerovene obtained API from Ipca to support its

11   ANDA.  Cerovene filed its ANDA on May 8, 2014.  That's not in

12   the timeline, your Honor.  The portions that are I will get to.

13            In January 2015, the FDA issued an import alert

14   preventing importation of Ipca's API into the U.S.  Forced to

15   find a new source of API, Cerovene looked to just two

16   companies, Fukuzyu and RL Fine, to get API.  Cerovene made no

17   effort to identify API suppliers other than those two.

18   Mr. Shah testified to that.

19            With respect to Fukuzyu, in 2015, Cerovene began

20   negotiating with Fukuzyu for API suppliers to supply.

21            (Continued on next page)

22

23

24

25

1          MR. CASEY:  (Continuing)  In September of 2015,

2     Fukuzyu provided Cerovene with a small amount of pyrimethamine

3     API for testing.  And then in October 2015, Cerovene wrote to

4     the FDA — and this is, again, a common theme here, as if

5     there's many, many FDA filings — Cerovene wrote to the FDA

6     seeking an exemption from the Ipca import ban.

7          Now, we fast forward to March of 2016.  Cerovene and

8     Ipca jointly asked the FDA for an exemption.  And in July 2016,

9     Cerovene contacted Fukuzyu again, after the FDA had denied the

10    exemption.

11         On September 9 of 2016, Cerovene told its broker that

12    it wished to place an order with Fukuzyu for 50 kilograms of

13    pyrimethamine API.

14         And then in October 4th –– on October 4th of 2016 —

15    and this is in your timeline, your Honor, in green there —

16    Fukuzyu told Cerovene that it would not supply the API, citing

17    low demand for pyrimethamine and high risk with the business.

18         Now, this denial by Fukuzyu occurred several months

19    before the Fukuzyu-Vyera master services agreement, which, as

20    the Court knows, happened on January 25th of 2017, and there is

21    no evidence that the later-in-time agreement between Fukuzyu

22    and Vyera had any effect on Fukuzyu's refusal to sell API to

23    Cerovene.

24         Let's talk about RL Fine.

25         In 2016, Manish Shah of Cerovene learned of RL Fine as

1    a potential API supplier.  On November 16th of 2016 — again,

2    this is on your timeline, your Honor, in green — Cerovene and

3    RL Fine entered into an exclusive supply agreement for four

4    years.

5            Now, Cerovene believed that exclusivity was important

6    to ensuring a viable commercial supply of API.  We heard that

7    from Mr. Shah at trial.

8            Cerovene purchased enough API from RL Fine under the

9    November 16, 2016 agreement for its bioequivalency testing for

10   the launch of its generic Daraprim product.

11           On November 30 of 2017, RL Fine stopped supplying

12   pyrimethamine API to Cerovene.  And, again, in terms of the

13   timing, this agreement was more than a year before the RL Fine

14   agreement with Vyera, which was December 27th of 2017.  There

15   is no evidence that the later-in-time agreement between Vyera

16   and RL Fine had any effect on RL Fine's decision to stop

17   supplying API to Cerovene.

18           In April of 2020, RL Fine delivered more API under

19   that November 16, 2016 agreement.  And on February 19, 2019,

20   Cerovene executed a supply agreement for a company we're

21   referring to as API-3 to supply pyrimethamine API if Cerovene

22   received FDA approval to use API-3 as its API supplier.

23           THE COURT:  I just want to backtrack a moment to make

24   sure I've captured your point.

25           MR. CASEY:  Okay.

LCMKFTC4                    Summation - Mr. Casey

1           THE COURT:  Your point with respect to Cerovene and

2    API supply is, one, they only identified Fukuzyu and RL Fine as

3    realistic suppliers of API?

4           MR. CASEY:  I don't know if I would say that, your

5    Honor.  I think the record evidence is that they're the only

6    two that they reached out to.

7           THE COURT:  Okay.  The only two that they reached out

8    to.  And your argument, with respect to that, is that they

9    should have reached out to more than those two?

10          MR. CASEY:  Well, there are lots of other companies,

11   and there were at that time, yes.

12          THE COURT:  Who else, in the record, was a

13   manufacturer of pyrimethamine?

14          MR. CASEY:  At that time?

15          THE COURT:  Yes.

16          MR. CASEY:  I don't have that available at this point,

17   your Honor, but there were others.

18          THE COURT:  Okay.

19          And then with respect to Fukuzyu, just to make sure I

20   understand your point, you think there is no record evidence

21   that Fukuzyu declining to supply Cerovene with API, that

22   there's no record evidence that that refusal by Fukuzyu can be

23   linked to Vyera's conduct?

24          MR. CASEY:  There's no record evidence that that

25   refusal can be linked to the challenged agreement in the

1    complaint, which is the January 25th, 2017 agreement.

2              THE COURT:  So you're not saying there's no evidence

3    that it can be linked to Vyera's efforts to negotiate that

4    agreement; your argument is sort of a legal one, that any

5    activity by Vyera before the agreement was actually executed is

6    irrelevant?

7              MR. CASEY:  I don't know if I would say that, your

8    Honor, but this came up in the examination of the plaintiffs'

9    expert, Mr. Bruno.  Mr. Bruno testified -- and he was asked

10   about this, and whether the negotiations could have affected --

11   if negotiations were going on at the time of the refusal,

12   whether they could have affected the refusal.  I mean

13   negotiations between Vyera and Fukuzyu.

14             And he said that he didn't see any evidence that Vyera

15   insisted that Fukuzyu decline to supply Cerovene on October 4,

16   2016.  He was asked the same thing with respect to the RL Fine

17   refusal, and he said the same thing, he said he did not see any

18   evidence that Vyera's agreement with RL Fine on December 27,

19   2017, prevented RL Fine from supplying Cerovene with API in

20   November 2017.

21             THE COURT:  Okay.  I think with respect to RL Fine, I

22   heard you say a moment ago — and I may have misheard — that

23   RL Fine's refusal was a year before RL Fine signed the

24   agreement with Vyera.  But you're saying it was a month before?

25             MR. CASEY:  If I did say that, I misspoke, your Honor.

THE COURT:  Okay, good.  Thanks.  I just want to make sure I capture your argument.

MR. CASEY:  Okay.

