**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION, et al.,

      Plaintiffs,

      v.

MARTIN SHKRELI,

      Defendant.

Case No. 1:20-cv-00706-DLC

**Plaintiffs' Opposition to Defendant Martin Shkreli's
Motion to Stay Order for Permanent Injunction Pending Appeal**

**Table of Contents**

ARGUMENT ............................................................................................................ 1

I.   Shkreli's appeal is not likely to succeed on the merits ................................... 2

     A.   The Court's injunction was well within its discretion and cannot be more
          narrowly tailored without risking the public's wellbeing ................................ 2

     B.   The Court correctly analyzed anticompetitive effects .................................... 4

          1.   The Court applied the correct legal standard ....................................... 4

          2.   Shkreli's causation argument fails ........................................................ 6

     C.   The Court properly held Shkreli jointly and severally liable ......................... 8

     D.   The Court correctly defined the relevant market ......................................... 10

II.  Shkreli will not suffer irreparable harm absent a stay of the judgment .............. 12

III. A stay risks substantial injury to patients and payers ............................................ 14

IV.  The public interest weighs against a stay ............................................................ 15

V.   The Court should not modify the injunction ........................................................ 15

## Table of Authorities

<u>**Cases**</u>

*212 Inv. Corp v. Kaplan*,
   847 N.Y.S.2d 905 (Sup. Ct., NY County, 2007) ..................................................... 9

*AD/SAT Div. of Skylight, Inc. v. Assoc. Press*,
   181 F.3d 216 (2d Cir. 1999) ...................................................................... 12

*Bd. of Trade of Chicago v. United States*,
   246 U.S. 231 (1918)................................................................................. 8

*City of New York v. Mickalis Pawn Shop, LLC*,
   645 F.3d 114 (2d Cir. 2011) ...................................................................... 4

*Discover Fin. Servs. v. Visa USA*,
   582 F. Supp. 2d 501 (SDNY 2008) .............................................................. 8

*Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*,
   841 F. App'x 399 (3d Cir. 2021) ................................................................ 6

*Frye v. Lagerstrom*,
   No. 15 Civ. 5348 (NRB), 2018 WL 4935805 (S.D.N.Y. Oct. 10, 2018) ................. 2

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986)........................................................................... 8, 12

*FTC v. Moses*,
   913 F.3d 297 (2d Cir. 2019) .................................................................... 10

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
   386 F.3d 485 (2d Cir. 2004) ........................................................... 6, 12, 13

*Hateley v. SEC*,
   8 F.3d 653 (9th Cir. 1993) ...................................................................... 11

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618 (E.D. Mich. 2000) ........................................................ 8

*In re Elec. Books Antitrust Litig. ("E-books")*,
   No. 11-MD-2293 (DLC), 2014 WL 1641699 (S.D.N.Y. Apr. 24, 2014)............... 2, 14

*Irvin Indus., Inc. v. Goodyear Aerospace Corp.*,
   974 F.2d 241 (2d Cir. 1992) ...................................................................... 8

*Liu v. SEC*,
   140 S. Ct. 1936 (2020)......................................................................... 9, 10

*N.Y. Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013) .................................................................... 15

*Naden v. Numerex Corp.*,
    593 F. Supp. 2d 675 (S.D.N.Y. 2009) ........................................................................ 14, 15

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978) .......................................................................................................... 7, 15

*NLRB v. Express Pub. Co.*,
    312 U.S. 426 (1941) .................................................................................................................. 4

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ............................................................................................................ 7

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ................................................................................................. 12

*SEC v. Citigroup Global Markets Inc.*,
    673 F.3d 158 (2d Cir.2012) .................................................................................................... 2

*SEC v. Contorinis*,
    743 F.3d 296 (2d Cir. 2014) ................................................................................................. 11

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ............................................................................................... 10

*SEC v. Pentagon Capital Mgmt. PLC*,
    725 F.3d 279 (2d Cir. 2013) ................................................................................................... 9

*United Food and Commercial Workers Local 1776 & Participating Emps. Health and*
    *Welfare Fund v. Takeda Pharm. Co. Ltd.*, 11 F.4th 118 (2d Cir. 2021) ................................ 7

*United States v. Shkreli*,
    460 F. Supp. 3d 287 (E.D.N.Y. May 16, 2020) .................................................................... 17

*United States v. Zaken Corp.*,
    57 F. Supp. 3d 1233 (C.D. Cal. 2014) ................................................................................... 3

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ................................................................................................... 13

*Zenith Radio Corp. v. Hazeltine Rsch. Inc.*,
    395 U.S. 100 (1969) ................................................................................................................ 8

## **Statutes**

21 U.S.C. § 355 ........................................................................................................................... 15

