**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA,<br><br>Plaintiffs,<br><br>v.<br><br>MARTIN SHKRELI,<br><br>Defendant. | Case No. 1:20-cv-00706 |

**Plaintiffs' Memorandum of Law in Support of Motion for an Order to Show Cause Why Defendant Shkreli Should Not Be Found in Civil Contempt for Violating the Court's February 4, 2022 Order**

**Table of Contents**


I. Factual Background ........ 2

A. Phase 1: 2022 trading competition ........ 3

B. Phase 2: 2024 Cassava short and more Pharmaceutical Company trading ........ 5

1. Cassava short ........ 6

2. Other Pharmaceutical Company trading ........ 9

C. Phase 3: 2025 $30,000 trading challenge ........ 10

1. Pharmaceutical Company trading ........ 11

2. The big shorts ........ 12

D. Phase 4: 2026 trading challenge with new $10,000,000 account ........ 17

E. Shkreli's known trading in Pharmaceutical Companies is likely the tip of the iceberg ........ 18

II. Shkreli Should Be Held in Civil Contempt and Sanctioned ........ 20

A. Shkreli's conduct plainly violates the Court's clear and unambiguous pharmaceutical industry ban against him ........ 20

1. The Court's order is clear and unambiguous ........ 20

2. The proof of Shkreli's noncompliance is clear and convincing ........ 21

3. Shkreli has not diligently attempted to comply in a reasonable manner ........ 23

B. Sanctions are necessary to purge Shkreli's current contempt and to coerce Shkreli's future compliance ........ 24

III. Shkreli, Izerne, and Voss Should Be Ordered Not to Destroy Evidence ........ 27

IV. Conclusion ........ 28

**Table of Authorities**

**Cases**

*AMG Cap. Mgmt., LLC v. FTC*,
593 U.S. 67 (2021) ... 25

*Applied Concepts Unleashed, Inc. v. Matthews*,
No. 12-cv-14035, 2012 WL 13015057 (S.D. Fla. Feb. 6, 2012) ... 28

Arkin v. Gracey-Danna, Inc.,
No. 8:16-cv-1717, 2016 WL 3959611 (M.D. Fla. July 22, 2016) ... 28

*Avalon Holdings Corp. v. Gentile*,
No. 18-cv-7291, 2024 WL 4252058 (S.D.N.Y. Sept. 20, 2024) (Cote, J.) ... 20, 24, 26

*Bright Sols. for Dyslexia, Inc. v. Doe 1*,
No. 15-cv-01618, 2015 WL 5159125 (N.D. Cal. Sept. 2, 2015) ... 28

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
814 F.3d 91 (2d Cir. 2018) ... 20, 24

*Chao v. Gotham Registry, Inc.*,
514 F.3d 280 (2d Cir. 2008) ... 24

*Citigroup Inc. v. Sayeg*,
No. 21-cv-10413, 2022 WL 1620298 (S.D.N.Y. May 23, 2022) ... 27

*City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n*,
170 F.3d 279 (2d Cir. 1999) ... 24

*Cordius Trust v. Kummerfield*,
No. 99-cv-3200, 2009 WL 3416235 (S.D.N.Y. Oct. 23, 2009) (Cote, J.) ... 20, 24

*Cordova v. Huneault*,
No. 25-cv-04685, 2025 WL 1745762 (N.D. Cal. June 23, 2025) ... 28

*Dallas Gen. Drivers, Loc. Union No. 745 v. NLRB*,
500 F.2d 768 (D.C. Cir. 1974) ... 27

*Deggs v. Fives Bronx, Inc.*,
No. 19-cv-406, 2020 WL 3100023 (M.D. La. June 11, 2020) ... 28

*First Tech. Safety Sys., Inc. v. Depinet*,
11 F.3d 641 (6th Cir. 1993) ... 28

*FTC v. Bronson Partners, LLC*,
654 F.3d 359 (2d Cir. 2011) ... 25

*FTC v. Nat'l Urological Grp., Inc.*,
80 F.4th 1236 (11th Cir. 2023) ... 25

*FTC v. Pukke*,
53 F.4th 80 (4th Cir. 2022) ... 25

*FTC v. Shkreli*,
No. 22-728, 2024 WL 1026010 (2d Cir. Jan. 23, 2024) .................................................. 1, 21

*Hicks v. Feiock*,
485 U.S. 624 (1988) .............................................................................................. 26

*In re Markus*,
78 F.4th 554 (2d Cir. 2023) ................................................................................... 20

*Levin v. Tiber Holding Co.*,
277 F.3d 243 (2d Cir. 2002) ................................................................................... 20

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*,
885 F.2d 1 (2d Cir. 1989) ................................................................................. 24, 25

*Medina v. Buther*,
No. 15-cv-1955, 2019 WL 581270 (S.D.N.Y. Feb. 13, 2019) ............................................. 24

*N.Y. State Nat'l Org. for Women v. Terry*,
159 F.3d 91 (2d Cir. 1998) ..................................................................................... 24

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
369 F.3d 645 (2d Cir. 2004) ................................................................................... 24

*Powell v. Ward*,
487 F. Supp. 917 (S.D.N.Y. 1980) .......................................................................... 24

*Powell v. Ward*,
643 F.2d 924 (2d Cir. 1981) ............................................................................. 20, 24

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
241 F.3d 232 (2d Cir. 2001) ................................................................................... 21

*SEC v. Boock*,
No. 09-cv-8261, 2012 WL 3133638 (S.D.N.Y. Aug. 2, 2012) (Cote, J.) ............................. 25

*SEC v. Contorinis*,
743 F.3d 296 (2d Cir. 2014) ................................................................................... 25

*SEC v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996) ................................................................................. 25

*SEC v. Milan Cap. Grp., Inc.*,
No. 00-cv-108, 2014 WL 2815590 (S.D.N.Y. June 23, 2014) (Cote, J.) ............................. 25

*SEC v. Universal Exp., Inc.*,
546 F. Supp. 2d 132 (S.D.N.Y. 2008) ............................................................... 26, 27

*Shkreli v. FTC*,
145 S. Ct. 171 (2024) ............................................................................................... 1

*Simkin v. United States*,
715 F.2d 34 (2d Cir. 1983) ..................................................................................... 27

*Sistem Mühendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic*,
No. 12-cv-4502, 2020 WL 7890222 (S.D.N.Y. Nov. 5, 2020) ............................................ 27

*Sistem Mühendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic*,
No. 12-cv-4502, 2021 WL 39582 (S.D.N.Y. Jan. 5, 2021) .................................................. 27

*Treppel v. Biovail Corp.*,
233 F.R.D. 363 (S.D.N.Y. 2006) ......................................................................................... 28

*United States ex rel. Staggers v. Medtronic, Inc.*,
No. 1:15-cv-392, 2022 WL 4078969 (D.D.C. Sept. 6, 2022) .............................................. 28

*United States v. Donziger*,
No. 11-cv-691, 2021 WL 3141893 (S.D.N.Y. July 26, 2021) .............................................. 28

*United States v. Donziger*,
38 F.4th 290 (2d Cir. 2022) ................................................................................................. 28

*United States v. Mongelli*,
2 F.3d 29 (2d Cir. 1993) ...................................................................................................... 27

Martin Shkreli has flagrantly and repeatedly violated this Court's permanent injunction. After a full bench trial, this Court banned and enjoined Shkreli "for life from directly or indirectly participating in any manner in the pharmaceutical industry," including by "[a]cquiring or holding an Ownership Interest in a Pharmaceutical Company" or "[t]aking any action to directly or indirectly influence or control the management or business of any Pharmaceutical Company." Order for Permanent Injunction ¶ II, ¶¶ II.C-D (ECF No. 876) ("Permanent Injunction").[1] The Second Circuit upheld the Permanent Injunction in January 2024, and the Supreme Court denied Shkreli's petition for a writ of certiorari in October 2024. *FTC v. Shkreli*, No. 22-728, 2024 WL 1026010 (2d Cir. Jan. 23, 2024), *cert. denied*, 145 S. Ct. 171 (2024).

Notwithstanding these clear prohibitions, Shkreli has been violating them routinely since his release from prison in May 2022. Shkreli has been publicly trading in Pharmaceutical Company stocks and publicly broadcasting his opinions about the business and management of many Pharmaceutical Companies through livestreaming and posting on numerous social media platforms, including YouTube, X, and Reddit.