Now, if we can move on, then, your Honor, to the next timeline, which is I'm going to focus on Cerovene's accessing RLD.  That's the timeline that's where the boxes are orange.

Again, first, the main point is that Cerovene was able to obtain RLD for bioequivalence testing.  On April 3rd, 2017 — and this is going before the timeline that you have in front of you — Cerovene filed a major amendment to its ANDA to notify the FDA that it was substituting RL Fine for Ipca as its API supplier.

On December 26th of 2017, the FDA issued a complete response letter to Cerovene which directed Cerovene to conduct new bioequivalence testing using the new API supplier, RL Fine.

And even though there was some risk that the FDA would require new bioequivalence testing, during the period April 3rd and December 26, 2017, Cerovene made no attempt to obtain new RLD; instead, it simply waited for the FDA to respond to its major amendment.

On January 22nd, 2018, Cerovene asked the FDA to reconsider its decision requiring new bioequivalence testing. Cerovene did not want to commit the $600,000 it would have to spend acquiring RLD until the FDA acted on its request.  We heard that from Mr. Shah at trial.

LCMKFTC4                    Summation - Mr. Casey

1           On March 12 of 2018, Cerovene sent FDA a follow-up

2    letter demanding an answer to its request for reconsideration.

3    And on April 6, 2018, the FDA denied the request for

4    reconsideration.

5           Now let's talk about the RLD purchase orders that

6    Cerovene made.

7           On December 30, 2017, Cerovene placed a purchase order

8    with a procurement company called Espee.

9           On February 20, 2018, Cerovene canceled the Espee

10   order.  And in February 2018, Dr. Reddy's, Cerovene's marketing

11   partner, identified ProSupplier as a possible procurement

12   partner and urged Cerovene to partner with ProSupplier.

13   Cerovene, instead, went with Reliant, and in February 2018,

14   placed an order for five 100-count bottles with Reliant.

15          Cerovene's decision to go with Reliant as opposed to

16   ProSupplier was based on assurances that Cerovene received from

17   Reliant, that Reliant could obtain the samples quickly, and

18   that didn't happen.  Reliant did not make good on these

19   assurances and repeatedly asked Cerovene for additional time.

20          Cerovene had no reason to believe that ProSupplier

21   could not have supplied Daraprim RLD to Cerovene in

22   February 2018 if Cerovene had placed an order with ProSupplier

23   at that time.  Again, Mr. Shah testified to that.

24          In June of 2018, Reliant delivered one of the five

25   bottles that Cerovene had ordered.

LCMKFTC4                    Summation – Mr. Casey

1            And then on July 13, 2018, Cerovene wrote to the FDA

2     asking for a waiver from the five-bottle requirement.

3            Following that request, Cerovene continued to wait for

4     Reliant to deliver the additional four bottles rather than

5     switch to ProSupplier, as its more established pharmaceutical

6     partner, Dr. Reddy's, was urging Cerovene to do.  Dr. Reddy's

7     believed that ProSupplier could deliver the requested bottles

8     within two to three weeks.

9            And in September 2018, Cerovene finally relented and

10    agreed to place a purchase order with ProSupplier for three

11    100-count bottles rather than five.

12           Justin, if we could get up, please, DX 168.

13           Your Honor, I just wanted to show you a document

14    that's been admitted and was used in the Cerovene examination.

15    This is an email which shows Dr. Reddy's business plan to put

16    two orders out to both Reliant and ProSupplier, but not to

17    order five bottles, but to, rather, order a maximum of three.

18    I'm not going to read the whole thing, but the Court's familiar

19    with it from the trial testimony.

20           It's clear, from this email and from the other

21    testimony, that Cerovene and Dr. Reddy's were making a business

22    decision to limit the number of bottles they were going to

23    order at a time when they still had the FDA requirement of five

24    bottles, and, instead, they ordered three to control the risk,

25    and so that if one supplier was able to deliver just a couple

LCMKFTC4                    Summation - Mr. Casey

1    of bottles, they would get a refund from the other.  Again,

2    this is the kinds of business decisions that were being made by

3    the generic companies.

4          Now, the order with ProSupplier, which was in

5    September, was placed after Cerovene had sought the FDA waiver,

6    as I mentioned, but before it was granted.  The waiver was not

7    granted until April of 2019.  So they knew they were required

8    to get five bottles, but they got three, and asked for a waiver

9    from the FDA in the meantime.  And they took the risk that the

10   FDA would deny the waiver request, but they didn't want to

11   spend the extra money to obtain the five bottles.

12         Dr. Mukhopadhyay, of Dr. Reddy's, testified that if

13   Dr. Reddy's had known that the FDA had not granted the request

14   for the waiver, Dr. Reddy's would have advised Cerovene to

15   order five bottles instead of three.

16         And then on October 17 of 2018, Cerovene made its

17   initial payment to ProSupplier for the RLD, and about a month

18   later, November 19, 2018, ProSupplier obtained three bottles,

19   and ProSupplier was, of course, the company that Cerovene chose

20   not to go with back in February.

21         And Dr. Mukhopadhyay, of Dr. Reddy's, testified that

22   there's no reason Cerovene could not have ordered the required

23   five bottles from ProSupplier — five bottles rather than

24   three — and no reason it could not have obtained five bottles

25   instead of three.

1          Now, following the order with ProSupplier and the

2     obtaining of the RLD, Cerovene waited.  They waited until the

3     FDA approved its use of the three bottles, and, again, that

4     happened on April 19, 2019, to conduct the bioequivalence

5     testing.  And in May and June of 2019, following the waiver

6     grant — the grant of the waiver — Cerovene conducted the

7     bioequivalence testing using the three bottles that ProSupplier

8     had obtained.

9          Moving forward, September 4 of 2019, Cerovene reported

10    the results of its bioequivalence testing to the FDA.

11         February 28, 2020, the FDA approved Cerovene's ANDA.

12         And then less than a month later, March 19 of 2020,

13    Cerovene and Dr. Reddy's jointly announced the commercial

14    launch of the generic Daraprim product.

15         So, in summary, your Honor, in terms of the timeline

16    for the RLD purchases, any delay in receiving the required

17    amount for the bioequivalence testing is attributable to the

18    following factors:

19         First, Cerovene's decision to not look for RLD during

20    the period April 2017 to December 2017, while the FDA

21    considered Cerovene's major amendment, stating that it was

22    switching to RL Fine as its API supplier.