## **Rules**

Federal Rules of Civil Procedure, Rule 62(d) ............................................................................. 1

Defendant Martin Shkreli once again seeks to avoid the consequences of his unlawful conduct. After a full trial, the Court found that Shkreli had engaged in a "heartless and coercive" anticompetitive scheme to inflate the price of Daraprim. Op. 125 (ECF 865). It determined that his "egregious, deliberate, repetitive, long-running, and ultimately dangerous illegal conduct" warranted a permanent ban from participating in the pharmaceutical industry. Op. 124 (ECF 865). And the Court expressly rejected Shkreli's attempts to defang this injunction by limiting it to a narrow and difficult-to-monitor set of prohibitions. Op. 127 (ECF 865). Shkreli now asks the Court to stay the injunction pending an appeal to the Second Circuit. The Court should not do so.

First, Shkreli has not demonstrated a meaningful likelihood of success on appeal. He simply repeats arguments that contravene Second Circuit precedent and disagrees with this Court's thorough factual findings. Second, Shkreli has not established a sufficient irreparable injury. Because he is currently incarcerated, he has no actual or imminent employment prospect in the pharmaceutical industry. Third, staying the injunction creates the risk of substantial injury in light of Shkreli's proven ability to coordinate anticompetitive schemes from prison. Finally, the public interest weighs strongly against a stay.

## ARGUMENT

In determining whether to grant an application for a stay of an injunction pending appeal under Rule 62(d) of the Federal Rules of Civil Procedure, the Court must consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *SEC v. Citigroup Global Markets Inc.*, 673 F.3d 158, 162 (2d Cir.2012) (per

curiam); *see also In re Elec. Books Antitrust Litig.* ("*E-books*"), No. 11-MD-2293 (DLC), 2014 WL 1641699, at *4 (S.D.N.Y. Apr. 24, 2014).

"Of these factors, the first two 'are the most critical.'" *Frye v. Lagerstrom*, No. 15 Civ. 5348 (NRB), 2018 WL 4935805, at *2 (S.D.N.Y. Oct. 10, 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 434-35 (2009)). Demonstrating a "strong showing of a likelihood of success on the merits" requires "more than a mere possibility of relief." *E-books*, 2014 WL 1641699, at *7 (quoting *Nken*, 556 U.S. at 434). And to show irreparable injury, the movant must show "injury that is not remote or speculative but actual and imminent." *E-books*, 2014 WL 1641699, at *4. Each of these factors weigh against Shkreli's motion for a stay.

## I.     Shkreli's appeal is not likely to succeed on the merits

### A.     The Court's injunction was well within its discretion and cannot be more narrowly tailored without risking the public's wellbeing

For the third time before this Court,[1] Shkreli contends that a lifetime ban from the pharmaceutical industry is overly broad and not adequately tailored to his violations of federal and state antitrust laws. Shkreli Mem. 5 (ECF 880). The Court appropriately found that "Shkreli's egregious, deliberate, repetitive, long-running, and ultimately dangerous illegal conduct warrants imposition" of a lifetime ban. Op. 124 (ECF 865). As the Court explained:

> There is no reason to believe that a [more] narrowly crafted injunction will succeed in providing adequate protection against a repetition of illegal conduct. Shkreli has demonstrated that he can and will adapt to restrictions….
>
> Shkreli's anticompetitive conduct at the expense of the public health was flagrant and reckless. He is unrepentant. Barring him from the opportunity to repeat that conduct is nothing if not in the interest of justice. "If not now, when?"

---

[1] *See* Shkreli Pretrial Mem. 25-28 (ECF 654); Shkreli Obj. to Proposed Order (ECF 867); Shkreli Mem. (ECF 880).

Op. 127 (ECF 865) (quoting Mishnah, Pirkei Avot 1:14). In this motion, Shkreli reiterates his twice-rejected position that the injunction should be limited to prohibiting "exclusive supply agreements for API and limited distribution agreements for the finished pharmaceutical product." Shkreli Mem. 7 (ECF 880). His arguments opposing the injunction imposed by this Court are unlikely to prevail on appeal.

First, the lifetime ban from the pharmaceutical industry is not "dissociated" with Shrekli's anticompetitive conduct. Shkreli Mem. 5 (ECF 880). As the Court previously explained, Shkreli's anticompetitive scheme was dependent on "a coordinated effort that reached into the global pharmaceutical market." Op. 5-6 (ECF 875). "Without a lifetime ban, there is a real danger that Shkreli will engage in anticompetitive conduct within the pharmaceutical industry again." Op. 125 (ECF 865). While Plaintiffs can monitor whether a company like Vyera enters into a prohibited agreement, Plaintiffs have far less visibility into the conduct of an individual like Shkreli. Indeed, Shkreli both regularly starts new businesses and controls businesses indirectly. He could find myriad ways to evade detection of a specific conduct prohibition without leaving a paper trail. Thus, a conduct-specific injunction, as Shkreli proposes, would be too difficult to effectively monitor and enforce. *See United States v. Zaken Corp.*, 57 F. Supp. 3d 1233, 1242 (C.D. Cal. 2014) (finding that "replac[ing a] lifetime ban . . . with essentially a 'follow the law' injunction . . . would be wholly inadequate to protect consumers in the future").