For his brazen violations of this Court's Permanent Injunction, Shkreli should be held in civil contempt and face sanctions to purge his current contempt and to coerce his future

[1] The Permanent Injunction broadly defines "Pharmaceutical Company" as "any Entity engaged in the research, Development, manufacture, commercialization, or marketing of any Drug Product or [active pharmaceutical ingredient]" and "Ownership Interest" as "any voting or non-voting stock, share capital, or equity in an Entity." Permanent Injunction ¶¶ I.L-M.

"Drug Product" means "any product that is subject to an FDA Authorization, or any product that is regulated through an over-the-counter drug monograph." *Id.* ¶ I.H.

"Development" means "all preclinical and clinical research and development activities related to a Drug Product, including discovery or identification of a new chemical entity, test method development, all studies for the safety and efficacy of a Drug Product, toxicology studies, bioequivalence and bioavailability studies, pharmaceutical formulation, process development, manufacturing scale-up, development-stage manufacturing, quality assurance/quality control development, stability testing, statistical analysis and report writing, for the purpose of obtaining any and all FDA Authorizations, licenses, approvals, or registrations necessary for the manufacture, use, storage, import, export, transport, promotion, marketing, and sale of a Drug Product, and regulatory affairs related to the foregoing." *Id.* ¶ I.G.

compliance, including but not limited to a complete accounting of his Pharmaceutical Company stock trades, divestment of any ownership in any Pharmaceutical Company, a monetary fine in the amount of Shkreli's profits made through his contumacious conduct, and clear and escalating consequences—including additional fines and incarceration—for any future violations.

Finally, because Shkreli's sister, Leonora Izerne, and significant other, Chelsea Voss, appear to have assisted or be assisting Shkreli in violating the Permanent Injunction (by, for example, [redacted] or funding Shkreli's trading), we ask the Court to instruct Izerne and Voss as well as Shkreli to preserve all evidence relating to potential violations of the Permanent Injunction.

## I. Factual Background

As the CEO of Turing Pharmaceuticals (later renamed Vyera Pharmaceuticals), Shkreli acquired the life-saving pharmaceutical Daraprim, raised the price per pill 4,000% from $17.50 to $750, and restricted entry from potential generic competitors through a web of anticompetitive agreements that severely limited the generics' ability to obtain the samples and active pharmaceutical ingredient needed for FDA approval. *FTC v. Shkreli*, 581 F. Supp. 3d 579, 590, 600-01 (S.D.N.Y. 2022). The Court found Shkreli individually liable for violating Sections 1 and 2 of the Sherman Act and parallel state laws. *Id*. at 637. "Shkreli conceived of, implemented, maintained, and controlled Vyera's anticompetitive and monopolistic scheme." *Id*.

The Court recognized the seriousness of "[b]anning an individual from an entire industry and limiting his future capacity to make a living in that field," but found that "Shkreli's egregious, deliberate, repetitive, long-running, and ultimately dangerous illegal conduct warrants imposition of an injunction of this scope." *Id*. at 639. The Court found "no reason to believe that a narrowly crafted injunction will succeed in providing adequate protection against a repetition of illegal conduct." *Id*. at 640.

When the Court issued the lifetime ban in February 2022, Shkreli was still incarcerated for securities violations. After his release in May 2022,[2] Shkreli wasted little time diving back into the pharmaceutical industry despite being permanently banned from doing so. Shkreli's YouTube livestreams[3] show that Shkreli has been publicly trading in Pharmaceutical Company stocks since July 2022, with his publicly-shared activity roughly breaking down into four phases: (1) a 2022 trading competition with another YouTuber; (2) shorting a small biotech firm in 2024, along with trading in other Pharmaceutical Company stocks; (3) a 2025 trading challenge in which he shorted three small biotech firms along with trading in many other Pharmaceutical Company stocks; and (4) a trading challenge begun in June 2026 with a $10,000,000 account in which he is again trading in Pharmaceutical Company stocks.

### A. Phase 1: 2022 trading competition

In July 2022, Shkreli began streaming himself on YouTube multiple times a week, often for hours at a time. That same month, Shkreli began a public trading competition against fellow YouTuber Matt Kohrs, declaring: "We're both putting up $50,000 USD to see who can do better over two months."[4] Shkreli used an Interactive Brokers account[5] [redacted] to compete.[6] On July 14, 2022, Shkreli shared his screen view of the Interactive Brokers account on YouTube, showing that his "50,000.00 USD deposit has cleared and is now available for

---

[2] Ex. E-59.

[3] Hosted at https://www.youtube.com/@realmartinshkreli/streams and/or https://x.com/MartinShkreli, all videos quoted or cited in this brief or Exhibit B are also submitted to the Court on a hard drive (Exhibit C). All direct quotes are also transcribed in Exhibit D.

[4] Ex. E-62.

[5] *See, e.g.*, Ex. C-2 at 4:00-4:10; Ex. C-53 at 4:02-4:11; Ex. C-54 at 4:33:26-4:33:37.

[6] Ex. F-9-10.

trading!"[7] For the next two months, Shkreli regularly livestreamed himself trading. His portfolio was largely comprised of Pharmaceutical Company stocks, including:[8]

Adial Pharmaceuticals, Inc.
Anavex Life Sciences Corp.
Apellis Pharmaceuticals, Inc.
Catalent, Inc.
CEL-SCI Corp.
Charles River Laboratories Int'l, Inc.
Exscientia plc
Liquidia Corp.
SIGA Technologies, Inc.
Veru Inc.
Verve Therapeutics, Inc.

Shkreli also discussed many Pharmaceutical Companies at length on his livestreams. Exhibit B provides descriptions of these Pharmaceutical Companies and evidence of Shkreli's Ownership Interest in each of them during this period.

After September 16, 2022, Shkreli's trading competition appears to have petered out. Shkreli began posting less and stopped sharing his Interactive Brokers account on screen. Shkreli would later recall of the competition:

> I remember my big short way back when I . . . challenged Matt Kohrs to a competition with SIGA. Do you guys remember that? . . . I'd just . . . gotten out of jail, basically . . As you guys can see, this is what I do. I . . . pop bubbles . . . . Matt lost all his money and also his . . . dad died, so he didn't want to continue the competition, but I did great . . . . [T]his is what I do to stocks, baby.[9]

Through mid-2024, Shkreli sometimes discussed Pharmaceutical Companies and their stocks on his livestreams, but it appears he did his trading offscreen. In February 2023, Shkreli affirmed his continued interest and investment in the pharmaceutical industry:

> I watch the pharma markets. I'm not banned from the[m] outside of . . . America . . . . I'm going to get the appeals reversed obviously, but, you know . . . pharma's, like, you know, not my favorite field

[7] Ex. C-1 at 2:57.

[8] Ex. B-5, 12-17, 57-60, 62-63, 76, 99-100, 147-150, 161-163.

[9] Ex. C-73 at 40:37-41:29, Ex. D-216.

> anyway. I feel software is in many ways far superior and far more exciting . . . . I'll still probably follow pharma forever just as an investor.[10]

**B. Phase 2: 2024 Cassava short and more Pharmaceutical Company trading**

Shkreli's public activity in the pharmaceutical industry picked up significantly in July 2024. He began a series of "Evaluating Stocks" livestreams where he did deep dives into various companies, including Pharmaceutical Companies.[11] On August 26, 2024, Shkreli began to publicly question the viability of Cassava Sciences, Inc.,[12] and shortly thereafter he began to build a short position in the company.

Shorting is a mechanism to profit when a stock's value declines, rather than increases.[13] In brief, the short seller borrows the stock from a brokerage and then sells the borrowed stock, hoping to later repurchase it at a lower price before returning the stock to the brokerage.[14] Shorting carries considerable risk. To borrow the stock, the short seller must establish a margin account with collateral such as bonds, cash, mutual funds, or other stocks.[15] If the value of the collateral falls below the broker's minimum, the broker can make a "margin call" requiring the short seller to put up additional collateral or forfeit what remains.[16] And the short seller could face a loss greater than his initial investment if the stock's value increases rather than decreases.[17]

---

[10] Ex. C-22 at 31:30-32:11, Ex. D-32.

[11] *See, e.g.*, Ex. C-24 at 1:19:22-1:41:56, 1:45:07-1:56:07; Ex. C-25 at 3:19:47- 3:34:56; Ex. C-26 at 33:18-35:55; Ex. C-27 at 1:13:32-2:26:04; Ex. C-28 at 3:36-27:04.

[12] Ex. C-29 at 48:13-48:32.

[13] Ex. E-457.

[14] Ex. E-457.

[15] Ex. E-457.

[16] Ex. E-460.

[17] Ex. E-459.