23         Two, the Ipca import ban, which required Cerovene to

24    start from scratch, beginning on December 26, 2017, to find new

25    RLD.

LCMKFTC4                    Summation - Mr. Casey

1          Third, Cerovene's decision not to follow the

2    recommendation of its more established partner, Dr. Reddy's,

3    and, instead, to choose Reliant over ProSupplier to obtain RLD

4    as Reliant could not live up to its representations that it

5    could access the RLD quickly.

6          Fourth, Cerovene's decision that upon receiving only

7    one bottle from Reliant in June 2018, to ask the FDA for a

8    waiver of the five-bottle requirement and purchase three

9    bottles rather than five, once it finally agreed to use

10   ProSupplier in September 2018.

11         And then, fifth, Cerovene's decision to not

12   immediately conduct bioequivalence testing once it received the

13   three bottles from ProSupplier on November 29, 2018, but,

14   rather, to wait for FDA approval of its request on April 19,

15   2019.

16         I was going to move on to Fera now, your Honor.

17         So there is a Fera timeline, your Honor.  On that

18   timeline, there is both the API portion, the boxes that are in

19   green, and the blue boxes are the RLD portions of the

20   discussion.

21         First, just focusing on API, the global point, again,

22   is that Fera was able to access API.

23         With respect to Fukuzyu:  Fera made two attempts to

24   contact Fukuzyu to inquire about its ability to supply

25   pyrimethamine API.  In late 2015/early 2016, the first attempt

1  was an email from Genevieve Della Fera, and there was no

2  response from Fukuzyu.  There is no record evidence that Fera

3  followed up.

4       The second outreach took place after Fera made the

5  business decision to form a contract with another API supplier,

6  referring to that supplier as API-1, and around eight months

7  after Fukuzyu entered the exclusive contract with Vyera in

8  January 2017.  At no point prior to this second outreach did

9  Fera make another attempt to reach out to Fukuzyu.

10       With respect to API-1, in March of 2016, Fera

11  approached two possible API suppliers, including API-1, at

12  DCAT, the conference that you heard testimony about.  API-1 did

13  not at the time, and does not now, have a DMF.  Fera did no due

14  diligence on API-1 other than confirming it was a reputable

15  company.

16       On June 13, 2016, API-1 and Fera entered a

17  confidentiality and exclusivity agreement.  Fera selected API-1

18  approximately seven months before Vyera entered into the MSA

19  with Fukuzyu and approximately 18 months before Vyera's

20  agreement with RL Fine.  Therefore, Vyera's supply agreements

21  with Fukuzyu and RL Fine could not have affected Fera's

22  decision to go with API-1.

23       Now, API-1 estimated 34 to 40 weeks to develop

24  pyrimethamine.  Ultimately, API-1 completed its first batch of

25  pyrimethamine in October of 2017.  Fera is unaware of the

LCMKFTC4                        Summation - Mr. Casey

1  reasons why it took API-1 approximately six months longer than

2  its estimate.

3           On April 6, 2018, Fera and API entered into a second

4  agreement, a ten-year mutually exclusive supply agreement, for

5  pyrimethamine.

6           So now I'm moving to the discussion of RLD.

7           Fera was able to access RLD.

8           In June of 2017, Fera received a purchase agreement

9  from Vyera for the sale of 13 30-count bottles of Daraprim from

10 Vyera.

11          The purchase agreement permitted Fera to use the

12 Daraprim tablets to conduct bioequivalence testing.  Rather

13 than sign the agreement and obtain the Daraprim RLD directly

14 from Vyera, Fera, without consulting an attorney, struck out

15 the entirety of an indemnity clause and returned the edited

16 document to Vyera.  Negotiations ended after the wholesale

17 deletion of this provision.

18          In October 2017, Fera got small quantities for initial

19 testing by having a doctor write two prescriptions, which a

20 local pharmacy filled within a couple of days.

21          Now, moving on to negotiations with a company called

22 Tanner:  In December 2016, Fera received an offer from Tanner

23 Pharma to sell Fera 100-count bottles of Daraprim.  At that

24 time, Fera had no reason to believe that Tanner could not have

25 supplied it with Daraprim, but Fera did not place a purchase

LCMKFTC4                    Summation - Mr. Casey

1   order.

2             In January 2017, Tanner offered to sell Fera up to

3   seven 100-count bottles of Daraprim.  Again, Fera did not make

4   a purchase order.

5             Moving forward to September of 2017, Tanner made a

6   third offer to supply Daraprim to Fera, and, again, no offer.

7             Throughout its dealings with Tanner, Fera was

8   concerned over price.  To address this, Tanner sent Fera a

9   signed escrow agreement that Fera had edited and emailed to

10  Tanner for execution.  Fera never countersigned the agreement

11  and never placed an order.

12            And so, to sum up, Fera had three opportunities to

13  place a purchase order for RLD with Tanner but never placed an

14  order.

15            Now, moving to another topic with respect to Fera's

16  access to RLD:  On October 25, 2017, Fera sought a pre-ANDA

17  meeting with the FDA to conduct a pharmacokinetic study for its

18  bioequivalence testing, which would not require Fera to use any

19  RLD.

20            On December the 1st, 2017, the FDA denied Fera's

21  request without a meeting.

22            Now, moving on to Fera's purchases from Reliant:

23            Having had its request denied, Fera finally determined

24  to place an order for RLD and did so through Reliant.

25            On January 22nd, 2018, Fera placed an order for two

LCMKFTC4                      Summation - Mr. Casey

1    bottles with Reliant.  Fera received the two bottles eight days

2    later.

3            Fera knew about the FDA's five-bottle requirement and

4    had the opportunity to purchase five bottles in January 2018,

5    and could have through Reliant but it opted not to.

6            On February 12, 2018, Reliant offered to procure more

7    bottles but Fera declined, saying, "we are good for now." Fera

8    opted not to purchase additional bottles because it made the

9    decision to quote-unquote derisk the purchase.  We heard that

10   from Ms. McDougal.

11           Fera opted to seek a waiver of the FDA's five-bottle

12   requirement even though it later acknowledged that, quote, the

13   FDA's general policy is not to waive the five-times testing

14   requirement.