Second, the ban does not prohibit all possible breaches of the law. Shkreli Mem. 5-6 (ECF 880).[2] Instead, the injunction is tailored to prohibit Shkreli from participating in one

---

[2] Nor does the injunction "restrain purely *legal* conduct," as Shkreli (contradictorily) argues. Shkreli Mem. 6 (ECF 880).

industry in which his entire business strategy was to reap monopoly profits by violating federal

and state antitrust laws, without any regard for those harmed by his conduct. The pharmaceutical

industry ban is not punitive, but rather necessary "to protect the public against a repetition of the

conduct proven at this trial." Op. 127 (ECF 865). The cases upon which Shkreli relies are, thus,

inapposite. *NLRB v. Express Pub. Co.*, 312 U.S. 426, 436 (1941) (modifying injunction that

"ordered broadly that respondent should in effect refrain from violating the [National Labor

Relations] Act in any manner whatsoever."); *City of New York v. Mickalis Pawn Shop, LLC*, 645

F.3d 114, 144 (2d Cir. 2011) (remanding for further proceedings after vacating injunctions that

imposed "an obligation to act 'in full conformity with applicable laws pertaining to firearms' . . .

without specifying which laws are 'applicable.'").

Finally, the terms of the injunction are not "impermissibly vague." Shkreli Mem. 8 (ECF

880). The term "Pharmaceutical Company" is clearly defined (Order for Permanent Injunction 4

(§ I.M) (ECF 876)), and Shkreli himself has signed settlements using the same term and

definition, including the common pharmaceutical industry terms "marketing" and

"commercialization." Pls.' Resp. to Shkreli's Obj. to Proposed Order 3-4 (ECF 869). Indeed,

Shkreli argued to the Court that he "should not be precluded from conduct that does not involve

the *commercialization* of pharmaceutical drugs." Shkreli Obj. to Proposed Order 3 (ECF 867)

(emphasis added).

### B. The Court correctly analyzed anticompetitive effects

#### 1. The Court applied the correct legal standard

Shkreli contends that the Court used the wrong legal standard to analyze the

anticompetitive effects of Vyera's API exclusivity agreements. Shkreli is wrong. Citing

controlling Second Circuit precedent, the Court explained that exclusive dealing is an antitrust

violation "only when the agreement freezes out a significant fraction of buyers or sellers from

the market." Op. 89 (ECF 865) (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 508 (2d Cir. 2004)). The Court further noted "[t]he test is not total foreclosure, but rather whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." Op. 119 (ECF 865) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 656 (2d Cir. 2015)). Applying this well-established standard to the facts before it, the Court found that "Vyera's agreements with Fukuzyu and RL Fine closed off access to the two most viable suppliers of pyrimethamine for years," forced generic manufacturers "to undertake a time-consuming and costly journey to develop alternative API manufacturers," and "delayed the entry of generic pyrimethamine into the market." Op. 111-12 (ECF 865). Thus, the "sole purpose and effect" of the API exclusivity agreements "was to foreclose generic pharmaceutical companies from acquiring the API [] that would have otherwise been readily available to them in the ordinary course and that were critical to their efforts to compete with Vyera." Op. 119-20 (ECF 865).[3]

Shkreli argues that this analysis applied a "lesser standard" than the traditional "substantial foreclosure" test for evaluating exclusive agreements. Shkreli Mem. 10, 12 (ECF 880). But "substantial foreclosure" is not substantively different than "freez[ing] out a significant fraction of buyers or sellers from the market" or "bar[ring] a substantial number of rivals or severely restrict[ing] the market's ambit." *See* Op. 89, 119 (ECF 865). Indeed, Shkreli's primary authority, a footnote in the Third Circuit's unpublished decision in *Fresenius Kabi v. Par Sterile Prods.*, itself describes substantial foreclosure as "barr[ing] a substantial number of rivals or

---

[3] This conclusion is similar to the Second Circuit's determination in *Geneva Pharmaceuticals* that an API exclusivity agreement could have anticompetitive effects when it forced a generic pharmaceutical company to develop a new supplier and resulted in "a one-year delay." *Geneva Pharms.*, 386 F.3d at 493-94 .