Small drug companies are vulnerable to short selling because their stock price can swing dramatically upon certain events with a binary outcome, such as FDA approval or the success or failure of a clinical drug study.[18] Short sellers can exploit this volatility by betting on a negative outcome for such events.[19]

Shkreli prides himself on his track record of shorting Pharmaceutical Companies facing binary events:

> I've made a lot of profitable trades in my career, especially in binary events. . . . I've made five, ten, twenty million a piece on binary events, . . . so this is, like, my thing. . . . I never pat myself on the back. You know, I like to stay humble, but when it comes to binary events, I don't know . . . too many people that are better at . . . them than me. There's a handful of guys out there I really respect, but I'd say I'm just as good as them. . . . You can criticize me on anything else, that's fair game, but when it comes to binary events, predicting the outcome of clinical trials, I'm that guy.[20]

In September 2024, Shkreli bragged to his viewers that "[t]he last time I shorted a stock, I made $20 million bucks, it was called Vital Therapies . . . . I made a similar amount of money in Celadon. I mean, you can look at my track record of public shorts. . . . It's very good in biopharma only."[21] In September 2025, Shkreli declared himself "the GOAT of binary events."[22]

**1. Cassava short**

Cassava, a small biotech company, was developing the drug simufilam for the treatment of Alzheimer's disease.[23] Cassava had no approved drugs and nothing else in its pipeline.[24] In

[18] Ex. E-152-53.

[19] *See* Ex. E-430-31.

[20] Ex. C-76 at 31:30-32:42, Ex. D-231.

[21] Ex. C-31 at 55:22-55:37, Ex. D-92.

[22] Ex. C-95 at 1:03:01-1:03:06, Ex. D-402.

[23] *See* Ex. E-259.

[24] Ex. E-227-28.

August 2024, Cassava announced that it expected to release the results of a large-scale clinical study of the drug by the end of the year.[25]

From that point until Cassava's announcement of the results on November 25, 2024, Shkreli dedicated dozens of livestream hours to discussing Cassava and why its clinical study was doomed to fail.[26] Shkreli argued that "the odds that this drug works is, like . . . 1%."[27] Shkreli emphasized the arrest of the study's lead scientist, the departure of the company's founder, and ongoing SEC and DOJ investigations into the company: "[T]he drug doesn't work by the clinical trial evidence. . . . You've got the founder of the company quit, his wife quit, and the guy who invented the drug is under arrest. This is not what great drug companies are made of."[28] Shkreli urged his livestream viewers to "[s]top that bullsh[*]t. Short this stock."[29]



[30]

[25] Ex. E-87.

[26] Ex. C-29; Ex. C-30; Ex. C-31; Ex. C-32; Ex. C-33; Ex. C-37; Ex. C-39; Ex. C-41; Ex. C-42; Ex. C-43; Ex. C-44; Ex. C-45; Ex. C-46; Ex. C-47; Ex. C-48; Ex. C-49; Ex. C-50.

[27] Ex. C-30 at 1:05:06-1:05:10, Ex. D-70.

[28] Ex. C-30 at 1:36:43-1:37:16, Ex. D-74.

[29] Ex. C-31 at 1:22:13-1:22:18, Ex. D-100.

[30] Ex. E-94.

On October 24, 2024, Shkreli shared the live view of his Interactive Brokers account, stating that "I finally have enough money in this account to go H.A.M."[31] Shkreli's livestreams on October 25 and November 4, 12, 13, 18, and 25, 2024 show him trading heavily in Cassava.[32] Shkreli livestreamed his "CASSAVA WATCH" six times between November 20 to 25, 2024.[33] On November 21 on X, he proclaimed "I don't *think* it doesn't work. It is impossible for it to work,"[34] and on November 24, 2024, he declared that if Cassava's trial was successful, he would shave his head, delete his social media accounts, change his name to Martina, move to Haiti, and "retire from business completely"[35]:




On November 25, 2024, Cassava released the topline results from its simufilam clinical study, which, as Shkreli predicted, failed.[36] Shkreli gloated about the success of his short:

> They don't want you to know. They want you to stay stupid. I try to give you some advice. Twenty years of experience. I made a lot of money in these binary events, man. Some people say that I'm the

[31] Ex. C-37 at 6:03-6:10, Ex. D-122. "Going H.A.M." is slang for going all out. *See* Ex. E-477.

[32] Ex. C-38; Ex. C-39; Ex. C-40; Ex. C-42; Ex. C-43; Ex. C-44; Ex. C-50.

[33] Ex. C-45; Ex. C-46; Ex. C-47; Ex. C-48; Ex. C-49; Ex. C-50.

[34] Ex. E-218.

[35] Ex. E-220.

[36] Ex. E-222.

> GOAT at it, but you didn't want to hear nothing. You don't want to hear sh[*]t. That's like Kanye's song, "You Can't Tell Me Sh[*]t," right? I can't tell you. Like, "Me? Martin Shkreli? . . . Well, yeah, I've never done this before. Me? A binary event? Martin Shkreli? Not me. Not Shkreli. He doesn't know how to play this game." Come on, man.[37]

The next day, Shkreli reflected that "the whole SAVA thing was . . . a little anticlimactic. It was almost too easy. You know, it's never easy when millions of dollars are involved, but . . . . [i]t feels easy after the fact."[38] The total value of his Interactive Brokers climbed to $841,000,[39] up from $138,200 shortly before the Cassava announcement.[40] In an April 2025 livestream, in response to a viewer asking what would happen to that account, Shkreli explained that "I'm just going to sunset it . . . . That account got too crazy."[41]

### 2. Other Pharmaceutical Company trading

Shkreli's livestreams show that he also engaged in trading many other Pharmaceutical Company stocks from August to December 2024, including:[42]

| | |
|---|---|
| ADMA Biologics, Inc. | Lantheus Holdings, Inc. |
| Amgen Inc. | Monopar Therapeutics Inc. |
| Anavex Life Sciences Corp. | Neumora Therapeutics, Inc. |
| AstraZeneca PLC | Novo Nordisk A/S |
| Biohaven Ltd. | Nuvation Bio Inc. |
| Galectin Therapeutics Inc. | Praxis Precision Medicines, Inc. |
| Humacyte, Inc. | Rezolute, Inc. |
| Inhibikase Therapeutics, Inc. | SELLAS Life Sciences Group, Inc. |

[37] Ex. C-50 at 2:50:37-2:51:31, Ex. D-147-48.

[38] Ex. C-51 at 1:58-2:20, Ex. D-150.

[39] Ex. C-51 at 1:34:18 ("Net Liquidity" of "841.0K" on upper right of Interactive Brokers interface).

[40] Ex. C-44 at 5:25:41 ("Net Liquidity" of "138.2K" on upper right of Interactive Brokers interface). Interactive Brokers defines "Net Liquidity" as "the total value of all assets marked-to-market." Ex. E-480.

[41] Ex. C-60 at 2:30:56-2:31:03, Ex. D-181.

[42] Ex. B-6-7, 10-15, 18, 32-34, 77-79, 81-86, 93-94, 98, 105-06, 108-13, 118, 130-31, 142-146, 164-65.

| | |
|---|---|
| Intellia Therapeutics, Inc. | Viking Therapeutics, Inc. |

Exhibit B provides descriptions of these companies and evidence of Shkreli's Ownership Interest in each of them during this period. Throughout this period, Shkreli appears to have used the same Interactive Brokers account ([redacted]9844) as the one he used—[redacted][43]—for his 2022 trading challenge.[44]

### C. Phase 3: 2025 $30,000 trading challenge

On April 2, 2025, Shkreli started a trading challenge with a new Charles Schwab individual account ([redacted]SCHW) with $30,000.[45] Shkreli immediately began trading in Pharmaceutical Company stocks: "I'm showing you how to trade and invest in biotech."[46] Shkreli explained to his viewers his "magic trick": "It doesn't matter what trades I make because I can always find a couple of biotech stocks to smoke. I can be terrible at everything else."[47] From April to December 2025, Shkreli worked to grow this $30,000 account, predominantly trading in Pharmaceutical Company and tech stocks.[48]

---

[43] Ex. F-9-10.

[44] *See* Ex. C-3 at 4:46 (showing view of Shkreli's open windows, including "[redacted]9844 Interactive Brokers" and "[redacted]9844 Account"); Ex. C-35 at 2:39:36 (showing view of Shkreli's open windows, including "[redacted]9844 Interactive Brokers"); Ex. C-58 at 2:35:29 (showing view of Shkreli's open windows, including "[redacted]9844 Interactive Brokers").

[45] *See* Ex. C-61 at 30:03, 5:56-6:01.

[46] Ex. C-61 at 2:09:03-2:09:09, Ex. D-189.

[47] Ex. C-81 at 1:49:20-1:49:36, Ex. D-260.