15           On August 24, 2018, seven months after buying two

16   bottles of RLD from Reliant, Fera sent FDA a letter seeking a

17   waiver of the five-bottle requirement.  The FDA denied this

18   request in January 2019.

19           Three months later, Fera tried again, in April 2019,

20   sending a letter to the FDA, but not disclosing to the FDA that

21   it had opportunities to buy five bottles but declined.

22           On June 4, 2019, the FDA granted the waiver.

23           Now, there was another series of events happening with

24   Fera around this time relating to its CMO, contract

25   manufacturing organization.  Fera encountered delays with its

LCMKFTC4                    Summation - Mr. Casey

1    CMOs that had nothing to do with Vyera's distribution

2    agreements.  Fera terminated its first CMO with Xcelience in

3    July of 2017 and hired a new CMO, Latitude, in November of

4    2017.  Latitude completed developing the prototype for generic

5    Daraprim in August 2018, and Fera then hired a company called

6    Rivopharm as its CMO to manufacture Daraprim tablets for use in

7    stability and bioequivalence studies.

8            The tech transfer from Latitude to Rivopharm was not

9    implemented until October of 2018, and Rivopharm did not

10   manufacture the first batches of Daraprim until March 2019.

11           So, prior to March 2019, Fera could not have done

12   stability and bioequivalence testing because its product wasn't

13   finished.

14           And then Fera submitted its ANDA on December 19, 2019,

15   and got approval on June 27, 2021.

16           So, in summary, any delay in Fera submitting its ANDA

17   was caused by its own business decisions and FDA filings,

18   including the following:

19           Fera's business decision to proceed with API-1 after

20   Fukuzyu did not respond to Fera's initial outreach, and API-1's

21   failure to meet its projected timeline for production of API.

22           Two, Fera's business decision to buy only two bottles

23   of RLD instead of five.

24           Three, Fera's waiting seven months, from January to

25   August 2018, after buying the two bottles, to seek an FDA

LCMKFTC4                     Summation - Mr. Casey

1    waiver.

2           Fourth, Fera's strategic decision to pursue a

3    time-consuming and uncertain waiver from the FDA.

4           Five, Fera's waiting three months, from January to

5    April 2019, to submit a second request to the FDA after the

6    first one was denied.

7           And then, finally, Fera's business decision to switch

8    CMOs.

9           So that's the Fera discussion, your Honor.

10          Now, moving to InvaTech — and that's the last of the

11   timelines, your Honor — again, InvaTech obtained RLD.  And I'll

12   do these in reverse order now, your Honor, for InvaTech because

13   the RLD discussions are pretty brief.

14          InvaTech decided on Daraprim generic in 2014.

15          In October 2014, InvaTech bought six 100-count bottles

16   from a pharmacy in New Jersey.

17          InvaTech completed its bioequivalence testing in 2016,

18   using those samples and pyrimethamine API from RL Fine.

19          InvaTech has had no need for additional samples of

20   Daraprim to conduct bioequivalence testing since it completed

21   that testing in 2016.

22          Now, moving on to API:

23          InvaTech obtained API.  Like Cerovene, InvaTech

24   originally was supplied by Ipca, but after the import ban, it

25   was forced to find a new API supplier.

1    On February 17, 2017, InvaTech and RL Fine entered a

2    preliminary collaboration agreement whereby RL Fine would

3    supply InvaTech with three APIs, including pyrimethamine.  This

4    collaboration agreement was ten months before the Vyera-RL Fine

5    agreement.

6        The collaboration agreement required RL Fine to submit

7    a DMF for pyrimethamine but RL Fine did not do so.

8        By January 2017, InvaTech was ready to file its ANDA,

9    but RL Fine had not yet submitted its DMF.

10       Therefore, in July 2017, InvaTech submitted DMF

11   materials for RL Fine in the CMC-section of the ANDA.

12       InvaTech filed its generic Daraprim ANDA on July 28,

13   2017.

14       Now I will discuss RL Fine's decision to stop

15   supplying API to InvaTech.  In December of 2017, InvaTech

16   contacted RL Fine for help responding to the FDA's questions

17   regarding its generic Daraprim ANDA.  RL Fine informed InvaTech

18   by phone that it would no longer support InvaTech's ANDA.

19   Mr. Patel of InvaTech flew to India and was told that Daraprim

20   was too small a product for RL Fine to continue supporting

21   InvaTech's ANDA.

22       RL Fine's decision to not support InvaTech's ANDA came

23   approximately ten months after the Cerovene-RL Fine agreement,

24   which, by its terms, prevented RL Fine from supplying

25   pyrimethamine API to InvaTech.  More importantly, it came

LCMKFTC4                    Summation - Mr. Casey

approximately three months before Vyera's agreement with

RL Fine.  There is no evidence that the later-in-time agreement

between Vyera and RL Fine had any effect on RL Fine's decision

to stop supplying API to InvaTech.

Thus, Vyera's agreement with RL Fine could not have

affected RL Fine's decision to not support InvaTech's ANDA.

Now, InvaTech -- we'll discuss and InvaTech and API

No. 2.  There's an API manufacturer we're referring to as

API-2.  InvaTech then needed a new source of API, and it found

one in API-2.  API-2 did not have a DMF on file, and it never

manufactured pyrimethamine API before.  API-2 was the only

company that InvaTech looked at, considered, as an API supplier

after it stopped working with RL Fine, and InvaTech did not do

any due diligence on API-2.

It took API-2 approximately six months to develop a

process for developing pyrimethamine API.

Now I'm going to discuss FDA responses to InvaTech.

Going to the next timeline, the next page:

On May 22nd, 2018, InvaTech received a complete

response letter from FDA identifying over 50 deficiencies

regarding InvaTech's ANDA.

InvaTech worked with API-2 to gather information to

respond to the FDA, and did so 14 months later, on July 31st,

2019.

On January 24, 2020, the FDA sent another letter

1   identifying an additional 20 issues to be addressed by

2   InvaTech.  InvaTech experienced delays relating to COVID-19,

3   and only recently responded to the complete response letter in

4   the fourth quarter of 2021.

5          So, in sum, with respect to InvaTech, any delay in

6   InvaTech's pursuit of its ANDA was caused by the following,

7   none of which is attributable to Vyera:

8          One, the Ipca import ban, which required InvaTech to

9   find a new source of pyrimethamine API.