5

severely restrict[ing] the market's ambit." *Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*, 841 F. App'x 399, 404 n.12 (3d Cir. 2021) (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)).[4] Shkreli is thus unlikely to prevail on an argument that the standard applied by this Court is lower than "substantial foreclosure."

### 2. Shkreli's causation argument fails

Shkreli further contends that the Court failed to require Plaintiffs to prove anticompetitive effects by showing "a delay in the entry of generic competition." Shkreli Mem. 13 (ECF 880). He claims that the Court did not consider various alleged business mistakes by the generic companies that he believes constitute "independent causes" insulating him from liability. This argument is both legally and factually wrong. As a legal matter, Plaintiffs did not need to prove an actual delay in competition to show anticompetitive effects. As the Supreme Court has explained, an antitrust plaintiff can meet its initial burden under the rule of reason *either* (1) directly with "proof of actual detrimental effects . . . such as reduced output, increased prices, or decreased quality in the relevant market," *or* (2) indirectly with "proof of market power plus some evidence that the challenged restraint harms competition." *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018).[5] Indirect proof does not require a showing of actual delay or actual

---

[4] Shkreli also argues that "substantial foreclosure" requires "careful analysis and consideration of the full range of potential API suppliers available to drug manufacturers, including suppliers that do not currently manufacture the specific API in question but have the capability to do so." Shkreli Mem. 11 (ECF 880). But the Court did consider the availability of other suppliers and found that Fukuzyu and RL Fine were the "two most viable suppliers of pyrimethamine" and the only alternative was "to undertake a time-consuming and costly journey to develop alternative API manufacturers." Op. 111-12 (ECF 865). Shkreli did not establish that any other API manufacturer was a viable source of pyrimethamine API during the relevant period.

[5] *See also United Food and Commercial Workers Local 1776 & Participating Emps. Health and Welfare Fund v. Takeda Pharm. Co. Ltd.*, 11 F.4th 118, 137 (2d Cir. 2021) (in monopolization case, a plaintiff must show that conduct "has *or is likely to have* the effect of controlling prices or excluding competition" (emphasis added)).

higher prices. Instead, the Supreme Court has condemned restraints as anticompetitive where they "impede[d] the ordinary give and take of the marketplace" (*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)) or were "likely enough to disrupt the proper functioning of the price-setting mechanisms of the market . . . even absent proof that [they] resulted in higher prices" (*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461-62 (1986)). *See also Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918) (rule of reason examines "the nature of the restraint and its effect, actual or probable").[6]

Regardless, the Court found as a factual matter that Shkreli's conduct *did* delay generic competitors "[e]ven under [his] rigid view of the law." Op. 119 (ECF 865). The Court held that Plaintiffs provided "direct evidence of increased prices in the relevant market." *Id.* at 118. And the Court's thorough factual findings make clear that the years-long delay in generic entry was due to Shkreli's anticompetitive scheme—not business mistakes by the generic companies. For example, the Court explained that "RLD suppliers struggled to fill orders for Daraprim" due to Vyera's restrictive contracts, and that in the one instance where a supplier was able to circumvent Vyera's restrictions, "Mulleady rushed to buy those bottles back and paid twice their purchase price to do so." Op. 117 (ECF 865). In calculating disgorgement, the Court accepted

---

[6] The cases cited in Shkreli's memorandum concern the standards for antitrust injury or damages, not anticompetitive effects. *See Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244 (2d Cir. 1992) (in addition to proving a violation, private plaintiff must show "its injury was, in fact, caused by the defendant's violation of the antitrust law"); *Zenith Radio Corp. v. Hazeltine Rsch. Inc.*, 395 U.S. 100, 106 & nn.8, 9 (1969) (explaining that Sherman Act was "no doubt" violated but analyzing "fact of damage" to private plaintiff); *Discover Fin. Servs. v. Visa USA*, 582 F. Supp. 2d 501, 503-04 (SDNY 2008) (examining standard "to recover damages in an antitrust action"); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 652-53 (E.D. Mich. 2000) (examining "causal connection between the alleged antitrust violation and the plaintiff's injury"). Shkreli has previously acknowledged that Plaintiffs as government enforcers are not required to show antitrust injury. *See* Defs.' Reply Mem. Addressing an Unanticipated Legal Arg. 6 (ECF 627).

Plaintiffs' estimates that Shkreli's scheme delayed Cerovene's entry by 18 months and Fera's entry by 24 months—and found that these estimates were conservative. Op. 130 (ECF 865). The Courts' findings are supported by overwhelming record evidence, and Shkreli's factual disagreement with them is unlikely to prevail on appeal.