[48] *See, e.g.*, Ex. E-336 (reflecting Shkreli's 2025 YTD stock performance).

### 1. Pharmaceutical Company trading

In the biotech sector, Shkreli took long and short positions in numerous Pharmaceutical Company stocks and spoke at length about those companies and his positions on his livestreams, including:[49]

Abivax SA
ADMA Biologics, Inc.
Akero Therapeutics, Inc.
Amgen Inc.
Anavex Life Sciences Corp.
aTyr Pharma, Inc.
Baxter Int'l Inc.
Biogen Inc.
Biohaven Ltd.
Capricor Therapeutics, Inc.
Cardiff Oncology, Inc.
Cencora, Inc.
Charles River Laboratories Int'l, Inc.
Day One Biopharmaceuticals, Inc.
Eli Lilly & Co.
Equillium, Inc.
Galectin Therapeutics Inc.
Gilead Sciences, Inc.
Humacyte, Inc.
INmune Bio Inc.
Invivyd, Inc.
Kazia Therapeutics Ltd.
Merck & Co., Inc.
Nektar Therapeutics
Novo Nordisk A/S
Pharming Group N.V.
Precigen, Inc.
Recursion Pharmaceuticals, Inc.
Regeneron Pharmaceuticals, Inc.
Replimune Group, Inc.
Revolution Medicines, Inc.
Rocket Pharmaceuticals, Inc.
Sarepta Therapeutics, Inc.
SELLAS Life Sciences Group, Inc.
Spruce Biosciences, Inc.
Tarsus Pharmaceuticals, Inc.
Theratechnologies Inc.
uniQure N.V.

[49] Ex. B-1-4, 6-15, 19-27, 30-44, 61-63, 67-73, 77-85, 87-92, 95-97, 101-02, 107, 110-12, 115-17, 119-29, 132-46, 151-60.

Exhibit B provides descriptions of these companies and evidence of Shkreli's Ownership Interest in each of them during this period. Also during this period, Shkreli appeared to use funds from Chelsea Voss, his significant other,[50] co-parent,[51] and "Wifey."[52]

### 2. The big shorts

In addition to regularly trading in many Pharmaceutical Company stocks, Shkreli focused his efforts on shorting three small biotech companies: INmune Bio Inc., aTyr Pharma Inc., and Capricor Therapeutics.

#### a) INmune

INmune Bio was developing a potential treatment for Alzheimer's disease called XPro 1595, a TNF-α inhibitor.[53] In November 2024, INmune announced that it expected to share topline results of a key clinical study of XPro in the second quarter of 2025.[54] Like Cassava, INmune had no approved products and little else in its pipeline.[55] Shkreli immediately began building a short position in INmune for his $30,000 trading challenge.[56]

In June 2025, Shkreli dedicated hours of his livestreams to discussing INmune and why he thought its clinical study was doomed to fail.[57] On June 27, 2025, Shkreli declared "I'm

[50] Ex. E-494.

[51] *Compare* Ex. E-304, *with* Ex. E-305.

[52] *See, e.g.*, Ex. C-89 at 3:20:30-3:22:07, Ex. D-384 ("I remember the three, four different people from JP Morgan calling non-stop. I told Wifey, 'Don't answer the phone. Don't answer.' 'So why are they calling?' What's the problem?' 'Nothing, babe. Don't worry about it.' They almost got Shkreli. [] Yeah, we needed to dip into Wifey's purse a couple times."); Ex. C-100 at 5:46:00-5:49:27, Ex. D-428-30 ("Hey, babe, Hey. How are you? I muted my livestream but can I get like 30K or more for these accounts because, they're talking about margin call. . . . Okay, thanks for everything. Love you. Bye.").

[53] *See* Ex. E-287.

[54] Ex. E-210.

[55] *See* Ex. E-451.

[56] Ex. C-62 at 40:38; Ex. C-64 at 1:16:14-1:17:05, Ex. D-191; Ex. C-67 at 28:39-28:42, Ex. D-198; Ex. C-70 at 6:24:15.

[57] *See, e.g.*, Ex. C-75 at 9:16:17-9:17:05, Ex. D-227; Ex. C-76 at 28:14-28:25, Ex. D-229; Ex. C-79 at 2:25-3:14, Ex. D-236; Ex. C-79 at 43:40-47:48, Ex. D-244-46.

shorting more. F[*]ck this sh[*]t" and "let me get as much short as I can here."[58] On X, he predicted INmune's stock would collapse:[59]




On June 30, 2025, INmune reported that XPro failed to show the drug was effective.[60] Shkreli happily told his viewers: "the INmune drug failed."[61] The primary endpoint "actually favored placebo, so the placebo beat the drug very slightly, so pretty amazing result there."[62] Upon the announcement, INmune's stock plummeted,[63] and Shkreli bragged: "you know, for binary events, [] I don't think we've lost yet. So, you know, in my career, I've batted pretty well on these, and this is just another notch for me."[64]

**b) aTyr**

Shkreli's next short target was aTyr, a self-described "clinical stage biotechnology company" with no marketed products.[65] aTyr's product farthest along in development was efzofitimod, a novel biologic for the potential treatment of interstitial lung disease.[66] On July 22,

---

[58] Ex. C-79 at 46:03-46:04, 47:19-47:23, Ex. D-245-46.

[59] Ex. E-270.

[60] Ex. E-272.

[61] Ex. C-80 at 5:28-5:30, Ex. D-252.

[62] Ex. C-80 at 5:31-5:45, Ex. D-252.

[63] Ex. E-280.

[64] Ex. C-80 at 26:20-26:32, Ex. D-258.

[65] Ex. E-256-57.

[66] Ex. E-256.

2025, aTyr announced that it had completed a pivotal efzofitimod clinical study and expected to share topline results in the third quarter of 2025.[67]

Days later, on X, Shkreli predicted that aTyr's drug would fail in the clinical trial and that its stock would plummet accordingly:



[68]

Shkreli proceeded to spend hours of his livestreams discussing aTyr and why, as with his other shorts, he believed their outstanding efzofitimod clinical study—and therefore their drug—would fail.[69] Shkreli alleged that certain prior clinical study "data looks doctored. Like, this might just be pure fraud."[70] Shkreli asserted "there is literally a 0% chance the drug works. I think it's as bad as anything I've ever looked at before."[71] His "thesis" was that "there is no mechanism or supporting clinical data to suggest there is any chance that the drug works . . . in a large, well-randomized, controlled study."[72] aTyr has "done nothing but disappoint"; after its stock had edged up to from approximately $2 to $6 per share, Shkreli told his viewers "[w]e got

---

[67] Ex. E-292.

[68] Ex. E-299.

[69] *See, e.g.*, Ex. C-85 at 13:37-16:34, 26:24-30:22, 30:59-35:10, 1:08:17-1:15:37, 1:42:46-1:48:00, 3:06:04-3:31:56; Ex. C-93 at 6:01:47-6:13:45; Ex. C-95 at 57:32-1:05:18; Ex. C-96 at 3:25:18-3:26:35, 7:22:11-7:22:25, 7:52:21-7:52:35, 8:06:49-8:07:08.

[70] Ex. C-85 at 1:08:18-1:08:25, Ex. D-296.

[71] Ex. C-87 at 16:06-16:12, Ex. D-316.

[72] Ex. C-95 at 1:01:11-1:01:43, Ex. D-399-400.

to smack it back down again."[73] For Shkreli, "the best thing of all is ATYR is going to be down 90%."[74]

On September 15, 2025, aTyr announced that efzofitimod performed no better than placebo in the clinical trial.[75] Upon the news, the stock fell 80% in premarket trading,[76] making Shkreli's short a success. Shkreli had "sold everything and went all in on ATYR,"[77] driving Shkreli's Schwab account balance above $90,000—the "[h]ighest it's ever been by far."[78]

**c) Capricor**

As with INmune, Shkreli began building a short position in Capricor on Day 1 of his $30,000 trading challenge.[79] Capricor was developing deramiocel, an investigational cell therapy for the treatment of cardiomyopathy in patients with a severe genetic neuromuscular disorder called Duchenne Muscular Dystrophy (DMD).[80] Capricor had no approved products and deramiocel was its most promising product, with little else in the pipeline.[81]

On November 24, 2025, Shkreli announced on X that Capricor was his next big short and that he would be co-publishing a 46-page report explaining why deramiocel would fail in the clinical trial.[82] Shkreli's public prediction caused Capricor's stock to immediately drop 17%.[83]

---

[73] Ex. C-85 at 1:47:49-1:48:00, Ex. D-299-300.