10         Two, RL Fine's delays in filing a DMF for

11  pyrimethamine between 2015 and 2017.

12         Three, RL Fine's decision to stop supporting

13  InvaTech's ANDA in September 2017 before the RL Fine supply

14  agreement but after the RL Fine-Cerovene exclusive agreement.

15         And then, finally, recent delays caused by COVID-19.

16         Now, your Honor, I know that was a lot, and I

17  appreciate you listening through that, but I'm done with that

18  section.

19         Excuse me one second.

20         (Pause)

21         MR. CASEY:  Your Honor, at this point, I'd like to

22  talk about the data-blocking agreements.

23         The data-blocking agreements had no effect on the

24  market.  These agreements were entered after all the generic

25  companies in this case had already assessed the generic

LCMKFTC4                        Summation - Mr. Casey

1   Daraprim market opportunity.  There were two data-blocking

2   agreements.

3           First was an ASD agreement — Vyera and ASD agreed —

4   and that agreement was dated September 12 of 2017.  And then

5   Cardinal Health and Vyera reached a data-blocking agreement,

6   and that was dated September 20, 2017.

7           So Cerovene, Fera and InvaTech also assessed the

8   market opportunity prior to those agreements.  Cerovene

9   assessed the market for Daraprim in 2013, four years before the

10  data-blocking agreements were entered.  Cerovene decided to

11  enter and relied upon publicly available data rather than IQVIA

12  data to make its assessment.

13          Fera had a thorough opportunity to assess the market

14  for generic Daraprim in late 2015 and early 2016.  Public data

15  and IQVIA data from 2014 showed the market opportunity at

16  1 million tablets, so Fera clearly overestimated the market

17  opportunity.

18          InvaTech assessed the market opportunity for Daraprim

19  in 2014 based on publicly available IQVIA sales data.

20          The plaintiffs' economic expert, Professor Hemphill,

21  provided no opinion on the data-blocking theory, and so in

22  conclusion, the plaintiffs' data-blocking theory has absolutely

23  no support in the record.

24          I'd like to talk about Vyera's distribution system

25  now, your Honor.  The Vyera distribution system expanded access

1    to Daraprim, and there's lots of record evidence of this.

2           Vyera inherited the specialty distribution system from

3    Amedra and Impax, the previous owners of the rights to

4    Daraprim.  Amedra's specialty distribution agreements only

5    licensed two specialty distribution pharmacies to distribute

6    Daraprim — Walgreens, which had the exclusive right to

7    distribute Daraprim directly to patients, and ICS, that had the

8    exclusive right to distribute to hospitals and government

9    entities.  Vyera added four additional specialty distributors —

10   ASD Healthcare, Biorich Pharma, Cardinal Specialty, and Optime.

11          Vyera amended its distribution agreement with

12   Walgreens that it inherited from Amedra to remove its

13   exclusivity provisions.

14          Vyera then significantly increased the number of

15   specialty pharmacies that could sell Daraprim to patients.

16          Vyera, likewise, added significant patient support

17   services to the Daraprim distribution system through contracts

18   with Asembia LLC and Optime.

19          Vyera instituted a hub as a, quote, key intake for the

20   patient, quote, to ensure that patients were able to access the

21   benefits, the copay benefits and the affordability benefits,

22   that Vyera was offering.  That's from the trial testimony at

23   Christina Ghorban.

24          And Vyera expanded the distribution to state ADAP

25   programs, the AIDS Drug Assistance Programs.  And, again,

1    that's from the testimony of Christina Ghorban.

2             In terms of supply agreements:  Exclusive supply

3    agreements are common in the industry.  As the Second Circuit

4    has said, exclusive supply agreements often, "have

5    pro-competitive purposes and effects, such as ensuring steady

6    supply for the protection against price fluctuations, reducing

7    selling expenses, and promoting stable long-term business

8    relationships."  The case is *Geneva Pharm. Tech. Corp.*, 386

9    F.3d 485 at page 508 (2d Cir. 2004).

10             THE COURT:  Which of those do you think was most

11   relevant to the analysis of the Fukuzyu and RL Fine supply

12   agreements?

13             MR. CASEY:  Which of what, your Honor?

14             THE COURT:  Those pro-competitive effects.

15             MR. CASEY:  Well, I think, certainly, it assured a

16   steady supply.  We had testimony on that from, I believe it was

17   Dr. Salinas.

18             THE COURT:  Of the actual agreements, I'm talking

19   about, not generally, but in this case --

20             MR. CASEY:  Right.

21             THE COURT:  -- of the agreements at issue, what are

22   the pro-competitive effects?

23             MR. CASEY:  I think that the agreements -- well, the

24   Fukuzyu agreement assured a steady supply.  Afforded protection

25   against price fluctuations, I'm not sure about that, I don't

1   know if there's record of evidence of that, but, certainly, I

2   think it promoted a stable relationship with Fukuzyu.

3        THE COURT:  Thank you.

4        MR. CASEY:  And so exclusive supply agreements are,

5   thus, presumptively legal.  That's from the case *CDC*

6   *Techs, Inc. v. IDEXX Labs, Inc.*, 186 F.3d 74, at page 80

7   (2d Cir. 1999).

8        We had several witnesses testify to the benefits of

9   the exclusive supply agreements in this case.  Manish Shah, the

10   president of Cerovene — and this gets, I guess, to your

11   question, your Honor — Manish Shah testified that Cerovene

12   wanted an exclusive supply agreement with RL Fine so that

13   Cerovene could ensure that RL Fine is able to supply Cerovene

14   with a commercial quantities of the API that Cerovene needed.

15   Dr. Salinas testified that exclusive supply agreements are very

16   common, and, according to John S. Russell, the defense expert,

17   exclusive API agreements are common in the pharmaceutical

18   industry and are used to maintain high quality, avoid drug

19   shortages and protect revenues.  That's the John Russell

20   written direct at paragraph 104.

21        Now, your Honor, I wanted to get back to something

22   that you mentioned in the plaintiffs' presentation, that came

23   up during the trial, and that is the issue of whether Vyera's

24   API was set to expire.  You asked if there was record evidence

25   of that.  There is, your Honor.

1           I'd like to show you DX 511.  This is a document that

2       Mr. Russell cited in his written direct testimony.  If you'll

3       see that first bullet point, this is a Turing meeting notes.