### C.    The Court properly held Shkreli jointly and severally liable

Courts sitting in equity can properly order joint and several liability for disgorgement awards so long as the imposition of joint and several liability serves the principles of equity and does not act as a penalty. *Liu v. SEC*, 140 S. Ct. 1936, 1949 (2020). The Second Circuit has permitted joint and several liability orders where defendants "collaborate on a common scheme" (*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013) ("[I]n light of their collaboration, [defendants] should be held liable for the disgorgement award on a joint and several basis.")), as have New York State courts (*see, e.g., 212 Inv. Corp v. Kaplan*, 847 N.Y.S.2d 905, 910 (Sup. Ct., NY County, 2007) ("[T]here is a significant body of authority holding that '[w]hen apportioning liability for disgorgement among multiple defendants, courts have the discretion to find joint and several liability when two or more individuals collaborate in the illegal conduct'" (citations omitted))). Shkreli provides no reason to question the imposition of joint and several liability in this case.

First, Shkreli misconstrues *Liu* as establishing a rigid set of "*Liu* factors." Shkreli Mem. 21 (ECF 880). Contending that these factors are not specifically present in the instant case, Shkreli concludes that joint and several liability is inappropriate. This is a total mischaracterization of *Liu*. In fact, *Liu* stands for the proposition that flexible, fact-specific determinations must be made to support imposition of joint and several liability to ensure consistency with well-established equitable principles.

8

Considering the facts of *this* case, equity demands the imposition of joint and several liability against Shkreli. The Court made extensive factual findings that Shkreli originated and controlled the anticompetitive scheme at the heart of the case. As the Court found, Shkreli was "no side player" in the scheme: "[i]t was his brainchild and he drove it each step of the way." Op. 24-27, 34, 40, 134 (ECF 865). The scheme implemented by Shkreli at Vyera is part of a repeated "pattern"; prior to founding Vyera, "Shkreli road-tested the scheme at issue here at another company that he founded, Retrophin," "design[ing] its business model" to suppress competition so as to protect massive drug price hikes. *Id*. at 24-25. After founding Vyera, Shkreli immediately began to acquire sole-source drugs "with the intent to raise their prices, block generic competition, and reap extraordinary profits." *Id*. at 27. He was intimately involved in erecting illegal competitive barriers. He closed Daraprim distribution channels to restrict access by potential competitors, and ensured that those restrictions continued even once he was sent to federal prison. *Id*. at 34, 40. From prison, he likewise worked to restrict access to the Daraprim active pharmaceutical ingredient, drafting emails for Vyera businesspeople that were sent verbatim to trading partners. *Id*. at 50. Indeed, the Court made over five pages of findings specifically concerning Shkreli's central role at Vyera. *Id.* at 80-86. Holding him jointly and severally liable for the disgorgement award is therefore consistent with equitable principles. *See Liu*, 140 S. Ct. at 1949 ("The common law did, however, permit liability for partners engaged in concerted wrongdoing . . . . The historic profits remedy thus allows some flexibility to impose collective liability." (citation omitted)); *see also FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019) (holding that a showing of "sufficient authority over the Corporate Defendants, and knowledge of their practices" is sufficient to hold a defendant "individually liable for [Corporate

Defendants'] misconduct as a matter of law"); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996).[7]

Second, Shkreli erroneously contends that he did not personally profit from the anticompetitive scheme in this case. Shkreli Mem. 16 (ECF 880). That is simply not true: as the Court explained, Shkreli personally profited from the scheme through his substantial ownership stake in Vyera. *See* Op. 133 (ECF 865) ("Shkreli explains in his direct testimony that he took the actions he did at Vyera based on his belief that the 'entry of a generic alternative to Daraprim . . . would have a significant effect on my investment in the company.'"). Moreover, as the Second Circuit has observed, "the amount a court may order a wrongdoer to disgorge may not exceed the total amount of gain from the illegal action, but that does not entail that the gain must personally accrue to the wrongdoer." *SEC v. Contorinis*, 743 F.3d 296, 305-06 (2d Cir. 2014).

### D.      The Court correctly defined the relevant market

Shkreli's challenge to the Court's market definition holding—which is supported by a "cascade of evidence that FDA-approved pyrimethamine is the relevant product market"—is also unlikely to succeed. Op. 103 (ECF 865). Shkreli contends that "[n]either 'reasonable interchangeability of use' nor 'cross-elasticity of demand'" supports a relevant market of FDA-approved pyrimethamine. Shkreli Mem. 19 (ECF 880). He is wrong on both counts.

---

[7] Shkreli's contention that *First Jersey* "was entirely dependent upon the individual defendant's personal liability as a 'controlling person under § 20(a) of the 1934 [Securities Exchange] Act'" is incorrect. Shkreli Mem. 17 (ECF 880). As a Ninth Circuit case cited in the relevant section of *First Jersey* explains: "While section 20(a) provides for joint and several liability between controlling and controlled persons, we are aware of no legal principle or case law suggesting that such liability is appropriate *only* where that relationship exists. In circumstances similar to those in this case, the SEC has concluded, without relying on section 20(a), that joint and several liability is appropriate." *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993). Furthermore, the Second Circuit's reasoning in *First Jersey* was completely consistent with the equitable principles later articulated in *Liu*.