[74] Ex. C-89 at 3:22:33-3:22:37, Ex. D-387.

[75] Ex. E-308.

[76] Ex. E-312.

[77] Ex. C-97 at 6:26-6:29, Ex. D-414.

[78] *See* Ex. C-97 at 1:52-1:59, Ex. D-412.

[79] *See* Ex. C-61 at 1:47:30-1:47:32, 1:48:38-1:48:52; Ex. C-64 at 1:16:14-1:17:01; Ex. C-69 at 5:38:06-5:39:26.

[80] Ex. E-424-25.

[81] *See* Ex. E-448.

[82] Ex. E-342.

[83] Ex. E-344-45; Ex. E-347-48.



[84]

Published the next day, the report purported to "present an air-tight case challenging the safety and efficacy of Deramiocel" as a treatment for DMD.[85] In support of this conclusion, the report:

- asserted that the "assembled data" was not "compelling or rooted in the scientific process";
- emphasized the "repeated failure of deramiocel in cardiac indications" and its "alarmingly high rate of anaphylaxis and severe immune mediated reactions"; and
- predicted that the pivotal clinical study would fail, causing the company's stock to decline more than 60% "from its current price of ~$5.80 per share (landing near $2)."[86]

But Shkreli apparently missed the mark. On December 3, 2025, Capricor announced positive top-line data from the clinical trial, including meeting its primary and secondary cardiac objectives.[87] Capricor stated that the results "demonstrate clinically meaningful and statistically significant skeletal and cardiac benefits, supporting Deramiocel as a potential first-in-class therapy designed to treat Duchenne cardiomyopathy, the leading cause of mortality in [DMD patients]."[88] Upon release of the positive topline data, Capricor stock skyrocketed over 370%.[89]

---

[84] Ex. E-342.

[85] Ex. E-355.

[86] Ex. E-355.

[87] Ex. E-413.

[88] *Id.*

[89] Ex. E-418.

On December 4, 2025, Shkreli stated that "[i]t's over for the Schwab account" after he had gone all in on Capricor and lost.[90] On X, Shkreli stated his belief that "$CAPR is lying about their data, like they have before," and he "apologize[d] to anyone who followed me in it."[91]

**D. Phase 4: 2026 trading challenge with new $10,000,000 account**

After going mostly quiet for the first half of 2026, on June 25, 2026, Shkreli announced a "[n]ew trading challenge"[92]: "I will be trading an account live, and actually, a fairly big account. Probably the biggest I've ever traded, so that'll be fun."[93] He began livestreaming frequently again on YouTube.[94] Shkreli has shared the spreadsheet he uses to track his new portfolio on his livestream, revealing a starting balance of $10 million.[95] Shkreli says he is using "Godel Brokerage, amongst other things," for his current trading challenge.[96] Shkreli is again trading in many Pharmaceutical Company stocks, including:[97]

| | |
|---|---|
| Abivax SA | Moderna, Inc. |
| BioCryst Pharmaceuticals | Pfizer Inc. |
| Capricor Therapeutics, Inc. | Sarepta Therapeutics, Inc. |
| Crinetics Pharmaceuticals | SELLAS Life Sciences Group |

[90] Ex. C-106 at 1:33-1:36, Ex. D-438.

[91] Ex. E-412.

[92] Ex. C-107 at 1:12-1:22, Ex. D-442.

[93] Ex. C-107 at 13:34-13:44, Ex. D-446.

[94] *See* Ex. C-107; Ex. C-108; Ex. C-109; Ex. C-110; Ex. C-111; Ex. C-112; Ex. C-113; Ex. C-114; Ex. C-115; Ex. C-116; Ex. C-117; Ex. C-118; Ex. C-119; Ex. C-120; Ex. C-121; Ex. C-122; Ex. C-123; Ex. C-124.

[95] *See, e.g.*, Ex. C-109 at 47:30, 1:14:55, 3:45:55.

[96] Ex. C-116 at 1:00:55-1:00:59, Ex. D-575. Shkreli is the CEO of DL Software, which offers the Godel Terminal. Ex. C-117 at 1:02:59-1:03:05. The Godel Terminal is a financial information platform that Shkreli has described as an alternative to the platforms used widely by Wall Street. Ex. C-107 at 22:22-22:50. Shkreli's new trading challenge coincides with Godel's upcoming launch of an integrated brokerage. *See, e.g.*, Ex. C-109 at 1:27:40-1:27:56, 1:28:53-1:29:03. Of note, in 2018 Shkreli agreed to be "barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization" to resolve an SEC administrative action against him. Ex. E-497-98.

[97] Ex. B-1-4, 28-29, 35-42, 64-66, 74-75, 103-04, 114, 134-46, 151-52.

| | |
|---|---|
| Danaher Corp. | Spruce Biosciences |
| Evommune, Inc. | |

Shkreli continues to dedicate much of his now-frequent livestreams to discussing Pharmaceutical Company stocks and their relative merits. Capricor and SELLAS are frequent topics. Capricor was his unsuccessful short that he "lost millions in . . . late last year"[98] and "ended our last challenge."[99] Shkreli continues to insist that Capricor "lied" about the data[100] and that if the Capricor CEO "fakes this data, I'm sending that b[*]tch to jail."[101] Shkreli is shorting SELLAS, which, according to Shkreli, is "a joke of a company"[102] with a "ret[*]rd" CEO.[103] Shkreli "guarantee[s]" that SELLAS's Phase 2 study of a potential treatment for acute myeloid leukemia "will fail."[104]

### E. Shkreli's known trading in Pharmaceutical Companies is likely the tip of the iceberg

The Pharmaceutical Company trading detailed above is based on reviewing a fraction of Shkreli's vast social media footprint. In addition to his public trading, Shkreli himself has indicated that he has more accounts and does most of his trading off social media: "I have some

---

[98] Ex. C-112 at 3:09:19-3:09:24, Ex. D-501.

[99] Ex. C-109 at 4:34-4:50, Ex. D-458.

[100] Ex. C-109 at 6:00:21-6:00:51, Ex. D-487; Ex. C-114 at 3:36:19-3:36:36, Ex. D-571.

[101] Ex. C-112 at 5:48:26-5:48:29, Ex. D-522. On July 29, 2026, the FDA convened an Advisory Committee of outside experts to assess the evidence offered by Capricor. FDA staff presented significant evidence that the study data offered by Capricor had been manipulated to support a favorable outcome, and the Advisory Committee voted nine to three that the available evidence did not provide substantial evidence of effectiveness of deramiocel for the treatment of cardiomyopathy in DMD patients. The FDA has not made a final determination on Capricor's deramiocel application. *See* Ex. E-347-51.

[102] Ex. C-114 at 39:45-39:55, Ex. D-528.

[103] Ex. C-114 at 3:11:22-3:11:59, Ex. D-565.

[104] Ex. C-109 at 4:27:10-4:28:19.

other accounts that I'[d] show you, but, like, I know feds are watching, so f[*]ck that."[105] Further indicia that Shkreli conducts additional trading on other accounts include:

- Shkreli specified that his Interactive Brokers account used for his Cassava short was just "one" of his brokerage accounts[106] and that he had funded it with $100,000 "just for, like, trading on the stream."[107]

- After a bad tech stock short in June 2025, Shkreli walked through the brokerages that had not made a margin call on his accounts, including Schwab, Interactive Brokers, UBS, Goldman, and "one more" he did not identify.[108]

- In August 2025, Shkreli similarly recalled a different occasion when J.P. Morgan Chase and UBS made margin calls on his accounts.[109]

- In June 2025, Shkreli was "running out of borrow" with Schwab and had to "try my other brokers" to short more INmune.[110]

- Brief screen views of the windows open on Shkreli's computer show an E*TRADE account.[111]

- In July 2026, Shkreli stated that he "lost millions" in his 2025 Capricor short,[112] which would not be possible with his "small" Schwab "challenge account" alone.[113]

Finally, Shkreli has repeatedly described the tens of millions he has made on his infamous biotech shorts.[114] Those funds were never reflected in the Interactive Brokers or Schwab accounts shared with viewers.

---

[105] Ex. C-102 at 19:00-19:08, Ex. D-434.

[106] Ex. C-50 at 2:34:44-2:34:52, Ex. D-142.

[107] Ex. C-36 at 30:50-31:33, Ex. D-120.

[108] Ex. C-74 at 5:24:22-5:25:07, Ex. D-225.

[109] Ex. C-89 at 3:20:00-3:22:12.

[110] *See* Ex. C-79 at 47:20-47:49, 51:37-52:05, Ex. D-246.

[111] Ex. C-79 at 52:01.