4           There it is.  It says, the second bullet there,

5       current API inventory of, roughly, 76 kilograms to expire in

6       August 2016.  So this memo is, as you go up to the top, the

7       date of the memo, so as of January 12, your Honor, the

8       projection was that the API inventory would have expired in

9       August of 2016.

10          THE COURT:  So the inventory acquired in 2015, the

11      entirety of the inventory, was to expire in August of 2016?

12          MR. CASEY:  Yes.

13          THE COURT:  And so when did Vyera need additional

14      inventory, then, from Fukuzyu?

15          MR. CASEY:  Well, your Honor, I know that, of course,

16      the agreement was about a year later, January of 2017, but I

17      believe there's record evidence that there were discussions

18      prior to that time about the need to get a supply agreement

19      during that period of time.

20          THE COURT:  Yes.  But when did it next order

21      pyrimethamine from Fukuzyu because its entire inventory of API

22      expired in August of 2016?

23          MR. CASEY:  I don't know the answer to that, your

24      Honor.  I could get you that evidence, but I'm not aware of it

25      at this point.

LCMKFTC4                          Summation - Mr. Casey

1           THE COURT:  Thank you.

2           MR. CASEY:  It does say that its projection is, it

3    will expire, not that it has expired.  Its projection in

4    January was that it would expire in August.

5           THE COURT:  Thank you.

6           MR. CASEY:  Certainly.

7           And then, finally, on exclusive supply agreements:

8    Both Cerovene and Fera entered into exclusive supply

9    agreements, as the Court is aware, with RL Fine and API-1

10   respectively.

11          Now, I'd like to move on now to the product market

12   discussion.  Of course, the threshold element plaintiffs must

13   establish, under either Section 1 or Section 2 of the Sherman

14   Act, is harm to competition in the relevant market.

15          And in the case *U.S. Airways, Inc. v. Sabre Holdings*

16   *Corp.*, 938 F.3d 43, at page 64 (2d Cir. 2019), the Second

17   Circuit said, "The relevant market must be a market for

18   particular products or services, the outer boundaries of which

19   are determined by the reasonable interchangeability of use or

20   the cross-elasticity of demand between the product itself and

21   substitutes for it."  And that passage quoted the Brown Shoe

22   case, *Brown Shoe Company v. United States*.

23          So now, neither the reasonable interchangeability of

24   use nor the cross-elasticity of demand support plaintiffs'

25   proposed relevant product market of FDA-approved pyrimethamine.

LCMKFTC4                         Summation – Mr. Casey

1          So just focusing on interchangeability:  That standard

2    looks to the use or function of the given product as compared

3    to other products.  That case is *Bayer Schering Pharma AG v.*

4    *Sandoz, Inc.*, 813 F.Supp.2d 569, 575 (S.D.N.Y. 2011).

5          Now, the evidence in this case is uncontroverted that

6    TMP-SMX, atovaquone, and compounded pyrimethamine are medical

7    alternatives for treating patients with active toxoplasmosis

8    and for prophylaxis.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. CASEY:  Dr. Hardy testified to that, the

2     plaintiffs' expert.

3          The evidence showing decision making of actual

4     physicians supports the conclusion that all of these

5     alternative therapies are within the proper standard of care,

6     as explained by plaintiffs' own expert, Dr. Hardy.  The fact

7     that FDA approved pyrimethamine is the gold standard for active

8     toxoplasmosis and that TMP-SMX is the gold standard for

9     toxoplasmosis prophylaxis only shows that these alternative

10    treatments are better options for certain patients, not that

11    they are each their own relevant product market.

12          Now, turning from the interchangeability to the cross

13    elasticity of demand, the cross elasticity is related to

14    interchangeability.  It requires a consideration of the extent

15    to which a change in the price of one product will alter the

16    demand for another product.

17          Professor Hemphill admitted that he did not have

18    quantity and price data for TMP-SMX, atovaquone, or compounded

19    pyrimethamine to use cross elasticity of demand to establish a

20    relevant product market.

21          In summary, in terms of the relevant product market,

22    which is plaintiffs' burden, the real-world evidence of

23    substitution, the choices that consumers are actually making

24    when treating toxoplasmosis establishes that there are several

25    alternative therapies for toxoplasmosis, depending on the

LCMMFTC5                       Summation - Mr. Casey

1    patient, the type of toxoplasmosis, and the price of the

2    alternative treatments.  Plaintiffs have failed to prove -- to

3    meet their burden of proof that FDA-approved pyrimethamine is a

4    proper relevant product market.

5          Your Honor, I want to move -- I am nearing the end of

6    my presentation, your Honor.  I wanted to talk a little bit

7    about Mr. Shkreli's -- the plaintiffs' claim that he should be

8    held individually liable.  Again, this gets back to a

9    discussion we had earlier.

10         We heard a lot of evidence of Mr. Shkreli exercising

11   influence as a large shareholder of Phoenixus.  But there has

12   been no evidence presented of his direction of or participation

13   in the challenged agreements.  There is no evidence to show

14   that he negotiated or signed --

15         THE COURT:  Let me make sure I have that formulation.

16   No evidence of his direction or what?

17         MR. CASEY:  Participation in the challenged

18   agreements.

19         THE COURT:  Thank you.

20         MR. CASEY:  You're welcome.

21         There has been no evidence that he negotiated or

22   signed the Fukuzyu or RL Fine agreements which were entered

23   after he left the company, nor has there been any evidence to

24   show that he negotiated or signed any of the challenged

25   distribution agreements, nor that he is familiar with any of

LCMMFTC5                    Summation - Mr. Casey

1    the terms of those agreements.

2             At this point, your Honor, I would like to move on to

3    the relief issues, injunctive relief and equitable monetary

4    relief.  Plaintiffs have asked for an industry ban.  This

5    morning it appeared that they were asking for a lifetime ban.

6    It's not clear to me whether that's in fact what they are

7    seeking.  In their pretrial memo they asked for at least a

8    20-year ban.  But, in any event, they are asking for a

9    significant industry ban from the Court.