First, the Court's extensive factual findings show that TMP-SMX, atovaquone, and compounded pyrimethamine are not even therapeutic substitutes for FDA-approved pyrimethamine.[8] As the Court explained, FDA-approved pyrimethamine is the "only pharmaceutical to receive [the Opportunistic Infections Guideline's highest possible] rating for the treatment of active toxoplasma encephalitis" and has "many unique features." Op. 101 (ECF 865). Vyera executives acknowledged that TMP-SMX is "medically inferior" for the treatment of active toxoplasmosis, and it cannot be used at all for a significant percentage of toxoplasmosis patients. *Id*. at 103-05. Compounded pyrimethamine—viewed as an inappropriate and dangerous substitute—never made significant sales despite its rock-bottom price. *Id*. at 105-06.[9] And Shkreli's assertion that "alternative therapies are better options for certain patients" (Shkreli Mem. 19 (ECF 880)) only reinforces that these therapies serve "distinct customers" from FDA-approved pyrimethamine, and thus should be excluded from the relevant market. *See* Op. 92, 108 (ECF 865); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019).

Second, the Court also correctly found that other therapies lacked sufficient cross-elasticity to be included in the relevant market. Substitutes with sufficient cross-elasticity "restrain[] a firm's ability to raise prices above the competitive level." *Geneva Pharms.*, 386 F.3d at 496. But here the Court found—and Shkreli does not contest—that other therapies did

---

[8] To be clear, products with reasonable interchangeability *of use* are not necessarily "reasonably interchangeable" to warrant inclusion in the relevant market, which requires "sufficient cross-elasticity of demand" such that "consumers would respond to a slight increase in the price of one product by switching to another product." *AD/SAT Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 227 (2d Cir. 1999); *see also Geneva Pharms.*, 386 F.3d at 496 (finding brand and generic warfarin to be in "separate markets for antitrust analysis" despite being "therapeutically equivalent").

[9] As the Court observed, the limited evidence presented about atovaquone fails to show that it was "either therapeutically or economically substitutable with Daraprim." Op. 105 n.36 (ECF 865).

not prevent Vyera from imposing an "astronomical" and immensely profitable price increase. Op. 107-08 (ECF 865). Even if, as Shkreli posits, some consumers switched to other therapies in the wake of Vyera's profitable price increase (Shkreli Mem. 19 (ECF 880)), these therapies clearly did not "constrain[] the price of Daraprim." Op. 107-08. If they had, "generic entry would not have resulted in the significant drop in the price of FDA-approved pyrimethamine that occurred." *Id*. Thus, the Court properly concluded that generic FDA-approved pyrimethamine possesses a "high degree of cross-elasticity" with Daraprim, while other therapies do not. *Id*. at 102-03, 107-08. Shkreli is unlikely to succeed in challenging this finding on appeal.

## II.    Shkreli will not suffer irreparable harm absent a stay of the judgment

Shkreli bears the "burden of showing" that, absent a stay, he would suffer irreparable injury. *E-books*, 2014 WL 1641699, at *4. To be irreparable, an injury cannot be "remote or speculative but actual and imminent." *Id.* (quoting *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir.2011)). Shkreli has failed to make this showing.

First, Shkreli's claim that he will suffer irreparable harm from "losing the opportunity to [work] in the industry in which he has specialized knowledge" (Shkreli Mem. 19 (ECF 880)) does not establish an "actual and imminent threat" of harm since Shkreli's current imprisonment already prevents him from any such employment. *See, e.g. Naden v. Numerex Corp.*, 593 F. Supp. 2d 675, 680-81 (S.D.N.Y. 2009) (finding no irreparable injury where movants' purported "inability to take advantage of employment and business opportunities" lacked "any detail about what specific opportunities existed with what prospective employers or co-venturers"). Even after his release, which is no sooner than November 2022,[10] Shkreli has not "express[ed] a clear

---

[10] *See* Jody Godoy, *U.S. judge bans Martin Shkreli from running public companies*, Reuters (Feb. 23, 2022, 3:31 PM), https://www.reuters.com/business/healthcare-pharmaceuticals/us-judge-bans-martin-shkreli-running-public-companies-2022-02-23/.

desire" to return to the pharmaceutical industry and, in any event, his prospects for obtaining employment in that industry are weak. Op. 125-126 (ECF 865) (quoting Shkreli Aff. ¶ 82 (ECF 837)). Any purported injury based on loss of employment is thus too "vague and unsubstantiated" to support a stay. *See Naden*, 593 F. Supp. 2d at 681.