[112] Ex. C-112 at 3:09:04, Ex. D-501.

[113] Ex. C-109 at 5:58:22-5:58:32, Ex. D-484.

[114] Ex. C-51 at 1:58-2:20, Ex. D-150; Ex. C-76 at 31:30-31:42, Ex. D-231; Ex. C-79 at 38:52-39:00, Ex. D-242.

## II. Shkreli Should Be Held in Civil Contempt and Sanctioned

The Court has "'inherent power to enforce compliance with [its] lawful orders through civil contempt.'" *Avalon Holdings Corp. v. Gentile*, No. 18-cv-7291, 2024 WL 4252058, at *1 (S.D.N.Y. Sept. 20, 2024) (Cote, J.) (quoting *In re Markus*, 78 F.4th 554, 564 (2d Cir. 2023)); *see also Cordius Trust v. Kummerfield*, No. 99-cv-3200, 2009 WL 3416235, at *5 (S.D.N.Y. Oct. 23, 2009) (Cote, J.) (quoting *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir. 1981)).

The Court may hold a party in civil contempt for failing to comply with its order "'if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner.'" *Avalon Holdings*, 2024 WL 4252058, at *1 (quoting *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2018)). "In the context of civil contempt, the clear and convincing standard requires 'a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred.'" *Cordius Trust*, 2009 WL 3416235 at *6 (quoting *Levin v. Tiber Holding Co.*, 277 F.3d 243, 250 (2d Cir. 2002)). Each of these elements is easily met here.

### A. Shkreli's conduct plainly violates the Court's clear and unambiguous pharmaceutical industry ban against him

#### 1. The Court's order is clear and unambiguous

The Court's Permanent Injunction clearly and unambiguously bans and enjoins Shkreli "for life from directly or indirectly participating in any manner in the pharmaceutical industry." Permanent Injunction ¶ II. Though not limited to enumerated conduct, the Court's lifetime pharmaceutical industry ban explicitly prohibits Shkreli from acquiring or holding an "Ownership Interest in a Pharmaceutical Company" (*id.* ¶ II.C) and from making any "public statements about a Pharmaceutical Company" intended or reasonably expected to "directly or indirectly influence or control the management or business of any Pharmaceutical Company" (*id.*

¶ II.D). The Second Circuit upheld the Court's injunction, finding the order to be sufficiently "'specific and definite . . . to apprise those within its scope of the conduct . . . being proscribed.'" *Shkreli*, 2024 WL 1026010, at *3 (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001)).

### 2. The proof of Shkreli's noncompliance is clear and convincing

The evidence overwhelmingly establishes that Shkreli has repeatedly and audaciously violated his lifetime ban from the pharmaceutical industry.

#### a) Acquiring and/or holding Pharmaceutical Company stocks

Shkreli's livestreams show that he has violated Paragraph II.C of the Order by "[a]cquiring or holding an Ownership Interest"—whether under his own name, [redacted], or his significant other's—in more than 60 Pharmaceutical Companies since July 2022. Shkreli's ownership of these Pharmaceutical Companies is established by live brokerage account views, his direct statements, and profit and loss (P&L) attributions he created and publicly shared. Exhibit B summarizes evidence of Shkreli's ownership for each of these companies from his livestreams (Exhibit C contains the full video of each Shkreli livestream cited and Exhibit D contains transcriptions of direct quotes from those livestreams) and other statements or writings Shkreli posted online (Exhibit E).

#### b) Influencing and/or controlling the management or business of Pharmaceutical Companies

Shkreli has violated Paragraph II.D of the Order by making innumerable public statements through his thousands of hours of livestreams and other social media content intended or reasonably expected to "directly or indirectly influence or control the management or business of any Pharmaceutical Company," best exemplified by his public statements supporting his decisions to short Cassava, INmune, aTyr, and Capricor. As made clear by the Permanent

Injunction, "Shkreli's public statements about a Pharmaceutical Company will be deemed" to violate this provision "if Shkreli intended the statement to have that effect ***or*** if a reasonable person would conclude that the statement has that effect." Permanent Injunction ¶ II.C (emphasis added). Shkreli's public comments maligning these companies in furtherance of shorting their stock meet both metrics.

Shkreli—the self-proclaimed "GOAT of binary events"[115]—intended his comments to drive down the price of the stocks to make his shorts successful. As Shkreli bragged during his campaign to short aTyr:

> [W]hat's funny is that if somebody has a good track record of shorting . . . biotech stocks, say, I don't know, for their whole life and they say that they're shorting a biotech stock, it kind of makes sense that the stock drops. . . . Nobody can just post, "Hey, I think this stock is going to drop," and drop it. What matters is the person with the track record and the market believes that person. So when the market believes the guy, it's because the market trusts the guy. If you post, nobody believes you.[116]

When Shkreli talks about shorting Pharmaceutical Companies, investors listen. Industry observers recognize that Shkreli has an "outsized influence" on the market,[117] and his short recommendations are regularly covered by investment news outlets.[118] Shkreli has held this sway for years.[119] Indeed, even though his Capricor short was ultimately unsuccessful, Shkreli publicly urging his viewers to short Capricor caused Capricor's stock price to immediately drop

[115] Ex. C-95 at 1:03:01-1:03:06; Ex. D-402.

[116] Ex. C-85 at 2:10:17-2:11:00, Ex. D-303.

[117] Ex. E-319.

[118] *See, e.g.*, Ex. E-225; Ex. E-232; Ex. E-282; Ex. E- 287; Ex. E-300; Ex. E-313 ("Martin Shkreli is shorting a pharmaceutical company, and people are listening to him for some reason."); Ex. E-344.

[119] *See* Ex. E-45 ("It took a while for Shkreli to gain a following, but when the market began to react to his screeds, the internet began to notice. In a matter of a few years, Shkreli had attacked several biotech companies and gained the confidence of investors, biotech pundits, and the media, who marveled at his investment acumen, which boiled down to his ability to beat up on defenseless stocks.").

17%.[120] As Shkreli told his viewers, Capricor's stock had "dropped a bunch since I recommended the short."[121]

Shkreli's ability to move the market with his spoken and written assaults has real consequences for the small biotech companies that are the subject of his short attacks. With no products generating revenue, a clinical-stage biotech company relies entirely on investors to sustain them until they can get their product approved and on the market.[122] When their stock price drops and their reputation is under attack, the company may be unable to raise the needed funds through the typical path of additional public stock offerings.[123] Short attacks are thus well-understood to compromise a biotech's ability to secure capital investment, discourage enrollment in its clinical trials, subject it to legal and regulatory scrutiny, and, in some cases, "completely derail" drug development.[124] Indeed, facing such a cash crunch in the wake of Shkreli's successful short attacks, Cassava laid off a third of its workforce[125] and subsequently rebranded as Filana Therapeutics,[126] and INmune Bio "has substantial doubt about [its] ability to continue as a going concern."[127]

**3. Shkreli has not diligently attempted to comply in a reasonable manner**

The sum of Shkreli's actions makes plain that he has made no effort to comply with the Court's Permanent Injunction and has no intention of doing so going forward. To overcome the clear and convincing proof that he has repeatedly violated the Permanent Injunction's clear and

---

[120] Ex. E-344; Ex. E-347.

[121] Ex. C-61 at 1:47:37-1:47:42, Ex. D-183.

[122] Ex. E-53; Ex. E-154-55.

[123] Ex. E-170.

[124] Ex. E-153-54, 173-75.

[125] Ex. E-248.

[126] Ex. E-445.

[127] Ex. E-451.

unambiguous lifetime pharmaceutical industry ban, Shkreli must have been "reasonably diligent and energetic in attempting to comply." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 291 (2d Cir. 2008) (citations omitted). "[A] defendant is 'not reasonably diligent' when he . . . ignores the order . . . ." *Medina v. Buther*, No. 15-cv-1955, 2019 WL 581270, at *25 (S.D.N.Y. Feb. 13, 2019) (quoting *Powell v. Ward*, 487 F. Supp. 917, 933-34 (S.D.N.Y. 1980), *aff'd and modified*, 643 F.2d 924 (2d Cir. 1981)). Shkreli's "behavior belies [any] assertions of good faith." *Cordius Trust*, 2009 WL 3416235 at *8.