10            Here, your Honor, this obviously is an issue for your

11   discretion.  This is an equity court.  In our view, any

12   injunctive relief, if the Court disagreed with us and believed

13   that Mr. Shkreli should be held liable, the question is, what

14   is the consequence of that?  Any injunctive relief should be

15   narrowly tailored to the specific violations and avoid

16   unnecessary burden on lawful commercial activity.  That's a

17   quote from a case called *Syntel Sterling Best Shores Mauritius*

18   *Ltd. v. Trizetto Group, Inc.*, 2021 WL 1553926 at page 14

19   (S.D.N.Y. April 20, 2021)

20            Your Honor, the plaintiffs concede in their pretrial

21   brief that an industry ban is "uncommon and reserved for the

22   most egregious cases."  That's a direct quote from their

23   pretrial memorandum at page 49.

24            But this is not the type of case in which the FTC or

25   the states have pursued industry bans.  For this Court to issue

1    an industry ban, we submit would simply constitute punishment,

2    which is not the purpose of an equity court.

3            For that, your Honor, I can refer you to the Liu case,

4    which was cited earlier by plaintiffs in the Supreme Court.

5    *Liu v. SEC*, 140 S. Ct. 1936 at page 1945 (2020).  The

6    plaintiffs have cited a number of cases in their pretrial

7    memorandum, some of those we saw this morning, maybe all of

8    them, in which courts have issued industry bans.  In every

9    single one of those cases there was fraudulent conduct by the

10   defendant.  And there has been no fraud alleged here.

11           This is a civil rule-of-reason antitrust case.  It's

12   not about, we would humbly submit, whether the price increase

13   was a wise decision and whether we agree or if the Court agrees

14   with that decision.  This is about antitrust.  They have not

15   shown why in this particular case, on these facts, with these

16   allegations, the defendant should be banned from an industry

17   for the remainder of his life.  The cases where they have done

18   that have been fraud cases akin to criminal cases.  Whatever

19   else Mr. Shkreli has done, which I would submit is not relevant

20   to what he did in this case, there is no justification for an

21   industry ban in this particular case.

22           I don't want to discuss those cases that they have

23   cited in any detail, but I would mention one that is worth

24   mentioning.  It's a case called *FTC v. Ross*, 897 F.Supp.2d 369.

25   It's from the District of Maryland in 2012.  The Court in *Ross*

1    specifically declined to issue an industry ban.  Instead, the

2    defendant was permitted to continue working in the industry

3    with conduct restrictions.  This was so despite that the

4    defendant's fraudulent marketing scheme generated large sums of

5    money and resulted in the filing of over 3,000 consumer

6    complaints with the FTC.

7         Plaintiffs point to no case where the government has

8    sought or the Court has imposed an industry ban in an antitrust

9    case without any allegations of fraud.  The Court should not

10   take the apparently unprecedented step of imposing an industry

11   ban in an antitrust case when conduct restrictions would be

12   sufficient to restrain and prevent the challenged conduct from

13   recurring.

14        THE COURT:  What conduct restrictions do you

15   recommend?

16        MR. CASEY:  Your Honor, I don't think you should

17   impose any.  Our position is you should not.  We don't think

18   you should find liability.  But if the Court were to find

19   liability, restrictions that are tailored to the allegations in

20   the complaint:  Exclusive supply agreements, restricted

21   distribution agreements, data blocking agreements.  Those are

22   the allegations in the complaint.  And what they are doing now

23   is going well beyond those.

24        I know the Court has lots of criminal cases.  It's as

25   if the defendant was ready to plead to every count of the

1   indictment but yet that's not enough.  There has got to be some

2   extra sanction imposed on the defendant.

3          In this case the FTC and the states are enforcing the

4   antitrust laws and they do a very good job of it.  I used to be

5   at the FTC many years ago.  I respect what they do.  But what

6   they do is, they are there to protect the market and to make

7   sure that this kind of conduct -- again, I don't agree with

8   their theory of the case, but I respect their right to bring

9   the case.  They bring the case.  They get relief and the

10  market -- they fix the market harm.  In my view, that's what

11  they should be doing instead of expelling an individual from an

12  industry for the rest of his life.  I don't think that's

13  appropriate here, particularly in an equity court.  I don't

14  think there has been anything presented by them other than --

15  obviously, there has been a lot of negative publicity

16  associated with Mr. Shkreli.  He has acknowledged that.  He

17  takes responsibility for that.  He did in his affidavit.

18         THE COURT:  He didn't take responsibility for

19  violating the antitrust laws.

20         MR. CASEY:  Correct.

21         THE COURT:  He has not admitted liability here.

22         MR. CASEY:  He has not, your Honor.  We are defending

23  the case.

24         THE COURT:  When you say he took responsibility, he

25  admitted that he's the one who set the price for the drug, for

Daraprim.  He admitted he set it at 750.  He is not denying he

said he should have set it higher.  I'm not quite sure what you

are saying, he admitted.

MR. CASEY:  I didn't mean to suggest that he's

admitting the conduct.

THE COURT:  OK.

MR. CASEY:  What I'm saying is, from the tenor, I will

say, of the discussion about what their relief should be, it

seems like it's a little bit beyond what they have charged in

the complaint and what they should be seeking.  That is my

view.  I would submit to the Court that whatever the Court

does -- and I respect that this is the Court's decision.  You

have discretion to do it.  But my only point is, this is an

equity court and the Court should find an equitable resolution,

if the Court finds liability, that advances the legitimate law

enforcement purposes of the plaintiffs.  I don't know that they

have made a case, at least I haven't heard it made, for why

they would need to ban Mr. Shkreli from this industry for the

rest of his life.

THE COURT:  Is it or is it not relevant, from your

point of view, for me to consider that he was the author of the

strategy?

MR. CASEY:  Your Honor, I don't know that I would

necessarily agree -- it depends on what you mean by author, but

certainly there is record evidence to support the fact --

LCMMFTC5                    Summation - Mr. Casey

1          THE COURT:  No.  I'm sorry.  Let me put my question

2   more directly.  If I find he is liable for a violation of the

3   antitrust laws and am now considering what kind of injunctive

4   relief is appropriate, which is what I think you're addressing

5   now.

6          MR. CASEY:  Yes.

7          THE COURT:  On the assumption that I have found him

8   liable and have turned to the issue of formulating injunctive

9   relief, is it -- in your view, should I find it to be true that

10  I consider, in shaping the injunctive relief, that I have found

11  he is the author of the anticompetitive strategy?

12         MR. CASEY:  I think that's a valid consideration for

13  the Court to make.