Second, Shkreli's assertions of "vague," "unnecessary[,] and punitive" restrictions on his First Amendment rights are insufficient to warrant a stay. Shkreli Mem. 21-22 (ECF 880). To be sure, the injunction necessarily limits Shkreli's ability to influence or control pharmaceutical companies by various means, including "public statements." Order for Permanent Injunction 5, § II.D (ECF 876). But as the Court explained, those restrictions are "necessary to control the very real risk that he will continue to participate in the industry by working through others employed in the industry, as he has done while incarcerated." Op. 8 (ECF 875); *see also Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 697 ("While the resulting order may curtail the exercise of liberties that the [defendant] might otherwise enjoy, that is a necessary and, in cases such as this, unavoidable consequence of the violation."). The Court has already correctly rejected Shkreli's argument that the injunction language is vague or overbroad. Op. 7-9 (ECF 875). And these tailored restrictions do not support a stay where, as here, Shkreli has demonstrated no serious likelihood of success on appeal. *See, e.g., N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[I]n the First Amendment context, . . . the likelihood of success on the merits is the dominant, if not the dispositive, factor.").

Finally, Shkreli offers no support for his contention that the divestiture of his Vyera shares would cause him irreparable harm.[11] As the Court previously found:

---

[11] *See* Shkreli Mem. 27-28 (ECF 880) (citing only *Flowers Indus. v. FTC*, 849 F.2d 551, 552 (11th Cir. 1988), for the proposition that "[c]ourts have acknowledged that a divestiture of property can constitute irreparable harm").

> Shkreli used his position as the largest Phoenixus shareholder to exert control over it and Vyera's operations even after he had given up all formal role in the companies' operations. Through that control, he orchestrated their violation of the antitrust laws. The divestiture of his ownership interest in Phoenixus arises directly from the violation of law found at trial.

Op. 9-10 (ECF 875). Furthermore, "Shkreli's future interest in any [Vyera] shares . . . is entirely speculative" given that they are currently held by a receiver who is working to liquidate the shares to satisfy the judgment against Shkreli in an unrelated civil case. Op. 5-6 (ECF 895). A speculative future interest in company shares does not warrant a stay of the injunction.

## III.   A stay risks substantial injury to patients and payers

As the Court found, the injunction is necessary to address the "real danger that Shkreli will engage in anticompetitive conduct within the pharmaceutical industry again." Op. 125 (ECF 865). Shkreli has—without remorse—perpetuated several such schemes in the pharmaceutical industry, showing a reckless disregard for patients' health. *See id*. at 125-26. Additionally, as the Court has observed, "Shkreli has demonstrated that he can and will adapt to restrictions"— including by running his scheme from prison. *Id*. at 127. There is a significant danger that if the injunction is stayed, Shkreli will begin a new anticompetitive scheme with another pharmaceutical company in the near term.

Shkreli nonetheless contends that there is "little risk" from a stay of the injunction because Vyera is prohibited from entering API exclusivity agreements or distribution restrictions, and because the CREATES Act "places legal limits on the precise conduct the Court's Order enjoins." Shkreli Mem. 23 (ECF 880). But the Vyera settlement does not prevent Shkreli from using a different company to carry out another anticompetitive scheme. *See* Op. 125 (ECF 865). And the CREATES Act—even assuming Shkreli does not find a way to evade it— applies only to distribution restrictions. *See generally* 21 U.S.C. § 355-2. It does not address API exclusivity agreements or any other form of anticompetitive conduct Shkreli might pioneer.

14

Thus, neither Vyera's consent decree nor the CREATES Act addresses the substantial risk that Shkreli would engage in anticompetitive conduct during the pendency of a stay.

## IV.      The public interest weighs against a stay

Contrary to Shkreli's claims, a stay would not be in the public interest. Shkreli first contends that the order deprives the public of his "abilities and desire to develop [life-saving] drugs." Shkreli Mem. 24 (ECF 880). This claim is plainly fanciful as Shkreli is incarcerated and has no scientific background. Indeed, another district court rejected a similar claim by Shkreli in an application for compassionate release. *See United States v. Shkreli*, 460 F. Supp. 3d 287, 291 (E.D.N.Y. May 16, 2020) (noting the Probation Department viewed Shkreli's claim that he could develop a cure for Covid-19 as "delusional self-aggrandizing behavior"). Shkreli further argues that a stay protects the public interest in First Amendment rights. But on balance—and particularly in light of Shkreli's extremely low odds of successful appeal—the public interest is best served by the injunction's restrictions on Shkreli's "influence or control" of pharmaceutical companies (Order for Permanent Injunction 5, § II.D (ECF 876)), which he has repeatedly used to "profit . . . on the backs of a dependent population of pharmaceutical distributors, healthcare providers, and [] patients." *See* Op. 125 (ECF 865).