**B. Sanctions are necessary to purge Shkreli's current contempt and to coerce Shkreli's future compliance**

"District courts possess 'broad discretion to design a remedy that will bring about compliance' with the court's orders." *Avalon Holdings*, 2024 WL 4252058, at *2 (quoting *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004)). "A sanction coerces a defendant when it 'force[s] the contemnor to conform his conduct to the court's order.'" *CBS Broad.*, 814 F.3d at 101 (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 93 (2d Cir. 1998)). "Monetary sanctions for civil contempt traditionally have been awarded to compensate the plaintiff for injury caused by past noncompliance or to prevent continued disobedience." *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir. 1989). "Arrest may be an appropriate sanction for civil contempt, so long as it is designed to compel the party to comply with the court's orders, rather than to punish." *Avalon Holdings*, 2024 WL 4252058, at *2.

To purge his current contempt and coerce his future compliance, the Court should order the following civil sanctions:

*First*, divestment of Shkreli's ownership interest(s) in any Pharmaceutical Company. Divestment is necessary because Shkreli remains in contempt so long as he owns a single share of any Pharmaceutical Company. Permanent Injunction ¶ II.C.

*Second*, a monetary fine in the amount of Shkreli's profits from trading in Pharmaceutical Company stocks since the Order issued on February 4, 2022, with no offset from losses on violative trades,[128] plus pre-judgment interest.[129] "[U]nder a theory of unjust enrichment, a contempt plaintiff is entitled to defendant's profits . . . ." *Manhattan Indus.,* 885 F.2d at 6. Such a monetary fine is an appropriate civil sanction "to prevent continued disobedience." *Id*. at 5. Allowing Shkreli to profit from violating the Court's Permanent Injunction would only encourage him to continue his contemptuous conduct. And the amount is not punitive because it does not exceed "the profits derived by the defendant's wrongful conduct." *Id*. at 5-6. The FTC[130] and the Plaintiff States would be appropriate recipients of such a fine, particularly given that Shkreli still owes the full amount of equitable monetary relief the Court ordered him to pay the Plaintiff States in the underlying case.[131]

---

[128] "[I]t is well established that defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." *SEC v. Milan Cap. Grp., Inc.*, No. 00-cv-108, 2014 WL 2815590, at *6 (S.D.N.Y. June 23, 2014) (Cote, J.) (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011), *abrogated on other grounds by AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021)). Accordingly, this Court has rejected arguments "that the disgorgement calculation should be reduced to account for securities that he sold at a loss." *SEC v. Boock*, No. 09-cv-8261, 2012 WL 3133638, at *4 (S.D.N.Y. Aug. 2, 2012) (Cote, J.).

[129] "Prejudgment interest on a disgorgement amount is intended to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government." *SEC v. Contorinis*, 743 F.3d 296, 308 (2d Cir. 2014).

[130] *AMG Cap. Mgmt.* does not alter the Court's authority to impose or the FTC's ability to receive monetary sanctions through civil contempt for violations of a previously-issued permanent injunction. *See FTC v. Nat'l Urological Grp., Inc.*, 80 F.4th 1236, 1241 (11th Cir. 2023) ("*AMG* had no bearing on the underlying injunction or the district court's authority to order contempt sanctions for violating the injunction."); *FTC v. Pukke*, 53 F. 4th 80, 106 (4th Cir. 2022) (explaining that *AMG* "did not impair courts' ability to enter injunctive relief under Section 13(b)" and upholding $120.2 million civil contempt judgment). Disbursement to the Treasury may be appropriate where, as here, "it would be enormously difficult, if not impossible, to identify . . . and to disburse the disgorgement funds to those [harmed] investors." *SEC v. O'Brien*, 674 F. Supp. 3d 85, 103 (S.D.N.Y. 2023) (Cote, J.).

[131] Permanent Injunction ¶ III (ordering Shkreli to pay $64.6 million (subject to offset of up to $40 million if paid by Corporate Defendants) to the Plaintiff States). Shkreli remains a judgment debtor in at least two other cases. *See*
(Continued…)

*Third*, under penalty of perjury, a complete sworn accounting of Shkreli's trading in Pharmaceutical Company stocks from the issuance of the Permanent Injunction (Feb. 4, 2022) to present and a sworn financial statement. Because the extent of Shkreli's trading in Pharmaceutical Company stocks is unknown, an accounting is a necessary first step to identify what stocks must be divested and to determine his profits from all his trades made in violation of the Permanent Injunction. The sworn financial statement is necessary to understand Shkreli's ability to pay.

*Fourth*, appointment of an auditor at Shkreli's expense to verify the accuracy and truthfulness of Shkreli's complete and sworn accounting and sworn financial statement and to determine Shkreli's profits from trading in Pharmaceutical Company stocks. A receiver may also be necessary if Shkreli is not forthcoming or otherwise uncooperative.

*Fifth*, clear and escalating consequences for failing to purge himself of contempt, and for any future violations, including but not limited to fines and incarceration. Should Shkreli not purge himself of contempt as directed by the Court, "[o]nly the most powerful coercive sanction" of incarceration would "offer[] any prospect of producing compliance." *SEC v. Universal Exp., Inc.*, 546 F. Supp. 2d 132, 142 (S.D.N.Y. 2008); *see also Avalon Holdings*, 2024 WL 4252058, at *2 ("Arrest may be an appropriate sanction for civil contempt, so long as it is designed to compel the party to comply with the court's orders, rather than to punish."); *cf. Hicks v. Feiock*, 485 U.S. 624, 631-34 (1988) (finding imprisonment for civil contempt appropriate where

---

Writ of Continuing Garnishment, at 1, *SEC v. Shkreli*, No. 15-cv-7175 (E.D.N.Y. July 31, 2025), Dkt. No. 69 ("On July 28, 2025, the Court imposed a penalty against Defendant of $1,392,000 . . . . As of January 23, 2025, Defendant owes penalties of $1,392,000 plus post-judgment interest."); Order for Turnover and Appointment of Receiver, at 1, *Koestler v. Shkreli*, No. 16-cv-7175 (S.D.N.Y. Aug. 16, 2021), Dkt. No. 120 (ordering appointment of receiver and turnover of assets to collect the outstanding judgment of $2,614,930 plus post-judgment interest from Shkreli); Letter Addressed to Judge Cote re: extension of receivership, at 1, *Koestler v. Shkreli*, No. 16-cv-7175 (S.D.N.Y. Jan. 21, 2026), Dkt. No. 342 ("The Judgment remains unsatisfied . . . .").

remedial). The Court should also establish a series of escalating fines[132] to "insure against further violations" by Shkreli, who "ha[s] exhibited a marked recalcitrance to obey" the Permanent Injunction. *Dallas Gen. Drivers, Warehousemen & Helpers, Loc. Union No. 745 v. NLRB*, 500 F.2d 768, 771 (D.C. Cir. 1974). Should fines no longer have a "realistic possibility" of "having a coercive effect," *Citigroup Inc. v. Sayeg*, No. 21-cv-10413, 2022 WL 1620298, at *3 (S.D.N.Y. May 23, 2022) (quoting *Simkin v. United States*, 715 F.2d 34, 37 (2d Cir. 1983)), incarceration would likely be necessary to have "any prospect of producing compliance." *SEC v. Universal Exp.,* 546 F. Supp. 2d at 142.

Our proposed order to impose sanctions for civil contempt is attached as Exhibit G.

## III. Shkreli, Izerne, and Voss Should Be Ordered Not to Destroy Evidence

Finally, to ensure the integrity of this proceeding and to minimize the risk that future noncompliance goes undetected, the Court should direct Shkreli, Izerne, and Voss to refrain from destroying any potential evidence related to Shkreli's past, present, or future Permanent Injunction violations, including but not limited to evidence posted publicly to the internet.

The examples of Shkreli's conduct discussed above are just that—examples. Though they amply demonstrate that he is violating the Court's order banning him from the pharmaceutical industry for life, they may be just the tip of the iceberg. We do not currently have access to the vast majority of evidence that would establish the extent of his misconduct, including how he has profited from his violations and whether he continues to own any Pharmaceutical Company stocks. Though Shkreli is already obliged to preserve evidence upon service of this motion, his spoliative conduct in this litigation[133] justifies "an affirmative preservation order 'to reinforce

[132] *Sistem Mühendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic*, No. 12-cv-4502, 2020 WL 7890222, at *3-*4 (S.D.N.Y. Nov. 5, 2020), *report and recommendation adopted,* No. 12-cv-4502, 2021 WL 39582 (S.D.N.Y. Jan. 5, 2021) (citing *United States v. Mongelli*, 2 F.3d 29, 30 (2d Cir. 1993)).

[133] *See* Opinion and Order at 6 (June 1, 2021), Dkt. No. 451.

[his] pre-existing duty.'"[134] And given Izerne and Voss's involvement—apparent from Shkreli contemptuously trading with one or more brokerage accounts [redacted][135] and from Shkreli at times trading with Voss's funds[136]—any do-not-destroy order will likely have little effect absent their inclusion.[137]

Our proposed order to show cause includes the necessary do-not-destroy provisions.