14         THE COURT:  Would it be relevant, from your point of

15  view, as a legal matter, for me to consider that it was a

16  strategy, again, directed to the pharmaceutical industry and

17  the role that the pharmaceutical industry plays in providing

18  life-saving remedies to the public?

19         MR. CASEY:  Certainly.  That's certainly a

20  consideration that's appropriate.

21         THE COURT:  Would it be relevant for me to consider in

22  this decision making that the specific drug that's at the heart

23  of this is in fact a life-saving drug for which the decision

24  about its administration must be made generally within 24 hours

25  of symptoms?

1    MR. CASEY:  Well, certainly, your Honor, that's

2  something you could consider.

3    My point only, your Honor, is that you have to fashion

4  and mold the relief to stop this from occurring again.  I think

5  that's an appropriate role for the Court.  But a narrowly

6  tailored injunction for a reasonable period of time would be an

7  appropriate resolution rather than a ban.  I don't know why

8  they need a ban in this case.  They have said there is an

9  enforcement problem with something less than a ban.  I am not

10  sure I understand that.  But I just ask the Court to consider

11  that, what is appropriate and necessary, again, given that the

12  issue here is whether there has been a violation of the

13  antitrust laws and whether the Court needs to put in place an

14  injunction to prevent that from happening again.  That's I

15  think the role of the Court.  I respect the Court's discretion

16  to come up with an appropriate injunction, if the Court decides

17  to do that.

18    In terms of equitable monetary relief, your Honor, the

19  *Liu* case from the Supreme Court says that disgorgement should

20  not be a joint and several remedy.  In *Liu*, the Supreme Court

21  said the rule against joint and several liability for profits

22  that have accrued to another appears throughout equity cases

23  awarding profits.  That's in the *Liu* case, 140 S. Ct. at page

24  1945.  In other words, allowing joint and several liability

25  "runs against the rule to not impose joint liability in favor

1   of holding defendants liable to account for such profits only

2   as have accrued to themselves."

3          *Liu* also held that the amount of disgorgement must be

4   limited to profits the defendant took from the alleged scheme.

5   Here, the plaintiffs have failed to meet their burden to prove

6   that Mr. Shkreli profited at all from Vyera sales of Daraprim.

7   Mr. Shkreli testified in his written direct testimony that he

8   invested approximately $18 million into Vyera, and plaintiffs

9   have not rebutted this testimony.

10         The only asset Mr. Shkreli has from Vyera is his Vyera

11   stock.  He took no salary from the company.  The plaintiffs

12   have not proven the value of that stock.  Professor Hemphill's

13   calculation is flawed because even if the Court is inclined to

14   hold Mr. Shkreli jointly and severally liable for Vyera's

15   profits from Daraprim, the plaintiff has failed to show that

16   those profits should be in the range of 53 to $64.6 million, as

17   Professor Hemphill claims.

18         Professor Hemphill admitted on cross-examination that

19   in performing his calculation he did not take into account the

20   numerous business decisions that the generic companies made

21   that I have talked about here today that contributed to their

22   delay in entering the market.  Therefore, the assumptions on

23   which his excess profits model is based are flawed.

24         Your Honor, I just wanted to mention a few things

25   about Mr. Shkreli and his future plans.  I know it was

LCMMFTC5

1    referenced in plaintiffs' presentation, and he addresses it in

2    his affidavit.

3             Again, the Court has the discretion to decide, if the

4    Court finds him liable, what the appropriate relief is.  I will

5    just say this.  He does hope to change the public's perception

6    of him following his release from prison and his return to

7    civilian life.  He said in his written direct testimony at page

8    83 that he hopes to "continue playing a role in the discovery

9    of cures and treatments for rare and life-threatening

10   diseases."

11            In conclusion, your Honor, we would ask that the Court

12   find that Mr. Shkreli is not liable for any of the counts in

13   the amended complaint.  In the alternative, should the Court

14   disagree, we ask the Court to impose relief that is narrowly

15   tailored to the allegations of the amended complaint, such as

16   an injunction to not engage in the alleged conduct for a

17   reasonable period of time and to deny any monetary relief.

18   Thank you very much, your Honor.

19            THE COURT:  Thank you.

20            Counsel, I leave it to you as to whether we take a

21   break, a short break, a luncheon recess, or no break at all.

22   Whatever is your choice.

23            MR. MEIER:  Your Honor, we think we would benefit from

24   taking a break, either a short break and come back, or a lunch

25   break.  They are telling me short break on our side.

LCMMFTC5

```
 1              THE COURT:  Why don't counsel consult, since it
 2     affects all of you, just off the record here with each other.
 3              MR. MEIER:  Your Honor, I think the parties agree to a
 4     15-minute break and then we come back and wrap it up.
 5              THE COURT:  Great.  Thanks.
 6              (Recess)
 7              MS. McFARLANE:  Your Honor, may I briefly be heard on
 8     remedy?
 9              THE COURT:  Certainly.
10              MS. McFARLANE:  Thank you.
11              Your Honor, I'll be very brief.  New York Executive
12     Law 6312 is a remedial statute, not a penal statute.  There is
13     no distinction in the statute between remedies for fraudulent
14     conduct and otherwise illegal conduct.  The anticompetitive
15     conduct in this case is at least as egregious as the fraudulent
16     conduct at issue in our cited cases.
17              (Continued on next page)
18
19
20
21
22
23
24
25
```

LCMKFTC6

1          MS. McFARLANE:  (Continuing)  Whether a ban is

2     appropriate in equity and whether joint and several liability

3     is appropriate in equity is based on your Honor's fact-finding

4     about Mr. Shkreli's conduct and culpability.

5          Mr. Casey was right — enforcers aim to protect the

6     markets.  And the only way to protect the market here is to

7     keep Mr. Shkreli out of the market.

8          Thank you, your Honor.

9          THE COURT:  So, counsel, that's it for the reply?

10          MS. McFARLANE:  That's it.

11          THE COURT:  That's fine, that's fine.

12          Okay.  I think we're done.  I will spend some time

13     taking my pen to my draft and taking into account all the hard

14     work counsel have expended during this trial to educate me.  I

15     thank you, and I wish everyone a happy holiday season.

16          Thank you.

17          (Adjourned)

18

19

20

21

22

23

24

25