## V.      The Court should not modify the injunction

Shkreli also requests that, if the Court does not grant a stay, it modify the injunction pending appeal so that it only bars Shkreli from entering exclusive supply deals or distribution limitations. But the Court has already found that "[t]here is no reason to believe a narrowly crafted injunction will succeed in providing adequate protection against a repetition of illegal conduct." Op. 127 (ECF 865). Indeed, the injunction Shkreli requests would leave open many avenues for anticompetitive conduct and would also be extremely difficult to monitor or enforce. Thus, a modification to the injunction pending appeal is not appropriate here.

Dated: March 28, 2022                    Respectfully Submitted,

                                         **FOR FEDERAL TRADE COMMISSION**

                                         */s/ Markus H. Meier*
                                         Markus H. Meier

                                         Bradley S. Albert
                                         Armine Black
                                         Daniel W. Butrymowicz
                                         Maren Haneberg
                                         Leah P. Hubinger
                                         Lauren Peay
                                         Neal J. Perlman
                                         James H. Weingarten
                                         Amanda Triplett
                                         Matthew Weprin

                                         Federal Trade Commission
                                         600 Pennsylvania Avenue, NW
                                         Washington, DC 20580
                                         Tel: (202) 326-3748
                                         MMEIER@ftc.gov

                                         *Counsel for Plaintiff Federal Trade Commission*

Dated:  March 28, 2022                              Respectfully submitted,

**FOR PLAINTIFF STATE OF NEW YORK**

*/s/ Amy McFarlane*
Amy McFarlane
Office of the New York Attorney General
28 Liberty Street
New York, NY 10005
Tel: (212) 416-6195
Amy.Mcfarlane@ag.ny.gov

*Counsel for Plaintiff State of New York*

17

Dated: March 28, 2022                   Respectfully submitted,

**FOR PLAINTIFF STATE OF CALIFORNIA**

*/s/ Michael D. Battaglia*
Michael D. Battaglia
Deputy Attorney General

Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Telephone: (415) 510-3769
Michael.Battaglia@doj.ca.gov

*Counsel for Plaintiff State of California*

Dated: March 28, 2022

Respectfully submitted,

**FOR PLAINTIFF STATE OF ILLINOIS**

*/s/ Richard S. Schultz*
Richard S. Schultz
Assistant Attorney General

Attorney General of Illinois
100 W. Randolph Street, 11th Floor
Chicago, IL 60601
Tel: (872) 272-0996
Richard.Schultz@ilag.gov

*Counsel for Plaintiff State of Illinois*

Dated: March 28, 2022

Respectfully submitted,

**FOR PLAINTIFF**
**STATE OF NORTH CAROLINA**

_/s/ Jessica Sutton_
Jessica Sutton
Special Deputy Attorney General

North Carolina Department of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC  27603
Telephone: (919) 716-6000
Jsutton2@ncdoj.gov

_Counsel for the Plaintiff State of North Carolina_

Dated: March 28, 2022                    Respectfully submitted,

                                         **FOR THE PLAINTIFF STATE OF OHIO**

                                         */s/ Derek Whiddon*
                                         Derek Whiddon
                                         Assistant Attorney General

                                         Office of the Ohio Attorney General
                                         Antitrust Section
                                         30 E. Broad Street, 26th Floor
                                         Columbus, OH 43215
                                         Telephone: 614.466.4328
                                         Derek.whiddon@OhioAGO.gov

                                         *Counsel for Plaintiff State of Ohio*

Dated:  March 28, 2022                    Respectfully submitted,

**FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA**

*/s/ Joseph S. Betsko*
Joseph S. Betsko
Senior Deputy Attorney General

Pennsylvania Office of Attorney General
Antitrust Section
Strawberry Square, 14th Floor
Harrisburg, PA 17120
jbetsko@attorneygeneral.gov

*Attorney for Plaintiff Commonwealth of Pennsylvania*

Dated: March 28, 2022        Respectfully submitted,

**FOR PLAINTIFF**
**COMMONWEALTH OF VIRGINIA**

*/s/ Tyler T. Henry*
Tyler T. Henry
Assistant Attorney General

Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
thenry@oag.state.va.us

*Counsel for the Plaintiff Commonwealth of Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2022, I have electronically filed a true and correct copy of the Plaintiffs' Opposition to Defendant Martin Shkreli's Motion to Stay Order for Permanent Injunction Pending Appeal with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

Dated: March 28, 2022

/s/ Markus H. Meier
Markus H. Meier

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3748
MMEIER@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*

24