## IV. Conclusion

For the reasons set forth above and in the accompanying declarations and exhibits, Plaintiffs respectfully request that the Court immediately issue the proposed Order to Show Cause Why Shkreli Should Not Be Found In Civil Contempt of the Court's February 4, 2022 Order and, ultimately, hold Shkreli in civil contempt and impose the requested civil sanctions (Ex. G), and any additional sanctions the Court deems fit.

---

[134] *Cordova v. Huneault*, No. 25-cv-04685, 2025 WL 1745762, at *1 (N.D. Cal. June 23, 2025). Generally, courts evaluate whether to issue preservation orders on: (1) the risk of destruction or compromise without an order; (2) any irreparable harm likely to be caused without an order; and (3) any potential burdens associated with an order. *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 370 (S.D.N.Y. 2006); *see also Applied Concepts Unleashed, Inc. v. Matthews*, No. 12-cv-14035, 2012 WL 13015057, at *2 (S.D. Fla. Feb. 6, 2012) (order justified where "adverse party has a history of disposing of evidence or violating court orders"); *United States v. Donziger*, No. 11-cv-691, 2021 WL 3141893, at *14, *24 (S.D.N.Y. July 26, 2021), *aff'd*, 38 F.4th 290 (2d Cir. 2022) (noting prior preservation order against allegedly contumacious defendant, which was filed concurrently with initial contempt motion).

[135] *See* Ex. F-9-10.

[136] *See* Ex. C-89 at 3:20:30-3:22:07, Ex. D-384; Ex. C-100 at 5:46:00-5:49:27, Ex. D-428-30.

[137] *See United States ex rel. Staggers v. Medtronic, Inc.*, No. 1:15-cv-392, 2022 WL 4078969, at *5 (D.D.C. Sept. 6, 2022) ("[C]ourt-issued preservation orders are 'all the more pressing' where nonparties are 'under no duty to preserve absent a court order'" and imposing "limited preservation order" on nonparty because "the burdens" of an order were "outweighed by the Court's concern that evidence valuable to this case will be destroyed," "irreparably harm[ing]" movant (); *Deggs v. Fives Bronx, Inc.,* No. 19-cv-406, 2020 WL 3100023, at *6 (M.D. La. June 11, 2020) (issuing preservation order to nonparty); *Arkin v. Gracey-Danna, Inc.,* No. 8:16-cv-1717, 2016 WL 3959611, at *2 (M.D. Fla. July 22, 2016) (same); *Bright Sols. for Dyslexia, Inc. v. Doe 1*, No. 15-cv-01618, 2015 WL 5159125, at *3 (N.D. Cal. Sept. 2, 2015) (same).

Dated: October 13, 2026

Of Counsel:

DANIEL GUARNERA
(NY Bar No. 5346937)
*Director*

TAYLOR HOOGENDOORN
(TX Bar No. 24130794,
DC Bar No. 1672463;
*pro hac vice* forthcoming)
*Deputy Director*

Federal Trade Commission
Bureau of Competition

Respectfully submitted,

*/s/ Maren Haneberg*
MAREN HANEBERG
(DC Bar No. 975383; admitted *pro hac vice*)
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, DC 20580
Tel: (202) 326-3084
Email: mhaneberg@ftc.gov
*Attorney*

BRADLEY S. ALBERT
(MD Bar No. 9412130008;
admitted *pro hac vice*)
*Assistant Director*

LAUREN K. PEAY
(DC Bar No. 982275; admitted *pro hac vice*)
*Deputy Assistant Director*

MARIBETH PETRIZZI
(NY Bar No. 2386712)
*Assistant Director*

JAMIE TOWEY
(DC Bar No. 475969;
*pro hac vice* forthcoming)
*Deputy Assistant Director*

EVAN J. CARTAGENA (PA Bar No. 327586)
ANDREW KENNEDY (DC Bar No. 90004128)
KELLY MCCLUER (DC Bar No. 1725231)
DANIELLE SIMS (DC Bar No. 982506,
FL Bar No. 42310)
*Attorneys*
(admissions *pro hac vice* forthcoming)

Federal Trade Commission
Bureau of Competition

*Counsel for Plaintiff*
*Federal Trade Commission*

Dated: October 13, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF NEW YORK

LETITIA JAMES
*Attorney General*

*/s/ Elinor R. Hoffmann*
ELINOR R. HOFFMANN
Email: Elinor.Hoffmann@ag.ny.gov
*Chief, Antitrust Bureau*

AMY MCFARLANE
Email: Amy.McFarlane@ag.ny.gov

SAAMI ZAIN
Email: Saami.Zain@ag.ny.gov

Office of the New York Attorney General
Antitrust Bureau
28 Liberty Street, 20th Floor
New York, NY 10005
Tel: (212) 416-8262

*Counsel for Plaintiff*
*State of New York*

Dated: October 13, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA

ROB BONTA
*Attorney General of California*

*/s/ Winston H. Chen*
WINSTON H. CHEN
(CA Bar No. 166959; *pro hac vice* forthcoming)
Email: Winston.Chen@doj.ca.gov
*Deputy Attorney General*

Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 269-6000

*Counsel for Plaintiff*
*State of California*

Dated: October 13, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
*Attorney General of Illinois*

*/s/ Richard S. Schultz*
RICHARD S. SCHULTZ
(admitted *pro hac vice*)
Email: Richard.Schultz@ilag.gov
*Assistant Attorney General*

Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Tel: (872) 272-0996

*Counsel for Plaintiff*
*State of Illinois*

Dated: October 13, 2026

Respectfully submitted,

FOR PLAINTIFF
STATE OF NORTH CAROLINA

JEFF JACKSON
*Attorney General of North Carolina*

*<u>/s/ Kimberley A. D'Arruda</u>*
KIMBERLEY A. D'ARRUDA
(*pro hac vice* forthcoming)
Email: kdarruda@ncdoj.gov

State of North Carolina
Department of Justice
Office of the Attorney General
14 W. Edenton Street
Raleigh, NC 27603
Tel: (919) 716-6013

*Counsel for Plaintiff*
*State of North Carolina*

Dated: October 13, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF OHIO

ANDY WILSON
*Attorney General*

/s/ Sarah Mader
SARAH MADER
(*pro hac vice* forthcoming)
Email: Sarah.Mader@OhioAGO.gov

BETH A. FINNERTY
(admitted *pro hac vice*)
Email: Beth.Finnerty@OhioAGO.gov

Office of the Ohio Attorney General
Antitrust Section
30 E. Broad St. 26th Floor
Tel: (614) 466-4328

*Counsel for Plaintiff*
*State of Ohio*

Dated: October 13, 2026

Respectfully submitted,

FOR PLAINTIFF
COMMONWEALTH OF PENNSYLVANIA

DAVID W. SUNDAY, JR.
*Attorney General*

SEAN A. KIRKPATRICK
*Executive Deputy Attorney General*
Public Protection Division

TRACY W. WERTZ
*Chief Deputy Attorney General*
Antitrust Section

*/s/ Joseph S. Betsko*
JOSEPH S. BETSKO
(admitted *pro hac vice)*
Email: Jbetsko@attorneygeneral.gov
*Assistant Chief Deputy Attorney General*
Antitrust Section

Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: (717) 787-4530

*Counsel for Plaintiff*
*Commonwealth of Pennsylvania*

Dated: October 13, 2026

Respectfully submitted,


FOR PLAINTIFF
COMMONWEALTH OF VIRGINIA

JAY JONES
*Attorney General of Virginia*

*/s/ Tyler T. Henry*
TYLER T. HENRY
(VA Bar No. 87621; admitted *pro hac vice*)
Email: THenry@oag.state.va.us
*Senior Assistant Attorney General*
Antitrust Unit

Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Tel: (804) 692-0485

*Counsel for Plaintiff*
*Commonwealth of Virginia*

**WORD COUNT CERTIFICATION**

I, Maren Haneberg, hereby certify that the foregoing memorandum in support of Plaintiffs' Motion for an Order to Show Cause Why Defendant Shkreli Should Not Be Found in Civil Contempt for Violating the Court's February 4, 2022 Order complies with the word count limitations set forth in Local Rule 7.1(c) of the United States District Court for the Southern District of New York. The memorandum contains 8,308 words, exclusive of the caption, table of contents, table of authorities, signature block, and this certificate.

Dated: October 13, 2026
Washington, D.C.

/s/ *Maren Haneberg*
MAREN HANEBERG
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3084
mhaneberg@ftc.gov